**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized tribe, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 02-1383L<br>Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**UNITED STATES' MOTION TO DISMISS**

Defendant, UNITED STATES OF AMERICA, respectfully moves, pursuant to Rules 12(b)(1) of the United States Court of Federal Claims ("RCFC"), for dismissal of Plaintiff's second Amended Complaint. This Court lacks jurisdiction over Plaintiff's claims because none of the statutes cited by Plaintiff in its Second Amended Complaint can fairly be interpreted as mandating compensation. A memorandum in support of this motion follows.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized tribe, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 02-1383L |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**UNITED STATES' MEMORANDUM**
**IN SUPPORT OF ITS MOTION TO DISMISS**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . . . . . . iii

QUESTION PRESENTED . . . . . . . . . . 1

1. The Bureau of Indian Affairs' Tribal Priority Allocation Funding Mechanism Does Not Establish Fiduciary Duties that Can Fairly Be Interpreted As Money-Mandating. . . . . . . . . . 14

2. The Housing Improvement Program Is Not Money-Mandating. . . . . . . . 21

B. Plaintiff's Program Statutes Are Not Money-Mandating. . . . . . . . . . 24

1. The 1937 Housing Act and Its Amendments Do Not Establish Money-Mandating Duties. . . . . . . . . . 26

2. The Indian Health Care Improvement Act and Amendments are Not Money-Mandating. . . . . . . . . . 29

3. The Supplemental Nutrition Program for Women Infants and Children Is Not Money-Mandating. . . . . . . . . . 33

4. The Commodity Food Program Is Not Money-Mandating. . . . . . . . . . 36

5. The Food Stamp Program Is Not Money-Mandating. . . . . . . . . . 37

6. The Job Training Statutes Are Not Money-Mandating.. . . . . . . . . . 39

C. Plaintiff's Alleged Block Grant Statutes Are Not Money-Mandating. . . . . . . . . 40

1. The State and Local Fiscal Assistance Act of 1972 Is Not Money-Mandating . . . . . . . . . . 41

2. The OBRA Block Grants Are Not Money-Mandating. . . . . . . . . . 43

D. The Appropriations Acts Are Not Money-Mandating.. . . . . . . . . . 46

III. PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE THE APPROPRIATIONS WERE CAPPED AND HAVE BEEN DISBURSED... . . . . . . . . . 47

IV. PLAINTIFF HAS NOT ESTABLISHED A FIDUCIARY DUTY GIVING RISE TO A CLAIM FOR DAMAGES WITHIN THE TUCKER ACT OR INDIAN TUCKER ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## TABLE OF AUTHORITIES

FEDERAL CASES

Allred v. United States, 33 Fed. Cl. 349 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Army & Air Force Exch. Serv. v. Sheehan, 456 U.S. 728 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Bowen v. Massachusetts, 487 U.S. 879 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 42

Carter v. United States, 62 Fed. Cl. 66 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cherokee Nation of Oklahoma v. United States, 69 Fed. Cl. 148 (2005) . . . . . . . . . . . . . . . 10, 27

City of Houston v. HUD, 24 F.3d 1421 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

City of Manassas Park v. United States, 633 F.2d 181 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

City of Newark v. Blumenthal, 457 F. Supp. 30 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

Commodity Futures Trading Com'n v. Nahas, 738 F.2d 487 (D.C. Cir. 1984) . . . . . . . . . . . . . . 4

Eastport S.S. Corp. v. United States, 372 F.2d 1002 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . 6, 11, 28

Fields v. United States, 423 F.2d 380 (Ct. Cl. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21, 29

Greenlee County v. United States, 68 Fed. Cl. 482 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Hoopa Valley Tribe v. Christie, 812 F.2d 1097 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 16

Hopi Tribe v. United States, 55 Fed. Cl. 81 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 27

Katz v. Cisneros, 16 F.3d 1204 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Kraft Foods v. Commodity Credit Corp., 164 F. Supp. 168 (D. Wis. 1958) . . . . . . . . . . . . . . . . 36

Lincoln v. Vigil, 508 U.S. 182 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16, 22, 30, 46

Malone v. United States, 34 Fed. Cl. 257 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 41, 42

McDonald v. United States, 37 Fed. Cl. 110 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Mitchell v. United States, 445 U.S. 535 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7, 11, 12

Mitchell v. United States, 463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 11–12, 17, 21

Nat'l Ctr. for Mfg. Sci. v. United States, 114 F.3d 196 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . 8, 42

Navajo Nation v. United States, 68 Fed. Cl. 805 (2005) . . . . . . . . . . . . . . . . . . . . . 11-12,15, 21

OPM v. Richmond, 496 U.S. 414 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Fort Sill Apache Tribe of Oklahoma v. United States, 477 F.2d 1360 (Ct. Cl. 1973) . . . . . 4, 21, 29

Osage Nation v. United States, 57 Fed. Cl. 392 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Perri v. United States, 340 F.3d 1337 (Fed. Cir. 2003) . . . . . . . . . . . . . 10, 11, 24, 28, 34, 35, 39, 46

Quick Bear v. Leupp, 210 U.S. 50 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 20, 46

Renne v. Geary, 501 U.S. 312 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . 5

Samish Indian Nation v. United States, 419 F.3d 1355 (2005) . . . . . . . . . . . 4, 7, 9-11, 15-17, 21, 22, 27, 28, 31-34, 36, 37, 43, 44, 49

Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala, 988 F. Supp. 1306 (D. Or. 1997)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Star-Glo Assoc., LP v. United States, 59 Fed. Cl. 724 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . 47

United States Department of Energy v. Ohio, 503 U.S. 607(1992) . . . . . . . . . . . . . . . . . . . . . . . 4

United States ex rel. Norton Sound Health Corp. v. Bering Strait School Dist., 138 F.3d 1281 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Cherokee Nation of Oklahoma, 480 U.S. 700 (1987) . . . . . . . . . . . . . . 15, 18, 48

United States v. King, 395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Navajo Nation, 537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Testan, 424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 25

United States v. White Mountain Apache Tribe, 537 U.S. 465 (2003) . . . . . . . . . . 11-13, 15, 17, 21

Vigil v. Andrus, 667 F.3d 931 (10th Cir. 1982) . . . . . . . . . . 18

FEDERAL STATUTES

110 Stat. 3009-205 . . . . . . . . . . 31

5 U.S.C. § 5596 . . . . . . . . . . 4

7 U.S.C. §§ 2011-2036 . . . . . . . . . . 11-13, 15, 17, 21

12 U.S.C. § 1701q . . . . . . . . . . 27

25 U.S.C. § 13 . . . . . . . . . . 47

25 U.S.C. § 452 . . . . . . . . . . 6, 7, 11

25 U.S.C. § 1601 . . . . . . . . . . 25, 26

25 U.S.C. § 1621 . . . . . . . . . . 10, 27, 42, 43

25 U.S.C. § 1680a . . . . . . . . . . 47

25 U.S.C. § 1901 . . . . . . . . . . 16–18

25 U.S.C. § 1902 . . . . . . . . . . 16

25 U.S.C. § 1931. . . . . . . . . . . 15, 18, 48

25 U.S.C. § 2401 . . . . . . . . . . 4, 10, 21, 27, 29

25 U.S.C. § 2402 . . . . . . . . . . 30

25 U.S.C. § 3201 . . . . . . . . . . 8

25 U.S.C. § 3208 . . . . . . . . . . 36

25 U.S.C. § 3302 . . . . . . . . . . 17, 19

28 U.S.C. § 1491 . . . . . . . . . . 6, 7, 15, 18

28 U.S.C. § 1505 . . . . . 4, 21, 29

31 U.S.C. §§ 1221–1263 . . . . . 5, 42

31 U.S.C. § 1341 . . . . . 4

37 U.S.C. § 242 . . . . . 6, 7, 25

42 U.S.C. § 1786 . . . . . 30, 47

Pub. L. No. 81-439 . . . . . 36

Pub. L. No. 89-642 . . . . . 33

Pub. L. No. 93-150 . . . . . 33, 47

Pub. L. No. 93-203 . . . . . 39, 40

Pub. L. No. 93-383 . . . . . 26–28

Pub. L. No. 94-437 . . . . . 29, 31

Pub. L. No. 95-113 . . . . . 39

Pub. L. No. 95-128 . . . . . 26

Pub. L. No. 97-35 . . . . . 43–48

Pub. L. No. 97-300 . . . . . 40

Pub. L. No. 99-500 . . . . . 22, 47

Pub. L. No. 100-358 . . . . . 27

Pub. L. No. 100-713 . . . . . 32

Pub. L. No. 104-208 . . . . . 31

S. Rep. 93-404 . . . . . 33

S. Rep. No. 94-1207 . . . . . 41, 42

FEDERAL RULES

RCFC 12(b)(1) . . . . . . . . . . 4

FEDERAL REGULATIONS

7 C.F.R. Part 281 . . . . . . . . . . 38

7 C.F.R. Pt. 246 (2005) . . . . . . . . . . 33

7 C.F.R. § 246.4 . . . . . . . . . . 34

7 C.F.R. § 253.1 (1984) . . . . . . . . . . 36, 37

7 C.F.R. §§ 253.2–253.4 . . . . . . . . . . 36

24 C.F.R. § 905.206 (1984) . . . . . . . . . . 28

25 C.F.R. pt. 261 (1976) . . . . . . . . . . 22

25 C.F.R. § 256.3(b) (1995) . . . . . . . . . . 23–25

25 C.F.R. § 256.4 (1982) . . . . . . . . . . 24

25 C.F.R. § 256.6 (1995) . . . . . . . . . . 23

25 C.F.R. § 265.5 (1982) . . . . . . . . . . 23

25 C.F.R. § 265.5(a) (1982) . . . . . . . . . . 23

24 C.F.R. § 805.104. . . . . . . . . . . 26

24 C.F.R. § 905.207(a) (1984). . . . . . . . . . . 29

**QUESTION PRESENTED**

In this case, in which Plaintiff seeks money damages based on a claim that the United States wrongfully refused to treat it as a federally recognized Indian tribe until 1996 and, as a consequence, it was denied the rights, programs, services and benefits that federally recognized Indian tribes were eligible to apply for and potentially receive from 1969 through 1996, must this Court dismiss Plaintiff's claims for lack of jurisdiction because Plaintiff's claims are not based on any statutes that can fairly be interpreted as mandating compensation?

**STATEMENT OF THE CASE**

This case was first filed in this Court in 2002. This Court granted the United States' motion to dismiss Plaintiff's complaint, and Plaintiff appealed that decision to the Federal Circuit. The Federal Circuit affirmed the Court's decision in part, but overturned the Court's decision on the statute of limitations, and remanded Plaintiff's second claim back to the Court. Plaintiff filed its Second Am. Complaint (hereinafter "Am. Compl.") on January 27, 2006.

Plaintiff alleges that from 1969 to 1996 the United States wrongfully refused to treat it as a federally recognized Indian tribe. *See* Am. Compl. ¶ 1. Due to its non-recognition, Plaintiff alleges that it and its members were denied rights, programs, services and benefits between 1969 and 1996, which the United States provided to federally recognized Indian tribes under money-mandating federal laws. *Id.* ¶ 2. As a result, Plaintiff seeks damages for its denial of the rights, programs, services and benefits that federally recognized tribes were eligible to apply for and potentially receive during that time period.

In its Complaint, Plaintiff alleges that it "has continuously existed as an Indian tribe from the time of the Treaty of Point Elliott . . . in 1855 up to the present," and that, in 1969, the

Department of the Interior (“Interior”) omitted it from a list of Indian tribes. According to the Amended Complaint, the list was not intended to be a list of federally recognized tribes, but the United States used the list to identify federally recognized tribes. *Id.* ¶¶ 1, 9. Plaintiff alleges that the omission of the Samish from the list resulted in the “treatment of the Tribe as not federally recognized, caus[ing] the [Tribe] and its members to be deprived of all the rights, benefits and services afforded by the United States to other federally recognized Indian tribes and their members, for the period 1969 to 1996.” *Id.* ¶ 9. Plaintiff alleges that every tribe that was federally recognized by 1996 “today receives some amount of federal funds by virtue of being a federally recognized tribe.” *Id.* ¶¶ 22–25. According to Plaintiff, it did not receive any funds “appropriated by Congress and distributed to or expended on behalf of federally recognized tribes during the period from 1969 through April 8, 1996.” *Id.* ¶ 26. Plaintiff also alleges that its tribal members were denied federal services and benefits made available to members of federally recognized tribes from 1969 to 1996 because the United States wrongfully refused to recognize the Samish Tribe. *Id.* ¶ 28. Plaintiff alleges further that the United States’ “wrongful failure to recognize the Samish Indian Nation during this 27 year period put the Samish Tribe behind all other federally recognized tribes with regard to economic development, the provision of programs and services to its members, and in the development of tribal government and tribal community.” *Id.* 29.

Plaintiff asserts two claims for relief: (1) violation of federal statutes that mandate funding to all eligible federally recognized Indian tribes and their members; and (2) failure to treat Plaintiff as a federally recognized Indian tribe with respect to federal funding. The first claim asserts that “Congress has enacted a broad range of programs, services and benefits for the

benefit of all Indian tribes and their members." *Id.* ¶¶ 33–43. Plaintiff alleges that these statutes are money-mandating because they provide clear standards for payment, compel payment upon the satisfaction of pre-set conditions, and the amount that each recipient will receive can be readily determined. *Id.* ¶ 33. According to Plaintiff, the United States' failure to recognize Plaintiff between 1969 and 1996 led to Plaintiff's inability to participate in the programs, services and benefits available for the benefit of all tribes and Indians under federal statutes. *Id.* ¶¶ 34–36.

Plaintiff's second claim alleges that only Congress has the authority to "terminate" a federally recognized tribe by discontinuing the federal trust responsibility and the federal funding provided by virtue of the tribe's status as a federally recognized tribe. *Id.* ¶ 38. According to Plaintiff, "the federal government's failure to provide any federal funds to the Samish Indian Nation from 1969 to 1996 was, in effect, an unlawful effort to terminate the Tribe." *Id.* ¶¶ 39–40. This claim also alleges that all of the federal statutes providing funding for programs, services, and benefits for federally recognized tribes and their members "comprise a network of statutes defining a fundamental aspect of the federal government's trust responsibility to tribes." ¶ 41. Plaintiff's second claim asserts that the federal government's failure to provide federal funding to Plaintiff can fairly be interpreted as a violation of the federal government's trust responsibility. *Id.* ¶¶ 42–43.

## ARGUMENT

In this case, Plaintiff seeks to be compensated for programs that it did not run or spend money on over a 27 year period, from 1969 to 1996, during which it alleges the United States wrongfully failed to recognize it as Indian tribe. Plaintiff asserts a plethora of statutes that allow

eligible federally recognized Indian tribes to administer social service programs, and asserts that these statutes entitle it to money damages.[1/] Plaintiff is mistaken, and its complaint must be dismissed because none of the statutes are money-mandating and do not, individually or collectively, create a fiduciary duty for the United States. This Court, therefore, lacks jurisdiction over Plaintiff's complaint.

## I. LEGAL STANDARDS FOR EVALUATION OF THE COURT'S JURISDICTION UNDER THE TUCKER ACT AND INDIAN TUCKER ACT

### A. Standards for a Motion to Dismiss for Lack of Jurisdiction

RCFC 12(b)(1) provides for dismissal of a claim if the court lacks jurisdiction over the subject matter of a claim. A party seeking federal court jurisdiction bears the burden of demonstrating that it is so entitled. *Commodity Futures Trading Com'n v. Nahas*, 738 F.2d 487, 492 n. 9 (D.C. Cir. 1984). The Supreme Court presumes that federal courts lack jurisdiction unless the contrary appears affirmatively from the record. *See United States Dep't of Energy v. Ohio*, 503 U.S. 607, 614 (1992); *Renne v. Geary*, 501 U.S. 312, 315 (1991). A plaintiff must also provide and support a jurisdictional basis for judicial review. *See McDonald v. United States*, 37 Fed. Cl. 110, 113 (1997). To the extent that Defendant relies on evidence outside the

---

[1/]Plaintiff's Amended Complaint discusses programs that both provide funding for federally recognized tribes and their members. *See, e.g.,* Am. Compl. ¶ 41. Only "group claims," or claims which allege injury to the tribe as a whole as opposed to individual injuries to tribal members, can be litigated under Section 1505 jurisdiction. Individual claims must be brought under the Tucker Act, 28 U.S.C. § 1491. *See Fields v. United States,* 423 F.2d 380, 383 (Ct. Cl. 1970). In this case, because only the tribe itself is a plaintiff, this Court has jurisdiction over only those claims that relate to a tribal injury, not to individual injuries to tribal members. *See Fort Sill Apache Tribe of Oklahoma, v. United States*, 477 F.2d 1360 (Ct. Cl. 1973) (noting that tribe does not have a separate and distinct right to recover for injuries solely to individual tribal members).

In addition, it is important to note that some individual members of the Samish tribe received benefits up until the mid-1970s. *See Samish,* 419 F.3d at 1359–60.

pleadings, the Court may properly consider such evidence in ruling on jurisdictional issues. *Carter v. United States*, 62 Fed. Cl. 66, 67–68 (2004). "Plaintiff cannot rely merely on the allegations in the complaint if jurisdiction is challenged." *Osage Nation v. United States*, 57 Fed. Cl. 392, 396 (2003). "[I]f the truth of jurisdictional facts is challenged, then the court may consider relevant evidence in order to resolve the factual dispute." *Id.* (citing *Reynolds v. Army & Air Force Exch. Serv*., 846 F.2d 746, 747 (Fed. Cir. 1988)).

### B. Standards for Determining Whether the Court of Federal Claims Possesses Jurisdiction under the Tucker Act and Indian Tucker Act

"It is elementary that '[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *Mitchell v. United States*, 445 U.S. 535, 538 (1980) ("*Mitchell I*") (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). In determining whether such consent is present, the Supreme Court has long held that "[a] waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Id.* (quoting *United States v. King*, 395 U.S. 1, 4 (1969)).

Congress has consented to suit against the United States for certain claims for money damages in the Court of Federal Claims ("CFC"). The Tucker Act grants the CFC jurisdiction with respect to any claim against the United States founded either upon the Constitution, any Act of Congress, any regulation of an executive department, upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1). The Indian Tucker Act was enacted in 1946 to ensure that Indian or tribal claimants would enjoy the "same" rights and remedies in suits against the United States as non-Indians, but no more. *Mitchell I*, 445 U.S. at 539; *see Mitchell v. United States*, 463 U.S.

206, 212 n.8 (1983) ("*Mitchell II*"). The Indian Tucker Act grants jurisdiction to the same court with respect to claims by an Indian Tribe against the United States, "whenever such [a] claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe." 28 U.S.C. § 1505.

The Tucker Acts themselves do "not create any substantive right enforceable against the United States for money damages." *Mitchell II*, 463 U.S. at 216; *see also Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 738 (1982); *United States v. Testan*, 424 U.S. 392, 398 (1976). Thus, in order to state a cause of action under one of the Tucker Acts, a plaintiff suing other than for breach of contract must point to an "Act of Congress" or "regulation of an executive department," 28 U.S.C. 1491(a)(1), that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Mitchell II*, 463 U.S. at 217 (quoting *Testan*, 424 U.S. at 400, and *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)); *see Bowen v. Massachusetts*, 487 U.S. 879, 905–06 n.42 (1988); *Sheehan*, 456 U.S. at 739. The requisite waiver of sovereign immunity is present under the Tucker Acts only if "a claim falls within th[at] category." *Mitchell II*, 463 U.S. at 218; *see OPM v. Richmond*, 496 U.S. 414, 431 (1990).

The Supreme Court has observed that "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication.'" *Mitchell II*, 463 U.S. at 217 n.16; *but cf. Sheehan*, 456 U.S. at 739–40 ("*Testan* [held] that the Tucker Act provides a remedy only where damages claims against the United States have been authorized explicitly."). But the Court has been reluctant to recognize a damages remedy against the United States under

the Tucker Acts when a statute does not clearly sanction one. *See Testan*, 424 U.S. at 400 ("We are not ready to tamper with these established principles [concerning the reach of the Tucker Act] because it might be thought that they should be responsive to a particular conception of enlightened governmental policy."); *see also Mitchell II*, 463 U.S. at 218 ("Of course, in determining the general scope of the Tucker Act, this Court has not lightly inferred the United States' consent to suit.") (citation omitted). That restraint reflects the general rule that waivers of sovereign immunity must be unequivocally expressed. *See Mitchell I*, 445 U.S. at 538; *OPM*, 496 U.S. at 432.

### 1. Standards for Money-Mandating Statutes.

A statute is money-mandating "where the statutory text leaves the government no discretion over payment of claimed funds." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (2005). Money-mandating duties have also been found with certain discretionary statutory schemes, but only when the statutes at issue: (1) "provide 'clear standards for paying money' to recipients;" (2) "state the 'precise amounts' that must be paid;" or (3) "as interpreted, compel payment on satisfaction of certain conditions. *Id.* at 1364–65.

#### a. Statutes That Subsidize Expenditures on Social Services Programs Instead of Compensating for Injuries Are Not Money-Mandating.

Statutes that direct the government to pay money to subsidize future expenditures on social services programs are not money-mandating because they do not seek to compensate a particular class of persons for past injuries. Courts have held such statutes — sometimes called "grant-in-aid" statutes — are not money-mandating because they subsidize future expenditures instead of compensating a particular class of person for past injuries. *See Nat'l Ctr. for Mfg. Sci.*

*v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) (noting that courts have distinguished between two types of suits that seek money as a remedy: (1) those seeking payment to which Plaintiff is entitled pursuant to statute, which do not provide Tucker Act jurisdiction; and (2) those seeking compensation for losses suffered, which do provide Tucker Act jurisdiction); *Katz v. Cisneros*, 16 F.3d 1204, 1207–09 (Fed. Cir. 1994) (finding that, in suit in which housing developer sought payments from the Department of Housing and Urban Development under the Housing Act of 1937, APA review was proper because plaintiff was seeking "payments to which it alleges it is entitled pursuant to federal statute and regulations," not money as compensation for a loss suffered).

In *Bowen*, the Supreme Court held that "an action to enforce the requirement that the government pay certain amounts for appropriate Medicaid services 'is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.'" *Nat'l Ctr.*, 114 F.3d at 200 (quoting *Bowen*, 487 U.S. at 900). The *Bowen* Court noted that statutes that have been found to be money-mandating[2/] "attempt to compensate a particular class of persons for past injuries or labors." 487 U.S. at 907 n.42 (citing *Testan*, 424 U.S. at 405; *Bell v. United States*, 366 U.S. 393, 398 (1961)). "In contrast, the statutory mandate of a federal grant-in-aid program directs the Secretary to pay money to the State, not as compensation for a past wrong, but to subsidize future state expenditures." *Bowen*, 487 U.S. at 907 n.42 (citing *United States v. Mottaz*, 476 U.S. 834, 850–851 (1986)).

[2/] The Court noted specifically, the Back Pay Act, 5 U.S.C. § 5596(b) and 37 U.S.C. § 242 (1958 ed.) (repealed, see 76 Stat. 498 (1962)), which provided compensation to prisoners of war, as examples of money-mandating statutes. 487 U.S. at 907 n.42

In *Malone v. United States*, the Court of Federal Claims applied this rule, finding that it did not have jurisdiction over a case where a landlord sought damages for retroactive housing assistance payments from the Department of Housing and Urban Development (HUD). 34 Fed. Cl. 257, 262 (1995). The court held the statute in question was not money-mandating because it directed HUD to pay "a calculable rental subsidy as part of a program designed to aid low-income families obtain housing," and did not mandate compensation for damages sustained by participating landlords. *Id.* "In other words, the payment contemplated by the statute is not for the landlords' past injuries or labor, the essence of a Tucker Act claim for monetary relief." *Id.*

The Federal Circuit's language in its decision in this case also supports a finding that grant-in-aid statutes are not money-mandating. *See Samish*, 419 F.3d at 1367. According to the court, the Indian Self Determination and Education Assistance Act ("ISDA") must be construed in light of its purpose, which was "removing the financial burden incurred by tribes and tribal organizations when implementing federal programs under self-determination contracts." *Id.* The court noted that ISDA did not demonstrate congressional intent to provide damages "for contract support costs never incurred, on contracts never created, based on a wrongful refusal to accord federal recognition." *Id.* Providing Plaintiff with damages in the form of administrative costs on a contract they never obtained or performed "would provide them with nothing but a windfall" and would not advance the remedial purpose of the statute. *Id.* Similarly, reading a damage remedy into a grant-in-aid statute when a plaintiff has not provided social services pursuant to such a statute would provide a plaintiff with a windfall not in keeping with the purpose of the statute.

**b. To Be Money-Mandating, The Language And Effect of A Statute Must Be Mandatory.**

If "the statutory text leaves the government no discretion over payment of claimed funds," the Court is without jurisdiction. *Samish*, 419 F.3d at 1364. As this Court has noted, "it is evident that '[i]f the language and effect of the statute is mandatory, then the court possesses jurisdiction . . . . If, on the other hand, the language of the statute is permissive in scope and effect, the statute does not grant jurisdiction to hear the case.'" *Cherokee Nation of Oklahoma v. United States*, 69 Fed. Cl. 148, 158 (2005) (quoting *Hopi Tribe v. United States*, 55 Fed.Cl. 81, 86 (2002). Courts have construed phrases such as "may" and "is authorized" as being discretionary. *See, e.g., Hopi*, 55 Fed. Cl. at 86. In *Hopi*, the court noted that nothing in the language of the statute "creates a plainly prescribed duty that the Secretary authorize payment" because the statute stated that the Secretary "is authorized" instead of "shall." *Id.* at 87. Accordingly, the court found that "the plain language of the statute demonstrates that the Secretary's duty to compensate plaintiff . . . is discretionary." *Id.*

**c. Certain "Discretionary Schemes" May Be Money-Mandating If The Statutes Are Sufficiently Specific So As To Mandate Payment.**

As the Federal Circuit stated in this case, the court also has jurisdiction over "[c]ertain discretionary schemes," including "statutes: (1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." *Samish*, 419 F.3d at 1364–65 (citing *Perri v. United States*, 340 F.3d 1337, 1342–43 (Fed. Cir. 2003). "[T]he allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Eastport*, 372. F.2d at 1007; *see also Perri*, 340 F.3d at 1342. "The lack of any standards . . . governing the payment of such awards necessarily means that . . . the

determination whether to pay an award and its amount is within the discretion of the Attorney General." *Perri*, 340 F.3d at 1343.

### 2. Fiduciary Duties

A fiduciary duty can give rise to a claim for damages within the Tucker Act or Indian Tucker Act. *Samish*, 419 F.3d at 1367. In order for a fiduciary duty to exist, there must be a specific trust relationship enforceable by an award of damages for a breach. *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 471–73 (2003). Under the established framework from the *Mitchell* cases, in order to state a claim cognizable under the Indian Tucker Act, a plaintiff must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties. *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003); *Mitchell II*, 463 U.S. at 216–17, 219; *Mitchell I*, 445 U.S. at 542. Once a plaintiff has identified "a substantive source of law that establishes a specific fiduciary or other duty . . . the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" *Navajo*, 537 U.S. at 506 (quoting *Mitchell II*, 463 U.S. at 219) (alterations in original). The existence of a general trust relationship between the United States and an Indian tribe is insufficient, standing alone, to support jurisdiction under the Indian Tucker Act. *Id.* Instead, "the analysis [of a breach-of-trust claim under the Indian Tucker Act] must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.*

The key question in determining whether a fiduciary duty exists is whether a statute creates a limited or "bare" trust or whether a specific trust relationship enforceable by money

damages exists. *See White Mountain*, 537 U.S. at 470–71 (distinguishing between *Mitchell I* and *Mitchell II*). In *Mitchell I*, the Supreme Court held that the General Allotment Act did not create "private rights enforceable in a suit for money damages under the Indian Tucker Act." *Navajo*, 537 U.S. at 504. The Court found that the Act created only a limited trust relationship between the plaintiffs and the United States, and did not impose any duty on the government to manage timber resources because the "'Indian allottee, and not a representative of the United States'" was responsible for using the land and, thus, a standard element of the trust relationship had been removed. *Id.* (quoting *Mitchell I*, 445 U.S. at 542). In *Mitchell II*, the Supreme Court held that a network of other statutes and regulations imposed judicially enforceable fiduciary duties upon the United States in its management of forested allotted lands because the statutes and regulations gave "the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians." *See Navajo*, 537 U.S. at 504 (citing *Mitchell II*, 463 U.S. at 224). The *Navajo* and *White Mountain* cases built on the *Mitchell* cases, holding that only statutory language giving full responsibility to the government triggers fiduciary duties that can fairly be interpreted as mandating compensation through money damages. *See Navajo*, 537 U.S. at 1367; *White Mountain*, 537 U.S. at 473–75.

## II. PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE COURT HAS JURISDICTION OVER ITS CLAIMS

Plaintiff's argument essentially is that, even though it did not provide social services through the alleged programs during the time period at issue, Congress intended it to recoup those funds through a retroactive damage remedy. Plaintiff argues that Congress appropriated substantial funding for the benefit of Indian tribes in the period of 1969 to 1996, and provided "some measure of federal funding" to every federally recognized Indian tribe during that period

pursuant to a number of programs, services, and benefits. Am. Compl. ¶¶ 25, 33. Plaintiff alleges that each statute listed in Paragraph 30 of its Complaint is money-mandating because it (1) provides clear standards for payment, (2) compels payment upon the satisfaction of pre-set conditions, and (3) the amounts that each recipient will receive can be readily determined. *Id.* ¶ 33.

None of the statutes on which Plaintiff relies are money-mandating. For ease of analysis, the statutes can be categorized into four groups: (1) programs under which Plaintiff would receive funding or assistance for its members; (2) statutes that provide funds for Indian tribes to administer social service programs; (3) block grant statutes; and (4) appropriations statutes. In every category, Congress enacted the statutes to provide social services for needy people, not to provide a profit center for tribes. Reading a damage remedy into these statutes would provide Plaintiff with a windfall Congress did not intend. In addition, under each statute, the Secretary has considerable discretion over payment of claimed funds, meaning that payment is not automatic upon the satisfaction of certain conditions. In short, this Court should find that none of the statutes Plaintiff alleges are money-mandating, and dismiss this case based on lack of jurisdiction.

### A. The Statutes That Fund Programs Through Which Plaintiff Alleged It Would Have Received Assistance Are Not Money-Mandating.

#### 1. The Bureau of Indian Affairs' Tribal Priority Allocation Funding Mechanism Does Not Establish Fiduciary Duties that Can Fairly Be Interpreted As Money-Mandating.

Plaintiff argues that the Tribal Priority Allocations ("TPA") mechanism, along with several statutes through which the Bureau of Indian Affairs ("BIA") allocates funds via the TPA system — specifically, the Johnson-O'Malley Act, the Indian Child Welfare Act of 1978, the Higher Education Tribal Grant Authorization Act, and the Indian Child Protection and Family Violence Prevention Act — and Congressional appropriations acts, "provide a network of statutes that are money-mandating." Am. Compl. at ¶¶ 6, 30a, and 32.[3] Plaintiff does not allege that these statutes individually are money-mandating,[4] but argues that "this network of statutes can fairly be interpreted to provide some funds for all federally recognized tribes, and the failure of the government to abide by that purpose can fairly be interpreted to give rise to a claim for money damages." *See* Am. Compl. ¶ 30a. Plaintiff's argument is specious.

The "trust" responsibility to Indians is implicated only where Indian property is at stake.

---

[3]Plaintiff did not allege or mention the TPA program in its First Amended Complaint, filed on June 4, 2003. Plaintiff purportedly filed its Second Amended Complaint after the Federal Circuit's remand "to eliminate the claims that are no longer live, and focus[] the remaining claims" in light of the Federal Circuit's decision in this case, but this amended complaint added several statutes and programs as bases for Plaintiff's claims. Because this case is on remand merely to address the remaining statutes after the Federal Circuit's decision, it should not provide an opportunity for Plaintiff to take another bite of the apple. This Court should dismiss Plaintiff's statutes that were not contained in its previous complaint.

[4]To the extent that Plaintiff does so allege, Defendant moves to dismiss on the basis that these statutes are not money-mandating for the same reasons described above. In addition, because the TPA system is not statutorily mandated or described in regulations, and is merely the means by which BIA distributes its congressional allocations, it cannot be money-mandating. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

*See United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707 (1987). In this case, no Indian property rights are at stake. Funds made available pursuant to the authorizations in the Snyder Act or the other acts Plaintiff alleges are "gratuitous appropriations," not trust funds belonging to the Indians. *See Lincoln v. Vigil*, 508 U.S. 182, 194–95 (1993); *Quick Bear v. Leupp*, 210 U.S. 50, 80–81 (1908) (holding that monies appropriated for support of Indian schools are gratuitous appropriations but monies appropriated to fulfill treaty obligations are trust funds). Even when a plaintiff alleges that a network of statutes and regulations creates fiduciary duties, "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *See Navajo*, 537 U.S. at 506; *see also Navajo Nation v. United States*, 68 Fed. Cl. 805, 811 (2005). Plaintiff cannot show any such fiduciary duty because the TPA system does not deal with trust funds. The TPA system also is not required by statute or regulation, but is merely the internal system through which BIA allocates its appropriated funds. Further, Plaintiff cannot cite to a source of fiduciary duty in any of the other statutes it cites that create a damage remedy. Nor do the programs and statutes taken together as a "network" create fiduciary duties that can fairly be interpreted as money-mandating. None of the statutes Plaintiff cites, or the TPA system, relate to any trust asset or management responsibilities on the part of the United States.

With regard to the TPA system, Plaintiff cannot point to any statutory language expressly creating a trust relationship in a specific property interest. *See Samish*, 419 F.3d at 1368. The TPA system is not statutorily mandated, but is merely the means by which the BIA requests and distributes its lump sum appropriations from Congress. *See* Clark Decl. ¶¶ 3–4, 9. In developing its budget request from Congress, the BIA asks tribes to identify their recommendations for

funding priorities, called TPAs. *Id.* ¶ 8. Because there are 561 federally recognized Indian tribes, the BIA does not include individual tribal budget requests within the BIA budget, but instead requests funds for prioritized programs that support all tribes and are determined by the priorities of all Indian tribes nationwide. *Id.* ¶¶ 8–9. BIA then submits its budget to Interior, which reviews the budget and can make changes. *Id.* Interior's overall budget request is sent to the Office of Management and Budget, and then, after the Office of Management and Budget makes changes, becomes part of the President's budget, which is sent to Congress. *Id.* Congress appropriates a lump-sum of money to the BIA, based in part on the aggregation of all base budget amounts included in BIA's budget requests to Congress. *Id.* Once appropriated, the BIA allocates the money to various programs based on the TPA funding requests and the Indian tribes' identified tribal priorities. *Id.* ¶¶ 9–10. The Snyder Act and ISDA are the mechanisms for providing the funds for the programs the Indian tribes wish to operate. *Id.* ¶¶ 10–11.

To the extent that Plaintiff relies on the TPA program as a source of a money-mandating fiduciary duty, that reliance is misplaced. In *Lincoln*, the Supreme Court explained that courts cannot review "an agency's allocation of funds from a lump-sum appropriation" so long as the agency acts to meet permissible statutory objectives. 508 U.S. at 193. In *Lincoln*, the Court noted that the contours of the trust relationship between the Indian people and the United States government did "not limit the Service's discretion to reorder its priorities from serving a subgroup of beneficiaries to serving the broader class of all Indians nationwide." *Id.* at 194–95 (citing *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir. 1986)). Like the Snyder Act and ISDA, which courts have found are not money-mandating, the TPA system does not require the expenditure of general appropriations, on specific programs, for particular classes of

Native Americans. *See Samish*, 419 F.3d at 1366. In addition, the TPA mechanism does not involve trust funds or trust assets and, does not, therefore, invoke fiduciary duties on the part of the United States. *See White Mountain*, 537 U.S. at 471–73. Therefore, the TPA system is not a money-mandating statute.

In support of its contention that a trust obligation entitling them to compensation exists, Plaintiff cites to five additional legal authorities: (1) the Johnson-O'Malley Act, 25 U.S.C. § 452 *et seq.*; (2) the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 *et seq.*; (3) the Higher Education Tribal Grant Authorization Act, 25 U.S.C. § 3302 *et seq.*; (4) the Indian Child Protection and Family Violence Prevention Act, 25 U.S.C. § 2401 *et seq.*; and (5) the annual congressional appropriations Acts. *See* Am. Complaint ¶ 30a, 30o. None of these authorities, however, creates the requisite money-mandating obligation, fiduciary or otherwise, necessary to sustain Plaintiff's breach of trust claim. None establishes a trust corpus or provides fiduciary responsibilities for the United States with regard to trust assets. In addition, even if these statutes did create a limited trust, these programs delegate responsibility to tribes to administer programs, so the statutes are not in the same vein as *Mitchell II* or *White Mountain*. These statutes simply do not "confer[s] on the government pervasive or elaborate control over a trust corpus, such as would increase federal obligations beyond any long-recognized 'general trust relationship between the United States and the Indian people.'" *See Samish*, 419 F.3d at 1368.

Plaintiff's first cited authority, the Johnson-O'Malley Act, authorizes the Secretary, at her discretion, to enter into contracts with states, local governments, and private institutions and "expend under such contract or contracts, moneys appropriated by Congress for the education, medical attention, agricultural assistance, and social welfare, including relief of distress, of

Indians." 25 U.S.C. § 452. The Johnson-O'Malley Act also establishes a program that enables States to supplement the costs associated with educating Indian children attending public schools and for Indian tribes to provide additional education services. *Id.* This statute does not use trust language, much less implicate Indian funds or property. This statute, therefore, does not provide Plaintiff with a source of fiduciary duty that would provide a damage remedy. *See Vigil v. Andrus*, 667 F.3d 931, 934 (10th Cir. 1982) (finding that language of Johnson-O'Malley Act, like Snyder Act, is too broad to support a conclusion that Congress has expressly appropriated funds for lunches for all Indian school children).

Plaintiff's second cited authority, the Indian Child Welfare Act, establishes standards for removing Indian children from their homes and placing them in foster or adoptive care, and provides assistance to tribes for the operation of child and family service programs. *See* 25 U.S.C. § 1902. Section 1931 of the ICWA establishes a grant program for on and off reservation programs and the preparation and implementation of child welfare codes. 25 U.S.C. § 1931. This statute, although it contains general trust language — recognizing "the special relationship" between the United States tribes, and "the Federal responsibility to Indian people," and finding that the United States has a direct interest as trustee in protecting Indian children — does not involve a trust corpus or trust assets and, therefore, creates no fiduciary duties. *See* 25 U.S.C. § 1901; *Cherokee Nation,* 480 U.S. at 707. In addition, even if a trust were established, the statutory scheme places primary responsibility on the tribes by providing grants for tribes to administer programs and ensure that performance goals are achieved. 25 U.S.C. § 1931; 25 C.F.R. § 23.44 (1994).

The Higher Education Tribal Grant Authorization Act, Plaintiff's third cited authority,

provides a grant system through which the Secretary, under her Snyder Act authority, makes grants to tribes in order to permit tribes to provide individual Indian students with financial assistance to attend institutions of higher education. 25 U.S.C. § 3303. Again, this statute contains general trust language regarding “the Federal Government’s continuing trust responsibility to provide education services to American Indian and Alaska Natives,” 25 U.S.C. § 3302(7), but does not involve a trust corpus or other trust assets. In addition, the tribe plays the main role in running the programs and a stated purpose of the statute is to further tribes’ administering programs and “making decisions on these programs reflecting their determinations of the tribal and human needs.” 25 U.S.C. §§ 3302, § 3302(3). The statute specifically provides that the Secretary cannot place limitations on the tribe’s use of funds, other than those found in the statute. *Id*. at § 3303(b). Accordingly, this statute does not establish any trust relationship, much less a specific one creating fiduciary duties enforceable in money damages.

Plaintiff’s fourth cited authority, the Indian Alcohol and Substance Abuse Prevention and Treatment Act of 1986, “provide[s] authority and opportunities for Indian tribes to develop and implement a coordinated program for the prevention and treatment of alcohol and substance abuse at the local level.” 25 U.S.C. § 2402. Congress acknowledged that the “Federal Government has a historical relationship and unique legal and moral responsibility to Indian tribes and their members,” and “included in this responsibility is the treaty, statutory, and historical obligation to assist the Indian tribes in meeting the health and social needs of their members.” 25 U.S.C. § 2401. This statute also, however, clearly does not establish more than a general trust responsibility as it does not involve Indian property. In addition, it states that “the Indian tribes have the primary responsibility for protecting and ensuring the well-being of their

members and the resources made available under this chapter will assist Indian tribes in meeting that responsibility." 25 U.S.C. § 2401(12). None of the statutory provisions contained in the Indian Alcohol and Substance Abuse Prevention and Treatment Act imposes an obligation to compensate Plaintiff for a breach of fiduciary duty.

Finally, Plaintiff's fifth cited authority, the Indian Child Protection and Family Violence Prevention Act sets up an Indian Child Abuse Treatment Grant Program to provide "grants to any Indian tribe or intertribal consortium for the establishment on Indian reservations of treatment programs for Indians who have been victims of child sexual abuse." 25 U.S.C. § 3208. This Act also contains general trust language — noting the "historical and special relationship of the Federal Government with Indian people," and finding that " there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and the United States has a direct interest, as trustee, in protecting Indian children who are members of, or are eligible for membership in, an Indian tribe" — but does not involve a specific trust corpus or asset. *See* 25 U.S.C. § 3201. Again, the tribes are responsible for establishing and administering the programs. 25 U.S.C. § 3208.

The purpose of all the statutes Plaintiff alleges as part of its "network" is to provide tribes with funds to run programs.[5/] These statutes deal with "gratuitous appropriations," not trust funds; they do not involve Indian property. *See Quick Bear*, 210 U.S. at 80–81. As noted, even though Plaintiff alleges that a "network of statutes can fairly be interpreted to provide some

---

[5/]Indeed, none of the statutes Plaintiff alleges are specific to Plaintiff as opposed to any other federally recognized Indian tribes. Therefore, Plaintiff's argument amounts to a claim that any federally recognized tribe has a money-mandating claim against the United States with regard to BIA's budgeting and distribution of funds.

funds for all federally recognized tribes," it must still identify a source of fiduciary duty. *Navajo*, 537 U.S. at 512. None of the statutes that Plaintiff cites contains anything more than general trust language; they do not contain "statutory language expressly creating a trust relation in a specific property interest." *See Samish*, 419 F.3d at 1368. Even taken together, these statutes do not establish the detailed fiduciary responsibilities that supported a claim for money damages in *Mitchell II.* In addition, even if the statutes did involve a general trust, each statute gives the leading role to the tribe to administer the programs. Thus, the government does not have "pervasive or elaborate control over a trust corpus, such as would increase federal obligations beyond any long-recognized 'general trust relationship between the United States and the Indian people.'" *See Samish*, 419 F.3d at 1368 (citing *Mitchell II*, 463 U.S. at 225). Plaintiff's attempt to argue a "network" and fit this case into the framework of *Mitchell II* or *White Mountain* is without merit.

**2. The Housing Improvement Program Is Not Money-Mandating.**

Plaintiff also alleges that the BIA's Housing Improvement Program (HIP) is money-mandating because the BIA, through the HIP, provided financial assistance to Indians "who were members or descendants of members of federally recognized tribes in need of housing that could not be met through other sources."[6/] Am. Compl. ¶ 30c. The HIP is not money-mandating because it is not based on money-mandating statutes, the BIA has discretion in program administration, and no damage remedy can be implied.

---

[6/]This statute, in particular, relates to injuries to individual tribal members as opposed to an injury to the tribe as a whole. Accordingly, because only the tribe is a plaintiff and the tribe cannot recover for injuries solely to individual tribal members, this Court does not have jurisdiction to hear this claim. *See Fort Sill*, 477 F.2d at 1365; *Fields*, 423 F.2d at 383.

The HIP, based on the BIA's policy that "every American family should have the opportunity for a decent home and suitable living environment," is designed to "serve the neediest of the needy Indian families who have no other resource for standard housing." *See* 25 C.F.R. § 256.3 (1982). The HIP provides assistance to needy Indian families in a number of ways: financial assistance to make repairs to homes, grants necessary to make down payments in order to secure loans, and financing new home construction. *Id.*

The HIP program is not money-mandating. First, the authority for the HIP is the Snyder Act, 25 U.S.C. § 13, which has been held not to be money-mandating.[7/] *See* 25 C.F.R. pt. 261 (1976); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993); *Samish*, 419 F.3d at 1368. Second, in appropriations bills, Congress does not specifically appropriate money for HIP for any individual tribe. *See, e.g.*, Pub. L. No. 99-500 (1985) (appropriating a certain amount of money "[f]or construction, major repair, and improvement of irrigation and power systems, buildings, utilities, and other facilities, including architectural and engineering services by contract; acquisition of lands and interests in lands; preparation of lands for farming; and construction, repair, and improvement of Indian housing"). Thus, the appropriations bills do not create an entitlement to any particular tribe for any particular amount. Therefore, neither the Snyder Act nor the appropriations acts are money-mandating.

In any event, however, the regulations administering the HIP program are not money-mandating. The regulations are phrased in non-mandatory language. *See, e.g.*, 25 C.F.R. § 256.3 (1982) ("*To the maximum extent possible*, the program will be administered through tribes,

[7/] In fact, Plaintiff's First Amended Complaint refers to the HIP only in terms of the Snyder Act. *See* First Am. Compl. ¶ 5j ("The Housing Improvement Program of 1965, implemented pursuant to the Snyder Act, 25 U.S.C. § 13....").

tribal housing authorities, or other tribal organizations, or by having tribal officials participate in the applicant selection process. Every effort will be made to use Housing Improvement Program funds in conjunction with other programs . . . .") (emphasis added). As Plaintiff's own complaint states, financial assistance under HIP was provided when housing needs "could not be met through other sources." *Id.;* Am. Compl. ¶ 30c. The BIA, therefore, has discretion in determining whether "other sources" would be available to applicants.

The regulations also do not provide standards for determining payment and the amount to be paid is neither stated nor calculable. First, the HIP funds were distributed on a competitive basis, meaning that whether an individual received funding and the amount of that funding would be based on other requests for funding in the same time period. *See* 25 C.F.R. § 265.5 (1982) (listing various priorities for distribution of funds). The regulations set out criteria for eligibility and note that "[p]riority is given to families with the greatest need in relation to income, family size, and of not being eligible for other available programs providing housing assistance." 25 C.F.R. § 265.5(a) (1982); *see also* 25 C.F.R. § 256.6 (1995). In 1992, the regulations changed to note that every eligible Indian, as defined by the statute, is entitled to participate in the HIP, regardless of tribal affiliation. *See* 25 C.F.R. § 256.3(b) (1995); *see also* 57 Fed. Reg. 3105 (Jan. 27, 1992). This version of the regulations notes that the distribution of funds among tribes is based on BIA's "certified inventory of tribal housing needs, a viable work plan, and the tribe being in compliance with the intent of the program." 25 C.F.R. § 256.3 (1995). Accordingly, even though BIA considers every eligible individual Indian entitled to the HIP, BIA has discretion to distribute funds amongst the tribes.

Second, HIP provided funding and resources through a variety of means. The 1983

regulations state that the HIP could be implemented through, *inter alia*, direct grants, contract or grant agreements, or programs administered directly by the BIA. *Id.* In addition, as noted, there are several types of funding available under the HIP: repairs to housing that will remain nonstandard, repairs to housing that will become standard, down payment assistance, and new housing. 25 C.F.R. § 256.4 (1982). Certainly, the HIP does not entitle any particular tribe to any particular amount of money. *See Perri*, 340 F.3d at 1342. In short, far from providing a remedy provision that either specifies the amount to be paid or giving a basis to calculate that amount, the HIP regulations provide for multiple ways in which the program could be implemented. Thus, the regulations cannot be money-mandating because they do not set forward standards for determining payment nor do they specify — or provide the Court with a means of determining — the payment amount. In conclusion, the HIP is not money-mandating and does not give this Court jurisdiction.

**B. Plaintiff's Program Statutes Are Not Money-Mandating.**

The second category of Plaintiff's alleged money-mandating statutes include statutes through which Indian tribes run various social service related programs. Under these statutes, instead of providing services directly, federal agencies subsidize State, local, and tribal governments' provision of services. None of these programs contemplate that a tribe would profit from their involvement in the distribution of governmental services. Costs for administering the programs are reimbursed, but if a tribe does not distribute the goods, it does not engender the costs or an entitlement to reimbursement. There is no indication from the statutory text of any of these statutes that the provision of social services is intended to be a profit center for tribes. This is not a case where a State or other governmental provider agreed to

perform the government services with reimbursement for costs engendered and the agency is alleged to have paid less than the costs stated by statute or regulation. Interpreting these statutes to contain a Tucker Act damage remedy would provide Plaintiff with a windfall, because it did not provide the services anticipated by the statutes. In addition, the statutes give the Secretaries of the various agencies that administer the programs a great deal of discretion over which this Court does not have Tucker Act jurisdiction. In short, these programs are not money-mandating.

This case is similar to the Supreme Court's analysis in *Testan*, which held that the Tucker Act did not support jurisdiction in a case where government employees sought backpay due to their wrongful classification on the government pay scale. 424 U.S. at 394. In *Testan*, the plaintiffs claimed that they were denied the benefit of a position to which they should have been, but were not, appointed. *Id.* at 402. The Court held that the remedy Congress had made available was prospective reclassification on the pay scale, not money damages through retroactive classification. *Id.* at 403. Likewise, here, Plaintiff claims that it should have been recognized as an Indian tribe in 1969 and it was denied the benefit of that recognition between 1969 and 1996. As in *Testan*, Congress has not made retroactive money damages a remedy for this type of claim. This Court simply does not have jurisdiction over every "instance of misgovernment by a United States agency that is costly to private parties, or local and state interests." *See City of Manassas Park v. United States*, 633 F.2d 181, 183 (1980). Congress has not made a retroactive money damages remedy available in this situation, and this Court does not have jurisdiction.

**1. The 1937 Housing Act and Its Amendments Do Not Establish Money-Mandating Duties.**

In addition to its network argument, Plaintiff alleges that it is entitled to damages under the 1937 Housing Act and its amendments. Am. Compl. ¶ 30b. Specifically, Plaintiff alleges that tribes were eligible to receive financial assistance under this statute "if they were federally recognized, had authority to exercise governmental powers, sought such financial assistance by adopting an ordinance to establish a Housing Authority that would implement the programs authorized by the Act, and had or were able to establish the administrative capability to carry out the housing project." *Id.* As is clear from Plaintiff's own description of the statute, the 1937 Housing Act and its amendments are not money-mandating.

The Housing Act of 1937 authorized loans to public housing agencies for development or administration of public or low rent housing. *See* Felix S. Cohen's Handbook of Indian Law, Ch. 13 § E2 (1982). Tribes have been considered governmental entities eligible for participation in housing projects, and the 1974 amendments explicitly stated that tribes were "units of general local government" eligible to compete for block grant funding.[8] *See* Pub. L. No. 93-383 § 102(A)(1). In 1977, Congress passed the Housing and Community Development Act of 1977, which established a separate funding mechanism for Indians and required the Secretary of HUD to designate a Special Assistant for Indian and Alaska Native Programs to coordinate HUD programs relating to Indian housing. Pub. L. No. 95-128 § 901. The Indian Housing Act of 1988 required the Secretary to establish a separate program of assisted housing for Indians and Alaskan natives and a mutual help homeownership opportunity program for Indian families.

---

[8] It is also important to note that tribes did not need to be federally recognized to participate in HUD programs. 24 C.F.R. § 805.104.

Pub. L. No. 100-358 § 202.

This program cannot be interpreted as being money-mandating. First, the statute's purpose is to provide and maintain housing for poor and needy people. To further this purpose, the Act gives the Secretary discretion to issue grants to States and units of general local government, including tribes, to help finance community development programs. Pub. L. No. 93-383 § 103 (1974). The Act, therefore, does not provide money in compensation for an injury, but, instead, seeks to subsidize state and local expenditures on housing programs. Providing Plaintiff with funds under this Act when it did not provide such services to needy people would result in a windfall for Plaintiff. *See Samish*, 419 F.3d at 1367. This statute does not reveal congressional intent to provide that kind of damage remedy, and this Court should not read such a remedy into the statute.

In addition, the plain language of the statue shows that Congress invested the Secretary with discretion, meaning that the statute is not money-mandating. The statute uses the terms "is authorized" and "may" instead of the mandatory language "shall." *See Cherokee Nation*, 69 Fed. Cl. at 158; *Hopi*, 55 Fed. Cl. at 87. For example, in § 103 of the Housing and Community Development Act of 1974, the statute states that "The Secretary *is authorized* to make grants to states and units of general local government to help finance community development programs," and "[t]he Secretary *is authorized* to incur obligations on behalf of the United States in the form of grant agreements." Pub. L. No. 93-383 § 103(A)(1)(emphasis added). Likewise, section 201 notes that the Secretary "*may make* loans or commitments to make loans to public housing agencies," and "*may issue*" notes and obligations, "may make annual contributions to public housing agencies," and "is authorized to enter into contracts for annual contributions." *See* Pub.

L. No. 93-383 § 201 (emphasis added); *see also id.* § 210 (codified at 12 U.S.C. 1701q(b)) (stating that "The Secretary *is authorized* to provide assistance to private nonprofit organizations and consumer cooperatives to expand the supply of supportive housing for the elderly. . .Assistance *may also* cover the cost of real property acquisition, site improvement, conversion, demolition, relocation, and other expenses that *the Secretary determines are necessary* to expand the supply of supportive housing for the elderly) (emphasis added).

Further, the 1937 Housing Act and its amendments are not money-mandating because they do not explicitly provide for money damages or state the precise amount to be paid. *See Samish*, 419 F.3d at 1364. Instead, the amount of money Plaintiff would have received, had it been eligible for the programs, is dependent on not only whether Plaintiff applied for the programs, but which programs it applied for, how much it requested, whether HUD would have found Plaintiff capable of administering the program, how many other tribes applied, how much Congress appropriated that year, and countless other factors. The statute does not provide a means to determine how much funding, if any, Plaintiff would have received. Thus, the particular provision of law upon which Plaintiff relies does not grant it "expressly or by implication, the right to be paid a certain sum." *See Perri*, 340 F.3d at 1342; *Eastport*, 372 F.2d at 1007.

The Housing Act and its amendments also cannot be considered money-mandating because the statute does not compel payment on satisfaction of certain conditions. The Housing Act programs were all competitive, meaning that not every tribe or person who applied for funding would receive it. *See* 24 C.F.R. § 905.206 (1984) (setting forth criteria for tribal applications to be submitted to HUD). In addition, in order for HUD to approve a tribe's

application, HUD must determine that the Indian housing authority is capable of administering the program without an unreasonable need to continuing assistance. 24 C.F.R. § 905.207(a) (1984). This determination necessarily involves discretion on the part of HUD. The statute, therefore, is not one that mandates compensation upon meeting certain conditions, and the program is not money-mandating.

### 2. The Indian Health Care Improvement Act and Amendments are Not Money-Mandating.

Plaintiff claims that the United States gives money to federally recognized tribes through the Indian Health Care Improvement Act (IHCIA) and amendments to that act. Am. Compl. ¶ 30d. According to Plaintiff, Indians who are enrolled members of federally recognized tribes have been eligible for and received direct and contract health services, and federally recognized Indian tribes have been entitled to contract with Indian Health Services ("IHS") to operate health care facilities and provide health care services.[9] *Id.* (citing 25 U.S.C. § 1621(d), 1680a). Plaintiff's argument is without merit because the IHCIA and amendments are not money-mandating.

Congress enacted the IHCIA in 1976, calling it "An Act to implement the Federal responsibility for the care and education of the Indian people by improving the services and facilities of Federal Indian health programs and encouraging maximum participation of Indians in such programs, and for other purposes." Pub. L. No. 94-437. The purpose of the IHCIA was "to ensure sufficient resources to provide Indians with proper health care and adequate funding

---

[9] This statute, as well, as alleged by Plaintiff, relates at least partly to injuries to individual tribal members as opposed to an injury to the tribe as a whole. Again, this Court does not have jurisdiction to decide claims based on injuries to individual tribal members as opposed to a tribal injury. *See Fort Sill*, 477 F.2d at 1365; *Fields*, 423 F.2d at 383.

to construct modern hospitals and other health care facilities." *United States ex rel. Norton Sound Health Corp. v. Bering Strait School Dist.*, 138 F.3d 1281, 1282 (9th Cir. 1998).

The IHCIA has been held not to be money-mandating. The Supreme Court in *Lincoln* addressed the IHCIA along with the Snyder Act, and found that Congress provided IHS with unreviewable discretion to allocate its lump sum appropriations. 508 U.S. at 192. In *Lincoln*, the plaintiffs brought suit to challenge IHS's decision to terminate the Indian Children's Program. *Id.* at 188–89. The plaintiffs argued that in terminating the program, IHS violated the IHCIA, the Snyder Act, the Administrative Procedure Act, and the Due Process Clause. *Id.* at 189. The Supreme Court found that "[t]he allocation of funds from a lump sum appropriation is another administrative decision traditionally regarded as committed to agency discretion," because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* The Court found that "both the Snyder Act and the Improvement Act likewise speak about Indian health only in general terms." *Id.* at 193–94. *Lincoln* therefore "foreclosed the possibility of receiving damages for claims under the IHCIA." *Allred v. United States*, 33 Fed. Cl. 349, 355 (1995); *see also Lincoln*, 508 U.S. at 194; (holding that IHCIA is not money-mandating); *Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala*, 988 F.Supp. 1306, 1330 (D. Or. 1997) ("Based on an analysis of the Snyder Act, 25 U.S.C. § 13, and the Indian Health Care Improvement Act, 25 U.S.C. § 1601 et seq, the Supreme Court held in *Lincoln* . . . that Congress had delegated to IHS the unreviewable discretion to reallocate funds included in a lump sum appropriation. . . .").

Even if the Supreme Court had not already addressed this issue, this Court should find

that the IHCIA is not money-mandating. As with the Snyder Act, the IHCIA "does not require the expenditure of general appropriations on specific programs, for particular classes of Native Americans." *See Samish*, 419 F.3d at 1366 (citing *Lincoln*, 508 U.S. at 194). Instead, Congress appropriates funds for IHS health care programs through an annual lump-sum appropriation for "Indian Health Services." See, e.g., Department of the Interior and Related Agencies Appropriations Act, 1997, Pub. L. No. 104-208, Tit. II, 110 Stat. 3009–205, 3009–212. The IHS then allocates and spends its appropriated funds under the authority of the Snyder Act and the IHCIA. The IHCIA, which is intended to "assure the highest possible health status for Indians," 25 U.S.C. 1602(a), authorizes appropriations in a number of health-related areas and establishes several health programs. *See* 25 U.S.C. 1621; *see generally* 25 U.S.C. 1601–1616p.

Further, the IHCIA does not provide a remedy for an injury incurred. Instead, the statute's purpose is to improve the services and facilities of Federal Indian health programs and encourage maximum participation of Indians in such programs. *See* Pub. L. No. 94-437 (1976). Providing a damage remedy would not further the purpose of the statute, but would provide Plaintiff with a windfall. *See Samish*, 419 F.3d at 1367.

The IHCIA is also not money-mandating because it is uses discretionary language. For example, the IHCIA provides that the Secretary "*is authorized* to spend funds which are appropriated under the authority of this section, through IHS, for" certain specified purposes. 25 U.S.C. § 1621(a) (emphasis added); *see also* Pub. L. No. 94-437 § 201(a) (codified at 25 U.S.C. § 1621) (noting that the Secretary "is authorized to expend" money in furtherance of the statute); § 201(b) (noting that Secretary "*is authorized* to employ persons to implement the provisions); § 201(c) ("authoriz[ing]" amounts and positions). Nothing in the plain language of the IHCIA

requires the Secretary to expend money for Plaintiff.

Plaintiff cites 25 U.S.C. § 1680a for the proposition that "federally recognized Indian tribes have been entitled to contract with IHS to operate health care facilities and provide health care services." Am. Compl. ¶ 30d. This section was added in 1988 and provides:

> The Service shall provide funds for health care programs and facilities operated by tribes and tribal organizations under contracts with the Service entered into under the Indian Self-Determination Act [25 U.S.C.A. § 450f et seq.] —
>
> (1) for the maintenance and repair of clinics owned or leased by such tribes or tribal organizations,
> (2) for employee training,
> (3) for cost-of-living increases for employees, and
> (4) for any other expenses relating to the provision of health services,
>
> on the same basis as such funds are provided to programs and facilities operated directly by the Service.

*See* Pub. L. No. 100-713 § 705; 25 U.S.C. § 1680a. This section provides that the IHS is obligated to provide funding to programs that it operates directly on the same basis as it provides funding for tribes that contract with IHS to provide the programs on their own through the ISDA. In other words, if IHS provides increased funding for programs it directly operates, it must also increase funding to programs contracted to tribes through the ISDA. Nothing in this provision, however, mandates that the Secretary must provide grants to any particular class of plaintiffs.

Finally, as with the other statutes Plaintiff cites, the IHCIA does not provide clear standards for paying money to recipients, state the precise amount that must be paid, or compel payment upon satisfaction of certain conditions. *See Samish*, 419 F.3d at 1364–65. This Court, therefore, should find that the IHCIA is not money-mandating for purposes of jurisdiction under the Tucker Act.

**3. The Supplemental Nutrition Program for Women Infants and**

**Children Is Not Money-Mandating.**

Plaintiff next alleges that since 1973, "federally recognized tribes have been entitled to receive federal funds to administer a supplemental food program (known as the "WIC" program to aid pregnant and post-partum women, infants, and children." Am. Compl. ¶ 30e. According to Plaintiff, the United States allocates funding for this program among the states, state agencies, and Indian tribes pursuant to a formula, and all federally recognized tribes seeking to participate in the program have been able to do so. *Id.* Plaintiff's argument that the WIC program is money-mandating is incorrect. In fact, the WIC program is a grant program that provides tribes with funding to administer a social service program, and is sufficiently discretionary so as not to be money-mandating.

The WIC program is designed to benefit pregnant, breastfeeding, postpartum women, infants, and children up to five years in age. The WIC program, part of the Child Nutrition Act of 1966, is a federal grant program for which Congress authorizes a certain amount of funds each year. *See* 7 C.F.R. Pt. 246 (2005); Pub. L. No. 93-150 § 6(a); Pub. L. No. 89-642 § 17. The Food and Nutrition Service (FNS) at the Department of Agriculture, responsible for administering the WIC program at the federal level, provides supplemental foods and nutrition education through payment of cash grants to State agencies which administer the program through local agencies at no cost to eligible persons. *Id.* The 1973 Amendments to the Child Nutrition Act of 1966 made Indian tribes eligible to participate in the Special Supplemental Nutrition Program for Women, Infants, and Children (the "WIC"). Pub. L. No. 93-150 § 6(a), S. Rep. 93-404. Federally recognized Indian tribes can participate in the WIC program either as a State agency or at the local level. State agencies develop policies and procedures for

administering the program within federal guidelines. State agencies, including those Indian tribes who choose to apply to participate as a State agency, must comply with a number of requirements, including submitting a yearly plan and entering into an agreement with FNS to administer the program. *See* 7 C.F.R. § 246.4.

The WIC program is not money-mandating. Far from being an entitlement to all federally recognized tribes, the WIC program is a grant program meant to provide eligible tribes who apply and are accepted as participants in the WIC program with funding in order to administer a health services program. For example, section 1786(h) provides that a portion of the grants are "for costs of nutrition services and administration incurred by State and local agencies for such year." 42 U.S.C. § 1786(h). The statute, therefore, seeks to "remov[e] the financial burden incurred by tribes and tribal organizations when implementing federal programs," *see Samish*, 419 F.3d at 1367, and not to compensate for an injury.

The language of the statute is also discretionary and does not provide for "a certain sum to be paid" to Plaintiff. *See Perri*, 340 F.3d at 1342. The statute provides that "[t]he Secretary may carry out a special supplemental nutrition program to assist State agencies through grants-in-aid and other means." 42 U.S.C. § 1786(c). Further, the Secretary's grants are subject to the availability of funds, meaning that the WIC program is not an entitlement program and not every eligible individual can receive funds.[10/] Tribes who choose to participate in the program must affirmatively seek to do so by applying to and administering the program within all federal

[10/] In its proposed rulemaking to change the funding formula in 1986, the FNS acknowledged this: "Because it is not possible to serve all eligible persons, a formula is needed that would place greater emphasis on the efficient use of funds, and on the targeting of available resources to serve persons most in need." 51 Fed. Reg. 32093-01.

legislative and regulatory requirements. *See* 42 U.S.C.A. § 1786(f)(1). The statute gives the Secretary the authority to "establish income eligibility standards to be used in conjunction with the nutritional risk criteria in determining eligibility of individuals for participation in the program," *Id.* § 1786(d), as well as to establish standards for the "the proper, efficient, and effective administration of the program." *Id.* § 1786(f). Accordingly, the Secretary has discretion to choose how to allocate funds, and the statute is not money-mandating.

Plaintiff, presumably, will argue that 1786(h) provides sufficient information to make the statute money-mandating by providing a "formula" to determine the amount to be paid. On the contrary, the "formula" demonstrates that the statute is not money-mandating for several reasons. First, to the extent the Secretary provides grant funding, it is to be used only for state and local allowable WIC expenditures. *Id.* § 1786(h)(2). Thus, tribes and other governments that apply for and administer the program will recoup the costs of administering the program, but the statute is not designed to be a profit center for tribes. Second, the "formula," therefore does not actually specify the amount to be paid, or even give the Court a means by which to determine the amount. *See Perri*, 340 F.3d at 1342. Instead, the section directs that the Secretary prescribe a formula, which should take into account certain factors, including the needs of the state, the number of individuals participating in each state, and "other factors which serve to promote the proper, efficient, and effective administration of the program." 1786(h)(2). Third, this section provides the Secretary with discretion to determine which "other factors" are necessary "to promote the proper, efficient, and effective administration of the program." There are, thus, no "clear standards" for determining payment, and the statute does not compel payment on the

satisfaction of certain conditions. *See Samish*, 419 F.3d at 1364–65.[11]

**4. The Commodity Food Program Is Not Money-Mandating**.

Next, according to Plaintiff, the Department of Agriculture's Commodity Food Program provided federally recognized Indian tribes, during the period of 1969 to 1996, with financial assistance and surplus foods and commodities for distribution to low income families. Am. Compl. ¶ 30l. According to Plaintiff, under the Agricultural Act of 1949 and regulations promulgated in 1984, 7 C.F.R. §§ 253.2–253.4, federally recognized Indian tribes were entitled to administer the program upon the submission of an application to do so and showing that it is potentially capable of administrating the program. *Id.* Plaintiff's argument that this statute is money-mandating, however, must fail.

Section 416 of the Agricultural Act of 1949 requires that certain surplus food be distributed in the following priority: "First to school-lunch programs; and then to the Bureau of Indian Affairs and Federal, State, and local public welfare organizations for the assistance of needy Indians and other needy persons." Pub. L. No. 81-439; *see also Kraft Foods v. Commodity Credit Corp.*, 164 F. Supp. 168, 171 (D. Wis. 1958). The regulations at 7 C.F.R. § 253.1 (1984) provide for the distribution of commodities that "may be distributed to households on or near any part of any Indian reservation" and this program "may be administered by capable Indian tribal organizations." The regulations also describe the application process for taking over the food distribution program, *id.* § 253.4(d), and the process for determining tribal

[11] Indeed, FNS's formulas established pursuant to this section show that FNS has chosen a number of other factors that would influence the amount each state agency received. For example, in 1986, the FNS proposed a rule that factored in "each State agency's performance in reaching the most high risk persons in an efficient fashion." 51 Fed. Reg. 32093-01.

capability, *id*. at 253.4(e)

The Commodity Food Program is not money-mandating. Contrary to Plaintiff's assertion, this statute does not automatically entitle Indian tribes to receive financial assistance. Rather, it sets out a prioritized scheme for distributing surplus food to "needy Indians and other needy persons" when such food is available. If the FNS determines that an Indian tribe is capable, the tribe steps into the place of the Federal, State, or local government and administers the program. *Id.* § 253.4. Thus, the Program does not compensate a tribe for an injury, but subsidizes the provision of food to needy persons.

In addition, this program does not include language that provides clear standards for paying money to Indian tribes, states the precise amounts that must be paid, or compels payment on satisfaction of certain conditions. Instead, this program provides that Indian tribes are eligible, not entitled, to apply to distribute food to needy persons. Likewise, the statute is not money-mandating because tribes do not automatically receive funds merely by nature of being a federally recognized tribe. The tribe must apply to participate in the program, and FNS must deem it capable of effective and efficient program administration. *See id.* FNS's determination involves discretion, particularly because FNS must consult with other sources, weigh the factors, and determine if other factors for evaluation are required. *See id.* Accordingly, because the program does not automatically compel the payment of a certain amount of money based on the tribe's meeting certain specific requirements, it is not money-mandating. *See Samish*, 419 F.3d at 1366.

**5. The Food Stamp Program Is Not Money-Mandating**.

Similarly, Plaintiff claims that in 1977 federally recognized tribes were entitled to receive

from the federal government financial assistance to administer the Food Stamp program for their eligible members. Plaintiff asserts that title XIII of the Food Stamp and Agriculture Act of 1977, codified at 7 U.S.C. §§ 2011-2036. Pursuant to this Act and regulations promulgated in 1984, 7 C.F.R. Part 281, Plaintiff claims that federally recognized Indian tribes were entitled to administer the Food Stamp program upon the submission of an application to do so and showing that it is potentially capable of administering the program. *Id.* Plaintiff cannot, however, show that the Food Stamp Program is money-mandating.

The Food Stamp Act of 1977 created the food stamp program as a means to alleviate hunger and malnutrition and to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011. The term "State agency" is defined by the Food Stamp Act as being an agency of the State government and "the tribal organization of an Indian tribe determined by the Secretary [of Agriculture] to be capable of effectively administrating a food distribution program" as determined in § 2013(b). *Id*. at § 2012(n).

As with the other statutes Plaintiff alleges are money-mandating, the Food Stamp Act seeks not to provide compensation for injury, but "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income household." *Id.* at § 2011. The Act permits Indian tribes that are "capable of effectively and efficiently administering" a food distribution program to take over the role of states in administering the program. *Id.* at § 2013(b). Thus, the Act subsidizes tribal expenditures, and is not money-mandating.

Further, the Food Stamp Act uses discretionary language. It provides that "[s]ubject to

the availability of funds appropriated under section 18 of this Act [7 U.S.C. § 2027], the Secretary [of Agriculture] *is authorized* to formulate and administer a food stamp program." *Id*. at § 2013(a) (emphasis added). The Secretary determines the standards for eligibility under the program. Pub. L. No. 95-113 § 5 (codified at 7 U.S.C. § 2014). The Secretary determines if the tribe is capable of administering the program, and the statute does not provide standards for this determination. *Id.* § 3(n) (codified at 7 U.S.C. § 2012). The Food Stamp Act does not provide any particular plaintiff with the right to be paid a certain sum. *See Perri*, 340 F.3d at 1342. In short, the Food Stamp Act and its implementing regulations do not include language that provides clear standards for paying money to Indian tribes, that states the precise amounts that must be paid, or that compels payment on satisfaction of certain conditions. This is not the type of discretionary scheme that gives this Court jurisdiction.

**6. The Job Training Statutes Are Not Money-Mandating.**

Plaintiff also alleges that "[s]ince December 1973, federally recognized Indian tribes have been entitled to federal funding to provide job training and employment opportunities to their members," first through the Comprehensive Employment and Training Act of 1973 ("CETA") and amendments, and then through the Job Training Partnership Act ("JTPA"). Am. Compl. ¶ 30n.

CETA's stated purpose is to provide job training and employment opportunities to assure maximum employment and self-sufficiency "by establishing a flexible and decentralized system of federal, state, and local programs." Pub. L. No. 93-203 § 2 (1973). The CETA provides that the Secretary "may make such grants" or otherwise spend funds "as he may deem necessary to carry out the provisions of this Act." *Id.* Likewise, JTPA seeks "to establish programs to

prepare youth and unskilled adults for entry into the labor force and to afford job training to those economically disadvantaged individuals and other individuals facing serious barriers to employment, who are in special need of such training to obtain productive employment." Pub. L. No. 97-300 § 2.

These statutes are not money-mandating. First, like the other statutes Plaintiff alleges, these statutes do not provide compensation for injury, but merely funding for tribes to help administer social services programs. Here, federally recognized tribes that the Secretary determines are capable can directly administer job training programs. Because Plaintiff did not administer or spend money on these programs, reading a damage remedy into the statute would result in a windfall for Plaintiff. Second, CETA and JTPA use discretionary language. CETA provided that the Secretary "may make" grants. Pub. L. No. 93-203 § 2 (1973). JTPA provides that "the Secretary shall, wherever possible, utilize Indian tribes," but requires the Secretary to determine that such tribe has demonstrated the capability to effectively administer a comprehensive employment and training program. Pub. L. No. 97-300 § 401. If the Secretary determines the tribe is capable, the Secretary shall require the tribe "to submit a comprehensive plan meeting such requirements as the Secretary prescribes." *Id.* Clearly, therefore, the statute is not money-mandating because the Secretary has discretion to determine whether a tribe is capable to provide employment and training services, and to prescribe requirements for a tribe's comprehensive plan. Neither statute provides clear standards for payment, a precise amount that must be paid, or compels payment upon the satisfaction of certain conditions.

**C. Plaintiff's Alleged Block Grant Statutes Are Not Money-Mandating.**

The third category, for purposes of analysis, of Plaintiff's statutes is block grant statutes.

According to Plaintiff, each statute provides that funding would be available to tribes upon their request and the amount of funding provided to tribes was based on a formula contained in the statute. Even assuming that this is true, these block grant statutes are not money-mandating.

Funds provided through block grants represent federal subsidies of state, local, and tribal expenditures on various programs. Thus, payment under these statutes does not represent damages for injury sustained. *See Malone*, 34 Fed. Cl. at 263–63. These programs, therefore, do not indicate congressional intent to create the damage remedy and do not support jurisdiction in the Court of Federal Claims. In addition, the statutes are not money-mandating because they do not provide for a certain sum to be paid upon the satisfaction of certain conditions.

**1. The State and Local Fiscal Assistance Act of 1972 Is Not Money-Mandating.**

Plaintiff alleges that "[f]rom 1972 to September 30, 1983, federally-recognized Indians [sic] tribes received federal funds under the State and Local Fiscal Assistance Act of 1972." Am. Compl. ¶ 30f. According to Plaintiff, these funds were distributed on a formula basis and made available to all state, local, and tribal governments for the "purposes of public safety (law enforcement and fire protection), environmental protection, public transportation, health, social services for the poor or aged, financial administration, and ordinary and necessary capital expenditures authorized by law. *Id*.

The State and Local Fiscal Assistance Act of 1972 provided grant-in-aid funds to State and local governments. *See* 31 U.S.C. §§ 1221–1263 (Supp. II 1972); S. Rep. No. 94-1207. This act appropriated money to a trust fund, and directed the Secretary of the Treasury "to allocate funds to state and local governments pursuant to specified formulae and other statutory limitations." *See City of Newark v. Blumenthal*, 457 F. Supp. 30, 31 (1978) (citing 31 U.S.C. §

1228 (Supp. V 1975). The formulas took into account population and need, among other factors. *See* 31 U.S.C. § 1227 (Supp. II 1972); S. Rep. No. 94-1207.

The State and Local Fiscal Assistance Act of 1972 is not money-mandating. First, it is a grant-in-aid statute that sought to subsidize state, local, and tribal governments' future expenditures. *See* 31 U.S.C. § 1228 (Supp. V 1975); S. Rep. No. 94-1207 (noting that if statute was not renewed, "State and local governments would lose more than 10 percent of all Federal *grant-in-aid* funds") (emphasis added). The statute required funds to be used for particular purposes — namely, for public safety, environmental protection, public transportation, health, recreation, libraries, social services for the poor or aged, and financial administration — and entities receiving grants had to report on their use of funds and meet other requirements, such as establishing a trust fund to deposit payments. *See* 31 U.S.C. §§ 1222, 1241, 1243 (Supp. II 1972). Suits to enforce grant-in-aid programs are not suits for money damages because they do not seek compensation for a past wrong. *See Bowen*, 487 U.S. at 907 n.42, *Nat'l Ctr. for Manuf. Sci.*, 114 F.3d at 201; *Malone*, 34 Fed. Cl. at 263–63.

Second, there is no indication of congressional intent to provide a damage remedy. The statute provided for " judicial review by the Courts of Appeals of any decision by the Secretary to reduce or withhold payments to a state or unit of local government," but did not contain an "affirmative grant of jurisdiction to review the general scheme of allocation or any recipient's proportionate share of that allocation." *Blumenthal*, 457 F. Supp. at 32 (citing 31 U.S.C. § 1263(c) (Supp. V 1975)). At least one court has held that the Secretary's action under the State and Local Fiscal Assistance Act of 1972 was wholly committed to his discretion and, therefore, unreviewable. *Id.* at 32. In *Blumenthal*, the court held it could not review agency action under

the APA's arbitrary and capricious standard because the court cannot order the Secretary to make a discretionary determination. Likewise, in this case, the statute gave the Secretary sufficient discretion that the Court cannot determine the amount to be paid, or find that the statute provides clear standard for payment. *See Samish*, 419 F.3d at 1364–65.

**2. The OBRA Block Grants Are Not Money-Mandating**.

Plaintiff alleges that it is owed money under a number of block grant programs established in the Omnibus Budget Reconciliation Act of 1981 (OBRA '81).[12/] According to Plaintiff, each statute provides that funding would be available to tribes upon their request and the amount of funding provided to tribes was based on a formula contained in the statute.

OBRA '81 authorized a number of grant programs. First, the Community Services Block Grants section of OBRA provides that "[t]he Secretary is authorized to make grants in accordance with the provisions of this subtitle, to States to ameliorate the causes of poverty in communities within the State," and authorizes a certain amount of money for the year 1982 and for each of the four succeeding years. Pub. L. No. 97-35 § 672. Second, the Preventive Health and Health Services Block Grants, contained at §§ 901–911 of OBRA '81, authorize grants for preventive health and service, for such programs as control of rodents and the establishment and maintenance of community and school-based fluoridation programs, and allocates a certain amount of money to be allocated to the states. *Id*. Third, OBRA '81 established the Alcohol and Drug Abuse and Mental Health Services Block Grants program. *Id.* § 1911. Fourth, for a five year period of time between 1981 and 1986, Congress provided for Primary Health Care Block

[12/]Neither OBRA '81 nor the various block grant programs Plaintiff alleges within OBRA '81 are mentioned in Plaintiff's First Amended Complaint and should, therefore, be dismissed.

Grants. *See* Pub. L. No. 97–35 § 1921. This section provided that "[t]he Secretary may make grants to any State to undertake planning and other administrative activities to enable the State to administer allotments provided to it under this part. The amount of any grant to a State shall be determined by the Secretary but may not exceed $150,000." *Id.* Finally, the Low Income Home Energy Assistance Program (LIHEAP) provides that the Secretary of Health and Human Services is authorized to make grants to assist eligible households to meet the costs of home energy. *Id.* § 2601. OBRA '81 appropriated certain sums of money to carry out the provisions of each of these block grant programs. *Id.* § 672, 901, 1911, 1921, 2601. In addition, for each program, if the Secretary receives a funding request from an Indian tribe requesting funding and determines that the tribe's members would be better served by direct grants, the Secretary shall reserve funds from the State's portion to be directly granted to the tribe. *Id.* §§ 674(c)(1); 1902(d); 1912(d); 1921; 2601.

These statutes are not money-mandating because they subsidize state, local, and tribal expenditures on social service programs and are not designed to be profit centers for tribes. Further, these statutes give sufficient discretion to the Secretary such that her action is unreviewable. For example, the language of this block grant provisions is not mandatory. Under this section, the Secretary has sufficient discretion that the statute does not provide clear standards for payment or compel payment upon satisfaction of certain conditions. *See Samish,* 419 F.3d at 1364–65. Before a tribe is eligible for funding under this provision, the Secretary must receive a request from the governing body of the tribe or tribal organization, and "determine[] that the members of such tribe or tribal organization would be better served by means of grants made directly to provide benefits under this subtitle." Pub. L. No. 97–35 §

674(c)(1). In addition, the provision states that "[i]n order for an Indian tribe . . . to be eligible for an award," it must submit an application "which meets such criteria as the Secretary may prescribe by regulation." Pub. L. No. 97–35 § 674(c)(4). The language of this provision indicates that tribes are not automatically eligible for funding, and gives the Secretary discretion to prescribe criteria for applications. *Id.*

In addition, section 681 of the Community Services Block Grants section is titled "Discretionary Authority of Secretary," and authorizes the Secretary to provide grants and loans to States and other organizations to provide, *inter alia*, training and special programs. *Id.* § 681. This statute invests the Secretary with considerable discretion, and is not a "discretionary scheme" which this Court can review, as there are no clear standards for payment and the statute does not compel payment upon satisfaction of certain conditions. This provision neither states the precise amount to be paid, nor provides a means to determine an amount. Plaintiff alleges that the amount of funding under this section is based on a formula "under which all participating tribes[,] like all participating states, were funded." Am. Compl. ¶ 30g. The "formula" is merely a statement that the Secretary will reserve funds for eligible tribes that submit applications that meet all requirements from the State's allotment for the fiscal year in a ratio based on the "population of all eligible Indians for whom a determination has been made." *See, e.g.,* Pub. L. No. 97-35 § 675(c)(2). This formula does not provide an explicit amount to a particular plaintiff, and is not specific enough to make this statute money-mandating. In addition, under the Alcohol and Drug Abuse and Mental Health Services Block Grants program, the Secretary "shall conduct a study for the purpose of devising a formula for the equitable distribution of funds available for allotment to the States." *Id.* § 1912(d). The statute directs the

Secretary to consider the financial resources and populations of the various States as well as "any other factor which the Secretary may consider appropriate." *Id.*

In this case, the "formula" gives even more discretion to the Secretary, because the Secretary must determine the formula, as well as appropriate factors to consider in the determination.

In conclusion, the block grant statutes cited by Plaintiff are not money-mandating.

**D. The Appropriations Acts Are Not Money-Mandating.**

The final category of Plaintiff's statutes, for purposes of this motion, are the appropriations statutes. Plaintiff alleges that Congress enacted numerous money-mandating federal statutes appropriating funds for the Department of the Interior and other federal agencies. Am. Compl. ¶ 30o. Plaintiff does not indicate any particular provisions in these acts that are money-mandating. For the same reasons that the acts themselves are not money-mandating, the appropriation of funds for those programs is not money-mandating.

In addition, these appropriations bills give lump sums to Interior and the other federal agencies. As *Lincoln* established, this Court does not have jurisdiction to review the agency's distribution of its lump sum appropriation. *See Lincoln*, 508 U.S. at 193. The purpose of lump sum appropriations is to allow agencies the flexibility to balance competing priorities and fund those programs that it determines best meet those priorities. *Id.* The contours of the general trust relationship between the Indian people and the federal government does not restrict the agencies' discretion. *Id.* at 195. Because these are "gratuitous appropriations," and not trust funds, there is no money-mandating duty. *See Quick Bear*, 210 U.S. at 80–81. In addition, there is no right to be paid a certain sum. *See Perri*, 340 F.3d at 1342. Accordingly, the appropriations acts do not provide this Court with jurisdiction over Plaintiff's claims.

## III. PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE THE APPROPRIATIONS WERE CAPPED AND HAVE BEEN DISBURSED.

In addition, Congress set aside a capped amount of funds for the statutes Plaintiff cites. Under the Antideficiency Act, 31 U.S.C. § 1341(a)(1)(A), the United States can not authorize or make expenditures "exceeding an amount available in an appropriation or fund for the expenditure or obligation." *See Star-Glo Assoc., LP v. United States,* 59 Fed. Cl. 724, 728–29 (2004) (affirmed at 414 F.3d 1349 (Fed. Cir. 2005)). "[W]hen a cap exists on an appropriation and the funds have been disbursed to other recipients, funds are no longer available to the agency for that purpose." 59 Fed. Cl. at 734; *see also City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994); *Greenlee County v. United States,* 68 Fed. Cl. 482, 489–90 (2005). In *Star-Glo*, plaintiff argued that they were entitled to additional payments from the Department of Agriculture in connection with their citrus trees. 59 Fed. Cl. at 728. The court held that summary judgment was proper because Congress established a maximum cap on the available funds and since that cap was reached, no relief was available to plaintiffs. *Id.* at 734.

In this case, Congress appropriated set amounts for each statute for each year. *See, e.g.*, Pub. L. No. 93-150 § 6(a) (WIC program); Pub. L. No. 99-500 (Interior and related agencies appropriation act for fiscal year 1985); 31 U.S.C. § 1224(b) (Supp II 1972) (State and Local Fiscal Assistance Act); Pub. L. No. 97-35 §§ 672, 901, 1911, 1921, 2601. As noted above, many of the programs Plaintiff alleges are money-mandating in fact distribute funds on a competitive basis because there is a limited amount of funds available. Those funds have already been spent. Because Congress set a cap on the amount of funds and that cap was reached, Plaintiff does not have any relief available in the form of money damages.

## IV. PLAINTIFF HAS NOT ESTABLISHED A FIDUCIARY DUTY GIVING RISE TO

**A CLAIM FOR DAMAGES WITHIN THE TUCKER ACT OR INDIAN TUCKER ACT.**

Plaintiff bases its jurisdiction before the Court of Federal Claims on the allegation that Interior violated a host of statutes, including all of the Interior appropriations acts providing funds for Indian tribes for the 1969 to 1996 time-frame, and other federally-funded programs when it failed to federally recognize the Tribe prior to 1996. *Id*. at ¶¶ 3, 6, 30, and 43. In addition to claiming that these statutes are individually money-mandating, Plaintiff asserts that the statutes, congressional appropriations, and underlying programs constitute a money-mandating network. Thus, Plaintiff argues that when Congress enacted this network of statutes, it intended to provide programs, benefits, and services to all federally recognized Indian tribes. Plaintiff, therefore, concludes that Interior's failure to provide these programs, benefits, and services to it prior to 1996 violates the federal government's trust responsibility and gives rise to a claim for money damages. *Id*. at ¶¶ 35–36, and 43–44.

To the extent that Plaintiff argues a breach of trust claim based on the United States' fiduciary duties to federally recognized Indian tribes, this claim fails for the same reason Plaintiff's network claim fails, as addressed in Section I.A.1 on page 22 and 23. Plaintiff has not identified a source of fiduciary duty that would provide a damage remedy. The statutes Plaintiff alleges do not contain statutory trust language that establishes more than a general trust relationship between the United States and federally recognized Indian tribes. The statutes do not involve any trust corpus or trust assets that would give rise to fiduciary duties. *See Cherokee Nation*, 480 U.S. at 707. Many of the statutes Plaintiff alleges are not specifically for the benefit of Indians, but are intended to benefit the needy, whether Indian or not. Further, as discussed numerous times throughout this document, all of the statutes Plaintiff alleges are designed to

give tribes responsibility in administering programs. The government does not have the kind of pervasive control over tribal assets as described in the *Mitchell II* or *White Mountain* cases. These statutes, therefore, do not create a trust relationship that is compensable in money damages. *See Samish*, 419 F.3d at 1367–68.

**CONCLUSION**

For the foregoing reasons, Defendant requests that this Court dismiss Plaintiff's complaint.

Respectfully submitted this 22nd day of March, 2006.

SUE ELLEN WOOLDRIDGE
Assistant Attorney General

________________________________
DEVON LEHMAN McCUNE,
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington DC 20044-0663
202-305-0434
202-305-0506 (fax)

Of Counsel:

Jason Roberts
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAMISH INDIAN NATION, a federally recognized tribe,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendant. | Case No. 02-1383L<br>(Chief Judge Edward J. Damich)<br><br>Declaration of Debbie L. Clark |

I, Debbie L. Clark, do hereby state as follows:

1. I am employed by the Office of the Assistant Secretary - Indian Affairs ("AS-IA Office") within the United States Department of the Interior ("Interior"), which has responsibility for matters arising out of Indian relations with the United States. I hold the position of Deputy Assistant Secretary - Indian Affairs (Management). My primary responsibilities are formulation and execution of the budget for the Bureau of Indian Affairs ("BIA"), the Office of Indian Education Programs ("OIEP"), and the AS-IA Office, including the distribution of budget funds to BIA, OIEP, and AS-IA Office program officials. I oversee the calculation and distribution of Tribal Priority Allocation ("TPA") funds to the BIA Central and Regional Offices, OIEP, and Office of Self-Governance for ultimate distribution to Indian Tribes and Tribal entities or expenditure on their behalf for direct service Indian Tribes. I am familiar with the funding for the Operation of Indian Programs, Construction, Miscellaneous Claims and Settlements, and Guaranteed Loans.

2. Annually, Interior receives guidance from the Office of Management and Budget

("OMB") that identifies the Administration's priorities that are to be considered during the budget formulation process. Interior uses OMB's guidance to develop agency specific guidance that identifies and promotes the Administration's, as well as the agency's, strategic goals and objectives. The different Bureaus within Interior, such as the BIA, use this guidance in the formulation of their budget requests to the Secretary of the Interior.

3. The BIA uses TPA as a budgetary device or tool to categorize and describe how it plans to allocate certain funds to Indian Tribes, which it requests through the President's or Administration's budget and receives in a congressional lump sum appropriations. This internal budgetary tool is an agency creation, there is no statutory or regulatory authority for TPA.

4. The BIA must allocate the congressionally appropriated amount among the tribes. Congress does not specifically say how much each tribe is to receive. Tribal "base budgets" have, over time, been established for distributing recurring TPA funding. Non-recurring funding is awarded on a competitive, needs, or project basis. Funding distribution methodologies have been established for non-recurring programs.

5. The TPA funding category was developed to provide Indian Tribes greater flexibility in the use of non-earmarked funds. This greater flexibility gives each Indian Tribe a more direct way to individually allocate funds to requirements specific to their tribal situation and needs. It also provides continuity and greater long-term stability in the operation of tribal programs. Essentially, TPA identifies recurring funding to be provided to BIA

offices or Indian Tribes to run many of the programs that benefit individual Indians and Indian Tribes. It reflects the choices that Indian Tribes have made for the use of these funds. Using this budgetary device, Indian Tribes have the authority to reallocate funds to and from TPA programs.

6. Congress has not directed specific TPA amounts to any tribe. However in other non-TPA funding categories, Congress has "earmarked" funds to specific tribes for specific purposes. The TPA budgetary tool resulted from the recommendations of a Joint Tribal/BIA /DOI Advisory Task Force on Reorganization of the BIA. The TPA process was preceded by a Band Analysis process which allowed Tribes to group together individual programs.

7. The BIA TPA provides program funds for the following categories: a) Tribal Government; b) Human Services; c) Education; d) Public Safety and Justice; e) Community Development; f) Resources Management; g) Trust Services; and h) General Administration. Funds can be directly paid out to an Indian Tribe only if it performs one or more of those programs through a contract, Indian Self-Determination and Education Assistance Act ("ISDA") funding compacts (93-638), or grant (100-297 Education) agreement.

8. In formulating its budget, the BIA affords all Indian Tribes the opportunity to discuss and provide their recommendations for funding priorities, including the TPA portion of the BIA budget. Occasionally, individual Tribal base budget amounts have been identified

and included within the BIA budget request to Congress. TPA funding is included in Tribal base budgets. When Congress appropriates the BIA budget, the Tribal base budgets are adjusted accordingly. Congressional across the board cuts or rescissions are applied to Tribal base funding.

9. In the budget formulation process, the BIA submits its budget to Interior, which reviews the budget and can make changes. The BIA budget then goes to OMB as part of Interior's overall budget request. OMB reviews Interior's budget and can make changes. Interior's budget then becomes part of the President's budget, which is sent to Congress. Congress appropriates money to the BIA based in part on the aggregation of all base budget amounts included in the BIA budget requests to Congress. Once appropriated, the base funding is distributed to the Indian Tribes. The Indian Tribes have the authority to reallocate the TPA funding to and from TPA programs.

10. Once appropriated by Congress, the BIA allocates the money to various programs based on the TPA funding distribution methodology for base funding, any approved project funding requests and the Indian Tribes' identified tribal priorities. The Snyder Act and ISDA are the authorities for transferring the funds for the programs the Indian Tribes want to operate for their members, or in some cases, all eligible members of Indian Tribes within an established service area.

11. All federally recognized Indian Tribes are eligible to benefit from the appropriation of funds either by direct services provided by the BIA's staff or through negotiated

agreements (such as an ISDA contract or compact) for all or some programs. Once an agreement is completed, the Tribe may drawdown as cash from the United States Treasury, as approved by the BIA. Subject to appropriations, recurring funds (including those for TPA) are included in a Tribe's base. Section 106(b) of ISDA identifies the criteria that must be met to reduce recurring funding included in a Tribe's ISDA contract or compact.

12. The Secretary of the Interior ("Secretary") has the authority to realign up to 10 percent of any Indian tribe's TPA allocation for higher priority needs. The Secretary also may reprogram up to 10 percent or $500,000.00, whichever is less, of any program activity for higher priority needs. To exceed this limit, the Secretary must obtain Congress's approval.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on the 22nd day of March, 2006

DEBBIE L. CLARK
Deputy Assistant Secretary - Indian Affairs (Management)
Office of the Assistant Secretary - Indian Affairs
Department of the Interior