**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe, Plaintiff, | Case No. 02-1383L (Chief Judge Edward J. Damich) |
| v. | |
| THE UNITED STATES OF AMERICA, Defendant. | |

**Plaintiff's Report on Why Discovery Should Be Permitted Prior to Responding to Defendant's Motion to Dismiss**

Craig J. Dorsay, Esq.
Attorney at Law
2121 S.W. Broadway, Suite 100
Portland, Oregon 97201
Tel: (503) 790-9060; Fax: (503) 242-9001
cdorsay@involved.com

*Counsel of Record for Plaintiff*
*Samish Indian Nation*

Of Counsel:
William R. Perry, Esq.
Anne D. Noto, Esq.
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Tel: (202) 682-0240, Fax: (202) 682-0249
wperry@sonosky.com; anoto@sonosky.com

May 8, 2006

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. The Tribe's legal theory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Discovery regarding jurisdictional facts is appropriate here. . . . . . . . . . . . . 12

A. Discovery is warranted when a motion to dismiss disputes jurisdictional facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B. The Samish Indian Nation is entitled to discovery here. . . . . . . . . . . . . 14

1. Discovery is appropriate regarding Tribal Priority Allocations. . . . . . . 14

2. Discovery is appropriate regarding other federal statutes and regulations that provide funds for tribes. . . . . . . . . . . . . 17

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Addendum

Ex. 1, Department of Interior Bureau of Indian Affairs, *Report on Tribal Priority Allocations,* (July 1999)

Plaintiff Samish Indian Nation's Proposed First Set of Requests for Admissions

Plaintiff Samish Indian Nation's Proposed First Set of Interrogatories and Request for Production of Documents

## Table of Authorities

***Cases***

*Abbott v. United States*, 47 Fed. Cl. 582 (2000) . . . . . . . . . . 13

*Britell v. United States*, 372 F.3d 1370 (Fed. Cir. 2004) . . . . . . . . . . 8

*Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535 (9th Cir 1986) . . . . . . . . . . 12

*Canavan v. Beneficial Finance Corporation*, 553 F.2d 860 (3rd Cir. 1977) . . . . . . . . . . 12

*Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573 (Fed. Cir. 1993) . . . . . . . . . . 13

*Chippewa Indians of MN v. United States*, 307 U.S. 1 (1939) . . . . . . . . . . 6

*Eastern Trans-Waste of Md., Inc. v. United States*, 27 Fed. Cl. 146 (1992) . . . . . . . . . . 13

*Gentry v. United States*, 546 F.2d 343 (Ct. Cl. 1976) . . . . . . . . . . 8

*Greene v. Babbitt*, 943 F. Supp. 1278 (W.D. Wash. 1996) . . . . . . . . . . 3, 4

*Greene v. Lujan*, No. C89-645Z, 1992 WL 533059 (W.D. Wash. Feb. 25, 1992);
*aff'd* 64 F.3d 1266 (9th Cir. 1995) . . . . . . . . . . 3

*Hamlet v. United States*, 873 F.2d 1414 (Fed. Cir. 1989),
*appeal after remand,* 14 F.3d 613 (Fed. Cir. 1993) . . . . . . . . . . 13

*Ignatiev v. United States*, 238 F.3d 464 (D.C. Cir. 2001) . . . . . . . . . . 12, 13

*Inter-Coastal Xpress, Inc. v. United States*, 49 Fed. Cl. 531 (2001) . . . . . . . . . . 13

*Joint Tribal Council of the Passamaquoddy Tribe v. Morton,*
388 F. Supp. 649 (D. Me. 1975); *aff'd* 528 F.2d 370 (1st Cir. 1975) . . . . . . . . . . 5, 9

*Laub v. United States Department of the Interior*, 342 F.3d 1080 (9th Cir. 2003) . . . . . . . . . . 12

*Lawrence v. Dunbar*, 919 F.2d 1525 (11th Cir. 1990) . . . . . . . . . . 13

*Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901 (11th Cir. 1984) . . . . . . . . . . 12

*Maniere v. United States*, 31 Fed. Cl. 410 (1994) . . . . . . . . . . 13

*McBryde v. United States*, 299 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968) . . . . . . . . . . . . . . . . . . . . . . . 6

*Natural Res. Defense Council v. Pena*, 147 F.3d 1012 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . 12

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Reidell v, United States*, 43 Fed. Cl. 770 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

*Rincon Band of Mission Indians v. Califano*, 464 F. Supp. 934 (N.D.Cal. 1979), *aff'd sub nom. Rincon Band of Mission Indians v. Harris*, 618 F.2d 569 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . 6

*Tiger v. W. Inv. Co.*, 221 U.S. 286 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Trintec Indus., Inc. v. Pedre Promotional Prod.*, 395 F.3d 1275 (Fed. Cir. 2005) . . . . . . . . . . . 13

*United States v. Dion*, 476 U.S. 734 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Nice*, 241 U.S. 591 (1916) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Valentin v. Hosp. Bella Vista*, 254 F.3d 358 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Williamson v. Tucker,* 645 F.2d 404 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

***Statutes and Regulations***

Comprehensive Employment and Training Act of 1973 ("CETA"), Pub. L. No. 93-203, § 204(2), 87 Stat. 839, *as amended by* the Youth Employment and Demonstration Act of 1977, Pub. L. No. 95-93, 91 Stat. 627, the Comprehensive Employment and Training Act Amendments of 1978, Pub. L. No. 95-524, §§ 201, 301, 302, 92 Stat. 1909, and the Job Training Partnership Act, Pub. L. No. 97-300, 96 Stat. 1322 ("JTPA") . . . 19

Economic Opportunity Act of 1964, Pub. L. No. 88-452, 78 Stat. 508 . . . . . . . . . . . . . . . . . . . 18

Federally-Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454 § 103(4), 108 Stat. 4791 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Tribal Judgment Funds Use and Distribution Act, 25 U.S.C. §§ 1401-1408 . . . . . . . . . . . . . . . . 11

Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub. L. No. 97-35, §§ 671, 674(c), 901, 2601-2611, 95 Stat. 172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

25 U.S.C. §§ 476(f), (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

45 C.F.R. § 96.41 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

46 Fed. Reg. 48,582 (Oct. 1, 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

***Legislative Materials:***

*Hearings before the House Committee on Interior and Insular Affairs on H.R. 6629, to Amend the Indian Health Care Improvement Act,* 96th Cong (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

S. Rep. No. 100-508 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 6183 . . . . . . . . . . . . . . . . . . . 10

S. Rep. No. 102-392 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 3943 . . . . . . . . . . . . . . . . . . . 10

H. R. Rep. No. 103-781 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3768 . . . . . . . . . . . . . . . . 4, 5

S. Rep. No. 107-170 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

***Treatises:***

8 Charles Allen Wright, Arthur P. Miller & Richard L. Marcus, *Federal Practice and Procedure*, § 2009 (2d ed. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 02-1383L<br>(Chief Judge Edward J. Damich) |

**Plaintiff's Report on Why Discovery Should Be Permitted Prior to Responding to Defendant's Motion to Dismiss**

## Introduction

This case raises the following question: what happens when the government singles out one federally-recognized Indian tribe, and arbitrarily and wrongfully denies that tribe all of the programs and benefits that Congress makes available for all other federally-recognized tribes? That is what happened to the Samish Indian Nation, and it lasted for a period of 27 years.

The government's position in this litigation is that it can simply cut off one tribe from all federal programs benefitting tribes and never be held accountable. The Tribe's position is that only Congress can terminate a tribe, and that federal agencies can not, with impunity, simply stop treating one tribe as it treats all other federally-recognized tribes. Where federal agencies do effectively terminate a particular tribe by denying <u>all</u> federal funding, the government can indeed

be held liable in damages. In jurisdictional terms, the Tribe's position is that Congress intended the statutes that provide programs and services for federally-recognized Indian tribes to benefit all the Tribes, so those statutes are money-mandating for purposes of a claim by a tribe that has been completely denied participation in all of those statutes.

The question now before the Court is whether the Tribe will be permitted limited discovery prior to responding to the government's motion to dismiss. The Tribe seeks discovery regarding the administrative construction of some of the statutes that provide programs and services for tribes. In particular, the Tribe seeks discovery to show that federal agencies have construed statutes cited in the Second Amended Complaint ("Complaint") in the manner that the Tribe contends they should be construed -- to provide funds to all federally-recognized tribes.

Limited discovery is appropriate here for two reasons. First, the government's motion to dismiss places in question certain jurisdictional facts contained in the Complaint. Rather than assuming the truth of the allegations in the Complaint (as would be typical practice in a motion to dismiss), the government instead contends that the facts are otherwise. Among other things, the government has filed with its motion a declaration from a government official describing various aspects of a program under which the Tribe is seeking damages. Having expressly placed jurisdictional facts into question in its motion, the government should not now be heard to object to the Tribe seeking to address jurisdictional facts through discovery.

Second, discovery is appropriate because the statutory framework for federal funding of Indian programs is complex and in many ways unique – so agency construction is particularly important in providing an understanding of the scope and meaning of the underlying statutes. Discovery is needed to show that the longstanding construction and practice of the agencies supports the proposition that Congress fairly intended the United States to be liable in damages if the agencies single out one tribe for adverse treatment in a manner tantamount to termination.

While discovery is important to developing the Tribe's case, it should not be viewed as an undue burden on the government.[1] To the contrary, what the Tribe seeks in discovery could rather simply be included in a stipulation. If the government is willing, a stipulation regarding its own construction of the applicable statutes would obviate the need for formal discovery and enable the parties to move forward on the pending legal questions. The Tribe has included a proposed set of discovery with this Report and invites the government to join the Tribe in discussions regarding a stipulation.

**Facts**

The wrongs suffered by the Samish Indian Nation are well documented in prior litigation. *Greene v. Lujan,* No. C89-645Z, 1992 WL 533059, at *9 (W.D. Wash. Feb. 25, 1992), *aff'd* 64 F.3d 1266 (9th Cir. 1995); *Greene v. Babbitt*, 943 F. Supp. 1278 (W.D. Wash. 1996). While

[1] The Tribe is not here seeking discovery as to all of the statutes cited in the Complaint. Rather, the proposed discovery is limited to a few statutes, which provide a basis for resolving the legal arguments in the motion to dismiss. The Tribe has done this to keep discovery limited and to facilitate a more efficient approach to resolving the legal issues on the motion to dismiss. In the event that the parties are unable to agree on a stipulation and the government fails to provide responsive answers to Plaintiff's discovery, further discovery may be necessary.

Samish was a party to the 1855 Treaty of Point Elliott and the Tribe's relationship with the federal government was never terminated by Congress, for 27 years the federal government acted as if the Tribe did not exist. After a federal bureaucrat dropped the Tribe from a 1969 list of tribes (an occurrence that could not later be explained or justified), the federal government simply stopped providing to the Tribe all the programs and services it provided to every other federally-recognized tribe. The Samish were cut off without a cent. And efforts by the Tribe to restore its proper place as a federally-recognized tribe were met with decades of agency delay, repeated denials of due process, and an unsavory course of federal conduct, including improper ex parte contacts that were later roundly criticized by the federal court that reviewed the matter. *Greene v. Babbitt*, 943 F. Supp. at 1282-1295.

Having finally succeeded through the prior litigation in restoring its federally-recognized status, the Tribe brought this action in 2002. The gravamen of the complaint was that the federal government had acted unlawfully in singling out the Samish as the only tribe to be totally denied federal funding. The Tribe contended that but for the wrongful action of the federal government, the Samish Indian Nation would have received programs and services provided to every other tribe.

This Court, in its initial ruling, dismissed the Tribe's claims. On appeal, the Federal Circuit reversed with respect to the statute of limitations (holding the claims are not barred) and remanded for a determination on the "money-mandating" issue. The Tribe filed a Second Amended Complaint, to refine and narrow its claims.

## Argument

### I. The Tribe's legal theory.

This case concerns the mistreatment of the Samish Indian Nation by the federal government from 1969 to 1996. The Tribe here seeks damages based on federal funds that were provided to all tribes except Samish. But what happened to the Tribe went far beyond funding alone. The federal government, for the period 1969 to 1996, denied the Samish Indian Nation's existence as a federally-recognized tribe. During that period, every aspect of the federal-tribal relationship was denied by the federal government. As a result, during those 27 years the Tribe could not, even apart from questions of funding, administer schools or health programs, have land taken into trust, or participate in federal programs to advance tribal economic development. It is this broad federal denial of the Tribe's existence that is at the heart of this case.

The federal government's denial of Samish tribal existence had the effect of terminating the Tribe. No aspect of the special tribal-federal relationship remained in effect from 1969 to 1996. But only Congress has the authority to terminate a Tribe, as Congress itself expressly acknowledged. Federally-Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, § 103(4), 108 Stat. 4791.[2] As stated by the House Committee on Natural Resources in connection with that Act, federal recognition

> imposes upon the Secretary of the Interior specific obligations to provide a panoply of benefits and services to the tribe and its members. . . . While the Department [of the Interior] clearly has a role in extending recognition to

---

[2] *See also Joint Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 380 (1st Cir. 1975) (citing *United States v. Nice*, 241 U.S. 591, 598 (1916); *Tiger v. W. Inv. Co.*, 221 U.S. 286, 315 (1911)).

> previously unrecognized tribes, it does not have the authority to 'derecognize' a tribe. . . .The Committee cannot stress enough its conclusion that the Department may not terminate the federally-recognized status of an Indian tribe absent an Act of Congress. Congress has never delegated that authority to the Department, or acquiesced in such a termination.

H. R. Rep. No. 103-781 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3768, 3769-3770. Further, when Congress intends to terminate a tribe, Congress must use clear, unambiguous language to do so.[3] But Congress never terminated the Samish Indian Nation. As a result, the federal government's treatment (or lack of treatment) of Samish was patently unlawful.

This history provides an important backdrop for determining whether the statutes at issue are money-mandating for purposes of the Tribe's claims here. The basic question in this regard is what Congress intended – whether a "fair inference" supports a determination that the United States can be held liable. *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005). Express language authorizing liability is not required. *E.g.*, *McBryde v. United States*, 299 F.3d 1357, 1361-1364 (Fed. Cir. 2002). In fact, the Courts have supported the use of a range of tools – including legislative history and agency construction – for determining Congressional intent in this regard. *E.g.*, *Reidell v. United States*, 43 Fed. Cl. 770, 772-773 (1999).

As we discuss below, the statutes cited in the Complaint provide funding for all federally-recognized tribes. The Second Amended Complaint, like the initial complaint, seeks damages

---

[3] *See Nice*, 241 U.S. at 598-601 (allotment of lands did not terminate tribal existence); *Chippewa Indians of MN v. United States*, 307 U.S. 1, 4-5 (1939) (tribes' cession of land in trust did not result in dissolution of the tribe). *See also Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412-413 (1968); *United States v. Dion*, 476 U.S. 734, 738-740 (1986).

for the wrongful manner in which the federal government treated the Tribe for 27 years. The first claim arises under a series of statutes which provided funding for 14 programs for the benefit of tribes and their members. Every federally-recognized tribe (or in some cases, every federally-recognized tribe that made a request) benefitted from some funding under these statutes at some time in the relevant period (1969 to 1996). Since every federally-recognized tribe actually benefitted, it can fairly be assumed that Congress intended that result. In other words, the facts regarding the actual payment of money under these statutes underscore that the agencies that administered them understood these statutes to be money-mandating.

The second claim covers all of these statutes together – viewing the statutes as a network providing a broad framework of programs and benefits for federally-recognized tribes. Here again, every tribe received some funding during 1969 to 1996 under this network of statutes. Thus, under this claim as well, discovery will support the view that Congress, in enacting this network of statutes, intended all federally-recognized tribes to receive some funds – and therefore the network, viewed as a whole, is money-mandating.

The discovery that the Tribe seeks will show that the federal agencies so understood these statutes, and implemented them to make funding available to all federally-recognized tribes. It is a "fair inference" that Congress intended that when it provided funding to benefit all federally-recognized tribes, the federal agencies not undermine that intent by totally excluding one Tribe – as they did with Samish.

This understanding of Congressional intent is supported by established legal principles. As noted above, only Congress can terminate a tribe. It would be highly anomalous for Congress to enact statutes (like those cited in the Complaint) that benefit all tribes – and for those same statutes to be construed to silently authorize federal agencies to terminate a tribe, in derogation of Congress' own exclusive authority over termination. No rational Congress would enact a measure to that effect.

Likewise, the funding statutes at issue here must not be construed in a manner that would violate equal protection. Congress has explicitly provided, in the arena of Indian affairs, that the federal government can not diminish the privileges and immunities of one tribe vis a vis another. 25 U.S.C. §§ 476(f), (g). This enactment is essentially a statutory form of equal protection to ensure that certain tribes are not treated with disfavor. More broadly, federal case law provides that violations of equal protection can be a proper component of money-mandating claims – where implementation of a federal statute that provides for the payment of money implicates equal protection. *See Gentry v. United States*, 546 F.2d 343, 346, 348-351 (Ct. Cl. 1976); *see also Britell v. United States*, 372 F.3d 1370, 1378-1379 (Fed. Cir. 2004). Construing federal funding statutes (as the government urges here) to authorize federal agencies to completely exclude one tribe from every program and service would raise serious equal protection concerns. Congress should not be presumed to have enacted a measure intending it to be construed to violate equal protection. Accordingly, the better view is that Congress in enacting federal statutes to fund Indian programs intended that all tribes benefit – not that one Tribe could be left out.

The government's motion does not discuss these principles at all. Indeed, the government argues that the statutes in this case are not money-mandating because the government has discretion on how to allocate the funds. But, whatever the contours of government discretion to allocate funds, that discretion does not include the arbitrary allocation of federal funds among tribes, *see Rincon Band of Mission Indians v. Califano*, 464 F. Supp. 934, 936-937 (N.D.Cal. 1979), *aff'd sub nom Rincon Band of Mission Indians v. Harris*, 618 F.2d 569 (9th Cir. 1980), much less the arbitrary and unauthorized termination of a single tribe. Indeed, while there may have been a range of policy decisions that the government could have taken regarding Samish, termination was not one of them. *See Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 388 F. Supp. 649, 665-666 (D. Me. 1975) *aff'd* 528 F.2d 370 (1st Cir. 1975). When the government failed to treat Samish as all other tribes were treated, it did not purport to be doing so based on funding allocation decisions. The government can not decide to terminate all relations with a tribe and later seek to justify that wrongful act by a post hoc argument relating to its authority to allocate funds.

The government also argues that some of the Tribe's claims should have been brought by individuals. But the government misconstrues the Tribe's claim. The Tribe brought this case seeking a remedy for something that happened to the Tribe. The federal government wrongfully stopped treating the Samish Indian Nation in the same manner it treated every other federally-recognized tribe. The damages sought by the Tribe here are measured by certain federal programs that benefitted every other tribe during this period. Moreover, the underlying

obligations with respect to all of the programs at issue are federal obligations to <u>tribes</u> – arising from Treaties, statutes and a course of dealings with the tribes.[4]

Nor is there any merit to the government's argument that the payment of damages to the Tribe would constitute a "windfall." As a result of the government's arbitrary and unlawful actions in failing to treat the Samish Indian Nation as a federally-recognized tribe for more than a quarter of a century, the Tribe was completely denied all federal funding that the United States otherwise made available to federally-recognized tribes. During that period, tribes throughout the United States were able, with federal assistance, to develop their governmental systems and infrastructure, to provide governmental services and benefits to their members, to begin to make

[4] For example, the Government's obligation to provide health care to Indian people is one that the United States owes to the tribes based on promises contained in treaties and in exchange for the cession of million of acres of land. As stated by the Senate Committee for Indian Affairs:

> The United States' responsibility to <u>Indian tribal governments</u> and their members for the provision of health care was established in numerous treaties with Indian tribes in which the United States agreed to provide such services. . . . The responsibility has been further delineated and defined by numerous status[sic] and administrative regulations. Based upon the Constitution, historical development, treaties and statutes, the United States has assumed a legal and moral obligation to provide adequate health care and services to Indian tribes and their members.

S. Rep. No. 102-392 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 3943, 3944 (emphasis added). *See also* S. Rep. No. 100-508 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 6183, 6184; S. Rep. No. 107-170, at 1-2 (2002). Likewise, the IHS allocates its federal funds <u>by tribe</u> and develops its budget by soliciting the input of all federally-recognized tribes. *See, e.g., Hearings before the House Committee on Interior and Insular Affairs on H.R. 6629, to Amend the Indian Health Care Improvement Act*, 96th Cong. 352-53 (1980) (testimony of George I. Lythcott, Administrator, Public Health Service describing process by which tribes develop tribal specific health plans as part of the IHS budget process).

economic progress to address decades of accumulated poverty, to preserve and advance tribal culture and traditions, and to continue operation as a tribal government for the benefit of its people. But, as a result of the United States' failure to recognize the Samish Indian Nation, the Tribe was unable to move forward in these areas on the same basis as all other federally-recognized tribes. The federal government's wrongful failure to recognize the Samish Indian Nation during this 27 year period put the Samish Tribe behind all other federally-recognized tribes with regard to economic development, the provision of programs and services to its members, and in the development of tribal government, tribal infrastructure and tribal community. Recovery of damages here would be but a small measure by which the Tribe might catch-up to all other federally-recognized tribes, and have a source of funds from which to begin to address these long-standing needs. [5]

In short, the Tribe should be afforded the opportunity to support its claims through discovery. With discovery, the Tribe will show that the statutes cited in the Second Amended Complaint were construed and implemented by the federal agencies to provide funding for all federally-recognized tribes, and that this administrative construction was consistent with and gave effect to Congressional intent regarding these statutes and renders these statutes money-mandating for purposes of jurisdiction under the Tucker Act.

[5] Moreover, appropriate limitations can be placed on an award as required by the Tribal Judgment Funds Use and Distribution Act, 25 U.S.C. §§ 1401-1408.

## II. Discovery regarding jurisdictional facts is appropriate here.

### A. Discovery is warranted when a motion to dismiss disputes jurisdictional facts.

"[I]t has long been clear that discovery on jurisdictional issues is proper." 8 Charles Allen Wright, Arthur P. Miller & Richard L. Marcus, *Federal Practice and Procedure*, § 2009, at 124 (2d ed. 1994). As the Supreme Court has noted, "where issues arise as to jurisdiction or venue, discovery is [also] available to ascertain the facts bearing on such issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) (citations omitted).

The federal courts regularly allow discovery when a challenge is made to the court's jurisdiction. Discovery has been granted where the court's subject matter jurisdiction is at issue and the defendant disputes the allegations contained in plaintiff's complaint. "'[D]iscovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted . . . .'" *Laub v. United States Department of the Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) *quoting Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir 1986). Where a defendant makes a factual challenge to the court's subject matter jurisdiction, the "court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." *Williamson v. Tucker,* 645 F.2d 404, 414 (5th Cir. 1981).[6] Jurisdictional discovery is especially appropriate where the jurisdictional question

---

[6] *See also, Ignatiev v. United States*, 238 F.3d 464, 466-467 (D.C. Cir. 2001); *Natural Res. Defense Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998); *Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir. 1984); *Canavan v. Beneficial Finance Corporation*, 553 F.2d 860, 864 (3rd Cir. 1977). *See also Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

"is intermeshed with the merits of the claims." *Lawrence v. Dunbar*, 919 F.2d 1525, 1531 (11th Cir. 1990).

This Court and the Federal Circuit have followed this approach and have permitted discovery when facts bearing on jurisdiction are challenged on a motion to dismiss.[7] Indeed, this Court has allowed discovery before requiring a plaintiff to respond to the government's motion to dismiss which asserted that the statute under which the claim was made was not money-mandating. *Abbott v. United States*, 47 Fed. Cl. 582, 583 (2000).[8] That is precisely what the Tribe seeks here.

In short, discovery is proper where a motion to dismiss places jurisdictional facts – including facts regarding agency construction of statutes – at issue. As we describe in more detail below, this is such a case.

---

[7] *See also Trintec Indus., Inc. v. Pedre Promotional Prod.*, 395 F.3d 1275, 1282-1283 (Fed. Cir. 2005); *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993); *Inter-Coastal Xpress, Inc. v. United States*, 49 Fed. Cl. 531, 534, 543 (2001); *Maniere v. United States*, 31 Fed. Cl. 410, 413 (1994); *Eastern Trans-Waste of Md., Inc. v. United States*, 27 Fed. Cl. 146, 148 n.1 (1992).

[8] The courts have likewise looked to agency interpretations as providing a sound basis for determining whether a statute is money-mandating. As this Court found in *Reidell v, United States*, 43 Fed. Cl. 770, 772-773 (1999), an agency's interpretation of its obligations under statute and regulation are relevant to determining whether a statute was money-mandating for purposes of Tucker Act jurisdiction. Likewise, jurisdictional discovery has been permitted to determine federal policies and internal rules that were relevant to the question of the court's subject matter jurisdiction. *Ignatiev*, 238 F.3d at 466-467. *See also Hamlet v. United States*, 873 F.2d 1414, 1416-1417 (Fed. Cir. 1989), *appeal after remand*, 14 F.3d 613 (Fed. Cir. 1993).

**B. The Samish Indian Nation is entitled to discovery here.**

1. Discovery is appropriate regarding Tribal Priority Allocations.

The Bureau of Indian Affairs (BIA) provides funding for a broad array of programs to benefit tribes. In seeking funding for many of these programs from Congress, and in allocating the funds for the Tribes, the BIA groups numerous programs together – under the title "Tribal Priority Allocations." These are BIA funds that support a broad range of programs, services and benefits including: Tribal Government, Human Services, Education, Public Safety and Justice, Community Development, Resources Management, Trust Services and General Administration. Within each of these program categories are several specific programs – each of which is a component of TPA. Every federally-recognized tribe receives some TPA funds every year. In general, once a federally-recognized tribe receives TPA funds, that amount becomes part of that tribe's "base funding," and the tribe receives that amount in subsequent years as well (subject to action by Congress to increase or decrease funding for that program within TPA through appropriations).[9] Second Amended Compl. at ¶ 30a. While every other tribe received some TPA funds between 1992 and 1996, the Samish Indian Nation did not.

The Tribe's position is that the various statutes underlying TPA are together money-mandating – and that this is best demonstrated by the BIA's own construction of those statutes.

---

[9] In the years beginning in 1969, but prior to the existence of TPA, the programs that are now part of TPA were funded as part of the BIA budget, within the category of "Operation of Indian Programs." During those years, as well, once a tribe received funding for such a program, that funding became a part of the base amount that was (subject to appropriations levels rising or falling) provided to that tribe in subsequent years.

The BIA provided TPA to every Tribe (except Samish) because that is what Congress intended. The BIA organized TPA as a funding mechanism to cover certain basic programs for all tribes, it represented to Congress that TPA was serving all tribes, and Congress provided ongoing funding for TPA based on that understanding.

Elsewhere the BIA has in essence admitted that TPA serves all tribes – and that it must do so. A 1999 report issued by the Bureau of Indian Affairs expressly recognized the unique basis on which it provides funds to Indian tribes, stating:

> The BIA is unique among government agencies in many respects. It is unique in relation to its own mission and structure. Some agencies operate programs or deliver services directly to beneficiaries; others are grant making agencies. Even in an agency that may combine the two functions, the line of demarcation is clear and established by statute. With few exceptions, potential beneficiaries of Federal services or grants do not have any form of a "right" to the service or to a particular share of benefits; they merely have the right of access on equitable grounds.
>
> The BIA, on the other hand, serves all Federally recognized Tribes and groups. It operates either programs or contracts for the delivery of services at the discretion of the Tribes. The Tribes also have the right to change from direct to contracting and back again at virtually any time and for virtually any reason. . . . Further, the BIA must maintain a level of direct services to each Tribe throughout the country while also trying to provide adequate resources for Tribal contracting and Self-Governance compacting.

Ex. 1, Department of Interior Bureau of Indian Affairs, *Report on Tribal Priority Allocations,* at 3-4 (July 1999) (emphasis added).

Nevertheless, the government here argues that the TPA is not supported by money-mandating statutes. Def. Mot. at 14-21.[10] Even in this case, however, the government provides something of a mixed message regarding TPA. The declaration that the government submitted in support of its motion appears to corroborate many of the Tribe's allegations regarding that program.[11] While the government's declaration suggests some common ground regarding the attributes of TPA, the government's submission stops short of conceding the truth of the Tribe's allegations.

The Tribe seeks discovery to close this gap – to show that by the government's own construction, the statutory and regulatory framework under which TPA is provided reflects

---

[10] Defendant also contends that Plaintiff did not "allege or mention the TPA program in its First Amended Complaint . . ." and argues that the "Court should dismiss Plaintiff's statutes that were not contained in its previous complaint" Def. Mot. at 14 n.3. Defendant's assertion is in error. As set out in the Second Amended Complaint, *see* ¶30a(iv), the TPA program is funded pursuant to a number of different statutes. Plaintiff identified these statutes in its First Amended Complaint, in paragraphs ¶¶ 5.d, 5.aa, 5.bb, 5.dd, 5.ff, 5.mm, and 5.nn.

[11] The declaration confirms that "[t]he BIA TPA provides program funds for the following categories: a) Tribal Government; b) Human Services; c) Education; d) Public Safety and Justice; e) Community Development; f) Resource Management; g) Trust Services; and h) General Administration." *Compare* Def.'s Decl. of Debbie L. Clark ("Def.'s Decl.") at ¶ 7, *with* Second Amended Compl. at ¶ 30.a(i). The declaration further explains that "[t]he BIA must allocate the congressionally appropriated amount among the tribes[,]," and while "Congress does not specifically say how much each tribe is to receive[,] Tribal 'base budgets' have, over time, been established for distributing recurring TPA funding." Def.'s Decl. at ¶ 4 (emphasis supplied). Finally the declaration explains that "all federally recognized tribes are eligible to benefit from the appropriation of funds" for the TPA program, and that "[s]ubject to appropriations, recurring funds (including those for TPA) are included in a Tribe's base." *Id.* at ¶ 11 (emphasis supplied). *See also* Def. Mot. at 16 ("Because there are 561 federally recognized Indian tribes, the BIA does not include individual tribal budget requests within the BIA budget, but instead requests funds for prioritized programs that support all tribes and are determined by the priorities of all Indian tribes nationwide.") (emphasis supplied).

congressional intent that funding be provided to all federally-recognized tribes. This, in turn, is the predicate for establishing that the statutes and regulations underlying TPA are money-mandating.

2. Discovery is appropriate regarding other federal statutes and regulations that provide funds for tribes.

Discovery is warranted regarding other federal programs established for the benefit of Indian tribes for much the same reason – to show that agency construction supports a determination that the statutes providing that funding are money-mandating. For example, in 1981 Congress established a series of block grants that were available to all federally-recognized tribes. Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub. L. No. 97-35, §§ 671, 674(c), 901, 2601-2611, 95 Stat. 172. Second Amended Compl. at ¶¶ 30.g, h, i, j and k. The 1981 Act provided that upon request a tribe would receive funds to administer the program, upon a determination by the Secretary of Health and Human Services that "the members of such tribe would be better served by means of grants made directly to provide benefits under this title."[12] The amount of funds made available to such tribes (like the funding made available to the states under this same program) was based on a formula, under which tribes received a pro rata share of the funds that would otherwise be distributed to the state. *Id.*

---

[12] *See* OBRA, at § 674(c)(2) (codified at 42 U.S.C.§ 9911(b)) (Community Services Block Grant); *id.* § 901, (codified at 42 U.S.C. § 300w-1) (Preventive Health and Health Services Block Grant); *id.* § 901 (codified at 42 U.S.C. § 300x-33(d)(1)) (Alcohol and Drug Abuse and Mental Health Services Block Grant); *id.* § 901 (formerly codified at 42 U.S.C. § 300y-4) (Primary Care Block Grant); *id.* § 2406(d)(2) (codified at 42 U.S.C. § 8623(d)) (LIHEAP grant funding).

In the regulations issued under the Act, the Secretary of Health and Human Services made clear that funding under the Act automatically would be provided to every federally-recognized tribe that requested such funding. As the regulations stated:

> The Secretary has determined that Indian tribes and tribal organizations would be better served by means of grants provided directly by the Secretary to such tribes and organizations out of the State's allotment of block grant funds than if the State were awarded its entire allotment. Accordingly, where provided for by statute, the Secretary will, upon request of an eligible Indian tribe or tribal organization, reserve a portion of a State's allotment and, upon receipt of the complete application and related submission that meets statutory requirements, grant it directly to the tribe or organization.

46 Fed. Reg. 48,582, 48,5888 (Oct. 1, 1981) (announcing final rule 45 C.F.R. § 96.41 (1981)) (emphasis supplied). *See also id.* at 48,586-48,587 (preamble to regulations) ("If a tribe or organization concludes that it would be better served by Federal funding, however, and therefore applies for a direct grant, the Secretary will concur with that assessment and will provide funds directly to the tribe or tribal organization.").

The government in this case, however, contends that funds under these programs were not made available to all federally-recognized tribes that so requested and argues that these statutes are not money-mandating. Def. Mot. at 43-46.[13] The government baldly states that tribes were "not automatically eligible for funding," *id.* at 45, despite the contrary statement in the regulations. The Tribe seeks discovery to resolve the factual issue arising from the government's

---

[13] Defendant also seeks dismissal by contending that these statutes were not mentioned in the Plaintiff's First Amended Complaint. Def. Mot at 43 n.12. That contention is incorrect. The 1981 OBRA was, in part, an amendment to the Economic Opportunity Act of 1964, Pub. L. No. 88-452, 78 Stat. 508, which was referenced in paragraph 5.h of the Plaintiff's First Amended Complaint, and preserved by paragraph 5.nn.

motion – how did the federal government construe the statutes underlying these programs? We submit that discovery will show that the government construed these statutes as its own regulations provided – so that all federally-recognized tribes which requested funding under these programs received it, rendering the statutory and regulatory framework money-mandating.

Other federal programs cited in the Complaint follow much the same pattern. Under these other statutes, all federally-recognized tribes requesting assistance received it, absent some significant deficiency regarding administrative capability. This was true, for example, of the job training programs offered under CETA and JTPA,[14] and the federal assistance for the development of low-income housing under the Housing Act of 1937. Second Amended Compl. at ¶¶ 30.n, 30.b. Essentially, all federally-recognized tribes that sought financial assistance under these statutes, and others identified in the Complaint, received such assistance.[15] While the government contends that funding under these programs is discretionary because the Secretary has authority to determine whether a tribe has the administrative capability to administer the program, *see, e.g.* Def. Mot. at 30, 40, we expect discovery would show that federally-recognized

[14] The Comprehensive Employment and Training Act of 1973 ("CETA"), Pub. L. No. 93-203, § 204(2), 87 Stat. 839, *as amended by* the Youth Employment and Demonstration Act of 1977, Pub. L. No. 95-93, 91 Stat. 627, the Comprehensive Employment and Training Act Amendments of 1978, Pub. L. No. 95-524, §§ 201, 301, 302, 92 Stat. 1909, and the Job Training Partnership Act, Pub. L. No. 97-300, 96 Stat. 1322 ("JTPA").

[15] Under some statutes, like those establishing the CETA and JPTA job training programs, tribes would receive financial assistance on an annual basis. Under others, like the 1937 Housing Act, tribes (through tribally-established housing authorities) which requested financial assistance to construct low income housing, might not receive federal assistance in the first year that such was requested, but would eventually receive federal assistance in order to construct such housing. Thereafter, the tribe's housing authority would receive some funds for operations and maintenance.

tribes were not only eligible for such assistance, but in fact received such assistance, and that the requirements that an applicant possess or develop administrative capability to carry out the program were construed and implemented by the relevant agencies so that this was not a barrier to receiving assistance.

**Conclusion**

For the reasons described above, limited discovery on jurisdictional facts is proper here. The Tribe invites the government to join with it to address the jurisdictional facts by stipulation, thereby obviating the need for discovery. But if a stipulation on the facts bearing on jurisdictional issues can not be reached within a reasonable time (we suggest 60 days), this Court should allow the Tribe to pursue discovery as set forth in its proposed request.

Respectfully submitted,

Dated: May 8, 2006

Craig J. Dorsay by Anne D. Noto

By Anne D. Noto

Craig J. Dorsay, Esq.
Attorney at Law
2121 S.W. Broadway, Suite 100
Portland, Oregon 97201
Telephone: (503) 790-9060; Fax: (503) 242-9001
cdorsay@involved.com

*Counsel of Record for Plaintiff*
*Samish Indian Nation*

Of Counsel:
William R. Perry, Esq.
Anne D. Noto, Esq.
Sonosky, Chambers, Sachse, Endreson & Perry LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Telephone: (202) 682-0240, Fax: (202) 682-0249
wperry@sonosky.com
anoto@sonosky.com