# REPORT ON TRIBAL PRIORITY ALLOCATIONS

DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

JULY, 1999

Exhibit 1
to Plaintiff's Report on Why Discovery Should Be Permitted
*Samish Indian Nation v. United States*, No 02-1383 (FedCl)

# EXECUTIVE SUMMARY

Pursuant to Congressional direction given in the FY 1999 appropriations (Senate Report 105-56), as well as other Congressional action attempted in the 105th Congress, the Congress has clearly conveyed its concern for the distribution of Tribal Priority Allocations (TPA) funds to Federally recognized Tribes in our Nation. TPA provides the principal source of funds for local units of Tribal Governments and agency offices at the reservation level. Under Congressional directions, the BIA has been directed to provide options on other methods of distributing TPA funds based on the identified need of a Tribe; however, it provided no definition of "need" or other standards in which to measure need. Yet, it is recognized that both Tribal governments and the BIA must accurately identify and gather data to support funding requests for Tribal programs.

In response, the BIA joined with Tribal Leaders representative of the 12 Areas of the BIA across the Nation to address the issue of funding need relative to the distribution of TPA funds. In January, 1998, this joint effort was formalized through the establishment of the BIA/Tribal Workgroup on Tribal Needs Assessment. As TPA is the core funding provided by the BIA to Tribes to assist in the operation of their Tribal governments, this was a crucial and precedent-setting task undertaken by both the BIA and the Tribes. The Workgroup recognized that the task at hand must include consideration of factors that are historical, objective, and to some degree, subjective in nature. Further, it is recognized that while the Congress wishes to base distribution of TPA funds solely on a needs basis, it should be noted that while many Tribes view current Federal funding as inadequate to meet their needs, they also view Federal funds as representative of the Federal trust responsibility and commitment to the American Indian and Alaska Native.

The Workgroup, comprised of BIA and Tribal representatives, included both policy and technical members. To address the daunting task, the Workgroup established key focus areas, including:

- National budget overview of Indian programs:
  - Identify consistent criteria (by program) to assess current "unmet need";
  - Identify and compare data to national standards;
- TPA:
  - Identify consistent criteria (by program) of current TPA funding levels; and,
- Scope and Definition of Federal obligation to Indian Tribes, i.e., based on legal status, treaties, statutes, and Executive Orders.

The Workgroup met on almost a monthly basis since January, 1998, to March, 1999, formulating the report.

Following are the Chapter Summaries of the *Report on Tribal Priority Allocations*:

Chapter 1 - Background
- The wide variations among Indian Tribes and the lands on which they live present significant impediments to development of one or more funding formulas.
- Based upon a range of socio-economic indicators, Indian people remain severely disadvantaged compared to the U.S. population as a whole.
- Federal Indian policy places both a legal and a moral duty on the Bureau of Indian Affairs to fulfil the Federal trust responsibilities.
- Legislative authorities lack specific programmatic goals and prohibit imposition of standards and reporting requirements which would be required for any for Tribe-by-Tribe comparison.
- TPA base budgets are a result of history, geography, policies, politics, and timing.
- Tribal Governments, no less than any state or local government, deserve to have their priorities respected.

Chapter 2 - Historical and Legal Basis for Services to Tribes
- TPA programs are founded on and result from a complex and lengthy statutory and historical bases.
- TPA is the embodiment of the policy of Self-Determination and is intended to implement the unique obligations of the United States arising from its relationship with the indigenous Indian Tribes.
- The Congress has on occasion experimented with policies that were intended to materially (and unilaterally) alter the Federal/Tribal relationship.
- The Congress has consistently returned to the concept of dealing with the Tribes as governments and has consistently reaffirmed its obligations to the Tribes.

Chapter 3 - Measures of Tribal Need
- Preliminary indications are that current funding meets only one-third of identified need.
- 18 Tribes nearly match the BIA support for local government services.
- Eight Northern Pueblos propose community involvement in shaping needs determination.

Chapter 4 - Measures of Tribal Revenue
- There is no statutory or regulatory requirement for Tribal Governments to report all income.
- Single Audit reports are available for only half of the Tribes; these audits contain varying amounts of information on non-Federal revenues.
- Income derived from trust lands and resources cannot be segregated from other income.
- In an effort to create more employment opportunities, Tribes often operate businesses at a loss.
- Gaming profits range from less than $1 per member to over $500,000 per member.
- Revenue must be used not only for current operations, but also to repair 150 years of general neglect of Indian people and Indian reservations.

Chapter 5 - Results of Tribal Consultation
- Tribal Governments wish to exercise independent decisions on the composition of base budgets.

- Tribal Governments are far more concerned by the unequal status of Indian people as a group compared to the Nation as whole than they are about any perceived or real inequities among Tribes.
- The BIA does not have the ability to accurately maintain, manage, and report performance data for all Tribes.
- There are conflicts between the laws passed by the Congress in providing Tribal flexibility in program administration and priority setting and the information requested by the Congress as to how Federal funds are being used by Tribes.
- Refinement of Small Tribes Initiative is required for extremely small Tribal populations.
- There is no support for reallocation of existing resources.
- Fewer than 10 percent of Indian Tribes have realistically achieved a revenue stream which would allow them to provide a full range of services to their citizens. Given relative small proportion of BIA funds that would be available from the TPA base of these Tribes to meet the overwhelming needs of other Tribes and the significant increased administrative workload which would require additional BIA staff, reallocation of base funds does not represent a cost effective solution to meet the needs in Indian Country.

Chapter 6 - Conclusions

- Base funding to Tribal Governments should not be redistributed.
- The Federal Government does not apply means tests to State and Local Governments. These governments are eligible for Federal funds because of their status as governments; the same principle should apply to Tribal Governments.
- Additional detail in the BIA budget presentations may improve understanding of Tribal program operations.
- Incentives may prove a cost effective method to encourage development of shared service delivery among small Tribes.
- If the Congress changes the current TPA policies and procedures, an appeal process must be established for those Tribal Governments affected by such a change.

# Table of Contents

Introduction - Requirements of Section 129 . . . . . 1

Chapter 1- Background . . . . . 3
The Bureau of Indian Affairs . . . . . 3
BIA's Constituency . . . . . 5
BIA Programs . . . . . 6
Program Standards . . . . . 9
Use of TPA Funds . . . . . 10
Reporting . . . . . 10
BIA Budget Structure and Funding . . . . . 11
Tribal Priority Allocations - Process and Implications . . . . . 13
Tribal Priorities . . . . . 14
Reallocation of TPA Cannot be based on Simple Single Criteria . . . . . 15
Source of TPA Funding Data . . . . . 15
TPA Funds Included in the Analysis . . . . . 16
Self-Governance Compacts . . . . . 16
Consolidated Tribal Government Programs . . . . . 16
Human Services Funds . . . . . 17
Population Data . . . . . 17
Natural Resources Funds . . . . . 17
Indian Trust Lands Data . . . . . 18
Distribution of TPA Funds to the Twelve Areas, with Self Governance Compacts Included in Each Area . . . . . 18
Distribution of TPA Funds . . . . . 19
Distribution of Natural Resource Funds . . . . . 22
Distribution of TPA Funds to the Twelve Areas, and to Self Governance Compacts as a "13th" Area . . . . . 24
Allocating Self Governance Compact Funds to Program Categories . . . . . 25
Distribution of Human Services Funds to the "13th" Areas . . . . . 25
Human Services Funds on a Per-Person Basis . . . . . 26
Distribution of Natural Resources Funds to the "13th" Areas . . . . . 28
Reasons for Variation in Base Funding . . . . . 31
BIA Agency Offices . . . . . 31
Congressional Add-ons . . . . . 32
Programmatic Factors . . . . . 32
Demographic Factors . . . . . 33
Legal Obligations . . . . . 33

Newly Recognized (or Acknowledged) Tribes . . . . . 33
Small Tribes Distribution . . . . . 33
Self-Determination and Self-Governance . . . . . 33
Chapter Summary . . . . . 35

Chapter 2 - Historical and Legal Basis for Services to Tribes . . . . . 36
Introduction . . . . . 36
Major Federal Indian Policies . . . . . 37
Removal Policy (1800-1880's) . . . . . 38
Assimilation Policy (1887-1934) . . . . . 38
Reorganization Policy (1934-1953) . . . . . 39
Termination Policy (1953-1960) . . . . . 40
Policy of Tribal Self-Determination (1960 to Present) . . . . . 41
Fulfillment of Federal Responsibilities to Tribes Through the TPA Process . . . . . 44
Chapter Summary . . . . . 46

Chapter 3 - Measures of Tribal Need . . . . . 47
Table 1 - National Unmet Tribal Needs Summary . . . . . 49
Table 2 - Preliminary Comparisons of Tribal Needs Non-Base Funding Summary . . . . . 50
Table 3 - Human Services . . . . . 51
Indian Child Welfare Act . . . . . 51
Services to Children, Elderly and Families . . . . . 52
Table 4 - Public Safety and Justice . . . . . 52
Tribal Courts . . . . . 53
Table 5 - Consolidated Report of Preliminary Need and Tribal Supplement
Of 18 Tribes Sampled . . . . . 53
Eight Northern Pueblos Pilot . . . . . 54
Chapter Summary . . . . . 55

Chapter 4 - Measures of Tribal Revenue . . . . . 56
Single Audits . . . . . 57
Scope of this Review . . . . . 58
Conclusions on Single Audits . . . . . 59
Concerns about Tribal Revenue Use . . . . . 59
Losses From Tribal Enterprises . . . . . 60
Fluctuations in Profitability . . . . . 60
Long-Term Debt . . . . . 60
Net Revenues . . . . . 60
Retained Earnings . . . . . 61
Tribal Gaming Revenues . . . . . 61
Average State Per Capita Expenditures by Local Governments by Funding

Source (Table) . . . . . 63
Gross Net Gaming Revenues (Table) . . . . . 63
Net Revenues Per Member (Table) . . . . . 64
Chapter Summary . . . . . 66

Chapter 5 - Results of Tribal Consultations . . . . . 67
Chapter Summary . . . . . 88

Chapter 6 - Conclusions . . . . . 89
Chapter Summary . . . . . 94

Appendices:
1 Description of Major Federal Programs by Budget Category . . . . . 95
2 1998 Catalog of Federal Domestic Assistance (CFDA) Programs Which Indicate That Federally Recognized Indian Tribal Governments May Apply . . . . . 99
1998 Catalog of Federally Domestic Assistance (CFDA) Programs State/Local Government Eligibility Appears to Exclude Indian Tribes . . . . . 112
3 Tribal Priority Allocations (TPA) Standards . . . . . 117
Tribal Government . . . . . 117
Human Services . . . . . 119
Education . . . . . 120
Public Safety and Justice . . . . . 122
Community Development . . . . . 124
Resource Management . . . . . 125
Trust Services . . . . . 132
Tribal Priority Allocations (TPA) - NON-BASE FUNDING . . . . . 135
4 Tribal Leaders Letter (includes BIA Report Outline) . . . . . 136
5 BIA/Tribal Workgroup on Tribal Needs Assessment -Membership . . . . . 141

# INTRODUCTION

**Requirements of Section 129**

This report by the Bureau of Indian Affairs (BIA) is in response to the directive included in Section 129 of the Interior and Related Agencies portion of Omnibus Consolidated and Emergency Supplemental Appropriations for Fiscal Year 1999 bill.

Section 129 states:

> *a. In the event any tribe returns appropriations made available by this Act to the Bureau of Indian Affairs for distribution to other tribes, this action shall not diminish the Federal Government's trust responsibility to that tribe, or the government-to-government relationship between the United States and that tribe, or that tribe's ability to access future appropriations.*
>
> *b. The Bureau of Indian Affairs (BIA) shall develop alternative methods to fund tribal priority allocations (TPA) base programs in future years. The alternatives shall consider tribal revenues and relative needs of tribes and tribal members. No later than April 1, 1999, the BIA shall submit a report to Congress containing its recommendations and other alternatives. The report shall also identify the methods proposed to be used by BIA to acquire data that is not currently available to BIA and any data gathering mechanisms that may be necessary to encourage tribal compliance. Notwithstanding any other provisions of law, for the purposes of developing recommendations, the Bureau of Indian Affairs is hereby authorized access to tribal revenue-related data held by any Federal agency, excluding information held by the Internal Revenue Service.*
>
> *c. Except as provided in subsection d, tribal revenue shall include the sum of tribal net income, however derived, from any business venture owned, held, or operated, in whole or in part, by any tribal entity which is eligible to receive TPA on behalf of the member or any tribe, all amounts distributed as per capita payments which are not otherwise included in net income, and any income from fees, licenses or taxes collected by any tribe.*
>
> *d. The calculation of tribal revenues shall exclude payments made by the Federal government in settlement of claims or judgements and income derived from lands, natural resources, funds, and assets held in trust by the Secretary of the Interior.*
>
> *e. In developing alternative TPA distribution methods, the Bureau of Indian Affairs will take into account the financial obligations of a tribe such as budgeted health,*

> *education and public works service costs; its compliance, obligations and spending requirements under the Indian Gaming Regulatory Act; its compliance with the Single Audit Act; and its compact with its State.*

The statutory directive requires the BIA to develop alternative methods to distribute Tribal Priority Allocation (TPA) base funds in future years, taking into account Tribal revenues and the relative needs of Tribes and Tribal members. This directive aims at an equitable distribution of BIA resources among the Tribes.

# CHAPTER 1
# BACKGROUND

**Scope of BIA Operations**
**Basic Legislative Authorities**
**Prohibition on Imposition of Program Standards**
**Tribal Priority Allocations**

## The Bureau of Indian Affairs

The Bureau of Indian Affairs (BIA) provides services directly or through Self-Determination contract, grant or compact agreements with Tribes and Tribal organizations to more than 1.2 million American Indians and Alaska Natives in 31 states. The BIA's programs are funded and operated in a highly decentralized manner with more than 90 percent of all appropriations expended at the local level. Nearly 55 percent of BIA funds are expended by Tribes and Tribal organizations through contracts or Self-Governance compacts, according to the FY 1998 Annual Report. In addition, the BIA administers more than 43 million acres of Tribally-owned land, more than 11 million acres of individually-owned land held in trust, and 443,000 acres of Federally-owned land.

Federal Indian policy and the trust responsibility are derived from the special legal and political relationship between the Tribes and the Federal Government, embodied in treaties and other agreements, the Constitution, statutes, and court decisions. While the BIA has been given explicit duties with respect to the trust relationship, that relationship is between the whole of the Federal Government and each individual Tribe. Other Federal agencies share the trust responsibility with BIA.

Much of Federal Indian policy revolves around this special relationship, which is often broadly expressed in terms of legal duties, moral obligations, and expectancies that have arisen from the historical dealings between the Tribes and the Federal Government. In its narrowest sense, the special relationship is described as a trust relationship between a trustee and the beneficiary, with explicit standards of performance often enforceable in court. In the larger sense, the relationship has been likened to that of a protectorate in which the larger nation extends protection to the smaller and safeguards its right to existence.

In the last two centuries, the Congress has passed an extraordinary number of Federal laws dealing with Indian Tribes. While the Snyder Act, the Indian Self-Determination and Education Assistance Act and the Indian Education Amendments of 1978 provide the primary budgetary authorities of the BIA, numerous statutes, court decisions, treaties and other authorities (including those passed in the early 1800s regulating trade with Indians) continue to guide the BIA's operations and administration.

The BIA is unique among government agencies in many respects. It is unique in relation to its own mission and structure. Some agencies operate programs or deliver services directly to beneficiaries; others are grant making agencies. Even in an agency that may combine the two functions, the line of demarcation is clear and established by statute. With few exceptions, potential beneficiaries of Federal services or grants do not have any form of "right" to the service or to a particular share of benefits; they merely have the right of access on

equitable grounds.

The BIA, on the other hand, serves all Federally recognized Tribes and groups. It operates either programs or contracts for the delivery of services at the discretion of the Tribes. The Tribes also have the right to change from direct BIA services to contracting and back again at virtually any time and for virtually any reason. The uncertainties inherent in such a process are enormous. Further, the BIA must maintain the level of direct services to each Tribe throughout the country while also trying to provide adequate resources for Tribal contracting and Self-Governance compacting.

The BIA is also unique in its relationship with its Tribal constituents. It is the principal agency of the Federal government charged with the responsibility to administer Federal Indian policy and programs and to fulfill the Federal trust responsibility for American Indian and Alaska Native Tribes and Tribal organizations. As such, it has on the one hand certain supervisory functions, particularly those relating to trust property, and on the other hand, it is obligated to implement a policy of Tribal Self-Determination and turn over large portions of the BIA budget and programs to the Tribes. No other Federal agency has quite the same obligation to consult with its constituents in the course of implementing its statutory responsibilities.

The scope of BIA programs is broader than that of any other Federal agency. It is extensive and covers virtually the entire range of state, local and Tribal government services, including elementary, secondary and post-secondary education; social services; law enforcement; Tribal justice systems; business loans; etc. land and heirship records; Tribal government support; forestry; agriculture and range land development; water resources; fish, wildlife and parks; roads; housing; adult and juvenile detention facilities; and irrigation and power systems.

This comprehensive scope of activities creates many unique challenges for the BIA and its Tribal constituents. Virtually every program activity within the scope of the BIA has a counterpart in another Federal agency, which in many cases provide Federal assistance to state and local government to conduct various functions at the local level. Although many non-BIA Federal programs also benefit Indian Tribes and individuals, there is little or no guidance from the Congress as to how the BIA and BIA-funded programs should relate to these larger Federal resources.

In the BIA budget process, Indian needs compete with other Indian needs. While this is inherent in any budget, it is of particular importance in the BIA budget. Despite more than 200 years of Federal trusteeship, Indian people are still, as a group, the poorest people in the nation with generally the highest indicia of poverty and related socio-economic maladies. At the same time, the most specific statutory duties of the BIA relate to its trust obligations regarding Indian land and natural resources, creating a tension and competition between trust and resource functions and the social and humanitarian needs of the Tribes. The BIA's budget process is, then, a series of tradeoffs between the need for support for the BIA's fundamental trust functions and the need to meet various social and economic requirements of the Tribes. Striking the balance between the immediate poverty-related needs of the Tribes and the necessity for investment in longer term infrastructure and development programs which would, it is presumed, keep future generations from poverty vexes both the Administration and the Congress.

Finally, the BIA is unique in that, while its budget is allocated according to specific program categories, its contracting and compacting constituents have wide latitude to transfer funds among categories. As the Tribe's Self-Determination discretion has increased, the BIA's power to target funds has consequently decreased.

**The BIA's Constituency**

The BIA's programs serve communities that face great challenges. According to the 1990 census, the American Indian population increased to 1,937,391, four times the population reported in 1960. While most of this increase is due to an increase in self-identification, a large portion is an actual population increase. Based on this rapid rate of growth, the Census Bureau estimates that the American Indian population will reach 4.3 million, representing just over 1 percent of the population, by the year 2050. Geographically diverse, almost half of American Indians reside on approximately 300 reservations and other restricted and trust lands located throughout the United States. Reservations range in size from a few acres, such as the rancherias in California, to the 17.5 million-acre Navajo reservation. Approximately 63 percent of American Indians reside in urban areas, half of whom are concentrated in a relatively small number of cities. According to the 1990 census, more than one-half of the American Indian population lived in just 6 states: Oklahoma, California, Arizona, Alaska, Washington and New Mexico.

The American Indian population is relatively young as reported by the 1990 census:

| | American Indians | U.S. Population |
|---|---|---|
| Under 5 years | 9.7% | 7.3% |
| Under 18 years | 34.2% | 25.6% |

The census also reports that the median age of American Indians is 26 years, compared to 33 years for the population at large. This young population is in part the result of mortality rates that are higher for American Indians than for the U.S. population. The Indian Health Service reports that the age-adjusted death rate for American Indians is 35 percent higher than that of the general population. Infant deaths are 30 percent higher. Accidental death is 300 percent higher. Alcoholism death is 700 percent higher. The diabetes death rate is 300-400 percent higher. Despite these alarming health status measures, the appropriations for the Indian Health Service have lagged far behind the appropriations for the Department of Health and Human Services.

Socioeconomic measures also show that American Indians trail the general U.S. population. According to the 1990 census, American Indian median family income was $21,619 annually, compared to $35,225 for the U.S. population. More significant is the comparison of 1980 to 1990 census data and socioeconomic trends which indicate that American Indians are slipping farther behind the U.S. population. In 1979, 28 percent of American Indians were living below the poverty level, compared to 12 percent of the U.S. population. By 1989, 31 percent of American Indians were living in poverty, compared to 13 percent of the U.S. population. Other socioeconomic indicators reveal the following:

| | American Indians | U.S. Population |
|---|---|---|
| High School Graduates | 65.5% | 75.2% |
| 4 or More Years of College | 9.3% | 20.3% |
| Single Parent Households | 35.8% | 21.4% |