UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe, | ) | Case No. 02-1383L |
| | ) | (Chief Judge Edward J. Damich) |
| Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

# Samish Indian Nation's Opposition to United States' Motion to Dismiss Regarding Tribal Priority Allocations and Indian Health Service Funding

Craig J. Dorsay, Esq.
Attorney at Law
2121 S.W. Broadway, Suite 100
Portland, Oregon 97201
Tel: (503) 790-9060; Fax: (503) 242-9001
craig@dorsayindianlaw.com

*Counsel of Record for Plaintiff*
*Samish Indian Nation*

Of Counsel:

William R. Perry, Esq.
Anne D. Noto, Esq.
Sonosky, Chambers, Sachse, Endreson & Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Tel: (202) 682-0240; Fax: (202) 682-0249
wperry@sonosky.com; anoto@sonosky.com

May 2, 2007

Table of Contents

Table of Authorities ..... vii

Question Presented ..... 1

Introduction ..... 1

Statement of the Case ..... 2

Facts ..... 7

A. Tribal Priority Allocations ..... 7

B. Indian Health Service Funding ..... 15

Argument ..... 23

I. This Court has jurisdiction ..... 23

A. A statutory scheme is money-mandating where a "fair interpretation" of the statutes supports a damages remedy. ..... 23

B. A statutory scheme that provides money for the benefit of a designated class of beneficiaries is money-mandating. ..... 25

C. Indian law principles must inform the understanding of Congressional intent here. ..... 27

D. The statutory schemes underlying TPA and IHS are money-mandating. ..... 31

II. The Government's Arguments Should Be Rejected ..... 32

A. *Lincoln v. Vigil*, 508 U.S. 182 (1993) is not controlling here. ..... 32

B. This Court's *Mitchell* line of cases does not support dismissal here. ..... 36

C. Other arguments by the government have no merit. ..... 38

Conclusion ..... 40

Appendix

**I. History relating to federal recognition of the Samish Indian Nation** **Page**

Ex. 1 United States Department of the Interior, Office of Hearings and Appeals, Recommended Decision of Administrative Law Judge Torbett, No. Indian 93-1 (Aug. 31, 1995) ........................................................ 1

Ex. 2 Assistant Secretary for Indian Affairs, Final Determination to Acknowledge the Samish Tribal Organization as a Tribe (Nov. 8, 1995) ........................................................ 66

Ex. 3 Assistant Secretary's Decision, 61 Fed. Reg. 15,825 (April 9, 1996) ........................................................ 109

Ex. 4 *Greene v. Babbitt*, No. C89-645Z (Final Judgment) (W.D. Wash. Nov. 1, 1996) ........................................................ 111

**II. Tribal Priority Allocations**

Ex. 5 Declaration of James H. McDivitt ........................................................ 113

Attachment A ........................................................ 140

Attachment B ........................................................ 164

Attachment C ........................................................ 190

Ex. 6 United States Department of the Interior, *Budget Justifications, F.Y. 1992, as printed in Department of the Interior and Related Agencies Appropriations for 1992, Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 102nd Cong. part 2, 885-891, 1297-1316 (1991) ........................................................ 222

Ex. 7 United States Department of the Interior, *Budget Justifications, F.Y. 1993, as printed in Department of the Interior and Related Agencies Appropriations for 1993, Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 102nd Cong. part 2, 877-883, 1231-1250 (1992) ........................................................ 238

Ex. 8 United States Department of the Interior, *Budget Justifications, F.Y. 1994, as printed in Department of the Interior and Related Agencies Appropriations for 1994, Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 103rd Cong. part 2, 867-873, 1202-1226 (1993) ........................................................ 254

Ex. 9 United States Department of the Interior, *Budget Justifications, F.Y. 1995, as printed in Department of the Interior and Related Agencies Appropriations for 1995, Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 103rd Cong. part 2, 961-967, 1328-1351 (1994) ........................................................................272

Ex. 10 United States Department of the Interior, *Budget Justifications, F.Y. 1996, as printed in Department of the Interior and Related Agencies Appropriations for 1996, Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 104th Cong. part 2, 773-781, 1150-1280 (1995) ........................................................................289

Ex. 11 United States Department of the Interior, *Budget Justifications, F.Y. 1997, as printed in Department of the Interior and Related Agencies Appropriations for 1997, Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 104th Cong. part 4, 1-5, 298-349 (1996) ........................................................................321

Ex. 12 United States Department of the Interior, *Budget Justifications, F.Y. 1998, as printed in Department of the Interior and Related Agencies Appropriations for 1998, Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 105th Cong. part 2, 631-679, 972-1022 (1997) ........................................................................351

***B. Appropriations Acts on TPA***

Ex. 13 Department of the Interior and Related Agencies Appropriations Act for FY 1992, Pub. L. No. 102-381, 106 Stat. 1374, 1388-90 (1992)........................................................................386

Ex. 14 Department of the Interior and Related Agencies Appropriations Act for FY 1994, Pub. L. No. 103-138, 107 Stat. 1379, 1390-92 (1993)........................................................................390

Ex. 15 Department of the Interior and Related Agencies Appropriations Act for FY 1995, Pub. L. No. 103-332, 108 Stat. 2499, 2510-12 (1994)........................................................................394

Ex. 16 Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-169 - 1321-170 (1996)........................................................................398

Ex. 17 Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-192 - 3009-194 (1996) ......................................401

Ex. 18 Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-83, 111 Stat. 1543, 1554-1555 (1997) ....................405

Ex. 19 Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501, 1501A-164 (1999) .......... 409

Ex. 20 Interior Appropriations Act for FY 2001, Pub. L. No. 106-291, 114 Stat. 922, 934-935, 944 (2000) .......... 411

***C. Congressional Committee Reports on TPA***

Ex. 21 S. Rep. No. 103-114, 49-51 (1993) .......... 415

Ex. 22 H.R. Rep. No. 103-158, 49-50 (1993) .......... 419

Ex. 23 S. Rep. No. 102-345, 46-48 (1992) .......... 422

***D. Congressional Hearings and Reports submitted to Congress on TPA***

Ex. 24 Department of the Interior and Related Agencies Appropriations for 1996, Hearings Before a Subcomm. of the H. Comm. on Appropriations, Part 11, 104th Cong. 936, 969 (1995) .......... 426

Ex. 25 Fiscal Year 1998 Budget, Oversight Hearing of the President's Budget Request for the Bureau of Indian Affairs and the Indian Health Service, Before the S. Comm. on Indian Affairs, 105th Cong. part 2, addendum, 1-19 (1997) .......... 429

Ex. 26 Department of the Interior and Related Agencies Appropriations for Fiscal Year 1998, Hearings on H. R. 2107 before a Subcomm. of the S. Comm. on Appropriations, 105th Cong. 111, 119-120 (1997) .......... 440

Ex. 27 H.R. 2107, Interior Appropriations Bill for Fiscal Year 1998, 105th Cong. §118 (1997) .......... 444

Ex. 28 U.S. General Accounting Office: *Report to Congressional Requesters: Indian Programs, Tribal Priority Allocations Do Not Target the Neediest Tribes,* GAO/RCED 98-181, at 1-6 (July 1998) .......... 448

Ex. 29 *Tribal Allocations by BIA Fiscal Year 1999, Hearing Before the S. Comm. on Indian Affairs, on Task Force Findings on Providing a Method of Distributing Additional Tribal Priority Allocations Funds,* 105th Cong. 22-29, 93 (1998) .......... 455

Ex. 30 *Empowerment of Tribal Governments: Final Workgroup Report, Tribal Workgroup on Tribal Needs Assessments, Related to: Bureau of Indian Affairs Tribal Priority Allocations* (May 1999) 1-3 (Executive Summary) .......... 465

Ex. 31 Department of Interior Bureau of Indian Affairs, *Report on Tribal Priority Allocations,* 1-5, 86 (July 1999) .......... 472

**III. Indian Health Service Funding**

Ex. 32 Declaration of David T. Mather .......... 485

***A. Statutes***

Ex. 33 Indian Health Care Improvement Act (IHCIA), Pub. L. No. 94-437, tit. II, § 201, 90 Stat. 1400 (1976).......... 504

Ex. 34 Indian Health Care Amendments of 1980, Pub. L. No. 96-537, 94 Stat. 3173, 3178 (1980).......... 519

Ex. 35 Indian Health Care Amendments of 1988, Pub. L. No. 100-713, 102 State. 4784-4785, 4800-4803, 4428 (1988).......... 521

Ex. 36 Indian Health Amendments of 1992, Pub. L. No. 102-573, 108 Stat. 4526-4530, 4544-4546 (1992).......... 528

***B. Congressional Committee Reports on IHCIA amendments***

Ex. 37 H.R. Rep. No. 94-1026, 13-17 (1976) .......... 536

Ex. 38 S. Rep. No. 96-758, 2-27 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 6645-6648, 6664-6670 .......... 541

Ex. 39 S. Rep. No. 100-508, 1-5, 8-11, 29, 37-40 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 6183- 6187, 6190-6193, 6211, 6219-6222.......... 550

Ex. 40 S. Rep No. 102-392, 1-7, 14-16 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 3943-3949, 3956-3958 .......... 564

Ex. 41 H.R. Rep. No. 102-643, 42,73-74 (1992) .......... 574

***C. Congressional Committee Reports on IHS***

Ex. 42 H.R. Rep. No. 103-740, 51-52 (1994) (Conf. Rep.).......... 578

Ex. 43 H.R. Rep. No. 104-173, 94-98 (1995) .......... 581

Ex. 44 H.R. Rep. No. 104-625, 91 (1996) .......... 587

Ex. 45 S. Rep. No. 105-56, 97 (1997) .......... 589

Ex. 46 S. Rep. No. 106-99, 98 (1999) .......... 591

Ex. 47 S. Rep. No. 107-170, 1-2 (2002) ....................................................................593

**IV. <u>Congressional Committee Report on Federally Recognized Tribes</u>**

Ex. 48 H.R. Rep. No. 103-781, 1-4 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3768, 3768-3770....................................................................595

Table of Authorities

**Cases**

*Agwiak v. United States*, 347 F.3d 1375 (Fed. Cir. 2003) .................... 24, 37

*Bath Iron Works Corp. v. United States*, 20 F.3d 1567 (Fed. Cir. 1994) .................... 34

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .................... 38

*Britell v. United States*, 372 F.3d 1370 (Fed. Cir. 2004) .................... 30

*Byrnes v. United States*, 330 F.2d 986 (Ct. Cl. 1963) .................... 33

*Chippewa Indians of Minn. v. United States*, 307 U.S. 1 (1939) .................... 27

*Clark v. United States*, 322 F.3d 1358 (Fed. Cir. 2003) .................... 24

*Doe v. United States*, 100 F.3d 1576 (Fed. Cir. 1997) .................... 25, 26

*Doe v. United States*, 16 Cl. Ct. 412 (1989) .................... 34

*Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006) .................... 37

*Duwamish v. United States*, 79 Ct. Cl. 530 (1934) .................... 2

*Gentry v. United States*, 546 F.2d 343 (Ct. Cl. 1976) .................... 30

*Grav v. United States*, 886 F.2d 1305 (Fed. Cir. 1989) .................... 26

*Greene v. Babbitt*, 943 F.Supp. 1278 (W.D. Wash. 1996) ....................1, 3, 4, 5

*Greene v. Lujan*, 1992 WL 533059 (W.D. Wash.), *aff'd*, *Greene v. Babbitt*, 64 F.3d 1266 (9th Cir. 1995).................... 2, 3

*Greene v. United States*, 996 F.2d 973 (9th Cir. 1993) .................... 27

*Hannon v. United States*, 29 Fed. Cl. 142 (1993) .................... 33

*Joint Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370 (1st Cir. 1975) .................... 27

*Katz v. Cisernos*, 16 F.3d 1204 (Fed. Cir. 1994) .................... 38

*Lebeau v. United States*, 474 F.3d 1334 (Fed. Cir. 2007) .................... 37

*Lincoln v. Vigil*, 508 U.S. 182 (1993)....................32, 33, 34, 35

*McBryde v. United States*, 299 F.3d 1357 (Fed. Cir. 2002).................... 26

*McHenry v. United States*, 367 F.3d 1370 (Fed. Cir. 2004) .................... 37

*Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968).................... 27

*Morton v. Ruiz*, 415 U.S. 199 (1974) ....................28, 29, 30, 31, 33

*Nat'l Ctr. For Mfg. Sci. v. United States*, 114 F.3d 196 (Fed. Cir. 1997) .................... 38

*Navajo Nation v. United States*, 347 F.3d 1327 (Fed. Cir. 2004) .................... 36

*Reidell v. United States*, 43 Fed. Cl. 770 (1999).................... 24

*Rincon Band of Mission Indians v. Califano*, 464 F. Supp. 934 (N.D.Cal. 1979), *aff'd sub nom Rincon Band of Mission Indians v. Harris*, 618 F.2d 569 (9th Cir. 1980) .......... 20

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) .......... 3, 5, 20, 25, 29, 37

*Samish Tribe of Indians v. United States*, 6 Ind. Cl. Comm. 159 (1958) .......... 2

*Saraco v. United States*, 61 F.3d 863 (Fed. Cir. 1995) .......... 26

*Sawyer v. United States*, 930 F.2d 1577 (Fed. Cir. 1991) .......... 26

*Suburban Mortg. Assoc., Inc. v. United States Dep't of Hous. and Urban Dev.*, 480 F.3d 1116 (Fed. Cir. 2007) .......... 38

*Tiger v. W. Inv. Co.*, 221 U.S. 286 (1911) .......... 27

*Tyson v. United States*, 32 F. Supp. 135 (Ct. Cl. 1940) .......... 26

*United States v. Dion*, 476 U.S. 734 (1986) .......... 27

*United States v. Mitchell*, 445 U.S. 535 (1980) .......... 36

*United States v. Mitchell*, 463 U.S. 206 (1983) .......... 36, 37, 38

*United States v. Navajo Nation*, 537 U.S. 488 (2003) .......... 36

*United States v. Nice*, 241 U.S. 591 (1916) .......... 27

*United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003) .......... 1, 2, 23, 36

*Vigil v. Rhoades*, 953 F.2d 1225 (10th Cir. 1992) .......... 33

*White Mountain Apache Tribe v. United States*, 249 F.3d 1364, *aff'd* 537 U.S. 465 (2003) .......... 35, 36

**Treaties and Statutes**

1855 Treaty of Point Elliott. 12 Stat. 927 (Jan. 22, 1855) .......... 2

31 U.S.C. § 1304 .......... 34

Anti-Deficiency Act, 31 U.S.C. § 1341(a) .......... 34

Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501, § 127 (1999) .......... 14

Department of the Interior and Related Agencies Appropriations Act for FY 1993, Pub. L. No. 102-381, 106 Stat. 1374 (1992) .......... 14

Department of the Interior and Related Agencies Appropriations Act for FY 1994, Pub. L. No. 103-138, 107 Stat. 1379 (1993) .......... 14

Department of the Interior and Related Agencies Appropriations Act for FY 1995, Pub. L. No. 103-332, 108 Stat. 2499 (1994) .......... 14

Department of the Interior and Related Agencies Appropriations Act for FY 1998, Pub. L. No. 105-83, 111 Stat. 1543 (1997) .......... 14

Department of the Interior and Related Agencies Appropriations Act for FY 2001, Pub. L. No. 106-291, 114 Stat. 922 (2000) ... 15

Federally-Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, § 103(4), 108 Stat. 4791 (1994), *codified at* 25 U.S.C. § 479a ... 27

Higher Education Tribal Grant Authorization Act, Pub. L. No. 102-325, pt. B, 106 Stat. 798 (1992), *codified at* 25 U.S.C. §§ 3301-3307 ... 7

Indian Alcohol and Substance Abuse Prevention and Treatment Act of 1986, Pub. L. No. 99-570, tit. IV, subtit. C, 100 Stat. 3207, *codified as amended at* 25 U.S.C. §§ 2401-2478 ... 7

Indian Child Protection and Family Violence Prevention Act, Pub. L. No. 101-630, tit. IV, 104 Stat. 4544 (1990), *codified at* 25 U.S.C. §§ 3201-3211 ... 7

Indian Child Welfare Act of 1978, Pub. L. No. 95-608, 92 Stat. 3069, *codified at* 25 U.S.C. §§ 1901-1963 ... 7

Indian Health Care Improvement Act, Pub. L. No. 94-437, 90 Stat. 1400 (1976), *codified as amended at* 25 U.S.C. §§ 1601-1683 ... 16, 17, 32

Indian Health Care Amendments of 1980, Pub. L. No. 96-537, 94 Stat. 3173 ... 16, 20

Indian Health Care Amendments of 1988, Pub. L. No. 100-713, 102 Stat. 4784 ... 16, 18

Indian Health Amendments of 1992, Pub. L. No. 102-573, 108 Stat. 4526 ... 16, 18

Indian Self-Determination Act, 25 U.S.C. §§ 450-450n ... 5, 17, 20, 21, 29

25 U.S.C. § 450f ... 9

25 U.S.C. § 450j-1(a)(1) ... 21

25 U.S.C. §§ 476(f), (g) ... 30

Indian Tucker Act, 28 U.S.C. § 1505 ... 24

Johnson-O'Malley Act, ch. 147, 48 Stat. 596 (1934), *codified as amended at* 25 U.S.C. §§ 452-457 ... 7

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ... 14

Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996) ... 14

Snyder Act, 25 U.S.C. § 13 ... 5, 7, 16, 35

Tucker Act, 28 U.S.C. § 1491(a)(1) ... 24

**Congressional Materials**

Department of Interior Bureau of Indian Affairs, *Report on Tribal Priority Allocations* (July 1999) ... 11, 12

*Department of the Interior and Related Agencies Appropriations for 1996, Hearings Before a Subcomm. of the Comm. on Appropriations*, Part 11, 104th Cong. 969 (1995) ........ 10

*Department of the Interior and Related Agencies Appropriations for Fiscal Year 1998, Hearings on H. R. 2107 before a Subcomm. of the S. Comm. on Appropriations*, 105th Cong. (1997) ........ 10

*Empowerment of Tribal Governments: Final Workgroup Report, Tribal Workgroup on Tribal Needs Assessments, Related to: Bureau of Indian Affairs Tribal Priority Allocations* (May 1999) ........ 11

*Fiscal Year 1998 Budget, Oversight Hearing of the President's Budget Request for the Bureau of Indian Affairs and the Indian Health Service, Before the S. Comm. on Indian Affairs*, Part 2, Addendum, 105th Cong. (1997) ........ 10, 28

H.R. 2107, 105th Cong. § 118 (1997) ........ 10

H.R. Rep. No. 102-643 (1992) ........ 19

H.R. Rep. No. 103-158 (1993) ........ 13

H.R. Rep. No. 103-740 (1994) ........ 22

H.R. Rep. No. 103-781 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3768 ........ 27

H.R. Rep. No. 104-173 (1995) ........ 22

H.R. Rep. No. 104-625 (1996) ........ 22

H.R. Rep. No. 94-1026 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 2652 ........ 17

S. Rep. No. 100-508 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 6183 ........ 18, 19, 20

S. Rep. No. 102-345 (1992) ........ 13

S. Rep. No. 102-392 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 3943 ........ 19

S. Rep. No. 103-114 (1993) ........ 13

S. Rep. No. 105-56 (1997) ........ 22

S. Rep. No. 106-99 (1999) ........ 22

S. Rep. No. 107-170 (2002) ........ 19

S. Rep. No. 96-758 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 6645 ........ 16, 17

*Tribal Allocations by BIA, Fiscal Year 1999, Hearing Before the S. Comm. on Indian Affairs on Tribal Priority Allocations*, 105th Cong. (1998) ........ 8

U.S. General Accounting Office: *Report to Congressional Requesters: Indian Programs, Tribal Priority Allocations Do Not Target the Neediest Tribes*, GAO/RCED 98-181 (July 1998) ........ 12

## Question Presented

Whether Congress, in providing funds for the benefit of every federally recognized tribe, can fairly be understood to have intended a damages remedy where the government wrongfully excludes one tribe.

## Introduction

The Samish Indian Nation ("Tribe") suffered a significant wrong at the hands of the federal government. After a federal bureaucrat dropped the Tribe from a 1969 list of tribes (an occurrence that could not later be explained or justified), the federal government simply stopped providing the Tribe with all the programs and services the government provided for the benefit of every other federally recognized tribe. The Samish were cut off without a cent. Efforts by the Tribe to restore its proper place as a federally recognized tribe were met with decades of agency delay, repeated denials of due process, and an unsavory course of federal conduct, including improper ex parte contacts that were later roundly criticized by the federal court that reviewed the matter. *Greene v. Babbitt*, 943 F.Supp. 1278, 1282-1295 (W.D. Wash. 1996).

Congress provides certain federal funding for the benefit of all federally recognized tribes. This includes Tribal Priority Allocations ("TPA") and Indian Health Service ("IHS") funding, which are the subject of this opposition.[1] Congress provides these funds (and the relevant federal agencies administer these funds) with the clear intention that they serve all federally recognized tribes.

The legal issue here – whether the statutory schemes underlying TPA and IHS funding are "money-mandating" – turns on a fair inference of Congressional intent regarding damages under the narrow circumstances presented. *United States v. White Mountain Apache Tribe*, 537

[1] In its Order of April 3, 2007, this Court authorized the Tribe to address these programs first.

U.S. 465, 472 (2003). Where Congress provides funds to benefit every federally recognized tribe, but a federal agency nevertheless arbitrarily and wrongfully denies one tribe the benefits of such funding, it is fair to infer that Congress intended the harmed tribe to have a claim for damages. This is reinforced by the fact that the Bureau of Indian Affairs ("BIA") and IHS construed and implemented the TPA and IHS statutory schemes to require that every federally recognized tribe be benefited and Congress provided funding year after year based on the understanding that all tribes would be served, as we demonstrate below. Accordingly, the motion to dismiss should be denied.

Statement of the Case

The Tribe was a party to the 1855 Treaty of Point Elliott. 12 Stat. 927 (Jan. 22, 1855), and its status as a separate tribal entity was confirmed in litigation binding on the United States. *Duwamish v. United States*, 79 Ct. Cl. 530, 533 (1934); *Samish Tribe of Indians v. United States*, 6 Ind. Cl. Comm. 159 (1958).

Prior to 1969, Samish Indians received federal health and other benefits provided by the United States to members of Indian tribes. *Greene v. Babbitt*, 64 F.3d 1266, 1269 (9th Cir. 1995), *aff'g Greene v. Lujan*, 1992 WL 533059, No. C89-645Z, at *7-*8 (W.D. Wash. Feb. 25, 1992). From that time forward, other tribes continued to receive federal funds to address a wide range of needs, but the Samish Indian Nation was excluded from participation in all federal programs from 1969 until 1996. Second Amended Complaint, ¶9.

This did not arise from any action by Congress. Nor was there any formal administrative decision by the Department of the Interior ("Department") that the Samish were not entitled to federal recognition. Instead, the change was triggered by the action of a low level bureaucrat in the BIA, who prepared a list of tribes.

Although the Samish Tribe was included on a 1966 BIA list of tribes, the Tribe was omitted from the list when it was revised in 1969.[2] These lists were "'never intended to be . . . list[s] of federally recognized tribes,'" and the Department employee who prepared the 1966 and 1969 lists had no authority to determine whether tribes were federally recognized. Ex. 1, ALJ Decision, App. B at 1, Fdgs., 1, 3. Nor could the Department adequately explain why the Tribe had been omitted from the 1969 list.[3] Nevertheless, the 1969 list was later used by Department employees for purposes of determining whether they would treat the Tribe as recognized. Ex. 1, ALJ Decision, App. B at 1. The Federal Circuit, in summarizing this history, characterized the Department's conduct as "wrongful[]" and "arbitrary and capricious." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1373 (Fed. Cir. 2005).

In 1972, the Tribe petitioned the Department for a determination of its continued tribal existence. *Greene*, 943 F. Supp. at 1281. After extensive delays by the government, in February 1987, the Assistant Secretary for Indian Affairs issued a decision denying the Tribe's petition for recognition. In April 1989, the Tribe filed suit challenging the Assistant Secretary's adverse decision. The federal district court found that the Department's decision violated due process, as the Tribe was not afforded a hearing, and "there is evidence that would lead an objective bystander to believe that some of the decision-makers prejudged the case."[4]

On remand, the Administrative Law Judge ("ALJ") appointed to hear the Tribe's claim found that:

---

[2] Ex. 1, United States Department of the Interior, Office of Hearings and Appeals, Recommended Decision of Administrative Law Judge Torbett, No. Indian 93-1 (Aug. 31, 1995) ("ALJ Decision"), App. B at 1, Fdgs. 1-3.

[3] *Greene*, 943 F. Supp. at 1288 n.13; Ex. 4, *Greene v. Babbitt*, No. C89-645Z (Final Judgment) (W.D. Wash. Nov. 1, 1996).

[4] *Greene v. Lujan*, 1992 WL 533059, at *9 (W.D. Wash.), *aff'd*, *Greene v. Babbitt*, 64 F.3d 1266 (9th Cir. 1995).

> [T]here is no question that there is a preponderance of evidence to support the Petitioners as to each and every element contained in the recognition regulations. Further, there is no question that the quality of the evidence demonstrates that it is reasonable and believable that the Samish have continually existed as an Indian tribe up until this very day. The quality of the proof supports the Petitioner as to each element contained in the recognition regulations.

Ex. 1, ALJ Decision at 19 (emphasis added). The ALJ also found that the failure of the Department to treat the Tribe as a federally recognized tribe was the result of the clerical error – under which the Tribe was removed from an internal list of Indian tribes which was later used by Interior personnel as a short-hand reference list. The ALJ concluded that the Department had no rational basis for omitting the Tribe, and that the list of tribes was not intended to be used by the Department to determine which Indian groups were or should be recognized by the United States. *See* Ex.1, ALJ Decision, App. B at 1.

The ALJ's decision was forwarded to the Assistant Secretary for Indian Affairs for final action. In her decision, the Assistant Secretary removed the ALJ's findings that the Interior Department had no rational basis for omitting the Tribe from the Department's list of tribes. Ex. 2 at 38-39. The Assistant Secretary did this at the ex parte urging of Department officials because of concern about Department liability for not treating the Tribe as a recognized tribe between 1969 and 1996. *Greene*, 943 F. Supp. at 1282-85, 1288.

The Tribe appealed that part of the Assistant Secretary's decision which removed findings made by the ALJ. On appeal, the district court found the ex parte communications to be unlawful,[5] reinstated the findings, and characterized the Department's action as follows:

---

[5] The court further found that "[t]he proceedings before the Bureau of Indian Affairs have been marred by both lengthy delays and a pattern of serious procedural due process violations. The decision to recognize the Samish took over twenty-five years, and the Department has twice disregarded the procedures mandated by the APA, the Constitution, and this Court." *Greene*, 943 F. Supp. at 1288 (footnote omitted).

> the omission of the Samish from a list of tribes prepared by [the Department of the Interior] in the 1960s was neither based on actual research, nor was it intended to be used as the basis for determining which Indian groups are to be recognized by the United States.

943 F. Supp. at 1288 n.13. The court emphasized the arbitrary nature of the Department's treatment of the Tribe:

> The Department of Interior could not adequately explain why the Samish had been omitted from a list of federally recognized tribes prepared during the 1970s.

Ex. 4, *Greene v. Babbitt*, No. C89-645Z, slip op. at 2. The final decision in the *Greene* proceedings established that the Tribe continually existed as an Indian tribe from treaty times and accordingly should have been federally recognized all along.

The Tribe brought this action in 2002. The Tribe contended that but for the wrongful action of the government in failing to treat the Samish as a federally recognized tribe from 1969 to 1996, the Tribe would have received the benefit of programs and services provided to every other tribe.

This Court, in its initial ruling, dismissed the Tribe's claims. On appeal, the Federal Circuit affirmed with respect to claims arising solely under the Indian Self-Determination Act and Snyder Act, reversed with respect to the statute of limitations (holding that the remaining claims are not barred), and remanded for a determination by this Court on the "money-mandating" issue. *Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005). The Tribe filed a Second Amended Complaint to refine and narrow its claims.

The government again moved to dismiss. The Tribe sought discovery regarding the administrative construction and implementation of some of the statutes at issue – including those under which TPA and IHS funding are provided – to show that federal agencies have construed these statutes to provide funds to benefit all federally recognized tribes.

This Court, acknowledging the relevance of the government's construction of the statutes, granted the Tribe's motion for limited discovery. As the Court stated,

> given the unique set of circumstances that brought Plaintiff before the Court, particularly the finding in *Greene* that the omission of the Tribe from the 1969 unofficial list was arbitrary, Plaintiff should have the opportunity to make this argument [that agency construction provides evidence from which to "fairly infer" that the statutory scheme is money-mandating] once all the relevant jurisdictional facts are known.

Order of July 21, 2006, at 8. The Tribe submitted discovery requests, but the government responses were generally evasive, misleading or incomplete. *See* Ex. 5, Declaration of James H. McDivitt ("McDivitt Dec."), ¶45-49.[6] In an effort to avoid protracted discovery disputes, the Tribe proposed that the Court permit briefing now on two major programs – TPA and IHS funding. Despite the government's failure to provide full answers to the Tribe's discovery requests, the Tribe offered to respond to the motion to dismiss on TPA and IHS, based on the Tribe's own research and experts. The Court ordered briefing as to TPA and IHS funding, as well as certain basic issues raised by the government. Order of April 3, 2007. This opposition addresses these matters in accordance with the Court's order. We turn next to the jurisdictional facts regarding TPA and IHS funding.

---

[6] James H. McDivitt, is a career federal official (now retired) who served, among other things, as the Budget Officer for the BIA, Chief of Staff to the Assistant Secretary for Indian Affairs, and Deputy Assistant Secretary for Management, Indian Affairs in the Department of Interior. In these positions, he had major responsibilities regarding all aspects of the BIA budget, and became knowledgeable about the implementation and history of TPA and its predecessors. *Id*., ¶¶1-8. Mr. McDivitt's Declaration is offered 1) to respond to the Declaration of Debbie L. Clark submitted by the government with its motion to dismiss, 2) to provide a more detailed description of TPA and the manner in which it is funded, and 3) to provide jurisdictional facts pertaining to agency construction of the statutory scheme under which TPA is provided for the benefit of tribes.

## Facts

### A. Tribal Priority Allocations

The federal government provides funds for the benefit of every federally recognized Indian tribe. One major source of such funds is Tribal Priority Allocations, a category of funds appropriated by Congress each year. Ex. 5, McDivitt Dec., ¶17.

TPA funding comprises about half the BIA operating budget and provides funds for core governmental functions in Indian country.[7] TPA funds public safety programs, such as fire protection, tribal courts and road maintenance. Vital education programs – higher education scholarships, adult vocational education and Johnson-O'Malley aid to public schools in Indian country – are also TPA funded. So too are programs that address key social problems, including child abuse and neglect, and welfare assistance. Overall, TPA funds governmental activity that is essential to any government's ability to meet its responsibilities. *Id*., ¶17.[8]

---

[7] TPA is part of the Bureau of Indian Affairs Appropriation Account "Operation of Indian Programs," and includes the subactivities Tribal Government, Human Services, Education, Public Safety and Justice, Community Development, Resource Management, Trust Services and General Administration. *Id*., ¶17. Within each of these categories, TPA funds specific program elements for a broad range of important programs for the benefit of Indian tribes and their members. *Id*.

[8] TPA is provided under a range of federal statutes including the Johnson-O'Malley Act, ch. 147, 48 Stat. 596 (1934), *codified as amended at* 25 U.S.C. §§ 452-457, the Indian Child Welfare Act of 1978, Pub. L. No. 95-608, 92 Stat. 3069, *codified at* 25 U.S.C. §§ 1901-1963, the Higher Education Tribal Grant Authorization Act, Pub. L. No. 102-325, pt. B, 106 Stat. 798 (1992), *codified at* 25 U.S.C. §§ 3301-3307, the Indian Alcohol and Substance Abuse Prevention and Treatment Act of 1986, Pub. L. No. 99-570, tit. IV, subtit. C, 100 Stat. 3207, *codified as amended at* 25 U.S.C. §§ 2401-2478, and the Indian Child Protection and Family Violence Prevention Act, Pub. L. No. 101-630, tit. IV, 104 Stat. 4544 (1990), *codified at* 25 U.S.C. §§ 3201-3211, as well as the annual Interior Appropriations Acts and the Snyder Act, 25 U.S.C. § 13. The government erroneously contends that the Tribe did not "allege or mention the TPA program in its First Amended Complaint . . ." and argues that the "Court should dismiss Plaintiff's statutes that were not contained in its previous complaint." Gov. Mot. at 14 n.3. As stated here and in the Second Amended Complaint, *see* ¶30a(iv), the TPA program is funded pursuant to a number of different statutes and the Tribe identified these statutes in its First Amended Complaint, in ¶¶5.d, 5.aa, 5.bb, 5.dd, 5.ff, 5.mm, and 5.nn.

Formally established in Fiscal Year 1993, TPA was intended to provide tribes with input into the budgeting process, and flexibility to shift funds among TPA programs to address tribal needs. Under TPA, tribes set the priorities among the included programs. Funds provided for the benefit of a tribe under TPA can be used for any program within TPA, without special authorization from Congress. Thus, TPA is intended to support the federal Self-Determination policy, by providing for more tribal participation in the BIA budget process and greater tribal authority to allocate TPA funds to meet tribal needs.[9]

The Department's policy, practice and express statements confirm that TPA was provided for the benefit of every federally recognized Tribe. Ex. 5, McDivitt Dec., ¶50. Each year as part of the formal federal budget process, the BIA submits to Congress its Budget Justification (a lengthy document known as the "Green Book" because of the color of its cover). Ex. 5, McDivitt Dec., ¶¶9-12. The Green Book provides the basic program descriptions, rationales and amounts requested by the administration from Congress for the BIA's various activities, subactivities and programs. With respect to TPA, each Green Book, starting with Fiscal Year 1992, contained a table reporting the amount the BIA requested for TPA for the benefit of every federally recognized Tribe. *See Id.*, ¶41.[10] In other words, the Department's practice in the

---

[9] Prior to Fiscal Year 1993, most programs that are now part of TPA were funded under the BIA's "Operations of Indian Programs" appropriations account. During the 1970's these were generally referred to as "banded programs." From the early 1980's through 1992, the programs were part of the "Indian Priority System" within the BIA Budget. Ex. 5, McDivitt Dec., ¶¶18, 33. *See also* Ex. 29, *Tribal Allocations by BIA, Fiscal Year 1999, Hearing Before the S. Comm. on Indian Affairs on Tribal Priority Allocations*, 105th Cong. 28-29, 93 (1998). These were predecessors to TPA, and certain basic principles applied to these predecessors as they did to TPA – including that every federally recognized tribe benefited from these funds and that once a tribe received such funds those became part of the base funding for the benefit of that Tribe and were generally made available for the benefit of that Tribe in subsequent years. Second Amended Complaint, ¶30(a)(ii); Ex. 5, McDivitt Dec., ¶34.

[10] *See also* Exs. 6 – 12 (Green Book TPA Tables for Fiscal Years 1992-1998). Mr. McDivitt, who has extensive experience regarding BIA budget matters, compared the official, published lists of

relevant years (as it is now) was to request TPA funding from Congress on a tribe-by-tribe basis – with a specific amount designated for the benefit of each tribe.[11] *Id.*, ¶¶39-43 (and Attachments A-C of McDivitt Dec.).

The Department administered TPA consistent with its Green Book requests. That is, after requesting TPA for every federally recognized Tribe, once Congress appropriated funds, "every federally recognized tribe was allocated some funds every year." *Id.*, ¶19. As to these TPA funds, each tribe had the option of contracting to operate programs and provide services itself under the Indian Self-Determination Act,[12] or having the programs and services provided by the BIA for the tribe's benefit. Ex. 5, McDivitt Dec., ¶19. Also, "once a federally recognized tribe received a particular amount of TPA funds, that amount became part of that Tribe's "base funding," and the Tribe was routinely allocated that amount in subsequent years as well." *Id.*, ¶20; *See* Second Amended Complaint, ¶30a. As noted by Mr. McDivitt, the Department "never excluded a federally recognized tribe from an allocation of TPA (or its predecessors)." Ex. 5, McDivitt Dec., ¶21.

The Department's statements to Congress reinforce this same point – that every federally recognized tribe benefited from TPA. During House Interior Appropriations Subcommittee

---

federally recognized tribes with the TPA tables in the Green Books for fiscal years 1992, 1994 and 1998, and found that the lists reflect the Department's request to Congress to provide TPA to benefit every federally recognized tribe. Ex. 5, McDivitt Dec., ¶41. McDivitt further stated that "[i]f a similar comparison were made for each of the fiscal years, I am confident they would similarly show that the BIA allocated some TPA funding to every federally recognized tribe." *Id.* The published lists of federally recognized tribes examined by Mr. McDivitt are at 53 Fed. Reg. 52,829 (Dec. 29, 1988) and 61 Fed. Reg. 58,211 (Nov. 13, 1996). The 1988 list was the most recently-published list at the time the BIA prepared its budget justifications for FYs 1992 and 1994.

[11] The Department's policy was (and is) to support TPA funding for newly recognized tribes, and to seek separate funding for newly recognized in order to protect the base funding levels of other tribes. In some instances such additional new tribe funding was not received in the first year following recognition. Ex. 5, McDivitt Dec., ¶22.

[12] 25 U.S.C. § 450f.

hearings in March 1995, the Committee submitted written questions to the Assistant Secretary for Indian Affairs, one of which asked whether every tribe regardless of size received TPA. The Assistant Secretary responded stating:

> Yes, Tribal Priority Allocations are distributed to every tribe. The Federal Government has a government-to-government relationship with all federally-recognized tribes.[13]

The Department also told Congress that once TPA was appropriated and allocated to benefit a Tribe, that funding became a part of the tribe's "base funding," which (subject to overall increases or decreases) would be provided to the tribe in future years.[14]

Beginning in the mid-1990's, Congress considered whether to change the manner in which TPA was allocated among tribes. One proposal was to impose a "means testing" approach – to limit or eliminate TPA for those tribes that had the most outside income, including income from gaming.[15] The Department "opposed means testing" and "argued it [the Department] lacked the authority to reduce a tribe's share of TPA funds. . . ." Ex. 5, McDivitt Dec., ¶21.

As part of its process for considering means testing and other options, Congress asked the Department and the tribes to establish a workgroup. *See* Ex. 5, McDivitt Dec., ¶35. The resulting workgroup, which included both BIA and Tribal participants, closely examined the

---

[13] Ex. 24, *Department of the Interior and Related Agencies Appropriations for 1996, Hearings Before a Subcomm. of the Comm. on Appropriations*, Part 11, 104th Cong. 969 (1995) (emphasis added). Ex. 5, McDivitt Dec., ¶29. *See also*, *id*., ¶30; Ex. 25, *Fiscal Year 1998 Budget, Oversight Hearing of the President's Budget Request for the Bureau of Indian Affairs and the Indian Health Service, Before the S. Comm. on Indian Affairs*, Part 2, Addendum, 105th Cong. 17 (1997). ("TPA base programs are those in which funds are distributed on a pro-rata basis among all Tribes.") (emphasis added).

[14] Ex. 26, *Department of the Interior and Related Agencies Appropriations for Fiscal Year 1998, Hearings on H. R. 2107 before a Subcomm. of the S. Comm. on Appropriations*, 105th Cong. 120 (1997). See Ex. 5, McDivitt Dec., ¶32.

[15] *See* Ex. 27, H.R. 2107, 105th Cong. § 118 (1997). This provision was ultimately not enacted, but was the subject of Congressional hearings and extensive consideration.

history and policies surrounding TPA. The Tribal workgroup, which completed its report in May 1999, described TPA as follows:

> For years, Tribal Priority Allocations (TPA) base funds have been provided through the Bureau of Indian Affairs (BIA) to each of the more than 550 Tribal governments on a recurring basis. Tribes have used TPA funds to operate core governmental functions and essential programmatic services to address all Tribal needs.[16]

The Department submitted its report on TPA to Congress in July 1999. In its report, the Department described the unique mission and legal obligations that the BIA had to Indian tribes which made it unlike any other federal agency.

> The BIA is unique among government agencies in many respects. It is unique in relation to its own mission and structure. Some agencies operate programs or deliver services directly to beneficiaries; others are grant making agencies. Even in an agency that may combine the two functions, the line of demarcation is clear and established by statute. With few exceptions, potential beneficiaries of Federal services or grants do not have any form of "right" to the service or to a particular share of benefits; they merely have the right of access on equitable grounds.
>
> The BIA, on the other hand, serves all Federally recognized Tribes and groups. It operates either programs or contracts for the delivery of services at the discretion of the Tribes. The Tribes also have the right to change from direct BIA services to contracting and back again at virtually any time and for virtually any reason.[17]

In response to a specific question raised as to whether "the most prosperous Tribes be required to give up their TPA allocations," the Tribal workgroup responded:

> No, Tribes should not be required to give up their TPA allocations. Consistent with Federal treatment of other governmental entities, any standard or criteria used to define "prosperous" should not be considered for Tribal governments.

* * *

---

[16] Ex. 30, *Empowerment of Tribal Governments: Final Workgroup Report, Tribal Workgroup on Tribal Needs Assessments, Related to: Bureau of Indian Affairs Tribal Priority Allocations* (May 1999) at 3 (Executive Summary) (emphasis added).

[17] Ex. 31, Department of Interior Bureau of Indian Affairs, *Report on Tribal Priority Allocations,* at 3-4 (July 1999) (emphasis added).

> All Tribes must be funded to fulfill the United States Government's unique responsibilities to Indian Tribal governments which are grounded in the Constitution, and treaties developed by the Congress and the Federal common law over the course of more than 200 years.

*Id.* at 86. The BIA agreed with the Tribal position on this issue. The BIA stated (*id.*):

> BIA agrees with the TPA Tribal Workgroup and the responding Tribal leaders that Tribes should not be required to give up their TPA allocation based on prosperity or some measure of self-sufficiency.

Despite the lengthy consideration of options regarding allocation of TPA, Congress did not then enact any provision to authorize means testing, and has not done so to this day. But the means testing debate underscores the common understanding of Congress, the Department and the tribes that absent a specific statutory provision to the contrary, the Department can not unilaterally reduce (much less eliminate) TPA funding for a tribe.[18] As stated by Mr. McDivitt, who was a key BIA official on budget matters during this period, "I never heard any Department official express the view that the Department had the authority to exclude a federally recognized tribe from TPA." Ex. 5, McDivitt Dec., ¶21.[19]

Consistent with the representations by the Department, Congress clearly understood that TPA was provided for the benefit of every federally recognized tribe. Ex. 5, McDivitt Dec., ¶25. First, year after year Congress appropriated funds for TPA, following the express representation by the Department (in the Green Books) that it intended to provide TPA to every federally

---

[18] "[A]ll of the discussions about modifications to the allocation were premised on the fundamental understanding that under the existing system, all federally recognized Indian tribes received an allocation of TPA." Ex. 5, McDivitt Dec., ¶28.

[19] Congress also solicited a report from the General Accounting Office regarding the allocation of TPA funds. GAO in a report issued in 1999 found that "[a]ll federally recognized tribes are eligible to receive TPA funds," and that under TPA, "[t]he funding process used today has remained essentially the same since the early 1970's." Ex. 28, U.S. General Accounting Office: *Report to Congressional Requesters: Indian Programs, Tribal Priority Allocations Do Not Target the Neediest Tribes,* GAO/RCED 98-181, at 3 (July 1998); *see also* Ex. 5, McDivitt Dec., ¶¶32-33.

recognized tribe. This longstanding pattern – the Department requesting TPA for the benefit of every federally recognized tribe and Congress providing the funds – provides significant evidence that Congress understood where the money was going and that Congress approved of that principle of allocation.

Second, where Congress, in the appropriations process, provided an increase or decrease in TPA funds from the overall amount the Department proposed in the Green Book, Congress specified that every tribe would share in the increase or decrease. For example, in connection with a TPA increase regarding the 1994 Interior Appropriations Act, the Senate Appropriations Committee specified that "the additional $3,000,000 which the Committee recommends for tribal priority allocations represents an increase for distribution to all tribes according to their base."[20] Similar instructions appeared in other years – each time directing that the overall amount be allocated among all tribes.[21]

Third, Congress expressly affirmed that each tribe could use its TPA funds for various purposes – in addition to the basic purpose of TPA to authorize tribes to reallocate funds among various TPA programs. For example, beginning with the 1993 Appropriations Act, Congress authorized tribes to set their own eligibility criteria for general assistance payments to indigent Indians, at the same time requiring that

> increased payment levels for general assistance shall be met exclusively from funds available to the tribe from within its tribal priority allocation.

[20] Ex. 21, S. Rep. No. 103-114, at 51 (1993). *See also* Ex. 22, H.R. Rep. No. 103-158, at 50 (1993) (TPA increase "to be distributed to all tribes for their highest priority programs.") (emphasis added).

[21] Ex. 23, S. Rep. No. 102-345, at 48 (1992) (TPA increase: "The Committee expects the Bureau to distribute this funding to all tribal budgets according to their base") (emphasis added).

Ex. 13, Pub. L. No. 102-381, 106 Stat. 1374, 1389-1390 (1992) (emphasis added).[22] Likewise, beginning with the 1995 Interior Appropriations Act, Congress specified that tribes could use TPA "for unmet indirect costs of ongoing contracts, grants or compact agreements".[23] And, beginning with the Interior Appropriations Act for FY 1998, Congress further authorized tribes to use TPA to cover the costs of repair or replacement of school facilities.[24]

Fourth, Congress used express language when it intended to authorize any departure from the allocation of TPA to all tribes as specified by the Department in each Green Book. Beginning with the 2000 Appropriations Act, Congress authorized the Department to "redistribute any Tribal Priority Allocation funds," to a limited degree. Generally, the reallocation under this provision could not result in any tribe having its TPA reduced by more than 10 percent for the fiscal year, with narrowly specified exceptions.[25] In the 2001 Appropriations Act, Congress reiterated all of the foregoing provisions and also placed a limitation on the allocation of TPA to Alaska Native tribes having fewer than 25 members,

---

[22] Congress did the same in Interior Department Appropriations Acts for subsequent Fiscal Years. *See, e.g.,* Ex. 14, Department of the Interior and Related Agencies Appropriations Act for FY 1994, Pub. L. No. 103-138, 107 Stat. 1379, 1392 (1993); Ex. 15, Department of the Interior and Related Agencies Appropriations Act for FY 1995, Pub. L. No. 103-332, 108 Stat. 2499, 2512; Ex. 16, Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-170 (1996); Ex. 17, Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-193 (1996); Ex. 18, Department of the Interior and Related Agencies Appropriations Act for FY 1998, Pub. L. No. 105-83, 111 Stat. 1543, 1555 (1997).

[23] Ex. 15, 108 Stat. at 2511. Congress reiterated this in the Interior Appropriations Acts for Fiscal Years 1996, 1997, 1998 and subsequent years. *See* Exs. 16-18.

[24] Ex. 18, 111 Stat. at 1555-56.

[25] Ex. 19, Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, 113 Stat. 1501, § 127 (1999).

directing that the TPA shares of those tribes be paid to the regional corporation of which such tribe was a part.[26]

In sum, Congress repeatedly appropriated funds for TPA in response to the specific tribe-by-tribe request of the Department, specified that funding increases or decreases be shared by all tribes, authorized the use of TPA for particular purposes beyond the scope of TPA programs, and authorized a very limited re-allocation of TPA funds by the Department (while rejecting broader proposals to impose a means testing approach). While one or another of these actions, standing alone, might not be sufficient evidence, together clearly demonstrate that Congress (like the Department) intended that every federally recognized tribe would benefit from TPA.

B. Indian Health Service Funding

Like TPA, federal funding provided to the Indian Health Service (IHS) is, and has been, allocated to benefit all federally recognized tribes and their members. These funds are used to provide hospital, medical, dental, mental health, and preventative care. Some of this care is provided in IHS-funded hospitals, clinics or other facilities. To the extent an IHS-funded facility is not capable of providing the service needed, the necessary health care is obtained through third party health care providers whose services are paid for by IHS funds under a program known as contract health care. In either instance (direct IHS care or contract health care), every federally recognized tribe has the option of operating these health programs under the Indian Self-Determination Act, or having IHS operate the program for the Tribe's benefit. Ex. 32, Declaration of David T. Mather ("Mather Dec.") ¶¶9, 10.[27] Since 1976, these services have been

---

[26] Ex. 20, Department of the Interior and Related Agencies Appropriations Act for FY 2001, Pub. L. No. 106-291, 114 Stat. 922, 944 (2000).

[27] David T. Mather is a health care consultant with close to 30 years working with tribes and tribal organizations that operate health care facilities funded through the Indian Health Service. He has considerable experience serving on IHS workgroups established to address allocation methodologies

provided in large part pursuant to the Indian Health Care Improvement Act ("IHCIA")[28] and funded through annual appropriations.

The largest part of the annual appropriations for the IHS has been for personnel and health services (the "services" appropriation). Ex. 32, Mather Dec., ¶8. These funds are disbursed annually to local health care facilities which may be operated by IHS, a tribe or a consortium of tribes. *Id*., ¶9.[29] The disbursements of these funds are generally based on prior years' funding levels, referred to as base budgets, which may be adjusted periodically "for inflation, population growth, Congressional earmarks, or by formula for selected operating units." *Id*., ¶10.

In providing funds for Indian health services, Congress intends the funds to benefit every federally recognized tribe. Since the mid-1970's Congress has directed IHS to address the health care needs of tribes to facilitate self-determination. Throughout this period, IHS – albeit sometimes reluctantly – took steps to fulfill these mandates, accounting for certain categories of funds on a tribe-by-tribe basis and developing the capacity to account for all funding provided

---

for IHS funding, and he has expertise regarding IHS budgeting and resource allocation practices. Ex. 32, Mather Dec., ¶1-6. Mr. Mather's Declaration is offered to provide a description of how the federal government has allocated IHS funding, and to provide jurisdictional facts related to agency construction of the statutory framework under which IHS funds are provided for the benefit of federally recognized tribes.

[28] Pub. L. No. 94-437, 90 Stat. 1400 (1976) (Ex. 33), *codified as amended at* 25 U.S.C. §§ 1601-1683. The IHCIA was amended by: Ex. 34, Indian Health Care Amendments of 1980, Pub. L. No. 96-537, 94 Stat. 3173; Ex. 35, Indian Health Care Amendments of 1988, Pub. L. No. 100-713, 102 Stat. 4784; Ex. 36, Indian Health Amendments of 1992, Pub. L. No. 102-573, 108 Stat. 4526. Before 1976 federal funding to provide health care for Indians was authorized by treaties between the United States and many tribes, as well as the Snyder Act, 25 U.S.C. § 13. Both the Treaty obligations and the Snyder Act remain in effect. While the Snyder Act is cited as a source of authority for health care funding for the benefit of tribes and their members, the IHCIA is the primary statute by which the federal government implements its responsibility for health care of Indian people. *See* Ex. 38, S. Rep. No. 96-758, at 3 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 6645, 6647.

[29] Appropriations for IHS also include funds for construction, maintenance and support of health facilities (the "facilities" appropriation.). *Id.*, ¶8.

for the benefit of each tribe. During this period the IHS also refined its allocation methods in an effort to provide greater equity among tribes. All of this activity demonstrates that IHS construes the statutory scheme underlying IHS funding to require that every tribe benefit from that funding. *See* Ex. 32, Mather Dec., ¶¶14-24.

Congress' directive that IHS account for health care funds on a tribe-by-tribe basis arose from two important measures enacted in the mid-1970s. The Indian Health Care Improvement Act, 25 U.S.C. §§ 1601-1683, was a comprehensive measure authorizing a broad range of health care programs to raise "the health status of Indians to . . . the highest possible level and to encourage the maximum participation of Indians in the planning and management of those services."[30] The Indian Self-Determination Act, 25 U.S.C. §§ 450-450n, was intended to promote tribal self-determination and improve delivery of critical government, health, social and educational services by authorizing tribes to contract for federal funds and assume control over programs and services historically provided by BIA and IHS. These two statutes were intended to work in conjunction with one another "to establish a framework within which Indian people can effectively decide their role in health programs. Public Law 93-638 [ISDA] provides the mechanism, but relies on [the IHCIA] and . . . other authorities to provide the resources to make Indian Self-Determination a reality." [31]

The IHCIA, as amended, instructed IHS to allocate IHS funds for the benefit of each federally recognized tribe. In 1988 amendments to the Act, Congress expressly required IHS to examine the health resource levels of each <u>tribe</u> and to allocate supplemental funds – known as the

---

[30] Ex. 33, P.L. 94-437, §2(b). *See also* Ex. 37, H.R. Rep. No. 94-1026, at 13-17 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 2652-2657; Ex. 38, S. Rep. No. 96-758, at 3.

[31] Ex. 38, S. Rep. No. 96-758, at 22 (Statement of George Lythcott, Administrator, Health Services Administration).

Indian Health Care Improvement Fund – for the use or benefit of those tribes in greatest need in order "to raise all Indian tribes to" an acceptable level of health care resources. Ex. 35, 1988 Amendments § 201(b)(2), (3), 25 U.S.C. § 1621(b)(2), (3) (emphasis supplied).[32] Congress further expressed its intent that IHS continue to seek equity among tribes with regard to health care funding, stating that "nothing in this section is intended to diminish the primary responsibility of the Service to eliminate existing backlogs in unmet health care needs, nor are the provisions of this section intended to discourage the Service from undertaking additional efforts to achieve parity among Indian tribes." *Id.* § 201(g), 25 U.S.C. § 1621(g) (emphasis supplied).[33]

Congress reiterated its intent that all tribes benefit from health care funding when it amended the Act in 1992. Ex. 36, 1992 Amendments, § 201. The 1992 amendments expressly state Congress' goal to "eliminat[e] the deficiencies in health status and resources of all Indian tribes." *Id.*, § 201(a)(1), 25 U.S.C. § 1621(a)(1) (emphasis supplied). In those amendments, Congress also required that IHS revise its funding allocation methodology to achieve "true equity funding." *See* Ex. 40, S. Rep. No. 102-392, at 14 (1992), *as reprinted in* 1992

[32] The Act further stated that while IHS could allocate appropriated funds to a service unit, "such allocation shall be made in a manner which ensures that the requirements of paragraph (2) [allocation of funds for use or benefit of a tribe] is met. The funds allocated to each service unit under the subparagraph shall be used by the service unit to raise the deficiency level of each tribe served by such service unit," *id.* § 201(b)(3)(A), 25 U.S.C. § 1621(b)(3)(A), and that the apportionment of such funds be done in consultation with the tribes. *Id.* § 201(b)(3)(B).

[33] In its reports on the 1988 amendment, the Senate Committee on Indian Affairs explained the purposes of these amendments, stating that Congress had "consistently recognized the serious levels of unmet health needs among Indian tribes," and that IHS funding would be used to benefit all Indian tribes in order to "raise all Indian tribes to a zero level of health resources deficiency." Ex. 39, S. Rep. No. 100-508, at 9-11 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 6183, 6191-6193. To do this, Congress required that IHS provide Congress with reports on the methodologies being used to "identify the level of health resources deficiency for each tribe served by the Service," *id.* at 10, and "that the Indian Health Service work cooperatively and in consultation with Indian tribal governments to identify health needs, to jointly plan for the provision of health care services to address those needs, and to allocate resources based upon a rational identification of needs." *Id.* at 11.

U.S.C.C.A.N. 3943, 3956. Congressional intent continued to be "to eliminate deficiencies in health status and resources of all tribes."[34] Modifications to the methodology for allocating these funds has continued over time, including the development of the Federal Disparity Index between 1998 and 2000 to measure level of need for purposes of allocating this fund. *See* Ex. 32, Mather Dec., ¶22.

In seeking to advance the Congressional directive in the Indian Health Care Improvement Act to eliminate tribal health care deficiencies and to limit disparities in health status among tribes, IHS took action affecting broad categories of IHS funds. Beginning in the mid-1970's IHS increasingly moved to allocation methodologies that identified amounts to benefit each tribe. That is, over the years, IHS developed and revised resource allocation processes for various health care services and programs in order "to identify all funds that were expended in support of health services to each tribe." Ex. 32, Mather Dec., ¶15. This was done initially for

[34] Ex. 41, H.R. Rep. No. 102-643, at 73 (1992) (emphasis supplied). These statutory provisions refute the government's argument that the Tribe's claims should have been brought by individuals. Gov. Mot. at 29 n.9. As shown above, Congress intended that health care resources be allocated for the benefit of tribes, and the Samish Tribe brought this case seeking a remedy for something that happened to the Tribe. The federal government wrongfully stopped treating the Samish Indian Nation in the same manner it treated every other federally recognized tribe. The damages sought by the Tribe here are measured by federal programs, like IHS, that benefited every other tribe during this period. Moreover, the underlying obligation with respect to this program is a federal obligation to tribes – arising from treaties, statutes and a course of dealings with the tribes, and in exchange for the cession of millions of acres of land. As stated by the Senate Committee for Indian Affairs:

> The United States' responsibility to Indian tribal governments and their members for the provision of health care was established in numerous treaties with Indian tribes in which the United States agreed to provide such services. . . . The responsibility has been further delineated and defined by numerous status[sic] and administrative regulations. Based upon the Constitution, historical development, treaties and statutes, the United States has assumed a legal and moral obligation to provide adequate health care and services to Indian tribes and their members.

Ex. 40, S. Rep. No. 102-392, at 2 (1992), *as reprinted in* 1992 U.S.C.C.A.N. 3943, 3944 (emphasis added). *See also* Ex. 39, S. Rep. No. 100-508, at 1-2 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 6183, 6184; Ex. 47, S. Rep. No. 107-170, at 1-2 (2002).

funds provided at the local operating or service unit level, and was generally based on "historical utilization of IHS services by a tribe," or where "multiple tribes shared an IHS service unit and historical tribal specific budget data was not available, on the number of 'active users' from each tribe to divide the historical funding level among tribes." *Id.*, ¶ 15; *see also id.*, ¶24. "In some programs other objective criteria or variables were also used in program specific 'program formulas' to determine the appropriate proportionate tribal allocation for certain categories of funding." *Id.*, ¶15. Allocations among all federally recognized tribes were also made of specific program funds, such as those for diabetes care. *Id.*, ¶21.

IHS was not uniformly successful in allocating Indian health care funds in a fair manner. To the contrary, in at least one significant instance, IHS applied its resource allocation criteria in distributing health care funds in an arbitrary manner to the detriment of the tribes, and was directed by a federal court to correct its funding methodology. *See Rincon Band of Mission Indians v. Califano*, 464 F. Supp. 934 (N.D.Cal. 1979), *aff'd sub nom Rincon Band of Mission Indians v. Harris*, 618 F.2d 569 (9th Cir. 1980). Congress not only monitored IHS' compliance with the court's directive,[35] but sought to ensure greater fairness among tribes by providing additional federal funds to IHS for the Indian Health Care Improvement Fund – already described above.

Congressional intent that IHS funds benefit all tribes is further demonstrated by the Indian Self-Determination Act and the manner IHS implemented it over the years.[36] ISDA provides that, upon request of a tribe, IHS must enter a contract under which the tribe carries out

---

[35] *See* Ex. 34, 1980 Amendments, § 8(b) (requiring Secretary to submit a resource allocation plan to Congress); *see also* Ex. 39, S. Rep. No. 100-508, at 10, 39.

[36] The ISDA was held by the Court of Appeals not to be a money-mandating statute, and we are not suggesting otherwise here. Rather, we rely on the ISDA to demonstrate that Congress intends Indian health care funds to benefit every tribe – as reflected in the manner in which IHS implements ISDA. As the Court of Appeals stated, ISDA is the "mechanism for directing benefits arising under other statutes." *Samish*, 419 F.3d at 1365.

the health care program that was previously provided by the IHS and the funds provided to the tribe for this purpose "shall not be less than the . . . Secretary would have otherwise provided for the operation of the programs. . . ." 25 U.S.C. § 450j-1(a)(1). This basic feature of the ISDA requires IHS to know how much of its program funding is allocated to each Tribe. And that is what IHS did – it "identif[ied] the full amount of funds that were being used at the local operating or service unit level to benefit a tribe. . ." Ex. 32, Mather Dec., ¶14.

ISDA was amended in 1988 and 1994, to clarify that tribes that opt to run former federal programs are entitled, in addition to the program amounts IHS spent locally for that tribe, to a full measure of costs associated with services provided for that tribe that are performed at other IHS offices, like the Area Office or the Headquarters Office.

> These amendments require the agency to identify all of the administrative resources expended in support of local health care activities from the Headquarters or the Area Office and, provided these services were not required to be carried out by federal employees (and defined as "residual" to the agency), provide these "tribal shares" dollars directly to the tribe, if requested through an ISDA award. These funds are normally referred to as "Area and Headquarters Tribal Shares."

Mather Dec., ¶17. This provision means that – for purposes of facilitating the policy of self-determination – IHS must determine how much program money it spends directly for the benefit of each tribe locally, and how much of the funds used at its Area and Headquarters offices it allocates in support of each tribe. This is necessary both to allow tribes to provide health care services under ISDA with the full measure of funding to which they are entitled, and to ensure that adequate funds are available for IHS to serve tribes that opt not to contract for the operation of IHS programs. This further demonstrates that Congress required IHS to allocate its funds by tribe, and IHS complied with Congress' directive. *See* Ex. 32, Mather Dec., ¶¶18-20, 24.

Congressional intent that IHS funding would benefit all federally recognized tribes was further confirmed in the course of appropriating funds for IHS. Congress directed that increases or reductions in funding be applied equitably among all federally recognized tribes. For example, in 1995 and again in 1996 the House Committee on Appropriations stated:

> It is the Committee's intent that all tribes, including those compacting or contracting under Indian self-determination or Indian self-governance, should share equitably as a result of any reductions from the budget request.

Ex. 43, H.R. Rep. No. 104-173, at 95 (1995) (emphasis supplied); Ex. 44, H.R. Rep. No. 104-625, at 91 (1996). In 1994, the Conference Committee addressing the FY 1995 Appropriations for IHS agreed that:

> Funds provided for the facilities program should be distributed in accordance with a methodology that addresses the fluctuating annual workload and maintains parity among the IHS areas and the tribes as the workload shifts.

Ex. 42, H.R. Rep. No. 103-740, at 52 (1994) (Conf. Rep.) (emphasis supplied). Similar statements were made regarding these funds in subsequent Congresses.[37]

Throughout this period, the underlying premise to all of the actions by Congress and the IHS was that IHS funds be allocated to benefit all federally recognized tribes and their members. In accordance with Congress' directives, IHS' longstanding practice has been to do this.

> While the mechanisms for funding various IHS activities are complex, certain principles are clear. First, the broad Congressional mandate for IHS is, and has been, to provide health care to members of every federally recognized tribe. Second, consistent with that objective the IHS has in fact since 1975, to the best of my knowledge, expended money to benefit every federally recognized tribe. Third, the IHS is required to inform any tribe that seeks a Self Determination Act contract to run an IHS program of the amount of program funds that IHS has been using to benefit that tribe. Fourth, IHS has the capacity to determine the amount of program funds that it is using to benefit each federally recognized tribe – whether the Tribe enters a Self Determination Act contract or not, and has been able to make such determinations for the IHS programs operated at the local

[37] *See, e.g.,* Ex. 43, H.R. Rep. No. 104-173, at 98 (1995); Ex. 45, S. Rep. No. 105-56, at 97 (1997); Ex. 46, S. Rep. No. 106-99, at 98 (1999).

> operating or service unit level since the late 1970s. Fifth, in addition to program funds, IHS has determined the "Headquarters and Area Office tribal shares" – that is, the administrative support resources provided by the IHS Headquarters and Area Offices – for every federally recognized tribe. Sixth, for purposes of allocating resources appropriated by Congress with the Indian Health Care Improvement Fund, IHS has calculated since at least 1999, the health deficiency of each federally recognized tribe, using Level of Need or a Federal Disparity Index. Seventh, IHS' longstanding practice has been to allocate IHS funding – through the mechanisms described here and others – to benefit each federally recognized Tribe. Eighth, the amounts allocated to each federally recognized tribe have been or can be ascertained by IHS. Ninth, Congress is aware of the fact that IHS allocates funds to every federally recognized tribe, and it appropriates funds with that understanding.

Ex. 32, Mather Dec., ¶24.

In sum, Congress intends Indian health services funds to benefit every federally recognized tribe. Congress has instructed IHS to raise the health status of every federally recognized tribe, to allocate funds to every tribe using methodologies that advance that goal (and that promote equity among tribes), to ensure that every tribe's share of program dollars including Area and Headquarters funds are accounted for on a tribe-by-tribe basis, and to apportion increases or decreases in overall funding in an equitable manner among all tribes. IHS has likewise construed Congress' actions as requiring the allocation of funds for the benefit of every federally recognized tribe.

## Argument

### I. This Court has jurisdiction

#### A. A statutory scheme is money-mandating where a "fair interpretation" of the statutes supports a damages remedy.

Establishing jurisdiction here requires two basic elements. First, there must be a "clear statement from the United States waiving sovereign immunity. . . ." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). Here, the clear waiver is provided by the

Tucker Act, 28 U.S.C. § 1491(a)(1), and the Indian Tucker Act, 28 U.S.C. § 1505. *Id.* Second, there must be a claim for damages within the terms of the immunity waiver:

> As we said in *Mitchell II*, a statute creates a right capable of grounding a claim within the waiver of sovereign immunity if, but only if, it "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." 463 U.S. at 217, 103 S.Ct. 2961 (quoting *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)) (internal quotations marks omitted.)
>
> This "fair interpretation" rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity. "Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity." *Mitchell II*, *supra*, at 218-219, 103 S.Ct. 2961. It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," 463 U.S. at 218, 103 S.Ct. 2961, a fair inference will do.

*Id*. at 472 (emphasis added). *See Agwiak v. United States*, 347 F.3d 1375, 1379 (Fed. Cir. 2003); *Clark v. United States*, 322 F.3d 1358, 1362-63 (Fed. Cir. 2003). Thus, the issue here is whether in providing TPA and IHS funding to benefit all federally recognized tribes, Congress can fairly be understood to have intended a damages remedy where the government wrongfully excludes one tribe.[38]

Congressional intent to permit a damages remedy can be demonstrated in different ways. As the Court of Appeals stated in this case:

> The court has found Congress provided such damages remedies where the statutory text leaves the government no discretion over payment of claimed funds. But Tucker Act jurisdiction is not limited to such narrow statutory entitlements. Certain discretionary schemes also support claims within the Court of Federal

[38] In determining Congressional intent regarding the availability of damages against the government, the Courts have supported the use of various tools – including legislative history and agency construction. *E.g.*, *Reidell v. United States*, 43 Fed. Cl. 770, 772-73 (1999). This Court so recognized in its ruling permitting limited discovery pertaining to agency construction. Opinion and Order of July 21, 2006, at 8.

> Claims jurisdiction. These include statutes: (1) that provide "clear standards for paying" money to recipients; (2) that state the "precise amounts" that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions.

*Samish*, 419 F.3d at 1364. Significantly, the Court of Appeals' list of various categories of "discretionary" statutory schemes that provide a damages remedy is illustrative, not exhaustive. *See Id*. (the categories of money-mandating statutes "include" those specified by the Court). The issue here turns on the intent of Congress with respect to the rather unique statutory schemes that underlie TPA and IHS funding for tribes, and the unusual history involving the Samish Tribe.

This case involves statutory schemes that have clear parallels with money-mandating statutes in the non-Indian context. At the same time, this case involves an Indian tribe, and Indian law principles must inform the determination here. Both elements support a conclusion that TPA and IHS funding involves statutes that are money-mandating.

B. <u>A statutory scheme that provides money for the benefit of a designated class of beneficiaries is money-mandating.</u>

In the non-Indian context, it is well established that a statute that provides money for the benefit of a designated class of recipients is money-mandating for purposes of a claim that someone was improperly treated as ineligible by a federal agency. For example, in *Doe v. United States*, 100 F.3d 1576, 1580-82 (Fed. Cir. 1997), the Court considered a statute which provided that the Secretary of the Treasury "may . . . pay" a reward not to "exceed 25 percent of the net amount so recovered" to any person who provides information to the United States about the commission of a crime that leads to the recovery of a fine. The Court held that this statute was money-mandating, so an informant who was denied payment of a reward could bring a claim for damages against the United States. The Court found that the discretion given to the Secretary concerned the amount, but not the obligation to pay, if the informant otherwise satisfied the conditions for the reward. As the Court explained:

> "Congress did not intend to leave to the caprice or whim of the Secretary an informer's right to the award. It intended to confer upon the informer an absolute right to demand the payment of the award when he had met the conditions precedent thereto laid down by Congress . . . and if the Secretary . . . arbitrarily or capriciously refused to pay [the award], the informer had the right to file suit in court to compel that payment. This is a Government of laws, not of men."

*Id*. at 1579-80 (alterations in original) (quoting *Tyson v. United States*, 32 F. Supp. 135, 136-37 (Ct. Cl. 1940)).

This principle also applies to statutes under which an agency is directed to enter into contracts for the payment of federal funds. *Grav v. United States*, 886 F.2d 1305, 1307-08 (Fed. Cir. 1989), involved the Milk Diversion Program, which provided that the Secretary of Agriculture "shall offer to enter into a contract, . . . with any producer of milk . . . for the purpose of reducing the quantity of milk marketed by the producer for commercial use." This was held to be a money-mandating, so a milk producer who was improperly denied a contract could bring suit for damages. Similar conclusions have been reached in other cases. *See, e.g., McBryde v. United States*, 299 F.3d 1357, 1361 (Fed. Cir. 2002); *Saraco v. United States*, 61 F.3d 863 (Fed. Cir. 1995); *Sawyer v. United States*, 930 F.2d 1577, 1580-81 (Fed. Cir. 1991).

These cases support a determination that the statutes providing TPA and IHS funding are money-mandating. The statutory schemes for TPA and IHS benefit every federally recognized tribe – as the BIA and IHS have repeatedly told Congress. The arbitrary omission of the Samish Tribe from a list of federally recognized tribes deprived the Tribe of its right to share with all other federally recognized tribes in TPA and IHS funds. That wrongful misclassification of the Tribe – like the erroneous eligibility determinations in *Grav*, *Doe*, *McBryde*, *Saraco* and *Sawyer* – gives rise to a claim for damages. Congress could not have intended "to leave to the caprice or whim" of the BIA or IHS the Tribe's right – or any other tribe's right – to benefit from programs intended to benefit every tribe. *Doe*, 100 F.3d at 1579.

C. Indian law principles must inform the understanding of Congressional intent here.

While no more is needed, the special relationship between the United States and Indian tribes reinforces this conclusion. First, federal recognition imposes on BIA and IHS the duty to provide services and benefits to the tribe and once established, the relationship between the United States and a federally recognized tribe can only be terminated by Congress – not by any executive branch official. Congress has expressly acknowledged this principle.[39] Indeed, federal recognition

> imposes upon the Secretary of the Interior specific obligations to provide a panoply of benefits and services to the tribe and its members. In other words, unequivocal federal recognition of tribal status is a prerequisite to receiving the services provided by the Department of the Interior's Bureau of Indian Affairs and establishes tribal status for all federal purposes. . . . While the Department [of the Interior] clearly has a role in extending recognition to previously unrecognized tribes, it does not have the authority to 'derecognize' a tribe. . . . The Committee cannot stress enough its conclusion that the Department may not terminate the federally-recognized status of an Indian tribe absent an Act of Congress. Congress has never delegated that authority to the Department, or acquiesced in such a termination.

Ex. 48, H.R. Rep. No. 103-781 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3768, 3769-3770 (emphasis supplied). *See Greene v. United States*, 996 F.2d 973, 978 (9th Cir. 1993) ("Federal recognition brings its own obvious rewards, not the least of which is the eligibility of federal money for tribal programs, social services and economic development."). Further, when Congress intends to terminate a tribe, Congress must use clear, unambiguous language to do so.[40] Since Congress never took any action to terminate the Tribe, the Department's action in denying

---

[39] Federally-Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, § 103(4), 108 Stat. 4791, *codified at* 25 U.S.C. § 479a (note). *See also Joint Council of the Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 380 (1st Cir. 1975) (citing *United States v. Nice*, 241 U.S. 591, 598 (1916); *Tiger v. W. Inv. Co.*, 221 U.S. 286, 315 (1911)).

[40] *See Nice*, 241 U.S. at 598-601 (allotment of lands did not terminate tribal existence); *Chippewa Indians of Minn. v. United States*, 307 U.S. 1, 4-5 (1939). *See also Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412-413 (1968); *United States v. Dion*, 476 U.S. 734, 738-740 (1986).

all funding to the Tribe for a generation, an action tantamount to termination, was unquestionably wrongful.

Second, the federal responsibility to provide assistance to tribes has a strong legal, historical and moral foundation. Responding in writing to a 1998 question from the Senate Indian Affairs Committee – "is there a federal responsibility to provide for the operation of tribal governments grounded in treaty, statutes, course of dealing and court decision?" – the Assistant Secretary for Indian Affairs stated (in part):

> U.S. law and court decisions have consistently recognized and re-affirmed the principles articulated by [Chief Justice] Marshall: tribes are distinct political entities with whom the United States has a unique legal and political relationship, including "moral obligations of the highest responsibility and trust." *Seminole Nation v. U.S.*, 316 U.S. 286 (1942). *See also*, *Ex parte Crow Dog*, 109 U.S. 556 (1883); *Talton v. Mayes*, 163 U.S. 376 (1896); *Williams v. Lee*, 358 U.S. 217 (1959); *U.S. v. Mazurie*, 419 U.S. 544 (1975); *U.S. v. Wheeler*, 435 U.S. 313 (1978); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978); *Montana v. United States*, 450 U.S. 544 (1981); *Oklahoma Tax Commission v. Chicksaw Nation*, ___ U.S. ___ (1995), 115 S.Ct. 2214 (1995). Over the decades, these principles have found expression in Congressional legislation and resolutions, Executive Orders, and innumerable federal court rulings. Throughout its 200 year history, the United States has not only recognized these principles, but has established a "course of dealings" which not only acknowledges the concept, but also actively promotes self-governance by providing services and resources.[41]

Third, the Supreme Court has emphasized that in connection with the funding for Indian programs, the representations made by the federal government to Congress regarding appropriations are critical to understanding Congressional intent. In *Morton v. Ruiz*, 415 U.S. 199 (1974), the Supreme Court held that the Department could not simply limit BIA general assistance payments to those indigent Indians who reside on the Reservation (as opposed to those living "on or near" the Reservation). The Court's determination turned principally on the

---

[41] Ex. 25, *Fiscal Year 1998 Budget, Oversight Hearing of the President's Budget Request for the Bureau of Indian Affairs and the Indian Health Service, Before the S. Comm. on Indian Affairs*, Part 2, Addendum, 105th Cong. 4-5 (1997) (emphasis added).

Department's representations to Congress about the scope of its general assistance program (and other BIA programs). As the Court stated:

> [T]hat history clearly shows that Congress was led to believe that the programs were being made available to those unassimilated needy Indians living near the reservation as well as to those living 'on.' Certainly, a fair reading of the congressional proceedings up to and including the fiscal 1968 hearing can lead only to the conclusion that Indians situated near the reservation, such as the Ruizes, were covered by the authorization.

*Id*. at 229. *Ruiz* further demonstrates that the Department can not take ad hoc action contravening its own representations to Congress, where such action eliminates Indians from eligibility for a federally funded program for the benefit of Indians. As the Court stated (*id*. at 236):

> The overriding duty of our Federal Government to deal fairly with Indians wherever located has been recognized by this Court on many occasions. *See*, *e.g.*, *Seminole Nation v. United States*, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942); *Board of County Comm'rs v. Seber*, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943). Particularly here, where the BIA has continually represented to Congress, when seeking funds, that Indians living near reservations are within the service area, it is essential that the legitimate expectation of these needy Indians not be extinguished by what amounts to an unpublished ad hoc determination of the agency that was not promulgated in accordance with its own procedures, to say nothing of those of the Administrative Procedure Act. The denial of benefits to these respondents under such circumstances is inconsistent with 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.' *Seminole Nation v. United States*, 316 U.S. at 296, 62 S.Ct. at 1054, *see Squire v. Capoeman*, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). Before benefits may be denied to these otherwise entitled Indians, the BIA must first promulgate eligibility requirements according to established procedures.

While we do not suggest that these Indian law principles mean that every statute for the benefit of Indians is money-mandating,[42] these principles are important in understanding

[42] The Court of Appeals in this case held that the Indian Self-Determination Act was not money-mandating because "[s]elf-determination contracts under ISDA are a mechanism for directing benefits arising under other statutes." *Samish*, 419 F.3d at 1365. While tribes can contract for the operation of TPA and IHS programs under ISDA, we are not relying on ISDA for purposes of establishing that the statutory schemes underlying TPA and IHS are money-mandating. ISDA however is relevant to an overall understanding of the law which required the BIA and IHS to

Congressional intent here. Did Congress, in providing funding for TPA and IHS, intend to allow the executive branch in effect to terminate the Samish Tribe – when such termination would be outside the scope of any executive officer's authority? Did Congress, in providing funding for TPA and IHS, intend to allow federal agencies to ignore the strong historical, legal and moral foundation on which federal funding for tribes is based – a foundation the Department itself emphasized to Congress specifically with regard to TPA funds? Did Congress, in providing funding for TPA and IHS, intend to allow the federal agencies to contravene their own representations to Congress that these very programs were intended to benefit all federally recognized tribes – and thereby sanction a diminution in the coverage of these programs, contrary to the principle articulated in *Ruiz*? The government's position here requires that the answer to each of these questions be "yes." The Tribe's position is that these principles strongly support a determination that it is fair to infer that Congress intended to remain consistent with the basic principles of Indian law, to hold the Department to its representations, and to permit a damages claim where the Samish Tribe was wrongfully denied these federal funds under these specific circumstances.[43]

---

allocate substantial parts of their appropriated funds under other statutes (including appropriations acts) for the benefit of tribes. As the Court of Appeals found, ISDA established a mechanism by which tribes may chose to contract for programs and benefits provided by other law. *See*, *id*. at 1365-66.

[43] Likewise, the funding statutes at issue here must not be construed in a manner that would violate equal protection. Congress has explicitly provided, in the arena of Indian affairs, that the federal government can not diminish the privileges and immunities of one tribe vis-à-vis another. 25 U.S.C. §§ 476(f), (g). This enactment is essentially a statutory form of equal protection to ensure that certain tribes are not treated with disfavor. More broadly, federal case law provides that violations of equal protection can be a proper component of money-mandating claims – where implementation of a federal statute that provides for the payment of money implicates equal protection. *See Gentry v. United States*, 546 F.2d 343, 346, 348-351 (Ct. Cl. 1976); *see also Britell v. United States*, 372 F.3d 1370, 1378-1379 (Fed. Cir. 2004). Construing federal funding statutes (as the government urges here) to authorize federal agencies to completely exclude one tribe from every program and service would raise serious equal protection concerns. Congress should not be presumed to have enacted a

D. The statutory schemes underlying TPA and IHS are money-mandating.

The statutory scheme under which Congress provides TPA is money-mandating for two basic reasons. First, Congress provides TPA for a defined class of beneficiaries – every federally recognized tribe.[44] The Department's construction of TPA – as evidenced by its repeated representations to Congress, its express statements regarding the reach of TPA, and its longstanding manner of implementing TPA – underscores this principle. Congress itself – by appropriating funds in response to the Department's tribe-by-tribe requests for TPA, instructing that all tribes share in pro rata increases or decreases, and expressly providing only limited authority to the Department to reallocate TPA among tribes – has acted in a manner that can only be understood to signify that it intends TPA to benefit every federally recognized tribe. Accordingly, under well established case law, where Congress establishes a statutory framework to benefit every member of a defined class, that statutory framework is money-mandating for purposes of a claim that one member of the class was unlawfully treated as ineligible. Since that is precisely what happened to the Tribe, the Tribe's TPA claim is within the jurisdiction of this Court.

Second, the statutory scheme underlying TPA is money-mandating because to hold otherwise would attribute to Congress an intent to contravene established principles of Indian law. As the Supreme Court has emphasized, "[t]he overriding duty of our Federal government to deal fairly with Indians" includes the duty to provide federal funding to the class of tribal beneficiaries that the Department repeatedly informs Congress will be served. *Ruiz*, 415 U.S. at 236. There is simply no evidence that Congress intended to permit the Department to contravene

---

measure intending it to be construed to violate equal protection. Accordingly, the better view is that Congress in enacting federal statutes to fund Indian programs intended that all tribes benefit – not that one Tribe could be left out.

[44] The same is true for TPA's predecessors. *See* p. 8 n.9 above.

this principle by allowing the Department to single out the Samish Tribe for exclusion, where the Department expressly told Congress that TPA funding was to benefit every federally recognized tribe. The only fair construction – and the one compelled by principles of Indian law – is that Congress intended that damages be available here.

The same is true of IHS funding. The statutory framework under which Congress provided funds for Indian health care is money-mandating because Congress intended those funds to serve a defined class of beneficiaries – all federally recognized tribes – and IHS so construed its obligations. To carry out Congress' intent, IHS established methodologies to allocate the funds it received so that it was able to determine each federally recognized tribe's share of such funds.[45] When IHS' funding methodologies were found to be arbitrary, IHS and Congress undertook to correct this and sought to eliminate health care resource deficiencies among tribes and establish "true equity funding" for all tribes. In the IHCIA, Congress specifically required that IHS measure health care resources by reference to each tribe, and IHS has done so. Under well-established law, because Congress intended and IHS implemented Indian health services to benefit all federally recognized tribes, the statutory framework under which such funding and services were provided is money-mandating and this Court has jurisdiction.

## II. The Government's Arguments Should Be Rejected

### A. *Lincoln v. Vigil*, 508 U.S. 182 (1993) is not controlling here.

The government relies on *Lincoln v. Vigil*, 508 U.S. 182 (1993), in seeking dismissal of the Tribe's TPA and IHS claims. Gov. Br. at 14-16, 30. But *Vigil* did not address the issue here.

[45] With respect to both TPA and IHS funding, the amount allocable for each tribe is readily determinable, based on the BIA and IHS distribution methodologies.

To the contrary, *Vigil* involved an effort by the government to expand its services to Indians, not an effort to contract its funding to exclude one Tribe – which is the circumstance here.[46]

*Vigil* involved an IHS program for "handicapped Indian children." *Id*. at 186. The history of this program was obscured by a "clou[d] [of] bureaucratic haze." *Id*. at 185 (quoting *Vigil v. Rhoades*, 953 F.2d 1225, 1226 (10th Cir. 1992)). Although the original plan apparently was to establish treatment centers nationwide, for the first several years the program was operative only in the Albuquerque area. *Id*. at 186. Returning to its original concept, IHS in 1985 decided to move toward a nationwide program, and "discontinued the direct clinical services to Indian children in the Southwest." *Id*. at 188. Handicapped children eligible for services in the Albuquerque program filed suit to challenge IHS's decision. *Id*. at 189. The Supreme Court held that the IHS decision to discontinue the Albuquerque program in favor of implementing a national program was unreviewable under the Administrative Procedure Act. *Id*. at 193.

There are significant differences between *Vigil* and this case. First, *Vigil* was an APA action, seeking to require a federal agency to change its future conduct. This case is a damages claim, seeking to address previously-adjudicated agency misconduct, with no bearing on future agency action.[47]

---

[46] *Vigil* also makes clear that *Morton v. Ruiz*, 415 U.S. 199 (1974), remains good law. *Id*. at 199.

[47] Contrary to the government's claim, Gov. Mot. at 30, *Vigil* does not address the money-mandating test or this Court's jurisdiction and in fact does not even use the term "money-mandating." Moreover, as the Court of Claims and Court of Federal Claims have recognized, although an agency may have discretionary authority to modify a program *in the future*, that discretion is irrelevant to this Court's jurisdiction over a damages claim where the agency in fact exercised its discretion to implement a program that provided money to a defined class of eligible recipients but then arbitrarily denied funding to some member of that group. *Hannon v. United States*, 29 Fed. Cl. 142, 148 (1993) (quoting *Byrnes v. United States*, 330 F.2d 986, 991 (Ct. Cl. 1963)).

Second, in *Vigil*, "the appropriations Acts for the relevant period do not so much as mention the Program. . . ." 508 U.S. at 193-94. Here, the Appropriations Acts do mention TPA and IHS funding in a manner that supports the Tribe's damages claim here.[48]

Third, in *Vigil*, while IHS informed Congress that the Albuquerque program was ongoing, there was apparently a lack of clarity regarding the agency's intent regarding the program's scope (regional or national). Here, BIA and IHS repeatedly informed Congress that every federally recognized tribe would benefit from TPA and IHS funding – and the geographic scope of these programs was not in question.

Fourth, *Vigil* involved a single, small program. This case involves broadly framed programs that support the foundation of the relationship between the federal government and the tribes with respect to critical matters including tribal government, education, social welfare and health. In *Vigil*, the change in the scope of the handicapped children's program did not impact the core relationship between the federal government and any tribe. But the total denial of any TPA and IHS funding for the Samish had a devastating impact on the federal-tribal relationship, which was effectively (and wrongfully) terminated. Nothing in *Vigil* suggests that an agency's

---

[48] *See* pp. 8–23 above. The government also errs in its contention that because the funds appropriated by Congress each year have been spent, the Tribe "does not have any relief available in the form of money damages." Gov. Mot. at 47. The Anti-Deficiency Act, on which the government relies, has no relevance here. That statute limits the authority of federal officials from entering into contracts or otherwise obligating the United States to pay funds in excess of the amounts appropriated, 31 U.S.C. § 1341(a), but it is not a limitation on the jurisdiction of this Court. To the contrary, Congress established the permanent Judgment Fund to provide a means by which judgments for damages against the United States are to be paid "when payment is not otherwise provided for," 31 U.S.C. § 1304; *see Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1583 (Fed. Cir. 1994); *Doe v. United States*, 16 Cl. Ct. 412, 423-23 (1989), and did not condition payment on the continuing availability of appropriations from the specific agency or fiscal year in which the wrong occurred. If the government's position were the law, it would completely vitiate the Tucker Act, as no plaintiff could ever recover on a damages claim against the United States unless the claim was filed, fully litigated, and judgment entered all before the appropriated funds were spent. No statute so requires and none of the cases on the money-mandating test so conditions this Court's jurisdiction.

authority over funding extends so far as to provide the basis for a fundamental destruction of the federal government's basic obligations to a tribe.

Most significantly, *Vigil* involved a federal agency effort to broaden the class of Indians served by a category of federal funding, while here, the agencies sought to narrow those served, by arbitrarily denying funds to one tribe. The Court in *Vigil* acknowledged this distinction, stating:

> The Court of Appeals saw a separate limitation on the Service's discretion in the special trust relationship existing between Indian people and the Federal Government. 953 F.2d at 1230-1231. We have often spoken of this relationship, *see*, *e.g.*, *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831) (Marshall, C.J.) (Indians' "relation to the United States resembles that of a ward to his guardian"), and the law is "well established that the Government in its dealings with Indian tribal property acts in a fiduciary capacity."
>
> * * *
>
> Whatever the contours of that relationship, though, it could not limit the Service's discretion to reorder its priorities from serving a subgroup of beneficiaries to serving the broader class of all Indians nationwide. *See Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (CA9 1986) (Federal Government "does have a fiduciary obligation to the Indians; but it is a fiduciary obligation that is owed to *all* Indian tribes") (emphasis added).

508 U.S. at 194-95 (underscoring added, italics in original). There was no need in *Vigil* for the Court to address the question of whether a federal agency can simply take action to narrow those tribes it serves (where that agency repeatedly tells Congress that every tribe is benefiting). It is nevertheless clear from the underscored language that such an action stands on a different footing from the action in *Vigil* (which broadened the class of Indians served). In this regard *Vigil* confirms that a narrowing of the tribes served by TPA or IHS funding would be disfavored, as contrary to the government's obligation that runs to "all tribes."[49]

---

[49] *Vigil* describes the Snyder Act as speaking "only in general terms," *Vigil*, 508 U.S. at 183, and the Court of Appeals in this case relied in part on *Vigil* in finding that the Snyder Act, standing alone, is not money-mandating. *See Samish*, 419 F.3d at 1368. But neither *Vigil* nor the Court of Appeals in this case suggests that a statutory scheme involving multiple statutes – one of which is the Snyder Act – can not be money-mandating. To the contrary, one of the two cases cited by the Court of Appeals in this regard was just such a case. *See White Mountain Apache Tribe v. United States*, 249

B. <u>This Court's *Mitchell* line of cases does not support dismissal here.</u>

The government argues that the Tribe's TPA claim should be dismissed based on "the Supreme Court's rulings in the *Mitchell* cases, *Navajo*, and *White Mountain Apache*." U.S. Supp. Brief Re. Its Motion to Dismiss at 6. But those cases merely hold that where the government assumes control over trust property, the government may be held liable in damages for breaching its fiduciary duty to manage the property for the benefit of the tribe or Indians. *See United States v. Mitchell*, 463 U.S. 206 (1983) (*Mitchell II*); *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475-76 (2003); *compare United States v. Navajo Nation*, 537 U.S. 488, 507-08 (2003).

The question in the *Mitchell* line of cases was the extent to which the government had been assigned by Congress statutory duties to manage trust property (such as timber or oil and gas). Where the government has been granted and exercises significant control, it can be held liable in damages for mismanaging or wasting Indian property. *Mitchell II*, *White Mountain*. On the other hand, where the statutory scheme provides for significant tribal (or individual Indian) control of the trust assets, the government can not be held liable. *United States v. Mitchell*, 445 U.S. 535 (1980) (*Mitchell I*); *Navajo*. This line of cases does not support dismissal here for several reasons.

---

F.3d 1364, 1372 (Fed. Cir. 2001), *aff'd* 537 U.S. 465 (2003). The Court of Appeals in *White Mountain* held that the Snyder Act alone was not money-mandating but upheld the Tribe's claim based on another statute that was one among several that provided the basis for the Tribe's claim. *See also Navajo Nation v. United States*, 347 F.3d 1327, 1332 (Fed. Cir. 2004) (a "network of other statutes and regulations" may provide a basis for a money-mandating claim even though a single statute, standing along, had not satisfied that test). Here, while the Snyder Act is part of the statutory framework with regard to TPA and IHS funding, that Act does not stand alone. The money-mandating nature of the Tribe's claims here – like the claim in *White Mountain Apache* – reflects Congressional intent that arises under non-Snyder Act enactments.

First, the *Mitchell* line of cases involves issues arising from ongoing federal activities in connection with the management of a federally recognized tribe's trust resources. This case involves essentially the opposite – the absence of any federal activities on behalf of the Tribe. The *Mitchell* line of cases simply involves a very different set of circumstances and statutes than those at issue here.[50]

Second, the test for whether a statutory scheme is money-mandating is the same in the *Mitchell* line of cases as in the non-Indian money-mandating cases. In fact, the non-Indian money-mandating cases in the Federal Circuit and this Court typically rely on the standards articulated in the *Mitchell* line of cases.[51] We rely on that standard here. *See* pp. 23-25 above.

Third, while the *Mitchell* line of cases looks to the issue of control for determining whether claims for damages can be brought regarding management of trust assets, nothing in those cases suggests that control is the only way to determine if Congress intended a claim for damages to be available. Indeed, the Court of Appeals in this case listed some of the ways a statute can be shown to be money-mandating, and those are by no means limited to control of physical assets. *See Samish*, 419 F.3d at 1364.

Fourth, nothing in the *Mitchell* line of cases suggests that the basic principles from the non-Indian money-mandating cases are unavailable to tribes. The government's efforts to make

---

[50] While this case does not involve federal management of trust assets, as in the *Mitchell* line of cases, it is nevertheless so that the United States had control over TPA and IHS funding – and the Samish Tribe had no control at all. Where Congress enacts a measure for the allocation of funds among a class of tribes, such a measure is money-mandating for purposes of a claim that the proper distribution was not made. *See Lebeau v. United States*, 474 F.3d 1334, 1342 n.5 (Fed. Cir. 2007) ("The terms of the 1972 Distribution Act created a trust responsibility because the United States retained control over tribal monies while the tribes were preparing their rolls subject to the Secretary's approval. . . .").

[51] *See*, *e.g.*, *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006); *McHenry v. United States*, 367 F.3d 1370, 1377-78 (Fed. Cir. 2004); *Agwiak v. United States*, 347 F.3d 1375, 1379-80 (Fed. Cir. 2003).

this Court less available to tribes than to other litigants for purposes of damages claims against the government should be rejected.

In short, the basic test – as set forth in the *Mitchell* cases and elsewhere – is whether it is fair to construe the statutory scheme as providing damages. The *Mitchell* line of cases applies that standard in connection with mismanagement of trust assets. This Court should apply that standard to this case – which involves not mere mismanagement, but the total federal failure to provide for the Tribe any of the basic funding it provided for the benefit of every other federally recognized tribe.

C. Other arguments by the government have no merit.

The government relies on cases that deal with an irrelevant question: whether a case that seeks both damages and declaratory and injunctive relief, properly lies within the jurisdiction of this Court under the Tucker Act or the District Court under the Administrative Procedures Act.[52] As the Federal Circuit recently explained, these cases require the court to determine "the jurisdictional boundary between the Tucker Act and the Administrative Procedures Act." *Suburban Mortg. Assoc., Inc. v. United States Dep't of Hous. and Urban Dev.*, 480 F.3d 1116, 1117-18 (Fed. Cir. 2007). These cases have no application here. The Samish Nation does not seek to correct the future application of an agency policy, secure specific performance of a contract, or obtain other prospective relief. The only relief the Tribe seeks in this suit is money damages, a claim squarely within this Court's jurisdiction.

Nor is there any merit to the government's argument that the payment of damages to the Tribe would constitute a "windfall." Gov. Mot. at 13, 24-25, 31. As a result of the government's

[52] *See* Gov. Mot. at 7-9 (citing *Nat'l Ctr. For Mfg. Sci. v. United States*, 114 F.3d 196 (Fed. Cir. 1997); *Katz v. Cisernos*, 16 F.3d 1204 (Fed. Cir. 1994); *Bowen v. Massachusetts*, 487 U.S. 879, 901-904 (1988)).

arbitrary and unlawful actions in failing to treat the Tribe as federally recognized for more than a quarter of a century, the Tribe was completely denied all federal funding made available to all federally recognized tribes. During that period, tribes throughout the United States were able, with federal assistance provided through TPA and IHS, to develop their governmental systems and infrastructure, to provide governmental services and benefits to their members, to begin to make economic progress to address decades of accumulated poverty, to preserve and advance tribal culture and traditions, and to continue operation as a tribal government for the benefit of its people. But, as a result of the government's failure to recognize the Samish Indian Nation, the Tribe was unable to move forward in these areas on the same basis as all other federally recognized tribes. The federal government's wrongful failure to recognize the Tribe during this 27 year period put the Tribe behind all other federally recognized tribes with regard to economic development, the provision of programs and services to its members, and in the development of tribal government, tribal infrastructure and tribal community. Recovery of damages here would be but a small measure by which the Tribe might begin to remedy these deficiencies and address its long standing and long ignored needs.

Conclusion

For the forgoing reasons, the Motion to Dismiss should be denied.

Respectfully submitted,

Dated: May 2, 2007

*/s/ Craig J. Dorsay*
*by /s/ Anne D. Noto*

Craig J. Dorsay, Esq.
Attorney at Law
2121 S.W. Broadway, Suite 100
Portland, Oregon 97201
Tel: (503) 790-9060; Fax: (503) 242-9001
craig@dorsayindianlaw.com

*Counsel of Record for Plaintiff*
*Samish Indian Nation*

Of Counsel:

William R. Perry, Esq.
Anne D. Noto, Esq.
Sonosky, Chambers, Sachse, Endreson & Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Tel: (202) 682-0240; Fax: (202) 682-0249
wperry@sonosky.com; anoto@sonosky.com