August 31, 1995

| | | |
|---|---|---|
| MARGARET GREENE, et al.<br>Appellants, | : | Docket No. Indian 93-1 |
| | : | |
| v. | : | |
| | : | |
| BRUCE BABBITT, et al.,<br>Defendants. | : | |

Appearances: Scott Keep, for the Appellant, Solicitor's Office, U.S. Department of the Interior, Division of Indian Affairs, Washington, DC

Russell Barsh, for the Defendant, Samish Tribal Office, 2704 Dundee Place, Anacortes, Washington

Before: Administrative Law Judge Torbett

**EXHIBIT 1**
In Support of Plaintiff's Opposition to
Motion to Dismiss on TPA & IHS
Samish v. U.S., No. 02-1383L

August 31, 1995

| | | |
|---|---|---|
| MARGARET GREENE, et al.<br>Appellants, | : | Docket No. Indian 93-1 |
| v. | : | |
| BRUCE BABBITT, et al.,<br>Defendants. | : | |

Appearances: Scott Keep, for the Appellant, Solicitor's Office, U.S. Department of the Interior, Division of Indian Affairs, Washington, DC

Russell Barsh, for the Defendant, Samish Tribal Office, 2704 Dundee Place, Anacortes, Washington

Before: Administrative Law Judge Torbett

## RECOMMENDED DECISION

This matter was heard by the undersigned on August 22-30, 1994, in Seattle, Washington. At the conclusion of the hearing, a schedule for the filing of briefs was set which has now been met. These briefs, along with the relevant parts of the entire record, have been considered in reaching a decision in this case. Where appropriate, parts of these briefs may, with or without attribution, be incorporated verbatim into this opinion.

### Procedural History

This matter has an extensive procedural history, only a part of which needs to be recounted here. In a decision dated February 25, 1992, the United States District Court for the Western District of Washington found that the hearing afforded the Petitioner on their petition for recognition as an Indian tribe under 25 C.F.R. Part 83 did not comport with due process. The Court ordered a new hearing which would have procedures to

meet the constitutional requirements of due process.[1] The trial was held under procedures agreed to by the parties with the object of providing a hearing wherein all parties could present any relevant evidence to the issue being tried.

The undersigned is of the opinion that both parties to this case have now had a fair trial. Any objections to the pretrial procedure or that which was followed at the trial or all objections otherwise, including the Petitioner's objection to Defendant's motion to amend it's post hearing brief, are now specifically overruled. All the evidence which was presented and not rejected at the trial will be considered as a part of the record of this case. The trial, of course, was not perfect but then what else is?

Issue

There is but one issue to be determined in this case, that is should the Samish be recognized as an Indian tribe under the provisions of 25 C.F.R. Part 83. The criterion for recognition contained in the regulation are as follows:

(a) A statement of facts establishing that the petitioner has been identified from historical times until the present on a substantially continuous basis, as "American Indian," or "aboriginal."

* * *

(b) Evidence that a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area.

(c) A statement of facts which establishes that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present.

(d) A copy of the group's present governing document, or in the absence of a written document, a statement describing in full the membership criteria and the procedures through which the group currently governs its affairs and its members.

(e) A list of all known current members of the group and a copy of each available former list of members based on the tribe's own defined criteria. The membership must consist of individuals who have established, using evidence acceptable to the Secretary, descendancy from a tribe which existed

---

[1]The District Court was affirmed in Greene v. Babbitt, No. 92-73010 (9th Cir. August 22, 1995).

historically or from historical tribes which combined and functioned as a single autonomous entity.

* * *

(f) The membership of the petitioning group is composed principally of persons who are not members of any other North American Indian tribe.

(g) the petitioner is not, nor are its members, the subject of congressional legislation which has expressly terminated or forbidden the Federal relationship."

It is agreed by the parties that the Petitioner must meet all seven (7) criteria and only four (4) of these are in dispute. They are the criterion governing identification as an Indian entity (criterion a); distinct community (criterion b); political authority and influence (criterion c); and descendancy from a tribe (criterion e). It should be noted that in the aforementioned decision of the United States District Court for the Western District of Washington that that Court declined to find the regulations set out above unconstitutional.

## Burden and Standard of Proof

The Petitioners have claimed that there should be a presumption that they are an Indian tribe which must be overcome by the Defendant. The undersigned agrees with the Defendant that it is established that the Petitioners have the burden of proof and are not entitled to any presumptions based on the claim that its members descended from a treaty tribe.[2]

As to the standard of proof the undersigned agrees with the Defendant's stated position as to this issue and incorporates that part of the Defendant's brief on this issue into this opinion as Appendix A. This part of the Defendant's brief starts in the middle of page 41 and continues through the end of page 49. Briefly, the standard of proof is a preponderance of the evidence standard as enunciated in Steadman vs. SEC, 450 U.S. 91 (1981). Also, the quality of evidence presented must show a "reasonable likelihood of the validity of the facts relating to that criterion". The Defendants correctly state that the evidentiary standard which must be met by the Petitioners requires minimum quantity and quality measures as to each of the four contested criterion.

[2]The Samish were signers of the 1855 Point Elliott Treaty.

## Summary of Evidence

Petitioner's witness, Yvonne Hajda, has a Ph.D. in social anthropology. The topic of her thesis was social organization of Indian culture in lower Columbia River region from 1792-1830. She has been an independent researcher and consultant on anthropological matters since 1984. She prepared an anthropological report on Samish as part of the acknowledgement process. (Tr. 783-787).

In her testimony, Dr. Hajda concluded that the history of Samish activities from treaty time until present day supports the proposition that the Samish have functioned continuously as a community.

She said the first generation or two following the treaty thought they would get a reservation of their own, but they never did. (Tr. 815). Some of the Samish moved to the Lummi reservation and others stayed off the reservation. Ibid. The off-reservation Samish continued to interact with those on the reservation by supporting each other, including pooling income and food. (Tr. 819-820). The off-reservation Samish tried to continue with their traditional Indian lifestyle of hunting and gathering, but this was made increasingly difficult because of white encroachment on what had been their lands. (Tr. 818).

Moving up to sometime around the turn of the century, Dr. Hajda testified that the Samish had an off-reservation village on Guemes Island (New Guemes Village). (Tr. 821). The village served as a religious center for the Samish, because it was the only place in the area where whites did not interfere with the holding of winter dances. (Tr. 822). The village also "served as a kind of refuge, refugee camp ... for Indians from other areas who were being driven off" with the Samish acting as host. Ibid. "It was a Samish house." Ibid. The village began breaking up sometime around 1900-1910, but people continued to live there until the 1920s. (Tr. 824). Even after people began moving away, the village was used for ceremonial purposes. Ibid. After the house was lost in the 1920s, the Samish participated as a group in religious activities held at other tribe's smokehouses. (Tr. 835).

Dr. Hajda stated that after the break-up of the village, among the places the Samish moved to included the Swinomish reservation, Anacortes and Ship Harbor. (Tr. 825). Some Samish lived at Ship Harbor seasonally and some lived there year-round. (Tr. 827). Ship Harbor had two canneries that made substantial employment of Samish people. (Tr. 825-826). The Samish cannery employees formed two baseball teams. (Tr. 828). At Ship Harbor, the Samish conducted religious activities. Ibid.

According to Dr. Hajda, the Samish held political meetings during the early part of this century, including a meeting at New Guemes Village where 200 or so people attended, and meetings in 1912 or 1913. (Tr. 828-829). "(T)here certainly was organization during that time." (Tr. 829-830). She said the Samish also participated as a tribe in meetings of the Northwest Federation of Indians. (Tr. 829-831). There were numerous meetings of Samish people in 1926-27. Apparently they were in response to legislation passed at about that time permitting Indians to sue the government for not fulfilling treaty rights. (Tr. 832).

Also, during the early part of this century (1900 to mid or late 20s), the Samish met together for Treaty Day celebrations and canoe races. (Tr. 833).

Moving to the time of the Depression, the Samish participated politically by taking a straw poll among its members about whether to support the Indian Reorganization Act. (Tr. 837-838). The Samish also played a roll in the northwestern Washington region during the Depression in preserving the winter dance religion. (Tr. 839).

Moving to the time of World War II, the witness testified that the war made it difficult to meet because of gas rationing, men being called away for military service and people leaving the region for war-related employment. (Tr. 840). Nevertheless, "we have oral testimony that people continue(d) to meet and to discuss the things that they had been discussing. Providing people with what needed to be provided, giving help to people, the usual -- (those) kinds of things. Concerned with fishing and land rights. The same things that had been there all along." (Tr. 841). She said there is also a written letter that provides evidence that a Samish council meeting was held in 1942. (Tr. 859-860).

In 1951, the Samish organized formally by adopting a tribal constitution, Dr. Hajda said. (Tr. 1951). Following the adoption, they pursued such concerns as health, social justice and employment, as well as fishing rights. (Tr. 844). Also during the 1950s, the Samish participated as a tribe in working with other Indian tribes to fight federal termination of Indian benefits. (Tr. 845). She said the Samish also played a formal role during this time as members of Affiliated Tribes of the Northwest, Small Tribes of Western Washington and the National Congress of American Indians.

During the 1960s, the Samish participated in economic development activities by obtaining federal grants from the War on Poverty programs. (Tr. 847).

From 1970s on, the Samish met together as part of the effort to obtain federal recognition, according to Dr. Hajda's testimony. (Tr. 847-854). In the last eight to ten years, the Samish have acted collectively as a community by operating a food bank, participating with the city of Ship Harbor and real estate developers in the effort to develop the community, and putting in the Maiden statue (an important symbol of Samish culture and history) at Deception Pass. (Tr. 855-856). The Samish also continue to participate as Samish in winter dances in the region. (Tr. 858).

Dr. Hajda also concluded that the distinction the government makes that classifies Samish living on the reservation as Samish Indians and those living off the reservation as Indian descendants is not reasonable.

"I don't find it reasonable. I've never understood it." (Tr. 861). For example, "the Cagey family had a white ancestor. Are they Indian descendants? I don't believe they're classified as such by the government. Probably because they're living on the reservation. Therefore they become whole bloods.

The Cumshelitsa-Whulhoten family does not live on a reservation, but they have continued to participate with the families that are not classified as being Indian descendants throughout --- from the beginning. I think one could go on this way. I don't think the distinction is relevant in those terms. It may be a way of classifying people who are really doing other kinds of activities, but to call them descendants, against real Samish, I think is very distinctive." (Tr. 862). By "distinctive" the witness apparently means misleading.

In her testimony, Dr. Hajda concluded that the Samish who live on the Swinomish and Lummi reservations have the capacity to maintain their Samish identity, despite their participation in the affairs of the reservations.

"I think that many of them managed to have office or whatever it was at Swinomish or Lummi, and continued to be Samish and to participate as Samish. It's not an unusual thing. If you look at the United States in general, I know of a great many Indian men who vote as United States citizens. It's not either/or. They serve in the armed forces with great pride, many Indian men are proud of this. It doesn't seem to make them less Indian to have done so. So I find it difficult to think that it's an either/or choice ... (P)eople who live on reservations may well maintain another identity, as well. It's not uncommom." (Tr. 867-868).

Dr. Hajda testified that the makeup of the Samish is similar to that of other Indian tribes in the Pacific Northwest.

The diversity of ancestry in the Samish is similar to that of other Indian tribes in the Pacific Northwest. (Tr. 876). Also, she said, other tribes in the region are similar to the Samish in their level of geographical disbursement. (Tr. 878-879). Basically, the Samish are similar to other Indian tribes in the region. (Tr. 882). Gaps in historical documents are also to be found in dealing other peoples' histories in the region. (Tr. 881-882).

Dr. Hajda testified that the fluctuation in Samish membership roles between 1920s and 1950s-1970s is not meaningful. (Tr. 870-871).

In her testimony, Dr. Hajda also provided examples of Samish leaders:

During the era of the New Guemes village, the Whulholten brothers provided economic leadership by running a fishery. (Tr. 823). Billy Edwards served as a Samish spiritual leader during this era. (Tr. 823-824). While Samish were living at the Ship Harbor community, Charlie Edwards served as a kind of labor boss in rounding up Samish people to work at the local canneries. (Tr. 827). Sas Kavanaugh played a leadership role in organizing Samish meetings around 1912-13. (Tr. 830). During the Depression era, Don McDowell served a leadership role for the Samish, including helping people fill out forms for governmental assistance. (Tr. 837). Following World War II, Alfred Edwards emerged as a Samish leader, serving as president of the new Samish organization. (Tr. 843). With the establishment of a formal Samish council, it has taken a leadership role, including the mobilization of resources. (Tr. 860).

Petitioners' witness, Dr. William Sturtevant testified that he did not think the government methods of evaluating the petition for recognition were proper. Dr. Sturtevant is curator of North American ethnology in the department of anthropology at the Smithsonian Institution. He has been with the Smithsonian since 1956. Dr. Sturtevant has conducted extensive field research with American Indian tribes, most extensively with the Seminole in Florida. (Tr. 31-33).

Dr. Sturtevant testified to problems he sees with the government's research methods.

"I think most of it would have trouble passing muster in a Ph.D. orals exam. How did you get to these results. Or a preliminary, before you go out to do the research on which your Ph.D. is based, how do you propose to get these results ... I think most of these things would have difficulty in passing that

kind of standard ... (I)t's kind of sloppy and unprofessional research . . . .." (Tr. 111).

"... I'm not saying that everything that's in the record (from the government) should be thrown out and discounted. It depends. But certainly it seems to me less thorough, less professional, less believable, in the Samish case, than expert witnesses and evidence from the other side, the Samish side." (Tr. 113).

He indicated that the government's researchers did not spend enough time in the field with the Samish to overcome their (the Samish) natural bias against the government. Because of the bias, Dr. Sturtevant said, the government's researchers should have spent more time with the Samish than the petitioner's researchers did, rather than the other way around. (Tr. 142-143).

He indicated that the government relied too much on telephone research. (Tr. 116). Dr. Sturtevant's opinion is that face-to-face research is more accurate, because you get a better reading of the person's responsiveness to the questions by also seeing their facial expressions. (Tr. 116). Also, he said, people are more likely to be perfunctory in telephone interviews and not give the whole story. (Tr. 116-117).

Dr. Sturtevant also indicated that the government's procedures are flawed because they relied too much on direct questions. He said beginning with general questions before working in the direct questions is a more accurate procedure. This is because direct questions tend to produce biased responses, he said. (Tr. 42-44).

Dr. Sturtevant also testified about the role of political leadership in an Indian tribe not recognized by the federal government.

"...(T)here's going to be much skimpier formal documentation, I think, for an unrecognized group than for a recognized group. People aren't going to sign papers by virtue of their political office, because the outside world doesn't recognize that they have any political office." (Tr. 84).

Dr. Sturtevant wouldn't expect to find a formal tribal council and there probably will be disagreement on who is chief. (Tr. 83). (He said the notion of formal leaders was a concept forced on the Indians by the white man in any event). (Tr. 82-83). Leaders will be found, but they may lead for different purposes, he said. (Tr. 85).

Regarding the meaning of silence in political situations, in Indian culture a person's abstaining from voting is more likely to mean they really vote "no", Dr. Sturtevant said. (Tr. 92-93).

Dr. Sturtevant also testified about the role of genealogy and kinship in determining cultural identity. He indicated that he puts as much emphasis on people's oral understandings about who they're related to than on formal documentation of bloodlines.

"(I)t's really necessary to work back and forth between living people and what they can tell you and the old documents, and to check one against the other. And often they supplement each other, they give hints and direct bits of information that you can then better interpret by looking at the other source of information." (Tr. 103).

The reasons include problems with the accuracy and completeness of the records, especially the accurate use of Indian names, Dr. Sturtevant said. (Tr. 98, 102-103). Also, people may have a shared understanding that they belong to the same clan by descending from a common ancestor, but it can't be traced back far enough to prove genealogically, he said. (Tr. 100-101).

Dr. Sturtevant discounted characterizations about a culture based solely on bloodlines.

"I think one should be careful about making generalizations purely on the basis of blood. Partly because there's a tendency in this society and maybe many societies to overemphasize the importance of biology. It's what we call racism ... I think there's a risk to assuming that just because they do or they don't have Indian ancestry, then they must be otherwise." (Tr. 105).

He noted that in many modern Indian communities, there's usually a higher degree of non-Indian ancestry than the official records say. (Tr. 105). He also said that social relations play the predominant factor in shaping a person's cultural identity, as opposed to ancestry. (Tr. 109-110).

Petitioners' witness, Dr. Wayne Suttles is a professor emeritus of anthropology and linguistics at Portland State University. (He retired in 1984.) Dr. Suttles has conducted extensive field research with the Coast Samish Indian people of northwest Washington and British Columbia, including the Samish. Some of the research was basis of his Ph.D. dissertation completed in 1951.

Dr. Suttles testified about Salish and Samish historical culture, including intermarriage among tribes and with white settlers. He said the Salish people, including the Samish, had a tradition against marrying close relatives (up to fourth cousins). (Tr. 165). The tradition included marrying outside one's tribe for economic and security reasons. (Tr. 165-167).

"(T)he reasons for this are that a marriage started a series of exchanges of foods and foods for wealth, and shared access of resources between the families marrying." (Tr. 165).

"(T)his advantage of marrying out, not only did it start exchanges, but there were political advantages. If you had in-laws somewhere else, you're less likely to be attacked by those people." (Tr. 166).

The Salish Indians also intermarried with white settlers when they showed up in the early part of the 19th century and recognized them as in-laws, Dr. Suttles said. (Tr. 179-182). Intermarriage with whites dropped off after more white women came into the area and expressed prejudice against Indian women and white settlers married to them, he said. (Tr. 236).

Even with the intermarriage among tribes, specific tribal identity was maintained, Dr. Suttles said. (Tr. 202). The various tribes "were part of a social network that extended pretty much indefinitely ... Samish had ties with the Swinomish and Skagit, Skagit had ties with the Snonomish, the Snonomish had ties with the Duwasmish, (and) so on ... It was a kind of social continuum through marriage, a biological continuum because of kinship relations. But each of the units that was in that had a real identity, real existence." (Tr. 202).

"Sometimes people have said, well now, you're saying this was a continuum. Doesn't that mean that these local groups, tribes, whatever you call them, don't really exist? And I say no, this is not this kind of homogeneous continuum where you can't find any units within it. It is a network, and --- well to use a metaphor, I think we can say that each of these local groups was a knot in the network. The network wouldn't exist without knots." (Tr. 202).

According to Dr. Suttles, evidence that the Salish people did not act as a homogenous tribe, but instead as a network of related specific tribes, include the existence of property rights among the tribes (Tr. 203); the hosting of intergroup gatherings (dances and potlaches) where one tribe was considered hosts and the other(s) guests (Tr. 199); and the existence of separate languages. (Tr. 161).

Dr. Suttles also testified about differences between the Samish and Noowhaha tribes: They spoke different languages. (Tr. 205). The Samish considered to be of higher status than Noowhaha. (Tr. 212).

Dr. Suttles also testified about the role of leaders in Salish culture. The Salish did not have head chiefs, he said. (Tr. 213). White settlers tried to force the concept onto them, he said. (Tr. 213-214). While there were no head chiefs, people took leadership roles by virtue of wealth, including ownership of property useful for hunting and fishing, and skills. (Tr. 214-216).

Dr. Suttles also testified about what distinguishes contemporary Coast Salish Indians from other people in northwestern Washington today. He said the differences include preservation of traditional ceremonies, including the winter dance (Tr. 223); participation in the Shaker Indian church (Tr. 223); pride about Indian ancestry (Tr. 224); and the wide recognition of kinship ties. (Tr. 224).

According to Dr. Suttles, Charlie Edwards' family and Annie Lyons' family did not own the only important economic sites for Samish people as a whole. (Tr. 249-251).

Dr. Suttles also testified about why some Samish families moved to the reservation in 19th century and others did not.

"I can only say from my general knowledge that it seemed likely that people moved onto reservations when they had relatives there who were well-established, where they felt they were going to be at home. And those who did not move on were those who felt less at home." (Tr. 251).

Petitioners' witness, Ms. Mary Hansen, a Samish, testified about whether the Samish have acted continuously as a community during her lifetime.

Ms. Hansen recalled meetings of Samish people during the 1930s. (Tr. 1029). Also during the 30s, the Samish people looked after one another by providing food and other support to the needy. (Tr. 1032).

This looking after one another continued during World War II, Ms. Hansen said. (Tr. 1032-33). The Samish also held formal political meetings and social gatherings during the war years. (Tr. 1033).

Moving up to the 1950s, Ms. Hansen was involved in the Samish establishing a formal tribal organization in 1951. Ibid. She said the formal council was in response to passage of the

Indian Claims Act, but other concerns, including concerns about sick and hungry members of the community, were also brought up in organization meetings. (Tr. 1034). Samish were also concerned about fishing rights during this time and the possible termination of federal benefits to Indians, including closing a local hospital. (Tr. 1037-39). She said correspondence was sent to the Samish membership to keep them apprised of the activities of the council. (Tr. 1039-40).

Also in the 1950s, Samish regularly were together at funerals, which were important occasions for exchanging information and getting caught up on each other. (Tr. 1036). Also in that decade, the Samish council provided $75 to Mrs. Lyons, a tribe member, after her house burned down. Ibid.

In the 1960s, the Samish made an unsuccessful effort to take over the extinct Ozette reservation. (Tr. 1040). Obtaining a land base is an important issue for the Samish and a Samish land acquisition committee was formed two years ago. (Tr. 1041).

Ms. Hansen testified that in the 1970s the Samish, by obtaining federal funding, established an office in Anacortes. Ibid. Also by virtue of obtaining federal funding or other sources of aid during the decade, the Samish attempted to set up a canning operation and conducted classes. (Tr. 1042). Cultural preservation, including preservation of sacred objects, became a priority of the Samish in the 1970s. (Tr. 1043).

According to Ms. Hansen, Samish group activities from the 1980s on have included operation of a food bank (Tr. 1051-52), a seniors nutrition program (Tr. 1052-53), a preschool (Tr. 1052), speaking to other groups in the community (Tr. 1051), holding gatherings at the Maiden of Deception Pass (Ibid), and trying to establish a cultural center museum at Ship Harbor (Tr. 1057).

Regarding activities on the Lummi and Swinomish reservations over the years, the Samish have held gatherings as Samish, Ms. Hansen said. (Tr. 1055-56).

Ms. Hansen also testified about Samish leaders. She said Mr. Cagey, Albert Edwards and Sas Kavanaugh were leaders during the 1930s. (Tr. 1030). According to her testimony, during the 1950s, Wayne Kavanaugh, Alfred Edwards and herself were among the people on the Intertribal Council, which was fighting against the termination of federal benefits to Indians, including the closing of a local hospital. (Tr. 1038).

Ms. Hansen testified that Cheryl Wheeler's analysis of the Samish's historical tribal council minutes is basically consistent with her recollections of the meetings. (Tr. 1059).

Obtaining federal recognition is important, but it's not the sole concern of the Samish, Ms. Hansen testified.

"I think federal recognition is the key to all these other doors that are out there. Without that we're losing programs because the state follows federal guidelines. We're not included in some state programs because we're not federally recognized. No, we have great ambitions for economic development, training for our children, our grandchildren at this point. No, we see a continuation of the tribe. We have a very proud heritage, and we certainly aren't going to turn it into garbage." (Tr. 1060).

It would appear to the undersigned that this testimony is an affirmative answer to counsel inquiries as to whether the Samish have other concerns outside of federal recognition. That is, they were not just meeting solely for the purposes of obtaining federal recognition as the Defendants contend.

The Defendants witness, Holly Reckord, is chief of the Branch of Acknowledgement and Research of Indian Tribes for the Bureau of Indian Affairs.

Ms. Reckord described seven mandatory criteria that a petitioner must meet under federal regulations to be recognized as a tribe. These criteria have been previously set out in this opinion.

According to Ms. Reckord, in deciding whether the standards are met or not, the branch does not use the "preponderance of the evidence standard," as meant in the legal sense.

"I think we're mostly coming at it from the point of view of anthropologists, genealogists and historians." (Tr. 273).

According to Ms. Reckord, the criteria regarding exercising of political authority does not mean legal authority.

"We're not looking for a governmental kind of political authority. We're basically looking for people making decisions and having them stick.

For example, the group owns a cemetery. Somebody wants to bury their father-in-law there who is not a member of the group. Who do they go to, who makes the decision, does the decision stick. That would be the kind of political activity that we're really looking for." (Tr. 275).

She said that proof of interaction is the key to meeting criterion number two.

"...I think what we are looking for in our regulations, and the way we have applied them, is for interaction ... (Petitioners) can show this in any number of ways. They can show this by showing us that they are doing things together. They are perhaps marrying each other, they are burying each other, they meet together. And also informal kinds of social relationships. They seem to know each other, they gossip about each other, they know what their relatives are doing, they know how they're related ... Whatever they can show us that shows they have continued to interact, and that they are in some way separate from the surrounding community." (Tr. 266-267).

The Defendant's witness, Dr. James Paredes, is professor of anthropology at Florida State University. He has conducted extensive study of American Indians while as a professor and as a graduate student, including Chippewa, Oneida, Poarch Creek and the Machis Lower Alabama Creek Indian. He helped prepare a history of Poarch Creek to support its case for federal recognition. He also was on an Association of American Indian Affairs committee to develop a program to help unrecognized Indian groups seek federal recognition. (Tr. 276-283).

In his testimony, Dr. Paredes concluded that kinship ties play an important role in maintaining Indian communities.

"In Indian communities, kinship is especially important, given that for so many, quote, 'traditional Indian cultures,' the political, religious and economic life was predicated upon various kinds of kinship structures ... American Indians, by virtue of being insulated, in increasingly insular communities, with prolonged patterns of intermarriage, kinship ... continues to be an important basis for the integration of that community, and for deciding who belongs and who doesn't belong." (Tr. 298-299).

Outmarriage, that is the marriage between people of Indian descent and those of no Indian descent, serves to weaken kinship ties between Indians, Dr. Paredes concluded.

"Outmarriage, in the case of Indian communities, obviously has occurred since the days of Jon Rolfe and Pocahontas ... But in any kind of small isolated community, marriage tends to be a very effective glue in keeping people obligated to each other ... At the simplest level, outmarriage means that one has their primary, secondary and tertiary kinship loyalties divided between two kinds of communities ... (w)heras inmarriage reinforces your existing kin ties ..." (Tr. 300-301).

Dr. Paredes also concluded that keeping a common locality plays an important role in maintaining Indian communities, as well as other kinds of communities. (Tr. 297-298).

Ms. Patricia Simmons is an employee of the Branch of Tribal Relations for the Bureau of Indian Affairs.

Ms. Simmons testified for the Defendants that, starting in the mid 1960s, the branch prepared lists of Indian tribal organizations that the federal government has had dealings with. (Tr. 347). They were not intended to be lists of federally recognized tribes as such, she said. (Tr. 348).

The Defendant's witnesses, Laura Wilbur, Chester Cayou, Barbara James and Susan Wilbur are people of Samish descent who are members of Swinomish tribe, live on the tribe's reservation and participate in tribal government.

All four testified that they are not aware of any incidents of discrimination in Swinomish tribal affairs against tribal members of Samish descent. (Tr. 510 (Laura Wilbur), 530 (Cayou), 548 (James), and 777 (Susan Wilbur).

According to Laura Wilbur, Ms. James and Susan Wilbur, Swinomish tribal government officials include people of Samish descent. (Tr. 510-511, 548, 777).

Laura Wilbur provided an example of Samish not being discriminated against: the Swinomish reservation community approved $450 for the funeral of Alfred Edwards, a Samish leader. This was the same amount as everyone else got, she said. (Tr. 511-512).

During cross examination, Mr. Barsh moved to disqualify Cayou as a witness because he couldn't remember preparing an affidavit regarding the case. (Tr. 542).

Also during cross examination, Ms. James said she attended a gathering of Samish people at the Maiden at Deception Pass and admitted that Samish were considered the hosts for the gathering. (Tr. 556-557). She testified that she participates in Indian smokehouse dancing ceremonies and said Indians would typically be reluctant to give much information about the activity to outsiders. (Tr. 558-559). Ms. James also said that the Samish sit as a group in smokehouse activities. (Tr. 559-560).

Ms. Lynn McMillion is a genealogist for the Branch of Acknowledgement and Research of Bureau of Indian Affairs.

She testified concerning the branch's review of documents presented by the Samish to show that they descended from a historical tribe. The issue of descendency is not disputed in this case with the exception of the Noowhaha.

Ms. Judy Flores is enrollment clerk for the Swinomish tribe.

She testified that, of Swinomish tribal members, 421 people, or about 72 percent of the tribe, live either on the reservation or in towns close by. (Tr. 765).

The Defendant's chief witness, Dr. George Roth is a cultural anthropologist with the Branch of Acknowledgement and Research of the Bureau of Indian Affairs. His qualifications as an expert include a Ph.D. degree in cultural anthropology with his dissertation based on a study of the Colorado River Indian and Chemehuevi Valley reservations. During his 16-year tenure with the branch, he has been the lead researcher on 13 petitions from groups of people claiming Indian descent seeking federal recognition as tribes. (Tr. 569).

In his testimony, Dr. Roth concluded that the people of Samish descent living at the Swinomish reservation, like the people residing at the reservation who descend from other tribes, have been fully integrated into reservation life such that they no longer exist as a separate community of their own.

"(O)ur basic conclusion was that over a period of time, the reservation became increasingly a real social unit unto itself, as opposed to simply a place where a variety of people with a variety of connections were living," Dr. Roth said. (Tr. 592-593).

He said evidence for the conclusion includes Samish leaders' participation in the reservation's official business, as reflected by their signatures on documents. The documents include a 1917 letter to the Commissioner of Indian Affairs regarding whether male Indians are subject to the draft (Tr. 594); a 1926 petition to the agency responsible for the reservation asking that dances not be allowed at the reservation's public hall due to liquor problems (Tr. 595); and documents pertaining to the organization of the Swinomish reservation community under the Indian Reorganization Act (Tr. 596-597).

Other evidence is the Ph.D. dissertation of Natalie Roberts at the University of Washington based on field study at the Swinomish reservation, Dr. Roth said.

"Her primary thesis is that over a period of time, the Swinomish reservation evolved into a community of its own. There are a number of informal and semi-formal social institutions and clubs and things which have grown up starting around 1920, and continuing to the present, so that the tribe has become socially

integrated as well as politically integrated," he said. (Tr. 599-600).

Dr. Roth indicated that the people of Samish descent living on the Lummi reservation are integrated into that reservation. He said evidence shows that Sammish people have consistently served in the Lummi tribal government since 1959. (Tr. 624-625).

Dr. Roth concluded that the people of Samish descent living off reservation do not have a high enough degree of social connectedness to be considered a community on their own. They are lacking in kin ties and geographical proximity, as well as lacking in other types of social ties such as common clubs or churches or informal visiting, he said. (Tr. 616).

Samish living off reservation "with a few exceptions, had little or no knowledge of or contact with others in the group. Particularly if you filter out the possible participation in meetings of the organization," he said. Ibid. Dr. Roth did not elaborate why participation in the organization should not be considered a valid form of social interaction.

Dr. Roth also concluded that the Samish living off reservation do not have significant contact with Samish living on reservation, with the exception of participation in the organization. (Tr. 619-620).

Under cross examination, Dr. Roth indicated that a specific level of proof is not used by the branch to determine how much interaction must be shown to meet the criteria for recognition. Instead, the branch uses an evolving standard based on "professional judgment".

"Our procedure, of course, is to pull together all the information that's available to us on the various kinds of social contact or social relations that we, I guess, if you will, come to an agreement that this is significant kind of evidence. It's the sort of thing that's laid out in the regs. And again, if it's a very, very strong case, then I think the thinking doesn't really go too much beyond that. Enough is really kind of a threshold question, how much is just enough contact to be okay, versus not quite enough contact to be okay.

And I'm afraid we just go on our -- I'd say we would go on our professional judgment, within this strong and weak end of the scale. I suspect we have to some extent evolved -- have kind of an evolving standard as we work on cases that are, if you will, somewhat towards the middle." (Tr. 665-666).

Dr. Roth concluded that, regarding the criterium that tribal leaders must exercise political leadership, little evidence has

been presented to prove or disprove that the Samish meet this standard. (Tr. 632).

Dr. Roth testified that a formal organization that included Samish people was created in 1926 to pursue legal claims against the federal government. (Tr. 601). The creation of the organization should not be considered a formalization of the Samish tribe, he concluded.

"(W)e looked very closely at this group in an attempt to determine what it was, and what it means in the process of trying to determine what's going on with the Samish ... The minutes are almost entirely concerned with the mechanics of pursuing the claims ... (T)he people that were enrolled in it were ... quite a varied combination of people. It included reservation Samish, as well as the descendants of these pioneer families ... The oral history ... indicated that it was a joint organization with the Swinomish, which also suggests that it was for a limited purpose. They had a single secretary, a single treasurer.

Our conclusion was that this was --- because of the diversity of the enrollment, that this was not in itself a formalization of the Samish tribe, but an organization which brought together a number of people with varying degrees of background, and varying degrees of social connection with each other, to help pursue the claim . . . ." (Tr. 603).

In response to a question from the undersigned, Dr. Roth said there is no set number regarding how many individuals it takes to make up a tribe. (Tr. 752). He said there has to be proof of desecendency back to a historical tribe. (Tr. 753).

The undersigned asked Dr. Roth whether the purpose of the criteria should be taken as a way of showing that a group of people asking for recognition have continuously maintained their intention of being an Indian tribe. While not agreeing to this analysis outright, the witness did not appear able to dispute this proposition. (Tr. 754-755).

## Discussion and Conclusions

The opinions rendered in the District Court decision and the United States Court of Appeals decision affirming that District Court both state in essence that a policy decision based on a governmental investigation does not give due process to the Petitioners in their efforts to obtain federal recognition as an Indian Tribe. These courts insist that something more is needed and that the Administrative Procedure Act is an appropriate mechanism to afford the Petitioners due process in this particular case. To the undersigned the right to due process

means a right to a hearing where the parties are allowed to present evidence which pertains to the issues and to confront and cross-examine the witnesses. To the undersigned it follows that the parties so entitled are entitled to a due process decision, that is, a decision based on the weight of the evidence adduced at the hearing.

On this basis, the recognition regulations themselves and not their history and development are of paramount significance. These regulations now have the force of law, and as they are clear in their meaning, there is no need to even consult the regulatory history. Stated plainly, if the Petitioners have by a simple preponderance of the reliable, probative and material evidence made a case which taken as a whole tends to show the truth of the Petitioners allegations, then they are entitled to recognition.

Under this standard, there is no question that there is a preponderance of evidence to support the Petitioners as to each and every element contained in the recognition regulations. Further, there is no question that the quality of the evidence demonstrates that it is reasonable and believable that the Samish have continually existed as an Indian tribe up until this very day. The quality of proof supports the Petitioner as to each element contained in the recognition regulations.

Before commenting further on the proof it should be stated that it is the opinion of the undersigned that all of the witnesses were truthful. Each witnesses testified credibly and each is entitled to be believed under oath. Chester Cayou had some difficulty with his recollection but this is not a reason to discount his testimony in its entirety.

There are no conflicts in the testimony as to the facts that haven't been resolved. The only contentious matters are those of conflicting interpretations.

For instance, Dr. Hadja and Dr. Roth draw different conclusions based essentially on the same facts. The Petitioners insist that since Dr. Hadja had a better opportunity for observing the tribe and examining the evidence that she should be believed as opposed to Dr. Roth. Specific expert anthropological conclusions supported by the record are evidence. Where Dr. Hadja and Dr. Roth or the other witnesses draw anthropological or other expert conclusions which are in conflict, the undersigned has in his finding of fact resolved the conflict or made a judgment as to which conclusion is the most believable.

Dr. Hadja and Dr. Roth are not the ultimate finders of fact. Their conclusions or that of the other witnesses that the Petitioners ultimately meet or do not meet the criteria of the

recognition regulations are legal conclusions and are not entitled to any weight in this type of proceeding.

Now, having considered the testimony set out above the undersigned is of the opinion that the testimony of the Petitioners' witnesses is accurate and factual. The undersigned accepts this testimony and the expert conclusions of the Petitioners' witnesses as the facts of this case. Further, the undersigned makes the additional findings of fact which are included and set out in Appendix B to this opinion. These findings of fact support the positive finding for the Petitioners as to each of the contested criteria.

It would serve no purpose to re-summarize the testimony of the Petitioners' witnesses. This testimony firmly supports the petitioners' position and needs no explanation. However, it is incumbent on the undersigned to considered some of the Defendant's testimony and their conclusions which are necessarily rejected by the undersigned's decision.

Dr. Roth testified for the Defendants in principle opposition to the position taken by Petitioners. His testimony did not seriously controvert the factual basis of the Petitioner's petition. His conclusions, however, based on these facts were radically different.

He testified that the Samish who lived on the established reservations such as the Swinomish and the Lummi had integrated into those reservations and become a part of those tribes. His basis in part for this testimony is that the Samish leaders participated in official reservation business.

Further, he refers to the Ph.D. dissertation of Natalie Roberts. He stated that her primary thesis is that the Swinomish Reservation evolved into a community of its own and that the Indians who were there had become socially and politically integrated. This was around 1920, according to Dr. Roth. Dr. Roth seems to contradict himself in that the evidence is practically unrebutted that the Samish continued to survive as a tribe even by Dr. Roth's standards up until the 1930's.

In another contradiction as to the evidence that the reservation Samish have merged with the Lummi, Dr. Roth testifies that the Samish consistently served in the Lummi tribal government since 1959. This is true but this was well after 1951 when the Samish formally reorganized and it can hardly be disputed that the Samish were not a tribe from that point on.

Dr. Suttles testimony negates the Natalie Roberts dissertation. It shows that many Samish families, like the Edwards family and others, still maintained their distinct

identity as Samish even though they participated in reservation affairs.

Speaking generally, the heart of the Defendant's case is their assertion that the true Indian Reservation Samish have integrated with other Indian tribes and that other Non-Reservation Samish are simply Indian descendants and are not Indian enough to be considered part of an Indian community. The undersigned specifically rejects this position as not being supported by the evidence. There is significant evidence in the record which supports the proposition that certain off reservation Samish continued to be a part of the Samish community.

There is no anthropological reason why the Samish who lived on reservations which were admittedly made up of many different tribes could not participate in the reservation activities and still maintain their Samish identity. The individuals who testified at the hearing who said that even though they had Samish blood that they considered themselves Swinomish spoke only for themselves. This is in opposition to the numerous members of the Samish tribe who live on reservations who consider themselves still to be Samish.

There is sufficient evidence in the record to show the continuation of the Samish tribal functions between 1935 and 1951. This period is probably the most seriously contested. There is oral history of meetings during that time and there is documentary evidence. Mary Hanson's testimony supports the proposition that the tribe continued to exist as a tribal entity during this period of time.

There are other important reasons to believe that the Samish continued to exist as a tribe during this critical period of time. There is a continuity of leadership. These leaders who emerged from one generation were often followed in succeeding generations by their children and grandchildren. They continued to maintain influence with the tribe throughout the history of the tribe. The Edwards family in particular have been leaders since almost the turn of the century and are still leaders in the tribal movement. There are other leaders such as Sas Kavanaugh and Don McDowell who demonstrated tribal leadership at certain times during the tribe's history.

Dr. Roth questions the Samish existence, stating that the Samish organized only for specific purposes; that is, to pursue claims such as government benefits or fishing rights. It is this showing up for specific purposes that convinces the undersigned that the tribe continues to exist. Whenever there was any reason for the Samish to demonstrate their existence, they immediately rose to the occasion. When there was ever an issue before it,

leaders appeared and the tribe immediately took action. To the undersigned's mind, this is conclusive evidence that the tribe continued to exist and to have political influence and authority with its members.

The Noowhaha[3] tribe and the Samish were at one time different tribes. Dr. Suttles and Dr. Hadja testified that the two tribes had combined probably around 1850 and that they had been one tribe since that time. This conclusion of Dr. Suttles and Dr. Hadja is controverted by the Defendants but the undersigned is convinced that the conclusions drawn by these two witnesses are sound.

The undersigned observes that the Samish never had a reservation. They did manage to maintain separate living areas for a good many years until these were lost to white encroachment. Then they were required to live either on the reservations of other tribes or to live independently on non-Indian lands. Those who lived on non-Indian land apparently intermarried with non-Indians considerably more than those who lived on reservation land. The Defendants argue that these circumstances led to a disintegration of the tribe at least in so far as the recognition regulations were concerned.

To be a member of a tribe is a political affiliation and it is essentially a matter of intention on the part of the individual tribal member. It is not a matter of blood nor is it necessarily a matter of living in the same immediate area. It is often necessary and always proper for people to participate in activities which control their immediate environment. However, in doing so, an individual's political affiliation is not changed because he or she associates with others of another political party.

The evidence in this case clearly demonstrates that a certain number of reservation and off reservation Samish intended to remain Samish and are Samish. This is their choice. This core of people have in accordance with the recognition regulations preserved the integrity of the Samish tribe. Because of them, the Samish should be recognized formerly as an Indian tribe.

---

[3]The record in this case reflects different spellings of the names of certain tribes. The undersigned has tried to consistently use an identical spelling for each tribe.

This decision constitutes a recommendation to the Assistant Secretary for Indian Affairs that the Petitioners be formerly recognized by the federal government as the Samish Indian Tribe.

David Torbett
Administrative Law Judge

Distribution:

Scott Keep, Associate Solicitor, Division of Indian Affairs, Room 6456, Office of the Solicitor, U.S. Department of the Interior, 1849 C. Street, NW, Washington D.C. 20240 (Certified Mail - Return Requested)

Russel Lawrence Barsh and Rachael Paschal, Esq., Samish Indian Tribe, 2704 Dundee Place, Anacortes, WA 98221 (Certified Mail - Return Requested)

Associate Solicitor, Division of Indian Affairs, Office of the Solicitor, U.S. Department of the Interior, Room 6456, 1849 C. Street, NW, Washington, DC 20240

James H. Jones, Jr., Bell & Ingram, P.O. Box 1769, Everett, WA 98206

Snoqualmie Indian Tribe, C/o Andy de Los Angeles, P.O. Box 280, 3946 Tolt Avenue, Carnation, WA 98014

Mitch R. Dailey, Wettrick, Toulouse & Howe, 658 Central Building, 810 Third Ave., Seattle, WA 98104.

Richard Dauphinais, Native American Rights Fund, 1712 N Street, NW, Washington, DC 20036

Arlinda F. Locklear, 3809 Jefferson Pike, P.O. Box 605, Jefferson, MD 21755

Timothy Brazill, Brazill & Bennett, Morrison Opera Place, 47 South Meridian Street, Suite 305, P.O. Box 856, Indianapolis, IN 46206

Herbert M. Whitish, Shoalwater Bay Indian Tribe, Old Tokeland Road, P.O. Box 130, Tokeland, WA 98590

Mary Gay Sprague, Arnold & Porter, 1200 New Hampshire Ave., NW, Washington, DC 20036,

Kerry Radcliffe, Garvey, Shubert & Barer, 1191 Second Ave., Suite 1800, Seattle, WA 98101

R. Anthony Rogers, Esq., General Litigation Section, Environment and Natural Resources Division, , U.S. Department of Justice, P.O. Box 663, Washington, DC 20044-0663

APPENDIX B

The findings set out below which are adopted principally from the Petitioners brief with modifications constitute additional Findings of Fact in this case and are incorporated by reference into this opinion.

1. Ms. Simmons, an employee of the Bureau of Indian Affairs for 30 years, testified that she began preparing lists of Indian tribes "with whom we had dealings" in 1966 (TR:347, TR:349). Her preliminary list was "based on a review of the files" in her office, and was circulated among staff for comment (TR:347-348). "It was never intended to be a list of federally recognized tribes as such," she recalled; "it may have evolved into that," however, under Congressional pressure to make clearer distinctions between recognized and non-recognized tribes (TR: 348). By 1969, she had restricted her list to "those groups who had a formal organization approved by the Department" (TR:349-350, TR:357).

2. Ms. Simmons explained that, initially, "we just listed everybody that there was a file records section for" in the Bureau's Washington, D.C. offices (TR:351, TR:36). The draft was then sent to Area Offices and Agency Superintendents to identify which of the groups listed had a "formal relationship" with them. This was the basis on which groups were then classified as Federally-recognized or not, but she admitted that records of Area and Agency comments have been lost (TR:351-352). Subsequently, her revised list was "generally" consulted to determine groups' legal status, although paradoxically she conceded that she had no authority to make such decisions (TR:353, TR:363).

3. Under cross-examination, Ms. Simmons identified an early draft of the list she prepared in 1966, which includes the Samish Tribe on page 14 (TR:355, Exhibit P-3). She recalled that the Samish had been taken off her 1969 list because the Bureau's Portland Area advised her that they were "recognized for claims purposes only," but she had no record of this (TR:355, TR:358-359, Exhibit P-4). On further questioning she conceded that she had no personal knowledge of the legal status of the groups she had listed under the Portland Area, and had relied upon the comments, now lost, which were made by the Portland Area (TR:367-368).

7. In 1978, the Defendants adopted standard procedures and criteria for reviewing the legal status of non-Federally-recognized groups, set out, as amended, in 25 C.F.R. Part 83. The Tribe submitted a petition for consideration under these regulations in 1979, which was denied in 1987. 52 Fed.Reg. 3709.

The Tribe subsequently challenged the denial on constitutional Due Process grounds, resulting in this remand.

8. Petitions for Federal acknowledgment are processed by the Branch of Acknowledgment and Research (BAR), in the Bureau of Indian Affairs. Ms. Reckord, who is currently chief of the Branch, described in detail the procedures her staff follows in evaluating the evidence contained in petitions (TR:261-264). She also summarized the seven criteria for Federal acknowledgment of an Indian tribe contained in 25 C.F.R. 83.7 (TR:264-268). Since Ms. Reckord began working at BAR *after* its final administrative determination against the Samish Indian Tribe, however, she has no direct knowledge of the research methods actually utilized by Dr. Roth and other BAR staff members to study the Samish, hence her testimony is of very limited probative value.

14. The parties also called a number of Indian witnesses. Defendants called four members of the Swinomish tribe's governing body, or senate --Laura Wilbur, Chester Cayou, Sr., Barbara Jean James, and Susan Day Wilbur--as well as the Swinomish tribal enrollment clerk, Judy Flores. Mr. Cayou's credibility was strained by his denial of having ever made the affidavit previously submitted by Defendants as the foundation for his testimony (TR:542-543) and his insistence that he had never served on the Samish Tribe's fish committee (TR:539-540), contradicted by the minutes of the committee (Exhibit P-31, added to the hearing record by leave of the ALJ, TR:540).

15. The Tribe called Ms. Hansen, who had served on its council and as its secretary since the 1950s. Mrs. Hansen is the great-granddaughter of Cubshelitsa, sister of Whulholten, one of the leaders of the Samish village on Guemes Island a century ago, and daughter of Don McDowell, Samish Tribal leader in the 1930s; she was given the name Cubshelitsa by Whulholten's granddaughter, Mary Ann Cladoosby (TR:1028-1029; also TR:805, TR:825, TR:837).

21. Dr. Sturtevant is the curator of North American ethnology at the Smithsonian Institution in Washington, D.C., with which he has been affiliated in various capacities since 1956 (TR:31). He has conducted anthropological fieldwork among Indian tribes in various regions of the United States including the Seminoles of Florida, the Senecas of New York, and the Pomo in California, as well as field research in Mexico and Burma (TR:32-34). By his own calculation, he has visited communities belonging to every American Indian cultural region except the Plateau (TR:34). He has also conducted historical research using a variety of print and graphic materials (TR:37-38).

22. Dr. Sturtevant has been the general editor of the Smithsonian Institution's encyclopedic *Handbook of North American Indians*, which is being written by leading anthropologists and historians under the sponsorship of an Act of Congress,

summarizing existing knowledge of Indian cultures and history (TR:35-36). His editorial role includes selecting experts to prepare various chapters, and evaluating their work professionally (TR:37).

23. Dr. Sturtevant was also invited, by the Government defendants, to participate in a workshop in January 1992, to advise them on reforming their procedures for determining whether particular groups are Indian tribes under 25 C.F.R. Part 83 (TR:58).

24. Dr. Suttles is professor emeritus at Portland State University in Portland, Oregon, where he began teaching anthropology and linguistics in 1966 (TR:154). Since he began his studies, before the Second World War, his research has focussed on the Coast Salish peoples of northern Washington and southern British Columbia, including Semiahmoo, Lummi, Samish, Saanich, Songhees, Sooke, Nooksack, Swinomish, Skagit, Katzie, Cowichan, Chilliwack and Musqueam (TR:154-156). Dr. Sturtevant regards him as the primary expert on the culture and society of Coast Salish Indians, and on that basis had arranged for him to edit the volume of the *Handbook of North American Indians* devoted to the Northwest Coast (TR:39).

25. Dr. Suttles explained that he had studied several different Coast Salish languages and dialects and understood "about three-quarters" of what he heard, although he did not regard himself as fluent (TR:160). He is presently working on a grammar, for the British Columbia Museum (TR:160-161).

26. Dr. Suttles began interviewing Samish elders in 1947, and in 1951 was asked by the attorneys representing a number of tribes in the area to testify on their behalf before the Indian Claims Commission; among the Samish he knew at that time were Charlie and Alfred Edwards, Tommy Bob, Annie Lyons, and Mary Hansen (TR:157; TR:222). He testified that he had remained in contact "off and on" with Samish people (TR:158).

27. In addition to his experience with Coast Salish peoples like the Samish, Dr. Suttles referred to research he had conducted with Indians further north along the Pacific Coast such as the Tsimshian, Kwakiutl, Bella Coola and Cloquallum, as well as the Northern Paiutes in Nevada, and the Okinawans in Japan (TR:158-159).

28. Dr. Hajda, an independent researcher, completed her doctorate in anthropology at the University of Washington in 1984. Her thesis, on the social organization of lower Columbia River Indians, drew heavily on historical records, as well as interviews with Indians on the Warm Springs and Grand Ronde reservations (TR:783-784, TR:887-888).

29. Dr. Hajda has continued this cultural and historical research as a consultant to the Indian tribes of the Warm Springs and Grand Ronde Reservations, and, under contract with the U.S. Forest Service, on the Yakima Reservation in Washington (TR:765-786). Her field research has focussed on Indians of coastal Oregon and southwestern Washington, and in this connection she has studied with Dr. Suttles at Portland State University (TR:787). Dr. Sturtevant and Dr. Suttles arranged for her to prepare a chapter for the volume of the *Handbook of North American Indians* on Northwest Indians (TR:39).

30. Dr. Hajda explained that she was referred to the Samish Tribe by Dr. Suttles, after the anthropologist originally assisting the Tribe, Dr. Snyder, fell ill (TR:787). She understood that her assignment was to assemble and analyze the materials assembled by Dr. Snyder and the Tribe, which was largely historical (TR:788). After she reviewed this material, it was decided that she should interview some of the oldest living members of the Tribe, and also conduct a survey of the members (TR:788). The elders came to the Tribe's offices with their families, to hear what they had to say (TR:788). Summaries of these interviews were submitted to BAR during the course of the previous administrative proceedings,[1] and the tapes were submitted here as Exhibit D-27.

31. While doing this, Dr. Hajda continued to consult with Dr. Suttles from time to time, and borrowed his old field notes (TR:790-791). Her active research on the Tribe's case was completed in 1987, but she has continued to re-evaluate her conclusions on the basis of more recently discovered historical documentation (TR:791, TR:889-890). In response to Defendants' cross-examination, she stressed that the Tribe had made no suggestions as to what she should include in her research findings (TR:932). She also clarified that she had reviewed all documents that she could find in the Tribe' possession up through 1987 (TR:991).

32. Dr. Roth has been employed for the past 16 years by BAR, where he has been their lead researcher on 13 Federal acknowledgment petitions (TR:568-569). He has been involved to some extent in internal reviews of six petitions from the Puget

---

[1]. In cross-examination, Dr. Hajda explained that the typed summaries of the interviews had been prepared by Plaintiffs' counsel, Mr. Russel Barsh (TR:965). She recalled no inconsistencies between the tapes and the summaries (TR:966-968). Defendants deposed Mr. Barsh, who stated that he had a B.A. in social anthropology from Harvard University, had done fieldwork in Fiji as well as North America, and had published his studies in a number of academic journals (BARSH DEP:**; TR:1009).

Sound area, including the Samish Tribe (TR:570, TR:574-575). He was not among the 11 scholars Dr. Sturtevant identified in his testimony as "well-known as specialists in one area or another of Coast Salish," however (TR:39-40). He estimated that he has spent a total of between five to 10 weeks doing field research for BAR on various Coast Salish peoples (TR:636-637).

33. Prior to his employment at BAR, Dr. Roth obtained a doctorate in cultural anthropology at Northwestern University based on his study of social integration on two multi-tribal Indian reservations in Arizona, Chemehuevi and Colorado River (TR:569). This work involved living for 18 months on the reservations, and comprised his "primary" experience with field research, as well as considerable archival study (TR:571). He also spent a month studying the political system in Tecate, Mexico (TR:572).

35. Since joining the staff at BAR, Dr. Roth has made 13 or 14 field visits, averaging a week or two, to evaluate petitioning communities, as well as field trips to Maine, Texas and Oklahoma in connection with proposed Federal legislation (TR:572-573). As a BAR anthropologist he is responsible for checking the quality of petitioners' research data, and conducting additional research and analysis (TR:576-577).

36. Ms. McMillion has been employed by BAR since it was organized 16 years ago, as staff genealogist (TR:379). Her training in this field has consisted of attending annual conferences and workshops, and holds a special certificate in Indian genealogical research; she has taught genealogical research methods several continuing education programs as well (TR:380-381). Before joining BAR, she worked independently as a genealogist (TRL:382). At BAR, she has worked on six cases, including the Samish, as well as "special studies" for the office (TR:385-386).

37. Ms. McMillion has no anthropological training, and stressed that her research on the Samish case was strictly documentary (TR:417).

38. Dr. Paredes, anthropology professor at Florida State University, obtained his doctorate from the University of New Mexico after writing a thesis on Chippewa Indians in Minnesota cities (TR:277). He worked as research coordinator of a Minnesota mental health center which had about 10 percent Indians in its service population, and as a community development specialist with the University of Minnesota (TR:277-278). He briefly taught anthropology and American Indian studies at Bemidji State College before completing his doctorate (TR:278).

39. Once at Florida State University, Dr. Paredes became interested in the Poarch Creek Indians of Mississippi, and in

1971 began what he described as a "long and continued steady relationship" with them as a researcher (TR:279-280).[2] He helped them prepare their successful case for Federal recognition as an Indian tribe, and then, he supposed as a result of that work, BAR contracted with him to spend two weeks collecting archival materials on another petitioning Indian group, the Lower Alabama Creeks (TR:281-282). More recently, he was consulted by the Brotherton Indians of Wisconsin on means of seeking Federal recognition (TR:284). Like Dr. Sturtevant, he had participated in the workshop convened by BAR in 1992 to discuss reforming procedures under 25 C.F.R. Part 83 (TR:58, TR:293).

40. Dr. Paredes felt it was also relevant that he had served on the scientific and statistical committee of the Gulf of Mexico Fishery Management Council, advising on socio-cultural impact issues involving non-Indian communities (TR:284-286, TR:303). In cross-examination, he maintained that there was "a very strong parallel" between his fishery work and the work of BAR because it involved "try[ing] to see that all the relevant published and unpublished studies have been incorporated" into the decision (TR:305).

41. Dr. Paredes stated that he had "[n]ot one bit" of field research experience with any Coast Salish Indians, nor any direct knowledge of the Samish (TR:339).

42. Ms. Forcia did not testify at the hearing but was deposed in 1993 by the parties. She holds a B.A. in sociology from Oakland University and did some graduate work at American University (FORCIA DEP:4). Her experience in interviewing and field research apparently was obtained in the context of serving as a State investigator in child abuse cases (DEP:4). She had not studied Northwest Indian ethnography, was unable to identify experts in that field when asked, and claimed that she had not done ethnography as an employee of BAR (DEP:3-4). Her first visit to Northwest Indian communities was in connection with the Samish case and she had no other direct experience with Northwest Indians (DEP:7).

43. Mr. Shapard explained that Ms. Forcia was asked to undertake some of the fieldwork in the Samish case as a kind of "experiment" (SHAPARD DEP:42-43, 83). "I think Lynn Forcia may have been at loose ends and we were looking for something for her to do" (SHAPARD DEP:81). In his testimony, Dr. Roth also

---

[2]. He described briefly the research methods he had used in that work, involving archival material and direct observation (TR:294-296), which appeared to be the same as those reportedly employed by Dr. Hajda and Dr. Roth, the principal experts called by the Tribe and the Defendants respectively.

referred to Ms. Forcia's participation as an "experiment" (TR:643).

44. In his direct testimony, Dr. Suttles provided an overview of the aboriginal Coast Salish peoples, who included the Samish. He referred to the Salish family of languages, which were mainly spoken by peoples who inhabited the Pacific Coast of Washington State near Grays Harbor, as well as the coastlines of Puget Sound and Georgia Strait, generally near the present-day cities of Seattle and Vancouver, Canada (TR:161). Samish was one of these Salish languages, and was spoken by the people living in the southeast quadrant of the San Juan Islands, and mainland to the east of the Islands (TR:162).

45. Dr. Suttles succinctly described Coast Salish social organization in the following terms:

> The social units were, small to large, the family [and] the household. The house itself occupied during the winter was a large wooden structure made of posts and beams holding wall planks tied to them, and with roof planks laid upon them. Each house was divided into a number of sections, and each section was occupied by a family. Some heirarchy [sic], but sharing a lot with other members of the household.

(TR:162-163). Villages consisted of one or more houses, and villages themselves were often grouped into larger linguistic and territorial divisions, which were usually referred to as "tribes" (TR:163). There was an upper class or elite in each house, as well as slaves, who were typically the descendants of war captives (TR:164).

46. Unlike Indians in most other parts of North America, Coast Salish reckoned descent from important ancestors on both their mother's side and father's side, with the result that all kinship groups overlapped (TR:163-164). A single family would typically have roots in more than one village or geographic area (TR:164, TR:166). By custom, "you had to marry somebody you weren't closely related to, or [at] least people didn't know you were closely related," and closeness in this instance meant the fourth degree or fifth descending generation (TR:165). Thus "the ideal thing was to seek some non-relative of a family of about equal status in some other place. And maybe even the more distant the better" (TR:165). Marriages were generally arranged, especially among high-status families (TR:165).

47. Long-distance marriages served an economic function, because each marriage resulted in a series of exchanges of wealth, enabling houses to share in the resources harvested over a very large geographic area (TR:165-166, TR:169-170). They also served a political function since "If you had in-laws somewhere else,

you're less likely to be attacked by those peoples," which was a distinct advantage in a region where raids and fighting were quite common (TR:166). Dr. Suttles noted that his study of the Lummi revealed that, collectively, they had managed to arrange marriages with all of the tribes surrounding them (TR:166). Differences of language were not an obstacle to this kind of strategic intermarriage, and several languages might be spoken in the same house (TR:190).

48. Each individual would accordingly have grandparents from as many as four different houses, and enjoy rights in each house;[3] they were "alternate homes" in the Coast Salish language, places where you could go if you didn't get along where you were already living (TR:166-167). Although there was some tendency for a newly-married couple to reside with the husband's relatives, moreover, this was by no means uniformly the case (TR:167-168). A house would therefore include people related to each other through their mothers as well as their fathers (TR:168). Since changes of residence were common--for example, after a dispute--there were no fixed social, or kinship boundaries between Coast Salish groups (TR:168-169, TR:172-174). Similarly, resources such as fishing locations had to be shared with all kin, regardless of their residence (TR:174).

49. Each family owned its own section of the house and could take the planks with them if they left (TR:241). When moving from one house to another, people did not automatically relinquish their former rights-- although there was always the possibility of eventually being treated as an "outsider" (TR:252). People might make extended visits to other related houses lasting years, or change their residence permanently as a result of a dispute, marriages, or deaths (TR:807-808). Indeed, Dr. Hajda indicated that it would not be easy for an outsider to tell, at any one time, which people living in a particular house considered it their primary attachment, since identity was determined by intentions, rather than simply physical residence (TR:808).

50. Disputes over kinship rights were settled by holding a potlatch, or feast where each side paid as many witnesses as possible to support their respective claims (TR:175). Potlatches were also used to assert claims to hereditary family names, which were a major part of identity and social status:

> [A]n individual, if he wants to be anyone or she wants to be anyone, has to have a name, and be given a

---

[3]. Dr. Suttles presented two genealogies that showed even more complex interconnections among houses over several generations (TR:185-189 and Exhibit P-1).

> name at a formal gathering, ith guests paid to witness this. And then to be called by that name at other formal gatherings. That is what good status was in the old days, and still is to some degree.

(TR:175). A high-status person might be particularly associated with the house in which he exercised leadership, but would still enjoy some claims elsewhere (TR:190-191).

51. Identification with a particular house was asserted whenever the families sharing the house jointly hosted an important gathering, such as a "potlatch" feast or "winter dance" (TR:199).[4] At a potlatch each family would "individually display its inherited privileges, name its children, honor its dead, or whatever, ... one after another"(TR:199-200). These activities required the combined wealth and work of every family in the house (TR:219, TR:806). "This was a way of establishing status for the household head [and] for the village," Dr. Hajda noted; "It made their name good" (TR:806).

52. Another way people strengthened their association with a specific house was through the acquisition of a special name, and the periodic renewal of claims to that name (TR:807). Dr. Hajda explained:

> [I]n those days of course there were no documents with which to write down what the name was, so witnesses would be called in at an event, at a feast, the name was given publicly, members of the related families would stand up and testify about the former holder of the name, how they had known the previous holder, how they know the family, and in general, establish firmly what the ancestry of the person and the name was. So this was another way of asserting one's identity.

(TR:806-807).

53. According to Dr. Suttles, there was no formal system of chiefs or principal leaders among the aboriginal Coast Salish. Every family had its own leader, and the wealthier men in the village were particularly important and influential because they could give feasts (TR:213-215). There were also special-purpose leaders, whose influence was based on the ownership of some expensive technology (such as a deer net or fish weir) or on

---

4. Dr. Suttles described "winter dances" as occasions at which people who had experienced visions or gained spiritual powers would gather to dance and sing (TR:176). The traditional longhouse in which gatherings of this sort still take place is called a "smokehouse".

their ritual knowledge (TR:216). Dr. Suttles suggested in fact that a majority of the "good" people in any Coast Salish village exercised personal leadership for some specific purposes (TR:216-217). This included experts in large-scale fishing or hunting, who organized these activities by "hiring" kinfolk to participate (TR:217-219). For example, Dr. Suttles referred to the inheritance of reef-net sites and the use of potlatches to maintain claims to them (TR:245-246).

54. In the 1820s, the Hudsons Bay Company tried to encourage some men to assume a more formal role as chiefs; in the 1850s, similarly, U.S. officials tried to identify a small number of "head chiefs" for treaty purposes (TR:214). These efforts did not displace aboriginal patterns of flexible, informal and special-function leadership, however.

55. Among Coast Salish, intermarriage with non-Indians began as soon as the Hudson Bay Company established its trading post at Fort Langley in the 1820s (TR:179-180). The Bay Company "discovered it was good to form alliances with the local people" this way, Dr. Suttles observed, "And the local people were very eager to form these alliances" as well (TR:180). To illustrate this point, he gave two examples of white in-laws helping protect their Samish relatives from encroaching settlers (TR:180-181). Marriages with non-Indians occurred "everywhere" among Coast Salish peoples, but Dr. Suttles was not aware of any statistical data on its precise extent (TR:238-239).

56. This explanation was restated by Dr. Hajda, who noted that Coast Salish Indians had not experienced the direct military conflicts with settlers that occurred elsewhere, and were therefore much more open to mixed marriages (TR:863). Most of the early settlers were single men, moreover, so they had little choice in establishing families (TR:863). Settlers enjoyed economic resources that made them attractive matches (TR:864, TR:915). They could also defend their Indian in-laws' rights to remain on their own lands (TR:864). These "squaw men" were viewed with disdain by other settlers, however, and their mixed-race children were not accepted in white society (TR:865, TR:890-891). As a result, the children may have had little choice but to consider themselves as Indians (TR:865). She noted in cross-examination that this prejudice gradually declined but has never completely disappeared (TR:909).

57. Dr. Hajda moreover explained that the social contrasts between a Samish Indian and a settler would have been less, even a century ago, than the contrasts between a Samish and an Indian from another region of the country (TR:917).

58. Dr. Roth contended that mixed marriages changed their meaning and effects after the major influx of settlers in the 1860s, which created a shortage of white women (TR:586-587).

> [A]lthough they were certainly stable marriages, ... in a number of cases, at least in the region, the wives were sent back to he tribe. I'm not sure with or without the kids. In any case, it no longer became an appropriate thing from the viewpoint of the whites, I don't know what the viewpoint of the Indians was at this point in time, to marry Indian women. So that there's a real shift. And apparently at the time some of the pioneers said, you know, take it or leave it, this is my wife. Others took a different view of it.

(TR:587-588). Dr. Roth did not challenge Dr. Hajda's contention that children of mixed ancestry would have been more welcome among Indians. He did admit that families of mixed ancestry maintained relationships with Indian tribes and produced some tribal leaders (TR:588).

59. Dr. Suttles did not think that the establishment of reservations put an end to traditional patterns of long-distance marriage, but that Indians' mobility was reduced. Many received individual allotments of land on particular reservations, for example, and they were likely to remain where their land was and identify with that place (TR:191). It was his impression that mobility, long-distance marriage and marriages with non-Indians continued to be more frequent among those Indians who did not move to reservations (TR:192). At the same time, sharing food from different parts of the region was still common among Coast Salish people both on and off-reservation (TR:221).

60. Dr. Suttles described the aboriginal territory of the Samish as having been bounded by the southeast tip of San Juan Island, Deception Pass, Padilla Bay, Samish Bay, Chuckanut Bay, and the northern end of Lopez Island (TR:192-193, Exhibit J-1). During the earliest period of contact (in the early 1800s) there were villages on the south shore of Guemes Island, at March's Point on Fidalgo Bay and on Samish Island (TR:193-194). As a result of epidemics and raids by northern Indians, all of the Samish appear to have concentrated in one village on Samish Island by Treaty time, which is to say the 1850s (TR:194-195).

61. The aboriginal relationship between the Samish and Noowhaha was a major issue in this case; Defendants argued that as many as one-fifth of the contemporary membership of the Tribe have Noowhaha, rather than Samish ancestry.

62. Dr. Suttles, who had studied the relationship between the Noowhaha and Samish in the early 1950s, noted that the aboriginal territory of the Noowhaha extended from the north end of Swinomish Channel to as far as Chuckanut Bay, and inland to include the Samish River drainage, Samish Lake and part of the Skagit River drainage (TR:204-205, Exhibit J-1). One important village was at Bayview, another at Bow, but most of the villages were farther

inland in "prairie" areas, which provided good hunting and foraging for roots and bulbs as opposed to fisheries (TR:205). The Noowhaha spoke a Salish language different from Samish, but Samish people Dr. Suttles had interviewed in the 1950s spoke both (TR:205-206).

63. According to Dr. Suttles, the Noowhaha were called "Stick" Samish, from the Chinook Jargon term for "forests", or sometimes Upper Samish, since they lived inland from the saltwater Samish (TR:206). They were tied by kinship with both the Samish, downriver, and with Upper Skagit people farther upstream; at least some Noowhaha families built their houses beside the Samish house on Samish Island (TR:207). Dr. Suttles considered it very likely that the Samish gradually expanded eastward, into what originally had been Noowhaha territory, leading to conflicts that were finally settled by arranged marriages between them--probably in the 1850s or a little earlier (TR:209-211). By the time the Samish built their new house on Guemes Island in 1876, some Noowhaha families were living with them (TR:210).

64. Some people of Noowhaha descent are enrolled today with the Upper Skagit, and others with the Samish (TR:248). Dr. Suttles had also met people of Noowhaha descent on the Swinomish Reservation, in the 1950s (TR:248). He was unaware of any contemporary organized Noowhaha group that might constitute the core of a continuing community (TR:248-249). Dr. Hajda also felt that "pretty much" all Noowhaha had been absorbed by other groups by the time of the Treaty (TR:809, TR:810-811).

65. Dr. Hajda "reserved judgment" on Dr. Suttles' surmise that there had been early warfare between the Samish and Noowhaha, but she agreed that "certainly the Samish and the Noowhaha had established what looks like a symbiotic relationship" involving "dependence and superiority," or a "patron-client" relationship (TR:799-800). The Samish protected the Noowhaha from raiders, and in return obtained access to resources farther inland. At some time in the 19th century, however, the Samish population declined, and some Noowhaha families gained higher status--in particular the family of Pateus, a treaty signer (TR:800). In more recent times, Samish and Noowhaha people lived together in the Guemes Island house and near the towns of Bow and Edison, and fished together (TR:804, TR:810).

66. Counsel for the Government also asked Dr. Suttles to explain the origins of the Indians who were living until the early 20th century at Mitchell Bay on San Juan Island. Dr. Suttles believed they had mostly been of Cowichan and Saanich (Vancouver Island) origin, possibly with some Samish and Lummi ancestry as well (TR:242-243). These families, it should be noted, have comprised less than 10 percent of the Tribe's members according to both parties' figures.

67. As Dr. Roth noted, the Samish were signatories to the 1855 Treaty of Point Elliott, which set aside reservations at Swinomish and Lummi, just south and north of Samish territory (TR:583-584).

68. According to Dr. Hajda, the Samish believed that they were going to obtain their own reservation under the treaty (TR:815). After the treaty, the Samish were told to go the the Lummi Indian Reservation, but by the 1860s only about one-third of them were still living there, though others continued to come there occasionally to collect their Treaty annuities (TR:212, TR:815). "It seemed pretty clear that they didn't think they were going to get what they thought was theirs," and resisted limitations on their freedom of movement, as well as efforts to convert them to Christianity (TR:242, TR:815).

69. Dr. Hajda explained that Indian life on 19th-century reservations was controlled by U.S. Indian Agents, and traditional ceremonies were forbidden after 1884 (TR:816). Treaty annuities were often delivered late; "you might be hungry, you might not have enough land to support yourself" (TR:816). Survival off-reservation was also difficult, but for different reasons. White settlers tried to drive Indians from the land; the Samish living on Samish Island moved to Guemes Island after Dan Dingwall, a local storekeeper, shot one of them (TR:817). Indians on the reservations were encouraged to farm, although the land was not really suitable for agriculture, while Indians living off-reservation found it increasingly difficult to fish or hunt, and increasingly went to work for whites as loggers and hop-pickers (TR:818). For instance, Annie Lyons tried to support herself by digging and selling shellfish, but after local whites accused her of stealing oysters and "gave her a bad time," she married a man from the Swinomish Reservation and moved there (TR:819).

70. Dr. Suttles surmised that Samish people moved to reservations if they had close relatives already well-established there (TR:251). He suspected that those who did not relocate were afraid of being treated as outsiders who lacked legitimate rights to local resources (TR:253). Dr. Roth agreed that pressure from white settlers forced an increasing number of Puget Sound Indians, including Samish, to take up lands on reservations, but noted that all available reservation lands had been allotted out by 1910 (TR:588-589).

71. Dr. Roth contended that up to two-thirds of the Indians of Samish ancestry eventually moved to reservations, and that many did not later seek membership in the Samish Tribe (TR:668-670). As discussed above, however, the number of Coast Salish people who could trace descent to a particular village was always considerably larger than the number of people who maintained *primary identification* with that village, since most individuals enjoyed multiple tribal ancestries.

72. By 1876, conflicts with local settlers on Samish Island persuaded the Samish there to the west side of Guemes Island, where they built a single longhouse (TR:195, TR:242; the "New Guemes" house or village).

73. Dr. Hajda characterized the New Guemes Island house as a kind of "refuge" for Samish families that were being driven off their lands by white settlers (TR:805). Two men took the initiative of acquiring the house site--Bob Edwards, who was of Samish and Noowhaha ancestry, and Citizen Sam, step-nephew to Whulholten, who was Samish (TR:805). The New Guemes house also became a kind of refugee camp for families from other areas who were being driven off their lands; they apear to have built smaller houses near the Samish longhouse (TR:822).

74. Nine different families lived together in the Guemes Island house in 1880 (TR:195, Exhibit P-2)[5] They had mainly Samish, Noowhaha and Klallam ancestry, but about half of them also had other connections or spoke other languages (TR:195).. For comparative purposes, Dr. Suttles described the complex composition of the last traditional longhouse on the Lummi Indian Reservation, also in the 1880s, which he described as "pretty typical" of Coast Salish houses (TR:198-199).

75. Dr. Hajda noted that these nine families formed two clusters, one associated with the Edwards and the other with Whulholten. They both self-identified as Samish, although it was unclear to her exactly how they had originally been related (TR:801). "There was a considerable representation of people who had been brought in by marriage" as well, which was customary (TR:802). The Samish were not all concentrated in this one house or village, moreover, although it served for many years as a headquarters (TR:804).

76. Samish people continued to fish and hunt; unlike the Indians on the nearby Lummi Reservation, they generally did not practice farming (TR:243). Their principal organized activity as a group continued to be the holding of ceremonials, at New Guemes village, to which Indians of other tribes were invited (TR:243). The New Guemes house even had its own baseball team at the turn of the century (TR:236).

77. Dr. Suttles' impression was that there was never any all-purpose leader in the house, although Charlie Edwards and Annie Lyons' father, Whulholten, were the owners or managers of reef net locations (TR:240, TR:801, TR:823).

---

[5]. Charlie Edwards, one of Dr. Suttles' informants, lived in the house as a child, together with the father of another one of his informants, Annie Lyons (TR:196-197).

78. In the 1890s, the Samish may have continued to control as many as three or four reef-net sites in the San Juan Islands, including sites owned by the families of Charlie Edwards and Annie Lyons (TR:245-247). Other important economic sites included a Samish halibut-fishing camp on Cypress Island, a halibut-fishing and salmon-trolling area at South Beach, salmon weirs on the Samish River and Whitehill Creek, and large beds of oysters and clams on both ends of Samish Island (TR:250-251). Although the reef-net sites were very important, their produce had to be complemented by others resources harvested under the supervision of other Samish families (TR:251, TR:254).

79. Mr. Cayou, one of Defendants' Swinomish witnesses, identified the areas he had known as Samish fishing sites as late as the 1940s, when many Indian fishermen began ignoring the customary boundaries between different tribes' harvesting sites (TR:538). Indeed, he admitted that the Swinomish tribe had used his family's claims of Samish ancestry as their basis for successfully asserting Swinomish treaty fishing rights in the San Juan Islands (TR:539).

80. By the 1890s, the Samish were selling their salmon to canneries, for instance at Friday Harbor, and making a new commercial business of extracting dogfish (shark) liver oil for sale at Samish Bay (TR:220). Others earned cash by digging shellfish and hawking them around white settlements (TR:220).

81. Dr. Suttles observed that, when the U.S. and Canadian governments tried to suppress the traditional winter dance, "it maintained itself, particularly in places off the reservation like the Samish village on Guemes Island, which had winter dances and potlatches right up to the time it was abandoned, I guess" (TR:176). Guemes Island was therefore for many years:

> ... a very important ceremonial center for people on the reservations as well as off the reservations, because of the reservations you did have the agents and the missionaries sort of looking askance at this kind of activitiy, or trying actively to suppress it. People of the reservation were free to do it. The Samish were a center of that.

(TR:177-178). Charlie Edwards, a leader in the winter dances in the 1940s when Dr. Suttles began his research, was clearly identified as Samish, as was Tommy Bob, who performed the important function of purifying or exorcising the house before the ceremony began (TR:178-179).

82. The role of the New Guemes Samish house in preserving traditional religious ceremonies was confirmed by Dr. Hajda, who noted that Indian people from all over Puget Sound reportedly went to feasts and dances there (TR:822-823).

83. The traditional New Guemes Island longhouse continued to be used, while many Samish families built newer individual European-style frame houses built nearby (TR:196). Settlers eventually moved into the area to take advantage of a local spring, however, and pressured the Samish to leave (TR:824). Some Samish remained until at least the 1920s, and there is a record of a big Samish gathering at the longhouse called by Jim Charles in 1907, with about 200 guests (TR:824).[6]

84. Some people from the New Guemes house, like Charlie Edwards, went to the Swinomish Reservation; others, like Harry Lyons, went back to Samish Island (TR:241). Harry Lyons' daughter Annie eventually moved to the Swinomish Reservation, but had relatives off-reservation and on the Lummi Reservation (TR:248). The Cageys married into families that had obtained of land on the Lummi Reservation (TR:591). According to Dr. Hajda, this was typical of the region: aboriginal houses divided, some families moving to different reservations, and others continuing to live off-reservation (TR:819). Related families continued to share income and assist one another, however (TR:819-820).

85. Billy and Bob Edwards were part of a group of families that moved to Ship Harbor, near Anacortes; Whulholten's sister Cubshelitsa moved to the town of Anacortes (TR:241, TR:825).[7] There were two canneries at Ship Harbor, the Fidalgo Island Packing Company and Alaska Packers; both employed Indians, Chinese, and whites in different seasonal crews (TR:825-826). The Fidalgo Island company hired Charlie Edwards as a "runner," or recruiter, and he found jobs for his Samish kin (TR:826). There was soon "a little cluster of shacks" on the company's property, where several Samish families lived year-round (TR:826-827). They had small gardens, their own baseball team, and Billy Edwards kept a small "smokehouse" there for religious gatherings (TR:828).

86. Dr. Roth contended that some of these year-round families may not have been Samish but did not identify them (TR:590). When counsel for the Tribe read him portions of the statements of two Swinomish elders, supporting Dr. Hajda's conclusion that the

---

[6]. In her testimony Mrs. Hansen made reference to sacred objects from the New Guemes house that were sent to Canada for safekeeping when the Samish were forced from the land (TR:1043).

[7]. The ALJ takes judicial notice that Anacortes, Ship Harbor (part of contemporary Anacortes), and the Swinomish Reservation are all within about ten miles of each other (Exhibit J-1).

permanent residents of Ship Harbor were Samish (TR:674-675),[8] Dr. Roth conceded that Ship Harbor had been "a good-sized Indian village" that was "in large part Samish" (TR:675). He also conceded that it would have been typical of a Coast Salish Indian village to include families related by marriage (TR:675-676). He could not recall his basis for concluding that this village had disappeared by the 1930s (TR:676).

87. A new phase of organized Samish political activity began at about this time (TR:828). There were meetings about land rights in 1912 and 1913 (TR:829). It was at this same time that the Northwest Federation of Indians was organized by Thomas Bishop, a Snohomish Indian, and he travelled throughout the region urging Indian communities to organize and demand the fulfillment of their sixty-year-old treaties (TR:829). Sas Kavanaugh, part of the Edwards family, was the main organizer for the Samish (TR:830). Dr. Hajda explained that Kavanaugh was typical of a new breed of leaders who had more schooling and experience with "the white world" (TR:830). They did not replace traditional leaders like Billy and Charlie Edwards, but provided complementary specialized skills, "[w]hich again is a traditional pattern" (TR:830).

88. The Samish participated in the Northwest Federation as a distinct group, rather than as individuals; membership was by tribe (TR:831). The Federation did not start off seeking compensation for land. "They wanted land" (TR:831). Enabling legislation was eventually adopted by Congress opening the courts to these claims (TR:832). Dr. Roth agreed that the Anacortes branch of the Northwest Federation appeared to be a Samish organization but said he "didn't actually know that much" about its functioning (TR:601).

89. Dr. Hajda noted that the Samish began taking formal applications for membership in 1926, but did not think this was directly related to claims litigation since official membership rolls were not required by the enabling legislation (TR:832). Those Samish collecting membership applications in the 1920s were "pretty much" the same as those who had been holding political meetings in the 1910s (TR:832-833). While land rights appeared to be the major focus of Samish political activity in the 1920s, fishing rights was also emerging as a concern (TR:832-833).

91. A tabulation of the minutes of 125 Samish Tribal Council meetings since 1926 showed that claims and fishing rights were the main topics of discussion, followed by education, health and other

---

8. The original statements of Bertha Dan and Laura Edwards are found in volume 9 of the Administrative Record.

social concerns (TR:927, TR:942; Exhibit P-24).[9] Contrary to what Dr. Roth stated, the earliest recorded meetings devoted less than half of their agendas to claims (TR:692 referring to Exhibit P-24), a point that he conceded he did not recall (TR:693).

92. Mrs. Hansen recalled attending Samish meetings in the 1930s where they discussed the proposed Indian Reorganization Act, and many elders required intepretation (TR:1029). Meetings were held at the American Hall in LaConner; the hall was owned by the Swinomish, but the Samish paid rent and hosted the meetings (TR:1055-1056). Several Samish men often simply met informally at the Cageys' house at Lummi, "or on my great-grandmother's farm where we lived," to talk about problems such as land, health or housing, and then report back to the other families (TR:1031-1032). She remembered Alfred Edwards and George Cagey acting as leaders at that time (TR:1030). Her father would also frequently visit elderly Samish people to help them with "a little something" or some money (TR:1032).

93. On the social front, Dr. Hajda noted that Charlie Edwards used to race his own all-Samish canoe, the Question Mark, in the Indian races sponsored by Puget Sound towns in the 1920s (TR:833-834). Samish from both on- and off-reservation families also continued to participate as a distinct group in inter-tribal activities such as winter dances and annual Treaty Day celebrations (TR:834). There were certain songs and dances that were identified as Samish in the smokehouse religion, and the Samish participants would be seated together in the smokehouse and called Samish (TR:835-836). Ms. James, a smokehouse dancer called by Defendants, testified that the Samish still sit in certain places for these cermonies (TR:560). After the loss of the New Guemes longhouse, however, they could no longer act as the sponsors or hosts (TR:835).[10]

94. During the Depression, Dr. Hajda testified, the canneries at Ship Harbor did less business and shut down from time to time, never again able to employ as many Indians as they had in the 1920s

---

9. The tabulation in Exhibit D-24 was prepared by Ms. Cheryl Wheeler, a graduate student in history at Western Washington University and was merely summarized by Dr. Hajda in response to Defendants' questions on cross-examination (TR:942, TR:1059). The original Council minutes are reproduced in full in the Administrative Record, volumes 13 and 30.

10. Ms. James, one of Defendants' witnesses, is enrolled as Swinomish, although she is of mixed Samish, Klallam, Swinomish, and Lower Skagit descent (TR:561). She is a "red paint dancer" in the smokehouse, and explained that she inherited this particular medicine from her Samish ancestors (TR:558, TR:561).

(TR:836). New Samish leaders emerged who had more education and more experience with government bureaucracy. Don McDowell, from the Whulholten-Cubshelitsa family line, was a notable example who "went around and visited people to see what kinds of help they needed" for many years (TR:837).

95. McDowell knew John Collier, the Commissioner of Indian Affairs at the time, and he helped promote Collier's Indian Reorganization Act to other Puget Sound tribes, as president of the Northwest Federation of American Indians (TR:684-685, 838-839). Dr. Hajda likened this to the way aboriginal Coast Salish leaders enlarged their personal prestige and the status of their own villages, by asserting regional leadership roles. Bereft of land or resources in the 1930s, the Samish were able to gain prestige by being regional political organizers (TR:839).

96. The Samish were permitted to vote as a distinct group in the 1934 referendum on the proposed Indian Reorganization Act. When individual Indian tribes were later asked to vote on whether they wanted the Act to apply to them, however, only reservation residents were allowed to vote, leaving out the Samish who were living off-reservation (TR:838). Dr. Roth acknowledged that he had not done any research to evaluate if the Samish living at Swinomish actually voted, or viewed their vote as a way of separating themselves from other Samish (TR:688).

97. During the Second World War, young Samish men were overseas, some people left the Anacortes area to find jobs in war industries in south Puget Sound like the Bremerton shipyards, and it was more difficult to meet frequently as a group because of gas rationing (TR:840). Several older Samish leaders also passed away in the 1940s, including Charlie Edwards, the Cagey brothers, and Don McDowell (TR:840-841). This also had an adverse effect on organized political activity (TR:841). There are few records of meetings during that period, but oral history tells of meetings to discuss land rights, fishing, and helping people out as before (TR:841; TR:859-860). Treaty Days were still being celebrated, but there were smaller crowds (TR:841).

98. Mrs. Hansen recalled that gas rationing restricted mobility, so she kept abreast of Tribal meetings by staying in touch with relatives who could still attend (TR:1033). There was money to share with needy Samish relatives during the war years from earnings at the shipyards, and at the Boeing aircraft factory (TR:1032-1033).

99. Dr. Roth noted that there was little documentation that the Tribe continued to function formally after 1935 (TR:603). He conceded that there is oral history of meetings after that date, however, indicating that "perhaps" the Tribe survived (TR:607-608). "[S]ome meetings were going on," he admitted, but to him their

purpose was unclear (TR:608, TR:689, TR:691). Under further questioning, he stated that he had no factual basis to conclude that Samish meetings after 1935 changed their nature or purposes, only that they were "of a smaller scale" than previously (TR:694). He attributed this to the court's dismissal of the Tribe's claims in 1935 (TR:695), but admitted he knew of other tribes that did not meet for two to five years because of the War, and agreed that the absence of young Samish men in the Armed Forces would be a "reasonable explanation" of smaller, less frequent meetings (TR:695).

100. While Dr. Roth acknowledged that Samish continued to participate in "intertribal" social and religious activities during the 1940s, he argued that he could not tell whether they were participating in these activities as individual Indians or as a tribe (TR:699-700). However, he admitted he did had no idea whether this distinction could be made, in any case, as a matter of research methodology (TR:700).

101. Some of the people who moved away for wartime jobs, or served in armed forces, did not return to the Tribe's traditional area when the war ended (TR:842). Other Indian tribes, and non-Indian communities, had the same experience (TR:842). The main Samish destinations after the war were Seattle and Bremerton, about an hour and a half by car to Anacortes (TR:842). Mrs. Hansen confirmed Dr. Hajda's observations in this regard (TR:1033).

102. The war produced a new generation of Samish leaders who were more concerned with "organization"; many had been union men, and brought a concern for issues such as paying dues, and following Roberts Rules of Order (TR:842-843). Continuity was provided by Alfred Edwards, son of Charlie Edwards, who became the president of the new, post-war Samish Tribal organization; Mary McDowell Hansen, daughter of Don McDowell, became Tribal Secretary. While many individual members of the Council were new, on the whole they came from the same families as the pre-war Council (TR:843).

104. Mrs. Hansen explained that communication with Tribal members was maintained by letters and postcards (TR:1039-1040).

105. Dr. Hajda also referred to increasing activity concerning health and employment, as well as renewed fishing rights advocacy, which led to about 150 individual Samish being issued "blue cards" in the 1950s by the Bureau of Indian Affairs to identify them as Samish entitled to exercise Treaty fishing and hunting rights (TR:844-845, TR:1072). The wartime dispersal of Samish people required new means of communication in this period (TR:846). Dr. Roth agreed that the Samish Tribe pursued concerns such as health and education after 1951, (TR:693).

106. The Samish Tribe provided money and volunteers to fight proposals to terminate Federal responsibilities to all Washington Indian tribes, in the 1950s (TR: 845, TR:1038-1039). Reservation and landless tribes joined together in an organization called the Intertribal Council, and Mrs. Hansen was its first secretary (TR:845-846, TR:1038). Each tribe had its own delegates, including Tulalips, Swinomish and Lummi as well as Samish, Snohomish and others (TR:1039).

107. In the late 1960s, the Tribe began to obtain grants from Federal War on Poverty programs (TR:847; TR:1041-1042). It also attempted to regain a land base, including an unsuccessful bid to obtain the Ozette Reservation, which was no longer inhabited (TR:1040-1041).

108. The Samish became members, as a tribe, of the Affiliated Tribes of the Northwest, the Small Tribes Organization of Western Washington, and the National Congress of American Indians (TR:846). They obtained grants through STOWW to open an office in Anacortes in 1972, and later to build a small fish-smoking and canning shop (TR:1041-1042).

109. In 1971, the Indian Claims Commission awarded the Samish roughly $5,400, which the Tribe refused to accept as a per capita payment to individual Tribal members and is still accruing interest (TR:847-848; TR:1043-1044). According to Mrs. Hansen the Tribe wanted land instead (TR:1043). The claims judgment put pressure on the Tribe to formalize its membership and, with assistance from the Bureau of Indian Affairs, to revise its constitution (TR:848), and develop a more formal roll of its members, which "through no fault of the Samish" was never finished (TR:388). The Tribe's new membership criteria, requiring evidence of Indian ancestry without any minimum blood degree, had been adopted on the advice of the Bureau of Indian Affairs (TR:451-455).

110. The earliest official references Dr. Hajda found to the Tribe not being Federally-recognized appeared in the same period (TR:849). Then in 1975, the Defendants opposed the Tribe's motion to intervene in the Northwest Indian treaty fishing-rights litigation on the grounds that they were not a recognized Indian tribe.

111. The dispute over Federal recognition led to a loss of confidence in the Tribal Council, political divisions, and a temporary change of leaders (TR:850, TR:854, TR:961, TR:1063).[11]

---

[11]. Mrs. Hansen identified the Wooten, Penter, and Cayou families with this coup (TR:1064-1064). She explained that they had not been active in Tribal affairs before or since. As discussed below,

Samish families which had consistently occupied key positions were unrepresented from 1975, when Margaret Greene was "ousted" as chairperson, to 1980, when Ken Hansen was elected chairman (TR:1046-1047). Dr. Hajda noted that Ken Hansen, son of Mrs. Hansen, brought youth and enthusiasm to the Tribal Council and helped mediate between different families, mobilizing support for the fight for Federal recognition (TR:851-852). Recognition became "a focus, both positive and negative, for tribal activity" from that time forward, requiring continuing efforts to raise cash donations, recruit volunteers, and organize travel (TR:860-861). The Tribe also received grants for this purpose from the Administration for Native Americans, a part of the U.S. Department of Health and Human Services (TR:1056).

112. The fight for Federal recognition caused special problems for the Samish who were then living on reservations; the Cagey family on the Lummi Reservation was experiencing discrimination for supporting the Samish (TR:853).

113. Mrs. Hansen described the effects of the administrative decision against the Tribe in 1987 as "devastating" (TR:1048). It took several more years before they "kind of squared our shoulders up and said, by golly, we're going to be back" (TR:1049). She expressed optimism for the next generation of Samish, but added, "We just wish we could give them a home" (TR:1050).

114. Defendants' counsel confronted Dr. Hajda with the computer print-out of responses to a survey the Tribe had conducted of its members in 1983, which he contended showed that the majority of them were opposed to seeking Federal recognition (TR:976-977; Exhibit D-28). As she had not previously seen this document, she declined to try to interpret it (TR:976, TR:1013).[12] On re-direct, however, Plaintiffs' counsel drew Dr. Hajda's attention to another question from the same survey, which asked expressly, "Are you willing to help the Samish tribe get Federal recognition?" to

---

the Cayou line is now regarded as being of doubtful Samish ancestry by both the Tribe and the Government. The families in question comprise less than 3 per cent of the persons on the Tribe's membership lists, however.

[12]. The question actually posed by the 1983 survey, which Defendants' counsel did not share with the witness, was: "What do you feel are the three most important *cultural* needs of the Samish people?" (TR:1013, emphasis supplied). It would be reasonable to suppose that few Tribal members would have regarded Federal recognition as a "cultural" need.

which 78 percent of respondents replied affirmatively (TR:1014-1015).[13]

115. During the period of time Dr. Hajda assisted the Tribe on Federal acknowledgment, a number of community projects other than recognition were still being pursued. The Tribe organized a privately-funded food bank that was open to non-Indian people as well as Samish, as well as a pre-school with State funding, and a series of luncheons for elders (TR:855-856).[14] The Tribe also participated in negotiations with real-estate developers and the City of Anacortes over including a cultural center in a planned development at Ship Harbor (TR:855).

116. It was also during this period that the Tribe erected a statue of "the Maiden" in a public park at Deception Pass, with cooperation from the City and County.

> The Maiden was supposed to be a woman who was married to one of the sea creatures in order that the sea would provide food to the Samish. So it symbolizes the relationship, the cooperative or the symbiotic relationship between the Samish and the sea and its resources. It's a really rather unique story.

(TR:856). When the statue was dedicated there was traditional singing and witnesses were invited from all around, Dr. Hajda observed, in the manner of aboriginal ceremonial events, a Samish day "sponsored by the Samish" (TR:856-857, TR:1051).

117. Dr. Hajda reported that the Maiden statue has continued to serve "as a symbolic focus" for the Tribe (TR:855-856). She had attended a Tribal meeting there in the summer of 1993, and was impressed that an elder from Swinomish, Laura Edwards, had insisted on bringing a plate of food to the Maiden and singing to her to honor the Samish (TR:857). Ken Hansen's traditional wedding potlatch was held there in July 1994, a month before the hearing in this case (TR:857, TR:1051). Ms. James, one of Defendants' witnesses and a member of the Swinomish government, said that the Samish "took the responsibility of having the Maiden--I would say,

---

[13]. Dr. Roth stated in his direct testimony that "only one person out of 188 said that federal [sic] recognition was important" in this 1983 survey (TR:633). This is manifestly incorrect on the face of Exhibit D-28.

[14]. Mrs. Hansen explained that many of these programs are financed and operated today through partnerships with Federally-recognized tribes, such as the Sauk-Suiattle, the Northwest Intertribal Council, and the State of Washington (TR:1052-1054).

in my terms, taking care of the spirit" (TR:556). She also confirmed that people of many tribes had come to witness the event, in the traditional manner (TR:557).

118. Dr. Hajda noted that Samish continue to participate, "as Samish," in winter dances. She recalled there having been 20 Samish smokehouse dancers when she did her research, which, supported by their families, represented "a considerably larger group". This included the families of the current chairperson, Margaret Greene, and previous chairperson, Ken Hansen (TR:858). Traditional Samish names continue to be bestowed at such events (TR:858). Mrs. Hansen explained that when a Samish has passed away, the speakers at the memorial in the smokehouse would all be Samish; she also referred to a recent memorial service for Mrs. Greene's daughter held in the Lummi Reservation smokehouse, but hosted by the Samish (TR:1055).

119. Another significant continuing manifestation of Samish identity, according to Dr. Hajda, has been a feeling of deprivation--first, from not being given land, and more recently from being denied recognition as an Indian tribe (TR:874-875). She emphasized the Tribe's repeated attempts to regain a land base as evidence of its "impressive" record of asserting its distinct identity (TR:875).

120. According to Dr. Hajda, the Tribal Council broadly represents the Samish families which have traditionally been politically active; she observed that this reflects voters' belief that family balance should be maintained (TR:859, TR:921-922, TR:924). She conceded that smaller or less active families might not consistently be represented, however (TR:925, TR:1001-1002).

121. Dr. Hajda explained that past and present leadership has included reservation and non-reservation families. Margaret Greene, currently chairperson of the Tribe, is from the Cagey family, who are residents of the Lummi Reservation, while Tribal secretary Mary Hansen is of the Cubshelitsa-Whulholten line, who never lived on reservations (TR:875-876). A generation earlier, similarly, Charlie Edwards represented a family residing on the Swinomish Reservation, while Sas Kavanaugh came from off-reservation (TR:876). Mrs. Hansen confirmed this based upon her own personal experience (TR:1047-1048).

122. During her research, "there was lots of volunteer help at that time in the [Tribe's] office," as well as donations of money (TR:861). Much of the Tribe's current operations, including food bank and school programs, are financed through inter-tribal organizations comprised of both recognized and non-recognized tribes (TR:1052-1054). Mrs. Greene is currently secretary of both the Northwest Intertribal Council, and the Small Tribes Organization of Western Washington (TR:1054).

123. According to Mrs. Hansen, the Tribe is still actively involved in the City's Ship Harbor development planning, and also participates in Federal and State environmental-impact reviews affecting its territory (TR:1057-1058).

124. At Defendants' request the Tribe produced an updated mailing list and voting list, both prepared by Mrs. Hansen (Exhibits D-10 and D-20; TR:1065). She explained that there has been a moratorium on approving membership applications since 1987, as a result of the present dispute (TR:1065-1066). Adults have only been added to these lists upon their own request, so they represent only such persons of Samish descent who wish to be identified as Samish (TR:1067, TR:1073).

125. Dr. Hajda concluded generally that as far as she could tell, most of the members of the Tribe are descendants of Samish and historically related families; have continued to assert their collective identity, by varying means, since the time of their Treaty in 1855; and remain genuinely committed to being Samish (TR:873). She also concluded that at least two major families provided a continuity of leadership since Treaty times (TR:873). In her opinion, the Samish Tribe falls within the normal range of social and cultural variation of Northwest Indian tribes as a whole (TR:882). Where they differ from other tribes, the differences are attributable to is in the consequences, for their way of life, of non-recognition by the Defendants (TR:883).[15] She stressed that she not only stands by her 1987 conclusions, but "could make them stronger now" (TR:791-792; also TR:994).

126. Dr. Suttles, who of all the expert witnesses had the longest and most extensive experience with Coast Salish peoples, including Samish, found Dr. Hajda's assessment of the Samish "persuasive" at the time he first read it (TR:231). He did not indicate that he had departed from that conclusion in the intervening years.

130. In the previous administrative proceedings on the Samish under 25 C.F.R. Part 83, the Secretary of the Interior found that they met the requirement of 25 C.F.R. 83.7(a), identification throughout history as Indian. Defendants made no contention at the remand hearing that they had a factual basis for reopening their previous finding on this point and conceded, in Ms. McMillion's testimony,

---

[15]. Dr. Hajda observed that the Indians on the Grand Ronde Reservation in Oregon, where she has done her most extensive research, "don't look particularly Indian" as a result of intermarriage, and have even begun to adopt elements of Plains Indian cultures as a means of re-asserting their Indian identity (TR:880). By comparison, the Samish are closer to the average situation among contemporary Indian tribes (TR:882).

that substantially all, if not all of the Tribe's members are of Indian ancestry (TR:413-414).

131. Ms. McMillion testified that she had insufficient data to confirm the Indian ancestry of just one family, the Vierecks, comprising just 9 out of 590 current Tribal members (TR:415-417), or 1.5 percent. The Tribe stipulated that it had its own doubts about this family and one other, the Cayous, and was planning to ask them to show cause why they should not be removed as members (TR:478; TR:812-813, TR:907).[16]

131. Dr. Sturtevant cautioned against confusing the concept of a "community" with that of a "tribe," noting that a tribe may consist of more than one community (TR:40-41, TR:76-77). At the same time, he explained that a "community" tends to be broader in membership than a group of people related by marriage, and more permanent and broader in its interests than a social club or professional society (TR:41). He indicated that he would approach the task of evaluating the existence or nature of a "community" by looking for "networks of communication," including "how much people know about other people[, w]hen they see them, what they see them for, what they know about them," and the frequency and nature of interactions between them (TR:42, TR:78).

132. In this respect, Dr. Sturtevant considered that the new, expanded definitions of "community" and "political authority" incorporated into 25 C.F.R. Part 83 by amendment in 1994 bring these criteria closer to the common understanding of anthropologists of these terms (TR:64-65). He stressed the usefulness of flexibility in the evidence required at different stages of a group's history, and of interpreting evidence in the context if the history, geography, culture and social organization of the group in question (TR:59-60, TR:62). He also observed that no real Indian tribe would display *all* of the attributes of a "community" listed in 25 C.F.R. Part 83, as amended, particularly in modern times, and welcomed the fact that the amended regulations do not require this (TR:65).

133. According to Dr. Sturtevant, 25 C.F.R. Part 83 reflects a belief that Federal recognition should be based on "the persistence of social groups," and it is therefore important to realize that "the group can continue and does continue through time, whereas the cultural features, the behavior, the way of being, changes"

---

[16]. At the hearing, the Tribe's counsel confronted Ms. McMillion with a book by Karen Jones Lamb, *Native American Wives of San Juan Settlers* (1994) identifying Jenny Viereck as an Indian from the Queen Charlotte Islands. Ms. McMillion was neither familiar with this book, nor with the Indians who live on those islands (TR:439-440).

(TR:66). What is distinctive about the group today may not be aboriginal; he cautioned against looking for stereotypes such as "war dances" and basket-making (TR:66-67). Moreover it is frequently the case that "in most respects their behavior and their interaction is not distinguishable from the characteristics of behavior among their non-Indian neighbors" (TR:67-68). Indeed, it is "very common" for Indians to participate actively in neighboring non-Indian communities (TR:69-70). He noted that about half of the Indians in the United States today live in cities, rather than predominantly Indian settlements (TR:74). The primary difference between Indian and non-Indian communities today, he stated, is mainly a matter of ancestry, rather than particular cultural characteristics (TR:71).

134. Dr. Roth paraphrased this criterion as "some substantial body ... of social connectedness and social distinction" (TR:664). He observed that there is no body of comparative data on the social connectedness of the members of Federally-recognized reservation tribes, but that in a case like the Samish, the analysis must take account of difficulties created by landlessness and non-recognition: "Obviously there's a lot of things you can't expect a group to be able to do" (TR:663, TR:665).

135. In Dr. Sturtevant's research experience, highly dispersed Indian tribes maintained a "community" by gathering periodically for special occasions, or maintaining kinship connections with at least some other people in the community (TR:74-75). In contrast with an "association" an Indian community has a historical relationship with a homeland some where--although "they don't by any means all necessarily live there"--and shares more than one purpose or interest (TR:125-126, TR:149).

136. It was likewise BAR's policy, at least until Mr. Shapard retired as chief of the unit, to regard a "community" as a set of "concentric circles" of decreasing degrees of involvement, around a "core" of very active people (SHAPARD DEP:83). Dr. Roth explained that he looks for some evidence that the peripheral members are connected with the core, but not necessarily connected with each other (TR:728). The core is a hub of communication with the periphery and need not consist of people living together in a geographical settlement (TR:728).

137. Dr. Suttles likewise observed that the term "community" was often used to refer to a "closed group of face-to-face relations with people within it, closed to outsiders." This fit the Okinawan village he had studied, but not aboriginal Coast Salish societies (TR:200). However, Coast Salish houses were "communities" in the sense of cooperation and exchange (TR:201). The Samish longhouse of the 1880s on Guemes Island was a "community" in this sense, even though its inhabitants had mixed ancestries and spoke several languages (TR:201).

138. Dr. Suttles testified that in the Coast Salish region as a whole, "Indian" identity was not only being asserted today through distinctly Indian religious activity, such as the winter dances and Indian Shaker Church, but through acute consciousness of kinship ties and loyalty to the extended family (TR:223-224). Dr. Hajda indicated that, based on her experience with Coast Salish and Columbia River Indian tribes, the Coast Salish today are more preoccupied with ancestry or kinship as a basis of Indian identity (TR:883).

139. Dr. Paredes also agreed that kinship is "central to defining who we are," and that this can be "especially" true in Indian communities (TR:298-299). Although he feared that there were many groups claiming to be Indian tribes in the Southeast, without legitimate foundation, he admitted that he had not explored the extent to which this was true of any other part of the country (TR:343-344). He did not express any opinion on the Samish Tribe.

141. Dr. Hajda noted for example that the Cubshelitsa-Whulholten family has always lived off-reservation, but it has always been actively involved with on-reservation Samish families (TR:862).

142. To justify his conclusion that the "Indian descendants" comprised a distinct population, Dr. Roth ultimately relied on the fact that the 1975-1980 political split within the Tribe had involved instances of "questioning the Samish ancestry of people" on each side (TR:702). He admitted that the Samish themselves had not expressly equated people's authenticity with whether they lived on a reservation, but maintained that this was the real basis for the dispute (TR:702, TR:706). It was noted above, however, that both Dr. Roth and Dr. Hajda recognized that one side to the dispute was led by Margaret Cagey, from a reservation family, and Ken Hansen from the off-reservation Cubshelitsa-Whulholten family line. Dr. Roth's analysis is contradicted by facts he admitted in his own testimony.

143. Both Dr. Hajda and Dr. Roth encountered negative remarks made by some Samish interviewees about other Samish families, often couched in racial terms. Dr. Roth thought it significant that "two or three" of the people he interviewed complained that the Tribe was "run by white men" (TR:644). Dr. Hajda took this as normal:

> It would be very difficult to find any such community where you did not have people saying bad things about each other. I don't think there would be any Indian group worth their salt if they didn't have a few bad things to say about each other.

(TR:789-790). She also explained that it was commonplace for Indians to tease other Indians, including relatives, about being white men or half-breeds, so that comments of this sort in interviews should not be taken literally (TR:1010, referring to

TR:971-972; TR:1019). Indeed, Dr. Roth himself argued that talk of "dirty linen" and conflicts are "actually to the benefit of the group," evidence of social interaction (TR:581).

144. Dr. Roth also recognized that the non-reservation Samish families living around the City of Anacortes include several politically active individuals, as well as some who are active in traditional religion as well (TR:709-710).

145. When asked in cross-examination how he could distinguish between an "Indian descendant" and a "reservation Samish" if he met them both on the street, Dr. Roth insisted that it would suffice to ask them to *which families* they belonged (TR:711). What is unclear, then, is how Dr. Roth could tell how genuinely Indian each person's *ancestors* had been, if he could not provide a profile of what he would look for in the descendant--other than, perhaps, Indian blood quantum.

146. In the course of the original administrative proceedings and this remand, the Tribe produced copies of membership lists from as early as the 1920s. Dr. Hajda cautioned that these lists were never thought of as formal membership rolls, and were not reliable or complete evidence of who was actually interacting socially within the community (TR:870-871). In any event, key families such as the Edwards and Cubshelitsa-Whulholten lines, could be found on all of these lists (TR:871). Like other Northwest Indians, the Samish would have had a relatively stable core group of families, to which various peripheral families attached themselves from time to time (TR:872).

147. Defendants' expert, Dr. Paredes, argued that if a group of people pick up their mail at the same post office "That's a community," or as he subsequently rephrased his reply, "one aspect of being a community" (TR:307). He conceded that the BAR regulations were amended, in 1994, to delete any geographical requirements for a "community," but argued that he could not imagine social interaction without "a core group at some locality, in some ways" (TR:308, TR:310). This might be a church or ceremonial site that is used and maintained (TR:308-309). It could also be a central office or meeting place (TR:309). He also contended that this emphasis on geography was supported by "ordinary dictionary definitions of community" (TR:297).

148. As indicated above, however, this view was not only rejected by Dr. Sturtevant as contrary to current thinking among anthropologists, but was rejected by Defendants after consultations with experts in the field in 1992.

149. Dr. Roth acknowledged that an Indian tribe could be maintained by purely electronic communications, without a settlement or any

physical contact, the genuine issue under the regulations being the maintenance of social relations (TR:755).

154. Dr. Sturtevant was very explicit in his rejection of Dr. Paredes' line of reasoning:

> I think one should be careful about making generaliza-tions purely on the basis of blood. Partly because there's a tendency in this society and maybe many societies to overemphasize the importance of biology. It's what we call racism.

(TR:105). In his experience, the use of terms such as "pure blood" or "mixed blood" in Indian communities was "more cultural and social than biological," a metaphor for political tendencies "like Republicans and Democrats" rather than a way of defining who belonged to the community (TR:106). He gave examples of individuals of mixed ancestry who were important traditional community leaders, and observed that reservation Indian tribes today commonly have no more than half "Indian blood"--although their proportion of "Indian blood" was usually overstated in official documents (TR:106-107).

155. According to Dr. Sturtevant, the principal factors determining an individual's cultural affiliation would be "[w]ho they talked to, who their friends were, who they associated with,...what kind of attention are the old people paying to them", and therefore, generally, whether they are treated like Indians by the relatives with they have formed a close relationship (TR:108). Children of mixed ancestry would have at least some contact with both societies and cultures, but tend to favor one over the other depending on the pattern of their own socialization (TR:109). In his opinion, then, "ancestry really is hardly relevant," in ascertaining an individual's cultural identity, compared to actual upbringing and social relations (TR:109-110). Statistical correlation between mixed ancestry and cultural behavior, he argued, would be very slight (TR:105).

156. Under cross-examination, Dr. Sturtevant distinguished between the questions of "Indian blood," and "blood degree". He noted that while the Government and Indians agree that an Indian tribe must consist of people who have at least *some* Indian ancestry, they do not agree about *how much* is necessary (TR:129). Federally-recognized tribes differ in their own internal requirements, and most have experienced a decrease over time in their "blood degree" (TR:129).[17] It would be "reasonable" to suppose that a child who

---

[17]. There was some confusion between counsel for Defendants and the witness over whether *all* Federally-recognized Indian tribes currently require some *minimum amount* of Indian blood to qualify

had more Indian relatives would be raised as an Indian, but "you'd better check that presumption before you act on it" (TR:130-131). For example, "quite a few... full-blooded Navajo children ... are adopted and raised by non-Indian Mormons" (TR:130). He maintained that the most "knowledgeable and friendly people" in the Indian communities he had studied were not necessarily those who were physically more Indian; degree of blood had been irrelevant (TR:133).

157. In her testimony, Dr. Hajda observed that by 1877, one-eighth of the Swinomish Indians (a Federally recognized tribe, on a reservation) were already of mixed ancestry according to the Indian Agent (TR:865). She stressed that most of the white parents were single men, separated by long distance from their own families (TR:865), which according to Dr. Paredes' analysis (TR:318) would suggest that the children had the most opportunity to interact with their Indian mothers' relatives. In any case, she agreed with Dr. Sturtevant that cultural identity is not a matter of blood, but of "circumstances," and gave as an example the current tribal chairman on the Umatilla Indian reservation, in Oregon (TR:866). She was personally aware of many contemporary mixed couples who were raising their children as Indians (TR:867). She also pointed out that the average blood quantum of Puget Sound Indians today was no more than 50 percent, and probably even lower among reservation tribes in Oregon (TR:997-998).

158. Dr. Hajda denied that blood quantum can be an objective measure of social behavior, however, pointing out that many children are born from very brief acquaintances between their parents, or are raised by persons other than their biological kin (TR:912-914). Even if a child has more non-Indian kin than Indian kin, s/he may spend more time with the Indian relatives (TR:998-999). Social ties rather than biological factors determine individual identity, hence the consequences of each marriage must be considered individually (TR:917, TR:994).

159. While she conceded Defendants' argument that people tend to marry those with whom they frequently associate (TR:910), Dr. Hajda stressed that marriage did not necessitate a relinquishment of either partner's cultural identity (TR:995). The Samish had not consistently married non-Indians, moreover, despite Defendants' contentions to the contrary (TR:910).

160. Dr. Hajda noted that Indians living on reservations today lack a free choice in selecting non-Indian marriage partners because of rules that restrict health services and other benefits on the basis of blood quantum (TR:878). As a result, reservation Indians may be

---

for membership (TR:131-132). This is irrelevant in any case, since 25 C.F.R. 83.7(d) does not require any minimum degree of Indian ancestry to be an Indian tribe.

more likely to marry other Indians than largely off-reservation groups such as the Samish, but this does not necessarily mean that they are more "Indian" in social or cultural terms.

161. Dr. Roth conceded that the average Indian blood quantum of Puget Sound reservation Indians may be as low as one-quarter today (TR:712). He acknowledged that mixed ancestry is only one factor in determining a person's social and cultural orientation, but when asked about other factors, repeatedly returned to mixed ancestry (TR:713-714). Dr. Roth himself recognized that "the real issue is who people interact with," but the principal measure of interaction he had explored in his Samish research was marriage or "genealogical distance" (TR:714-715, TR:717). He "would not claim" that he was familiar with any published research on the validity of inferring a child's cultural orientation from mixed ancestry, however (TR:717).[18] He moreover recognized that Coast Salish Indians maintained their identities although customarily marrying into distant villages that spoke different languages (TR:719). Indeed, his own doctoral dissertation described a group of people of predominantly non-Indian ancestry, many of whom were accepted as Chemehuevi Indians by the Chemehuevis themselves (TR:719-721). Dr. Roth finally restated his position, arguing that marrying outsiders raises a "suspicion" of social breakdown, which Dr. Hajda's research had not convinced him was unwarranted (TR:721, TR:723).

162. It may also merit noting that Mr. Shapard stated repeatedly that, when he was chief of BAR, he was *instructed* by the Solicitor's Office *not* to use blood quantum as a test of Indianness, although personally he felt that it was relevant (SHAPARD DEP:94-96, DEP:125, DEP:128). It is not clear why the Solicitor's Office has reversed this position in the present remand proceeding. Dr. Roth clearly acknowledged that the regulations do not, in his opinion, require tribal members to have any particular amount of Indian blood, only descendancy (TR:753).

163. This extended debate is relevant to the case at hand only because Dr. Roth argued that roughly half of the Tribe's members were what he termed "Indian descendants," and not Indians, on the grounds of their descent from early mixed marriages (TR:605-606). He implied, without further evidence,[19] that these "Indian

---

[18]. The validity of such inferences, as a general matter, is reviewed at considerable length below.

[19]. Dr. Roth did refer to the fact that several members of one of the families in question, the Blackintons, appeared on the 1920 Census as "one-half Indian" or "one-fourth Indian," and suggested that this was evidence of their "character" or of "how they were viewed at the time" (TR:605-606). Surely, the 1920 Census was

descendants" were socially and culturally separated from the Samish Tribe proper. This appears to be an inference based on blood quantum. As such it must be rejected.

168. Dr. Hajda cautioned that Dr. Roberts' work had been submitted to Swinomish tribal officials for approval and may reflect their position (TR:931-932). She also observed that Dr. Roberts had not examined the relationships between the Samish living on the Swinomish Reservation, and the Samish families who lived elsewhere (TR:1003). It appeared to Dr. Hajda that Dr. Roberts simply made an "assumption" that all of the Indians living on the Swinomish Reservation had relinquished any other tribal ties (TR:1002-1003).

169. Dr. Hajda explained that, although many Samish Indians had held public office on the Lummi and Swinomish Reservations, they continued to consider themselves as Samish and participate in Samish activities (TR:867). She compared this to American Indians who had served in the U.S. armed forces, without considering themselves any less Indian as a consequence, and to the situation of the Welsh (her own ancestry), who participated actively in British politics but fiercely retained their own distinct national identity (TR:868). While individual members of Samish families living today on reservations, such as the Edwards, may have given up their Samish identity, Dr. Hajda felt that on the whole they had not (TR:869). Samish leaders living at Swinomish were active in Swinomish affairs as a way of gaining personal prestige, and not as a declaration of Swinomish identity (TR:1004, TR:1021-1022).

170. Dr. Hajda described the Cagey family, who live in a distinct part of the Lummi Reservation locally known as Samish Hill, and have hosted Samish events there; some had identified chiefly as Samish, others as Lummi (TR:1000-1001). Dr. Hajda also observed that there have been a number of complaints of discrimination against Samish people at Lummi, including job discrimination and verbal harassment (TR:1018-1019).

171. Dr. Hajda also pointed out that the legal formalities involved in tribal membership today make it difficult for Indians to change their tribal affiliations or to retain multiple tribal affiliations (TR:870, TR:991-992). This may encourage reservation Indians to be limit their choice of marriage partners.

172. Dr. Hajda explained that, even among reservation Indians like the Warm Springs today, "tribal" identity is situational--that is, it may depend on the occasion or the purpose of the question (TR:897-898). A person of Samish descent may choose to assert that identity in certain circumstances but not others (TR:897). She

---

measuring race, not the way individual respondents were "viewed," culturally, by their neighbors.

distinguished this kind of self-identification when interacting with other Indians, from official membership in a tribal organization (TR:898). No simple rule, such as residence, can be used to ascertain an individual's "primary" identity (TR:899). This had been particularly true since the establishment of Indian reservations, because formal membership in a reservation tribe involves eligibility for benefits that can be lost if individuals move elsewhere (TR:992). Identifying with a *single* "tribe" is, in reality, a post-Treaty phenomenon among Coast Salish people (TR:896).

173. In the final analysis, according to Dr. Hajda, it is necessary to ask people directly what they regard as their "primary" allegiance or identity (TR:993).

174. Dr. Roth acknowledged that as a general proposition, a person can be a member of two communities at the same time, and that some overlap in the membership of communities does not necessarily jeopardize their autonomy or distinctness (TR:680-681). He conceded that Samish people who were participating in Swinomish Reservation activities, were also participating in Samish social and political activities (TR:682).

183. Dr. Sturtevant cautioned that present-day Indian "tribes" tend to be more formally organized than "communities," generally as a result of Federal Government policies requiring the identification of leaders and decisionmaking procedures (TR:81-83). Indian communities that had not been Federally-recognized or administered would not be expected to have political structures as clearcut or consistent as those which are Federally-recognized; people might disagree, for example, over who is the main leader (TR:83). There might be a number of informal leaders, in the sense of people who are often consulted, or asked for help, but no formal decisionmakers (TR:84-85). As a consequence, the community may have little consistent documentation of its activities (TR:84).

184. In response to a question by the ALJ, Ms. Record, currently chief of BAR, agreed that the regulations could not reasonably require legal control of the groups member or their territory, since exercising such authority depends on first being Federally-recognized (TR:275-276).

185. According to Dr. Sturtevant the existence of organized activities implies the existence of organizers or leaders (TR:88). The fact that certain individuals assume the responsibility for determining whether an anthropologist will be permitted to interview people, and make the necessary contacts, is evidence of political processes in a community (TR:90). He warned against over-simplification, observing that people may be leaders for different purposes and differ considerably in their degree of authority:

> I suppose that no political leader is going to get unanimous support on everything, in any society, unless it's a dictatorship, in which case there may be support, but silent opposition. So it's a matter of degree.

(TR:91). The meaning of silence or inaction can only be interpreted, moreover, by examining specific cases to see if decisions are actually followed (TR:87, TR:94-95). It cannot simply be assumed that Indians' failure to particiate in decisions, or to vote cannot, means that they reject the decisions or leaders involved (TR:127-128).

186. Dr. Roth acknowledged that the regulations do not demand evidence of that a group's formal organization has continued uninterrupted over time (TR:724). With respect to changes of the group's membership, he explained that it would be necessary to study the reasons why changes had occurred; questions would also be raised by "extreme instability" involving "totally different people" (TR:724-725). He explained this by reference to BAR's analysis of the Poarch Creeks, a case upon which he had worked, where the leaders of the Poarch Creek community created a formal organization including a wider collection of persons of Creek ancestry, "as a political strategy" in the 1940s (TR:726). He felt it was crucial to that case that there were leaders who served functions of a social character, apart from claims (TR:726). This may also have been true of Samish leaders in the 1920s, Dr. Roth observed, adding he did not personally consider it "fatal" to the Samish Tribe's case that there had been some shift of membership in the 1950s (TR:727).

187. With regard to "political authority," Dr. Hajda explained that in the case of the Samish, leaders have been:

> [p]eople who have skills in dealing with situations that are of concern. Those concerns have changed over the years, obviously. In that sense, I think it's a continuation of earlier patterns, where you had different leaders for different sorts of activities or aspects of life. It wasn't necessarily power and influence, but connections that would be useful for activities that the tribe might want to carry out, for instance. People who had education, people who were seen as having spiritual power, that sort of thing.

(TR:922). This was an individual matter, rather than the inheritance of authority through family lines (TR:922-923).

188. Dr. Roth contended that "there wasn't really information to, say, strongly disprove" the existence of genuine Samish leadership, "there just wasn't a lot of information, period" (TR:632, TR:658). He spoke, necessarily, of the information available to him when he reviewed this case as a BAR employee more than seven years ago, not

the information adduced at this hearing, at which he said nothing to rebut Dr. Hajda's testimony. Consequently, Dr. Hajda's testimony on criterion "c" must be accepted, as long as it suffices to make out a *prima facie* showing of the continued existence of Samish leaders with political authority, in the culturally-appropriate terms outlined by Dr. Suttles.

189. Ms. McMillion, BAR staff genealogist, explained that ancestry can be determined from Federal, State, and local records, or affidavits by tribal elders or leaders (TR:383, TR:391). The Samish Tribe provided her with ancestry charts for each of the Tribe's 590 members, as well as family trees showing the earlier relationships between the families (TR:393-395). Ms. McMillion checked these charts against a variety of other documents, including published historical studies and newspaper clippings, then spent two weeks in Washington State looking for other documents in local collections (TR:399-401). She also asked the Tribe for full documentation on a "selection" of its families (TR:412-413). 190. On cross-examination, Ms. McMillion clarified that she had spent one to two hours in the Samish Tribal office during her field trip to Washington State, and examined only one family file (TR:417-418). She noted that the Bureau of Indian Affairs had prepared a roll of Samish Indians for the purposes of distributing the Tribe's 1971 judgment in the Indian Claims Commission, but that it had never been completed and approved by the Secretary (TR:392). Ms. McMillion explained that this roll had been withdrawn and re-evaluated at the recommendation of BAR (TR:420-422). The only result of this re-evaluation Ms. McMillion was able to recall, was to reclassify some families as Noowhaha instead of Samish (TR:421-423).[20] The true identity of these families appears to be the main issue between the parties under criterion "e".

191. Dr. Sturtevant distinguished between "genealogy" and "kinship" in his testimony; the former is concerned with lines of descent, and the latter with actual behavior and social relationships (TR:96-97). Thus a "family tree" prepared by a genealogist provides little information about how much individuals interact, what they think of each other, or how they treat one another (TR:99). He underscored the fact that many societies have social systems based on "descent groups" or clans which claim to have common ancestors, but this cannot be specifically traced (TR:100-101). He compared this with adoption, which creates important social relationships between genealogically-unrelated people

---

[20]. Ms. McMillion testified that claims judgment rolls were generally prepared by Bureau of Indian Affairs staff who were not trained to do genealogical research (TR:490, TR:497-498). She was not aware of any other judgment roll being withdrawn by the Bureau, however (TR:499).

(TR:100). Biological ancestry is not a prerequisite for kinship (TR:101).

192. Dr. Sturtevant observed that while dates of birth or marriage may be more accurately recorded in documents, the nature of relationships among a group of people is better preserved in their memories (TR:98). Documents are particularly unreliable if they were recorded by persons who come from a different culture and speak a different language, and therefore may not have the same understanding of kinship terms such as "cousin" (TR:102). He also cautioned that the names actually used and remembered by kinfolk may differ from those which appear in documents (TR:98). In his experience, documents relating to Indian ancestry are often inaccurate or incomplete, and must be compared with oral history kept by Indian families.

193. In dealing with Northwest Indians, Dr. Hajda cautioned that there is a typical pattern of very diverse tribal ancestry, including serial marriages to spouses from different tribes (TR:876-877). As a result, it is impossible to identify an individual's "tribe" simply by tracing his genealogy. Changes of residence are also typical (TR:877), making residence an unreliable test of an individual's "tribe". The decision to take up residence in one village did not necessarily cut ties with other villages (TR:895-896). This was as much true of the Samish, as other tribes in the region (TR:892-894). She emphasized that she had not only relied on the genealogical data provided by the Samish Tribal office in drawing her conclusions, but field notes obtained from other scholars such as Wayne Suttles (TR:994).

194. Ms. McMillion acknowledged that the records she used to establish Samish genealogies did not necessarily indicate all of their ancestral linkages (TR:419-420). If an individual had a Samish ancester as well as Swinomish and Lummi ancestors, for example, only the Lummi ancestor might be identified in records prepared many years ago by non-Indians. Ms. McMillion acknowledged that the credibility and reliabilty of such records depends on who prepared them, and why (TR:465). Moreover, she agreed that written records of Indians' ancestry had "presumably" been based on asking Indians who they were (TR:467). Neither Ms. McMillion nor Dr. Roth could explain how Indian Agents determined the ancestries of Indians a century ago, in the records they used (TR:471, TR:673).

195. Ms. McMillion recalled that the Tribe and local Bureau employees had "work[ed] pretty closely together" on the the 1975 claims judgment roll (TR:425), which viewed Noowhaha families as Samish. She admitted that she did not know whether this decision was based upon discussions with Samish elders (TR:426), and stressed that her conclusion to treat the Noowhaha as a separate group was based strictly on what she could find in archival material (TR:427). She conceded that the association of families over generations is evidence that they consider themselves the same

tribe for purposes of criterion "e" (TR:429-431). This would be for the BAR anthropologist to assess, however (TR:434-435).[21]

196. BAR staff concluded that 74 percent of the Tribe's members are of "historic Samish" ancestry, 11 percent of Noowhaha ancestry, 3 percent Snohomish, and the rest descended from other tribes (TR:435-436). The decision to classify the Noowhaha as a separate group was Dr. Roth's, Ms. McMillion emphasized, rather than hers (TR:436). In her opinion, however, had the Noowhaha and Samish been treated as one group, making up 85 percent of the current Tribe's membership, this "probably" would have been sufficient to satisfy criterion "e," since BAR had accepted even lower percentages in other cases (TR:477-478).[22]

197. Dr. Hajda testified that all of the families of Noowhaha ancestry in the Tribe's membership had been integrated into the Samish Tribe by the sometime in the 19th century (TR:813). She estimated that she had doubts about the Samish ancestry, or longstanding Samish affiliations, of about five percent of the current membership of the Tribe (TR:814). If the Noowhaha and Samish did combine historically, as both Dr. Hajda and Dr. Suttles testified, then, the proportion of Tribal members with a common tribal ancestry under criterion "e" is 85-95 percent--enough, according to Defendants' own expert, to meet this test.

198. The Snohomish portion of the Tribe's membership consists of only one family line, descendants of Mary Quacadum Wood. Ms. McMillion had based her classification on an affidavit Mary Quacadum Wood submitted in 1918 to Charles Roblin, special Indian Agent, stating that she was a Snohomish (TR:436-437; Exhibit D-7). In 1926, however, her daughter applied for membership in the Samish Tribe, and claimed that Mary Wood was Samish (TR:437; Exhibit D-7). Ms. McMillion conceded that it was possible, among Coast Salish Indians, to assert multiple affiliations (TR:437-438, TR:444). She agreed that she might even identify her own ethnic background

---

21. Ms. McMillion conceded that individuals had no greater incentive to seek Samish membership, than membership in any other Indian tribes to which they had some ancestral links (TR:472-473). Applications for membership in one Indian tribe are thus no more likely to be biased or self-serving than applications to another.

22. It should be noted that the Tribe's decision to reopen the status of the Viereck and Cayou family lines, announced at the hearing, would have the effect of changing these percentages to 81 percent Samish and 12 percent Noowhaha, or a total of 93 percent demonstrated Samish and/ or Noowhaha ancestry. See below, paragraph 199.

differently in different circumstances (TR:441). She insisted, however, that the 1918 affidavit was better evidence because affiants were asked to list "all of their ancestry" (TR:443). Counsel for the Tribe produced the instructions from 1918, which Ms. McMillion conceded asked the affiants to identify only *two* grandparents, leaving two unreported (TR:499-503, Exhibit D-9). It is consequently possible that Mary Wood was of both Snohomish and Samish ancestry. Furthermore Dr. Hajda testified that Mary Wood's line "have been associated for a long time with the Samish," at least since 1920s (TR:811). Dr. Hajda also observed that the tribal classifications in Roblin's records were frequently erroneous or misleading (TR:793).

199. The Tribe stipulated in the course of the hearing that there were legitimate questions about the ancestry of the Cayou and Viereck lines (TR:478), accounting for roughly 9 percent of the current membership. Dr. Hajda agreed that there were "reasonable grounds" for raising such questions (TR:812-813, TR:907) adding that two other small families of debatable ancestry, listed on the Tribe's older membership lists, have since died out (TR:813-814).

200. Dr. Roth claimed that 90 percent of the Samish Tribal members he identified as "reservation Samish," excepting those living in Canada, were actually enrolled members of a reservation tribe (TR:623). Using his own figures that would represent 14 percent of the Tribe's current membership. Ms. McMillion testified that her original estimate of the overlap had been 9 percent, based on data she obtained from Gosta Dag in the Bureau of Indian Affairs, the original source for which she did not know (TR:402, TR:448-449). She further stated that Samish members were dually enrolled on both the Lummi and Swinomish Reservations, but she had only obtained a formal comparison of the Samish and Swinomish membership lists (TR:409-410). She had not asked the Tribe, or any of the dually-enrolled individuals about the reasons for dual enrollment, nor established that they were even aware of being listed on two rolls (TR:449-450). She was unaware of the extent to which the memberships of the Federally-recognized tribes in the Northwest overlap (TR:451).

201. Defendants introduced four witnesses and a number of exhibits at the hearing for the purpose of establishing the extent to which Samish Tribal members are dually enrolled on the Swinomish Reservation. This centered on a list of "Swinomish Members Dually Enrolled in the Samish Tribe" and a table of "Swinomish Base Roll Membership, 1935, of Samish Ancestry," both of them prepared for BAR by Swinomish tribal officials (TR:407-409).

202. Swinomish Indian Tribal Community Ordinance No. 35 provided for a base roll, prepared in 1976, consisting of all persons who were deemed to have been living of the Swinomish Reservation in 1935 (TR:458; *see* AR Exhibit IV-B-55-2). Ms. McMillion conceded

that a person could be listed on that base roll without having any Swinomish Indian ancestry, and without having chosen to be listed (TR:459-461). She did not know how membership was determined before 1976 (TR:461). Confronted with a Bureau document showing that there had been *no* approved Swinomish roll prior to 1976, she admitted that she had never checked the accuracy of the Swinomish rolls before comparing it with Samish Tribal membership lists (TR:462-464, AR Exhibit IV-A-9-57).

203. Ms. Laura Wilbur, a member of the Swinomish enrollment committee, explained that the committee consists of five tribal members (TR:512). At first she stated that anyone of Samish descent could enroll on the Swinomish Reservation, but after further questioning could not recall whether the Swinomish constitution required descent from an individual listed on the 1935 Swinomish base roll, which she knew did not include all Samish families (TR:515).

204. Ms. Flores, employed as the Swinomish tribal enrollment clerk for the past four years, testified that the Swinomish enrollment committee had decided which individuals in Exhibit D-5 had Samish ancestry "from their memory," not from records (TR:766). Ms. Flores had no knowledge of how many people on the Swinomish rolls have non-Swinomish ancestry, other than those who have some Samish ancestry (TR:768). She was also unable to explain why some individuals show more total Indian blood on the Swinomish membership roll than on Samish membership lists, how the the Swinomish base roll had been prepared, or that the Swinomish base roll had been prepared in 1976, not 1935 (TR:769-771). Ms. Flores did explain that new members would have to seek approval by the enrollment committee and the Swinomish senate, a discretionary decision (TR:772-775). This contradicted Ms. Laura Wilbur's testimony that any person of Samish descendant could enroll at Swinomish.

205. The purpose of criterion "f," suggested by 25 C.F.R. 83.2(d), is to prevent part of an existing Federally-recognized Indian tribe from splitting away and demanding Federal recognition as a new and separate entity (see also TR:630 [Dr. Roth]). Apart from the small size of the overlap here, this is not a case of a Lummi or Swinomish faction that is trying to split away, but, as Dr. Hajda's testimony plainly showed, a small number of strongly self-identified Samish families which have been forced to live on reservations as a means of survival, and cling to their Samish primary identity.