# Final Determination

## To Acknowledge the Samish Tribal Organization

## As a Tribe

Prepared in response to recommended finding by Administrative Law Judge, David L. Torbett, August 31, 1995.

SAMISH TRIBAL OFFICE
P.O. Box 217
Anacortes, WA 98221

Approved: NOV 08 1995

Ada E. Deer
Assistant Secretary - Indian Affairs

**EXHIBIT 2**
In Support of Plaintiff's Opposition to Motion to Dismiss on TPA & IHS
Samish v. U.S., No. 02-1383L

# EVALUATION OF THE SAMISH TRIBAL ORGANIZATION UNDER 25 CFR 83

## INTRODUCTION

This decision of the Assistant Secretary - Indian Affairs (ASIA) is an evaluation of the Samish Tribal Organization (STO) under the acknowledgment regulations (25 CFR 83). It also includes supplementary findings concerning the history and status of the petitioner, the historical Samish tribe, and the Federal acknowledgment process.

This determination is made under the acknowledgment regulations which became effective in 1978. Revised acknowledgment regulations became effective March 28, 1994 (59 FR 9280). Petitioners under active consideration at the time the revised regulations became effective in 1994 were given the option to be considered under the revised regulations or the previous regulations. The Samish requested to be considered under the 1978 regulations.

In accordance with sections 83.9 and 83.10 of the 1978 regulations, this determination will become effective in 60 days of its publication in the Federal Register unless the Secretary of the Interior requests that the Assistant Secretary - Indian Affairs reconsider her decision.

## ADMINISTRATIVE HISTORY

A final determination to decline to acknowledge the Samish Tribal Organization as a tribe was published in the Federal Register February 5, 1987 (52 FR 3709). The Secretary declined a request for reconsideration and the determination became effective May 6, 1987. In a 1992 decision in Greene v. United States, the court vacated the 1987 determination on the grounds that a formal hearing had not been given to the petitioner. The court ordered that a new hearing be held which conformed to the requirements for a formal adjudication under the Adminstrative Procedures Act.

Under instructions from the court, proceedings before an Administrative Law Judge (ALJ) of the Department of Interior's Office of Hearings and Appeals began in 1992. A formal hearing before the ALJ was held in Seattle, Washington, from August 22 to August 30, 1994. The court's instructions required the ALJ to make a recommended decision to the ASIA whether the STO should be acknowledged to exist as an Indian tribe.

The ALJ issued a recommended decision to acknowledge the Samish Tribal Organization. This recommended decision, which was dated August 31, 1995, was received by the ASIA on September 11, 1995. The parties and amicus curiae had 30 days from the receipt of the

decision by the ASIA, or until October 11, 1995, to submit comments on the ALJ's recommended decision. The procedures established by the court provided that a final determination be issued by the ASIA within 30 days of receipt of comment.

BASES OF THIS DECISION

This decision is based on weighings of evidence and findings of fact by the ALJ in his recommended decision to acknowledge the Samish. Only those findings of fact by the ALJ which are specifically referred to and accepted here form the basis of this decision. Some findings of fact by the ALJ have been rejected as clearly erroneous and contrary to evidence and testimony in the record. All findings of fact by the ALJ which are inconsistent with this report are rejected whether referred to specifically or not. This decision makes some supplementary findings of fact which are based on the ALJ's findings and our review of the record.[1]

The ALJ's recommended decision interprets some of the provisions of the acknowledgment regulations in a way that departs from precedents or does not rely upon an analysis of precedents. In this decision, the Government has rejected the ALJ's interpretations which are contrary to established practice and interpretation of the regulations in previous acknowledgment decisions.

The ALJ's decision upholds the acknowledgment regulations. The ALJ's decision also agreed with the Government's position as to the standard of proof to be met in presenting and evaluating evidence that the petitioner was a tribe under the criteria in 25 CFR 83.7. The ALJ incorporated that portion of the Government's brief dealing with standards of proof into his decision and used the Government's standard in making his decision (recommended decision 3).

MEMBERSHIP OF THE SAMISH TRIBAL ORGANIZATION

In order to evaluate the character of a petitioning group, the acknowledgment findings require a complete list of the petitioner's members. In this case, there are two lists. The membership list used for the 1987 administrative decision under 25 CFR 83 will be referred to here as the 1986 list. A second list was compiled by the Government in 1994, based on several lists provided by the STO in response to a discovery request for an updated membership list, and on hearing testimony by the STO Secretary which explained the lists. This membership list will be referred to as the 1994 list.

---

[1] We have reviewed also and considered the evidence and arguments submitted by the Swinomish Tribal Community, Tulalip Tribes, and the Upper Skagit Indian Tribe.

Based on a review of the evidence used by the ALJ to support his findings, it is clear that the ALJ relied on the 1986 list for purposes of defining the STO. We defer to this decision. This finding, therefore, also uses the 1986 list.

For tribes acknowledged under 25 CFR 83, the acknowledgment roll becomes the base roll of the newly acknowledged tribe. The 1986 list will be used as the base roll of the STO, subject to verification that individuals consent to be listed as members. This roll cannot be modified to such an extent that the validity of the acknowledgment decision becomes questionable. However, individuals may be added to the roll who are politically and socially part of the tribe and meet its membership requirements.

## Evaluation under 25 CFR Part 83

### INTRODUCTION

The acknowledgment regulations require that a petitioner must meet all seven criteria set forth in section 83.7 to be acknowledged. This decision begins with a statement of the three criteria which have not been in dispute. Separate evaluations under each of the four disputed criteria are then presented. Each evaluation describes the main findings by the ALJ which form the basis for the evaluation. In addition, each evaluation indicates the findings of the ALJ which have been rejected and the supplementary findings which have been adopted in relation to the criteria. Appended to the decision are additional and more detailed findings by the ALJ which also form the basis for this determination.

### CRITERIA FOR ACKNOWLEDGMENT

To be acknowledged a petitioner must meet all of the criteria for acknowledgment in 25 CFR 83.7 of the applicable 1978 regulations. These are:

83.7(a) A statement of facts establishing that the petitioner has been identified from historical times until the present on a substantially continuous basis, as "American Indian," or "aboriginal."

83.7(b) Evidence that a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area.

83.7(c) A statement of facts which establishes that the petitioner has maintained tribal political influence or other

authority over its members as an autonomous entity throughout history until the present.

83.7(d) A copy of the group's present governing document, or in the absence of a written document, a statement describing in full the membership criteria and the procedures through which the group currently governs its affairs and its members.

83.7(e) A list of all known current members of the group and a copy of each available former list of members based on the tribe's own defined criteria. The membership must consist of individuals who have established, using evidence acceptable to the Secretary, descendancy from a tribe which existed historically or from historical tribes which combined and functioned as a single autonomous entity.

83.7(f) The membership of the petitioning group is composed principally of persons who are not members of any other North American Indian tribe.

83.7(g) The petitioner is not, nor are its members, the subject of congressional legislation which has expressly terminated or forbidden the Federal relationship.

CRITERIA NOT IN DISPUTE

In the 1987 determination, vacated by the court, the Samish Tribal Organization was found to meet the criteria in 83.7(d), (f) and (g). Both parties accepted that those criteria were met by the STO. Consequently, they were not at issue in the proceedings before the ALJ. We find for purposes of this decision that the STO meets the criteria in 83.7(d), (f) and (g).

CRITERION A -- EXTERNAL IDENTIFICATION

The ALJ's decision found that "[t]hese findings of fact support the positive finding for the Petitioners as to <u>each</u> of the contested criteria (emphasis added)" (recommended decision 21). Although there was little evidence that there were external identifications of the STO for substantial periods of time, we defer to this finding. The ALJ was apparently persuaded that there had been substantially continuous external identification of the petitioner as an Indian entity and, therefore, that the STO meets the criterion in 83.7(a).

We do not, however, find the ALJ's finding 130 to be relevant to criterion (a) because it deals with the identification of individuals, while criterion (a) requires external identification of the <u>group's</u> Indian identity. This finding is therefore rejected.

CRITERION B -- COMMUNITY

Summary evaluation

The Samish were parties to the 1855 Treaty of Point Elliot. The Samish village at Samish Island was replaced in 1875 by a village established at New Guemes. This was maintained until around 1905. The Samish from, or associated with, this village moved to the Swinomish and Lummi Reservations. This movement began before 1900 and continued into the 1920's. After 1905, some Samish from this village became part of a small Indian settlement at Ship Harbor, which was largely Samish. This settlement persisted until approximately 1930. Some other Samish families, descendants of marriages with non-Indians, did not move to the reservations.

The reservation families continued to be somewhat distinct as a Samish community even after moving to the reservations, notwithstanding their social and political participation in the communities which emerged on those reservations. From the late 19th century to the present, the nonreservation families continued in significant contact with the reservation families, beyond simply being in the same organization, even though they had married non-Indians and lived elsewhere. A portion of these reservation and non-reservation families comprise the STO today.

Based on these findings, we conclude that the STO meets the requirements of criterion 83.7(b).

Findings by the ALJ which have been accepted

The administrative law judge found in part:

> A certain number of reservation and off reservation Samish intended to remain Samish. This core have in accordance with the regulations preserved the integrity of the Samish tribe (Recommended decision 22).
>
> There is significant evidence in the record which supports the proposition that certain off reservation Samish continued to be a part of the Samish community (Recommended decision 21).
>
> The Cumshelitsha-Whulhoten (sic) family does not live on a reservation, but they have continued to participate with the families that are not classified as being Indian descendants throughout. . . . (Recommended decision 6).

Additional findings by the ALJ relevant to this criterion are cited in the sections of adopted findings included at the end of this decision.

Additional findings

These supplemental findings of fact are based on the ALJ's findings concerning the existence of community. They are also based on his interpretation of the requirement for autonomy under the regulations, as modified in this decision (see discussion under criterion 83.7(c) below).

1. The 31 percent of the 1966 STO members who are enrolled in a recognized tribe also participate socially and politically in those reservation communities. Members have filled offices and held leadership roles in organizing the tribal governments under the Indian Reorganization Act.

2. The STO maintained a 1/8 Samish blood degree membership requirement until 1974, when it was changed to lineal descendancy. Blood degree was a political issue between the reservation and non-reservation family lines in the 1970's. This conflict is evidence that the STO had made significant distinctions between members and non-members and that membership had been based on more than descendancy alone.

3. Members of the non-reservation family lines were identified on the 1920 Federal census and on employment registers of the Ship Harbor canneries in the 1920's as Indian or part-Indian. This evidence supports a finding that they were socially distinct from non-Indians.

4. Geographical dispersion of a group's membership does not foreclose tribal existence, but neither does concentration in a broadly defined geographical area provide evidence for it. While a concentration of many members within, for example, a 50-mile radius creates an opportunity for these individuals to interact on a regular basis, it is not evidence that such interaction has occurred.

Findings by the ALJ which have been rejected

1. The ALJ's findings concerning intermarriage, genealogy and blood degree from his summary of evidence, p. 9, and findings 154-63 and 191-2 in Appendix B of the recommended decision are specifically rejected.

We affirm the interpretation of the regulations, based on past decisions, that where the members of a petitioner have only distant genealogical relationships with each other, this does not provide any evidence for the existence of community. The absence of marriages among a group's members over many generations, while not necessarily evidence that a community does not exist, makes it likely that there were no social ties among members based on kinship, unless the contrary can be established using other

evidence. A relationship as distant as second or fifth cousin between two individuals is far too distant to presume, on genealogical evidence alone, that a significant social tie exists between them. Such a genealogical relationship may provide the basis for actual social ties or relationships characteristic of a community, but they cannot be presumed to exist without direct evidence.

2. The Department testified that certain portions of the membership "with a few exceptions, had little or no knowledge of or contact with others in the group, particularly if you filter out the possible participation in meetings of the organization." The ALJ's comment on this testimony implied that participation in the organization should be considered a valid form of social interaction to show that a community exists. This comment is specifically rejected (recommended decision 17). We affirm that a tribe is more than a voluntary association (see also discussion of voluntary organizations under criterion c).

CRITERION C -- POLITICAL INFLUENCE.

Summary Discussion

The historical Samish tribe as it existed off-reservation until after 1900 was centered on a distinct settlement and had well-established traditional leaders. The next generation of traditional leaders, such as Charlie Edwards and Tommy Bob, moved to the reservations. They were influential among the Samish, and more generally on the reservations, as spiritual and cultural leaders as well as leaders in pursuing hunting and fishing rights. They remained active until as late as the 1940's. Charlie Edwards, perhaps the most influential person, survived until 1948. Contemporary with them were other, off-reservation leaders. These, especially Sarsfield Kavanaugh, most active from around 1912 to the late 1920's, and Donald McDowell, active from the 1930's to around 1950, were particularly important in dealing with non-Indian institutions on behalf of the Samish.

After 1951 a formal council was established which has been demonstrated to have had significant support of, and contact with, the STO membership. The council pursued goals which reflected significant interests and concerns of the membership. Internal conflicts in the 1970's demonstrated the involvement of a broad spectrum of the STO membership in its political processes.

We conclude that the STO meets the requirements of criterion 83.7(c).

Findings by the ALJ which have been accepted

The existence of a community with leadership before the end of the off-reservation New Guemes settlement in 1905 was not contested in the 1987 determination and is accepted here.

The ALJ has presented several findings concerning political leadership and influence after 1905. These findings are adopted here.

The ALJ concluded:

> There is sufficient evidence in the record to show the continuation of the Samish tribal functions between 1935 and 1951. . . . There is oral history of meetings during that time and there is documentary evidence. Mary Hanson's [sic] testimony supports the proposition that the tribe continued to exist as a tribal entity during this period of time. Recommended decision 21.
>
> There are other important reasons to believe that the Samish continued to exist as a tribe during this critical period of time. There is a continuity of leadership. These leaders who emerged from one generation were often followed in succeeding generations by their children and grandchildren. They continued to maintain influence with the tribe throughout the history of the tribe. The Edwards family in particular have been leaders since almost the turn of the century and are still leaders in the tribal movement. There are other leaders such as Sas Kavanaugh and Don McDowell who demonstrated tribal leadership at certain times during the tribe's history. Recommended decision 21.

Although this discussion by the ALJ refers to 1935-51 explicitly, the individuals referenced and the statements made in that discussion constitute a finding of tribal political leadership for a much longer period, from the early 1900's until the present (see also the portions of the ALJ's summary of evidence and supplementary findings of fact appended to this decision). Further, the statements and findings of fact constitute a finding of tribal political leadership which included the nonreservation families. This is a finding that the relationship between leaders and followers is based on more than simply that the leaders are the leaders of a voluntary organization. The ALJ found that the formal organization created in 1951 was a revitalization of an existing tribe not a newly created organization.

<u>Discussion of Criterion 83.7(c)</u>

The most culturally distinct and socially cohesive portion of the petitioner's membership is the 31 percent that are enrolled with recognized tribes. In the 1987 final determination on the STO, the activities of this portion of the STO membership was not included

as evidence for the evaluation under criterion 83.7(c) because they historically have participated socially and politically in the recognized tribes.

The ALJ specifically included the activity of the members of recognized tribes in evaluating the STO. For the reasons set forth below, we find that the political participation of the petitioner's members who are also enrolled in a recognized tribe is valid evidence for meeting criterion 83.7(c) in this case. In addition, their social cohesion and social and cultural distinction from non-Indians is valid evidence for demonstrating that the STO meets the requirements under 83.7(b) for demonstrating the existence of a community.

Criterion 83.7(c) requires the demonstration of "autonomous" political influence within the petitioning group. The regulations define "autonomous" in part as a group having ". . . its own means of making tribal decisions independent <u>of the control of any other Indian governing entity</u>" (emphasis added) (83.1(i)) of the 1978 regulations). The provisions of the regulations concerning autonomy, and the related language of 83.3(d) excluding acknowledgment of "splinter groups" from recognized tribes, reflects the intent of the regulations that they not be used to break up an already recognized tribe. "Autonomy" is defined only in relation to the governing body of a recognized tribe, not in relation to non-Indian political bodies.

The ALJ found that being "socially and politically integrated" into another Indian community is not incompatible with "maintaining a distinct Samish identity." While maintenance of distinct tribal identities within a reservation is extremely common, the ALJ argues further that, "It is often necessary and always proper for people to participate in activities which control their immediate environment. However, in doing so, an individual's political affiliation is not changed because he or she associates with others of another political party (recommended decision 22)."

The ALJ's findings, however, could be interpreted to mean that if a petitioning group is internally cohesive and is exercising political influence within itself, the involvement of its members in another Indian political system (one which is part of a recognized tribe) would not violate the requirement under 83.7(c) that a group be politically <u>autonomous</u>. The ALJ's decision is rejected to the extent that it conflicts with the requirement for autonomous political process under the regulations.

However, in the present case, the political participation of a minority portion of a petitioner in a recognized tribe does not violate the bar to autonomy under 83.7(c) nor the prohibition in section 83.3(d) against recognizing "splinter groups" because a minority of the petitioner's membership is involved. Where, as in the present case, most of the petitioning group is not maintaining

a political relationship with a recognized tribe, and the petitioner is maintaining internal political processes independent of a recognized tribe, the autonomy of these processes is not violated by the additional political affiliation of a minority of its members.

The ALJ's discussion concerning Samish political participation in the reservations states in part that "to be a member of a tribe is a political affiliation and it is essentially a matter of intention on the part of the individual tribal member (recommended decision 22). His use of "intention" here is in the context of his finding that this political participation was of necessity and was therefore not an indication that political affiliation with the Samish had been abandoned. The Department continues to affirm its position that an "intent" to be part of the political process of a tribe which is not carried out or acted upon is not valid evidence for the existence of political influence within a tribe under the meaning of the regulations.

Additional findings concerning criterion c.

These supplemental findings of fact are made based on the ALJ's findings concerning political influence and the interpretation, presented above, of the requirement for autonomy under the regulations.

1. The ALJ found that the political participation in the STO of members enrolled on reservations is valid evidence for political influence within the Samish. He also found that a community exists and that leadership in a broad sense exists. In the light of these findings by the ALJ, conflicts within the STO in the 1970's over control of the STO and over what the blood degree requirement should be for membership have the character of political conflicts between interest groups or subdivisions within the STO.

While these conflicts tended to follow reservation-nonreservation lines, portions of the non-reservation Cubshelitsha line sided with the reservation Indians. Relatively large numbers of individuals were involved. This series of conflicts shows the mobilization of political interests of large sections of the membership over a sustained period. They are thus good evidence of internal political processes which support a demonstration of meeting criterion 83.7(c).

2. Because the ALJ found that the political participation in the STO of members enrolled on reservations is valid evidence for political influence within the Samish, some of the political issues raised by such individuals within the STO during the period between 1951 to present are entitled to some weight as evidence of political processes. These issues include fishing rights, whether to have a blood degree requirement for membership, cultural

preservation, obtaining a land base and rejecting per capita payment of the Samish claims award.

Findings by the ALJ which have been rejected

1. The ALJ's findings concerning political influence are rejected to the extent that they do not differentiate clearly between a social club or voluntary organization and a tribe. A tribe is significantly more than a voluntary organization and the ALJ's findings are rejected to the extent they imply otherwise.

To be a tribe there must be more social contact between members, and distinction from non-members, than exists in a club. Precedents in previous acknowledgment decisions as well as in court decisions and Federal law underlying the acknowledgment process have consistently made this distinction. These precedents were cited in the Department's brief but were not commented on or analyzed in the ALJ's recommended decision.

A voluntary organization consists of otherwise unconnected individuals who join an organization for limited purposes. Mere common participation in a voluntary organization does not in and of itself demonstrate that the members of a petitioner have the kind of social and political links with each other to form a social and political community within the meaning of the acknowledgment regulations.

The petitioner's witness William Sturtevant supported this view, testifying that "One can contrast it [a community] with more temporary groupings of . . . interest groups, groups of people that are meeting together, talking to each other for a limited purpose. Social clubs or professional society meetings or employees of the Bureau of Indian Affairs, or employees of the Smithsonian, in a sense those are communities, but not really what either anthropologists or the BAR definition applies, as I understand it [Tr. 40]."

2. The ALJ found that organizing for specific purposes such as government benefits or fishing rights was conclusive evidence that the tribe continued to exist and had political influence over its members (recommended decision 21). We reject the ALJ's conclusion here and elsewhere in his decision to the extent that the ALJ has found that the creation of an organization for specific purposes in itself demonstrates political influence or internal tribal political processes under the regulations. Consistent with the regulations and their intent, as well as previous acknowledgment decisions, there must be evidence that these purposes reflect the needs and desires of the membership which have been communicated to the leadership.

A voluntary organization can represent, or claim to represent, the interests of a large body of individuals without the individuals represented having significant interest in, or even knowledge about, what the council is doing. Such interest and knowledge is crucial to distinguish between a voluntary organization and a tribe.

3. The ALJ's summary of evidence (recommended decision 21) cites the STO's opening of an office, holding classes, running cultural programs and a museum and obtaining Federal grants. Operation of programs and obtaining grants are not in themselves evidence of political influence within the meaning of the regulations.

CRITERION E -- ANCESTRY FROM THE HISTORICAL TRIBE

Introduction

The STO membership consists of individuals with ancestry from the historical Samish tribe and from other, non-Samish Indian families which historically became incorporated into the Samish tribe. This decision makes supplementary findings, based on the ALJ's findings, concerning the status of several family lines with ancestry from the Noowhaha tribe but not from the Samish tribe. A supplementary finding has also been made concerning a family line whose ancestry as Samish had not been clearly established.

Additional finding concerning the Noowhaha

The ALJ found that the Samish tribe as it existed in 1926 was a tribal political unit. The Noowhaha in the present STO are descendants of specific Noowhaha families--Blackinton, Wooten and Barkhousen--which were members in 1926. Under the precedents for interpreting the acknowledgment regulations, when individual families from other tribes have become incorporated historically into a tribe, their ancestry qualifies as ancestry from the historical tribe. Therefore ancestry from the Blackinton, Wooten, and Barkhousen family lines qualifies as descent from the historical Samish tribe.

Rejected finding concerning the Noowhaha

The ALJ's finding that the Noowhaha and the Samish combined in pre-treaty times is rejected (recommended decision 22). A review of the specific findings of fact in the recommended decision (findings 63 and 67), the testimony of the plaintiff's witnesses, and their writings, which form part of the administrative record of this case, reveals that by "combined" these individuals meant that the two tribes formed an alliance in pre-treaty times (cited in Def. Brief 149). The Department has never objected to this characteri-

zation of the relationship between the two tribes in pre-treaty times. However, a political alliance does not meet the requirements of criterion 83.7(e) for descent from a historical tribe or from tribes which "combined into a single autonomous political unit" (emphasis added).

In addition, the Federal district court in United States v. Washington, No. 9213, Subproceeding 89-3 (W.D. Wash) (Shellfish) held that the present Upper Skagit Tribe is the successor to the historical Noowhaha. The district court made specific findings concerning the incorporation of Noowhaha into the Upper Skagit. These findings are consistent with the Department's previous findings concerning the Noowhaha which were that many Noowhaha joined the Upper Skagit Tribe and that the Upper Skagit had been considered to represent the Noowhaha in the past, although some Noowhaha families moved to the Swinomish and Lummi Reservations (ASIA 1982a, 1982b, 1987). The Department reaffirms that the present Upper Skagit Tribe is the successor to the historical Noowhaha.

Previously, the Indian Claims Commission, in its March 11, 1958, opinion concerning the claim of the Samish in Docket 261, rejected the Samish's contention there was a merger between the Samish and the Noowhaha tribe at the time of the Point Elliott treaty of 1855 (Indian Claims Commission 1958).

Additional Finding concerning Quacadum Wood family

Based on the ALJ's supplementary finding number 198, we conclude that the Quacadum-Wood family line, classified by the Department as only of Snohomish Indian ancestry in previous decisions, also had Samish ancestry.

The following portions of finding 198 are accepted.

> The Snohomish portion of the Tribe's membership consists of only one family line, descendants of Mary Quacadum Wood.
>
> In 1926, however, her [Mary Quacadum Wood's] daughter applied for membership in the Samish Tribe, and claimed that Mary Wood was Samish (TR:437; Exhibit D-7).
>
> Furthermore Dr. Hajda testified that Mary Wood's line "have been associated for a long time with the Samish," at least since the 1920s (TR:811).

The balance of this finding is rejected.

Evaluation under the Criterion

The 1986 membership of the STO consisted of 61 percent who have Indian ancestry from the Samish tribe and 19 percent who have ancestry from Noowhaha families which historically became incorporated into the Samish tribe. The remaining members had Indian ancestry from other tribes. Thus, 80 percent of the 1986 members were descendants of the historical Samish tribe. We conclude, therefore, that the STO meets the requirements of criterion 83.7(e).

SUMMARY EVALUATION OF THE STO UNDER 25 CFR 83

The Samish Tribal Organization meets the requirements of each of the seven criteria in section 83.7 of the 1978 acknowledgment regulations. Therefore the STO meets the requirements to be acknowledged as a tribe.

## Additional Findings and Rejected Findings

These additional findings form part of this decision.

### The Historical Distribution of Samish

The Swinomish Tribe intervened in U.S. v. Washington as the successor to its four constituent band, Samish, Swinomish, Lower Skagit and Kikiallus. The court ruled in its favor, finding that "The intervenor Swinomish Indian Tribal Community is the present-day entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to certain tribes and bands and groups of Indians which were parties to the Treaty of Point Elliott, 12 Stat. 927 (459 F. Supp. 1020 (1978)).

The Samish are one of four constituent tribes of the Swinomish Tribal Community, a recognized tribe (Upchurch 1936). The Samish, who maintained a village off-reservation during the 19th century, abandoned that village around the turn of the century. Some had moved to the Swinomish Reservation before that time, and others moved early in the 20th century. A few remained off-reservation at Ship Harbor until as late as 1930. Most of the Samish, including some historically incorporated Noowhaha families, went to the Swinomish Reservation. A smaller number went to the Lummi Reservation. A major component of the Samish at Lummi, the Cagey family, originally had gone to the Swinomish reservation and participated in that reservation's government. Only later did the Cageys move to the Lummi Reservation. A few families who descended from the Samish married non-Indians at an early date and did not go either to New Guemes or to any reservation. The descendants of the latter represent the majority of the 1986 STO membership.

The leadership of the historic Samish tribe almost exclusively went to the Swinomish reservation. The leadership of the STO has historically included some of these leaders and individuals descended from those families, particularly the Edwards and Whulholten families.

The primary STO family lines from the reservations since 1951 have consisted of the Cagey, Whulholten, Underwood (Canadian Reserve members) and Tom (of Noowhaha descent) lines and part of the Edwards line. Most of the descendants of the Samish families who became part of the Swinomish and Lummi Reservations and those who joined Canadian Reserves identify as Samish. However, they are not members of the STO and have not appeared on any lists of members of the STO compiled from 1951 to the present.

The present-day membership includes only part of the Edwards descendants, a key family in the Samish leadership. Descendants of

the leaders from the Edwards family who are not members of the STO, but identify as Samish, are prominent today in the Swinomish Tribe's governing body. There are few living descendants of the Whulholten leadership line, and almost none are in the STO. Several reservation Samish family lines, which had individuals listed as members in 1926, now have no, or almost no, representation in the STO. These are the George, Paul, Stone and Jefferson families, which are part of the Lummi and Swinomish tribes.

Rejected findings concerning Reservation Samish

The ALJ's findings are rejected to the extent that they conclude that all members of recognized tribes who are of Samish ancestry and who have a Samish identity are members of the STO. The ALJ states that the four Swinomish reservation members of "Samish ancestry" who testified stated that they considered themselves Swinomish. The ALJ further states that these are "in opposition to the numerous members of the Samish tribe who live on reservations who consider themselves still to be Samish."

This contradicts the evidence in the record of this case as well as the testimony. The Samish individuals from Swinomish who testified clearly identified themselves as Samish but not members of STO. Further, the plaintiff has admitted that there are such individuals, holding only that certain reservation families remained distinct.

Further, the ALJ's overall finding of tribal continuity is flawed because it does not recognize that there are reservation Indians who are of Samish descent and identify as Samish but are not members of the STO. There is no statement or analysis of this significant point in the ALJ's recommended decision.

Previous Federal Recognition of the Samish

The Samish have not been federally recognized as a separate and distinct tribe since the early 1900's, when the core of the tribe moved to the reservations. The court in Greene rejected the contention that the Samish petitioner was a recognized tribe until the 1970's in its decision of February 25, 1992. The court stated that "The evidence, when viewed in the light most favorable to the defendants, is not sufficient to establish that the BIA treated the Samish as a recognized tribe" (Order, p. 12). The testimony of the long-time STO Secretary Mary Hansen at the hearing concerning the Samish clearly identified them as unrecognized in the 1950's (TR 1038). The ALJ's supplementary finding 110 is rejected, as are all other findings to the extent that they imply that the Samish petitioner was a recognized tribe until the 1970's.

Nature and Purpose of the government's research

A petitioner for acknowledgment under 25 CFR 83 has the burden to demonstrate through credible research that it meets all of the criteria in 83.7. Under section 83.6(d), "The Department shall not be responsible for the actual research on behalf of the petitioner."

The role of the Government's researchers who prepare recommended findings for the Assistant Secretary - Indian Affairs is that of evaluators who review the petitioner's research. The Government is not the primary researcher, though it may do supplementary research where necessary to complete its evaluation (see 25 CFR 83.9(a)). The Department's findings are thus based on research materials submitted by the petitioner, as supplemented and evaluated by its own research.

The comments and findings of the ALJ concerning this Department's research and the role of that research under 25 CFR 83 are based on an apparent misunderstanding of the role of this Department in the administrative process of acknowledgment. The ALJ's discussion, summary of evidence, and findings on these subjects are rejected as not an accurate description of the nature and purpose of the Department's research. The rejected findings specifically include those where the Department's research is discussed on pages 7-8, 13, and 17 of the ALJ's discussion of evidence.

## Accepted ALJ Findings on Nature of the STO

### I. Findings from the Summary of Evidence in the Recommended Decision

Introduction

The following portions of the summary of evidence in the ALJ's decision (recommended decision 4-18) are accepted and form part of the basis for this decision. Those portions not cited here or earlier in this decision are rejected as contrary to testimony and evidence in the record or contrary to established practice and interpretation of the regulations in previous acknowledgment decisions.

Excerpt

She [Yvonne Hajda] said the first generation or two following the treaty thought they [the Samish] would get a reservation of their own, but they never did. (Tr. 815). Some of the Samish moved to the Lummi reservation and others stayed off the reservation. Ibid. The off-reservation Samish continued to interact with those on the reservation by supporting each other, including pooling income and food. (Tr. 819-820). The off-reservation Samish tried to continue with their traditional Indian lifestyle of hunting and gathering, but this was made increasingly difficult because of white encroachment on what had been their lands. (Tr. 818).

Moving up to sometime around the turn of the century, Dr. Hajda testified that the Samish had an off-reservation village on Guemes Island (New Guemes Village). (Tr. 821). The village served as a religious center for the Samish, because it was the only place in the area where whites did not interfere with the holding of winter dances. (Tr. 822). The village also "served as a kind of refuge, refugee camp ... for Indians from other areas who were being driven off" with the Samish acting as host. Ibid. "It was a Samish house. Ibid.

The balance of this finding is rejected.

Dr. Hajda stated that after the break-up of the village, among the places the Samish moved to included the Swinomish reservation, Anacortes and Ship Harbor. (Tr. 825). Some Samish lived at Ship Harbor seasonally and some lived there year-round. (Tr. 827). Ship Harbor had two canneries that made substantial employment of Samish people. (Tr. 825-826). The Samish cannery employees formed two baseball teams. (Tr. 828). At Ship Harbor, the Samish conducted religious activities. Ibid.

According to Dr. Hajda, the Samish held political meetings during the early part of this century, including a meeting at New

Guemes Village where 200 or so people attended, and meetings in 1912 or 1913. (Tr. 828-829). "(T)here certainly was organization during that time." (Tr. 829-830). She said the Samish also participated as a tribe in meetings of the Northwest Federation of Indians. (Tr. 829-831). There were numerous meetings of Samish people in 1926-27. Apparently they were in response to legislation passed at about that time permitting Indians to sue the government for not fulfilling treaty rights. (Tr. 832).

Moving to the time of the Depression, the Samish participated politically by taking a straw poll among its members about whether to support the Indian Reorganization Act. (Tr. 837-838). The Samish also played a roll (sic) in the northwestern Washington region during the Depression in preserving the winter dance religion. (Tr. 839).

Moving to the time of World War II, the witness testified that the war made it difficult to meet because of gas rationing, men being called away for military service and people leaving the region for war-related employment. (Tr. 840). Nevertheless, "we have oral testimony that people continued).to meet and to discuss the things that they had been discussing. Providing people.with what needed to be provided, giving help to people, the usual -- (those) kinds of things. Concerned with fishing and land rights. The same things that had been there all along." (Tr. 841). She said there is also a written letter that provides evidence that a Samish council meeting was held in 1942. (Tr. 859-860).

In 1951, the Samish organized formally by adopting a tribal constitution, Dr. Hajda said. (Tr. 1951)(sic)[2]. Following the adoption, they pursued such concerns as health, social justice and employment, as well as fishing rights. (Tr. 844). Also during the 1950s, the Samish participated as a tribe in working with other Indian tribes to fight federal termination of Indian benefits. (Tr. 845).

The Cumshelitsa-Whulhoten (sic) family does not live on a reservation, but they have continued to participate with the families that are not classified as being Indian descendants throughout --- from the beginning. (Tr. 862).

In her testimony, Dr. Hajda concluded that the Samish who live on the Swinomish and Lummi reservations have the capacity to maintain their Samish identity, despite their participation in the affairs of the reservations.

"I think that many of them managed to have office or whatever it was at Swinomish or Lummi, and continued to be Samish and to

---

[2] The correct reference is page 842 of the transcript.

participate as Samish. It's not an unusual thing. If you look at the United States in general, I know of a great many Indian men who vote as United States citizens. It's not either/or. They serve in the armed forces with great pride, many Indian men are proud of this. It doesn't seem to make them less Indian to have done so. So I find it difficult to think that it's an either/or choice ... (P)eople who live on reservations may well maintain another identity, as well. It's not uncommom." (Tr. 867-868).

In her testimony, Dr. Hajda also provided examples of Samish leaders:

During the era of the New Guemes village, the Whulholten brothers provided economic leadership by running a fishery. (Tr. 823). Billy Edwards served as a Samish spiritual leader during this era. (Tr. 823-824). While Samish were living at the Ship Harbor community, Charlie Edwards served as a kind of labor boss in rounding up Samish people to work at the local canneries. (Tr. 827). Sas Kavanaugh played a leadership role in organizing Samish meetings around 1912-13. (Tr. 830). During the Depression era, Don McDowell served a leadership role for the Samish, including helping people fill out forms for governmental assistance. (Tr. 837). Following World War II, Alfred Edwards emerged as a Samish leader, serving as president of the new Samish organization. (Tr. 843). With the establishment of a formal Samish council, it has taken a leadership role, including the mobilization of resources. (Tr. 860).

Petitioners' witness, Dr. Wayne Suttles is a professor emeritus of anthropology and linguistics at Portland State University. (He retired in 1984.) Dr. Suttles has conducted extensive field research with the Coast Samish [sic] [Salish] Indian people of northwest Washington and British Columbia, including the Samish. Some of the research was basis of his Ph.D. dissertation completed in 1951.

Dr. Suttles testified about Salish and Samish historical culture, including intermarriage among tribes and with white settlers. He said the Salish people, including the Samish, had a tradition against marrying close relatives (up to fourth cousins). (Tr. 165). The tradition included marrying outside one's tribe for economic and security reasons. (Tr. 165-167).

"(T)he reasons for this are that a marriage started a series of exchanges of foods and foods for wealth, and shared access of resources between the families marrying." (Tr. 165).

"(T)his advantage of marrying out, not only did it start exchanges, but there were political advantages. If you had inlaws somewhere else, you're less likely to be attacked by those people." (Tr. 166).

The Salish Indians also intermarried with white settlers when they showed up in the early part of the 19th century and recognized them as in-laws, Dr. Suttles said. (Tr. 179-182). Intermarriage with whites dropped off after more white women came into the area and expressed prejudice against Indian women and white settlers married to them, he said. (Tr. 236).

Even with the intermarriage among tribes, specific tribal identity was maintained, Dr. Suttles said. (Tr. 202). The various tribes "were part of a social network that extended pretty much indefinitely ... Samish had ties with the Swinomish and Skagit, Skagit had ties with the Snonomish, the Snonomish had ties with the Duwasmish, (and) so on ... It was a kind of social continuum through marriage, a biological continuum because of kinship relations. But each of the units that was in that had a real identity, real existence." (Tr. 202).

"Sometimes people have said, well now, you're saying this was a continuum. Doesn't that mean that these local groups, tribes, whatever you call them, don't really exist? And I say no, this is not this kind of homogeneous continuum where you can't find any units within it. It is a network, and --- well to use a metaphor, I think we can say that each of these local groups was a knot in the network. The network wouldn't exist without knots." (Tr. 202).

According to Dr. Suttles, evidence that the Salish people did not act as a homogenous tribe, but instead as a network of related specific tribes, include the existence of property rights among the tribes (Tr. 203); the hosting of intergroup gatherings (dances and potlaches) where one tribe was considered hosts and the other(s) guests (Tr. 199); and the existence of separate languages. (Tr. 161).

Dr. Suttles also testified about differences between the Samish and Noowhaha tribes: They spoke different languages. (Tr. 205). The Samish [sic] considered to be of higher status than Noowhaha. (Tr. 212).

Dr. Suttles also testified about the role of leaders in Salish culture. The Salish did not have head chiefs, he said. (Tr. 213). White settlers tried to force the concept onto them, he said. (Tr. 213-214). While there were no head chiefs, people took leadership roles by virtue of wealth, including ownership of property useful for hunting and fishing, and skills. (Tr. 214216).

Dr. Suttles also testified about what distinguishes contemporary Coast Salish Indians from other people in northwestern Washington today. He said the differences include preservation of traditional ceremonies, including the winter dance (Tr. 223); participation in the Shaker Indian church (Tr. 223); pride about Indian ancestry (Tr. 224); and the wide recognition of kinship ties. (Tr. 224).

Petitioners" witness, Ms. Mary Hansen, a Samish, testified about whether the Samish have acted continuously as a community during her lifetime.

Ms. Hansen recalled meetings of Samish people during the 1930s. (Tr. 1029). Also during the 30s, the Samish people looked after one another by providing food and other support to the needy. (Tr. 1032).

This looking after one another continued during World War II, Ms. Hansen said. (Tr. 1032-33). The Samish also held formal political meetings and social gatherings during the war years. (Tr. 1033).

Moving up to the 1950s, Ms. Hansen was involved in the Samish establishing a formal tribal organization in 1951. Ibid. She said the formal council was in response to passage of the Indian Claims Act, but other concerns, including concerns about sick and hungry members of the community, were also brought up in organization meetings. (Tr. 1034). Samish were also concerned about fishing rights during this time and the possible termination of federal benefits to Indians, including closing a local hospital. (Tr. 1037-39). She said correspondence was sent to the Samish membership to keep them apprised of the activities of the council. (Tr. 1039-40).

Also in the 1950s, Samish regularly were together at funerals, which were important occasions for exchanging information and getting caught up on each other. (Tr. 1036). Also in that decade, the Samish council provided $75 to Mrs. Lyons, a tribe member, after her house burned down. Ibid.

In the 1960s, the Samish made an unsuccessful effort to take over the extinct Ozette reservation. (Tr. 1040). Obtaining a land base is an important issue for the Samish and a Samish land acquisition committee was formed two years ago. (Tr. 1041).

Regarding activities on the Lummi and Swinomish reservations over the years, the Samish have held gatherings as Samish, Ms. Hansen said. (Tr. 1055-56).

Ms. Hansen also testified about Samish leaders. She said Mr. Cagey, Albert Edwards and Sas Kavanaugh were leaders during the 1930s. (Tr. 1030). According to her testimony, during the 1950s, Wayne Kavanaugh, Alfred Edwards and herself were among the people on the Intertribal Council, which was fighting against the termination of federal benefits to Indians, including the closing of a local hospital. (Tr. 1038).

Obtaining federal recognition is important, but it's not the sole concern of the Samish, Ms. Hansen testified.

The Defendants (sic) witness, Holly Reckord, is chief of the Branch of Acknowledgement and Research of Indian Tribes (sic) for the Bureau of Indian Affairs.

According to Ms. Reckord, the criteria regarding exercising of political authority does not mean legal authority.

"We're not looking for a governmental kind of political authority. We're basically looking for people making decisions and having them stick.

For example, the group owns a cemetery. Somebody wants to bury their father-in-law there who is not a member of the group. Who do they go to, who makes the decision, does the decision stick. That would be the kind of political activity that we're really looking for.,, (Tr. 275).

She said that proof of interaction is the key to meeting criterion number two.

I think what we are looking for in our regulations, and the way we have applied them, is for interaction ... (Petitioners) can show this in any number of ways. They can show this by showing us that they are doing things together. They are perhaps marrying each other, they are burying each other, they meet together. And also informal kinds of social relationships. They seem to know each other, they gossip about each other, they know what their relatives are doing, they know how they're related ... Whatever they can show us that shows they have continued to interact, and that they are in some way separate from the surrounding community." (Tr. 266-267).

The Defendant's witness, Dr. James Paredes, is professor of anthropology at Florida State University. He has conducted extensive study of American Indians while as a professor and as a graduate student, including Chippewa, Oneida, Poarch Creek and the Machis Lower Alabama Creek Indian. He helped prepare a history of Poarch Creek to support its case for federal recognition. He also was on an Association of American Indian Affairs committee to develop a program to help unrecognized Indian groups seek federal recognition. (Tr. 276-283).

In his testimony, Dr. Paredes concluded that kinship ties play an important role in maintaining Indian communities.

"In Indian communities, kinship is especially important, given that for so many, quote, 'traditional Indian cultures,' the political, religious and economic life was predicated upon various kinds of kinship structures ... American Indians, by virtue of being insulated, in increasingly insular communities, with prolonged patterns of intermarriage, kinship ... continues to be an

important basis for the integration of that community, and for deciding who belongs and who doesn't belong." (Tr. 298-299).

Outmarriage, that is the marriage between people of Indian descent and those of no Indian descent, serves to weaken kinship ties between Indians, Dr. Paredes concluded.

"Outmarriage, in the case of Indian communities, obviously has occurred since the days of Jon Rolfe and Pocahontas ... But in any kind of small isolated community, marriage tends to be a very effective glue in keeping people obligated to each other ... At the simplest level, outmarriage means that one has their primary, secondary and tertiary kinship loyalties divided between two kinds of communities ... (w)heras inmarriage reinforces your existing kin ties ... " (Tr. 300-301).

Dr. Paredes also concluded that keeping a common locality plays an important role in maintaining Indian communities, as well as other kinds of communities. (Tr. 297-298).

Ms. Patricia Simmons is an employee of the Branch of Tribal Relations for the Bureau of Indian Affairs.

Ms. Simmons testified for the Defendants that, starting in the mid 1960s, the branch prepared lists of Indian tribal organizations that the federal government has had dealings with. (Tr. 347). They were not intended to be lists of federally recognized tribes as such, she said. (Tr. 348).

Ms. Judy Flores is enrollment clerk for the Swinomish tribe.

She testified that, of Swinomish tribal members, 421 people, or about 72 percent of the tribe, live either on the reservation or in towns close by. (Tr. 765).

The Defendant's chief witness, Dr. George Roth is a cultural anthropologist with the Branch of Acknowledgement and Research of the Bureau of Indian Affairs. His qualifications as an expert include a Ph.D. degree in cultural anthropology with his dissertation based on a study of the Colorado River Indian and Chemehuevi Valley reservations. During his 16-year tenure with the branch, he has been the lead researcher on 13 petitions from groups of people claiming Indian descent seeking federal recognition as tribes. (Tr. 569).

"(O)ur basic conclusion [concerning the Swinomish Reservation] was that over a period of time, the reservation became increasingly a real social unit unto itself, as opposed to simply a place where a variety of people with a variety of connections were living," Dr. Roth said. (Tr. 592-593).

Other evidence is the Ph.D. dissertation of Natalie Roberts at the University of Washington based on field study at the Swinomish reservation, Dr. Roth said.

"Her primary thesis is that over a period of time, the Swinomish reservation evolved into a community of its own. There are a number of informal and semi-formal social institutions and clubs and things which have grown up starting around 1920, and continuing to the present, so that the tribe has become socially integrated as well as politically integrated," he said. (Tr. 599-600).

Dr. Roth indicated that the people of Samish descent living on the Lummi reservation are integrated into that reservation. He said evidence shows that Sammish (sic) people have consistently served in the Lummi tribal government since 1959. (Tr. 624-625).

## II. Factual Findings from Appendix B of the ALJ's Decision

Appendix B of the ALJ's decision contains additional findings fact. The appendix states that "The findings set out below which are adopted principally from the Petitioners brief with modifications constitute additional Findings of Fact in this case and are incorporated by reference into this opinion."

The following portions of the appendix are accepted and form part of the basis for this decision. Those portions not cited here or earlier in this decision are rejected as contrary to testimony and evidence in the record or contrary to established practice and interpretation of the regulations in previous acknowledgment decisions.

Subject headings have been added and findings reorganized under them for clarity. The numbers are those appearing in the ALJ's decision. The numbers in the ALJ's decision were not consecutive, reflecting the latter's selection from the petitioner's proposed findings. Each numbered finding is complete here unless a notation is made that part of the language has been rejected.

### Findings re Traditional Culture and 19th Century History

44. In his direct testimony, Dr. Suttles provided an overview of the aboriginal Coast Salish peoples, who included the Samish. He referred to the Salish family of languages, which were mainly spoken by peoples who inhabited the Pacific Coast of Washington State near Grays Harbor, as well as the coastlines of Puget Sound and Georgia Strait, generally near the present-day cities of Seattle and Vancouver, Canada (TR:161). Samish was one of these Salish languages, and was spoken by the people living in the southeast quadrant of the San Juan Islands, and mainland to the east of the Islands (TR:162).

45. Dr. Suttles succinctly described Coast Salish social organization in the following terms:

> The social units were, small to large, the family [and] the household. The house itself occupied during the winter was a large wooden structure made of posts and beams holding wall planks tied to them, and with roof planks laid upon them. Each house was divided into a number of sections, and each section was occupied by a family. Some heirarchy [sic], but sharing a lot with other members of the household.

(TR:162-163). Villages consisted of one of more houses, and villages themselves were often grouped into larger linguistic and territorial divisions, which were usually referred to as "tribes"

(TR:163). There was an upper class or elite in each house, as well as slaves, who were typically the descendants of war captives (TR:164).

46. Unlike Indians in most other parts of North America, Coast Salish reckoned descent from important ancestors on both their mother's side and father's side, with the result that all kinship groups overlapped (TR:163-164). A single family would typically have roots in more than one village or geographic area (TR:164, TR:166). By custom, "you had to marry somebody you weren't closely related to, or [at] least people didn't know you were closely related," and closeness in this instance meant the fourth degree or fifth descending generation (TR:165). Thus "the ideal thing was to seek some non-relative of a family of about equal status in some other place. And maybe even the more distant the better" (TR:165). Marriages were generally arranged, especially among high-status families (TR:165).

47. Long-distance marriages served an economic function, because each marriage resulted in a series of exchanges of wealth, enabling houses to share in the resources harvested over a very large geographic area (TR:165-166, TR:169-170). They also served a political function since "If you had in-laws somewhere else, you're less likely to be attacked by those peoples," which was a distinct advantage in a region where raids and fighting were quite common (TR:166). Dr. Suttles noted that his study of the Lummi revealed that, collectively, they had managed to arrange marriages with all of the tribes surrounding them (TR:166). Differences of language were not an obstacle to this kind of strategic intermarriage, and several languages might be spoken in the same house (TR:190).

53. According to Dr. Suttles, there was no formal system of chiefs or principal leaders among the aboriginal Coast Salish. Every family had its own leader, and the wealthier men in the village were particularly important and influential because they could give feasts (TR:213-215). There were also special-purpose leaders, whose influence was based on the ownership of some expensive technology (such as a deer net or fish weir) or on

54. In the 1820s, the Hudsons Bay Company tried to encourage some men to assume a more formal role as chiefs; in the 1850s, similarly, U.S. officials tried to identify a small number of "head chiefs" for treaty purposes (TR:214). These efforts did not displace aboriginal patterns of flexible, informal and special-function leadership, however.

55. Among Coast Salish, intermarriage with non-Indians began as soon as the Hudson Bay Company established its trading post at Fort Langley in the 1820s (TR:179-180). The Bay Company "discovered it was good to form alliances with the local people" this way, Dr. Suttles observed, "And the local people were very

eager to form these alliances" as well (TR:180). To illustrate this point, he gave two examples of white in-laws helping protect their Samish relatives from encroaching settlers (TR:180-181). Marriages with non-Indians occurred "everywhere" among Coast Salish peoples, but Dr. Suttles was not aware of any statistical data on its precise extent (TR:238-239).

59. Dr. Suttles did not think that the establishment of reservations put an end to traditional patterns of long-distance marriage, but that Indians, mobility was reduced. Many received individual allotments of land on particular reservations, for example, and they were likely to remain where their land was and identify with that place (TR:191). It was his impression that mobility, long-distance marriage and marriages with non-Indians continued to be more frequent among those Indians who did not move to reservations (TR:192). At the same time, sharing food from different parts of the region was still common among Coast Salish people both on and off-reservation (TR:221).

60. Dr. Suttles described the aboriginal territory of the Samish as having been bounded by the southeast tip of San Juan Island, Deception Pass, Padilla Bay, Samish Bay, Chuckanut Bay, and the northern end of Lopez Island (TR:192-193, Exhibit J-1) . During the earliest period of contact (in the early 1800s) there were villages on the south shore of Guemes Island, at March's Point on Fidalgo Bay and on Samish Island (TR:193-194). As a result of epidemics and raids by northern Indians, all of the Samish appear to have concentrated in one village on Samish Island by Treaty time, which is to say the 1850s (TR:194-195).

68. According to Dr. Hajda, the Samish believed that they were going to obtain their own reservation under the treaty (TR:815). After the treaty, the Samish were told to go the the Lummi Indian Reservation, but by the 1860s only about one-third of them were still living there, though others continued to come there occasionally to collect their Treaty annuities (TR:212, TR:815). "It seemed pretty clear that they didn't think they were going to get what they thought was theirs," and resisted limitations on their freedom of movement, as well as efforts to convert them to Christianity (TR:242, TR:815).

69. Dr. Hajda explained that Indian life on 19th-century reservations was controlled by U.S. Indian Agents, and traditional ceremonies were forbidden after 1884 (TR:816). Treaty annuities were often delivered late; "you might be hungry, you might not have enough land to support yourself" (TR: 816). Survival offreservation was also difficult, but for different reasons. White settlers tried to drive Indians from the land; the Samish living on Samish Island moved to Guemes Island after Dan Dingwall, a local storekeeper, shot one of them (TR:817). Indians on the reservations were encouraged to farm,

although the land was not really suitable for agriculture, while Indians living offreservation found it increasingly difficult to fish or hunt, and increasingly went to work for whites as loggers and hop-pickers (TR:818). For instance, Annie Lyons tried to support herself by digging and selling shellfish, but after local whites accused her of stealing oysters and "gave her a bad time," she married a man from the Swinomish Reservation and moved there (TR:819).

72. By 1876, conflicts with local settlers on Samish Island persuaded the Samish there to the west side of Guemes Island, where they built a single longhouse (TR:195, TR:242; the "New Guemes" house or village).

73. Dr. Hajda characterized the New Guemes Island house as a kind of "refuge" for Samish families that were being driven off their lands by white settlers (TR:805). Two men took the initiative of acquiring the house site--Bob Edwards, who was of Samish and Noowhaha ancestry, and Citizen Sam, step-nephew to Whulholten, who was Samish (TR:805). The New Guemes house also became a kind of refugee camp for families from other areas who were being driven off their lands; they apear to have built smaller houses near the Samish longhouse (TR:822).

74. Nine different families lived together in the Guemes Island house in 1880 (TR:195, Exhibit P-2)[3] They had mainly Samish, Noowhaha and Klallam ancestry, but about half of them also had other connections or spoke other languages (TR:195). For comparative purposes, Dr. Suttles described the complex composition of the last traditional longhouse on the Lummi Indian Reservation, also in the 1880s, which he described as "pretty typical" of Coast Salish houses (TR:198-199).

75. Dr. Hajda noted that these nine families formed two clusters, one associated with the Edwards and the other with Whulholten. They both self-identified as Samish, although it was unclear to her exactly how they had originally been related (TR:801). "There was a considerable representation of people who had been brought in by marriage,, as well, which was customary (TR:802). The Samish were not all concentrated in this one house or village, moreover, although it served for many years as a headquarters (TR:804).

76. Samish people continued to fish and hunt; unlike the Indians on the nearby Lummi Reservation, they generally did not

[3] Charlie Edwards, one of Dr. Suttles' informants, lived in the house as a child, together with the father of another one of his informants, Annie Lyons (TR:196-197).

practice farming (TR:243). Their principal organized activity as a group continued to be the holding of ceremonials, at New Guemes village, to which Indians of other tribes were invited (TR:-243). The New Guemes house even had its own baseball team at the turn of the century (TR:236).

77. Dr. Suttles' impression was that there was never any all-purpose leader in the house, although Charlie Edwards and Annie Lyons' father, Whulholten, were the owners or managers of reef net locations (TR:240, TR:801, TR:823).

78. In the 1890s, the Samish may have continued to control as many as three or four reef-net sites in the San Juan Islands, including sites owned by the families of Charlie Edwards and Annie Lyons (TR:245-247). Other important economic sites included a Samish halibut-fishing camp on Cypress Island, a halibut-fishing and salmon-trolling area at South Beach, salmon weirs on the Samish River and Whitehall Creek, and large beds of oysters and clams on both ends of Samish Island (TR:250-251). Although the reef-net sites were very important, their produce had to be complemented by others resources harvested under the supervision of other Samish families (TR:251, TR:254).

80. By the 1890s, the Samish were selling their salmon to canneries, for instance at Friday Harbor, and making a new commercial business of extracting dogfish (sha rk) liver oil for sale at Samish Bay (TR:220). Others earned cash by digging shellfish and hawking them around white settlements (TR:220).

81. Dr. Suttles observed that, when the U.S. and Canadian governments tried to suppress the traditional winter dance, "it maintained itself, particularly in places off the reservation like the Samish village on Guemes Island, which had winter dances and potlatches right up to the time it was abandoned, I guess" (TR:176). Guemes Island was therefore for many years:

> ... a very important ceremonial center for people on the reservations as well as off the reservations, because of the reservations you did have the agents and the missionaries sort of looking askance at this kind of activitiy, or trying actively to suppress it. People of the reservation were free to do it. The Samish were a center of that.

(TR:177-178). Charlie Edwards, a leader in the winter dances in the 1940s when Dr. Suttles began his research, was clearly identified as Samish, as was Tommy Bob, who performed the important function of purifying or exorcising the house before the ceremony began (TR:178-179).

84. Some people from the New Guemes house, like Charlie Edwards, went to the Swinomish Reservation; others, like Harry Lyons, went back to Samish Island (TR:241). Harry Lyons'

daughter Annie eventually moved to the Swinomish Reservation, but had relatives off-reservation and on the Lummi Reservation (TR:248). The Cageys married into families that had obtained of land on the Lummi Reservation (TR:591). According to Dr. Hajda, this was typical of the region: aboriginal houses divided, some families moving to different reservations, and others continuing to live offreservation (TR:819). Related families continued to share income and assist one another, however (TR:819-820).

85. Billy and Bob Edwards were part of a group of families that moved to Ship Harbor, near Anacortes; Whulholten's sister Cubshelitsa moved to the town of Anacortes (TR:241, TR:825). There were two canneries at Ship Harbor, the Fidalgo Island Packing Company and Alaska Packers; both employed Indians, Chinese, and whites in different seasonal crews (TR:825-826). The Fidalgo Island company hired Charlie Edwards as a "runner," or recruiter, and he found jobs for his Samish kin (TR:826). There was soon "a little cluster of shacks" on the company's property, where several Samish families lived year-round (TR:826-827). They had small gardens, their own baseball team, and Billy Edwards kept a small "smokehouse" there for religious gatherings (TR:828).

Findings re the Noowhaha Tribe

62. Dr. Suttles, who had studied the relationship between the Noowhaha and Samish in the early 1950s, noted that the aboriginal territory of the Noowhaha extended from the north end include the Samish River drainage, Samish Lake and part of the Skagit River drainage (TR:204-205, Exhibit J-1). one important village was at Bayview, another at Bow, but most of the villages were farther inland in "prairie areas, which provided good hunting and foraging for roots and bulbs as opposed to fisheries (TR:205). The Noowhaha spoke a Salish language different from Samish, but Samish people Dr. Suttles had interviewed in the 1950s spoke both (TR:205-206).

63. According to Dr. Suttles, the Noowhaha were called "Stick" Samish, from the Chinook Jargon term for "forests", or sometimes Upper Samish, since they lived inland from the saltwater Samish (TR:206). They were tied by kinship with both the Samish, downriver, and with Upper Skagit people farther upstream; at least some Noowhaha families built their houses beside the Samish house on Samish Island (TR:207). Dr. Suttle's considered it very likely that the Samish gradually expanded eastward, into what originally had been Noowhaha territory, leading to conflicts that were finally settled by arranged marriages between them--probably in the 1850s or a little earlier (TR:209-211). By the time the Samish built their new house on Guemes Island in 1876, some Noowhaha families were living with them (TR:210).

64. Some people of Noowhaha descent are enrolled today with the Upper Skagit, and others with the Samish (TR:248) . Dr. Suttles had also met people of Noowhaha descent on the Swinomish Reservation, in the 1950s (TR:248). He was unaware of any contemporary organized Noowhaha group that might constitute the core of a continuing community (TR:248-249).

The balance of this finding is rejected.

65. Dr. Hajda "reserved judgment" on Dr. Suttles' surmise that there had been early warfare between the Samish and Noowhaha, but she agreed that "certainly the Samish and the Noowhaha had established what looks like a symbiotic relationship" involving "dependence and superiority," or a "patron-client" relationship (TR:799-800). The Samish protected the Noowhaha from raiders, and in return obtained access to resources farther inland. At some time in the 19th century, however, the Samish population declined, and some Noowhaha families gained higher status--in particular the family of Pateus, a treaty signer (TR:800). In more recent times, Samish and Noowhaha people lived together in the Guemes Island house and near the towns of Bow and Edison, and fished together (TR:804, TR:810).

Findings re Community:

101. Some of the people who moved away for wartime jobs, or served in armed forces, did not return to the Tribe's traditional area when the war ended (TR:842). Other Indian tribes, and non-Indian communities, had the same experience (TR:842). The main Samish destinations after the war were Seattle and Bremerton, about an hour and a half by car to Anacortes (TR:842). Mrs. Hansen confirmed Dr. Hajda's observations in this regard (TR:1033).

104. Mrs. Hansen explained that communication with Tribal members was maintained by letters and postcards (TR:1039-1040).

141. Dr. Hajda noted for example that the Cubshelitsa-Whulholten family has always lived off-reservation, but it has always been actively involved with on-reservation Samish families (TR:862).

146. In the course of the original administrative proceedings and this remand, the Tribe produced copies of membership lists from as early as the 1920s. Dr. Hajda cautioned that these lists were never thought of as formal membership rolls, and were not reliable or complete evidence of who was actually interacting socially within the community (TR:870-871). In any event, key families such as the Edwards and Cubshelitsa-Whulholten lines, could be found on all of these lists (TR:871). Like other Northwest Indians, the Samish would have had a relatively stable core group of families,

to which various peripheral families attached themselves from time to time (TR:872).

Findings re Political Influence (20th Century)

87. A new phase of organized Samish political activity began at about this time (TR:828). There were meetings about land rights in 1912 and 1913 (TR:829). It was at this same time that the Northwest Federation of Indians was organized by Thomas Bishop, a Snohomish Indian, and he travelled throughout the region urging Indian communities to organize and demand the fulfillment of their sixty-year-old treaties (TR:829). Sas Kavanaugh, part of the Edwards family, was the main organizer for the Samish (TR:830). Dr. Hajda explained that Kavanaugh was typical of a new breed of leaders who had more schooling and experience with "the white world" (TR:830). They did not replace traditional leaders like Billy and Charlie Edwards, but provided complementary specialized skills, "which again is a traditional pattern" (TR:830).

88. The Samish participated in the Northwest Federation as a distinct group, rather than as individuals; membership was by tribe (TR:831). The Federation did not start off seeking compensation for land. "They wanted land" (TR:831). Enabling legislation was eventually adopted by Congress opening the courts to these claims (TR:832).

The balance of this finding is rejected.

92. Mrs. Hansen recalled attending Samish meetings in the 1930s where they discussed the proposed Indian Reorganization Act, and many elders required intepretation (TR:1029). Meetings were held at the American Hall in LaConner; the hall was owned by the Swinomish, but the Samish paid rent and hosted the meetings (TR:1055-1056). Several Samish men often simply met informally at the Cageys' house at Lummi, "or on my great-grandmother's farm where we lived," to talk about problems such as land, health or housing, and then report back to the other families (TR:1031-1032). She remembered Alfred Edwards and George Cagey acting as leaders at that time (TR:1030). Her father would also frequently visit elderly Samish people to help them with "a little something" or some money (TR:1032).

94. During the Depression, Dr. Hajda testified, the canneries at Ship Harbor did less business and shut down from time to time, never again able to employ as many Indians as they had in the 1920s (TR: 836). New Samish leaders emerged who had more education and more experience with government bureaucracy. Don McDowell, from the Whulholten-Cubshelitsa family line, was a notable example who "went around and visited people to see what kinds of help they needed" for many years (TR:837).

97. During the Second World War, young Samish men were overseas, some people left the Anacortes area to find jobs in war industries in south Puget Sound like the Bremerton shipyards, and it was more difficult to meet frequently as a group because of gas rationing (TR:840). Several older Samish leaders also passed away in the 1940s, including Charlie Edwards, the Cagey brothers, and Don McDowell (TR:840-841). This also had an adverse effect on organized political activity (TR:841). There are few records of meetings during that period, but oral history tells of meetings to discuss land rights, fishing, and helping people out as before (TR:841; TR:859-860). Treaty Days were still being celebrated, but there were smaller crowds (TR:841).

98. Mrs. Hansen recalled that gas rationing restricted mobility, so she kept abreast of Tribal meetings by staying in touch with relatives who could still attend (TR:1033). There was money to share with needy Samish relatives during the war years from earnings at the shipyards, and at the Boeing aircraft factory (TR:1032-1033).

102. The war produced a new generation of Samish leaders who were more concerned with "organization"; many had been union men, and brought a concern for issues such as paying dues, and following Roberts Rules of Order (TR:842-843). Continuity was provided by Alfred Edwards, son of Charlie Edwards, who became the president of the new, post-war Samish Tribal organization; Mary McDowell Hansen, daughter of Don McDowell, became Tribal Secretary. While many individual members of the Council were new, on the whole they came from the same families as the pre-war Council (TR:843).

106. The Samish Tribe provided money and volunteers to fight proposals to terminate Federal responsibilities to all Washington Indian tribes, in the 1950s (TR: 845, TR:1038-1039). Reservation and landless tribes joined together in an organization called the Intertribal Council, and Mrs. Hansen was its first secretary (TR: 845-846, TR: 1038). Each tribe had its own delegates, including Tulalips, Swinomish and Lummi as well as Samish, Snohomish and others (TR:1039).

111. The dispute over Federal recognition led to a loss of confidence in the Tribal Council, political divisions, and a temporary change of leaders (TR:850, TR:854, TR:961, TR:1063)[4]

---

[4] Mrs. Hansen identified the Wooten, Penter, and Cayou families with this coup (TR:1064-1064) - She explained that they had not been active in Tribal affairs before or since. As discussed below, the Cayou line is now regarded as being of doubtful Samish ancestry by both the Tribe and the Government.

The balance of this footnote is rejected.

Samish families which had consistently occupied key positions were unrepresented from 1975, when Margaret Greene was "ousted" as chairperson, to 1980, when Ken Hansen was elected chairman (TR:1046-1047). Dr. Hajda noted that Ken Hansen, son of Mrs. Hansen, brought youth and enthusiasm to the Tribal Council and helped mediate between different families, mobilizing support for the fight for Federal recognition (TR: 851-852). Recognition became "a focus, both positive and negative, for tribal activity" from that time forward, requiring continuing efforts to raise cash donations, recruit volunteers, and organize travel(TR:860-861).

The balance of this finding is rejected.

121. Dr. Hajda explained that past and present leadership has included reservation and non-reservation families. Margaret Greene, currently chairperson of the Tribe, is from the Cagey family, who are residents of the Lummi Reservation, while Tribal secretary Mary Hansen is of the Cubshelitsa-Whulholten line, who never lived on reservations (TR:875-876). A generation earlier, similarly, Charlie Edwards represented a family residing on the Swinomish Reservation, while Sas Kavanaugh came from offreservation (TR:876). Mrs. Hansen confirmed this based upon her own personal experience (TR:1047-1048).

187. With regard to "political authority," Dr. Hajda explained that in the case of the Samish, leaders have been:

> [p] eople who have skills in dealing with situations that are of concern. Mary Ann Cladoosby (TR:1028-1029; also TR:805, TR:825, TR:837). Those concerns have changed over the years, obviously. In that sense, I think it's a continuation of earlier patterns, where you had different leaders for different sorts of activities or aspects of life. It wasn't necessarily power and influence, but connections that would be useful for activities that the tribe might want to carry out, for instance. People who had education, people who were seen as having spiritual power, that sort of thing.

Findings on Reservation Participation

169. Dr. Hajda explained that, although many Samish Indians had held public office on the Lummi and Swinomish Reservations, they continued to consider themselves as Samish and participate in Samish activities (TR:867).

The balance of this finding is rejected.

170. Dr. Hajda described the Cagey family, who live in a distinct part of the Lummi Reservation locally known as Samish Hill, and have hosted Samish events there; some had identified chiefly as Samish, others as Lummi (TR:1000-1001). Dr. Hajda also

observed that there have been a number of complaints of discrimination against Samish people at Lummi, including job discrimination and verbal harassment (TR:1018-1019).

172. Dr. Hajda explained that, even among reservation Indians like the Warm Springs today, "tribal" identity is situational--that is, it may depend on the occasion or the purpose of the question (TR:897-898). A person of Samish descent may choose to assert that identity in certain circumstances but not others (TR:897).

The balance of this finding is rejected.

174. Dr. Roth acknowledged that as a general proposition, a person can be a member of two communities at the same time, and that some overlap in the membership of communities does not necessarily jeopardize their autonomy or distinctness (TR:680-681). He conceded that Samish people who were participating in Swinomish Reservation activities, were also participating in Samish social and political activities (TR:682).

Findings concerning the Acknowledgment Regulations

131[5]. Dr. Sturtevant cautioned against confusing the concept of a "community" with that of a "tribe, ". noting that a tribe may consist of more than one community (TR:40-41, TR:76-77). At the same time, he explained that a "community" tends to be broader in membership than a group of people related by marriage, and more permanent and broader in its interests than a social club or professional society (TR:41). He indicated that he would approach the task of evaluating the existence or nature of a "community" by looking for "networks of communication," including "how much people know about other people, when they see them, what they see them for, what they know about them," and the frequency and nature of interactions between them (TR:42, TR:78).

132. In this respect, Dr. Sturtevant considered that the new, expanded definitions of "community" and "political authority" incorporated into 25 C.F.R. Part 83 by amendment in 1994 bring these criteria closer to the common understanding of anthropologists of these terms (TR:64-65). He stressed the usefulness of flexibility in the evidence required at different stages of a group's history, and of interpreting evidence in the context if the history, geography, culture and social organization of the group in Question (TR:59-60, TR:62). He also observed that no real Indian tribe would display all of the attributes of a

[5] The ALJ's decision at page 26 contains two findings numbered 131. This accepted finding 131 appears second.

"community" listed in 25 C.F.R. Part 83, as amended, particularly in modern times, and welcomed the fact that the amended regulations do not require this (TR:65).

133. According to Dr. Sturtevant, 25 C.F.R. Part 83 reflects a belief that Federal recognition should be based on "the persistence of social groups," and it is therefore important to realize that "the group can continue and does continue through time, whereas the cultural features, the behavior, the way of being, changes"(TR: 66) what is distinctive about the group today may not be aboriginal; he cautioned against looking for stereotypes such as "war dances" and basket-making (TR:66-67). Moreover it is frequently the case that "in most respects their behavior and their interaction is not distinguishable from the characteristics of behavior among their non-Indian neighbors" (TR:67-68). Indeed, it is "very common" for Indians to participate actively in neighboring non-Indian communities (TR:69-70). He noted that about half of the Indians in the United States today live in cities, rather than predominantly Indian settlements (TR:74). The primary difference between Indian and non-Indian communities today, he stated, is mainly a matter of ancestry, rather than particular cultural characteristics (TR:71).

134. Dr. Roth paraphrased this criterion as "some substantial body ... of social connectedness and social distinction" (TR:664). He observed that there is no body of comparative data on the social connectedness of the members of Federally-recognized reservation tribes, but that in a case like the Samish, the analysis must take account of difficulties created by landlessness and nonrecognition: "Obviously there's a lot of things you can't expect a group to be able to do,' (TR:663, TR:665).

135. In Dr. Sturtevant's research experience, highly dispersed Indian tribes maintained a "community" by gathering periodically for special occasions, or maintaining kinship connections with at least some other people in the community (TR:74-75). In contrast with an "association" an Indian community has a historical relationship with a homeland some where--although "they don't by any means all necessarily live there,,--and shares more than one purpose or interest (TR:125-126, TR:149).

136. Dr. Roth explained that he looks for some evidence that the peripheral members are connected with the core, but not necessarily connected with each other (TR:728). The core is a hub of communication with the periphery and need not consist of people living together in a geographical settlement (TR:728).

The balance of this finding is rejected.

137. Dr. Suttles likewise observed that the term "community" was often used to refer to a "closed group of face-to-face relations with people within it, closed to outsiders." This fit

the Okinawan village he had studied, but not aboriginal Coast Salish societies (TR:200). However, Coast Salish houses were "communities" in the sense of cooperation and exchange (TR:201). The Samish longhouse of the 1880s on Guemes Island was a "community" in this sense, even though its inhabitants had mixed ancestries and spoke several languages (TR:201).

138. Dr. Suttles testified that in the Coast Salish region as a whole, "Indian" identity was not only being asserted today through distinctly Indian religious activity, such as the winter dances and Indian Shaker Church, but through acute consciousness of kinship ties and loyalty to the extended family (TR:223-224). Dr. Hajda indicated that, based on her experience with Coast Salish and Columbia River Indian tribes, the Coast Salish today are more preoccupied with ancestry or kinship as a basis of Indian identity (TR:883).

139. Dr. Paredes also agreed that kinship is "central to defining who we are," and that this can be "especially" true in Indian communities (TR:298-299).

The balance of this finding is rejected.

Miscellaneous Findings

1. Ms. Simmons, an employee of the Bureau of Indian Affairs for 30 years, testified that she began preparing lists of Indian tribes "with whom we had dealings" in 1966 (TR:347, TR:349). Her preliminary list was "based on a review of the files" in her office, and was circulated among staff for comment (TR:347-348). "It was never intended to be a list of federally recognized tribes as such," she recalled; "it may have evolved into that," however, under Congressional pressure to make clearer distinctions between recognized and non-recognized tribes (TR: 348). By 1969, she had restricted her list to "those groups who had a formal organization approved by the Department" (TR:349350, TR:357).

2. Ms. Simmons explained that initially, "we,just listed everybody that there was a file records section for" in the Bureau's Washington, D.C. offices (TR:351, TR:36). The draft was then sent to Area Offices and Agency Superintendents to identify which of the groups listed had a "formal relationship" with them.

The balance of this finding is rejected.

3. Under cross-examination, Ms. Simmons identified an early draft of the list she prepared in 1966, which includes the Samish Tribe on page 14 (TR:355, Exhibit P-3). She recalled that the Samish had been taken off her 1969 list because the Bureauls Portland Area advised her that they were "recognized for claims

purposes only," but she had no record of this (TR:355, TR:358359, Exhibit P-4).

The balance of this finding is rejected.

15. The Tribe called Ms. Hansen, who had served on its council and as its secretary since the 1950s. Mrs. Hansen is the greatgranddaughter of Cubshelitsa, sister of Whulholten, one of the leaders of the Samish village on Guemes Island a century ago, and daughter of Don McDowell, Samish Tribal leader in the 1930s; she was given the name Cubshelitsa by Whulholten's granddaughter, Mary Ann Cladoosby (TR:1028-1029; also TR:805, TR:825, TR:837).

21. Dr. Sturtevant is the curator of North American ethnology at the Smithsonian Institution in Washington, D.C., with which he has been affiliated in various capacities since 1956 (TR:31). He has conducted anthropological fieldwork among Indian tribes in various regions of the United States including the Seminoles of Florida, the Senecas of New York, and the Pomo in California, as well as field research in Mexico and Burma (TR:32-34). By his own calculation, he has visited communities belonging to every American Indian cultural region except the Plateau (TR:34). He has also conducted historical research using a variety of print and graphic materials (TR:37-38).

22. Dr. Sturtevant has been the general editor of the Smithsonian Institution's encyclopedic *Handbook of North American Indians*, which is being written by leading anthropologists and historians under the sponsorship of an Act of Congress, summarizing existing knowledge of Indian cultures and history (TR:35-36). His editorial role includes selecting experts to prepare various chapters, and evaluating their work professionally (TR:37).

23. Dr. Sturtevant was also invited, by the Government defendants, to participate in a workshop in January 1992, to advise them on reforming their procedures for determining whether particular groups are Indian tribes under 25 C.F.R. Part 83 (TR:58).

24. Dr. Suttles is professor emeritus at Portland State University in Portland, Oregon, where he began teaching anthropology and linguistics in 1966 (TR:154). Since he began his studies, before the Second World War, his research has focussed on the Coast Salish peoples of northern Washington and southern British Columbia, including Semiahmoo, Lummi, Samish, Saanich, Songhees, Sooke, Nooksack, Swinomish, Skagit, Katzie, Cowichan, Chilliwack and Musqueam (TR:154-156). Dr. Sturtevant regards him as the primary expert on the culture and society of Coast Salish Indians, and on that basis had arranged for him to edit the volume of the *Handbook of North American Indians* devoted to the Northwest Coast (TR:39).

26. Dr. Suttles began interviewing Samish elders in 1947, and in 1951 was asked by the attorneys representing a number of tribes in the area to testify on their behalf before the Indian Claims Commission; among the Samish he knew at that time were Charlie and Alfred Edwards, Tommy Bob, Annie Lyons, and Mary Hansen (TR:157; TR:222). He testified that he had remained in contact "off and on" with Samish people (TR:158).

28. Dr. Hajda, an independent researcher, completed her doctorate in anthropology at the University of Washington in 1984. Her thesis, on the social organization of lower Columbia River Indians, drew heavily on historical records...

The balance of this finding is rejected.

29. Dr. Hajda has continued this cultural and historical research as a consultant to the Indian tribes of the Warm Springs and Grand Ronde Reservations, and, under contract with the U.S. Forest Service, on the Yakima Reservation in Washington (TR:765-786). Her field research has focussed on Indians of coastal Oregon and southwestern Washington, and in this connection she has studied with Dr. Suttles at Portland State University (TR:787). Dr. Sturtevant and Dr. Suttles arranged for her to prepare a chapter for the volume of the *Handbook of North American Indians* on Northwest Indians (TR:39).

33. Prior to his employment at BAR, Dr. Roth obtained a doctorate in cultural anthropology at Northwestern University based on his study of social integration on two multi-tribal Indian reservations in Arizona, Chemehuevi and Colorado River (TR:569). This work involved living for 18 months on the reservations, and comprised his "primary" experience with field research, as well as considerable archival study (TR:571). He also spent a month studying the political system in Tecate, Mexico (TR:572).

35. Since joining the staff at BAR, Dr. Roth has made 13 or 14 field visits, averaging a week or two, to evaluate petitioning communities, as well as field trips to Maine, Texas and Oklahoma in connection with proposed Federal legislation (TR:572-573). As a BAR anthropologist he is responsible for checking the quality of petitioners' research data, and conducting additional research and analysis (TR:576-577).

39. Once at Florida State University, Dr. Paredes became interested in the Poarch Creek Indians of Mississippi (sic), and in 1971 began what he described as a "long and continued steady relationship" with them as a researcher (TR:279-280). He helped them prepare their successful case for Federal recognition as an Indian tribe, and then, he supposed as a result of that work, BAR contracted with him to spend two weeks collecting archival materials on another petitioning Indian

group, the Lower Alabama Creeks (TR:281-282). More recently, he was consulted by the Brotherton Indians of Wisconsin on means of seeking Federal recognition (TR:284). Like Dr. Sturtevant, he had participated in the workshop convened by BAR in 1992 to discuss reforming procedures under 25 C.F.R. Part 83 (TR:58, TR:293).

66. Counsel for the Government also asked Dr. Suttles to explain the origins of the Indians who were living until the early 20th century at Mitchell Bay on San Juan Island. Dr. Suttles believed they had mostly been of Cowichan and Saanich (Vancouver Island) origin, possibly with some Samish and Lummi ancestry as well (TR:242-243). These families, it should be noted, have comprised less than 10 percent of the Tribe's members according to both parties' figures.

199. The Tribe stipulated in the course of the hearing that there were legitimate questions about the ancestry of the Cayou and Viereck lines (TR:478), accounting for roughly 9 percent of the current membership. Dr. Hajda agreed that there were "reasonable grounds" for raising such questions (TR:812-813, TR:907) adding that two other small families of debatable ancestry, listed on the Tribe's older membership lists, have since died out (TR:813-814).

## Documents Cited


ASIA

1987 Final Determination That the Samish Indian Tribe Does Not Exist as an Indian 52 Fed. Reg. 3,709.

1982a Assistant Secretary, Indian Affairs, Proposed Finding Against Federal Acknowledgment of the Samish Indian Tribe, 47 Fed. Reg. 50,110.

1982b Assistant Secretary, Indian Affairs, Anthropological Report on the Samish Tribe, 1st Draft prepared for proposed finding, September 15.

Department of Interior (Def. Brief)

1995 Defendant's post-hearing memorandum. Docket Indian 93-1, Office of Hearings and Appeals, Greene v. Babbitt.

Indian Claims Commission

1958 Opinion of the Commission in Docket 261. March 11.

Roberts, Natalie A.

1975 A History of the Swinomish Tribal Community, Ph.D dissertation, University of Washington

Transcript (TR)

1994 Transcript of Hearing before Administrative Law Judge David Torbett, Seattle, Washington, August 22-30, 1994.

United States District Court

1992 Greene v. Lujan, No. C89-645Z (W.D. Wash. Feb. 25, 20 Indian Law Rept. 3206 (1992).

Upchurch, Oscar C.

1936 The Swinomish People and Their State. Pacific Northwest Quarterly 37:4:283-310.