**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe, | ) | Case No. 02-1383L |
| | ) | (Chief Judge Edward J. Damich) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Declaration of James H. McDivitt

I, James H. McDivitt, do hereby declare:

1. I was employed by the federal government from 1969 through 2003. From 1990 through 2003, my work for the government focused on matters relating to the federal budget and specifically the budget for the Bureau of Indian Affairs.

2. In particular, from 1990 through 1995 I was employed in the U.S. Office of Management and Budget (OMB), serving as the Deputy Branch Chief, Acting Branch Chief and Budget Examiner. In those positions, I was responsible for Executive Office of the President's budget oversight for the Department of the Interior, and became familiar with the various Bureaus of Interior and their budget structure and rules, including the Bureau of Indian Affairs (BIA).

**EXHIBIT 5**
In Support of Plaintiff's Opposition to
Motion to Dismiss on TPA & IHS
Samish v. U.S., No. 02-1383L

3. From 1995 through 1998, I served as the Budget Officer for the Department of the Interior Bureau of Indian Affairs. In that position, I was responsible for making recommendations to policy officials about the development of BIA's budget and documenting decisions made by those officials; assisting policy officials with presentation of the budget to the Department, OMB and Congress; and executing the BIA budget after its appropriation by Congress. I reported directly to the Deputy Commissioner of BIA.

4. From 1998 through 2000, I served as Chief of Staff to the Assistant Secretary, Indian Affairs. In that position, I was responsible for a variety of tasks including oversight of budget activities for the Assistant Secretary. I reported directly to the Assistant Secretary and I supervised members of his staff. I also conducted liaison with the House and Senate Appropriations Committees and subcommittees on behalf of the Assistant Secretary.

5. From 2000 to 2003, I served as Deputy Assistant Secretary for Management, Indian Affairs in the Office of the Secretary of the Interior. In that position, I was responsible for all administrative activities in BIA, including the Budget and the Accounting offices. I reported directly to the Assistant Secretary. I supervised the Chief Financial Officer and Chief Information Officer of Indian Affairs as well as the chiefs of personnel, policy analysis and all miscellaneous administrative functions. I also continued my liaison work with the Appropriations Committees and subcommittees.

6. In my positions with the Department of the Interior, I was involved in the development and implementation of the BIA's budget policy. In addition, I was actively involved in the Department's communications with Congress regarding the BIA budget. I participated in Congressional hearings related to the BIA budget and appropriations process. I participated in meetings with members of Congress and their staff both with and without the Assistant Secretary for Indian Affairs on budget issues. I wrote testimony on issues related to the BIA's budget and appropriations for the Assistant Secretary and Secretary of the Interior. I was also responsible for supervising budget specialists and technicians and, as a result, became very familiar with the details of the BIA budget and the manner in which funds appropriated for the BIA were allocated. In essence, I had hands-on responsibility for all aspects of the BIA budget. In these positions, I became personally familiar with the amount and kinds of funding federally recognized tribes received from the BIA.

7. As a result of my years of work on the budgets for the Bureau of Indian Affairs, I acquired an in-depth understanding of the budget and funding for the Bureau of Indian Affairs program known as TPA or "Tribal Priority Allocations" among other things.

8. My work on the BIA budget during those years further required that I acquire an understanding of the history of TPA and the predecessors to the TPA program, and I became very knowledgeable about the history of TPA and its predecessors. In particular, during my tenure with the Interior Department, the Department at the request

of Congress undertook an analysis of the TPA program and its history and reported to Congress on the results of this analysis. I was directly involved in that work as an author of portions of the report. I did the next to last revision and edit for the entire report. The Assistant Secretary did the final edit.

9. The BIA follows the same budget process as other federal agencies. The BIA budget process starts about one year before the President's Budget is sent to Congress on the first Monday in February for the following Fiscal Year that will begin October 1. Congress generally acts during the period of time between February and October to appropriate funds for an agency by October 1. After the appropriation is law, the agency then executes the budget as appropriated. There are three phases from the BIA's perspective. The phase before February is called budget development. The phase during Congressional action is called budget presentation. The phase after appropriation is called budget execution.

10. During the development phase, the BIA gets general advice and direction on the expectations for the proposed budget from OMB and the Department. The BIA also holds meetings with Tribes to consult with the tribal leaders about what should be requested in the proposed budget. BIA then submits a proposed budget to the Department which the Department has the prerogative to change. The Department in turn submits its request to OMB which OMB has the prerogative to change. The final decision on what is requested in a budget lies with the President since it is his budget for the entire government that is sent to Congress in February. With the submission of the

President's Budget, the BIA prepares a document to accompany the BIA's budget request, called a Budget Justification, or the Green Book in budget jargon.

11. The Green Book breaks down the President's Budget for BIA for Congressional staff into all its relevant parts and follows the structure required by the Appropriation Committees. This structure is a hierarchy. At the highest level is the appropriations account. It represents a heading within the Appropriation bill which will have specific bill language describing how much funding is appropriated. The next level within each account is the budget activity. These are also usually described in the Appropriations bill with specific amounts of funding identified in the bill. The budget activities are further divided into budget subactivities, then program elements and subelements of programs. At the extreme, the subdivision can go down to identifying a specific project for a specific tribe. Congress can include as much detail and specificity of amounts within the bill language as it chooses and BIA may specifically define some program elements and subelements with sums of funding assigned in the BIA's proposed bill language. The extreme is a specific earmark for a specific tribe or project. While BIA would rarely, if ever, request an earmark, Congress included them quite frequently.

12. The breakdown contained in the BIA's Green Book included the appropriation accounts; the budget activities within these accounts; the subactivities within the activities; the program elements within the subactivities; and the subelements within the program elements. Not all components of the budget are broken down and displayed at the greatest levels of detail, but as described in more detail below, the BIA

has done this in its Budget Justification for TPA since Fiscal Year 1992 and has included in the Green Book for each fiscal year a table showing specific amounts of TPA by tribe.

13. The level of detail provided by the BIA in the Green Books is significant to Congress. Once the BIA provides detailed information about how it intends to spend appropriated funds in its Budget Justification, Congress expects BIA to spend the funds in that way regardless of whether the details are included by Congress in bill language. The Appropriations subcommittees view the Budget Justification as a "contract" between the Administration and Congress about how funds will be spent. If an executive branch agency violates the "contract," that agency will feel the wrath of the Appropriators during the next budget cycle. I have personally experienced this reaction for even suggesting I would change something during execution of the appropriation and have been strongly warned not to do so by the Appropriations Committee staff who would be writing next year's bill.

14. During the budget presentation phase, the Congress holds hearings, asks for written responses to questions, and meets with BIA officials to ask questions. If, during a hearing or in response to a question, the BIA agrees to something specific, Congress sees that agreement as an obligation on the part of the agency to carry through with what it has said. Congress concludes its part in this phase by passing an Appropriations bill. If the President signs the bill, it is law and Treasury will then make funds available to the Department, which in turn makes them available to the BIA.

15. During the budget execution phase, BIA breaks the funding down as described in the Green Book subject to any changes made by Congress. The BIA makes funding available to the parts of the BIA that expend the money through the preparation and transmittal of "documents" which authorize the expenditure of the funds. The central budget office provides documents to the twelve Regional offices of the BIA and directly to those tribes that have entered into Self-Governance compacts with the BIA (under which the compacting tribe assumes authority for the administration of all BIA programs and services); the Regional offices, in turn, provide documents to the BIA Agencies or directly to the tribes; and the Agencies either provide services directly for the tribes within their jurisdiction, or provide documents to those tribes under which the tribes spend the funds and administer the programs.

16. The BIA can not spend more funding than the amount in an appropriation bill. To authorize additional funds require another appropriation bill. In addition, the BIA, like other federal agencies, cannot change the use of the funds from their authorized purpose to another purpose, unless this is done in accord with specific rules that govern the reprogramming of funds. The BIA and other federal agencies must follow formal reprogramming guidelines. (In contrast, under the Indian Self-Determination Act, Indian tribes may reprogram funds within TPA and from one budget activity to another and are not subject to these reprogramming guidelines.) Reprogramming can only be used in certain cases. The Guidelines cite that reprogramming can be used for "unforeseen situations" where waiting for the next bill will "result in actual loss or damage."

Reprogramming cannot be used "to initiate new programs," or "to change allocations specifically denied, limited or increased by the Congress."

17. TPA is a category of funds (called a budget activity in budget terms) appropriated on an annual basis by Congress for the Bureau of Indian Affairs, within the appropriation account "Operation of Indian Programs," to provide a broad range of programs, services and benefits for federally recognized Indian tribes. These programs and services are funded within budget subactivities of TPA named Tribal Government, Human Services, Education, Public Safety and Justice, Community Development, Resources Management, Trust Services and General Administration. They fund certain specific budget program elements: 1) tribal government programs, such as aid to tribal governments, full funding of self-governance tribes' compacts, contract support for tribes providing themselves with BIA programs through self determination contracts, and funding for new tribes; 2) human service programs, such as child welfare, welfare assistance, and housing improvements; 3) education programs, such as scholarships, adult vocational education and Johnson-O'Malley funds for Indian children in public schools; 4) public safety and justice, such as fire protection and tribal courts; 5) community development programs, such as job placement and training, economic development and road maintenance; 6) resource management programs, such as agriculture, forestry, water resources, wildlife and parks and minerals and mining; 7) trust services, such as real estate services for probates and environmental quality as well as other title activities, and protection of other Indian rights; and 8) general administration programs that fund BIA agency costs when BIA provides these services directly for the tribes. TPA is the term

used to describe these appropriated funds beginning in Fiscal Year 1993 and continuing to the present day.

18. Before Fiscal Year 1993, nearly all of the many programs that are now part of TPA were funded as part of other BIA budget activities within the appropriations account of "Operation of Indian Programs" and, as with TPA, were appropriated and allocated for benefit of all federally recognized tribes. From the mid-1970s to the early 1980s, these programs were generally referred to as "banded" programs. Beginning in the early 1980s to 1992, they were referred to as the "Indian Priority System" or "IPS." Like TPA, the federal funds in these predecessors to TPA were used to fund local ongoing programs relating to the operation of the tribal government and services to tribal members. While the specific components of TPA and its predecessors have been modified from time to time, the basic principles have remained the same.

19. In accordance with BIA and Interior Department policy and practice, in administering TPA and its predecessors every federally recognized tribe was allocated some funds every year. Once appropriated, these funds – at the option of the Tribe – were either provided directly to the Tribe to operate programs and services, or retained and utilized by the Agency offices of the BIA for the BIA to operate those programs and services for the benefit of the Tribe and its members.

20. In addition, under the Department's policy and practice, once a federally recognized tribe received a particular amount of TPA funds, that amount became part of

that tribe's "base funding," and the tribe was routinely allocated that amount in subsequent years as well. If Congress, in a given year, reduced appropriations, the BIA would implement the reduction by making a pro rata reduction in all federally recognized tribes' base allocations of TPA. Similarly, increases in TPA would be applied to each federally recognized tribe by a pro rata increase in the tribes' base funding.

21. In my experience, the Interior Department never excluded a federally recognized tribe from an allocation of TPA (or its predecessors). I never heard any Department official express the view that the Department had the authority to exclude a federally recognized tribe from TPA. While during my time at the Department there were extensive debates in Congress over "means testing" – that is, whether tribes with certain levels of revenue from businesses like gaming should be excluded from TPA and other BIA funding – the Department opposed "means testing." And Congress never authorized the Department to use "means testing" to exclude tribes from BIA funding. The Department argued it lacked the authority to reduce a tribe's share of TPA funds, and the Department never asked for authority to exclude a federally recognized tribe from TPA funding. In FY 2000, Congress did include language in Section 127 of the Interior and Related Agencies Appropriations Bill which gave the Interior Department authority to reduce a tribe's TPA funding by up to ten percent and to use the funds to supplement other tribes having greater need. To my knowledge, the Department of the Interior has never used this authority to alter a tribe's share of TPA.

22. Newly-recognized tribes were not always seamlessly incorporated into the BIA system of funding federally recognized tribes. In certain instances, a newly-recognized tribe might not have received an allocation of TPA in the first year after the tribe was recognized, until additional funds were appropriated by Congress to provide an allocation for the newly recognized tribe. The Department's position was that newly-recognized tribes, like all other tribes, were entitled to an allocation of TPA funds – but the Department did not wish to remove base funding from other Tribes to accomplish that. Because Congress, like the Administration, wanted a separate source of funds identified to accommodate newly-recognized tribes, Congress agreed to the establishment of a New Tribes program element in the BIA budget. This created a separate allocation of funds for newly-recognized tribes without affecting the TPA allocations provided to existing federally recognized tribes. Once a newly-recognized tribe received such funds, it continued to receive a base level of TPA funds in all future years.

23. In addition, there were, and may still be, some instances where the TPA allocations are reported as going directly to an agency of the BIA which served a group of small tribes, particularly in California and Alaska, rather than expressly identifying the tribes. While the TPA allocations for these small tribes are not reported as allocations by reference to each individual tribe, but by reference to a consolidated agency or consortium that served a group of small tribes, each of those small tribes nevertheless received the benefits and services that were provided through the BIA to all federally recognized tribes. The problem affecting the small tribes in California and Alaska was that it was more cost-effective to provide tribal government programs and services

through a consolidated entity serving a group of small tribes. The amount of funding that would be made available to each tribe separately would be inadequate to provide any real benefit. However, in response to recommendations made by a Joint Task Force comprised of representatives of Tribes, the BIA and the Department of the Interior, Congress, beginning in FY 1994 increased appropriations for TPA to include an additional amount that would be used to increase the base level of TPA allocated to these small tribes.

24. There are other instances where TPA has been allotted directly to the agency without reference to a specific tribe. This occurs in single tribe agencies where the tribe does not choose to enter into a self governance compact and all the funding to that agency is for the goods and service of that specific tribe.

25. Based on my role in the Department's discussions with Congress on BIA funding and TPA, it is clear that Congress was aware and encouraged the Interior Department's policy and practice in administering TPA and its predecessors to allocate TPA to all federally recognized tribes and that no federally recognized tribe should be excluded. Congress clearly intended such a result.

26. The fact that the Department administered TPA so that all federally recognized tribes receive or benefit from TPA (and its predecessors), is confirmed by statements made by federal officials to Congress.

27. As stated above, in the course of my employment with the Department of the Interior, I regularly participated in both congressional hearings and meetings between Interior Department officials, members and Committees of Congress (and their staff) at which TPA was discussed.

28. When I began my service as Budget Officer for the Department of the Interior, the Bureau of Indian Affairs was in the process of evaluating how best to meet the needs of tribes and whether to make changes in the manner in which TPA was allocated. Discussions on those issues within the Department and with Congress continued during my tenure with the Department of the Interior. Significantly, all of the discussions about modifications to the allocation were premised on the fundamental understanding that under the existing system, all federally recognized Indian tribes received an allocation of TPA. The issue raised by Congress was whether funding formulas should be changed. But the baseline on which these issues were considered was that TPA was, and had been, allocated so that every federally recognized tribe had the benefit of a share of TPA.

29. For example, in March 1995 (shortly before I began my position as Budget Officer for the Department of the Interior), during hearings on Interior Department Appropriations for FY 1996, before a Subcommittee of the House Committee on Appropriations, there was discussion about TPA allocations for small tribes. The Committee submitted written questions to the Assistant Secretary for Indian

Affairs, one of which asked: "Is funding allocated to every tribe regardless of size?" Assistant Secretary Ada Deer responded stating:

> "Yes, Tribal Priority Allocations are distributed to every tribe. The Federal Government has a government-to-government relationship with all federally-recognized tribes. Population size is an initial allocation factor in some programs, such as Indian Child Welfare Assistance and Johnson-O'Malley Educational Assistance grants. The small and needy funds ensure that eligible tribes have the minimum resources necessary to establish and maintain a viable tribal government.

*Department of the Interior and Related Agencies Appropriations for 1996, Hearings Before a Subcommittee of the Committee on Appropriations House of Representatives*, Part 11, 104th Cong. 969 (1995) (emphasis added). This statement that "Tribal Priority Allocations are distributed to every tribe," accurately states both the Department's policy and the facts on the ground, both at the time and throughout the existence of TPA and its predecessors.

30. The Assistant Secretary for Indian Affairs re-affirmed this statement in February 1997 during an Oversight Hearing on the President's Budget Request for the Bureau of Indian Affairs and the Indian Health Service for Fiscal Year 1998. The Senate Committee of Indian Affairs posed a series of questions to the Assistant Secretary regarding TPA. In response to those questions, Assistant Secretary Deer explained that "TPA base programs are those in which funds are distributed on a pro-rata basis among all Tribes." *Fiscal Year 1998 Budget, Oversight Hearing of the President's Budget Request for the Bureau of Indian Affairs and the Indian Health Service, Before the Senate Committee on Indian Affairs*, Part 2, Addendum, 105th Cong. 17 (1997).

31. A member of the Committee further asked "Madam Secretary, is there a federal responsibility to provide for the operation of tribal governments grounded in treaty, statute, course of dealing, and court decision?" *Id.* at 3. The Secretary responded affirmatively, stating that the responsibility arose under federal statutes, treaties, court decisions and the Federal-Indian Tribal trust relationship. *Id.* at 3-5. This reflects, in part, the Department's understanding that there was a strong legal, historical, and moral basis for providing TPA funding to every federally recognized tribe.

32. During hearings before the Senate Committee on Appropriations held in March 1997, the Deputy Commissioner for Indian Affairs, Hilda Manual, advised the Committee Chairman of the basis on which tribes had been allocated TPA, stating:

> Historically, the funding that has been allocated to tribes has been based on an old system that the Department and the Bureau had in place for several years called the Indian priority system, where the tribes in each location and each area establish what they felt was their need for funding on the basis of population, land base, forestry dollars. They looked at the number of forestry acres.
>
> There was a process that actually was followed which to this day when we look at funding for new tribes we take the same factors into consideration.
>
> So the funding was established years ago and it has been pretty constant. Tribes pretty much know what their base funding has been for the past several years.

*Department of the Interior and Related Agencies Appropriations for Fiscal Year 1998, Hearings on H. R. 2107 before a Subcommittee of the Senate Committee on*

*Appropriations*, 105th Cong. 120 (1997). This reflects the Department's policy of establishing a base funding amount for every tribe, and carrying that amount forward each year.

33. In 1998, in response to a request from Congress, the General Accounting Office (GAO) also examined TPA and issued a report on TPA. While that report focused on proposals for modifying the criteria for allocating TPA among tribes, the GAO also described the history of TPA stating:

> In the early 1970s, BIA began giving the tribes more training, involvement, and influence in the process of allocating TPA funds. TPA funds are used for programs such as law enforcement, social services, adult vocational training, child welfare, and natural resource management. Most tribes have placed all their available TPA base funding in only 5 or 6 of the more than 30 TPA base fund programs. <u>All federally recognized tribes are eligible to receive TPA funds - either through contracts for operating tribal programs or through BIA-provided programs</u>. As of October 1997, 556 tribes had been recognized by the federal government.

*U.S. General Accounting Office: Report to Congressional Requesters: Indian Programs, Tribal Priority Allocations Do Not Target the Neediest Tribes*, GAO/RCED 98-181, at 3 (July 1998) (footnote omitted) (emphasis added). In this report, the GAO explained that its reference to TPA included TPA's predecessors. The GAO stated: "Over the years, BIA has referred to this process as 'band analysis,' the 'Indian Priority System,' and 'TPA.' For consistency throughout this report, we refer to the process as TPA." *Id.* at 3 n.2. The GAO also explained:

> The majority of the fiscal year 1998 TPA base funds was distributed on the basis of historical funding levels, as has been the case for decades. The funding process used today

> has remained essentially the same since the early 1970s, when BIA began allowing the tribes more input into budget decisions and priorities. TPA was created to further Indian self-determination by giving the tribes the opportunity to establish their own priorities and to move funds among programs accordingly, in consultation with BIA. BIA believes that a stable funding base enhances the tribes' ability to plan and budget their funds.

*Id* at 4.

> Depending on annual appropriation levels, increases or decreases to a tribe's base fund amount are made on a pro rata basis (e.g., a tribe that receives 0.2 percent of the total TPA base fund amount would receive 0.2 percent of any increase or decrease.)

*Id.*

34. In April 1998, Assistant Secretary for Indian Affairs Kevin Gover described the history of TPA in written responses to questions raised by the Senate Committee on Indian Affairs. As he stated:

> The evolution of TPA funding is closely linked to the evolution of Indian Self-Determination. TPA exists because of consultation, participation and self-determination on the part of Indian Tribes. Prior to the Indian Reorganization Act of 1934, there was no effort, expectation, or attempt to include Indian people in decisions related to funding Indian programs. The Indian Reorganization Act says, "The Secretary of the Interior shall advise such tribe or its tribal counsel [sic: council] of all appropriations estimates or Federal projects for the benefit of the tribe prior to the submissions of such estimates to the BIA of the Budget and the Congress." This was the beginning of consultation with tribes on funding.
>
> President Nixon, by special message to Congress, called for a policy of Self-Determination, and in 1975, the Congress passed the Indian Self-Determination Act. The Act calls for tribal participation in planning the annual BIA budget.

From this approach of involving tribes, in the budget planning process, came "banded" programs, the predecessors to TPA. By the early 1980s, the BIA had refined the budget planning process and changed the name to the Indian Priority System (IPS). In 1992, the BIA Reorganization Task Force recommended the budget planning process be expanded to include additional program elements for tribal consultation and renamed Tribal Budget System (TBS).

Under IPS, the tribes participated in budget planning for the Tribe/Agency portion of the BIA budget only. Under the TBS, tribes had the opportunity to participate in planning the entire BIA budget and had access to considerable additional information than they had in the past. TPA was the subset of funding information that applied to the Tribe/Agency portion of the budget under the Tribal Budget System. The TPA monies provide funding for local ongoing programs of a varied nature ranging from scholarships to employment assistance to tribal courts to credit assistance. Not included were: Other Recurring programs for the direct benefit of Indian people or for Indian lands, or where formula determined the distribution of funding; Non-Recurring programs where funds were time limited or competitive grant type projects; funds for Central or Area Offices; and funds for Special Programs and Pooled Overhead where the funding may be spent locally but remains under central control, or where costs are assessed for the whole BIA in a single charge like the GSA rents.

In FY 1993, Congress approved the BIA budget structure change and the name of Tribal Priority Allocations for the category of funding that covers tribes and agency office costs. It was, and is, the category of funding over which tribes can exercise the broadest discretionary authority. In 1995, Congress provided the BIA with specific reprogramming authority that allows tribes to shift funds among the TPA categories in accordance with their unique priorities and needs. One hundred percent reprogramming is permitted within the TPA category. This authority applies whether the programs are under compact or contract or delivered by the BIA.

*Tribal Allocations by BIA Fiscal Year 1999, Hearing Before the Senate Committee on Indian Affairs, on Task Force Findings on Providing a Method of Distributing Additional Tribal Priority Allocations Funds,* 105th Cong. 28-29 (1998). Assistant Secretary Gover further testified:

> The BIA is charged with the primary responsibility for administration of Federal programs for Federally recognized Indian tribes, and for carrying out the trust responsibility emanating from treaties, the U.S. Constitution, laws, court decisions and other agreements with American Indian tribes and Alaska Natives. The BIA has the primary Federal requirement, at law, to serve an identified constituent group.

*Id.* at 93 (emphasis added).

35. In 1999 a workgroup comprised of Tribal and Bureau representatives completed their analysis and recommendations regarding possible adjustments to the formula for TPA. I was a major contributor to this report as stated earlier in paragraph 8.

36. The Tribal Workgroup completed its report in May 1999, and described TPA stating,

> For years, Tribal Priority Allocations (TPA) base funds have been provided through the Bureau of Indian Affairs (BIA) to each of the more than 550 Tribal governments on a recurring basis. Tribes have used TPA funds to operate core governmental functions and essential programmatic services to address all Tribal needs. TPA base funds are primarily allocated to the operational costs associated with ongoing Tribal government administration, tribal courts, education, law enforcement, social services, and land management.

*Empowerment of Tribal Governments: Final Workgroup Report, Tribal Workgroup on Tribal Needs Assessments, Related to: Bureau of Indian Affairs Tribal Priority Allocations* (May 1999) at 3 (Executive Summary) (emphasis added).

37. In July 1999, the Department of the Interior submitted to Congress, its report on Tribal Priority Allocations, in which the Department described its view of TPA, stating:

> The BIA is unique among government agencies in many respects. It is unique in relation to its own mission and structure. Some agencies operate programs or deliver services directly to beneficiaries; others are grant making agencies. Even in an agency that may combine the two functions, the line of demarcation is clear and established by statute. With few exceptions, potential beneficiaries of Federal services or grants do not have any form of "right" to the service or to a particular share of benefits; they merely have the right of access on equitable grounds.
>
> <u>The BIA, on the other hand, serves all Federally recognized Tribes and groups</u>. It operates either programs or contracts for the delivery of services at the discretion of the Tribes. The Tribes also have the right to change from direct BIA services to contracting and back again at virtually any time and for virtually any reason. The uncertainties inherent in such a process are enormous. Further, the BIA must maintain the level of direct services to each Tribe throughout the country while also trying to provide adequate resources for Tribal contracting and Self-Governance compacting.

Department of Interior Bureau of Indian Affairs, *Report on Tribal Priority Allocations*, at 3-4 (July 1999) (emphasis added).

38. In response to specific questions raised for consideration – as to whether "the most prosperous Tribes be required to give up their TPA allocations, " the TPA Tribal Workgroup responded:

> No, Tribes should not be required to give up their TPA allocations. Consistent with Federal treatment of other governmental entities, any standard or criteria used to define "prosperous" should not be considered for Tribal governments. However, Tribes who voluntarily return their TPA funding should have a say in how these funds are distributed. This decision should be made on an annual basis and accounting of these Tribes' TPA funding must be tracked by the BIA.
>
> All Tribes must be funded to fulfill the United States Government's unique responsibilities to Indian Tribal governments which are grounded in the Constitution, and treaties developed by the Congress and the Federal common law over the course of more than 200 years.

*Id.* at 86. The BIA agreed with the Tribal position on this issue. The BIA stated (*id.*) :

> BIA agrees with the TPA Tribal Workgroup and the responding Tribal leaders that Tribes should not be required to give up their TPA allocation based on prosperity or some measure of self-sufficiency.

39. The Interior Department policy and practice in administering TPA and its predecessors – that every federally recognized tribe was allocated some TPA funds every year – is also shown by the information contained in the annual Budget Justifications for the Bureau of Indian Affairs (Green Books).

40. Specifically, beginning with the Budget for Fiscal Year 1992 and continuing throughout my tenure at Interior, the BIA has included a table in the Budget Justification reporting the amount of federal funds sought by the BIA for TPA (in FY

1992 this was described as the Indian Priority System), with the amount requested for each federally recognized Tribe.

41. I compared the list of federally recognized tribes (outside of the State of Alaska) that was published in the Federal Register and in effect at the time the Budget Justification was prepared, against the list of tribes contained in those tables for FY 1992, FY 1994 and FY 1998. Based on that review, I found that every tribe listed as federally recognized by the Department of the Interior was either also listed in the BIA's Budget Justification with an allocable share of TPA or could be tracked by BIA financial codes to an agency providing the tribe with such funds or services. The results of my analysis are shown on the tables that are attached as Attachments A, B and C. If a similar comparison were made for each of the other fiscal years, I am confident they would similarly show that the BIA allocated some TPA funding to every federally recognized tribe.

42. The attached tables and the TPA allocations shown in the BIA Budget Justifications represent only a portion of the TPA funding appropriated for most tribes. Only the BIA's TPA requests for self governance tribes include one-hundred percent (100%) of the funding those tribes will receive. The amounts shown for TPA for non-self governance tribes do not show all of their TPA funding. Some of their TPA funds remain in the agency office for the use and benefit of those tribes. For example, the TPA funding shown by tribe for many of the tribes in the Sacramento (California) Area of the

BIA is limited to funding for Indian Child Welfare Act programs. The remainder of the TPA funds for those tribes is shown in the TPA allocation for the agency.

43. TPA is also only a portion of the federal funds that were appropriated to the BIA and made available to federally recognized tribes. In addition to TPA, federally recognized tribes benefited from other federal funds appropriated for the operation of Indian programs by the BIA. The BIA makes allocations of those other funds, and those funds are then used, either by the tribe under self determination contracts or compact, or by the BIA to provide services to the tribe.

44. I reviewed the United States' responses to the Tribe's requests for discovery in this case. I saw that in response to the Tribe's Request for Admission No. 1, the United States objected stating that the question regarding the lists of federally recognized tribes, published in the Federal Register was vague and ambiguous. If during my tenure at the Department I had been asked to respond to this request for admission, I would not have found that request to be vague or ambiguous. It is common knowledge within the BIA, throughout the Indian community and among professionals dealing with the Indian community that the term "federally recognized tribes" and references to a "list" in that context means the Federal Register Notice published periodically by the Department of the Interior, Bureau of Indian Affairs titled "Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs." Those lists establish for all federal agencies whether or not a tribe has been recognized by the federal

government as eligible for federal funds and services. I did not find it difficult to understand what was being discussed or requested.

45. I also reviewed the United States' response to the Tribe's Requests for Admission Nos. 2 and 4, where the United States objected that those requests were overly board and burdensome. It is true that the Government could not assemble all of the budget execution documents for every year between 1969 and 1996 as many of those records have not been retained. However, there is an alternative source of information, contained in the Interior Department's automated accounting system, which would not impose such a burden and which would have allowed the Government to respond for at least some number of fiscal years. The automated accounting system uses unique codes to identify each BIA unit and each federally recognized tribe (and in some case more than one unique code for a tribal entity). The BIA can query the accounting database for any fiscal year (where the computer record exists) and tell how much money was expended by each tribal code. The query could include all sources of federal funding channeled through BIA, not just TPA. This is not a burdensome task and can be conducted as broadly or narrowly as the query defined by the selection of codes.

46. I also reviewed the Declaration of Debbie L Clark that was submitted in this case. While what is stated in Ms. Clark's declaration is correct, there are places where the statements made in the declaration are incomplete (and therefore misleading) in my opinion. I do not address each of these, but note some examples.

47. In paragraph 3 of her Declaration, Ms. Clark states that "The BIA uses TPA as a budgetary device or tool to categorize and describe how it plans to allocate certain funds to Indian Tribes . . ." and that "[t]his internal budgetary tool is an agency creation, there is no statutory or regulatory authority for TPA." While it is true that BIA uses TPA as a budgetary device and TPA started as a budgetary device, TPA has evolved into much more with the adoption by Congress of TPA as a budget activity, and the inclusion of the TPA table in the BIA's Budget Justifications. As a result, when Congress appropriated funds to the Bureau of Indian Affairs for the Operation of Indian Programs, it did so based on the BIA's express request, set out in the BIA's annual Budget Justifications, that the funds for the Operation of Indian Programs include funds to be allocated to the tribes for TPA. This means that the BIA has made a commitment to Congress on the use of the funds appropriated for TPA and the appropriation for TPA cannot be used for any other purposes absent compliance with the specific requirements of the Congressional Reprogramming Guidelines. TPA, as a result, is much more than an internal budgetary tool.

48. In paragraph 6 of the Declaration, Ms. Clark states that: "Congress has not directed specific TPA amounts to any Tribe." To be complete, this statement should read as follows:

> Although Congress has not expressly directed specific TPA amounts to each Tribe in Appropriation Bill or report language, Congress has and does appropriate funds in response to BIA requests for TPA that are tribe-specific in the Budget Justification. Each year since FY 1992, BIA has informed Congress that TPA will be allocated to every federally recognized Tribe through the Budget Justification and Congress appropriated funds on that basis. If Congress

> intended to deviate from the established principle that TPA is allocated to every federally recognized Tribe, it would have said so. Indeed, some members of Congress proposed such changes to TPA during the congressional debates on means-testing for TPA. However, the proposals of some Members of Congress to deviate from the practice of providing funding to all federally recognized tribes never had sufficient support to become law.

49. In the second sentence of paragraph 7 of the Declaration, Ms. Clark states that TPA "[f]unds can be directly paid out to an Indian Tribe only if it performs one or more of those programs through a contract, Indian Self-Determination and Education Assistant Act ("ISDA") funding compacts (93-638), or grant (100-297 Education) agreement." The statement would be more complete if it also included the following statement: "If the Tribe does not enter into one of those options, the Tribe's allocation of TPA is used by the BIA to provide direct services to that Tribe, in accord with the priorities and desires established by that Tribe for the use of those funds."

50. In sum, Interior Department policy and practice in administering TPA and its predecessors has been that every federally recognized tribe is allocated some TPA funds every year and that these funds are – at the option of the Tribe – either provided directly to the Tribe to operate programs and services, or retained by the Agency offices of the BIA for the BIA to operate those programs and services for the benefit of the Tribe and its members. Further, Interior Department did not permit a federally recognized tribe to be excluded from TPA funding, and in my experience, the Department never excluded a federally recognized tribe from an allocation of TPA (or its predecessors) except in the

very few cases where Congress failed to provide funding for a newly-recognized tribe in the first year after the tribe was recognized.

I declare under penalty of perjury of the laws of the United States, that the foregoing is true and correct.

Executed on the 23rd day of February, 2007

James H McDivitt
James H. McDivitt