ISBN 0-16-055207-9

429

**EXHIBIT 25**
In Support of Plaintiff's Opposition to
Motion to Dismiss on TPA & IHS
Samish v. U.S., No. 02-1383L

S. Hrg. 105–65, Pt. 2

# FISCAL YEAR 1998 BUDGET

# HEARING

BEFORE THE

## COMMITTEE ON INDIAN AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED FIFTH CONGRESS

FIRST SESSION

ON

OVERSIGHT HEARING OF THE PRESIDENT'S BUDGET REQUEST FOR THE BUREAU OF INDIAN AFFAIRS AND THE INDIAN HEALTH SERVICE

FEBRUARY 26, 1997
WASHINGTON, DC

**PART 2**

## ADDENDUM

U.S. GOVERNMENT PRINTING OFFICE
42–922 CC WASHINGTON : 1997

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-055427-6

430

United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

JUL 2 8 1997

Honorable Ben Nighthorse Campbell
Chairman, Committee on Indian Affairs
United States Senate
Washington, D.C. 20510-6450

Dear Mr. Chairman:

I am pleased to provide our response to the Committee's questions received within your letter of February 26, 1997, following the oversight hearing on the President's budget request for fiscal year 1998, held on the same day.

Please advise if the Committee needs further information.

Sincerely,

Ada E. Deer

Ada E. Deer
Assistant Secretary - Indian Affairs

Enclosure

(1)

**SUBMITTED BY: BEN NIGHTHORSE CAMPBELL, CHAIRMAN**

Question 1. Secretary Deer, the President's request includes an additional $76.5 million for the Tribal Priority Allocations (TPA) account which is a positive sign as more functions are made available to tribes through TPA's flexibility. In 1995, the TPA account was significantly reduced and many tribal governments were hurt badly. Does the request reflect these recent reductions in funding?

Answer: The significant budget reductions incurred by the Bureau of Indian Affairs (Bureau) in FY 1996 did hurt Tribes badly. TPA was reduced a total of 13 percent in FY 1996. Subsequently, the Administration's budget requests for both fiscal years 1997 and 1998 restored the budget to the FY 1995 enacted level. Funding has been requested to restore and enhance programs that affect the local tribe/agency level, while maintaining minimal Bureau increases.

Question 2. Secretary Deer, the request for the Office of Special Trustee for American Indians includes an increase of $7 million over FY 1997 levels. The management of tribal and individual Indian trust funds is a national disgrace. At this point, what are the priority tasks for the OSTAI and what does the OSTAI project its needs are to fulfill its responsibilities?

Answer: Paul Homan, Special Trustee has responded as follows: The priorities and the requested budget for the OSTAI to accomplish those tasks are included within the Office of the Special Trustee's Strategic Plan, submitted to the Congress and the Secretary of the Interior on April 11, 1997.

Question 3. Madam Secretary, the President's request continues the pattern of revenue shortfalls in contract cost support funds for Indian tribes. The BIA funded tribal contract costs at 87 percent of need in FY 1996 and at 84 percent in FY 1997. Tribes have to use program money to make up the difference and in the long-term, tribes will be discouraged from entering 638 contracts and self-governance compacts. In your statement you note that FTE reductions are taking place as a result of increased tribal contracting and compacting. Shouldn't we be providing incentives and assistance to tribes instead of reducing FTEs and not providing enough contract support costs?

Answer: When the Bureau reduces FTE at the local agency level, as a result of contracting or compacting, funds that supported those Bureau employees are transferred to the contracting tribes for the program operation they are assuming. The FY 1998 request for contract support costs represents a net increase of $15.0 million above the FY 1997 enacted level. It is estimated that this level of funding will pay approximately 95 percent of tribes' indirect cost rates for contracting Bureau programs. In addition, the request includes $5.0 million for the Indian Self-Determination Fund, specifically for new or expanded tribal contracts or contracts.

Question 4. The President's request also includes an increase of $3 million to clean up unsanitary landfills, leaking underground storage tanks (TANKS), and other environmental hazards. With a backlog of $200 million in environmental cleanup work, how will this increase be allocated? With regard to the problem, are the tanks to be cleaned up owned and operated by the BIA or by the tribes





themselves?

Answer: Although the Bureau had hoped to systematically address the Tribal needs by Area it has become apparent that the funds will need to be used to address the most serious needs over all Indian trust lands. The funds will be allocated based on ranking factors that will consider the immediate threat to health and safety, EPA actions, congressional mandates and the potential to eliminate the specific hazard within a particular funding cycle. The funds will address underground storage tanks owned or leased by both the Bureau and Tribes. Most of the tanks owned and operated by Tribes are at facilities once owned by the Bureau. All of these funds will be used to address environmental concerns on Indian trust lands.

Question 5a. Madam Secretary, is there a federal responsibility to provide for the operation of tribal governments grounded in treaty, statute, course of dealing, and court decision?

Answer: There is legislative responsibility. Over the years Congress has enacted many laws providing for United States support and assistance to tribal governmental operations in such areas as law enforcement, child welfare, tribal court systems, general assistance, social services, fire prevention and suppression, education, health care, housing, environmental protection, and similar governmental programs and services. See generally, Snyder Act, 25 U.S.C. § 13; Indian Reorganization Act 25 U.S.C.§ 461 et seq.; Indian Self-Determination and Education Assistance Act 25 U.S.C.§ 450; Johnson-O'Malley Act 25 U.S.C.§ 452; Anti-Drug Abuse Act, 25 U.S.C. § 2401 et seq.; Tribal Self-Governance Act 25 U.S.C.§ 458aa et seq.; Indian Tribal Justice Act 25 U.S.C.§ 3601 et seq. See also, Maine tribal courts, 25 U.S.C.§ 1721 et seq.; law enforcement 18 U.S.C.§ 3055; Indian Child Welfare Act 25 U.S.C.§ 1901 et. seq.; Indian Child Protection and Family Violence Prevention Act, 18 U.S.C.§ 53; Vocational Training 25 U.S.C.§ 309; Surface Transportation Assistant Act of 1982, 23 U.S.C.§ 101; Facility Construction 25 U.S.C.§ 631(2)(12)(14); 25 U.S.C.§ 465; 25 U.S.C.§ 318a; Road Construction, 23 U.S.C.§ 104(b)(5)(A); 23 U.S.C.§ 204(b) and (c).

Treaties. There are also provisions in numerous treaties obligating the United States to provide various types of support and assistance to tribal governments for governmental purposes, such as the Treaty with Kansas Tribe of January 14, 1846, (9 Stat. 842), the Treaty with the Choctaw and Chickasaw of June 22, 1855, (11 Stat. 611); and the Treaty of Fort Laramie with the Sioux of September 17, 1851, (11 Stat.749), for example. The Treaty of 1868 between the United States and the Sioux Nation expressly obligated the Congress to secure them an orderly government.

Court Decisions. As a general principle, the Supreme Court has interpreted Article I, Section 8 of the Constitution as incorporating tribal governments into the overall political framework of the United States. In a series of landmark decisions dating to

the 1830's, Chief Justice John Marshall fashioned the legal principles governing the relationship between the tribes and the Government of the United States and re-affirmed the principle that tribes retained not only the right to possession of the soil, but the inherent right of self-government. The history of federal acknowledgment of the nature and authority of tribes and the practice of providing aid to tribes dates to the earliest days of the republic.

Federal-Indian Tribal relationship. The federal-Indian Tribal relationship is deeply imbedded in the nation's jurisprudence. In the first of the cases now referred to as the Marshall Trilogy, the Chief Justice crafted the basic framework for the U.S. land tenure system, clarifying the exclusive right of the federal government to acquire land from the tribes through purchase or conquest. Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543 (1823). In the Johnson analysis, Marshall began to articulate the federal Indian law principles that he would more fully develop in the two subsequent cases in relation to the tribes' possessory interests in land, acknowledgment of tribal sovereignty, and the obligations of the conqueror toward the conquered. Over time, this latter concept, which derives from principles of international law, has evolved into the Indian trust doctrine – a doctrine containing both legal and moral prerogatives. "Humanity," wrote Marshall, "...has established as a general rule, that the conquered shall not be wantonly oppressed, and their condition shall remain as eligible as is compatible with objects of the conquest."

The nature of the federal-Indian Tribal relationship; the authority of tribes; the nature of the obligations of the United States to the native tribal peoples; and the status of tribes within the overall political framework of the United States were more fully visited in the Cherokee cases. In these landmark decisions, Marshall defined the principles governing the course of dealings between the United States and the Indian tribes into the present. Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831); Worcester v. Georgia, 31 U.S. (6 Pet.) 515 (1832).

U.S. law and court decisions have consistently recognized and re-affirmed the principles articulated by Marshall: tribes are distinct political entities with whom the United States has a unique legal and political relationship, including "moral obligations of the highest responsibility and trust." Seminole Nation v. U.S., 316 U.S. 286 (1942). See also, Ex parte Crow Dog, 109 U.S. 556 (1883); Talton v. Mayes, 163 U.S. 376 (1896); Williams v. Lee, 358 U.S. 217 (1959); U.S. v. Mazurie, 419 U.S. 544 (1975); U.S. v. Wheeler, 435 U.S. 313 (1978); Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978); Montana v. United States, 450 U.S. 544 (1981); Oklahoma Tax Commission v. Chickasaw Nation, __U.S.__ (1995), 115 S.Ct. 2214 (1995). Over the decades, these principles have found expression in Congressional legislation and resolutions, Executive Orders, and innumerable federal court rulings. Throughout its 200 year history, the United States has not only recognized these principles, but has established a "course of dealings" which not only acknowledges the concept, but also

432



actively promotes self-governance by providing services and resources.

The modern era of federal Indian policy was launched in 1934 with the passage of the Indian Reorganization Act. (25 U.S.C. § 461 et seq.) The Act was designed to strengthen the institutional infrastructures of tribal governments. It authorized the Secretary of the Interior on request of a tribe to convene a special election for the purpose of adopting a constitution and by-laws under which the tribal government could operate subject to the oversight of the Secretary. Except for the period between 1953 and 1973, when Congress experimented with the concept of terminating the political status of tribes, federal policy has consistently been supportive of tribal self-determination and self-governance, and federal aid to tribal governments has been viewed as essential to the long term economic growth and development of tribal communities. The present policy commitment to strengthening and enhancing tribal self-determination and self-governance is largely an outgrowth of the disastrous social and economic consequences of the termination policy. It is also consistent with the present federal policy supportive of providing various types of aid to state and local governments for government services.

In 1973, Congress renounced the policy of termination, replacing it with the policy of Self-Determination. Congress declared:

> "[O]ur national Indian policy shall give full recognition to and be predicated upon the unique relationship that exists between this group of citizens and the federal government and that a government-wide commitment shall derive from this relationship that will be designed to give Indians the freedom and encouragement to develop their individual, family, and community potential and to determine their own future..."

On January 4, 1975, Congress enacted the Indian Self-Determination and Education Assistance Act, declaring:

> "The Congress after careful review of the federal government's historical and special legal relationship with, and resulting responsibilities to, American Indian people, finds that -
>
> 1. The prolonged federal domination of Indian Service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the needs of Indian communities..."

With this legislation, Congress began the process of transferring tribal governmental

service delivery from the Bureau of Indian Affairs, to tribal governments through contracts. In 1994, Congress enacted the Indian Self-Governance Act, re-affirming the policy that the tribal right of self-government flows from the inherent sovereignty of Indian tribes and nations; and recognizing a special government-to-government relationship with Indian tribes including the right of the tribes to self-governance as reflected in the Constitution, treaties, federal statutes, and the course of dealings with the United States with Indian tribes.

Question 5b. Is this consistent with a "means test" for federal programs which I understand Secretary Babbitt supported last year?

Answer: The proposal to means test all Bureau programs is based on the false premise that a large number of tribes have sizeable independent revenues when in fact, with relatively few exceptions, American Indians lag behind the general population in income levels. There are encouraging signs that some of the Tribes have begun to experience successful economic development on certain reservations, and there may come a time when a Tribe's financial situation is a greater factor in distributing certain Bureau funds to Tribes. However, this must be done with great care and certainty after tribal consultation on the issue. The Federal Government will continue to have responsibility for fulfilling trust obligations.

Based on our experiences with the disastrous effects of the termination policies of the 1950's and 1960's, we strongly advise against any precipitous action that results in means testing.

433

The income, employment, and education attainment of the one million American Indians living on or near reservations falls well below the general population. Tribes depend on the Bureau for funding of a broad spectrum of critical programs, with economically self-sufficient Tribes falling in the minority. We have found that those Tribes that are beginning to experience economic development are using the revenues for programs where federal funding is insufficient or non-existent, and are using their revenues to begin to bring their reservations up to a standard found in the non-Indian communities.

The Bureau does provide some programs where eligibility for funding is primarily based on financial resources, including: Housing Improvement, Small and Needy Tribes, Attorneys Fees, General Assistance, and, Special Higher Education Scholarships.

Question 5c. What method would be used to means test Indian programs, and shouldn't it properly be preceded by a "Needs Assessment" to determine what tribes' needs are?

Answer: At this point in time, it is more critical to ensure that the United States fulfills its



responsibilities to Indian country than it is to conduct Tribal needs assessments. Any type of needs assessment would only verify the fact that by any socioeconomic measure, American Indians lag behind the general population and that current appropriations fall far short of meeting the overall need. For example, one third of all American Indians are living in poverty. As discussed above, the Tribes that are beginning to experience economic development are using their resources to try to raise the quality of life on their reservations to a level that is comparable to the rest of the country.

Question 6. My last question is this: in 1995 a proposal was introduced to prevent the Secretary from taking land into trust for a tribe unless there was a "binding agreement" between the tribe and the state for the payment of state sales and excise taxes on retail sales to non-members occurring on those lands. Does the Administration support this proposal? Some in Congress support the proposal because they "want a voice in the land into trust process". Under current law, are there provisions providing state and local officials with the opportunity to raise concerns about land into trust applications?

Answer: The Administration strongly opposes this proposal.

The proposal undermines Section 5 of the Indian Reorganization Act (IRA) of 1934, legislation which was enacted as part of a comprehensive package of reforms to stop and reverse the great loss of tribal land that occurred under the General Allotment Act. The allotment policies of the General Allotment Act resulted in the loss of over 90 million acres of Indian owned land between 1887 and 1934, almost two-thirds of the total Indian land base. Through Section 5, Congress recognized the devastating impact of this loss of land on Tribal governments and on the economic viability of the remaining Indian land base and gave Tribes the ability to have those lands re-acquired and protected as trust land, thereby promoting the security of the land for economic development.

The primary purpose of taking land into trust is most often to re-acquire land lost under the General Allotment Act; to provide tribal sovereignty; to provide land for Indian housing; and to allow Tribes a means of economic development. With the proposal, every time a tribe asked to have land taken into trust under authority enacted specifically to restore the Indian land base and to promote economic self-sufficiency, the Interior Department would be required to place the request on hold pending a tax compact agreement acceptable to states.

The proposal also constitutes an undue and unnecessary intrusion on tribal sovereignty, interfering with tribal rights to self-government. It is unnecessary because the Supreme Court has already cleared the way for tax collection in ways that do not impinge on tribal sovereignty. The Supreme Court decisions now clearly allow states to enact legislation that ensures collection of state taxes on goods before they are sold

on Indian lands. Collecting the tax before the product is sold on Indian land avoids interference with tribal sovereignty.

An additional problem with the proposal is that it would not require states to waive sovereign immunity as part of an agreement. Under the recent Seminole Decision by the Supreme Court, tribes cannot sue a state in federal court where jurisdiction over such an agreement would logically lie. Thus, a state could simply refuse to negotiate a tax compact and thereby preclude a tribe from having any lands taken into trust. Without any means of for Tribes to enforce state-tribal negotiation on the issue, states are given an unfair advantage over decisions which affect tribal economic development and self-governance. Under the current strictures, land transactions could come to a standstill.

Under current law there are provisions to allow state and local officials the opportunity to raise concerns about "land into trust" applications.

Those opportunities are set out below and are found in the regulations at 25 CFR Part 151.

1. 25 CFR § 151.10 allows local governments 30 days to respond to written notification that the Bureau of Indian Affairs has an application to take land into trust.

2. 25 CFR § 2.9 provides a 30 day appeal period during which a local government or other party may appeal a preliminary decision to take land into trust. The appeal process itself may take several months. [This appeal period is not available when the Assistant Secretary makes a decision to take land into trust--that decision is final for the Department of the Interior. The absence of the administrative appeal opportunity does not, however, affect the 30-day window to seek judicial review. That period is available except where there is a transfer of land from trust-to-trust status.]

3. At the end of the appeal procedure (either by expiration of the second thirty-day period or by a decision of the Interior Board of Indian Appeals at the conclusion of the appeal process), there is a 30-day period that provides an opportunity for judicial review before taking land into trust. It is that period that was established by the new regulation (61 FR 18082-83) on April 24, 1996. That period is triggered by either a notice in the Federal Register or by a notice in a newspaper of general circulation for the area in which the parcel is to be taken into trust.

**SUBMITTED BY: JOHN McCAIN**

Question 1. What is the anticipated shortfall in contract support costs for Indian tribes in Fiscal Year 1998?







Answer: The shortfall in contract support funds in FY 1998 will be dependent upon the level of funding provided for contractible programs. If the Bureau budget is appropriated at the President's request level, the shortfall would be about $5.7 million. This would allow the Bureau to pay contractors about 95 percent of estimated need.

Question 2. I was pleased to note that the BIA was requesting funds to address a growing concern in Indian country: leaking underground storage tanks and sanitary landfills in Indian country. Does the Bureau plan to use these funds to address the most serious environmental problems in Indian country regardless of whether it is a tribal facility or a BIA facility or will the BIA use these funds **only to limit their potential liability for BIA owned and operated facilities?**

Answer: The funds will be used to address the most serious environmental needs regardless of whether it is a Tribal facility or a Bureau facility. All funds will be used to remediate environmental problems on Indian trust lands. Although limiting Bureau liability is a major concern for the government, the health and safety of affected Tribal members is a much greater concern and serious Tribal needs will be addressed as timely as possible in light of the total unmet need.

Question 3. How does the BIA propose to change its leasing guidelines to ensure that proposed leases which include the installation of underground storage as will require the necessary financial assurances to cover any environmental remediation costs associated with the underground storage tanks?

Answer: The Bureau does not feel that it is necessary to amend the leasing regulations. Part 162 of 25 CFR provides the Secretary with the authority to require financial assurances to reasonably assure performance of contractual obligations. The Bureau does agree, however, that additional guidance may be necessary to assure that its offices are ensuring compliance with environmental laws as part of any contract and that they are obtaining sufficient financial bonding to cover any environmental remediation that is required under those laws. A plan for the development and implementation of additional guidance is being studied.

Question 4. I noticed the BIA has requested increases in the Safety of Dams program. How will this increase impact the current construction and maintenance backlog in the Safety of Dams program?

Answer: The proposed increase of $4 million for the Bureau's Safety of Dams Program provides funding for the following activities:

Repair construction of Lower Mundo Dam, New Mexico
Final Design for Equalizer Dam, Oregon
Conceptual Designs for: Allen Dam, South Dakota
Santa Ana Dam, New Mexico

Lake Capote Dam, New Mexico
Deficiency Verification analysis of Christmas Tree Dam, Arizona

Currently, there is an estimated $400 million backlog of repair construction projects for the 104 dams that are within the Bureau's responsibility. When the Indian Dams Safety Act became law in 1994, the Bureau had responsibility for 53 dams noted as posing a threat to human life in the event of a failure. The Bureau's 104 dams include 46, nearly half, of the top 100 hazardous dams on the 1996 Technical Priority Rating list. For comparison, in 1995, the Bureau was responsible for 22 of the top 50 dams. The number of dams requiring correction has doubled, yet appropriations for this program have remained level since the law passed in 1994.

If this program is not funded at the request level, serious dam safety incidents could occur as these critical infrastructures age. Catastrophic dam failures, a real possibility in the most hazardous Bureau dams, would result in the potential loss of life or at a minimum, significant economic damage with liability resting with the Federal Government. Public safety is a long-term responsibility that requires a continued commitment to fund the Safety of Dams Program adequately.

If the requested increase of $4 million is not provided, the potential for liability to the Bureau will continue to escalate as the Bureau will only be able to correct safety hazards on three dams, complete construction design on three dams, and conduct limited inspection work. The increase will allow the Bureau to correct deficiencies on unsafe dams affecting the public safety.

There is an estimated $750,000 shortfall in the Dam Safety Maintenance Program that is funded within the Bureau's Other Recurring Programs, Irrigation Operation and Maintenance. This shortfall will not be affected by the increase requested for the Safety of Dams construction program.

435

Question 5. I am deeply disappointed by the repeated failure of this Administration to request any funding for the prevention and treatment of child abuse in Indian country. This continued action can only mean that the BIA does not consider the problem of child abuse in Indian country of sufficient importance to dedicate the resources necessary to tackle the problem. If Congress appropriates funds to implement the Indion Child Protection and Family Violence Prevention Act, what assurances do we have that the BIA will take the appropriate steps to ensure that Indian tribal governments will receive these funds?

Answer: In the Bureau's FY 1998 budget, a separate line item is requested for Child Protection and Family Violence Prevention under the Tribal Priority Allocation (TPA) budget activity. This decision was made to give Tribes the ability to make prevention a high priority within TPA and redistribute funds from other TPA programs or form overall or general increases included in appropriations enacted for TPA into this new line





item. The Bureau is required by the Indian Self-Determination Act, as amended, to conduct national budget hearings with tribal representatives from the Bureau's twelve Area Offices. National Tribal funding priorities are communicated to the Bureau at these Hearings. Over the past few years, the Tribes have listed TPA programs as their highest priority. These national Tribal funding priorities become the Bureau's priorities in the submission of the initial annual budget request to the Department of the Interior. General increases in TPA have been requested so that Tribes can prioritize resources to meet their needs at the local level. The Bureau has held six annual National Budget Hearings, beginning in 1992. The Bureau will continue to support this process. Individual Tribes establish individual priorities.

The Bureau's FY 1998 budget includes a proposed general increase of $46.7 million for TPA. If the increase is appropriated, Tribes can fund a variety of programs including child protection.

**SUBMITTED BY: SENATOR BYRON L. DORGAN**

Question 1. I am extremely concerned that the Bureau's FY 1998 budget request includes no funding for Child Protection and Family Violence Prevention under the Tribal Priority Allocations account. Can you explain how this decision was arrived at and what steps the BIA is taking to ensure that the prevention of child abuse and neglect is a top priority?

Answer: In the Bureau's FY 1998 budget, a separate line item is requested for Child Protection and Family Violence Prevention under the Tribal Priority Allocation (TPA) budget activity. This decision was made to give Tribes the ability to make prevention a high priority within TPA and redistribute funds from other TPA into this new line item. The Bureau is required by the Indian Self-Determination Act, as amended, to conduct national budget hearings with Tribal representatives from the Bureau's twelve Area Offices. National Tribal funding priorities are communicated to the Bureau at these Hearings. Over the past few years, the Tribes have listed TPA programs as their highest priority. These national Tribal funding priorities become the Bureau's priorities in the submission of the initial annual budget request tot he Department of the Interior. General increases in TPA have been requested so that Tries can prioritize resources to meet their needs at hc local level. The Bureau has held six annual National Budget Hearings, beginning in 1992. The Bureau will continue to suppon this process. Individual Tribes establish individual priorities.

The Bureau's FY 1998 budget includes a proposed general increase of $46.7 million for TPA. If the increase is appropriated, Tribes can fund a variety of programs including child protection.

Question 2. The Ojibwa Indian School, located on the Turtle Mountain Reservation in North Dakota, is in desperate need of a new permanent facility. There are severe safety deficiencies,

asbestos, and structural problems in the School's three buildings. In fact, the BIA decided in 1994 that these buildings, housing 150 students, had to be evacuated and the students had to be relocated to temporary portable classroom units. However, the School currently is not on the BIA's Education Construction priority list. Even if it were, though, it would be many years before a new school could be built and students could have the opportunity to learn in a safe environment. What actions will the Bureau take to ensure that the severe education construction needs on Indian reservations will be met in a more timely fashion, either through creative financing mechanisms which would use existing construction and repair funding or other proposals?

Answer: The Bureau is very concerned about the safety deficiencies in the Ojibwa and many other Bureau school facilities. Of the total backlog of Bureau facility repairs ($890 million), $682 million is needed for education facilities: $62 million is needed for education quarters; $121 million is needed for non-education facilities; and $25 million is needed for non-education quarters. The new school priority list of 16 schools, approved by Congress in FY 1993, remains frozen until all schools are funded. The Bureau has completed construction of seven new schools. Funding for the construction of the Many Farms High School, requested annually since FY 1996, has yet to be funded by the Congress.

The BIA continues to explore a number of alternatives that may in the future provide viable means to facilitate more construction and repair of high priority BIA ranked projects, as described below.

1) Cost sharing of construction expenses by the Tribes/schools and BIA for repair or replacement of existing facilities.
2) Bonding legislation that would be available to the Tribes and acceptable to OMB, DOI and BIA.
3) Support of the Administration school reconstruction initiative, which proposes $5 billion dollars over four years for nationwide school construction and renovation, with a set-aside provided for Indian schools.
4) Expanded use of the existing portable classroom program to address problem areas such as increased enrollment, programmatic space, and unsafe and unhealthy classrooms.
5) A lease-purchase program has been considered in the past, however, due to the scoring requirements by OMB it was determined infeasible. Legislation and/or policy changes could enhance prospects for this alternative in the future.

The above are some of the alternatives that, if they were appropriately structured and become available, would stretch the BIA construction dollars to cover more projects. Unfortunately, both the Bureau's and the Department's efforts to explore alternative financing options have resulted in the finding that there are not many opportunities, mainly because lease arrangements, loans, and revenue bonds require repayment which is subject to appropriation.

436



In addition, the Bureau's Office of Indian Education Programs and Facilities Management and Construction Center have discussed alternative funding and intend to consult on the matter in the summer consultation meetings with Tribes.

The Administration has requested $5 billion to address facility repair needs for public schools across America with a two percent set-aside for the Department of Interior. This resource combined with the Bureau's education construction budget request will help eliminate the ever-growing backlog of repairs in these schools.

At the present rate of deterioration and with a constrained budget that has not kept up with aging buildings, emphasis will continue to be placed on addressing the most critical deficiencies that exist in a particular building/facility. The liability risks to the federal government are serious and potentially very costly. At the current time, however, the chief way to ensure that there are sufficient and adequate educational facilities in Indian Country is through increased appropriations.

Question 3. The need for correctional facilities in Indian Country far exceeds existing resources. For example, on the Fort Berthold Reservation, there are 3,000 arrests annually, but the jail facility that the Bureau leases only houses 8 inmates. Due to this situation, there essentially is no deterrence to crime on the reservation. I am disappointed that, despite the substantial backlog in construction projects, the FY 1998 budget request contains only $9.1 million to construct a jail in Colorado for a tribe that has been court-ordered to immediately address serious facility problems. Can you explain what steps the Bureau will immediately take to ensure that there are sufficient and adequate correctional facilities in Indian Country?

Answer: The Bureau strongly agrees that the need for correctional facilities far exceeds existing resources and that current facilities are inadequate, overcrowded and outdated. We have sought a coordinated effort by tribal leadership and federal agencies to convince Congress to provide funding necessary to build many more adult and juvenile detention facilities. Despite our effort, Congress eliminated funding for jail construction for fiscal years 1995 and 1996 altogether. Funding provided prior to FY 1995 was grossly insufficient.

The Bureau is aware of and very concerned about the jail facility for the Three Affiliated Tribes, as well as the facilities for other Tribes on the Detention Center Priority List (List). As the Senator points out in the question, the Ute Mountain facility is currently under federal court order to address serious health and safety related facility repairs. The FY 1998 budget is the third year the Bureau has sought funding to construct the Ute Mountain Ute facility, number 5 on the list. The Three Affiliated Tribes jail facility is number 17 on the list. There are facilities ahead of the Three Affiliated Tribes awaiting design completion and construction funding. No funds have been appropriated for law enforcement facility construction since FY 1995.

437

The Bureau cannot make progress on either construction or facility repairs unless Congress appropriates the funds.

Question 4. In December the North Dakota Congressional delegation wrote to Secretary Babbitt and OMB Director Raines to urge the Administration to secure additional resources for the therapeutic model program at the Circle of Nations School in Wahpeton, North Dakota. The FY 1998 budget request contains no such additional dollars.

What steps will the BIA take to allocate existing or new resources to ensure that the special educational, health and psychological needs of the students at the Circle of Nations School are met and to ensure the creation of a viable model for other Indian educational institutions?

Answer: The Bureau is aware of the school's effort to implement a therapeutic model program. In 1993, 1994 and 1995 the Bureau has provided additional funds to the school for purposes of implementing the model. The additional funds provided were above what the ISEP formula generated for the school. Due to current fiscal constraints, the Bureau can no longer provide additional support to the school without negatively affecting other Bureau schools. In an effort to help the school, the Bureau staff will be working with the school to explore several other options such as third party payments for some of the children they accept, outside funding from local, State, Federal and Tribal organizations whose children attend the school and new funding from private foundations. The BIA will do all it can to promote the efforts of the school, including collaboration with Indian Health Service officials, in implementation of the model.

Question 5. Chairman Russell Mason of the Three Affiliated Tribes in North Dakota has contacted me about the negative impact that the FY 1997 funding reductions in Tribal Priority Allocations (TPA) has had on social services, tribal court, and higher education scholarship programs. What is the actual amount allocated to Area Office administration of each of the functions and activities related to the programs listed above? What is the Area office reduction compared to agency and tribal level reductions in each of these programs?

Answer: There are no funds allocated to Area Office administration for each of the functions and activities related to the social services, tribal courts, and higher education scholarship programs. These programs are operated by the Tribe through P.L. 93-638 contracts funded within the Tribal Priority Allocations (TPA) budget activity. The following table illustrates the funds allotted to the programs based on the Tribe's priorities.

| | FY 1995 <u>Approp.</u> | FY 1996 <u>Request</u> | FY 1996 <u>Approp.</u> | FY 1997 <u>Request</u> | FY 1997 <u>Approp.</u> |
|---|---|---|---|---|---|
| Social Services | 349,700 | 358,600 | 345,100 | 500,300 | 350,300 |
| Scholarships | 489,300 | 512,600 | 452,800 | 600,900 | 494,800 |
| Tribal Courts | <u>303,200</u> | <u>311,900</u> | <u>254,300</u> | <u>368,000</u> | <u>275,800</u> |
| Total | 1,142,200 | 1,183,100 | 1,052,200 | 1,469,200 | 1,120,900 |



The modest increase provided in 1997 following the 1996 Conference mark did not bring the overall TPA funding back to the 1995 level, which has exacerbated the Tribe's shortfall in delivery of these program services.

Each program under Area Office Operations received an equitable reduction of approximately 29 percent in FY 1996. For FY 1997 there was a reduction of approximately 1.7 percent. The following is a comparison of the Aberdeen and Bureau-wide Area Office Operations recent funding:

| | FY 1995 <u>Approp.</u> | FY 1996 <u>Request</u> | FY 1996 <u>Approp.</u> | FY 1997 <u>Request</u> | FY 1997 <u>Approp.</u> |
|---|---|---|---|---|---|
| Aberdeen | 5,883,000 | 4,434,000 | 4,586,000 | 3,485,000 | 4,279,000 |
| Bureauwide | 54,617,000 | 54,994,000 | 36,714,000 | 36,562,000 | 38,861,000 |

**SUBMITTED BY: SENATOR MURKOWSKI**

Question 1. As you know, the national funding formula for BIA Roads funding uses the number of miles of existing BIA roads as a criteria to determine how much funding each area will receive. As we know, Alaska doesn't have many miles of rural roads, so we lose out in terms of BIA road funding. Shouldn't the funding formula be reversed to reflect Alaska's greater need?

Answer: It is true that Alaska has very few Bureau system roads; however, under the current national formula for the Bureau road construction program, the Juneau Area Office is permitted to use all the miles identified in their 1990 and 1993 Juneau Area Transportation Plans (JATP) for calculation of the funding distribution formula. This road mileage includes about 400 miles of existing roads and about 1,000 miles of proposed (non-existing) roads. This resulted in a total mileage increase from approximately 80 miles under the old formula to about 1,400 miles and a substantial increase in funding by about $13,000,000 under the current formula. Currently, the Juneau Area Office receives the third highest amount in road construction funds which is about $16,000,000.

The eleven Areas in the contiguous 48 States combined only have 567 miles of proposed (non-existing) roads compared to 1,000 miles of proposed roads for Alaska alone. The funding formula currently recognizes the road mileage for Alaska as identified in the 1990 and 1993 JATP which is the best information available to determine Alaska's road construction funding needs.

Accordingly, the current national formula for the Bureau road construction program

accounts for Alaska's need.

FY 1997 HIGHWAY TRUST FUNDS (HTF) ALLOCATION BY BIA AREA OFFICE

| Area | Population | | HTF Dollars Per Indian | | Area Road Miles | | | | | TOTAL HTF DOLLARS |
|---|---|---|---|---|---|---|---|---|---|---|
| | *Total* | *Rank* | *Total* | *Rank* | *IRR* | *Other* | *BIA* | *Existing* | *Planned* | |
| Aberdeen | 128,412 | 3 | 83 | 8 | 7,688 | 5,882 | 1,806 | 7,656 | 32 | 10,658.00 |
| Albuquerque | 59,598 | 8 | 168 | 3 | 4,282 | 1,175 | 3,108 | 4,219 | 63 | 9,993,00 |
| Anadarko | 45,535 | 11 | 86 | 6 | 1,460 | 1,247 | 213 | 1,455 | 5 | 3,937,00 |
| Billings | 42,427 | 12 | 183 | 2 | 2,801 | 1,068 | 1,733 | 2,791 | 10 | 7,744,00 |
| Eastern | 50,272 | 10 | 55 | 11 | 719 | 236 | 483 | 656 | 63 | 2,754,00 |
| Juneau | 85,259 | 6 | 142 | 4 | 1,442 | 1,382 | 60 | 361 | *1081 | 12,106,00 |
| Minneapolis | 76,883 | 7 | 84 | 7 | 4,593 | 3,502 | 1091 | 4546 | 47 | 6,456,00 |
| Muskogee | 284,740 | 1 | 35 | 12 | 1,220 | 1,220 | 0 | 1,217 | 3 | 9,861,00 |
| Navajo | 225,668 | 2 | 186 | 1 | 9,668 | 3,488 | 6,180 | 9,586 | 82 | 41,971,00 |
| Phoenix | 100,854 | 5 | 130 | 5 | 6,381 | 1,599 | 4,782 | 6,187 | 194 | 13,120,00 |
| Portland | 104,841 | 4 | 70 | 10 | 9,806 | 7,383 | 2,423 | 9,790 | 16 | 7,370,00 |
| Sacramento | 55,717 | 9 | 83 | 9 | 744 | 350 | 394 | 728 | 16 | 4,598,00 |

*Since 1992, Juneau is the only Area authorized to include, in the determination of funding, planned miles of which the required data for inclusion into the road inventory was not verifiable as defined in the Bureau of Indian Affairs Manual #57.

IRR - Indian reservation Roads. All public roads (state, local, BIA) that access or *travel through* a reservation or Alaska village.
Other - All other roads, including private roads.
BIA - BIA System Roads. BIA's responsibility.

Question 2. The Department says Alaska has 226 of the 500 plus tribes in the United States. Yet Alaska receives far less in federal funding than it should. Reports have listed Alaska in last place in every single funding category yet 9 percent of all Native Americans live in Alaska. Is the BIA

438





*considering changing its formulas to treat Alaska more fairly?*

Answer: As a matter of fact, Alaska does not rank in last place in every funding category.

As shown in the attached table which displays TPA base funding by Area, when comparing "dollars per Indian" for the Tribal Priority Allocation (TPA) base funding, Alaska ranks fourth among all 12 Areas. When comparing "dollars per acre" Alaska ranks second.

TPA base programs are those in which funds are distributed on a pro-rata basis among all Tribes. The remaining programs in TPA are those where funding is distributed in accordance with specific criteria. Contract support; welfare assistance; housing improvement; and road maintenance funds are distributed by formula, according to methodologies established for each program. The small and needy Tribes program funds are limited to Tribes with low enrollment and low base funding.

The BIA is not proposing to change its methods for the distribution of funds. There are distribution formulas for some programs, but not all. Distribution of funds for programs such as Welfare Assistance are based on actual need; Housing Improvement Program funds are based on an inventory of housing needs; and Contract Support Funds are based on indirect cost rates as determined by the Inspector Generals office, etc. As far as the formula or needs based type programs are concerned, Alaska tribes are treated the same as other tribes. Other funds, such as the $681 million included in the Tribal Priority Allocations (TPA) activity of the budget, are distributed based on historical funding levels.

Recognizing funding deficiencies, the BIA currently has an ongoing initiative (Small and Needy Tribes) which is designed to direct new funds to tribes which have small enrollments and funding levels. This initiative was first proposed in 1994 by the Joint Tribal/BIA/DOI Task Force on BIA Reorganization. The Task Force identified an approximate need of $23 million to bring all small and needy tribes to a "minimum base" funding level ($160K for tribes in the contiguous 48 states and $200K for the tribes in Alaska). Of the 554 Federally recognized Indian tribes, 309 are considered small and needy, including 209 from the State of Alaska.

Congress included $2 million in the FY 1995 BIA appropriations to begin funding this initiative. The BIA requested $5 million in the FY 1996 budget to continue the support of small and needy tribes. Congress denied this request. The BIA again requested $5 million in the FY 1997 budget and was appropriated $4 million. The President's FY 1998 request includes a request of $4 million.

With the first increment, Alaska tribes received over $1.9 million of the $2.0 million

appropriated. With the $4.0 million appropriated in FY 1997, Alaska tribes received over $1.5 million. Of the $6 million provided for the small and needy tribes, Alaska tribes have received over $3.4 million or almost 57 percent.

| Area | Number of Tribes | Population | Trust Acres | FY 98 PB TPA Base Funding (x1000) | Dollars Per Indian | Dollars Per Acre | Dollars Per Tribe |
|---|---|---|---|---|---|---|---|
| Aberdeen | 16 | 128,412 | 5,997,355 | 52,525.5 | 409.0 | 8.8 | 3,282.8 |
| Albuquerque | 24 | 59,598 | 4,392,358 | 27,616.5 | 463.4 | 6.3 | 1,150.7 |
| Anadarko | 23 | 45,535 | 476,427 | 19,514.3 | 428.6 | 41.0 | 848.4 |
| Billings | 7 | 42,427 | 6,468,477 | 29,782.0 | 702.0 | 4.6 | 4,254.6 |
| Eastern | 27 | 50,272 | 442,584 | 25,186.1 | 501.0 | 56.9 | 932.8 |
| Juneau | 226 | 85,259 | 884,131 | 49,660.0 | 582.5 | 56.2 | 219.7 |
| Minneapolis | 34 | 76,883 | 1,208,384 | 35,712.5 | 464.5 | 29.6 | 1,050.4 |
| Muskogee | 18 | 284,740 | 660,920 | 29,593.9 | 103.9 | 44.8 | 1,644.1 |
| Navajo | 1 | 225,668 | 15,432,171 | 48,993.8 | 217.1 | 3.2 | 48,993.8 |
| Phoenix | 43 | 100,854 | 12,560,571 | 60,376.3 | 598.7 | 4.8 | 1,404.1 |
| Portland | 42 | 104,841 | 4,663,947 | 81,288.1 | 775.3 | 17.4 | 1,935.4 |
| Sacramento | 95 | 55,717 | 446,473 | 22,866.2 | 410.4 | 51.2 | 240.7 |
| TOTAL | 556 | 1,260,206 | 53,633,798 | 483,115.2 | 383.4 | 9.0 | 868.9 |

TPA Base Programs: That portion of the TPA activity in which funds are distributed on a pro-rata basis among all Tribes - about 70 percent of TPA.

The remaining five programs in TPA are those where funding is currently distributed in accordance with specific criteria. Contract support; welfare assistance; housing improvement; and road maintenance funds are distributed by formula, according to the methodologies established for each program. For example, contract support funds are distributed depending on the contracting activity of each Tribe. The Bureau cannot notify the Tribes of the program allocations for these programs until funds are appropriated. Tribal application data are reviewed, and formula rankings are completed. (However, the BIA has been consulting with Indian Country on whether to continue the formula-driven distribution process for these programs.) In addition, the small and needy Tribes program funds are limited to Tribes with low enrollment and low base funding.







Question 3. Please provide my office a breakdown of BIA monies scheduled or projected to go to Alaska Natives in FY 1998. How do these totals differ from BIA monies sent to Alaska in FY 1997 and FY 1996?

Answer:

DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
FY 1998 STATE AND CONGRESSIONAL DISTRICT REPORT
(Dollars in Thousands)

STATE OF: Alaska
CONGRESSIONAL DISTRICT NO.: 00

| APPROPRIATION AND ACTIVITY | ACTUAL FY 1996 | ESTIMATE FY 1997 | ESTIMATE FY 1998 |
|---|---|---|---|
| OPERATION OF INDIAN PROGRAMS | | | |
| Other Recurring Programs | 1,983 | 2,136 | 2,349 |
| Non-Recurring Programs | 3,019 | 3,203 | 3,353 |
| Central Office Operations | 11 | 10 | 111 |
| Area Office Operations | 2,443 | 2,527 | 2,802 |
| Special Programs & Pooled Overhead | 650 | 594 | 578 |
| Tribal Priority Allocations | 66,376 | 67,535 | 75,144 |
| Department of Education Transfer Account | 0 | 0 | 0 |
| TOTAL OPERATION OF INDIAN PROGRAMS | 74,482 | 76,045 | 84,113 |
| MISCELLANEOUS PAYMENTS TO INDIANS | 0 | 0 | 0 |
| CROW CREEK SETTLEMENT | 0 | 0 | 0 |
| PAYMENT TO TRIBAL ECONOMIC RECOVERY FUND | 0 | 0 | 0 |
| INDIAN LOAN GUARANTY AND INSURANCE FUND LIQUIDATING ACCOUNT | 17 | 0 | 0 |
| TECHNICAL ASSISTANCE OF INDIAN ENTERPRISES | 130 | 0 | 0 |
| INDIAN GUARANTEED LOAN PROGRAM ACCOUNT | 55 | 0 | 0 |
| WHITE EARTH SETTLEMENT | 0 | 0 | 0 |
| ALASKA RESUPPLY PROGRAM | 5,507 | 3,300 | 3,500 |
| O&M, INDIAN IRRIGATION SYSTEMS | 6 | 0 | 0 |
| POWER SYSTEMS, INDIAN IRRIGATION PROJECTS | 0 | 0 | 0 |
| OPERATION AND MAINTENANCE OF QUARTERS | 26 | 30 | 30 |
| CLAIMS AND TREATIES | 0 | 0 | 0 |
| CONSTRUCTION | 70 | 75 | 0 |
| GRAND TOTAL | 80,287 | 79,440 | 87,633 |