United States General Accounting Office

GAO

Report to Congressional Requesters

July 1998

# INDIAN PROGRAMS

## Tribal Priority Allocations Do Not Target the Neediest Tribes

**EXHIBIT 28**
In Support of Plaintiff's Opposition to Motion to Dismiss on TPA & IHS
Samish v. U.S., No. 02-1383L

GAO/RCED-98-181

GAO

United States
General Accounting Office
Washington, D.C. 20548

Resources, Community, and
Economic Development Division

B-279789

July 17, 1998

The Honorable Ted Stevens
Chairman, Committee on Appropriations
United States Senate

The Honorable Slade Gorton
Chairman, Subcommittee on Interior
and Related Agencies
Committee on Appropriations
United States Senate

In recent years, media reports have highlighted Indian tribes that have garnered considerable wealth through gaming operations and other businesses. Accordingly, the Senate Committee on Appropriations commented, in its report on the Department of the Interior's (DOI) 1998 appropriation bill, that the tribes with substantial revenues of their own, such as business income, should become more self-sufficient. In the Committee's opinion, the Tribal Priority Allocations (TPA) distributed by the Department's Bureau of Indian Affairs (BIA) should be targeted at the most economically needy tribes. TPA funds are used to provide basic tribal services, such as law enforcement, social services, adult vocational training, child welfare, and natural resources management. TPA made up the largest portion of BIA's direct appropriation in fiscal year 1998, representing 45 percent—or $757 million—of the $1.7 billion total.

Concerned about possible inequities in the distribution of TPA funds, you asked us to report on BIA's method for distributing these funds and on the other (i.e., nongovernmental) revenues available to the tribes. We presented our preliminary results in April 1998, in testimony before the Subcommittee on Interior and Related Agencies, Senate Committee on Appropriations.[1] This report contains our final analyses of (1) BIA's method for distributing TPA funds and (2) additional information that could be useful in distributing TPA funds. We also provide, in appendixes I and II, our per capita analyses of TPA distributions, as requested by your offices. Specifically, appendix I provides a BIA-wide summary, by area office, of TPA distributions per capita; appendix II provides more detailed per capita information.

[1]Indian Issues: BIA's Distribution of Tribal Priority Allocations (GAO/T-RCED-98-168, Apr. 21, 1998).

## Results in Brief

Under the current method for distributing TPA funds, there is no assurance that the funds are effectively targeting the most pressing needs among the tribes. Currently, BIA distributes two-thirds of TPA funds, referred to as "base funds," largely on the basis of historical funding levels. In distributing these base funds, BIA does not take into consideration changing conditions, such as the tribes' levels of need or the tribes' own revenues from nongovernmental sources, such as business income. The remaining one-third of TPA funds, known as "non-base funds," are used for such activities as road maintenance and housing improvement and are generally distributed on the basis of specific program criteria. BIA's distribution of TPA base funds has been widely criticized over the last 20 years for, among other things, not being responsive to changes in the relative needs of the tribes. Furthermore, because the tribes' own revenues are not considered in the distribution of TPA base funds, the tribes with the highest revenues receive TPA base funds just as the tribes with the lowest revenues do. Our analysis showed that each of the 6 tribes with the highest reported revenues received more TPA base funds than did each of 16 tribes with no reported revenues or with losses. In addition, 62 small tribes reported having revenues of their own yet received the same amount of TPA base funds as small tribes that reported no revenues of their own.

A decision about whether and in what way to redistribute TPA funds is as complex as it is controversial. As long as BIA continues to distribute TPA base funds on a historical basis, it cannot be certain that the distribution accommodates the changing needs of the tribes. To determine an equitable distribution among the tribes, several types of data may be considered, such as (1) the economic status of each tribe, (2) the needs of each tribe, and (3) the government's responsibility to each tribe. However, much of this information is not currently or readily available in a consistent and reliable form. Furthermore, questions of equity in federal financial assistance extend beyond BIA and beyond TPA funds. Although TPA was nearly half of BIA's 1998 appropriation, it represented just 10 percent of the $7.5 billion in federal funding appropriated for Indian programs in 1998. Ultimately, however, the issues of how TPA and other federal funds should be distributed and what information should be considered in that process are policy questions for the Congress and other federal decisionmakers to address.

## Background

In the early 1970s, BIA began giving the tribes more training, involvement, and influence in the process of allocating TPA funds.[2] TPA funds are used for programs such as law enforcement, social services, adult vocational training, child welfare, and natural resource management. Most tribes have placed all their available TPA base funding in only 5 or 6 of the more than 30 TPA base fund programs. All federally recognized tribes are eligible to receive TPA funds—either through contracts for operating tribal programs or through BIA-provided programs. As of October 1997, 556 tribes had been recognized by the federal government.

The Joint Tribal/BIA/DOI Advisory Task Force on Bureau of Indian Affairs Reorganization, which was created in 1990 to develop goals and plans for reorganizing BIA to strengthen its administration of Indian programs, recommended that all small tribes—those with service populations of 1,500 or less—be brought up to a minimum level of TPA base funding to allow them the opportunity to develop basic self-governance capability.[3] The task force recommended that the small tribes in the lower 48 states have available at least $160,000 in TPA base funds and that the tribes in the state of Alaska have available $200,000. BIA identified 307 tribes as part of this "small tribes funding initiative" that were below the recommended minimum funding levels. As directed by the Congress, BIA used part of its appropriation for fiscal years 1995, 1997, and 1998 to raise all the small tribes up to $160,000 in available TPA base funding. About two-thirds of the tribes included in the funding initiative are located in Alaska, and, for fiscal year 1999, BIA has requested an additional $3 million to move them closer to the recommended $200,000 funding level.

The Single Audit Act of 1984, as amended, requires reporting by nonfederal entities, including tribes, that meet certain federal assistance thresholds. Before fiscal year 1997, the threshold was the annual receipt of $100,000 or more in federal funds; in fiscal year 1997, the threshold became the annual expenditure of $300,000 or more in federal funds. Entities meeting the threshold must submit an audited financial statement and a schedule of federal financial assistance.

[2]Over the years, BIA has referred to this process as "band analysis," the "Indian Priority System," and "TPA." For consistency throughout this report, we refer to the process as TPA. See Tribal Participation in the Bureau of Indian Affairs Budget System Should Be Increased (GAO/CED-78-62, Feb. 15, 1978) and Indian Programs: Tribal Influence in Formulating Budget Priorities Is Limited (GAO/RCED-91-20, Feb. 7, 1991).

[3]The Tribal Budget System: Preliminary Assessment of Most Needy Small Tribes, Joint Tribal/BIA/DOI Advisory Task Force on Bureau of Indian Affairs Reorganization (Apr. 1994).

## Historical Funding Levels Drive the Distribution of TPA Base Funds

Of the $757 million appropriated for TPA in fiscal year 1998, about $507 million was for base funding, and about $250 million was for non-base funding. BIA distributes TPA base funds primarily on the basis of historical distribution levels. That is, the amount available to a particular tribe is generally the same as last year's amount, without considering tribal needs or the tribes' own revenues. Depending on annual appropriation levels, increases or decreases to a tribe's base fund amount are made on a pro rata basis (e.g., a tribe that receives 0.2 percent of the total TPA base fund amount would receive 0.2 percent of any increase or decrease). In contrast, non-base TPA funds are distributed according to specific program criteria and, in some cases, the income levels of individual tribal members. BIA's distribution of TPA base funds has been criticized over the last 20 years for, among other things, not being responsive to changes in the relative needs of the tribes. Nor has the distribution of TPA base funds been responsive to changes in the relative levels of the tribes' own revenues.[4]

## BIA's Distribution of TPA Funds

The majority of the fiscal year 1998 TPA base funds was distributed on the basis of historical funding levels, as has been the case for decades. The funding process used today has remained essentially the same since the early 1970s, when BIA began allowing the tribes more input into budget decisions and priorities. TPA was created to further Indian self-determination by giving the tribes the opportunity to establish their own priorities and to move funds among programs accordingly, in consultation with BIA. BIA believes that a stable funding base enhances the tribes' ability to plan and budget their funds.

Once a program is categorized as part of the TPA base funds, it loses any need-based identity it once had. Prior to their inclusion in TPA, some programs were funded according to specific program criteria. For example, funds provided under the Johnson O'Malley Act of 1934, as amended, are intended to provide supplementary financial assistance to meet the educational needs of Indian children attending public schools. These funds used to be distributed on the basis of education costs in each state and the number of students eligible for program services. Beginning in 1996, however, Johnson O'Malley funds were transferred into the tribes' TPA base funds, using 1995 data on program costs and eligibility. Because both cost and eligibility may have changed since 1995, and because the

[4]A tribe's "own revenues" refers to all nongovernmental revenues available to a tribe for its discretionary use. That is, these revenues include net profits from business enterprises such as gaming operations, hotels, and restaurants. They also include such things as tribally imposed taxes, interest on investments, rental and lease income, and trust funds. They exclude financial assistance from federal, state, and local governments and from private foundations.

tribes have the authority to move funds in and out of the program, the current distribution may bear little resemblance to the original, formula-driven one.

In contrast to the base funds, the non-base funds—used for such programs as road maintenance, housing improvement, welfare assistance, and contract support—are generally distributed according to specific program criteria that consider, in some cases, individual income. Eligibility for housing improvement funds, for example, is based on whether and to what degree the housing being considered for improvement is substandard, as well as on the applicant's income level. Similarly, eligibility for welfare assistance is based on a determination that an individual's income is insufficient to meet his or her essential needs. In general, the tribes may not shift non-base funds among programs without special authorization.

## BIA's Distribution of TPA Base Funds Has Been Criticized in the Past

BIA's process for allocating base funds, while enhancing the tribes' budget flexibility, has been criticized for, among other things, not being responsive to changes in the relative needs of the tribes. Although the tribes set priorities for their individual programs, no mechanism exists within TPA for identifying the tribes' comparative needs and funding them accordingly. As the relative needs of the tribes have changed over time, no corresponding change has occurred in the distribution of TPA base funds, making the apparent funding discrepancies among the tribes more pronounced.

In 1978, we reported that BIA had been criticized by the Office of Management and Budget, the American Indian Policy Review Commission, and the tribes for its failure to develop a formula to ensure the equitable allocation of TPA funds among the tribes on the basis of need.[5] We reiterate our belief, as stated in our 1978 report, that "accurate, current, and comparable comprehensive tribal needs analyses would provide BIA with a measurement to be considered in developing a formula on which to allocate Bureau [TPA] funds."

In August 1994, the Joint Tribal/BIA/DOI Advisory Task Force on Bureau of Indian Affairs Reorganization—charged with developing plans for the reorganization of BIA—recommended that BIA develop a method for measuring the relative needs of each tribe for each BIA program. The task force envisioned that these standard assessment measures would be a

[5] Tribal Participation in the Bureau of Indian Affairs Budget System Should Be Increased (GAO/CED-78-62, Feb. 15, 1978).

cornerstone of an equitable distribution of TPA funds. At the same time, the task force noted the following:

"Developing a system to measure the relative needs of Tribes with widely varying locations, mix of programs, size, and circumstances will be a monumental undertaking. The development will rely heavily on information which can be gathered only through a Tribal/BIA partnership. Much of this information is not currently available in a consistent and reliable form."[6]

Finally, in 1998, a task force—established pursuant to Interior's 1998 appropriation bill and charged with deciding how to distribute a general increase in 1998 TPA funds—emphasized the importance of BIA's developing a TPA funding allocation method that addressed funding inequities and unmet tribal needs. This task force recommended in its January 1998 report that funds be set aside to create a working group to develop a standard assessment methodology. Accordingly, BIA set aside $250,000 for this purpose. The working group, according to BIA's fiscal year 1999 budget request, will develop a revised TPA allocation model that is based on tribal needs. BIA has requested an additional $250,000 for the working group in fiscal year 1999.

As long as it continues to use a funding distribution method that is relatively static, based largely on the initial division of funds among the tribes that was developed in the early 1970s, BIA has no assurance that its current TPA distribution is most effectively meeting the needs of the tribes. According to Interior officials, there is no clear documentation on how TPA base amounts for each tribe were initially determined. And even if those initial divisions were clearly documented, they may not support a distribution made in the early 1970s as the appropriate distribution today. At least two significant changes have occurred in the last 25 years that affect Indian tribes: The Indian population has more than doubled in size, and the revenues of some tribes have greatly increased since the approval of Indian gaming in 1988. In 1995, net income from Indian gaming operations was about $1.9 billion.[7]

## Tribes' Own Revenues Not a Factor in Distributing TPA Base Funds

Because the tribes' own revenues are not considered in distributing TPA base funds, rich and poor tribes alike receive them. In fact, the tribes in our analysis that reported the highest amounts of their own revenues

[6] Report of the Joint Tribal/BIA/DOI Advisory Task Force on Reorganization of the Bureau of Indian Affairs, BIA (Aug. 1994).

[7] Tax Policy: A Profile of the Indian Gaming Industry (GAO/GGD-97-91, May 5, 1997).