S. HRG. 105–507

# TRIBAL ALLOCATIONS BY BIA FISCAL YEAR 1999

## HEARING

BEFORE THE

## COMMITTEE ON INDIAN AFFAIRS
## UNITED STATES SENATE

ONE HUNDRED FIFTH CONGRESS

SECOND SESSION

ON

TASK FORCE FINDINGS ON PROVIDING A METHOD OF DISTRIBUTING ADDITIONAL TRIBAL PRIORITY ALLOCATIONS FUNDS

FEBRUARY 26, 1998
WASHINGTON, DC

U.S. GOVERNMENT PRINTING OFFICE
46–876 CC WASHINGTON : 1998

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-057105-7

EXHIBIT 29

456

# TRIBAL ALLOCATIONS BY BIA FISCAL YEAR 1999

THURSDAY, FEBRUARY 26, 1998

U.S. SENATE,
COMMITTEE ON INDIAN AFFAIRS,
*Washington, DC.*

The committee met, pursuant to notice, at 11:35 a.m. in room 562, Senate Dirksen Building, Hon. Ben Nighthorse Campbell (chairman of the committee) presiding.

Present: Senators Campbell, Inouye, and Wellstone.

## STATEMENT OF HON. BEN NIGHTHORSE CAMPBELL, U.S. SENATOR FROM COLORADO, CHAIRMAN COMMITTEE ON INDIAN AFFAIRS

The CHAIRMAN. The hearing of the Committee on Indian Affairs will be in session. Good morning, and I apologize for the delay. We have such problem when it comes to the change in plans for the leadership, with a couple of votes pending, as you know, and I had the conflicts. So Senator Inouye, the vice chairman, and I are going to chair this hearing, but we are going to try to move along as quickly as we can because both of us have other business we have to do.

The Fiscal Year 1999 Interior Appropriations Act directed the Secretary of the Interior to form a task force to look at the method used by the BIA in allocating Tribal Priority Allocations [TPA] funds. The task force met a statutory deadline, and agreed to an allocation formula for $23 million in fiscal year 1998 TPA dollars. It also agreed to develop and refine a TPA allocation method that is more equitable and takes into account unmet tribal needs.

The task force encountered problems in determining what criteria are used by the Bureau of Indian Affairs [BIA] in allocating TPA. It also had problems measuring tribal needs and developing a formula that takes into account the many variations which exist in Indian country.

The purpose of this hearing is to receive testimony from Federal and tribal representatives to the task force on their findings and the outcome of their meetings.

Let me say at the beginning that I am not a supporter of what is called "means testing" of Federal funds to Indian tribes. Many of the programs and services provided to Indian tribes fulfill treaty and other commitments that the United States has made to the tribes. It is unacceptable for the Federal Government to plead budget constraints as a way to justify breaking these commitments

OPENING STATEMENT
of
KEVIN GOVER, ASSISTANT SECRETARY - INDIAN AFFAIRS
on
TRIBAL PRIORITY ALLOCATION FUNDING
in the
FY 1999 BUDGET REQUEST FOR THE BUREAU OF INDIAN AFFAIRS
before the
COMMITTEE ON INDIAN AFFAIRS
UNITED STATES SENATE
February 26, 1998

**Introduction**

Good morning, Mr. Chairman and members of the Committee. I am Kevin Gover, Assistant Secretary for Indian Affairs at the Department of the Interior. It is my pleasure to be here today to discuss Tribal Priority Allocation (TPA) funding in the Department of the Interior, Bureau of Indian Affairs (BIA). I want to provide a little background on TPA and bring you up-to-date on the BIA's execution of the FY 1998 Appropriations Act guidance.

**Background on Tribal Priority Allocations**

The evolution of TPA funding is closely linked to the evolution of Indian Self-Determination. TPA exists because of consultation, participation and self-determination on the part of Indian tribes. Before the Indian Reorganization Act of 1934, there was no effort, expectation, or attempt to include Indian people in decisions related to funding Indian programs. Within the Indian Reorganization Act, it states that "The Secretary of the Interior shall advise such tribe or its tribal council of all appropriations estimates or Federal projects for the benefit of the tribe prior to the submission of such estimates to the Bureau of the Budget and the Congress." A small beginning for consultation.

President Nixon, by special message to Congress, called for a policy of Self-Determination, and in 1975, the Congress passed the Indian Self-Determination Act. The Act called for tribal participation in planning the annual BIA budget. From this approach to the involvement of tribes came what were known as "banded" programs, the predecessors to TPA. By the early 1980s, the BIA had refined the budget planning process and changed the name to the Indian Priority System (IPS). In 1992, the BIA Reorganization Task Force recommended the budget planning process be called the Tribal Budget System (TBS).

Under the former IPS, tribes participated in budget planning for the Tribe/Agency portion of the BIA budget. Under the TBS, tribes were given significantly greater opportunity to participate in planning the entire BIA budget with access to considerable additional information. TPA was the subset of funding information that applied to the Tribe/Agency portion of the budget under the Tribal Budget System. The money funded local, ongoing programs of a varied nature and ranged from scholarships



to employment assistance to tribal courts to credit assistance as well as core trust functions for real estate services. TPA does not include Other Recurring Programs for the direct benefit of Indian people or for Indian lands or where a formula determines the distribution of funding. It does not include Non-Recurring Programs where funds are time limited or competitive grant type projects. It does not include funds for Central or Area Offices, or funds for Special Programs and Pooled Overhead where the funding may be spent locally but remains under central control, or where costs are assessed for the whole BIA in a single charge like the GSA rents.

In FY 1993, Congress approved the change to the BIA budget structure and the Tribal Priority Allocations name for the category of funding that covered tribes and agency office costs. It is the category of funding over which tribes exercise the broadest discretionary authority. In 1995, Congress provided the BIA with specific reprogramming authority that allows tribes to shift funds among the TPA categories in accordance with their unique priorities and needs. One hundred percent reprogramming is permitted within TPA. This authority applies whether the programs are under compact, contract, or delivered by the BIA.

What is known as TPA is the Tribe/Agency portion of the BIA budget over which the tribes have been given a considerable amount of authority by Congress. The sums of money referenced as TPA base dollars are the sums that apply specifically to a particular tribe and/or the agency that serves the tribe(s). The TPA base dollars became the amounts they are, as a result of many years of individual decisions related to the circumstances, needs, and support for individual tribes and agencies. There is no unique formula or calculation that resulted in a tribe's TPA base. It was simply the transfer of what was the historic share of a tribe or agency's funding into a category now called the TPA base. TPA is consistently given the number one priority for increased funding by the tribes. This Administration has supported TPA to the point of having TPA protected in the Bipartisan Budget Agreement of August 1997.

**Confusions About TPA Base Dollars**

As with every rule, the TPA base has exceptions. One element of the existing confusion about TPA base dollars, but not an exception to the TPA base definition, is the formula based programs. These include: contract support, general assistance, and road maintenance that have been moved into TPA. This was done at the request of the tribes and by the concurrence of Congress. However, consultations with the tribes have yet to determine a mechanism to move this funding into the tribes' TPA base and these programs are still executed based on a needs formula.

The most significant exception to the TPA base is the Tribe/Agency portion of the budget that exists for Self-Governance tribes. The tribes operating under Self-Governance Compacts may have nearly every portion of their share of BIA funding included within their annual compact funding agreement. Since Self-Governance Compacts are funded as a single line item within TPA, all of their funding, not just the Tribe/Agency share, will be found in TPA. In reviewing one Self-Governance Tribe's compact from the Pacific Northwest, only 40 percent of the funding in the annual compact funding agreement was Tribe/Agency related. For a similar tribe that was not Self-Governance, its TPA base

funding would appear to be significantly less while each tribe could be receiving similar amounts of BIA funding.

The confusion about what is in the TPA base funding and what other sources of BIA funding are provided to tribes has led to questions about the fairness of TPA funding. During the FY 1998 appropriations process, the distribution of the President's requested general increase was debated at some length. A general increase to TPA is the tribe's most favored mechanism to receive additional funding. Given the discretion that a tribe can exercise over TPA funding with complete reprogramming authority, providing funds as a general increase is an efficient and effective way to get funding directly to reservation-based programs where it is most needed. The BIA has always distributed general increases pro rata depending on the size of the TPA base. The tribes have accepted this as equitable and funds have been distributed quickly. Nonetheless, the issue of fairness and whether this approach meets tribal needs became a major concern of certain members of Congress.

### The FY 1998 TPA Task Force

Section 118 of Public Law 105-83, the FY 1998 Interior and Related Agencies Appropriations Act, called for the creation of a task force to allocate remaining funds from the President's requested general increase after providing a minimum funding level of $160,000 for each Federally recognized tribe. The Task Force assembled and met during the first week of January 1998. They held their last meeting on January 29, 1998. The Task Force consisted of two Federal officials and two tribal officials from each of the 12 BIA Areas. The Task Force members were provided copies of the Appropriation Committees' and Subcommittees' bills and reports, and were tasked with addressing the Conference Committee directive "to consider the inequities in current TPA allocations and the disparate economic situations of the tribes."

458

During the first meeting, the Task Force discussed the need to develop a method and criteria for identifying unmet needs in Indian Country. However, there was insufficient time to do so for distributing FY 1998 funds. The Task Force decided to divide the funds equally among Areas for their use in meeting unmet needs within the "people programs," which include: community development, social services, housing, and education. The justification for this option stems from a recommendation within the Joint Tribal/BIA/DOI Task Force 1994 report, which also addresses inflationary increases. The issue of funding inequities and unmet needs could then be addressed by the tribes in each Area during the redistribution and reprioritization of the Area's share. Following the Area meetings, the Task Force would reconvene to review and approve the Area funding plans.

The Task Force members went back to their Areas and the resulting tribally-devised distributions proved to be enlightening. One-third of the Areas distributed funds equally to all tribes. One-third of the Areas developed a formula based on differing mixes of a base level of funding per tribe, a share based on enrolled population, a share based on land acreage, a share based on current level of TPA base funding, and/or a share based on members without work. The remaining Areas provided other ideas as the basis for distributing funds, such as the Tribe's priorities for Navajo, the level of





unmet needs developed in the FY 1999 data base for Aberdeen, and a segment of the TPA base funding applied only to the people programs for Minneapolis. The overall Task Force voted to accept the Area proposals on January 29, 1998.

The Task Force developed justification for the various options which will be provided to this Committee. The Task Force also felt strongly that they needed to make a long-term recommendation beyond simply accomplishing their FY 1998 distribution task. The Task Force held $250,000 of the funds they were to distribute to fund a separate work group. The assignment for this work group is to develop accurate and meaningful data to address funding inequities, unmet Tribal needs and funding shortfalls. More details of this recommendation are also included in the justification document attached.

### FY 1999 Budget Summary

The 1999 budget request for the BIA is $1,844,136,000 in current appropriations, an increase of $142,145,000 above the 1998 enacted level. The budget stresses the resources tribes need to provide basic reservation programs and develop strong and stable governments, ensure accreditation of BIA schools, address critical infrastructure needs, and meet the Secretary's trust responsibilities. The BIA continues to keep administrative costs low.

In FY 1999, the BIA will continue to operate as a highly streamlined and decentralized agency with maximum resources going to Tribal programs. The BIA anticipates that more than half of the FY 1999 operating and construction budget will be spent directly by tribes that elect to operate various BIA programs under self-determination contracts, grants, or self-governance compacts.

### Operation of Indian Programs

For FY 1999, the total request for the Operation of Indian Programs is $1,638,681,000, an increase of $110,093,000 over the FY 1998 enacted level.

### Closing Remarks

TPA provides the principal source of funds for local units of government, most of which are small and lack independent resources to meet the increasing costs of Tribal government operations. Congressional funding levels in 1996 and 1997 caused Tribal governments and the BIA to fall behind in their ability to maintain services to Indian communities and families, necessitating full funding for the FY 1999 request. Tribes depend on the TPA budget activity for basic necessities and services such as law enforcement, child welfare, scholarships, natural resource management, and other programs critical to improving the quality of life and the economic potential of the reservations. Congress has given the tribes the flexibility to prioritize funds among TPA programs according to their unique needs and circumstances. TPA supports the goals of Indian self-determination by providing tribes with the choice of programs provided as well as the means of delivery, either by the tribe or the BIA.

For FY 1999, the TPA activity is funded at $791,210,000, an increase of $33,862,000 over the FY 1998 enacted level, which will help tribes address the unmet needs in these basic programs. Shortfalls in these programs have become particularly serious with the reductions in this activity since 1995. Program increases proposed in this budget submission include $640,000 for New Tribes to support an anticipated four newly acknowledged tribes as they begin to establish viable Tribal government operations.

An increase of $4,015,000 is requested for Contract Support, which, when coupled with the $5 million internal transfer from the Indian Self-Determination Fund, will provide $9,015,000 over the 1998 request level. In FY 1997, the BIA was able to provide only 77 percent of contract support needs, which has resulted in significant concern, anger and hardship among tribes throughout Indian country. An increase of $3 million is proposed for Small and Needy Tribes to support the operation of viable Tribal governments. With the Congressional action during the FY 1998 Appropriations process of funding Small and Needy Tribes with the TPA increase, these funds will go entirely to Alaska to move those Native Alaskans toward the Task Force recommended level of $200,000.

An increase of $5 million is requested for Child Protection and Family Violence Prevention so that Tribes can establish or enhance existing child abuse and neglect prevention, substance abuse prevention (a significant direct cause of the Indian child abuse that exists) and family violence prevention programs. Tribes from across the country voiced deep concern about child abuse at the National Budget Hearing in May 1997. Child abuse and neglect referrals for 1992-1996 average almost 30,000 annually. An increase of $2 million is requested for Welfare Assistance for welfare-to-work programs, and an increase of $2 million is also requested for Adult Care Facilities Rehabilitation which will result in savings to the BIA when these facilities meet the State standards.

This concludes my statement and I would be happy to answer any questions you may have concerning the TPA.

459





United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

APR 16 1998

Honorable Ben Nighthorse Campbell
Chairman, Committee on Indian Affairs
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

It is my pleasure to provide answers to supplemental questions received following the Committee's February 26, 1998, oversight hearing on the Tribal Priority Allocations Request for Fiscal Year 1999 administered by the Department of the Interior's Bureau of Indian Affairs.

Sincerely,

Kevin Gover
Assistant Secretary - Indian Affairs

Enclosure

**Question 1. Can you explain the so-called "historical methods" that the TPA allocation is based on?**

**Answer:** What we have come to know as Tribal Priority Allocations (TPA) is the Tribe/Agency portion of the BIA budget over which the tribes have been given a considerable amount of authority by Congress. The sums of money we refer to as TPA base dollars are the sums that apply specifically to a particular tribe and/or the agency that serves the tribe(s). The TPA base dollars amounts became what they are today because of an accumulation of many years of individual decisions related to the circumstances, needs, and support for individual tribes and agencies. There is no unique formula or calculation that resulted in a tribe's TPA base. It consists of the transfer of the historic share of a tribe or agency's funding into a category called the TPA base.

As with every rule, the TPA base has exceptions. The formula based programs, such as contract support, general assistance, and road maintenance, are exceptions to the TPA base, although the funds were placed under TPA. The funding was moved to TPA at the request of the tribes and by congressional concurrence. However, consultations with the tribes have yet to determine a mechanism to move the funding into tribes' TPA base. All of these formula based programs are still executed based on a needs formula.

The most significant exception to the TPA base is the Tribe/Agency portion of the budget that exists for Self-Governance tribes. These tribes operate under self-governance compacts and may have nearly every portion of their share of BIA funding included within their annual compact funding agreement. Since self-governance compacts are funded as a single line item within TPA, all of their funding, not just the Tribe/Agency share, will be found in TPA. In reviewing one Pacific Northwest Self-Governance tribe's compact, only 40 percent of the funding in the annual compact funding agreement was Tribe/Agency related. For a similar Tribe that was not Self-Governance, its TPA base funding would appear to be significantly less while each tribe could be receiving similar amounts of BIA funding.

In addition to Self-Governance funding, there are other reasons that certain tribes have additions to their TPA base that appear to be inequitable. Tribal specific earmarks were included in some tribes' base allocations when TPA was created. If a tribe received unique funding as the result of legislation, it was elgible for inclusion within a tribe's base. Over time a variety of separate funding lines have been moved into TPA and into the base allocation of the benefitting tribes at the request of the tribes and concurrence of Congress.

The evolution of TPA funding is closely linked to the evolution of Indian Self-

460





Determination. TPA exists because of consultation, participation and self-determination on the part of Indian Tribes. Prior to the Indian Reorganization Act of 1934, there was no effort, expectation, or attempt to include Indian people in decisions related to funding Indian programs. The Indian Reorganization Act says, "The Secretary of the Interior shall advise such tribe or its tribal counsel of all appropriations estimates or Federal projects for the benefit of the tribe prior to the submissions of such estimates to the BIA of the Budget and the Congress." This was the beginning of consultation with tribes on funding.

President Nixon, by special message to Congress, called for a policy of Self-Determination, and in 1975, the Congress passed the Indian Self-Determination Act. The Act calls for tribal participation in planning the annual BIA budget. From this approach of involving tribes, in the budget planning process, came "banded" programs, the predecessors to TPA. By the early 1980s, the BIA had refined the budget planning process and changed the name to the Indian Priority System (IPS). In 1992, the BIA Reorganization Task Force recommended the budget planning process be expanded to include additional program elements for tribal consultation and renamed Tribal Budget System (TBS).

Under IPS, the tribes participated in budget planning for the Tribe/Agency portion of the BIA budget only. Under the TBS, tribes had the opportunity to participate in planning the entire BIA budget and had access to considerable additional information than they had in the past. TPA was the subset of funding information that applied to the Tribe/Agency portion of the budget under the Tribal Budget System. The TPA monies provide funding for local ongoing programs of a varied nature ranging from scholarships to employment assistance to tribal courts to credit assistance. Not included were: Other Recurring programs for the direct benefit of Indian people or for Indian lands, or where formula determined the distribution of funding; Non-Recurring programs where funds were time limited or competitive grant type projects; funds for Central or Area Offices; and funds for Special Programs and Pooled Overhead where the funding may be spent locally but remains under central control, or where costs are assessed for the whole BIA in a single charge like the GSA rents.

In FY 1993, Congress approved the BIA budget structure change and the name of Tribal Priority Allocations for the category of funding that covers tribes and agency office costs. It was, and is, the category of funding over which tribes can exercise the broadest discretionary authority. In 1995, Congress provided the BIA with specific reprogramming authority that allows tribes to shift funds among the TPA categories in accordance with their unique priorities and needs. One hundred percent reprogramming is permitted within the TPA category. This authority applies whether the programs are under compact or contract or delivered by the BIA.

United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

MAR 0 5 1998

IN REPLY REFER TO:
BCCO 2100

Honorable Ben Nighthorse Campbell
Chairman
Committee on Indian Affairs
United States Senate
Washington, D.C. 20510-6450

Dear Mr. Chairman:

Thank you for your letter of January 13, 1998, to the Secretary of the Interior concerning the distribution of funding for Tribal Priority Allocations (TPA) to Tribes. It was difficult to fully respond to all of your questions; however, we have enclosed our response and will continue to provide information in response to your requests from the hearing before your Committee on February 26.

Sincerely,

Hilda A. Manuel
Deputy Commissioner of Indian Affairs

Enclosure

461



Questions Submitted by Chairman Ben Nighthorse Campbell
of the Committee on Indian Affairs, United States Senate

**Question 1:** Please review the history of the United States providing funding to Indian tribes for "basic government services".

**Answer:** The Bureau of Indian Affairs (BIA) is the primary agency of the Federal Government charged with the responsibility to administer Federal Indian policy and to discharge the Federal trust responsibility for American Indian tribes, Alaska native villages and tribal organizations. Federal Indian policy and the trust responsibility are derived from the special legal and political relationship between the tribes and the Federal government.

This unique [legal and political] relationship is rooted in American history. Much of Federal Indian policy evolves around this "special" relationship which is often broadly expressed in terms of legal duties, moral obligations and expectations that have arisen from the historical dealings between tribes and the Federal Government. In the narrowest sense, the special relationship is described as a trust relationship between a Trustee and the Beneficiary. The evolution of the trust doctrine over time is primarily the result of U.S. Supreme Court decisions. The Court's literal references to a "guardian-ward" relationship in several cases has served as the conceptual basis for the existence of the trust relationship doctrine today. While the Supreme Court decisions fell short of defining all the attributes of an enforceable trust responsibility, the U.S. Constitution itself suggests the Nation's implicit decision to place Indian affairs under Federal control. See, e.g., Article I, §2, cl. 3 which expressly delegates to *"the Congress . . . the power...to regulate commerce with foreign nations, and among the several states, and with Indian tribes."*

As a source of Federal power, Congress set the basic framework of Federal Indian policy in enacting the Trade and Intercourse Acts passed between 1790 and 1834. The central policy of the Acts was to subject all interaction between Indians and non-Indians to Federal control. The Acts prohibited non-Indians from acquiring Indian lands, except with the specific approval of Congress. Trading with Indians was made subject to Federal regulation. The underlying objective of this early Federal policy was to protect Indians against incursions by non-Indians, since exploitation of Indians was one of the major causes of fighting and conflict between Indians and non-Indians on the western frontier. In fact, the Secretary of War was established in 1784 with its primary mission to "negotiate treaties with the Indians" and with the armed militia at the disposal of Indian commissioners. Over the next 50 years, laws regulating trade between non-Indians and Indians were added to the books and a network of Indian agents and subagents was established.

When trade restrictions proved ineffective in maintaining peaceful relations between Indians and their neighbors, Federal Indian policy evolved into the systematic forced removal of Indian groups from choice eastern lands to the wilderness west of the Mississippi. The Indian Removal Act of 1830 institutionalized the forced removal of Indians. The most notable removal occurred among the Five Civilized Tribes who were taken from their homes in the southeastern states and marched along the infamous "Trail of Tears" to what is now Oklahoma.

By 1849, with the creation of the Department of the Interior (DOI), the BIA passed from military to civil control, and its primary mission became "civilizing" the Indian people by training them for farming or trades. During this period, the wardship principle developed as those Indians who cooperated were protected and fed, while those who were intractable were "harassed and scourged without intermission". The General Allotment Act of 1887, the intent of which was to assimilate the Indian by giving him individual ownership, institutionalized the continuing efforts to civilize Indians. In the nearly 50 years of the allotment period, Indian land holdings were reduced from more than 136 million acres to less than 50 million acres in 1934 when the policy was completely abandoned.

In response to the Meriam Report, Congress passed the Indian Reorganization Act of 1934. This brought a halt to the allotment policy and created a foundation for tribal self-government. Although tribes were urged to adopt American-style elected democratic governments, in practice the BIA continued to direct and influence tribal affairs to a degree greater than was consistent with notions of self-government.

To expedite assimilation, the Congress shortly thereafter passed several bills terminating the special Federal relationship of Indian tribes with the United States. Twelve termination acts were passed by the Congress between 1954 and 1962, affecting about a dozen tribes and several hundred small bands and groups in Oregon and California. The tragic results forced the Federal Government to abandon termination, to de-emphasize its custodial functions, and to focus greater efforts on the development of both human and natural resources on Indian reservations. In 1970, President Nixon called for self-determination of Indian people without the threat of termination of the trust relationship over Indian lands. Since that date, self-determination has been the basis of Federal-Indian policy.

Today, the BIA provides services directly, or through Self-Determination contract, grant and compact agreements with tribes, to more than 1.2 million American Indians and Alaska Natives in 31 states. The scope of BIA programs is extensive and covers virtually the entire range of state and local government services:

- elementary, secondary and post-secondary education
- social services
- law enforcement
- judicial courts
- business loans
- land and heirship records
- tribal government support
- forestry
- agriculture and range lands development
- water resources
- fish, wildlife and parks
- roads
- housing
- adult and juvenile detention facilities
- irrigation and power systems

More important, BIA's programs are funded and operated in a highly decentralized manner with more than 90% of all appropriations expended at the local level with an increasing amount operated by





tribes and tribal organizations under contracts or self-governance compacts. In addition, the BIA administers more than 43 million acres of tribally-owned land, more than 11 million acres of individually owned land held in trust status and 443,000 acres of Federally-owned land.

The BIA is charged with the primary responsibility for administration of Federal programs for Federally recognized Indian tribes, and for carrying out the trust responsibility emanating from treaties, the U.S. Constitution, laws, court decisions and other agreements with American Indian tribes and Alaska Natives. The BIA has the primary Federal requirement, at law, to serve an identified constituent group.

In the last two centuries, the Congress has passed more Federal laws dealing with Indian tribes and Alaska Natives than any other group of people in the United States. While the Snyder Act, the Indian Self-Determination and Education Assistance Act of 1975 and the Indian Education Amendments of 1978 provide the primary budgetary authorities, numerous statutes, court decisions, treaties and other authorities (including those passed in the early 1800's regulating trade with Indians) continue to guide the BIA's mission and administration. The diversity of these mandates frequently requires the BIA to balance the inherent conflicts and problems created by more than 200 years of shifting and evolving Federal-Indian policy.

The BIA's most basic responsibilities are its trust obligations and facilitating tribal self-determination. However, while the protection of trust resources is a fundamental responsibility, tribal communities struggling to meet the basic needs of their communities must compete for the same limited resources the BIA uses to protect trust resources. The BIA's success relies on judiciously balancing these competing mandates.

The level of BIA funding by year from 1900 to FY 1998 is enclosed.

**Question 2:** Is the current allocation method based on "historical methods dating back to the 1930's" as suggested in the Conference Report? Please describe the criteria and factors used in the development of these "historical methods" noted in the Conference Report.

**Answer:** It is inaccurate to portray that historical methods alone make up the allocations of funds. It is more correct to state that as TPA base dollars for a Tribe were established, the base was the summation of accumulated historical decisions. As Tribes moved some or all of their funding in their TPA bases, it accumulated earmarks and special programs funding as well as the funds for bas services provided within TPA.

The evolution of TPA funding is closely linked to the evolution of Indian Self-Determination. TPA exists because of consultation, participation and self-determination on the part of Indian Tribes. When one goes back in the history of funding for Indian programs before the Indian Reorganization Act of 1934, there was no effort, expectation, or attempt to include Indian people in decisions related to funding Indian programs. In the Indian Reorganization Act, it says "The Secretary of the Interior shall advise such tribe or its tribal counsel of all appropriations estimates or Federal projects for the benefit of the tribe prior to the submissions of such estimates to the Bureau of the Budget and the Congress."

Case 1:02-cv-01383-MMS Document 60-33 Filed 05/02/2007 Page 8 of 10

President Nixon by special message to Congress called for a policy of Self-Determination, and in 1975, the Congress passed the Indian Self-Determination Act. The Act called for tribal participation in planning the annual BIA budget. From this approach of involvement of tribes came "banded" programs, the predecessors to TPA. By the early 1980s, BIA had refined the budget planning process and changed the name to the Indian Priority System (IPS). In 1992, the BIA Reorganization Task Force recommended the budget planning process be called the Tribal Budget System (TBS).

Under IPS, the tribes participated in budget planning for the Tribe/Agency portion of the BIA budget. Under TBS, tribes had the opportunity to participate in planning the entire BIA budget with access to considerable additional information. TPA was the subset of funding information that applied to the Tribe/Agency portion of the budget under the Tribal Budget System. The monies provide funding for local ongoing programs of a varied nature ranging from scholarships to employment assistance to tribal courts to credit assistance. Not included were: Other Recurring programs for the direct benefit of Indian people or for Indian lands, or where formula determined the distribution of funding; Non-Recurring programs where funds were time limited or competitive grant type projects; funds for Central or Area Offices; and funds for Special Programs and Pooled Overhead where the funding may be spent locally but remains under central control, or where costs are assessed for the whole Bureau in a single charge like the GSA rents.

In FY 1993, Congress approved the BIA budget structure change and the name of Tribal Priority Allocations for the category of funding that covers tribes and agency office costs. It was and is the category of funding over which tribes could exercise the broadest discretionary authority. In 1995, Congress provided BIA with specific reprogramming authority that allows tribes to shift funds among the TPA categories in accordance with their unique priorities and needs with one hundred percent reprogramming permitted within TPA. This authority applies whether the programs are under compact or contract or delivered by the BIA.

463

So rather simply what we have come to know as TPA is the Tribe/Agency portion of the BIA budget over which the tribes have been given a considerable amount of authority by Congress. The sums of money we refer to as TPA base dollars are the sums that apply specifically to a particular tribe and/or the agency that serves the tribe(s). The TPA base dollars became the amounts that they are as the accumulation of many years of individual decisions related to the circumstances, needs, and support for individual tribes and agencies. There is no unique formula or calculation that resulted in a tribes' TPA base. It was simply the transfer of what was the historic share of a tribe or agency's funding into a category now called TPA base.

As with every rule, TPA base has exceptions. One element of the confusion, but not an exception to the TPA base definition, is the formula programs such as contract support, general assistance, and road maintenance that have been moved into TPA. This was done at the request of the tribes and concurrence of Congress. However, consultations with the tribes have yet to determine a mechanism to move this funding into tribes' TPA base and these programs are still executed based on needs formula.

The most significant exception to TPA base being the Tribe/Agency portion of the budget exists for Self-Governance tribes. These tribes operating under Self-Governance Compacts may have nearly



every portion of their share of BIA funding included within their compact annual funding agreement. Since Self-Governance Compacts are funded as a single line within TPA, all of their funding, not just the Tribe/Agency share, will be found in TPA. In reviewing one Self-Governance Tribe from the Pacific Northwest, only 40 percent of the funding in the compact annual funding agreement was Tribe/Agency related. For a similar Tribe that was not Self-Governance, its TPA base finding would appear to be significantly less while each tribe could be receiving similar amounts of BIA funding.

**Question 3:** Is "outside" (i.e. non-federal) income used as a factor in making TPA distributions? Is it consistent with the special trust relationship the U.S. has with tribal governments to use other sources of tribal income in determining such allocations?

**Answer:** Tribal sources of income are not used in determining a Tribe's TPA base distribution. The BIA is not authorized to require the presentation of such information and has no way of knowing how much outside income a Tribe has. However, some Bureau programs to individuals are needs-based, such as General Assistance, Housing Improvement Program, and Scholarships.

It could be consistent with the special trust relationship to consider other sources of income in determining TPA distributions. In discussions with several Tribal leaders that have successful Tribal enterprises, they would not object to reductions in their TPA funding provided that such an act does not affect the special trust relationship and the funds go to less fortunate Tribes.

**Question 4:** Tribal trust assets and treaty-protected assets warrant special protection, both as a practical matter and as a matter of federal law. What is the Department's opinion as to how they ought to be treated in the TPA calculation, if at all?

**Answer:** Tribal trust assets and treaty-protected assets should not be considered in the allocation of TPA funds.

**Question 5:** How were unliquidated and/or unexploited assets and resources treated in determining these early allocation methodologies?

**Answer:** Unliquidated and unexploited assets and resources were not considered in any allocations as far as we know.

**Question 6:** What about individual Indian income? For example, what if a tribe was "poor" but individual tribal members were "wealthy"? Should this enter the equation?

**Answer:** Individual Indian programs are available dependent on the individual's needs whether provided by a Tribe or the BIA. Many of the programs within the categories of Human Services and Education are intended for individuals with specific needs. If an individual has sufficient income or wealth, they are not eligible for such programs and, therefore, the tribe may not receive funding for the program.

Alternatively, certain funds that are intended to benefit all Tribal members such as Tribal Government, Public Safety and Justice Law Enforcement, or Road Maintenance, do not exclude individual Indians with wealth from benefits. This is because if the benefits accrue to one, they accrue to all.

**Question 7:** Please describe the variety and nature of services provided by tribes through the TPA mechanism.

**Answer:** A complete listing of TPA programs and a description of the services is included in the BIA Budget Justification (Green Book) for any particular fiscal year. The following is a brief outline and description of programs in TPA:

TRIBAL GOVERNMENT
Community Services, General - technical assistance for contracting
Other Aid to Tribal Government - support tribal government functions
Self Governance Compacts - all compacted programs
New Tribes - assistance for newly recognized Tribes
ISD Fund (New/Expanded Contracts) - contract support for new contracts
Contract Support - direct expenses and overhead for assuming a BIA program
Tribal Courts - support and technical assistance to tribal courts
Small and Needy Tribes - funds for Tribes under 1,500 in enrollment and $160,000 in funding

HUMAN SERVICES
Services to Children, Elderly, & Families - supports social service staff
Indian Child Welfare Act - protects Indian children and prevents family separation
Welfare Assistance - financial assistance to needy families, children and provide institutional care
Child Protection and Family Violence Prevention - protection of Indian children
Housing Improvement Program - improve substandard housing and house homeless

464

EDUCATION
Scholarships - grants based on need for accredited post secondary studies
Adult Education - provides basic education and skills for job placement
TCCC'S Supplement to Grants - grant to TCCCs according to tribal priorities
Johnson-O'Malley Assistance Grants - supports public schools educating Indian children

PUBLIC SAFETY AND JUSTICE
Law Enforcement - supports reservation law enforcement and detention programs
Community Fire Protection - supports fire staff, training and equipment

COMMUNITY DEVELOPMENT
Direct Employment - provides job placement services and counseling
Adult Vocational Training - testing, counseling, guidance on vocational training
Economic Development - assistance in acquiring loans and grants
Road Maintenance - maintain reservation road systems



RESOURCES MANAGEMENT
Natural Resources, General - staff for natural resource programs
Agriculture - technical assistance for farmer and ranchers
Agric. Extension Services - advise on state-of-the-art agriculture techniques
Forestry - protect and enhance forest resources
Water Resources - supports management and development of reservation water resources
Wildlife & Parks - supports tribal needs in fisheries, wildlife and recreation
Minerals and Mining - support mineral and mining activities

TRUST SERVICES
Trust Services, General - staff to protect and conserve trust resources
Other Rights Protection - protect tribal rights under treaty or statute
Real Estate Services - real property management, counseling, and planning services
Real Estate Appraisals - ensure fair market value from real estate transactions
Environmental Quality Services - assistance to comply with environmental and cultural laws
ANILCA Programs - coordinate and consult with other federal and Alaska agencies
ANCSA Historical and Cemetery Sites - certify locations of historic places and cemeteries

**Question 8:** When was the most recent inventory of tribal needs conducted relative to available TPA funds?

**Answer:** During the FY 1999 budget preparation process, the Tribes were asked to request funding for unmet program needs. However, some Tribes did not believe this was a worthwhile exercise and did not participate. Also, there was no standard definition of needs, or types of needs, provided.

**Question 9:** Does the Department conduct an ongoing assessment of tribal needs?

**Answer:** To some extent, in as much as programs are based on individual eligibility for funding such as General Assistance, Housing Improvements, and Scholarships. The Tribal Priority Allocation task force has recommended that BIA with the Tribes establish a standard assessment technique and conduct such assessments. The Bureau intends to follow this recommendation.