**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe, | ) | Case No. 02-1383L |
| Plaintiff, | ) | (Chief Judge Edward J. Damich) |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DECLARATION OF DAVID T. MATHER

I, David T. Mather, do hereby declare:

1. I am a health care consultant. I work primarily with tribes and tribal organizations[1] that are operating health facilities and programs funded through the Indian Health Service (IHS) under the Indian Self Determination Act (ISDA).

2. I obtained my doctorate in public health from the University of California at Berkeley with an emphasis on health economics and the delivery of public health services. I obtained my Masters in public health from the University of North Carolina at Chapel Hill. A true and correct copy of my professional resume is attached to this declaration.

[1] For the purpose of this declaration I will utilize the term "tribe" to refer to both tribes and tribal organizations as defined in the Indian Self-Determination Act, which are those tribes that are recognized by the federal government as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.



87096.1

**EXHIBIT 32**
In Support of Plaintiff's Opposition to Motion to Dismiss on TPA & IHS
Samish v. U.S., No. 02-1383L

3. In my current capacity as a consultant and in my former employment, I have gained extensive personal knowledge of the IHS budgeting and resource allocation practices. This knowledge derives from experiences consulting with tribes from across the nation, including tribes in seven of the 12 IHS Area Offices. In addition, my knowledge stems from my previous employment in which I worked directly for two tribal organizations in Alaska as Chief Financial Officer, Deputy Director and Health Services Director. For example in one of these positions with the Tanana Chiefs Conference, Inc., an Alaskan inter-tribal organization, I was responsible for negotiating annual ISDA contracts with the IHS for health services to over 13,000 Alaska Native beneficiaries living in Interior Alaska.

4. During my professional career as both an employee and a consultant I have provided financial analysis and assisted in the negotiation of over 200 ISDA contract funding agreements. These contacts range in size and scope from agreements to provide limited services to very small tribes of less than 200 members to the largest ISDA funding agreement in the country for the Alaska Native Tribal Health Consortium, an inter-tribal organization, which provides secondary and tertiary health care services to over 130,000 Alaska Natives who are members of 225 tribes.

5. During my professional career, I have also served on several national IHS workgroups devoted to developing funding methodologies to fairly allocate IHS funding to tribes. These workgroup were convened at the request of the IHS Director to recommend formulas which were subsequently adopted by the agency. The workgroups were comprised of representatives of tribes, tribal health care providers, and the IHS. These workgroups included the Contract Support Costs Workgroup, which was first established in 1990 and developed

several IHS circulars that define how Contract Support Costs[2] are distributed; the Joint Allocation Methodology Workgroup on Headquarters Tribal Shares, established in April 1994; and the Tribal/IHS/HHS Workgroup on Centrally Paid Expenses, established in 2000, which reviewed costs paid directly from headquarters for services to all IHS operating units. I have also worked with tribes at both the IHS Area Office and national level to provide technical analysis to tribal representatives recommending IHS funding mechanisms for several other categories of funding. These workgroups recommended to the IHS Director methodologies to allocate funding increases in the contract health program; Indian healthcare improvement fund; diabetes; and tribal share funding for both Headquarters and Area Office tribal shares. Each of these workgroups operated with the understanding that each tribe was entitled to IHS services and funding whether those services were provided by the Tribe under an ISDA contract (in which case contract support funding might be available), or directly from the IHS. In general these tribal recommendations were adopted by the IHS Director without material changes.

6. During my career I have also completed analyses and authored or co-authored reports on the IHS funding process and tribal allocations on Area Office Tribal Shares, Contract Support Costs, Centrally Paid Expenses, and overall funding allocations of the IHS among Area Offices.

7. I am familiar with the facts and background of the issues presented in this case.

[2] Contract Support Costs are statutorily defined in the ISDA in section 106(1)(2) as funds added to an ISDA agreement to support costs not normally incurred by the Secretary in support of the services to be provided by the tribe under contract or are provided from resources not provided to the tribe under the contract.

*Background*

8. The IHS funding from Congress consists of annual appropriations currently in the range of $3.2 billion dollars. This is broken into three appropriation lines. The largest, the "services" appropriation (currently approximately $2.7 billion) is primarily for personnel and public health services. The "facilities" appropriation ($357 million) is primarily a capital investment account for the construction, maintenance and support of health and environmental health facilities, and the "diabetes" appropriation ($150 million) is for tribal and IHS grant programs targeted to diabetes treatment and prevention. The same breakdown in IHS appropriations has been used for appropriations of IHS funds in the past.

9. Congress intends the vast majority of these annual appropriations to be used in local healthcare programs to maintain health services for Indian people. The vast majority of appropriated funds are, and historically have been, disbursed annually to local or regional "operating units" which are composed of the hundreds of IHS or tribal health care programs operated in hospitals, ambulatory clinics, or other facilities located in 35 states.[3] Operating units are normally administrative and budgeting units which include the IHS facilities and programs operated in one geographical area. These operating units may be tribally operated (as the majority are now) or operated with federal employees directly by the IHS. Operating units may serve only one tribe as the Samish operating unit (which was established after confirmation of the Tribe's status as a federally-recognized tribe), or a consortium of tribes, or they may serve an

[3] A much smaller portion of funding may be distributed to the IHS headquarters, and IHS Area Offices to support the administrative infrastructure necessary to develop and operate the health services provided by IHS and or the tribe.

entire IHS Area as the Alaska Native Medical Center and Phoenix Indian Medical Center. A tribe may receive services from one or more operating units in the general geographical area.

10. IHS funding generally maintains previously existing levels of personal health and public health services provided from IHS or tribally operated facilities or through the Contract Health Program[4]. Because IHS funding is for costs such as personnel and facilities costs which continue from year to year, annual allocations of funding to IHS or tribal "operating unit" budgets are predominantly fixed and recur from year to year. This fixed amount of funding is normally referred to as "base" funding. In addition, small amounts of new funding may be added to this base amount for tribal programs or IHS direct budgets each year for inflation, population growth, Congressional earmarks, or by formula[5] for selected operating units.

11. The IHS may also provide a small portion of funding to operating units using "program formulas." These program formula allocations are also normally stable but they may allow small adjustments up or down from year to year based on changes in the objective criteria used in the allocation formula. These program formulas rely on program workload or other rational allocation criteria to allocate funding from these categories of funds. For example the allocation of funding to maintain IHS and tribal facilities is based on the size, condition, age and

---

[4] The Contract Health Program, or Contract Health Services (CHS) is an IHS Program funded by an appropriation sub line item (sub sub activity) that primarily is used by both tribes and IHS to purchase heath care services from the private (non federal) medical care sector in circumstances where a health care service was not available directly from a tribal or IHS-operated facility. Tribes may contract with IHS to operate a CHS program under the authority of the ISDA.

[5] The Indian Health Care Improvement Fund when appropriated is allocated by the Federal Disparity Index (FDI) which relies on a formula based on the amount the agency spends on each tribe eligible for services in the IHS. The FDI is used to determine the current "tribal expenditure" for each tribe in relation to a national benchmark, it is used to appropriate the Indian Health Care Improvement Fund when this fund is appropriated by Congress and as a general measure of adequacy of tribal funding levels for personnel health services (disparity) compared to the costs of a mid range Federal Health Care Plan for federal employees.

use or type of facility. Normally, however, the funding levels from these "program formulas" are also reasonably stable[6] from year to year.

12. The IHS also provides a small amount of funding under grants to address capacity development, specific public health problems or manpower development issues. Grants for these purposes may be awarded competitively or provided non-competitively on a "program formula" basis to tribes or tribal members. The largest category of grant funds supports the Diabetes Program. In this program about $105 million of the total $150 million appropriation is awarded to tribes on a non-competitive basis. These non competitive "program formula" grants are also generally stable with little variation from year to year unless appropriation levels for the programs significantly change. Appropriation levels for these categorical grant programs may result in proportionate changes for this categorical grant funding for all tribes.

***Funding Allocation History***

13. How the IHS defines an operating unit and allocates funding to operating units has changed over time. Before the passage of the Self Determination Act in 1975, the IHS was entirely operated as a federal program. The IHS headquarters received funding and distributed it to Area Offices based primarily on the previous year's base funding. Area Offices in turn distributed the base funding to Service Units which were geographically defined and normally served one[7] larger tribe or several smaller tribes which were located in the geographic area.

[6] The material exception to this would be construction appropriation from the "facilities" appropriation which would be associated directly with a health or environmental health facility to be constructed and will only be provided to complete the construction project. Funding for health facility construction however only affects a very small percentage of IHS operating units in a given year.

[7] In the case of the largest tribes, such as the Cherokee Nation and Navajo Nation, the tribe could be served by more than one service unit.

14. With the passage of the ISDA in 1975 the allocation of IHS resources to tribes became more systematic. Tribes were given specific and detailed rights to obtain a statutorily defined amount of funding from the IHS to operate their own health services. The agency was required to identify the full amount of funds that were being used at the local operating or service unit[8] level to benefit a tribe, and if requested provide part or all of those funds directly to the tribe to operate their own health services. Funding was first determined at the service unit level. Once an allocation was determined for a tribal contract, the tribe was entitled to this "base funding" amount of funds and that base amount of funding could only be reduced in subsequent years for specific reasons stated in the ISDA statute in section 106(a). In addition IHS was required by the ISDA statute to demonstrate that the amount of funds identified and provided for one tribe did not "adversely affect" the health services to other tribes.

15. To implement ISDA contracting activities the IHS modified its resource allocation process to develop the capacity to identify all funds that were expended in support of health services to each tribe. This was required to insure that all IHS funds expended to benefit a tribe were appropriately identified as available to the tribes for ISDA contracting and also to insure that tribes not choosing to contract under the ISDA were not "adversely affected" by tribal contracting. The IHS developed systematic methodologies for allocating IHS funds to determine the "tribal share" or the true amount of funds which were expended on behalf of the IHS health programs and service for each tribe. These methodologies relied on historical utilization of IHS services[9] by a tribe. In cases where multiple tribes shared an IHS service unit and historical

---

[8] The initial statute did not require that IHS funds for Area and Headquarters offices of IHS associated with the tribe's programs be transferred to the tribe as well. Later amendments to the law required that IHS funds from IHS Headquarters and Area Offices also be allocated and available to tribes.

[9] The IHS usually relied on "active user" count as the primary method of determining historical utilization. An "active user" is defined by the IHS as the number of tribal members who have registered to use an IHS or tribal

tribal specific budget data was not available, the IHS relied primarily on the number of "active users" from each tribe to divide the historical funding level among tribes. In some programs other objective criteria or variables were also used in program specific "program formulas" to determine the appropriate proportionate tribal allocation for certain categories of funding. These tribal allocations were used by the agency when a tribe requested a new or expanded ISDA contract, to inform the tribe of what level of funding was available to it under 106(a)(1) of the ISDA.

16. In Area Offices where tribal contracting predominated, such as the California, Alaska and Portland Areas, as ISDA contracting progressed older IHS designated Service Units[10] were often abandoned and replaced with budgetary "operating units" which were aligned with tribal ISDA contracts providing for "base funding" for tribal health programs. In the Portland Area, these operating units became for the most part synonymous with a specific tribe or in some cases served a confederation of tribes. These tribally defined "operating units" each had a recurring base amount which the agency utilized for annual budgeting purposes and each operating unit could expect to receive this base amount each year to continue to provide services.

---

health service in the past three years that report tribal membership and residence in service area of the tribal operating unit (CHSDA or reservation).

[10] In the Portland Area, the Puget Sound Service Unit was dissolved into separate tribal operating units in 1994 due to extensive tribal ISDA contracting in this service unit. The Samish Indian Nation is located within the service area formerly covered by the Puget Sound Service Unit.

*Area and Headquarters Tribal Shares[11] Resource Allocation*

17. In 1988 and 1994 ISDA was amended to clarify that additional resources from Headquarters and the Area Office budgets be directly provided to Tribal health programs. These amendments required the agency to identify all of the administrative resources expended in support of local health care activities from the Headquarters or the Area Office and, provided these services were not required to be carried out by federal employees (and defined as "residual" to the agency), provide these "tribal shares" dollars directly to the tribe, if requested through an ISDA award. These funds are normally referred to as "Area and Headquarters Tribal Shares."

18. The IHS responded to this requirement by developing a tribal share resource allocation methodology(s) which would allocate 100% of these available resources to the recognized tribes served by the IHS. All federally recognized tribes – including both tribes that ran their own IHS-funded programs under an ISDA agreement and those tribes that did not – had a calculated tribal share of these resources although only programs being operated under an ISDA agreement were actually eligible to obtain these funds through the ISDA award.

19. The Headquarters tribal shares in FY2006 totaled approximately 105 million dollars. The formula used to allocate these funds is called the Tribal Size Adjustment Formula. This formula relied primarily on two driving variables, the number of active users from a tribe (for approximately 92% of the total allocation) and a variable factor which measured tribal size which allow smaller tribes to receive a small adjustment factor for relatively higher costs of

[11] For the purpose of this declaration when I refer to funds that are expended or available to be expended on behalf of a tribe, I am referring both to funds that the agency expends through contracts, compacts or grants directly to the tribe as well as all funds which are expended by the IHS or another tribal organization directly or indirectly to provide personnel health, public health, or other IHS program functions services or activities to the tribal members.

providing a unit of care in a smaller tribe. Since 1996, the IHS has maintained a database in Headquarters[12] which has provided for an allocated share of the total Headquarters Tribal Share funds to each recognized tribe regardless of whether the tribe has requested these funds under ISDA or not. In cases where tribes operated programs serving more than one tribe, the Headquarters Tribal Share amount for each tribe was summed to provide the total Headquarters tribal share that was available to the operating unit under an ISDA contract if requested. To prevent adverse impacts to remaining tribes from the distribution of these funds to ISDA tribes and to insure that tribes that contract under the ISDA would still have access to these funds, tribes which received services from a federally operated IHS operating unit also have a share of their allocation of Headquarters tribal share funds calculated even though they did not obtain these funds from Headquarters to support the local budget.

20. Area Offices also developed area tribal share allocation policies which were developed on a similar basis to the Headquarters methodology. Again, each Area Office allocated all available area "tribal share" resources to tribally defined operating units based on common, objective criteria. Although these allocation methodologies have all been developed within each of the 12 area offices and may differ somewhat across area offices, they are applied consistently within area offices and are designed to be inclusive of every tribe and all the Area Office Tribal Share resources across the country. They provide for or reserve a tribal share for each federally recognized tribe.

---

[12] This database has been maintained by Mr. Cliff Wiggins, Special Assistant to the Director of IHS, and is currently being redesigned and will be transferred to the Office of Financial Management in FY2008.

*Other IHS funding methodologies*

21. Other funding methodologies adopted by IHS after 1975 also increasingly relied on tribally defined operating units which provided an allocation for each tribe based on number of tribal users, size of tribe, disease prevalence, etc. Each of these programs which utilize "program formulas" to allocate funding utilize differing objective criteria to allocate new funding to each operating unit and for the most part, each federally recognized tribe will be entitled to a defined allocation. These methodologies included funding for the Diabetes Grant program,[13] for the Indian Health Care Improvement Fund, population growth funds, etc.

***Federal Disparity Index[14] (for allocating Indian Health Care Improvement Fund)***

22. The Indian Health Care Improvement Act, enacted in 1976, calls for "eliminating the deficiencies in health status and resources for all *tribes*." All federally recognized tribes are entitled to these funds. Congress has directed the IHS to report health care deficiencies in resources for all tribes and has from time to time appropriated resources directly to a specific fund, known as the Indian Health Care Improvement Fund (IHCIF) to eliminate deficiencies for the specific tribes with the greatest need.[15] In 1998 through 2000 the IHS, working with Tribal representatives, developed the Federal Disparity Index[16] (FDI) to measure the resource

---

[13] In 2006 about $105 million of $150 million in diabetes funding is allocated to 333 agreements on a non-competitive basis by tribally developed formula tied to tribe size, user population, disease burden and inflation.

[14] The Federal Disparity Index was originally called the Level of Need Funded (LNF) when originally developed. Both names refer to the same index.

[15] In FY03 the IHS distributed 70% of the IHCIF to tribes with FDI scores less than 40% and the remaining 30% of the IHCIF to tribes with FDI scores less than 60%. Congress directed the agency to continue to use this allocation methodology in the FY2005 appropriation for IHCIF.

[16] The FDI was formerly called the Level of Need Funded (LNF).

deficiency for each tribe.[17] This FDI uses an index to compare the level of personal health care services provided to each Indian tribe to the level of health care provided in a mainstream private health insurance plan. This index first calculates a theoretical benchmark of the total cost for personal health services[18] which would be provided to tribal members if they were insured by a mainstream health benefit package. This benchmark relies on the cost of the Federal Employees Health Benefits Plan which is adjusted for several factors specific to the tribal members including age structure, morbidity, location, and regional prices.

23. After the determination of the benchmark for the tribal user, the IHS identifies all the IHS funds currently expended for personal health services for each tribe. These resources may be provided at one or more operating units. This provides a tribal allocation of IHS funding for the Tribe as it includes the total budget allowance for an operating unit plus a portion of area wide and IHS wide funds provided in support of these services. IHS funds provided in support of wrap around or public health and preventative services are not included in this amount. The funding level for each tribe is then expressed as a percent of the need for each tribal user to reach the computed benchmark. This is called the Federal Disparity Index or FDI. (Available $/needed $ = FDI %). This index is used for determination of how the Indian Health Care Improvement fund is distributed when appropriations are received from Congress for this purpose.

---

[17] In some cases where several smaller tribes were served by a single consortium a single FDI was developed for the consortium.

[18] The FDI index measures only personal health services and does not include wrap around public health, preventative and environmental services. It also only measures the deficiency for tribal members that currently access IHS or tribal health services and does not include services needed for tribal members that never access this system due to distance or other barriers.

***Summary of IHS funding allocations***

24. While the mechanisms for funding various IHS activities are complex, certain principles are clear. First, the broad Congressional mandate for IHS is, and has been, to provide health care to members of every federally recognized tribe. Second, consistent with that objective the IHS has in fact since 1975, to the best of my knowledge, expended money to benefit every federally recognized tribe. Third, the IHS is required to inform any tribe that seeks a Self Determination Act contract to run an IHS program of the amount of program funds that IHS has been using to benefit that tribe. Fourth, IHS has the capacity to determine the amount of program funds that it is using to benefit each federally recognized tribe – whether the Tribe enters a Self Determination Act contract or not, and has been able to make such determinations for the IHS programs operated at the local operating or service unit level since the late 1970s. Fifth, in addition to program funds, IHS has determined the "Headquarters and Area Office tribal shares" – that is, the administrative support resources provided by the IHS Headquarters and Area Offices – for every federally recognized tribe. Sixth, for purposes of allocating resources appropriated by Congress with the Indian Health Care Improvement Fund, IHS has calculated since at least 1999, the health deficiency of each federally recognized tribe, using Level of Need or a Federal Disparity Index. Seventh, IHS' longstanding practice has been to allocate IHS funding – through the mechanisms described here and others – to benefit each federally recognized Tribe. Eighth, the amounts allocated to each federally recognized tribe have been or can be ascertained by IHS. Ninth, Congress is aware of the fact that IHS allocates funds to every federally recognized tribe, and it appropriates funds with that understanding.

***Impacts of Wrongful Denial of Recognition on Tribal Funding***

25. In my experience, lack of federal recognition meant that the Samish Indian Nation was excluded from IHS funding allocations until its federal recognition was restored. Lack of federal recognition also denied the Tribe access to other IHS resources, like direct grant funding from the IHS tribal grant management funding program. This is a long standing grant program utilized by many small tribes for health planning and evaluation and to invest in improved health management information technology infrastructure. This lack of planning and investment in health management structure and information technology will have continuing impacts on the ability of a tribe to identify and collect or utilize third party revenue from tribal members; to achieve the most efficient purchase price in contract care programs; and, to develop new health programs which are responsive to tribal needs.

I declare under penalty of perjury of the laws of the United States, that the foregoing is true and correct.

Executed on the 19th day of April, 2007

David T. Mather

David T. Mather

# RESUME

**David Trigg Mather**
1569 Northfield Rd.
Fairbanks, AK 99709
907-455-6380 (home) 907-455-6942 (work)
907-455-7391(fax) dmather@alaska.com

## EDUCATION:

**University of California,** Berkeley, CA
Doctor of Public Health, December 1990
School of Public Health
Department of Health Policy and Administration
Qualified for Doctorate of Public Health "with distinction"

**University of North Carolina,** Chapel Hill, N. C.
Masters of Science in Public Health, May 1977
School of Public Health
Department of Health Administration

**Duke University,** Durham, N. C.
Bachelor of Arts, May 1973
Majors: Chemistry
Anthropology

## PROFESSIONAL EXPERIENCE:

**Consultant,** President of Mather and Associates, consulting firm to health and human service organizations concentrating on evaluation and quality assurance, strategic planning, capital project development, training and human resource development and facilitation for effective decision making. Recent projects include:

***Alaska Department of Health and Social Services***, Juneau, AK
Uniform Client Identifier Feasibility Study
Alaska Child Health Plan (3-volume plan)
Long-term Care Needs Assessment of the Yukon-Kuskokwim Region
Healthy Kids/EPSDT Program Evaluation and Plan
Public Health Nursing Capacity Workload Study
Division of Mental Health and Developmental Disabilities Planning Facilitation

***Alaska Native Health Board***, Anchorage, AK
ANMC/Area Regional Support Center -Contract Development, Project Consultant
Management Review of the Alaska Native Health Service Area Office
Project Planning for the Alaska Native Medical Center P.L. 93-638

***Alaska Tribal Health Compact (13 tribal Health Corporations)***
Planning and Consultation Support for the Alaska Tribal Health Compact

***Alaska Native Tribal Health Consortium,*** Anchorage, AK
Business Plan for Capital Development
Numerous on-going projects on financial management budget development issues

***Tanana Chiefs Conference Inc.***, Fairbanks, AK
Project Director for the Development of Adolescent Alcohol Treatment Center
Lead Negotiator/Project Coordinator for the Development of the Chief Andrew Isaac Health Center Replacement Project

Review of Health Services in McGrath Sub-region and strategic plan for improvement
***Numerous on going projects on financial management and budget process development***

***Fairbanks Memorial Hospital***, Fairbanks, AK
Facilitator for long term planning for Community Mental Health Service Development
Facilitator for Community Action Plan for Chronic Public Inebriates

***Arctic Slope Native Association***, Barrow, AK
Development and Training of Board of Directors
Development of Proposal for Bureau of Indian Affairs Services in NSB
Feasibility Study for Contract for the US Public Health Service Hospital in Barrow
Hospital Contract Development and Lead Negotiator

***Kodiak Area Native Association***, Kodiak, AK
Provide Feasibility Analysis, Functional Space Planning and Financial Consultation for Construction of 20,000 square foot Ambulatory Care Center

***Yukon Kuskokwim Health Corporation***, Bethel, AK
Strategic Planning for Community Health Services
Capital Planning Assistance for 54,000 square foot Administrative and Community Health Services Center

***Southeast Alaska Regional Health Consortium***, Juneau and Sitka, AK
Financial Consulting, Management Consulting of misc. projects

***Bethel Community Services***, Bethel, AK
Development of Strategic Plan for Board of Directors

***Maniilaq Association***, Kotzebue, AK
Financial Analysis of Nursing Home Operation

***Bristol Bay Native Association***, Dillingham, AK
Capital Project Assistance for Planning, Financing and Construction of 12,000 square foot Administrative Center
Feasibility study for Assisted Living Facilities in the BBAHC region

***Kawerak***, Nome, AK
Capital Project Assistance for Planning, Financing and Acquisition of 13,000 square foot Administrative Center

***Norton Sound Health Corporation***, Nome, AK
Strategic Planning and Board Training for Self-Governance
Resource Allocation Feasibility Study

***Eastern Band of Cherokee, Cherokee***, NC
Planning and development to Assume Cherokee Hospital under PL 93-638

***Cherokee Nation of Oklahoma***, Tahlequah, OK
Business Plan for the Strategic Health Plan for the Cherokee Nation

***Tuba City Regional Health Care Corporation***, Tuba City, AZ
Planning and development and proposal development to assume Tuba Indian Medical Center under PL 93-638.

*National Indian Health Board,* Denver, CO
Study of Indian Determination in Health Care Management

*National Congress of Indians,* Washington. D.C.
Study of the Impact on Contract Support Costs on Self Determination Contracting

**Director of Finance and Administration,** (7/88 - 9/91). Tanana Chiefs Conference Inc., 201 1st Avenue, Fairbanks, Alaska. The Tanana Chiefs Conference Inc., is a human services organization providing health, social services, and general governmental services to 44 native villages in the interior of Alaska. Annual revenues of approximately 40 million dollars from over 60 State and Federal grants and contracts and direct third party billings for health services.

**Doctoral Program,** (9/86 - 7/88). Doctoral student at the School of Public Health at the University of California at Berkeley. Research interests include: impacts of HMO and PPO competition on hospital costs; effects of DRGs on the quality of hospital care; the effects of the dramatic increase in uncompensated care on public and private health care institutions; and differences in behavior between for-profit and non-profit organizations in the hospital and nursing home industry. In addition, consultant to clients in Alaska including the Aleutian Pribilof Island Association, the Tanana Chiefs Conference Inc., and others.

**Director, Health Services Department,** (4/81 - 8/86). Tanana Chiefs Conference, Inc., 201 First Ave., Fairbanks, Alaska. Duties included the responsibility for the direction and management of a small, managed care health system with a budget of over 20 million dollars and 150 employees.

**Director, Division of Regional Health Development,** (3/79 - 4/81). Tanana Chiefs Conference Inc., Duties included: directing the planning and evaluation of program activities of the TCC Health Department, assisting with the preparation and negotiation of funding proposals, budget management and community health development.

**Acting Deputy Director,** (3/78 - 2/79). Bristol Bay Area Health Corporation, Box 10235, Dillingham, Alaska. Duties included: supervision and support of 25 central office employees, recruiting and hiring personnel, developing administrative policies and procedures, and coordinating the activities of the Corporation with other regional health care organizations.

**Program Planner,** (10/7 - 3/78). Bristol Bay Area Health Corporation. Duties included: preparation, submission and negotiation of all grants and contracts for the organization; project coordination for the implementation of a mid-level practitioner project funded under the National Health Service Corps; traveling to 32 villages of the region to assist village governments on such health related projects as health clinic construction; and coordination of planning and construction of village sanitation facilities.

**Consultant,** (5/77 - 10/77). Wiggins and Rimer, Consulting Engineers, Durham, NC. Duties included: sampling protocol development, survey bias testing, and compiling a 32 volume survey of municipal drinking water systems in North Carolina.

ACTIVITIES AND AWARDS:

*2001:* **IHS National Council Of Executive Officers, Superior Contributions and Outstanding Leadership on IHS Workgroup on Centrally Paid Expenses,** *Indian Health Service, National Council of Executive Officers, May, 2001*

*1996*: **Secretary's Award for Distinguished Service,** Department of Health and Human Services, Rockville, Maryland.

*1994:* **Governor's Transition Team for Human Services,** Chair for Health Services Subcommittee, Juneau, Alaska.

*1990 - 1992*: **Member of Health Resources and Access Task Force of the Alaska State Legislature,** Juneau, Alaska.

*1988 - 1991*: **Commissioner on the City of Fairbanks Health and Social Services Commission,** Fairbanks, Alaska.

*1988 - 1991*: **Association of Regional Finance Directors; President,** 1990 through 1991.

*1988*: **Grossman Fellowship** - University of California at Berkeley.

*1987, 1988*: **Wellness Fellowship** - University of California at Berkeley.

*1985*: **Mayors Transition Team,** Fairbanks North Star Borough, Fairbanks, Alaska.

*1981 - 1986*: **Association of Regional Health Directors; President,** 1983 through 1985.

*1984 - 1986*: **Instructor, Rural Health Systems Class,** WAMI Medical Program, University of Alaska-Fairbanks.

*1981 - 1985*: **Board of Directors,** Fairbanks Youth Services, Fairbanks, Alaska.

*1983 - 1985:* **Local Operating Board,** Fairbanks Memorial Hospital, ex-officio member, Fairbanks, Alaska.

**RELEVANT EXPERIENCE AND PROFESSIONAL QUALIFICATIONS**

*David Mather, Dr. P. H.* – Dr. Mather has worked extensively in nonprofit health and human service organizations and small rural hospitals for the past 25 years. He is founder of Mather and Associates, a management consulting firm providing strategic planning, project planning and management, and financial analysis and services for governmental and non profit and tribal health service organizations. Dr. Mather has held executive level positions in the Tanana Chiefs Conference, Inc., both as Chief Financial Officer and as Health Director, and as Deputy Director of the Bristol Bay Area Health Corporation. Dr. Mather holds degrees from Duke University, the University of North Carolina at Chapel Hill and a doctorate from the University of California at Berkeley School of Public Health with a focus on organizational behavior and health financing issues.

Dr. Mather has consulted extensively with a wide range tribal health organizations operating rural hospitals and ambulatory care networks. His clients include the: Eastern Band of Cherokee, Cherokee Tribe, Tuba City Health Care Corporation, Alaska Tribal Health Consortium (ANMC), Southeast Alaska Regional Health Consortium (Mt. Edgecumbe), Bristol Bay Regional Health Corporation (Kanakanak), Yukon Kuskokwim Health Corporation (YK Delta Hospital) , Maniilaq (Maniilaq Medical Center)., Arctic Slope Native Association (Samuel Simmeons Memorial), Ltd., Norton Sound Health Corporation (Nome), Tuba City Regional Medical Center, and with the Indian Health Service at both national and area office level.

He has also consulted with clients on several national projects involving evaluation and development of Indian Health Care Services including the Indian Health Service, National Indian Health Board, National Congress of American Indians, and Navajo Health Systems Corporation.