# INDIAN HEALTH AMENDMENTS OF 1992

*P.L. 102-573, see page 106 Stat. 4526*

DATES OF CONSIDERATION AND PASSAGE

*Senate: September 18, October 7, 1992*
*House: September 15, October 2, 3, 1992*

Cong. Record Vol. 138 (1992)

Senate Report (Indian Affairs Committee) No. 102-392,
Aug. 27, 1992
[To accompany S. 2481]

House Report (Interior and Insular Affairs Committee)
No. 102-643(I), July 1, 1992
[To accompany H.R. 3724]

House Report (Energy and Commerce Committee)
No. 102-643(II), July 28, 1992
[To accompany H.R. 3724]

*The Senate bill was passed in lieu of the House bill. The Senate Report (this page) is set out below, and the President's Signing Statement (page 4038) follows.*

## SENATE REPORT NO. 102-392

[page 1]

The Select Committee on Indian Affairs, to which was referred the bill (S. 2481) having considered the same, reports favorably thereon with an amendment and recommends that the bill as amended do pass.

### PURPOSE

The purpose of S. 2481 is to reauthorize the Indian Health Care Improvement Act. The Indian Health Care Improvement Act defines, in terms of authorizations, the programmatic structure for the Indian Health Service. S. 2481 would seek to stabilize the programs authorized by the Indian Health Care Improvement Act through the year 2000, in the same manner as the reauthorization initiatives for the National Health Service Corps and Maternal/Child Health Block Grant. Specific health care objectives set forth in S. 2481 are drawn from the Surgeon General's "Healthy People 2000 Report" of the Department of Health and Human Services which set national health promotion and disease prevention objectives. The reauthorization would set more stringent standards by which to measure progress toward the goal of raising the health status of American Indians and Alaska Natives to the highest possible level.



EXHIBIT 40
In Support of Plaintiff's Opposition to
Motion to Dismiss on TPA & IHS
Samish v. U.S., No. 02-1383L

[page 2]

## BACKGROUND

The United States' responsibility to Indian tribal governments and their members for the provision of health care was established in numerous treaties with Indian tribes in which the United States agreed to provide such services. For example, in Article 2 of the 1854 Treaty with the Rogue River Indians (10 Stat. 1119), the United States agreed that "* * * provision shall be made * * * for a hospital, medicines, and a physician." The responsibility has been further delineated and defined by numerous status and administrative regulations. Based upon the Constitution, historical development, treaties, and statutes, the United States has assumed a legal and moral obligation to provide adequate health care and services to Indian tribes and their members.

The Federal government has provided health care services to American Indians since the 19th century. As early as 1802, U.S. Army doctors worked to cure smallpox outbreaks among the Indians living near military posts. In 1849, the responsibility for providing health care shifted from the military to civilian authority, when the Bureau of Indian Affairs was transferred from the War Department to the Department of Interior.

With the enactment of the Snyder Act (25 U.S.C. 13) in 1921, formal authorization for Indian health appropriations became public law. The Snyder Act authorized the Bureau of Indian Affairs to provide certain services, including those for "relief of distress and conservation of health." Under this general authority, Indian health programs were administered by the Department of Interior until 1955, when they were transferred to the Division of Indian Health (now the Indian Health Service) in the Department of Health, Education and Welfare (now the U.S. Department of Health and Human Services), pursuant to the Transfer Act (42 U.S.C. 2001).

In response to documented deficiencies in the health status of American Indians and Alaska Natives, the Congress, in 1976, enacted the Indian Health Care Improvement Act (P.L. 94-437). This legislation authorized additional funds for Indian health care, in part to reduce unmet needs under existing programs, and in part to establish new program efforts, such as manpower training and urban health clinics. A major purpose of the 1976 Act was to raise the health status of American Indians and Alaska Natives over a seven year period, ending in fiscal year 1984, to a level comparable to that of the general population. Since the 1976 Act provided only a three-year authorization, the Congress, in 1980, revised and extended the legislation through September 30, 1984 (P.L. 96-537). The Act was again revised and extended in 1988 (P.L. 100-713).

In the concluding days of the 101st Congress, three major health bills which amend the Indian Health Care Improvement Act were enacted into law (P.L. 101-630). These amendments provide statutory authorization for a comprehensive and community based mental health program, authorization for demonstration of innovative health care delivery systems and expansion of the urban Indian health programs. Unfortunately the funding to implement these new programs authorized under P.L. 100-713 and P.L. 101-630, in

[page 3]

the amount of $55 million, has not been proposed in the fiscal year 1993 President's budget request for the IHS.

HEALTH STATUS OF AMERICAN INDIANS AND ALASKA NATIVES

The Federal government has a unique historical and legal relationship with the Indian people, whose health status is substantially inferior to that of the general U.S. population. There are approximately 1.6 million American Indians and Alaska Natives, of whom about one third live on reservations or historic trust lands, and about half live in urban areas. The Indian population is diverse, encompassing over 550 tribal governments and Alaska Native villages, each with its own traditions and cultural heritage.

When the Indian Health Care Improvement Act was first enacted in 1976, the overall goal was to improve the health status of Indians. While the health status of the Indian people has improved since 1976, it remains inferior to that of the U.S. population as a whole, as documented by the Office of Technology Assessment in "Indian Health Care" (1986).

According to the Indian Health Service, the mortality rates of American Indians and Alaska Natives continue to exceed that of the U.S. All Races group. For example, in 1987, the Indian age-adjusted mortality rates for the following causes exceeded those for the U.S. All races population by the following percentages:

| | Percent |
|---|---|
| Tuberculosis | 400 |
| Alcoholism | 332 |
| Diabetes mellitus | 139 |
| Accidents | 139 |
| Homicide | 64 |
| Pneumonia and influenza | 44 |
| Suicide | 28 |

In 1990 the Department of Health and Human Services issued "Healthy People 2000," a statement of health promotion and disease prevention objectives for the nation for the coming decade. The Department notes that, relative to other populations, the American Indian and Alaska Native population is young and impoverished, with more than 1 in 4 living below the poverty level. The Department goes on to explain: "One reason for the youthfulness of the population is the large proportion of the population who die before age 45. Most of the excess deaths—those that would not have occurred if American Indian death rates were comparable to those of the total population—can be traced to 6 causes: unintentional injuries, cirrhosis, homicide, suicide, pneumonia, and complications of diabetes." The Department's 1991 report, "Health Status of Minorities and Low-Income Groups: Third Edition," documents the higher death rates and shorter life expectancies of American Indians and Alaska Natives vis-a-vis the U.S. Caucasian population.

A March 1992 report entitled "The State of Native American Youth Health", drawn from a survey of 14,000 Indian youth, reported that suicide has emerged as a way for native youth to deal with emotional distress and hopelessness that is characteristic of many of their lives. The University of Minnesota report further found that regular use of tobacco and heavy use of substances, par-

ticularly, alcohol and marijuana, is linked to every single risk behavior found in the survey. In addition, the survey found that 20 percent of the youth felt their health is only fair to poor.

The Indian Health Care Improvement Act is administered by the Indian Health Service (IHS) within the Public Health Service of the Department of Health and Human Services. The IHS considers itself responsible for providing care to "approximately one and one half million" American Indians and Alaska Natives living on or near reservations in 33 States. In FY 1992, appropriations to the IHS totalled $1,701,017,000. This included $1,426,666,000 for health services (both direct and contract care) and $274,351,000 for health facilities construction. The President's budget for fiscal year 1993 proposes a total of $1,651,452,000 for the IHS in budget authority, a decrease of $49.5 million or 3 percent under the fiscal year 1992 budget in actual budget authority.

The IHS delivers health care to eligible Indians through three different mechanisms. It does so directly through its own facilities, including (as of January 25, 1992) 42 hospitals, 65 health centers, 4 school health centers, and 52 smaller health stations. The tribal health delivery system administered by tribal governments and tribal groups through contracts with IHS operates 8 hospitals, 93 health centers, 3 school health centers, 63 smaller health stations and satellite clinics, and 173 Alaska village clinics. In addition, the IHS funds 34 urban Indian organizations operating programs in 41 sites to deliver outpatient health and referral services to urban Indians. Where services are not offered directly through IHS or tribal facilities, limited funds are available in each area for the purchase of care on a contract basis from non-federal, non-tribal hospitals, clinics physicians and dentists.

The Committee recognizes that the task of improving the health status of American Indians and Alaska Natives, begun with enactment of the Indian Health Care Improvement Act in 1976, is not yet complete. The Department's "Healthy People 2000" sets forth 85 health status objectives for the U.S. population generally, including 31 targeted specifically at American Indians and Alaska Natives. The Committee Amendment would revise and reauthorize the Indian Health Care Improvement Act through FY 2000 to enable the IHS and the tribal governments to achieve both the targeted and some non-targeted objectives over the next 8 years.

## Legislative History

S. 2481 was introduced on March 25, 1992 by Chairman Inouye for himself, Vice-Chairman McCain, Senators Daschle, Domenici, Burdick, Murkowski, Simon, Cochran, Stevens, Akaka, DeConcini, Kassebaum, Wellstone, Reid, and Kennedy, and was referred to the Select Committee on Indian Affairs. The first hearing on S. 2481 was held in Washington, D.C. on April 1, 1992. Four field hearings were held in: Lower Brule, South Dakota (April 16, 1992); Anchorage, Alaska (May 23, 1992); Bethel, Alaska (May 24, 1992), and Phoenix, Arizona (May 29, 1992). The House companion bill, H.R. 3724, has been the subject of two Washington D.C. hearings and one field hearing in North Dakota. The House Energy and Commerce Committee's Subcommittee on Health and Environment re-

ported H.R. 3724 to full committee on March 25th, 1992 and the bill was considered for report in full Committee on April 7, 1992. The House Interior and Insular Affairs Committee favorably reported on H.R. 3725 on April 29, 1992. (H. Rept. 102-643).

### SUMMARY OF MAJOR PROVISIONS OF THE EXISTING ACT

Title I of the IHCIA was designed to accomplish two related goals: (1) to increase the number of Indians trained in the health professions and (2) to provide a larger pool of health professionals to serve Indian people. To accomplish these goals, the title establishes several programs: (a) a recruitment program to encourage young Indians to pursue medical careers; (b) a preparatory scholarship program to assist Indian students to orient toward a medical career; (c) a scholarship program to support Indian students in graduate schools of medicine; (d) an extern program to provide summer experience in IHS for Indian medical students; and (e) a program for continuing education of IHS personnel among others. A special nursing program and incentives for health professionals are also included.

Title II of the IHCIA is a congressional mandate to IHS to begin an incremental program to raise the health status of Indians to a level equal to the rest of the Nation. Health services includes direct and indirect patient care, dental care, mental health, alcoholism treatment, and maintenance and repair. A Catastrophic Health Emergency Fund; a Diabetes Prevention, Treatment and Control Program; and a Mental Health Program are also included in the Act.

Title III of the IHCIA pertains to the construction of health facilities, including hospitals, clinics, and health stations including necessary staff quarters, and to the construction of sanitation facilities for Indian communities and homes.

Title IV of the Act relates to the collection and use of Medicare/Medicaid reimbursements by the Indian Health Service. The Act establishes a program of grants and contracts with tribal organizations to assist eligible Indians in obtaining Medicare or Medicaid benefits.

Title V of the Act, as amended by the 1980 amendments, authorizes grants to urban Indian organizations to provide outreach and referral services to Indians in urban and other areas.

Title VI provides for organizational improvements in the Indian Health Service.

Title VII requires the Secretary to report to the Congress on the status of Indian health and also provides for Miscellaneous programs including eligibility provisions for California Indians.

### SUMMARY OF MAJOR PROVISIONS OF S. 2481

#### DECLARARTION OF HEALTH OBJECTIVES

The Committee Amendment amends section 2 to include an additional finding regarding the unmet needs of tribal programs operating under Indian Self-Determination contracts and notes that these Public Law 93-638 contract resources are varied, yet should be provided in a fashion which allows for maximum flexibility for

tribal governments in carrying out health programs to address their respective local needs.

The Committee Amendment reinstates the declaration of policy language to underscore the fundamental legal obligation of the United States government to raise the health status of American Indians and Alaska Natives, including urban Indians, to the highest possible level, and to provide the necessary resources to carry out this policy. The policy further provides that the Indian health Service, including tribal health care programs, is responsible for providing comprehensive health care delivery at all developmental stages of life and must assure access to the same fundamental health care benefits for all eligible Indian patients. In an effort to better implement this policy, the Committee included in the amendment 69 health status objectives. These objectives serve two goals: (1) they provide a measuring device for comparing the current health status of Native Americans to their health status and the health status of other Americans in the year 2000, and (2) beginning three years from the date of enactment of the Act, the health status objectives will serve as a resource driving mechanism for the Indian Health Care Improvement Fund and other resource allocation methods.

The health status objectives were derived from a publication of the U.S. Department of Health and Human Services, Public Health Services, entitled "Healthy People 2000: National Health Promotion and Disease Prevention Objectives" (DHHS Publication No. (PHS) 91-50212). This report was released in 1990 and involved 22 expert working groups, 300 national health organizations, and all state health departments in its development. The report recommends numerous health objectives for the general population and only 22 health status objectives specific to the Native American population. In an effort to more comprehensively address all developmental stages of life and the complete array of diseases most prevalent among the Native American population, the Committee adopted additional health status objectives from the Surgeon General's report.

It is the intent of the Committee that the Indian Health Service submit a substantial and well documented report on the progress toward achieving these objectives annually. The health status objectives will be utilized to assess the need for the resources required to allocate the Indian Health Care Improvement Fund. The Amendment provides that the Indian Health Service will be allowed a three year period to implement this new method of allocating the Fund. While the Committee expects that regulations will be developed by the agency to implement the gathering of this information, it expects that these regulations will not be overly complex or overly burdensome for Indian tribal governments and those who are involved in the provision of health care services or the operation of health care programs. The Committee suggests a minimum burden be placed on Community Health Representatives and other health care providers in the field in executing duties and that the development and updating of epidemiological data be the responsibility of the Area epidemiology centers authorized under the Amendment. Finally, because health problems and their degree of severity vary among tribal communities nationwide, each tribal

government should determine the appropriate tribal-specific health promotion and disease prevention goals that address a particular tribe's needs.

Four new definitions have been added to the Act, including "Service area", "Health profession", "Health professional", and "Substance abuse". It is the Committee's desire to clarify Title I of the Act, by defining "Health Profession" to include those professions eligible for scholarship assistance under the 1988 Amendments and to add the following new professions: Podiatric medicine, geriatric medicine, marriage and family therapy, and chiropractic medicine. "Substance abuse" is defined to include inhalant abuse.

## TITLE I—INDIAN HEALTH MANPOWER

*Indian health manpower programs and scholarship assistance*

The Committee considers the acute shortage of health professionals available to Indian and Alaska native communities, and in particular the acute shortage of Native health professionals, to be a priority policy issue. The ability of tribal governments to provide accessible and acceptable health care for their citizens is an important part of achieving self-determination. In working to accomplish this goal, tribal governments and tribal organizations have made clear to the Committee their strong desire that health manpower programs, to the extent possible, emphasize community-based training, recruitment and retention of tribal people. Health care must be available, accessible, and more importantly, acceptable. Witness testimony noted that health care provided by people of one's own culture is the most appropriate, and results in better utilization of health care services.

Indian and Alaska Native people lag far behind the general population in achieving parity in terms of their representation in the primary health professions. While the numbers of Native people employed as nursing aides, orderlies, attendants, licensed practical nurses, and physicians attendants are consistent with their percentage in the population, Indian and Alaska Native people are severely under represented in many of the primary health professions including positions for physicians, registered nurses, dentists, optometrists, pharmacists, podiatrists, dental hygiene, and speech therapists. (Source: "Minorities and Women in the Health Fields," 1990 Edition, U.S. Department of Health and Human Services.)

Tribal governments and tribal organizations have voiced concern that more opportunities must be developed for Native people to enter into the health professions. Many of the current federal or state programs which enhance opportunities for students to enter the health professions are not specifically directed at meeting the needs of Native students. The Indian Health Service also experiences constraints in this area due to limited resources and lack of sufficient recruiting personnel. The Committee believes that if the problems of clinical staffing shortages are to be addressed on a long term basis it is vital that concentrated efforts be made to draw more Native people into service in the IHS.

A study assessing the supply, geographic and specialty distribution of American Indian physicians was conducted by the Universi-

The Committee Amendment includes a new section to provide grants to public or private colleges, universities and tribally controlled community colleges to promote the development of interdisciplinary training in two or more schools or programs in optometry, pharmacy, psychology, public health, or social work.

An Amendment is included to allow the Secretary to provide grants to any college, university, or consortium, that is located in any of the three service areas determined to have the most acute health manpower shortages. The purpose of these grants is to provide for training of health professionals using the resources of grant recipients, including students and faculty, to serve in service areas with noted shortages. Grant recipients shall be required to enter into formal agreements with the tribal governments of those service areas in which training is taking place.

TITLE II—HEALTH SERVICE

*Health status and resources deficiency*

In 1988, the Congress established the Indian Health Care Improvement Fund. The origins of this fund can be traced back to 1974 when California Indians tribes filed a class suit against IHS alleging a denial of health care services which were provided to all other eligible American Indians. At that time, California Indians comprised 10 percent of the national IHS service population and yet, received approximately 2 percent of the funds. The District Court ruled that IHS was required to provide health care to California Indians comparable to services offered by IHS to Indians elsewhere in the United States. The ruling was upheld in the Ninth Circuit. *Rincon Band of Missions Indians* v. *Harris*, 618 F.2d 569 (9th Cir. 1980). As a result, the Appropriations Committees of the House of Representatives and Senate established the Equity Health Care Fund through most of the 1980s to provide resource allocations to areas and tribes with deficient levels of health care services.

In an effort to establish a more permanent means of dealing with the resource deficiency problem, in 1988, the Congress established in subsection 201 of the Act, the Indian Health Care Improvement Fund which was to take the place of the "Equity Fund." The Fund was to be allocated based on the level of resource deficiency.

The Committee Amendment provides that this system of allocating the Fund shall remain in place for another three years. However, during that three years interim the Committee expects the Service to begin, through its Epidemiology centers, the collection of data required under the 69 health status objectives. Amendments to the IHCIA would require that IHS program activities remain consistent with the stated health objectives established in Section 3. The Committee Amendment will require the IHS to terminate its current system of allocating the Indian Health Care Improvement Fund since the allocation was based only on historical funding rather than addressing actual health care needs. The Committee believe that true equity funding should be based on addressing health status deficiencies as well as evaluating historical funding deficiencies. Language is included to require the IHS to determine health needs based on the actual costs of providing health care

taking local conditions into account. The Committee's believes that equity funding needs to be targeted to areas where health status is the poorest. It is manifest that all Indians are entitled to comparable health care and the Committee amendment is based on that premise. The Fund will be utilized in three years to address the true health needs of Indian country and to provide equity in achieving health status objectives.

Based upon the documented backlog of services and waiting lists for surgeries that in some areas are as long as three to four years, Title II establishes an Indian Health Care Improvement Fund and authorizes the Secretary to expend amounts appropriated to that fund for the purposes of: eliminating the deficiencies in health status and resources of all Indian tribes; eliminating backlogs in the provision of health care services to Indians; meeting the health needs of Indians in an efficient and equitable manner; and augmenting the ability of the Indian Health Service to meet the health service responsibilities, either directly or through contract care, of providing clinical care, both direct and indirect, including clinical eye and vision care; preventive health care; direct and indirect dental care; mental health care, including community mental health services, inpatient mental health services, dormitory mental health services, therapeutic and residential treatment centers, and training of traditional Indian practitioners; emergency medical services; treatment and control of and rehabilitative care related to alcoholism and drug abuse including fetal alcohol syndrome; home health care; community health representatives, and maintenance and repair.

Because in the past there have been attempts to offset amounts that have been appropriated to address backlogs against amounts that are requested to address current health care needs, Title II makes clear that any amounts appropriated to the Fund are not to be used to offset or limit any appropriations made to the Indian Health Service under the authority of the Snyder Act of 1921 or any other provision of law.

In an effort to assure that funds are distributed to reduce the health status and resource deficiency within a service unit, the Title also provides that funds may be allocated on a service unit basis provided that the funds are used to reduce the health status and resource deficiency of each tribal community served by such service unit. And to assure that the manner in which funds are allocated is based upon tribal priorities in consultation with the Indian Health Service, the bill provides that the allocation of funds to a service unit and to what purposes such funds should be applied, is to be determined by the Indian Health Service in consultation with the affected tribal governments.

The term "health status and resource deficiency" means the extent to which (1) the health objectives set forth in section 3(a) of the Act (as amended by the bill) are not being achieved and (2) the Indian tribe lacks the health resources it needs. The health resources available to an Indian tribe are limited to local health resources used by an Indian tribe, including services and financing systems provided by other Federal programs, provided that the IHS in determining available resources shall also take into account the actual availability of local alternative sources of health care.

[page 16]

Title II directs the Secretary to establish procedures that will allow a tribal government to petition the Secretary for a review of any determination of the extent of the health status and resource deficiency level of the tribe. Title II makes clear that programs administered by a tribal government or tribal organization under the authority of the Indian Self-Determination and Education Assistance Act are to be eligible on an equal basis with programs that are administered directly by the Indian Health Service. If any funds allocated to a tribal government or service unit are used under an Indian Self-Determination contract, a reasonable portion of such funds may be used for health planning, training, technical assistance, and other administrative support functions.

The Committee Amendment requires that, within three years of enactment of the Amendment, the Secretary is to report to the Congress on the extent of health status and resource deficiency for each Indian tribe, and the methodology by which this was determined. The report shall set out the amount of funds necessary to eliminate the health status and resource deficiencies of all Indian tribes served by the IHS. In addition, the report shall include an estimate of the amount of health service funding appropriated under the authority of the Indian Health Care Improvement Act or any other Act including the amount of any funds transferred to the Service for the preceding fiscal year that is allocated to each service unit, Indian tribe, or comparable entity, the number of Indians eligible for health services in each service unit or tribal community, and the number of Indians using the Service resources made available to each service unit or tribal government. The Committee recognizes that data on health status may not be available for all Indian tribes immediately. Therefore, the Committee expects that, until the necessary data becomes available, the IHS will continue to target the amounts in the Fund on those areas most deficient in health resources.

The Committee intends that funds appropriated under the authority of this section for any fiscal year shall be included in the base budget of the Service for the purpose of determining appropriations under this section in subsequent fiscal years. The Committee also contends that nothing in this section is intended to diminish the primary responsibility of the IHS to eliminate existing backlogs in unmet health care needs, nor are the provisions of this section intended to discourage the IHS from undertaking additional efforts to achieve parity among Indian tribes. Any funds appropriated under the authority of section 201 shall be designated at the "Indian Health Care Improvement Fund".

Over the past several years, Administration budgets for Indian health have not reflected the realities of delivering health services on Indian lands, or the continued commitment of the Congress to maintain the Federal responsibility in the delivery of those health services. While Title II does not guarantee that Administration budget requests will reflect these realities, it does mandate a set of objective criteria against which to evaluate the adequacy of the President's annual budget requests.