**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized Tribe, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 02-1383L<br>Chief Judge Edward J. Damich |
| THE UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**UNITED STATES' CORRECTED REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS REGARDING TRIBAL PRIORITY ALLOCATIONS AND INDIAN HEALTH SERVICE FUNDING**

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . 2

I. Tribal Priority Allocations . . . . . . . . . . 2

II. Indian Health Service . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . 5

I. Plaintiff Has Not Alleged Any Statute, Regulation, or Other Provision of Law Establishing a Money-Mandating Duty . . . . . . . . . . 6

A. Neither The IHCIA, The Snyder Act, Nor The ISDA Are Money Mandating . . . 7

B. The Appropriations Acts Are Not Money-Mandating. . . . . . . . . . . 8

C. The Agency's Alleged Interpretations Do Not Provide a Money-Mandating Duty . . . . . . . . . . 11

D. The General Trust Responsibility Does Not Create A Money-Mandating Duty. 13

E. Plaintiff's Other Arguments that the Funding Schemes are Money-Mandating Are Without Merit . . . . . . . . . . 13

II. The *Mitchell* Cases Do Not Give this Court Jurisdiction Over Plaintiff's Claim . . . . . . . . . . 19

III. Plaintiff Fails to State a Claim for Which Relief Can Be Granted Because the Appropriations Have Been Disbursed . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . 22

# TABLE OF AUTHORITIES
## CASES

*Allred v. United States*, 33 Fed. Cl. 349 (1995) . . . . . . . . 7–8

*Am. Fed'n of Gov't Employees, AFL-CIO v. O'Connor*, 747 F.2d 748 (D.C. Cir. 1984) . . . . . . . . 12

*Am. Hosp. Assn. v. NLRB*, 499 U.S. 606 (1991) . . . . . . . . 9

*Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539 (Ct. Cl. 1980) . . . . . . . . 10

*Bowen v. Mass.*, 487 U.S. 879 (1988) . . . . . . . . 15

*Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006) . . . . . . . . 9, 16

*Doe v. United States*, 100 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . 17

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) . . . . . . . . 7, 16

*Grav v. United States*, 886 F.2d 1305 (Fed. Cir. 1989) . . . . . . . . 18

*Greenlee County, Ariz. v. United States*, — F.3d —, 2007 WL 1391389 (Fed. Cir. May 14, 2007) . . . . . . . . 21–22

*Hopi Tribe v. United States*, 55 Fed. Cl. 81 (2002) . . . . . . . . 14, 17, 18, 21

*Inter Tribal Council of Ariz., Inc. v. Babbitt*, 51 F.3d 199 (9th Cir. 1995). . . . . . . . . 20

*Lincoln v. Vigil*, 508 U.S. 182 (1993) . . . . . . . . passim

*LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975) . . . . . . . . 9

*Martinez v. United States*, 333 F.3d 1295 (Fed. Cir. 2003) . . . . . . . . 6–7

*McBryde v. United States*, 299 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . 18

*Metz v. United States*, 466 F.3d 991 (Fed. Cir. 2006) . . . . . . . . 7

*Morton v. Ruiz*, 415 U.S. 199 (1974) . . . . . . . . 19

*Navajo Nation v. United States*, 347 F.3d 1327 (Fed. Cir. 2003) . . . . . . . . 19

*Perri v. United States*, 340 F.3d 1337 (Fed. Cir. 2005) . . . . . . . . 16, 17

*Quick Bear v. Leupp*, 210 U.S. 50 (1908) . . . . . . . . 20

*Reidell v. United States*, 43 Fed. Cl. 770 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11–12

*Rincon Band of Mission Indians v. Califano*, 464 F. Supp. 934
(N.D. Cal. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sac and Fox Tribe of Indians of Okla. v. Apex Constr. Co., Inc.*,
757 F.2d 221 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) . . . . . . . . . . . . . . passim

*Samish Indian Nation v. United States*, 58 Fed. Cl. 114 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Saraco v. United States*, 61 F.3d 863 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sawyer v. United States*, 930 F.2d 1577 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Scholder v. United States*, 428 F.2d 1123 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . 20–21

*Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . 9

*TVA v. Hill*, 437 U.S. 153 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Navajo Nation*, 537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19–20

*United States. v. Mitchell*, 445 U.S. 535 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Mitchell*, 463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19–20

*United States v. Testan*, 424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18–19

*United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003) . . . . . . . . . . . . . . . . . 19–20

**STATUTES**

Dep't of the Interior & Related Agencies Appropriations Act for FY 1969,
Pub. L. No. 90-425, 82 Stat. 425 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Dep't of the Interior & Related Agencies Appropriations Act for FY 1995,
Pub. L. 103-322, 108 Stat. 2499 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Dep't of the Interior & Related Agencies Appropriations Act for FY 1996,
Pub. L. No. 104-134, 110 Stat.1321 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Dep't of Interior, Env't, and Related Agencies Appropriations Act of 2006,
Pub. L. No. 109-54, 119 Stat. 499 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Indian Health Care Improvement Act, Pub. L. No. 94-437, 90 Stat. 1400 (1976) . . . . . . . passim

Omnibus Consolidate Appropriations Act for FY 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996) . . . . . 22

19 U.S.C. § 1619 . . . . . 17

Snyder Act, 25 U.S.C. § 2 . . . . . passim

Snyder Act, 25 U.S.C. §13 . . . . . 3

Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 . . . . . passim

Johnson-O'Malley Act, 25 U.S.C. § 452 . . . . . 2, 7

25 U.S.C. § 1601 . . . . . 7

25 U.S.C. § 1602 . . . . . 7

25 U.S.C. § 1603 . . . . . 4, 15

25 U.S.C. § 1621 . . . . . 4, 7–8

S. Rep. No. 102-392 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3943 . . . . . 4

**FEDERAL REGULATIONS**

42 C.F.R. § 136.11 . . . . . 4, 15, 16

42 C.F.R. § 136.12 . . . . . 4, 15

42 C.F.R. § 136.13 . . . . . 4

42 C.F.R. § 136.14 . . . . . 4

42 C.F.R. § 136.23 . . . . . 4, 15

## INTRODUCTION

Plaintiff Samish Indian Nation propounds an entirely new theory of recovery that would significantly expand this Court's jurisdictional boundaries. In this portion of the case, Plaintiff alleges that it is entitled to recover based on its inability to receive funds from the Bureau of Indian Affairs ("BIA") and Indian Health Service ("IHS") from 1969 until 1996 because of the United States' wrongful refusal to treat it as a federally recognized Indian tribe. The question for the Court at this stage in the case is not whether the United States refused to provide benefits to the Tribe during that time. Instead, the threshold jurisdictional issue is whether Congress intended a damages remedy for Plaintiff.

Plaintiff does not point to any substantive provision of law showing that Congress required the agencies to allocate their lump sum allocations in a particular way, much less that Congress intended for a failure to do so to be compensable in money damages. Instead, Plaintiff relies on general Appropriations Acts, purported agency interpretation of those Acts, and the federal government's general trust responsibility to Indian tribes. Plaintiff argues that Congress appropriates money to the IHS and BIA with the intent to benefit all federally recognized tribes. According to Plaintiff, even though this purported intent is not stated anywhere in a statute, regulation, agency decision, or even the Appropriations Acts that allocate lump sums to the agencies, this Court should infer congressional intent to provide a damages remedy. To put it simply, Plaintiff equates an intent to benefit all federally recognized tribes with an intent to create a damages remedy. This argument contravenes controlling case law, which requires a substantive source of law that can fairly be interpreted as being money-mandating and establishes the principle that allocation of lump sum appropriations is committed to agency discretion.

For the reasons described below and in the United States' Memorandum in Support of its Motion to Dismiss ("United States' Memorandum") , the United States respectfully requests that this

Court grant its Motion to Dismiss as to Plaintiff's Tribal Priority Allocations ("TPA") and IHS claims. Plaintiff has failed to show that its Complaint is founded on a money-mandating requirement, and this Court lacks jurisdiction over Plaintiff's Complaint.

## BACKGROUND

The United States' Motion to Dismiss and Memorandum discussed all the programs in Plaintiff's Second Amended Complaint ("Complaint"). As this Court has narrowed the issues on the Motion to Dismiss to the TPA program and IHS funding, for the sake of clarity, this brief gives a concise background on the programs currently at issue.[1/]

### I. Tribal Priority Allocations[2/]

The TPA program is an internal budgetary tool that the BIA uses to categorize and describe how it plans to allocate certain funds to Indian tribes. Clark Decl. ¶ 3.[3/] As an internal agency tool, there is no statutory or regulatory authority for TPA. *Id.* During the budget process, BIA submits its proposed budget to the Department of the Interior (the "Department"). Since 1992, the BIA has included in its proposed budget for each fiscal year a table showing the specific TPA amounts requested for each tribe. *Id.* ¶ 12. The Department can change BIA's proposed budget before incorporating it into the Department's request, which it sends to the Office of Management and Budget ("OMB"). *Id.* ¶ 10. OMB can change the Department's budget, which it sends to the

[1/]Although the United States disagrees with some of Plaintiff's factual allegations and characterizations of its tribal status background, it does not raise those issues in this Motion to Dismiss because they are not relevant to the resolution of this matter.

[2/]The United States disagrees that Plaintiff appropriately raised the TPA program in its complaint in this Court prior to Plaintiff's appeal to the Federal Circuit. Although its previous complaints listed several statutes that it asserts underlie the TPA program, Plaintiff did not mention TPA itself, and in Plaintiff's Opposition, it does not mention the particular statutes, *e.g.*, the the Johnson-O'Malley Act, 25 U.S.C. § 452 *et seq*. U.S. Mem. at 17–21. Plaintiff, therefore, should be restricted from raising a claim as to TPA now.

[3/]Ms. Clark's Declaration was submitted with the United States' Memorandum. In response, Plaintiff submitted the declaration of Mr. James H. McDivitt. Pl.'s Opp'n, Exh. 5. Mr. McDivitt notes that he reviewed Ms. Clark's declaration and found it to be correct. *Id.* ¶ 46.

President, who can change it yet again before sending his budget to Congress. *Id.* After hearings before the Appropriations subcommittees, Congress passes an Appropriations bill, which, if signed by the President, becomes law. *Id.* ¶ 14. In the Appropriations Acts, Congress does not appropriate funds specifically for TPA. *Id.* ¶ 48. Instead, Congress appropriates funds to BIA in a lump sum for "Operation of Indian Programs." *Id.* ¶ 17.

Once BIA receives its appropriations for "Operation of Indian Programs," BIA distributes funds to federally recognized Indian tribes to fund various programs in the areas of: (a) tribal government; (b) human services; (c) education; (d) public safety and justice; (e) community development; (f) resources management; (g) trust services; and (h) general administration. *Id.*; Clark Decl. ¶ 7. Once appropriated, the funds are either directly provided to a federally recognized tribe "to operate programs and services, or retained and utilized by the Agency offices of the BIA for the BIA to operate those programs and services for the benefit of the Tribe and its members." McDivitt Decl. ¶ 19. The authority for transferring funds directly to tribes is the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 450 *et seq*., and the Snyder Act, 25 U.S.C. §§ 2, 13. Clark Decl. ¶ 10.

The Secretary of the Department has the ability to realign up to ten percent of any tribe's TPA allocation for higher priority needs. *Id.* ¶ 12; *see also* Pl.'s Opp'n at 14. In addition, the Secretary can reprogram up to 10 percent or $500,000 (or greater, with congressional approval), whichever is less, of any program activity for higher priority needs. *Id.* Some newly recognized tribes do not receive funding in the first year after they are recognized. McDivitt ¶ 50.[4]

---

[4] Citing Mr. McDivitt's declaration, Plaintiff asserts that "the Department 'never excluded a federally recognized tribe from an allocation of TPA (or its predecessors).'" Pl.'s Opp'n at 9. Mr. McDivitt's declaration actually states that *in his experience*, the Department did not do so. McDivitt Decl. ¶ 21. This misrepresentation underscores that one agency official's representations cannot establish the agency's interpretation. *See infra* p.12.

## II. Indian Health Service

IHS is an agency within the Department of Health and Human Services. IHS's principal mission is to provide a wide range of health services to the approximately 1.6 million individual American Indians and Alaska Natives ("AI/ANs") throughout the United States.[5] *See* S. Rep. No. 102-392, at 2–3 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3943. Originally, the Snyder Act authorized the expenditure of appropriations for the "relief of distress and conservation of health" of American Indians. 25 U.S.C. § 13.[6] Title II of the IHCIA authorizes supplemental appropriations in a number of broad, health-related areas. 25 U.S.C. § 1621.

Pursuant to the Snyder Act and the IHCIA, IHS fulfills its mission by providing direct health care services and administering other programs, such as a scholarship program. The direct health care services are operated both by IHS and by tribes that contract with IHS under the ISDA. Pl.'s Opp'n at 15. According to IHS regulations, "[t]he services provided to any particular Indian community will depend upon the facilities and services available from sources other than [IHS] and the financial and personnel resources made available to [IHS]." 42 C.F.R. § 136.11(c).

IHS receives two annual lump-sum appropriations from which it administers direct care operations, funds ISDA contracts and compacts, and operates its other statutory functions. The first lump-sum appropriation is designated for "Indian Health Services" and provides funding for the delivery of health care services to AI/ANs. *See, e.g.*, Dep't of the Interior, Env't, and Related Agencies Appropriations Act of 2006, Pub. L. No. 109-54, 119 Stat. 499 (2005); *see also Lincoln*

---

[5] IHS' authority is limited to providing services to eligible AI/ANs, as determined by the definitions of "Indian" and "Indian tribe" codified at 25 U.S.C. § 1603. Since IHS does not have the authority to extend recognition to a tribe, IHS must rely on such recognition from either Congress or the BIA to provide services to any individual AI/AN. *See* 25 U.S.C. § 1603; 42 C.F.R. §§ 136.11–136.14, 136.23.

[6] The Snyder Act applies by its terms only to BIA and the Department of the Interior ("Interior"). The Indian Hospitals and Health Facilities Act, codified at 42 U.S.C. § 2001, transferred responsibility for Indian health from BIA to the Department of Health and Human Services.

*v. Vigil*, 508 U.S. 182, 192 (1993). The second lump-sum appropriation is designated for "Indian Health Facilities" and provides funding for construction and maintenance of facilities. *See, e.g.*, Dep't of the Interior, Env't, and Related Agencies Appropriations Act of 2006, Pub. L. No. 109-54, 119 Stat. 499 (2005). IHS allocates and spends these appropriated funds under the authority of both the Snyder Act and the IHCIA. Any allocation of these funds to a tribe is made pursuant to ISDA compacts and contracts.

## ARGUMENT

The key question in this case is whether the Court can fairly infer a congressional intent to provide damages from the statutes and regulations at issue. Neither the Appropriations Acts, agency interpretation of these Acts, the general trust responsibility, nor any combination thereof demonstrates an intent to provide money damages. Even if Plaintiff could show that Congress generally intended to benefit tribes, Plaintiff cannot demonstrate any intent to make a violation of this general intent compensable with money damages. And in attempting to do so, Plaintiff does not rely on any statutory or regulatory provision, or even on an agency interpretation thereof. Rather, Plaintiff relies on lump sum congressional appropriations coupled with the federal government's general trust responsibility to tribes.

Plaintiff has not alleged any statute, regulation, or any other provision of law that can fairly be interpreted as money-mandating. Neither the Appropriations Acts, agency interpretations, the general federal trust responsibility or any combination thereof demonstrate congressional intent to provide money damages. In addition, as the United States showed in its Memorandum, the statutory provisions at issue here are not money-mandating. The statutes use permissive language, and do not provide that particular claimants be paid certain sums upon meeting certain conditions. Most importantly, to the extent funding is provided to tribes, the purpose of the funding schemes is to provide tribes with funds to operate programs that would otherwise be offered by the government.

Providing Plaintiff, who did not operate any programs during the period at issue, with a damages remedy would result in a windfall Congress could not have intended.

Neither does the *United States v. Mitchell*, 445 U.S. 535 (1980), line of cases, to the extent Plaintiff relies on it, provide Plaintiff with a money-mandating duty. The case at bar does not involve any trust assets or fiduciary duties on the part of the government. Finally, Congress allocated certain amounts to the BIA and IHS through the Appropriations Acts. Because those funds have already been dispersed, Plaintiff does not have a remedy available to it.

## I. Plaintiff Has Not Alleged Any Statute, Regulation, or Other Provision of Law Establishing a Money-Mandating Duty

Plaintiff states the issue in this case as: "whether in providing TPA and IHS funding to benefit all federally recognized tribes, Congress can fairly be understood to have intended a damages remedy where the government wrongfully excludes one tribe." Pl.'s Opp'n at 24. According to Plaintiff, Congress appropriates funds to IHS with the intention that they "benefit every federally recognized tribe," and that IHS has "construed Congress' actions as requiring the allocation of funds for the benefit of every federally recognized tribe." Pl.'s Opp'n at 23. Likewise, Plaintiff argues that BIA requests funds from Congress on a specific tribe-by-tribe basis, and Congress appropriates funds to BIA with the intent "that every federally recognized tribe would benefit from TPA." *Id.* at 15. Plaintiff then makes an unsupported leap between congressional intent to benefit every tribe to congressional intent to provide a damages remedy for a failure to do so. Were the Court to accept Plaintiff's argument, it would greatly expand this Court's jurisdiction.

The Tucker Act and Indian Tucker Act provide this Court with jurisdiction over "actions pursuant to contracts with the United States, actions to recover illegal exactions of money by the United States, and actions brought pursuant to money-mandating constitutional provisions, statutes, regulations, or executive orders." *Martinez v. United States*, 333 F.3d 1295, 1302–03 (Fed. Cir.

2003). The Tucker Acts themselves do not provide a substantive cause of action. *Metz v. United States*, 466 F.3d 991, 995–96 (Fed. Cir. 2006). Instead, a plaintiff must identify a substantive source of upon which to base its claim, and "[t]hat source must be 'money-mandating.'" *Id.* (quoting *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc portion). In this case, neither the statutes underlying IHS funding, the Appropriations Acts, the purported agency interpretation of those Acts, nor general Indian law principles are a money-mandating source.

### A. Neither The IHCIA, The Snyder Act, Nor The ISDA Are Money Mandating[7/]

This Court has held, and the Court of Federal Claims has affirmed, that neither the Snyder Act nor the ISDA are money-mandating statutes. *Samish Indian Nation v. United States*, 58 Fed. Cl. 114, 118–20 (2003); *aff'd*, 419 F.3d 1355, 1364–68 (Fed. Cir. 2005). Relying on the principles set forth in *Lincoln*, the Court of Federal Claims has also ruled that "the Supreme Court . . . foreclosed the possibility of receiving damages for claims under the IHCIA." *Allred v. United States*, 33 Fed. Cl. 349, 355 (1995). Based on the earlier rulings in this case regarding the ISDA and the Snyder Act, as well as the reasoning applied by the *Allred* court, none of the statutes on which Plaintiff have based their claim against IHS are money mandating.

IHS funding and services benefits individual American Indians. Congress' findings underlying the IHCIA focus on "the American Indian people." 25 U.S.C. § 1601. IHCIA's objectives are also aimed at "American Indian people, to assure the highest possible health status for Indians and urban Indians." 25 U.S.C. § 1602(a). Even the Indian Health Care Improvement Fund ("IHCIF"), on which Plaintiff relies, refers to eliminating backlogs in healthcare and meeting the health needs of "Indians." 25 U.S.C. § 1621(a)(2)–(3). Although the provisions governing the

---

[7/]As noted, the TPA is an internal budgetary tool that is not mandated by statute or regulation. The United States does not read Plaintiff's Opposition as arguing that any constitutional provision, statute, regulation, or executive order underlying the TPA program — *e.g.*, the Johnson-O'Malley Act, 25 U.S.C. § 452 *et seq.* — create a money-mandating duty. However, to the extent that Plaintiff so argues, the United States' Memorandum demonstrated that those statutes are not money-mandating, either alone or taken together. U.S. Mem. at 17–21.

IHCIF make reference to "all Indian tribes," 25 U.S.C. § 1621(a)(1), Congress provided that "[f]unds appropriated under the authority of this section may be allocated on a service unit basis." 25 U.S.C. § 1621(b)(2)(A). These provisions all demonstrate that IHCIA's focus and design is to provide healthcare to individual AI/ANs, and it does not mandate any specific apportionment of funds among the tribes.[8]

When the question of whether the IHCIA is money mandating was previously raised in the Court of Federal Claims, the *Allred* court relied on *Lincoln*'s ruling that "neither [the Snyder Act nor the IHCIA] mandate that IHS spend its general appropriations in any particular manner, save to improve Indian health" because both "'speak about Indian health only in general terms.'" *Allred*, 33 Fed. Cl. at 355 (citing *Lincoln*, 508 U.S. at 193–94). The *Allred* court recognized that the health care IHS provides benefits individual American Indians. *Id.* at 357. Therefore, the court concluded that *Lincoln* "foreclosed the possibility of receiving damages for claims under the IHCIA." *Id.* at 355. Similarly, on appeal in this case, the Federal Circuit relied on *Lincoln* when it found that "the Snyder Act does not provide a damage remedy because it does not require the expenditure of general appropriations, on specific programs, for particular classes of Native Americans." *Samish*, 419 F.3d at 1366 (relying on *Lincoln*, 508 U.S. at 194). Since the ruling in *Lincoln* applied to the IHCIA as well, the same reasoning supports a conclusion that IHCIA is not money mandating.

**B. The Appropriations Acts Are Not Money-Mandating.**

Nothing in the Appropriations Acts supports Plaintiff's claims. Pl.'s Opp'n at 15, 23, 31–32. For the TPA program, Plaintiff argues that:

In sum, Congress repeatedly appropriated funds for TPA in response to the specific tribe-by-

[8] As Plaintiff discusses in its Opposition, IHS does distribute funding to tribes pursuant to ISDA compacts and contracts. However, as Plaintiff admits, the ISDA, not IHCIA, necessitates identifying funds on a tribal basis. *See, e.g.*, Pl.'s Opp'n at 21. Furthermore, even funding that IHS provides tribes through ISDA compacts and contracts is intended for the operation of the health programs that the tribes operate, not to as a source of profit for the compacting and contracting tribes.

> tribe request of the Department, specified that funding increases or decreases be shared by all tribes, authorized the use of TPA for particular purposes beyond the scope of TPA programs, and authorized a very limited re-allocation of TPA funds by the Department (while rejecting broader proposals to impose a means testing approach).

Pl.'s Opp'n at 15. The Tribe also asks this Court to infer a damages remedy on the basis that IHS "has construed Congress' actions as requiring the allocation of funds for the benefit of every federally recognized tribe." *Id.* at 23. The error with Plaintiff's argument, however, is that Appropriations Acts are not a money-mandating source.

The allocation of lump sum appropriations is committed to agency discretion. *See Lincoln*, 508 U.S. at 192. Because lump sum appropriations are designed to provide agencies with flexibility, "a clear inference arises that [Congress] does not intend to impose legally binding restrictions." *Id.* A statute that gives an agency complete discretion is not money-mandating. *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) ("*Doe 2").* Accordingly, as both BIA and IHS receive lump sum appropriations, there are no legally binding restrictions on how they allocate those funds and the Appropriations Acts are not money-mandating.

*Lincoln* dictates that only the actual statutory language in the Appropriations Acts creates legally binding requirements. "'[I]ndicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on' the agency." *Lincoln*, 508 U.S. at 192 (quoting *LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975) and citing *Am. Hosp. Assn. v. NLRB*, 499 U.S. 606, 616 (1991) (holding that statements in committee reports do not have the force of law); *TVA v. Hill*, 437 U.S. 153, 191 (1978) ("Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress")). In *Lincoln*, even the agency's continual reports to Congress on a particular program did "not translate through the medium of legislative history into legally binding obligations." *Id.* at 187, 194; *see Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1085 (Fed. Cir. 2003) (holding that in order for a statutory cap on funding to be binding, "it must be carried into the legislation itself; such

a cap cannot be imposed by statements in committee reports or other legislative history"). Likewise, the agency's budget submissions to Congress "'on the bases of which a lump-sum appropriation is subsequently enacted, are not binding on the administrative officers unless those items (and their amounts) are carried into the language of the appropriations act itself'" or the statute otherwise restricts the agency's right to reprogram funds. *Id.* at 1086 (quoting *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 547 n.6 (Ct. Cl. 1980). Thus, the alleged implied "contract" between Congress and the agencies based on budget justifications did not create a binding, much less money-mandating, duty.

Plaintiff argues that *Lincoln* is not controlling here, and attempts to distinguish this case on several bases, all without merit. Pl.'s Opp'n at 32–35. According to Plaintiff, *Lincoln* does not control because, in *Lincoln*, the Appropriations Acts did not mention the program where here "the Appropriations Acts do mention TPA and IHS funding in a manner that supports the Tribe's damages claim here." Pl.'s Opp'n at 34. The Appropriations Acts in this case do not mention either TPA or the IHS funding in a meaningful way that would create a binding obligation. *See, e.g.*, Pub. L. No. 103-322, 108 Stat. 2499 (1994) (Dep't of the Interior & Related Agencies Appropriations Act for FY 1995); Pub. L. No. 104-134, 110 Stat. 1321 (1996) (Dep't of the Interior & Related Agencies Appropriations Act for FY 1996);[9] McDivitt Decl. ¶ 17. Without binding language restricting the agencies' discretion, these are clearly lump sum appropriations without binding restrictions on how the agency must allocate the funds. *See Lincoln*, 508 U.S. at 192, 194. Plaintiff cannot avoid the implications of these lump sum appropriations by focusing on a larger scale, *e.g.*, *all* IHS funding.

Plaintiff also argues that in *Lincoln*, there was a lack of clarity regarding the program's geographic scope, whereas in this case, there is no such question regarding the programs' geographic scope. Pl.'s Opp'n at 34. This distinction is specious because the Court's holding is not limited to

---

[9] The only references to "tribal priority allocations" in the two cited Acts, for example, are provisions that "tribes and tribal contractors may use their tribal priority allocations for unmet indirect costs of ongoing contracts, grants or compact agreements," and "any net increase in costs to the Federal Government which result solely from tribally increased payment levels for general assistance shall be met exclusively from funds available to the tribe from within its tribal priority allocation."

situations where the program's geographic scope is clear.

Finally, Plaintiff argues that *Lincoln* involved a single, small program, and an effort by the agency to broaden the class of Indians served. *Id.* at 34–35. In *Lincoln*, the Court stated that the general trust relationship between the federal government and Indian people did not limit the IHS's discretion to shift funding from a program designed to benefit a specific class of Indian people to "serving the broader class of all Indians nationwide." 508 U.S. at 194–95. The situation at bar is different from *Lincoln* in this regard. However, again, the lump sums available to the agencies in the Appropriations Acts do not "require the expenditure of general appropriations, on specific programs, for particular classes of Native Americans." *See Samish*, 419 F.3d at 1366. This is particularly true when Plaintiff admits that (1) the United States can reprogram money within certain limits, McDivitt Decl. ¶¶ 21, 47, (2) new tribes might not get funding immediately, *id.* ¶ 22, and (3) in some cases, BIA distributes money to BIA offices instead of tribes, *id.* ¶¶ 23, 24. Plaintiff's attempts to distinguish *Lincoln*, therefore, fail. The case is on-point and controlling.

**C. The Agency's Alleged Interpretations Do Not Provide a Money-Mandating Duty.**

Plaintiff provides no support for its claims that TPA and IHS have interpreted their funding schemes in a way that makes them money-mandating. Plaintiff's reliance on *Reidell v. United States*, 43 Fed. Cl. 770 (1999), misconstrues that case and seeks to expand this Court's jurisdiction by relying on an unproven and informal agency interpretation to support a money-mandating duty. Pl.'s Opp'n at 24 n.38.

As stated by this Court, *Reidell* "held that a regulation, though not money-mandating on its face, nevertheless, mandated the payment of money based upon agency interpretation." Opinion and Order of July 21, 2006, ("Ct.'s Op.") at 8 (citing *Reidell*, 43 Fed. Cl. at 771–72). The *Reidell* court relied on "a ruling [by the Department of Labor] interpreting its regulations as requiring such retroactive payments." *Id*. Therefore, although neither the applicable statute nor the implementing regulations were money-mandating, the Court found that it had subject matter jurisdiction over the claim in *Reidell* because "[i]n simple terms, the Plaintiffs are asking this court to enforce a

determination by a government agency that the United States owes money to the plaintiffs." *Reidell*, 43 Fed. Cl. at 773.

The case at bar is not analogous, as recognized by this Court:

> Unlike *Reidell*, the record does not currently show that Plaintiff has received a ruling from any relevant agency entitling it to receive payment under any statute or regulation. Nor does the record show that any relevant agency has taken any action that is functionally similar to that of the Department of Labor in *Reidell*.

Ct.'s Op. at 8 (citing *Reidell*, 43 Fed. Cl. at 771–72). Plaintiff's Opposition does not demonstrate any ruling comparable to that in *Reidell*, or any functional equivalent, in this case. As BIA's TPA system is not based on a statutory or regulatory requirement, there is no statute or regulation for BIA to interpret. But even with regard to IHS, Plaintiff does not rely on the agency's interpretation of a statute or regulation. *Reidell* is, quite simply, inapplicable to the case at bar.

Further, the two declarations Plaintiff offers in support of its claims cannot demonstrate agency interpretation. Although Mr. McDivitt is a former Department employee, one employee's declaration about his recollections and understanding of agency practice cannot suffice to prove the agency's interpretation. *See Am. Fed'n of Gov't Employees, AFL-CIO v. O'Connor*, 747 F.2d 748, 752–53 (D.C. Cir. 1984) (noting that statement of agency officer was not final agency position for purposes of review). Most, if not all, of Mr. McDivitt's declaration is limited to his particular experience at the Department. *See, e.g.*, McDivitt Decl. at ¶ 21 ("In my experience"). Dr. Mather is a health care consultant who does not and has never worked for the IHS.[10/] Clearly, Dr. Mather's testimony can not demonstrate IHS's interpretation of its congressional appropriations. Both declarations, even coupled with the selected representations to Congress Plaintiff cites, are a far cry from the formal agency interpretation at issue in *Reidell*.

In addition, even assuming that the agencies distributed their funds in a way that benefitted every federally recognized tribe, such distribution does not create a money-mandating duty. The

[10/] The United States also has significant questions about the qualifications of Dr. Mather to speak to IHS policy. Both the declaration and Dr. Mather's resume show that his experience is limited to ISDA funding. *See, e.g.*, Mather Decl. ¶ 1. Thus, Plaintiff's reliance on Dr. Mather to make its claim under the IHCIA is problematic, since he lacks sufficient familiarity with this area of IHS operations and funding.

agencies may simply have chosen to distribute their funds in such a fashion because they view that as the most efficient way to meet their general statutory responsibilities. *See Lincoln*, 508 U.S. at 192. Absent congressional intent to create a damages remedy, there is no money-mandating duty.

**D. The General Trust Responsibility Does Not Create A Money-Mandating Duty.**

Finally, Plaintiff argues that the general federal trust responsibility to Indian tribes makes the Appropriations Acts and agency interpretations thereof money-mandating. Pl.'s Opp'n at 27–30. Plaintiff's claim runs afoul of established precedent.

Courts have repeatedly held that the general trust responsibility, standing alone, is insufficient to establish a money-mandating duty. In the *United States v. Navajo Nation* case, for example, the Supreme Court specifically noted that the general trust relationship can reinforce a conclusion that the relevant statute or regulation imposes enforceable duties, but "that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." 537 U.S. 488, 506 (2003). Here, as demonstrated above, Plaintiff has failed to focus on "specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.*

Although Plaintiff urges that it does "not suggest that these Indian law principles mean that every statute for the benefit of Indians is money-mandating," Pl.'s Opp'n at 29, that is the import of its argument. Clearly, the Federal Circuit rejected this argument when considering the Snyder Act and ISDA. *Samish*, 419 F.3d at 1365, 1368. The same logic applies to Plaintiff's funding scheme arguments at issue here. The argument is stronger here because the Appropriations Acts underlying the TPA and IHS funding are not specific to Indian tribes and therefore do not reflect the general trust responsibility at all.

**E. Plaintiff's Other Arguments that the Funding Schemes are Money-Mandating Are Without Merit.**

As noted above, the jurisdictional question for this Court is whether it can infer a

congressional intent to create a damages remedy from the funding schemes[11/] at issue. Plaintiff argues that if Congress intended to benefit all Indian tribes, the funding schemes are money-mandating. This argument ignores the requirement that a substantive law be at least "'reasonably amenable' to an interpretation 'that it mandates a right of recovery in damages.'" *Samish*, 419 F.3d at 1364. In this case, there are simply no indications that Congress intended these programs to be money-mandating, and many indications that Congress did not so intend. Thus, fairly interpreted, the funding schemes do not reveal congressional intent to provide a damage remedy.

The starting point in determining congressional intent is the plain language of the provisions. *Samish*, 419 F.3d at 1365 ("To determine Congressional intent the court begins with the language of the statutes at issue."). For TPA, there is no statutory or regulatory provision to look to for guidance. For IHS funding, as discussed previously, the Snyder Act, the ISDA, and the IHCIA have already been determined not to be money-mandating. *See supra* p. 7–8. The Appropriations Acts do not contain statutory requirements limiting the agencies' discretion. And, a statute that authorizes but does not direct a government official to pay money indicates that the statute is not money-mandating. *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 91 (2002) ("That statute, like the Settlement Act, is not money-mandating because Congress has merely authorized payment of an appropriate sum or sums."). In short, the plain language (or lack thereof) underlying both funding schemes indicates that the schemes are discretionary and not money-mandating. U.S. Mem. at 29–33.

After examining the statutory language, the Court should look "'to the design of the statute as a whole and to its object and policy.'" *Samish*, 419 F.3d at 1365 (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990)). In this case, the purpose of these funding schemes is not to provide a profit center for tribes. *See* U.S. Mem. at 7–9, 24–25, 29–32. Instead, to the extent that the funding schemes provide funds to tribes, it is for the operation of programs that the government

---

[11/] Plaintiff refers to "statutory schemes" when discussing the TPA and IHS funding schemes. This notation, however, is misleading because TPA is not mandated or described by statute. Therefore, it is not clear to what Plaintiff refers when using the term "statutory scheme underlying TPA." Its Opposition refers only to Appropriations Acts. Pl.'s Opp'n at 31. Accordingly, the United States uses the more accurate "funding scheme."

would otherwise operate. With TPA, for example, funds go to tribes to operate, *inter alia*, various educational and public safety programs. Likewise, to the extent a tribe receives funds directly from IHS, such funding is given pursuant to a compact or contract under the ISDA, which has been dismissed from this litigation, for the tribe to operate health programs in lieu of IHS providing health services directly to eligible individual Indians.[12] With both programs, any funding a tribe receives is in exchange for the tribe providing services that otherwise would have been provided by the agency.

The United States' Memorandum noted the Supreme Court's explanation that money-mandating statutes "'attempt to compensate a particular class of persons for past injuries or labors.'" U.S. Mem. at 8 (quoting *Bowen v. Mass.*, 487 U.S. 879, 907 n.42 (1988)). According to Plaintiff, the *Bowen* line of cases is irrelevant. Pl.'s Opp'n at 38–39. On the contrary, the cases demonstrate that there is a distinction between grant-in-aid statutes, which subsidize future expenditures, and money-mandating statutes, which compensate for past injuries. U.S. Mem. at 7–9. To the extent the funding at issue here provides funds directly to tribes, it falls on the side of grant-in-aid statutes, as it provides funds for tribes to run programs that would otherwise be operated by the agencies. It does not attempt to compensate for past injuries. Furthermore, IHS funding given directly to the tribes occurs primarily pursuant to compacts and contracts under the ISDA, and not the funding schemes at issue in this litigation.

The reasoning underlying the Federal Circuit's decision on ISDA is instructive here. The court noted that the ISDA's purpose is to remove the financial burdens of entering into contracts to implement federal programs. *Samish*, 419 F.3d at 1367. Because Plaintiff did not enter into any ISDA contracts, it did not incur the financial burdens. *Id.* "On its face this section demonstrates no congressional intent to allow the Samish to seek damages for contract support costs never incurred, on contracts never created, based on a wrongful refusal to accord federal recognition." *Id.* Reading

[12] Notably, an eligible Indian may obtain services from any IHS- or tribally-operated facility. 25 U.S.C. § 1603; 42 C.F.R. §§ 136.11–12, 136.23.

a damages remedy into the ISDA, therefore, would have resulted in a windfall for Plaintiff. *Id.* Likewise, here, although the funding schemes are not necessarily designed to provide funds to tribes, to the extent funding is directly provided to tribes, it is for the tribes to run the programs in lieu of direct agency services. Plaintiff has not shown any congressional intent to allow Plaintiff damages when it did not provide any services, or incur any costs. And because Plaintiff did not incur any costs of running programs, a damage remedy would be a windfall.[13/] In addition, the programs at issue are not necessarily intended to provide funding directly to tribes. For example, the Appropriations Acts provide funding that IHS uses to provide services to individual AI/ANs, pursuant to the Snyder Act and the IHCIA. IHS also enters into contracts with tribes to operate facilities, but these contracts are entered under the ISDA, which has been dismissed from this litigation. Accordingly, the funding schemes cannot be money-mandating. In addition, it would be illogical to read in a damages remedy by relying on funding mechanisms developed for the ISDA when the ISDA is not at issue in the case.

The Federal Circuit has noted that a statute may still be money-mandating "when an analysis of congressional intent or the structure and purpose of the statute reveal one of the following: (1) the statute has 'clear standards for paying' money to recipients, (2) the statute specifies 'precise amounts' to be paid, or (3) the statute compels payment once certain conditions precedent are met." *Doe 2*, 463 F.3d at 1324, (quoting *Samish*, 419 F.3d at 1364-65, and citing *Perri v. United States*, 340 F.3d 1337, 1342–43 (Fed. Cir. 2005) and *Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005). None of those factors are present here. *See* U.S. Mem. at 10–11, 17–21, 29–33.

According to Plaintiff, the three schemes listed in *Doe 2, Samish, Perri, Fisher*, and various other cases are not exclusive, and it is "well established" that any statutory scheme that provides

[13/] It is not clear how Plaintiff proposes the Court calculate the amount to be paid under the statute. Under either scheme, tribes could receive either direct services or funds through ISDA contracts. Thus, tribes receiving direct services would not receive any funds from the agencies. In addition, not all tribes receive equal amounts of funding through TPA or IHS. *See, e.g.,* 42 C.F.R. § 136.11(c); United States Dep't of the Interior, *Budget Justifications*, F.Y. 1992, as printed in *Dep't of the Interior and Related Agencies Appropriations for 1992, Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 102nd Cong. Part 2, 885–891 (1992), attached as Exh. 6 to Pl.'s Opp'n. There is no way for this Court to determine what funds Plaintiff would have received if it had been recognized earlier.

money for the benefit of a designated class of beneficiaries is money-mandating. Pl.'s Opp'n at 25–26. In fact, Plaintiff's cited case law does not stand for this proposition, and such a proposition would significantly expand this Court's jurisdiction. *See United States v. Testan*, 424 U.S. 392, 405 (1976) (rejecting the plaintiffs' claim "that an admission of misclassification by an agency automatically gives rise to a cause of action for money damages against the United States").

Plaintiff asserts that *Doe v. United States*, 100 F.3d 1576 (Fed. Cir. 1996), demonstrates that "a statute that provides money for the benefit of a designated class of recipients is money-mandating for purposes of a claim that someone was improperly treated as ineligible by a federal agency." Pl.'s Opp'n at 25–26. *Doe* dealt with an amendment to the federal moiety statute, 19 U.S.C. § 1619, the previous version of which the court had found money-mandating. *Doe*, 100 F.3d at 1580. The *Doe* court did not, as Plaintiff urges, consider only whether the statute provides money for a designated class of beneficiaries. Instead, the court looked to the statute's plain language, legislative history, and purpose. The court first analyzed the plain language of the statute, noting the "force" of the argument that the language is discretionary. *Id*. at 1581; *Hopi*, 55 Fed. Cl. at 90 (discussing *Doe*). However, in light of the courts' interpretation of the previous version of the statute and Congress's intent to uphold that interpretation, the court found that the statute's plain language did not control. *Doe*, 100 F.3d at 1581–82; *see Perri*, 340 F.3d at 1343 ("The only question *Doe* decided was that the subsequent statutory amendment modifying the amount to be paid from a flat 25 percent to 'not [to] exceed 25 percent' did not change the money mandating character of the moiety statute."). The court also determined that if it found the statute to be discretionary, it would defeat the statute's purpose. *Doe*, 100 F.3d at 1582. The Federal Circuit later explained that the moiety statute was money-mandating because it provided clear standards for paying an award, it stated the precise amount to be paid, and it required payment upon the meeting of certain conditions. *Perri*, 340 F.3d at 1343. Thus, *Doe* does not support Plaintiff's argument.

Plaintiff argues that this principle also applies to statutes under which an agency is directed to enter into contracts for the payment of federal funds. Pl.'s Opp'n at 26. The Federal Circuit

dispelled Plaintiff's theory, however, by upholding this Court's dismissal of Plaintiff's ISDA claim. In addition, in Plaintiff's cited cases, the courts examined whether the statutes were sufficiently discretionary so as not to be money-mandating by examining factors other than merely whether a statute was meant to benefit a designated group of beneficiaries. *See Grav v. United States*, 886 F.2d 1305 (Fed. Cir. 1989); *McBryde v. United States*, 299 F.3d 1357 (Fed. Cir. 2002); *Saraco v. United States*, 61 F.3d 863 (Fed. Cir. 1995); *Sawyer v. United States*, 930 F.2d 1577 (Fed. Cir. 1991). In *Grav*, for example, the court noted that its analysis "turns on whether the Secretary of Agriculture was granted discretion to refuse participation by any applicant who was qualified for the program," and determined the issue by examining the plain language of the statute and the legislative history, noting that legislative history can only override a statute's plain language when it clearly expresses a contrary intention. 866 F.2d at 1307–08. Likewise, *McBryde* first addressed the statute's plain language, considering the effect of the terms "may" and "shall" on the government's discretion, before considering the statute's legislative history and purpose. 299 F.3d at 1361–63. The court found that reading discretion into the statute would lead to "serious constitutional questions." *Id.* at 1363; *see also Hopi*, 55 Fed. Cl. at 91 (noting *McBryde*'s finding). In addition, like *Grav* and *McBryde*, *Saraco* and *Sawyer* do not stand for the bright line rule Plaintiff advocates. *See Saraco*, 61 F.3d at 865 (holding that CFC had jurisdiction over Fair Labor Standards Act claim); *Sawyer*, 930 F.2d at 1580–81 (finding that Secretary did not have discretion to decide whether to pay disability retirement for servicemember). Thus, contrary to Plaintiff's argument, it is not the "the erroneous eligibility determinations" in these cases that gives rise to damages. It is the non-discretionary nature of the statutory or regulatory provisions at issue, as indicated by the plain language of the provisions, the legislative history, and the purpose of the provisions. In the case at bar, the language, the legislative history, and the purpose of the funding schemes demonstrates that they are discretionary, and evinces a lack of congressional intent to provide money damages.

That Plaintiff does not have a claim for money damages, however, does not mean, assuming it could prove the allegations in its Complaint, Plaintiff necessarily is without a remedy. *See Testan*,

424 U.S. 392 (discussed in U.S. Mem. at 25). In *Testan*, the Supreme Court held that money damages were not available to federal employees who were denied the benefits of a pay grade which they should have been, but were not, classified. Instead, the remedy Congress made available was prospective reclassification on the pay scale, not money damages through retroactive reclassification. Likewise, here, Congress has not made a money damages remedy available for the alleged failure to recognize Plaintiff as an Indian tribe before 1996. While the Court lacks jurisdiction over Plaintiff's suit for damages, Plaintiff might have a cause of action for prospective relief through the APA or based on equal protection principles. *Morton v. Ruiz*, 415 U.S. 199 (1974) (suit for equal protection); *Rincon Band of Mission Indians v. Califano*, 464 F. Supp. 934, 939 (N.D. Cal. 1979) (same).

## II. The *Mitchell* Cases Do Not Give this Court Jurisdiction Over Plaintiff's Claim.

It is not clear whether Plaintiff relies upon the *Mitchell* line of cases to support its case here. *Compare* Pl.'s Opp'n at 35–36 n.49 (suggesting that a statutory scheme including the Snyder Act may be money-mandating) *with id.* at 37 n.50 (recognizing that this case does not involve federal management of trust assets). To the extent Plaintiff so argues, that argument is unavailing. *See* U.S. Mem. at 14–21; 47–49. First, and foremost, this argument must fail because it was not raised in this Court in the first instance before Plaintiff's appeal to the Federal Circuit. The Federal Circuit remanded the case only to allow this Court to address the claims it previously held were time-barred, not to allow Plaintiff to add new claims and theories.[14]

In any event, however, this claim is unavailing because Plaintiff cannot demonstrate a source of fiduciary duty from which the Court could fairly infer a damage remedy. The *Mitchell* line of cases holds that "[t]o state a claim cognizable under the Indian Tucker Act, . . . a Tribe must identify

[14] Notably, if this Court allows Plaintiff to make a "network" argument, Plaintiff cannot rely on ISDA or the Snyder Act as part of its "network." *See Navajo Nation v. United States*, 347 F.3d 1327, 1332 (Fed. Cir. 2003). In *Navajo*, the Federal Circuit remanded the case back to this Court to decide whether the plaintiff had waived its claim that a network of statutes and regulations applied. The court held that if the claim was not waived, the plaintiff could not rely on three statutes that the Supreme Court had already determined did not give rise to money-mandating fiduciary duties. *Id.* at 1332. The same rule should apply here.

a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo*, 537 U.S. at 506. The *Mitchell* cases "give a sense of when it is fair to infer a fiduciary duty qualifying under the Indian Tucker Act and when it is not." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 466 (2003). In *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*"), and *White Mountain*, the Court held that "a network of other statutes and regulations did impose judicially enforceable fiduciary duties upon the United States in its management of" trust assets, such that the federal government had "'full responsibility to manage Indian resources and land for the benefit of the Indians.'" *Navajo*, 537 U.S. at 504–05 (quoting *Mitchell II*, 463 U.S. at 224); *see also White Mountain*, 537 U.S. at 474–75. Once a court finds that a statute provides a specific fiduciary obligation, it can infer a damages remedy. Conversely, in *United States v. Mitchell*, 445 U.S. 535 (1980) ("*Mitchell I*") and *Navajo*, the Court found that only a general trust responsibility existed, and no damages remedy could be inferred. *Mitchell I*, 445 U.S. at 542–43; *Navajo*, 537 U.S. at 493. The elements of a common law trust are a trustee, a beneficiary, and a trust corpus. *Mitchell II*, 463 U.S. at 225; *Inter Tribal Council of Ariz., Inc. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995).

This case does not fall within the *Mitchell II* framework because there is no trust corpus. There are no trust assets are involved, unlike the *Mitchell* line of cases, which dealt with the government's fiduciary duties with regard to management of tribal trust assets. Here, Plaintiff admits that "this case does not involve federal management of trust assets." Pl.'s Opp'n at 37 n.50. Courts have distinguished between "gratuitous appropriations," which belong to the United States, and trust funds, which belong to Indians. *See Quick Bear v. Leupp*, 210 U.S. 50, 80 (1908) (distinguishing between money appropriated to fulfill treaty obligations, to which trust relationship attaches, and "gratuitous appropriations"); *see also Lincoln*, 508 U.S. at 1944–95 (recognizing *Quick Bear*'s holding); *Sac and Fox Tribe of Indians of Okla. v. Apex Constr. Co., Inc.*, 757 F.2d 221, 222–23 (10th Cir. 1985) (noting *Quick Bear*'s "distinction between tribal funds and public monies of the United States"); *Scholder v. United States*, 428 F.2d 1123, 1129 (9th Cir. 1970) (holding that

funds distributed under the Snyder Act are gratuitous appropriations, not Indian property). Because distributions of lump sum appropriations are not trust property, Plaintiff cannot identify a source of fiduciary duty sufficient to support a money-mandating duty. U.S. Mem. at 11–12, 47–49.

Furthermore, the funding schemes at issue here are not necessarily designed to give funds directly to tribes. To the extent funding is given directly to tribes, as in the case of an ISDA compact or contract, the funding is comparable to *Navajo* because the purpose of the funding is to give the tribes greater control over program administration. *See* U.S. Mem. at 21, 48–49; McDivitt Decl. ¶ 34, Pl.'s Opp'n at 8. The United States, therefore, does not have pervasive control over tribal assets supporting a money-mandating duty as in *White Mountain* and *Mitchell II.*

In *Hopi*, this Court addressed a situation where the government established a fund to provide reimbursement of litigation expenses relating to litigation over the Navajo-Hope Settlement Act of 1974. *Hopi*, 55 Fed. Cl. at 83. The *Hopi* court found that in passing the act creating the fund, Congress did not create a fiduciary duty for the government. *Id.* at 95. In that case, like here, the United States controlled the fund and potential plaintiffs did not have access to it. That alone, however, contrary to Plaintiff's argument, did not create a fiduciary relationship. *Id.*; Pl.'s Opp'n at 37 n.50. This Court, therefore, should find that Plaintiff has not asserted a valid claim pursuant to the *Mitchell* line of cases.

**III. Plaintiff Fails to State a Claim for Which Relief Can Be Granted Because the Appropriations Have Been Disbursed.**

In its Memorandum, the United States showed that because appropriations were statutorily capped and the funds were spent, Plaintiff does not have relief available in money damages. U.S. Mem. at 47. A recent Federal Circuit decision further supports the United States' argument. *Greenlee County, Ariz. v. United States*, — F.3d —, 2007 WL 1391389 (Fed. Cir. May 14, 2007).

In *Greenlee County*, the Federal Circuit found that the plaintiff had identified a money-mandating statute, but failed to state a claim for which relief could be granted because Congress capped the amount of the government's liability under the statute at issue. *Id.* at *5. The statute in *Greenlee County*, the Payment in Lieu of Taxes Act ("PILT"), required the United States to make

annual payments to units of local government for their loss of tax revenues from tax-immune federal lands in their jurisdiction. *Id.* at *1. The PILT stated that payment "[a]mounts are available only as provided in appropriations laws." *Id.* The court concluded based on that language "that the government's liability for PILT payments was limited to the amounts appropriated by Congress." *Id.* at *7.

In this case, where Plaintiff clearly relies mainly on Appropriations Acts for its money-mandating duties, the amounts available have likewise been spent. In the Appropriations Acts, Congress appropriated a set amount for the agencies each year. *See, e.g.*, Dep't of the Interior and Related Agencies Appropriations Act for FY 1969, Pub. L. No. 90-425, 82 Stat. 425, 427 (1968); Omnibus Consolidated Appropriations Act for FY 1997, Pub. L. No. 104-208, 110 Stat. 3009 (1996). The agencies allocated all available monies. Because Congress capped the appropriations, the government's liability is limited to those amounts. Therefore, there is no remedy available to Plaintiff.

**CONCLUSION**

For the reasons in the foregoing and in the United States' Memorandum, the United States respectfully requests that this Court dismiss Plaintiff's Complaint as to the TPA and IHS programs with prejudice.

Respectfully submitted this 6th day of June, 2007.

RONALD J. TENPAS
Acting Assistant Attorney General

*s/ Devon Lehman McCune*
DEVON LEHMAN McCUNE,
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
1961 Stout St.
Denver, CO 80294
303-844-1487
303-844-1350 (fax)
devon.mccune@usdoj.gov

Of Counsel:
Jason Roberts
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.

Melissa A. Jamison
U.S. Department of Health and Human Services
Office of General Counsel
Indian Health Service
Rockville, MD