UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 02-1383L<br>(Chief Judge Edward J. Damich) |

Samish Indian Nation's Supplemental Brief

The government's reply on its motion to dismiss asks this Court to ignore the uncontested jurisdictional facts presented by the Tribe, and to deem the various statutes underlying funding for Tribal Priority Allocations ("TPA") and the Indian Health Service ("IHS") as unrelated, rather than as interconnected parts of a unified whole. The Tribe submits that such an approach would be clear error.

The Tribe's position is that Congressional intent regarding TPA and IHS funding can best be understood by examining those programs broadly – focusing on the statutory language, legislative history, agency construction and practice, and the manner in which the agency and Congress interacted over time with respect to TPA and IHS funding.

In the Tribe's opposition to the motion to dismiss, the Tribe demonstrated that the federal government provides TPA and IHS funding to benefit every federally recognized Tribe, that the

agencies administered those programs consistent with that guiding principle and that Congress knew this and provided funding with that same fundamental understanding. Since Congress provided funds to benefit every federally recognized tribe, it is fair to infer that Congress intended to make a damages remedy available in the limited circumstances of a Tribe that was unlawfully denied all benefits from these programs. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003); *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005).

As the government's reply demonstrates, the government's position is that the agency construction of TPA and IHS funding, the express agency representations to Congress about the scope of those programs, and the manner they were administered over time are all irrelevant. As a result, while the Tribe presented facts regarding these matters in considerable detail in the Tribe's Opposition (*see* Tribe's Opp. at 7-23), the government's reply offers nothing in response. While the Tribe submitted extensive materials about agency policy, practice and construction – including official federal agency reports, testimony to Congress, Congressional Committee reports, and expert declarations summarizing that material – the government's reply raised not a single factual objection to the Tribe's submission.[1] The Tribe's description of how these programs were administered – including the fundamental point that TPA and IHS funding were intended to benefit each federally recognized tribe – stands unrebutted and uncontested. Accordingly, the Tribe's submission on these matters must be accepted as true.

[1] The government does object to the qualifications of the Tribe's experts, a matter we discuss below.

In a like manner, the Tribe's position is that TPA and IHS are grounded in multiple statutes – and that in determining Congressional intent regarding those programs, the statutory framework must be understood as a whole. The government, in contrast, confines its argument to individual statutes viewed in isolation from one another – and argues that no single statute, standing alone, expresses an intent to provide a damages remedy. There is no basis for compartmentalizing consideration of statutes in that manner. To the contrary, since Congress provides funding for TPA and IHS through multiple enactments, the fair inference of Congressional intent regarding those programs requires consideration of the full statutory scheme.

In short, the jurisdictional facts as presented by the Tribe are uncontested. Congress intended TPA and IHS funding to benefit all Tribes. Viewing the underlying statutory schemes for TPA and IHS as a whole, and in light of the expressions by Congress and the construction and practice by the federal agencies, it is fair to infer that Congress intended a damages remedy for a Tribe that was wrongfully left out – as occurred here.

While not contesting any jurisdictional facts, the government does contend that the Court should give no weight to the submissions of the Tribe's experts, Mr. McDivitt and Dr. Mathers. *See* US Corrected Reply at 12.[2] That contention has no merit. To the contrary, McDivitt and

---

[2] As to Mr. McDivitt, the government asserts that "one employee's recollections and understanding of agency practice cannot be sufficient to provide the agency's interpretation." *Id.* (citing *Am. Fed. of Gov't Employees AFL-CIO v. O'Connor*, 747 F.2d 748, 752-53 (D.C. Cir. 1984)). But that case does not even remotely support such a conclusion. Rather, it stands solely for the proposition that an advisory opinion of agency counsel was not final agency action and therefore not ripe for purposes of judicial review under the Hatch Act. Nothing about that case addresses, in any way, the competency of a former high-ranking federal official, like Mr. McDivitt, to describe his knowledge of agency policy and practice with regard to a matter on

Mathers are eminently qualified to provide the Court with an understanding of agency practice and policy with respect to the statutory schemes for TPA and IHS funding. Having served as Budget Officer for the BIA, Chief of Staff to the Assistant Secretary for Indian Affairs, and Deputy Assistant Secretary for Management, Indian Affairs in the Department of Interior, Mr. McDivitt had major responsibilities regarding all aspects of the BIA budget, became knowledgeable about the implementation and history of TPA and its predecessors, appeared before Congress on behalf of the Department with regard to BIA budget, and was personally present at and involved in critical meetings at which policies relating to TPA were addressed. Ex. 5, McDivitt Decl. at ¶¶1-8.[3]

Likewise, Dr. Mathers has extensive experience working with IHS on matters relating to the allocation of IHS funds for the benefit of tribes and tribal organizations, including work as a member of several national IHS workgroups devoted to developing funding methodologies to fairly allocate IHS funding to tribes which were convened at the request of the IHS Director and were comprised of representatives of tribes, tribal health care providers, and the IHS. Ex. 32, Mathers Decl. at ¶¶2-6. His declaration describes his personal knowledge of and experience with the process by which IHS has administered those funds over the years, including its

---

which he was directly responsible and as to which he had served as a spokesman for the Department.

[3] The government's assertion that, because Mr. McDivitt's statements were based "on his experience," US Corrected Reply at 3 n. 4, he is less qualified to speak on this issues, is absurd. His personal experience in dealing with TPA, coupled with his status as former Budget Officer for the BIA, Chief of Staff to the Assistant Secretary for Indian Affairs, and Deputy Assistant Secretary for Management, Indian Affairs in the Department of Interior, enhance both his competence and credibility to speak to these issues.

procedures for allocating its funding for the benefit of each federally recognized tribe. Ex. 32, Mathers Decl. at, *e.g.* ¶15 ("The IHS developed systematic methodologies for allocating IHS funds to determine the 'tribal share'. . . for each tribe"); *see also id.* at ¶¶16-21.

Moreover, the information provided by Mr. McDivitt and Dr. Mathers is extensively corroborated – by virtue of materials referenced in their declarations and provided as exhibits to the Court here – by statements made by other officials to Congress and by Congress itself. For example, as to TPA, Mr. McDivitt's statement that every federally recognized tribe benefited from TPA is corroborated by the Assistant Secretary for Indian Affairs' March 1995 statements to a Committee of Congress on that issue. The Assistant Secretary stated:

> Yes, Tribal Priority Allocations are distributed to every tribe. The Federal Government has a government-to-government relationship with all federally-recognized tribes.[4]

Mr. McDivitt's statements are further corroborated by Congress itself which directed that increases or reductions in TPA funding be allocated pro rata among all tribes.[5]

---

[4] Tribe's Opp. at 10 (quoting Ex. 24, *Department of the Interior and Related Agencies Appropriations for 1996, Hearings Before a Subcomm. of the Comm. on Appropriations, Part 11*, 104th Cong. 969 (1995) (emphasis added)). *See also* Ex. 25, Fiscal Year 1998 Budget, *Oversight Hearing of the President's Budget Request for the Bureau of Indian Affairs and the Indian Health Service, Before the S. Comm. on Indian Affairs*, Part 2, Addendum, 105th Cong. 17 (1997) ("TPA base programs are those in which funds are distributed on a pro-rata basis among all Tribes.") (emphasis added).

[5] *See* Tribe's Opp. at 13 (citing Ex. 21, S. Rep. No. 103-114, at 51 (1993)). *See also* Ex. 22, H.R. Rep. No. 103-158, at 50 (1993) (TPA increase "to be distributed to all tribes for their highest priority programs.") (emphasis added); Ex. 23, S. Rep. No. 102-345, at 48 (1992) (TPA increase: "The Committee expects the Bureau to distribute this funding to all tribal budgets according to their base") (emphasis added).

The same is true of IHS funding. While IHS' obligation to allocate its funds for the benefit of each federally recognized tribe first arose in the mid-1970s, Congress clarified – in 1988 and 1992 amendments to the Indian Health Care Improvement Act – its intent that IHS examine the health resource levels of each tribe and allocate supplemental funds for the use or benefit of those tribes in greatest need in order "to raise all Indian tribes to" an acceptable level of health care resources. Tribe's Opp. at 17-19. The legislation and its history corroborate Dr. Mathers' description of the steps IHS has taken over the years to develop criteria and methodologies by which it allocates its funds for the benefit of each federally recognized tribe. Ex. 32, Mathers Decl. at ¶¶13-23.

While the government attacks Mr. McDivitt's and Dr. Mathers' qualifications, it does not suggest that the declarations are incorrect in any respect. While the government submitted a declaration of its own (from Interior Department official Debbie Clark) with its initial motion to dismiss, that declaration does not refute anything in the McDivitt or Mathers declarations.[6] Nor did the government respond to the Tribe's expert declarations with any additional declaration of its own. As a result, the government is reduced to merely asking this Court not to believe the statements of McDivitt and Mathers – without providing any basis for suggesting that their

[6] The government misrepresents Mr. McDivitt's declaration, taking a statement out of context to assert that Mr. McDivitt found the declaration of the government's witness, Debbie Clark, "to be correct." US Corrected Reply at 2 n. 3. On this issue, Mr. McDivitt's declaration plainly states that "While what is stated in Ms. Clark's declaration is correct, there are places where the statements made in the declaration are incomplete (and therefore misleading)." Ex. 5, McDivitt Decl. at ¶46 (emphasis supplied). Mr. McDivitt then provided several examples of statements contained in Ms. Clark's declaration that were misleading and explained how those might be revised to more accurately describe Department policy and practice with regard to TPA. *Id.* at ¶¶47-49. In short, the government's suggestion that Mr. McDivitt endorsed Ms. Clark's statements is false.

statements are wrong. In short, there are no contested jurisdictional facts – as the only facts on these questions that are in the record here are those presented by the Tribe. These facts – most significantly, the fact that Congress intended and the agencies understood that TPA and IHS funds were to be administered to benefit all federally recognized tribes – are established.

The government also misstates the facts and the law when it contends that, with respect to funds for IHS, the law "does not mandate any specific apportionment of funds among the tribes." US Corrected Reply at 7-8. The Indian Health Care Improvement Act, its legislative history, the Indian Self Determination Act, and the longstanding efforts by IHS to develop and implement methodologies by which it makes allocations of its appropriated funds for the benefit of each federally recognized tribe, all refute the government's assertion. *See* Tribe's Opp. at 15-23.

Finally, the government's reliance on the Federal Circuit's recent decision in *Greenlee County v. United States*, __ F.3d __, 2007 WL 1391389 (Fed. Cir. May 14, 2007), is misplaced. The government asserts that the Tribe can not recover damages here because the appropriated funds for the years in question have been spent. US Corrected Reply at 21-22. But *Greenlee* supports the Tribe's position on the law on this issue. Tribe's Opp. at 34 n. 48. As *Greenlee* makes clear, a damages claim against the United States is generally <u>not</u> barred by the absence of sufficient appropriated funds to pay the judgment. Rather, the Court explained that the unavailability of appropriated funds *only* bars recovery in this Court "if the statute creating the right to compensation restricts the government's liability or limits its contractual authority to the amount appropriated by Congress." 2007 WL 1391389 at *5. No such express limitation

appears in the laws applicable to the Tribe's claims here and the government cites none. That the appropriated funds have been spent is no bar to a suit for damages in this Court.

In sum, the jurisdictional facts are not in dispute. The government operated both the TPA and IHS programs for the benefit of all federally recognized tribes. Had Samish been federally recognized it would have benefited from the funds provided to federally recognized tribes through TPA and IHS programs. The sole issue for this Court is whether – given the undisputed practice in implementing these two programs – it can fairly be said that this Court has jurisdiction over the Tribe's claim to damages measured by the funds that it would have received had it been treated as a federally recognized tribe. The Court should deny the government's motion to dismiss the Tribe's TPA and IHS funding claims.

Respectfully submitted,

Dated: August 1, 2007

*/s/ Criag J. Dorsay*
*by Anne D. Noto*

Craig J. Dorsay, Esq.
Attorney at Law
2121 S.W. Broadway, Suite 100
Portland, Oregon 97201
Tel: (503) 790-9060; Fax: (503) 242-9001
craig@dorsayindianlaw.com

*Counsel of Record for Plaintiff*
*Samish Indian Nation*

Of Counsel:

William R. Perry, Esq.
Anne D. Noto, Esq.
Sonosky, Chambers, Sachse, Endreson & Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Tel: (202) 682-0240; Fax: (202) 682-0249
wperry@sonosky.com; anoto@sonosky.com