UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe, | ) | Case No. 02-1383L |
| | ) | (Judge Margaret M. Sweeney) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# SAMISH INDIAN NATION'S SUPPLEMENTAL BRIEF

Craig J. Dorsay, Esq.
Attorney at Law
2121 S.W. Broadway, Suite 100
Portland, Oregon 97201
Tel: (503) 790-9060; Fax: (503) 242-9001
craig@dorsayindianlaw.com

*Counsel of Record for Plaintiff Samish Indian Nation*

Of Counsel:

William R. Perry, Esq.
Anne D. Noto, Esq.
Sonosky, Chambers, Sachse, Endreson & Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Tel: (202) 682-0240; Fax: (202) 682-0249
wperry@sonosky.com; anoto@sonosky.com

Dated: February 1, 2008

# Table of Authorities

## *Cases*

*Bradley v. United States*, 870 F.2d 1578 (Fed. Cir. 1989)....11

*Doe v. United States*, 100 F.3d 1576 (Fed. Cir. 1996) ....3

*Grav v. United States*, 886 F.2d 1305 (Fed. Cir. 1989) ....3

*Greene v. Babbitt*, 943 F. Supp. 1278 (W.D. Wash. 1996) ....2

*Lebeau v. United States*, 474 F.3d 1334 (Fed. Cir. 2007)....11

*McBryde v. United States*, 299 F.3d 1357 (Fed. Cir. 2002)....3

*Navajo Nation v. United States*, 501 F.3d 1327 (Fed. Cir. 2007).... *passim*

*Samish Indian Nation v. United States*, 419 F.3d 1355 (Fed. Cir. 2005) ....3, 11

*Saraco v. United States*, 61 F.3d 863 (Fed. Cir. 1995) ....3

*Sawyer v. United States*, 930 F.2d 1577 (Fed. Cir. 1991).... 3

*Southern Ute Indian Tribe v. Leavitt*, 497 F. Supp.2d 1245 (D.N.M. 2007)....11

*United States v. Mitchell,* 463 U.S. 206 (1983) ("*Mitchell II*") ....3, 4

*United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003) ....3

## *Statutes*

Alcohol and Substance Abuse Prevention and Treatment Act of 1986,
Pub. L. No. 99-570, tit. IV, subtit. C, 100 Stat. 3207, *codified as amended at* 25 U.S.C. §§ 2401-2478 ....8
25 U.S.C. § 2401 ....8

Higher Education Tribal Grant Authorization Act,
Pub. L. No. 102-325, pt. B, 106 Stat. 798 (1992),
*codified at* 25 U.S.C. §§ 3301-3307 ....7
25 U.S.C. § 3302 ....7, 8

Indian Child Protection and Family Violence Prevention Act,
Pub. L. No. 101-630, tit. IV, 104 Stat. 4544 (1990),
*codified at* 25 U.S.C. §§ 3201-3211 ........ 8
25 U.S.C.§ 3201(a) ........ 9
25 U.S.C. § 3201(b)(8) ........ 9

Indian Child Welfare Act,
Pub. L. No. 95-608, 92 Stat. 3069, *codified at* 25 U.S.C. §§ 1901-1963 ........ 8
25 U.S.C. § 1901 ........ 8, 9

Indian Health Care Improvement Act, 25 U.S.C. 1601(a) ........ 9

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe, | ) | Case No. 02-1383L |
| | ) | (Judge Margaret M. Sweeney) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

SAMISH INDIAN NATION'S SUPPLEMENTAL BRIEF

The Court ordered supplemental briefing on *Navajo Nation v. United States*, 501 F.3d 1327 (Fed. Cir. 2007) ("*Navajo*"). As we discuss below, *Navajo* supports the position of the Samish Indian Nation ("Tribe") in this case in several key respects. While *Navajo* arises in a very different setting, and addresses some issues not pertinent here, it also confirms various principles that demonstrate that the statutory networks in this case, regarding Tribal Priority Allocations ("TPA") and Indian Health Service funding, are money-mandating for purposes of the Tribe's claims.

This case and *Navajo* share certain features. Both cases involve claims by an Indian tribe for damages arising from federal misconduct. In *Navajo*, the federal course of dealings concerning a coal lease renewal led to significantly diminished returns for the Navajo Nation. In this case, the federal course of dealings with the Samish Indian Nation (including the arbitrary action of a federal official dropping the Tribe from a 1969 list of tribes) totally eliminated for the Tribe all the federal programs and services that the federal government provided for the benefit of every other federally-recognized tribe.

This case and *Navajo* also both involved the unsavory backdrop of ex parte contacts which tainted the federal decisionmaking. *See Greene v. Babbitt*, 943 F. Supp. 1278, 1281-84 (W.D. Wash. 1996); *Navajo*, 501 F.3d at 1331-1332, 1346.

At the same time, one feature distinguishes this case from *Navajo*. *Navajo* involved a claim regarding the active mismanagement by the government of property (coal) held in trust for the Navajo Nation. As a claim relating to the mismanagement of trust assets, the legal analysis in *Navajo* centered on whether the government had "assume[d] comprehensive control of the Nation's coal. . . ." and whether that control – reflected by a network of statutes – gave rise to a claim for money damages. *Navajo*, 501 F.3d at 1336.

This case, in contrast, does not involve federal mismanagement of a tribe's trust resources. Rather, it addresses a more complete abdication of federal responsibility to the Tribe – the federal government here failed to do anything for the Tribe for a generation, withholding from the Tribe all categories of funding it provided to every other tribe throughout the period 1969 to 1996. So, while in *Navajo* the tribe's trust assets were mismanaged by the United States, in this case the federal misconduct was further upstream – as the federal conduct in ignoring the Tribe meant that the Tribe never received any federal funding at all, even though such funding was provided to every other federally-recognized tribe.

While there are factual differences between the claims raised in *Navajo* and those raised by the Samish Tribe, a number of principles applied in *Navajo* have equal application here. Moreover, the primary test applied in *Navajo* is not the only way to

demonstrate that a statute (or a network of statutes) is money-mandating. The Court of Appeals in this case provided an illustrative list of certain categories of statutes held to be money-mandating. *See Samish Indian Nation v. United States*, 419 F.3d 1355, 1364-65 (Fed. Cir. 2005). Likewise, the Federal Circuit has a well developed body of law regarding money-mandating statutes arising outside the context of federal Indian affairs. *See, e.g., McBryde v. United States*, 299 F.3d 1357 (Fed. Cir. 2002); *Doe v. United States*, 100 F.3d 1576 (Fed. Cir. 1996); *Saraco v. United States*, 61 F.3d 863 (Fed. Cir. 1995); *Sawyer v. United States*, 930 F.2d 1577 (Fed. Cir. 1991); *Grav v. United States*, 886 F.2d 1305 (Fed. Cir. 1989). Thus, nothing in *Navajo* (or any other case) makes the principles from these non-Indian cases inapplicable to Indian tribes. To the contrary, the cases like *Navajo* and the non-Indian money-mandating cases are complementary – both rely on a common core of principles regarding ascertaining Congressional intent, and both support the Tribe's position here.[1] In short, the fundamental principles set forth in *Navajo* for determining whether a network of statutes is money-mandating are relevant here.

First, *Navajo* reaffirms the basic test for determining whether a statute (or a network of statutes) is money-mandating as set forth in earlier cases, such as *White Mountain Apache* and *Mitchell II.* [2] As the Court stated in *Navajo*, in determining

[1] *See* Docket 60, Samish Indian Nation's Opposition to United States' Motion to Dismiss Regarding Tribal Priority Allocations and Indian Health Service Funding ("Tribe's Opposition") at 25, 27-30; Docket 69, Samish Indian Nation's Supplemental Brief at 2.

[2] *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003); *United States v. Mitchell,* 463 U.S. 206 (1983) ("*Mitchell II*").

whether a network of statutes is money-mandating, the key inquiry is "whether the statutes and regulations at issue in this appeal are reasonably amenable to the reading that they mandate a right of recovery in damages . . ." *Navajo*, 501 F.3d at 1335 (emphasis added). *See also id.* at 1334 (under the "fair interpretation rule" a statute "reasonably amenable" to a reading that it provides a damages remedy is sufficient; a "fair inference will do") (quoting *Mitchell II*, 537 U.S. at 472-73). In so doing, *Navajo* rejected government arguments (repeated by the government in this case[3]), that it is necessary to find specific claims authorization language in each statute, rather than relying on a fair inference. As the Court explained, the statutes "need not . . . expressly provide for money damages; the availability of such damages may be inferred." 501 F.3d at 1340 (citations omitted). It is this "fair inference" test affirmed in *Navajo* that controls.

Second, *Navajo* underscores that Congress often deals with Indian affairs in a comprehensive way – and accordingly Congressional intent must be understood in that context, with related statutes being read together as pieces of a broader whole. In *Navajo*, the Court looked at the entire federal law framework regarding the federal government's dealings with trust coal – the 1849 Treaty, the 1950 Navajo-Hopi Rehabilitation Act, the 1977 Surface Mining Control and Reclamation Act, the 1983 Federal Oil and Gas Royalty Management Act – and found that, read together, they demonstrated Congressional intent to provide a damages remedy. *See* 501 F.3d at 1346-48. That

[3] *See* Docket 39, United States' Memorandum in Support of its Motion to Dismiss ("U.S. Mem.") at 7-9 (asserting that Tribe must show that the statutory scheme "compensate[s] a particular class of persons for past injuries or labors"). *See also* Docket 68, U.S. Corrected Reply at 15, 16 (same and arguing that the Tribe prove "congressional intent to

approach applies here as well – as the full statutory framework underlying TPA funding and that underlying IHS funding provide networks that demonstrate that Congress intended a damages remedy for a tribe that was wrongfully left out. *Navajo* demonstrates that the government's approach in its motion to dismiss here – singling out individual statutes and analyzing them separate from others in the network[4] – is misguided. The statutes in a network must be read together.

Third, *Navajo* demonstrates that agency practice – that is, the manner in which the agency implements a network of statutes and regulations – is relevant in determining whether that network is money-mandating. *Navajo*, 501 F.3d at 1343. In evaluating the intent of Congress, the Court in *Navajo* found that certain regulations were relevant, even though they were not yet in effect at the time in question. *Id.* This was so because the regulations reflected the government's "actual practices" at the time. *Id.* As the Court stated "[w]here the government exercises actual control within its authority, neither Congress nor the agency needs to codify such actual control for a fiduciary trust

---

allow Plaintiff damages.").

[4] *See*, *e.g.*, U.S. Mem. at 17-21 (examining statutes in isolation of one another). *See also* U.S. Corrected Reply Brief at 6-13 (same). The government does not counter the Tribe's unrebutted evidence of the legislative history or the agencies' consistent practice in interpreting and implementing those statutory schemes. *See* Tribe's Opposition at 8-15 (describing Interior Department's practice in administering TPA, its representations to Congress regarding its practice to distribute TPA funds to every federally-recognized tribe, and Congressional understanding and intent to adopt that practice including express language whenever Congress intended to authorize any departure from the allocation of TPA to all tribes); *id.* at 16-23 (Congressional directives to IHS regarding the allocation of health care funds for the benefit of tribes as set out in statutes and their legislative history, as well as history of IHS practices regarding allocation of health care funds to benefit all federally-recognized tribes). *See also* Tribe's Supplemental Brief at 2-7.

relationship that is enforceable by money damages to arise." *Id.*

In this case, the "actual practices" of the federal government in implementing the statutory networks are likewise relevant to understanding what Congress intended. For example, the Interior Department's practices with respect to Tribal Priority Allocations ("TPA") confirm that Congress intended TPA to benefit every federally-recognized tribe. The Department, year after year, requested TPA for each Tribe and allocated TPA to benefit each Tribe. Congress knew the Department's representations and practices regarding TPA, and repeatedly provided funds on that basis, *see* Tribe's Opposition at 8-12,[5] and these facts are uncontested. *See* Tribe's Supplemental Brief at 2-7. As in *Navajo*, the Department's practice – that is, its manner of interacting with Congress and administering Congressional directives – provides evidence of Congressional intent.[6]

Fourth, *Navajo* addressed the unique relevance of the trust responsibility when evaluating whether statutes involving Indian tribes are money-mandating. As the Court

---

[5] The same is true of IHS funding. As described in the Tribe's Opposition, at 16-19, in the Indian Health Care Improvement Act and its amendments, Congress sought to fulfill the government's trust responsibility in the area of Indian health by ensuring that federal funds for Indian health services were allocated for the benefit of all federally-recognized tribes.

[6] We are not claiming that the Department's policies, unmoored to the applicable statutes, provide a basis for finding the network of statutes to be money-mandating. As the Court stated in *Navajo*, "departmental policies cannot provide the substantive source of law that mandates compensation for the government's alleged breach of trust." 501 F.3d at 1338. Our point rather is that, in construing the intent of Congress in the network of statutes underlying TPA, the actual practice of the Department – including its representations to Congress and its manner of implementing the statutes – is relevant in determining what Congress intended. While the ultimate inquiry must focus on Congressional intent, the Department's construction, as evidenced by its interaction with Congress and the tribes, is instructive in ascertaining Congressional intent.

there explained, "'once that focus [for the trust relationship i]s provided, general trust law [i]s considered in drawing the inference that Congress intended damages to remedy a breach of obligation.'" *Navajo*, 501 F.3d at 1346 (quoting *White Mountain Apache*, 537 U.S. at 477).

These principles apply here, as Congress, in enacting the statutes under which TPA[7] and IHS funding have been authorized, expressly relied on the government's trust responsibility to tribes as the basis for those programs. For example, Congress cited to the trust responsibility when authorizing federal funds for the benefit of federally-recognized tribes in the Higher Education Tribal Grant Authorization Act[8] – funds that are part of the TPA program. Congress there stated:

> The Congress finds that—
> (1) there are increasing numbers of Indian students qualifying for postsecondary education, and there are increasing numbers desiring to go to postsecondary institutions;
> (2) the needs of these students far outpace the resources available currently;
> (3) Indian tribes have shown an increasing interest in administering programs serving these individuals and making decisions on these programs reflecting their determinations of the tribal and human needs;
> (4) the contracting process under the Indian Self-Determination and Education Assistance Act [25 U.S.C. 450 et seq.] has provided a mechanism for the majority of the tribes to assume control over this program from the Bureau of Indian Affairs; . . .
> (6) the provision of these services in the most effective and efficient form possible is necessary for tribes, the country, and the individuals to be served; and
> (7) these services are part of the Federal Government's continuing trust responsibility to provide education services to American Indian and Alaska Natives.

---

[7] As set out in the Tribe's Second Amended Complaint at ¶ 30.a, and the Tribe's Opposition, at 7 n.8, TPA is provided under a range of federal statutes.

[8] Pub. L. No. 102-325, pt. B, 106 Stat. 798 (1992), *codified at* 25 U.S.C. §§ 3301-3307.

25 U.S.C. § 3302 (emphasis supplied).

Similarly Congress cited to its trust responsibility as the basis for the Indian Alcohol and Substance Abuse Prevention and Treatment Act of 1986[9] – funding which is also provided for the benefit of federally-recognized tribes through TPA. As Congress stated:

> (1) the Federal Government has a historical relationship and unique legal and moral responsibility to Indian tribes and their members,
> (2) included in this responsibility is the treaty, statutory, and historical obligation to assist the Indian tribes in meeting the health and social needs of their members . . .

25 U.S.C. § 2401 (emphasis supplied).

Congress made like findings in two other statutes that authorize funds for the benefit of federally-recognized tribes and which are allocated to such tribes through TPA – the Indian Child Welfare Act ("ICWA"),[10] and the Indian Child Protection and Family Violence Prevention Act.[11] In ICWA, Congress expressly recognized "the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people," 25 U.S.C. § 1901 (emphasis supplied), and found:

> (2) that Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources; [and]
> (3) that there is no resource that is more vital to the continued existence and

[9] Pub. L. No. 99-570, tit. IV, subtit. C, 100 Stat. 3207, *codified as amended at* 25 U.S.C. §§ 2401-2478.

[10] Pub. L. No. 95-608, 92 Stat. 3069, *codified at* 25 U.S.C. §§ 1901-1963.

[11] Pub. L. No.101-630, tit. IV, 104 Stat. 4544 (1990), *codified at* 25 U.S.C.§§ 3201-3211.

> integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe.

*Id.* (emphasis supplied). Congress included a similar description of the federal trust responsibility in the Indian Child Protection and Family Violence Prevention Act, *see* 25 U.S.C. § 3201(a), and adopted a series of measures to prevent domestic violence in Indian families including funding to "establish tribally operated programs to protect Indian children and reduce the incidents of family violence in Indian country." *Id.* § 3201(b)(8).[12]

In sum, here, as in *Navajo*, because Congress included express trust language in these statutes, general trust law principles must be "considered in drawing the inference that Congress intended damages to remedy a breach of obligation." 501 F.3d at 1346.

Fifth, *Navajo* shows that even where elements of a statutory scheme might provide for tribal control over some aspects of the matter, a limited measure of tribal control does not obviate federal duties arising under the statutory scheme for purposes of determining whether that statutory scheme is money-mandating. Thus, in *Navajo*, the Court found that although federal law gave "the Tribes, not the government, the lead role in negotiating mining leases with third parties," 501 F.3d at 1335, that did not end the

---

[12] Similarly, the trust responsibility is also the basis on which Congress has authorized funding for Indian health care. As Congress plainly stated in the Indian Health Care Improvement Act, 25 U.S.C. § 1601(a),

> Federal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people.

analysis. *Id.* at 1345 (holding that while the government relied on the self-determination aspects of statutes, "this court would err through overbroad application of the *Navajo III* holding.") Instead, the Court examined the broader network of statutes under which the federal government had assumed obligations to the Tribe and exercised control over the Tribe's trust property and concluded that the overall statutory scheme was money-mandating.

Although the Samish claims do not involve government management of tribal trust property, this aspect of *Navajo* has force here. *Navajo* rejects the government's contention here that because federal funds are provided directly to tribes "to give the tribes greater control over program administration," the government "therefore does not have pervasive control over tribal assets supporting a money-mandating duty." U.S. Mem. at 21, 48-49; U.S. Corrected Reply at 21. The Samish Tribe does not dispute that once distributed, Indian tribes have control over the specifics of how to expend the distributed funds and implement the contracted program. But implementation of federal programs is not the issue in this case and the government's argument is completely irrelevant because the Samish Tribe never was allowed to contract under any of the statutes for the period in question, never benefited from any of the funds and never had the opportunity to implement any of the federal programs. Here, while Congress intended, and the agencies understood, that the federal funds for TPA and IHS were to be allocated to benefit <u>all</u> federally-recognized tribes, the wrongful actions of the Interior Department in dropping Samish from its list of federally-recognized tribes meant that although the Samish Tribe <u>should</u> have been federally-recognized during the entire period

in question – 1969 to 1996[13] – the Tribe was not and was therefore completely deprived of all right to such funds. Thus, while the Interior Department and IHS had control over TPA and IHS funding – the Samish Tribe had no control at all.[14] And although the Executive branch controlled the distribution of these funds, it did not have "discretion" to arbitrarily decide to withhold funds from any particular federally-recognized Indian tribe.[15]

Finally, *Navajo* teaches that a statutory network must be interpreted to promote the broad Congressional purpose underlying that network. *Navajo*, 501 F.3d at 1345 ("Interpreting the asserted network to mandate a right of recovery in damages against the government in this case is consistent with the purposes of the statutes and regulations.") Here, the underlying purpose of the statutory network was to provide a measure of funding to benefit every federally-recognized tribe. *See* Tribe's Opposition at 8-32.

---

[13] The Court of Appeals so found. *See Samish*, 419 F.3d at 1373-74.

[14] *See Navajo*, 501 F.3d at 1336 ("We note at the outset that this is not a case where the government had the discretion to exercise control and did not do so. Rather, in this case, the government exerted actual and significant control over the determination . . .")

[15] Where Congress enacts a measure for the allocation of funds among a class of tribes, such a measure is money-mandating for purposes of a claim that the proper distribution was not made. *See Lebeau v. United States*, 474 F.3d 1334, 1342 n.5 (Fed. Cir. 2007) ("The terms of the 1972 Distribution Act created a trust responsibility because the United States retained control over tribal monies while the Tribes were preparing their rolls subject to the Secretary's approval . . ."). *See also Southern Ute Indian Tribe v. Leavitt*, 497 F. Supp.2d 1245, 1255-56 (D.N.M. 2007) ("Under the Appropriations Clause, only the legislative branch and not the executive branch of government may make ultimate decisions regarding public funds. The IHS may not unilaterally amend the [statute] by altering the [statutory] criteria" and federal law clearly limited the discretion of the government to decline a tribe's proposal for a self-determination contract.); *Bradley v. United States*, 870 F.2d 1578, 1580 (Fed. Cir. 1989) ("'There are limits, of course, to the discretion inherent in [the statute].' Inasmuch as discretion is not unlimited, the statute

Accordingly, the statutory network should be construed as money-mandating for purposes of a damage claim by a tribe that was omitted without any rational basis, since only that construction furthers the fundamental Congressional purpose.

Conclusion

For all the foregoing reasons and those set out the Tribe's prior briefs, the government's motion to dismiss should be denied.

Dated: February 1, 2008

Respectfully submitted,

Craig J. Dorsay for Anne D. Noto
Anne D. Noto

Craig J. Dorsay, Esq.
Attorney at Law
2121 S.W. Broadway, Suite 100
Portland, Oregon 97201
Tel: (503) 790-9060; Fax: (503) 242-9001
craig@dorsayindianlaw.com
*Counsel of Record for Plaintiff*
*Samish Indian Nation*

Of Counsel:

William R. Perry, Esq.
Anne D. Noto, Esq.
Sonosky, Chambers, Sachse, Endreson & Perry, LLP
1425 K Street, N.W., Suite 600
Washington, D.C. 20005
Tel: (202) 682-0240; Fax: (202) 682-0249
wperry@sonosky.com; anoto@sonosky.com

---

must be deemed to be a pay-mandating statute") (citation omitted).