# In the United States Court of Federal Claims

No. 02-1383 L
(Filed: May 27, 2008)

```
*************************************
SAMISH INDIAN NATION, a federally    *
recognized Indian tribe,             *
                                     *    RCFC 12(b)(1); Tribal Priority Allocations;
              Plaintiff,             *    Indian Health Service; Money-Mandating
                                     *    Network; Mitchell Line of Cases; Breach
v.                                   *    of Fiduciary Duty; Limited Trust; Common-
                                     *    Law Trust; Appropriations
THE UNITED STATES,                   *
                                     *
              Defendant.             *
*************************************
```

Craig J. Dorsay, Portland, OR, for plaintiff.

Devon Lehman McCune, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

      Plaintiff in the above-captioned case is a federally recognized Indian tribe that seeks compensation for the benefits it would have received between 1969 and 1996, if it had been properly recognized by the federal government during that time period. The government, in its motion to dismiss, contends that this court lacks jurisdiction over plaintiff's second amended complaint. Due to a discovery dispute, only limited issues from defendant's motion to dismiss are presently before the court. These issues concern the following general question: do the networks of statutes, regulations, and agency practices that underlie the Tribal Priority Allocation ("TPA") system and the Indian Health Service ("IHS") funding process confer jurisdiction on this court? For the reasons set forth below, the court finds that it lacks jurisdiction over these funding processes and therefore grants in part defendant's motion.

## I. BACKGROUND[1]

Plaintiff, the Samish Indian Nation, is a federally recognized Indian tribe. Second Am. Compl. ("Compl.") ¶¶ 1, 3. Plaintiff descends from a signatory tribe to the 1855 Treaty of Point Elliott. Id. ¶¶ 7-8. In 1958, the Indian Claims Commission recognized the modern tribe's right to sue for damages for lands lost under the treaty. Id. ¶ 8. Then, in 1969, the Department of the Interior omitted plaintiff from its unofficial list of federally recognized Indian tribes. Id. ¶ 9. As a result of this omission, plaintiff and its members were "deprived of all of the programs, benefits and services afforded by the United States to all other federally recognized Indian tribes and their members . . . ." Id. Accordingly, beginning in 1972, plaintiff sought to confirm its status as a federally recognized Indian tribe. Id. ¶ 10. After almost thirty years of administrative proceedings and multiple appeals to the federal courts, id. ¶¶ 10-18, plaintiff's status as a federally recognized Indian tribe was conclusively established on October 15, 1996, id. ¶ 15.

In an attempt to recover compensation for all of the benefits it would have received from 1969 to 1996 had the United States properly treated it as a federally recognized Indian tribe, plaintiff filed the instant action on October 11, 2002. Plaintiff's complaint, and the subsequently filed amended complaint, contained five claims for relief: (1) violation of the Indian Self-Determination Act, Samish Indian Nation v. United States, 58 Fed. Cl. 114, 116-17 (2003) ("Samish I"), aff'd in part, rev'd in part, 419 F.3d at 1355; (2) violation of the Snyder Act and other statutes benefitting federally recognized Indian tribes, id. at 119; (3) breach of the treaty rights of recognition, self-government, and protection, id. at 120; (4) temporary taking of plaintiff's treaty rights, id. at 121-22; and (5) continuing violation of plaintiff's rights, id. at 122. Defendant moved to dismiss all five claims. Id. at 115. On September 30, 2003, Chief Judge Edward J. Damich ruled that the first four claims were barred by the statute of limitations and that the fifth claim was precluded under 28 U.S.C. § 1500.[2] Id. The Chief Judge alternatively held that even if the first four claims were not barred by the statute of limitations, neither the Indian Self-Determination Act nor the Snyder Act provided the court with jurisdiction and plaintiff was collaterally estopped from pursuing the third and fourth claims. Id. at 115, 119 n.12.

Plaintiff appealed the dismissal of claims one, two, and five to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"). See 419 F.3d at 1362-63 (describing the three claims). In addition to affirming the dismissal of claim five, id. at 1374, the Federal Circuit held that plaintiff's first two claims were not barred by the statute of limitations, id. at 1357. The

---

[1] Because only a brief factual recitation is necessary for the purposes of this ruling, the court derives the facts in this section solely from plaintiff's second amended complaint. A more detailed fact statement can be found in Samish Indian Nation v. United States, 419 F.3d 1355 (Fed. Cir. 2005) ("Samish II"). The court derives the procedural history from prior rulings in this case.

[2] The case was transferred to the undersigned on November 1, 2007.

Federal Circuit also concluded that neither the Indian Self-Determination Act nor the Snyder Act were money-mandating sources of jurisdiction. Id. However, the Federal Circuit remanded the case to the United States Court of Federal Claims ("Court of Federal Claims") to determine whether the other statutes benefitting federally recognized Indian tribes conferred jurisdiction on the court. Id.

Once the case was returned to the Court of Federal Claims, plaintiff filed a second amended complaint to conform with the Federal Circuit's ruling. In its second amended complaint, plaintiff enumerates the myriad of statutes and regulations that established programs, services, and benefits for federally recognized Indian tribes from 1969 to 1996, and then alleges two claims for relief. Plaintiff's first claim for relief seeks damages for the government's failure to provide it with the identified programs, services, and benefits from 1969 to 1996. Compl. ¶¶ 31-36. Plaintiff contends that the "underlying legal framework" of each program, service, or benefit provides a money-mandating basis for jurisdiction. Id. ¶¶ 32-33. Plaintiff's second claim for relief seeks damages for the government's failure to properly treat it as a federally recognized Indian tribe. Id. ¶¶ 37-44. Plaintiff alleges that all of the cited statutes, taken together, "comprise a network of statutes defining . . . the federal government's trust responsibility" to Indian tribes that provides a money-mandating basis for jurisdiction. Id. ¶¶ 41, 43.

After plaintiff filed its second amended complaint, defendant moved to dismiss the complaint for lack of subject matter jurisdiction. Samish Indian Nation v. United States, No. 02-1383L, slip op. at 1 n.1 (Fed. Cl. July 21, 2006) ("Samish III"). In response to defendant's motion, plaintiff sought limited discovery. Id. at 1. In particular, plaintiff sought discovery concerning the government's construction of the TPA system–a mechanism by which the Bureau of Indian Affairs ("BIA") provides funds to Indian tribes for tribal governments, human services, education, public safety and justice, community development, resource management, trust services, and general administration–to show that the government construed the system to reflect the congressional intent that all federally recognized Indian tribes must receive funding. Id. at 3-4. Plaintiff also sought discovery concerning agency interpretation of the Omnibus Budget Reconciliation Act of 1981, the Comprehensive Employment and Training Act, the Job Training Partnership Act, and the Housing Act of 1937 to show that the government construed those statutes as mandating funding to all eligible tribes. Id. at 4-5. In his analysis of plaintiff's discovery request, the Chief Judge noted:

> At the very least, by placing Ms. Clark's declaration on the record in its Motion to Dismiss,[3] Defendant has, in effect, opened the door for Plaintiff to make further factual inquiries into the BIA's interpretation and construction of the statutes underlying the TPA mechanism. More significantly, the declaration itself is strongly suggestive that the BIA may very well have considered that the statutes

---

[3] Defendant attached one exhibit to its motion to dismiss: the Declaration of Debbie L. Clark ("Clark Declaration"), the Deputy Assistant Secretary–Indian Affairs (Management) at the Department of the Interior.

>and regulations underlying TPA, in fact, mandate the payment of money to federally-recognized tribes. . . .
>
>Plaintiff's argument on behalf of its request for discovery related to the non-TPA programs is not as strong . . . . [However, t]he Court finds plaintiff has adequately demonstrated that certain jurisdictional facts with respect to non-TPA programs are, in fact, disputed . . . .

Id. at 7-8 (footnote added). Accordingly, the Chief Judge granted plaintiff's request for limited discovery. Id. at 9.

Disputes arose concerning the limited discovery permitted by the Chief Judge, and the parties set forth their positions on how to proceed in a January 8, 2007 status report. Pursuant to court orders dated January 18, 2007, and February 16, 2007, the parties filed supplemental briefs identifying those issues in defendant's motion to dismiss that could be resolved without further discovery. The Chief Judge reviewed the parties' supplemental briefs, and in an April 3, 2007 order, directed plaintiff to "file its response to Defendant's motion to dismiss regarding 'the two major programs involved in this case'–TPA . . . and IHS . . . funding." The Chief Judge specifically directed plaintiff to address "all legal issues within Defendant's motion as to TPA and IHS, including, inter alia, those described in Defendant's supplemental brief as 'overarching legal arguments.'"[4] Finally, the Chief Judge directed defendant respond to plaintiff's arguments regarding TPA and IHS funding in its reply brief.

The initial briefing of defendant's motion to dismiss concluded on August 1, 2007. Chief Judge Damich subsequently reassigned the case to the undersigned, who directed the parties to file additional supplemental briefs concerning the Federal Circuit's recent decision in Navajo Nation v. United States, 501 F.3d 1327 (Fed. Cir. 2007) ("Navajo Nation II"), petition for cert. filed, 76 U.S.L.W. 3621 (U.S. May 13, 2008) (No. 07-1410). Briefing concluded on February 15, 2008. The court deems oral argument unnecessary.

---

[4] Defendant identified the following "overarching legal arguments": (1) "the programs Plaintiff alleges in its Complaint are not money-mandating because they are grant-in-aid statutes that subsidize tribes' future expenditures on social services programs"; (2) "these statutes cannot be money-mandating because they contain discretionary language"; and (3) the statutes "do not provide clear standards for payment, state the precise amounts to be paid, and, as interpreted, compel payment on satisfaction of certain conditions." United States' Supplemental Br. Regarding Its Mot. Dismiss 3-5.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

In ruling on a motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747. If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B. Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time. Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969).

Plaintiff asserts jurisdiction under both 28 U.S.C. § 1491 ("Tucker Act") and 28 U.S.C. § 1505 ("Indian Tucker Act"). The Tucker Act, the principal statute governing the jurisdiction of this court, provides that the Court of Federal Claims has jurisdiction over claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2000). The Indian Tucker Act further provides that the Court of Federal Claims has jurisdiction over claims brought by "any tribe, band, or other identifiable group of American Indians" against the United States that are founded upon "the Constitution, laws or treaties of the United States, or Executive orders of the President," as well as claims that "otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group." Id. § 1505. However, both the Tucker Act and the Indian Tucker Act are merely jurisdictional statutes, and do not create "a substantive right enforceable against the Government by a claim for money damages." United

States v. Navajo Nation, 537 U.S. 488, 503, 506 (2003) ("Navajo Nation I"); United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003).

Instead, the substantive right must appear in another source of law, United States v. Mitchell, 463 U.S. 206, 216 (1983) ("Mitchell II"), that, in general, "'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained,'" United States v. Testan, 424 U.S. 392, 400 (1976) (quoting Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1009 (Ct. Cl. 1967)). To make such a showing, a plaintiff must only demonstrate that the substantive source of law is "reasonably amenable to the reading that it mandates a right of recovery in damages." White Mountain Apache Tribe, 537 U.S. at 473. However, jurisdiction in the Court of Federal Claims may also derive from "[c]ertain discretionary schemes," including those "statutes (1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." Samish II, 419 F.3d at 1364 (citation omitted). Altogether, "[w]hile the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." White Mountain Apache Tribe, 537 U.S. at 473 (citation omitted).

### III. TRIBAL PRIORITY ALLOCATIONS AND THE INDIAN HEALTH SERVICE

As noted above, the scope of this ruling is constrained by the Chief Judge's April 3, 2007 order. In that order, the Chief Judge limited the parties' arguments to "all legal issues within Defendant's motion as to TPA and IHS, including, inter alia, those described in Defendant's supplemental brief as 'overarching legal arguments.'" Because the court's analysis is limited to the statutory frameworks underlying the TPA system and IHS funding, it is unable to rule on plaintiff's second claim for relief, which concerns an analysis of all of the statutes cited in plaintiff's second amended complaint.[5] Accordingly, the court will only consider whether it has jurisdiction over plaintiff's first cause of action with respect to the TPA system and IHS funding. The court begins with a description of the TPA system and the IHS funding process,[6] and then addresses defendant's contention that the court is precluded from entertaining plaintiff's TPA system claims due to the purportedly limited nature of the Federal Court's remand instructions in Samish II.

---

[5] As previously noted, in its second claim for relief, plaintiff seeks damages for the government's failure to properly treat it as a federally recognized Indian tribe, contending that all of the cited statutes, taken together, "comprise a network of statutes defining . . . the federal government's trust responsibility" to Indian tribes that provides a money-mandating basis for jurisdiction. Compl. ¶¶ 37-44.

[6] Plaintiff provides a basic description of each process in its second amended complaint. The parties then supplemented the basic description via declaration. To provide a more comprehensive picture, the court cites both the second amended complaint and the submitted declarations. See Land, 330 U.S. at 735 & n.4 (noting that a court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction).

### A. Tribal Priority Allocations

As noted above, Indian tribes receive funding from the BIA via the TPA system in the areas of tribal government support, human services, education, public safety and justice, community development, resource management, trust services, and general administration.[7] Samish III, slip op. at 3-4 (citing the Clark Declaration); Compl. ¶ 30a(i); McDivitt Decl. ¶ 17. Congress annually appropriates TPA funds to all federally recognized Indian tribes. Compl. ¶¶ 30a(i), (iii); McDivitt Decl. ¶¶ 17-19. Once an Indian tribe receives TPA funds, the amount of those funds comprises the "base amount" of funds for subsequent years. Compl. ¶ 30a(i). While Congress does not explicitly direct specific TPA funds to designated tribes via legislation, Decl. Debbie L. Clark ("Clark Decl.") ¶ 6; McDivitt Decl. ¶ 48, "Congress has and does appropriate funds in response to BIA requests for TPA that are tribe-specific in the Budget Justification,"[8] McDivitt Decl. ¶ 48. TPA funds are either provided directly to the Indian tribes or to the BIA to be used for the benefit of the Indian tribes. Id. ¶ 19.

According to the government, the TPA system is an "internal budgetary tool" and "an agency creation" that is not based on any "statutory or regulatory authority . . . ." Clark Decl. ¶ 3. But see McDivitt Decl. ¶ 47 ("While it is true that BIA uses TPA as a budgetary device and TPA started as a budgetary device, TPA has evolved into much more with the adoption by Congress of TPA as a budget activity, and the inclusion of the TPA table in the BIA's Budget Justifications. . . . [T]he BIA has made a commitment to Congress on the use of funds appropriated for TPA and the appropriation for TPA cannot be used for any other purposes . . . . TPA, as a result, is much more than an internal budgetary tool."). However, Congress has enacted authorizing statutes for some of the specific programs covered by the TPA system. Compl. ¶ 30a(iv). These authorizing statutes include the Johnson-O'Malley Act, ch. 147, 48 Stat. 596 (1934) (codified as amended at 25 U.S.C. §§ 452-457 (2000)); the Indian Child Welfare Act of 1978, Pub. L. No. 95-608, 92 Stat. 3069 (codified as amended at 25 U.S.C. §§ 1901-1963 (2000)); the Indian Alcohol and Substance Abuse Prevention and Treatment Act of 1986, Pub. L. No. 99-570, §§ 4201-4230, 100 Stat. 3207, 3207-137 to -152 (codified as amended at 25 U.S.C. §§ 2401-2455 (2000)); the Indian Child Protection and Family Violence Protection Act, Pub. L. No. 101-630, §§ 401-412, 104 Stat. 4531, 4544-56 (1990) (codified as amended at 25 U.S.C. §§ 3201-3210 (2000)); and the Higher Education Tribal Grant Authorization Act, Pub. L. No. 102-325,

---

[7] Although the TPA system was not established until fiscal year 1993, the TPA system's predecessor funding mechanisms operated with the same basic principles, including the fact that every federally recognized Indian tribe received funding. Decl. James H. McDivitt ("McDivitt Decl.") ¶ 18.

[8] The "Budget Justification," commonly referred to as the "Green Book," is the document prepared by the BIA to accompany the President's budget proposal that is sent to Congress. McDivitt Decl. ¶ 10.

§§ 1311-1317, 106 Stat. 448, 798-803 (1992) (codified at 25 U.S.C. §§ 3301-3307 (2000)). Compl. ¶ 30a(iv).

### B.  Indian Health Service

The IHS provides "hospital, medical, dental, mental health, and preventative care to Indians who [a]re enrolled members of federally recognized tribes."  Compl. ¶ 30d.  Beginning with the enactment of the Indian Health Care Improvement Act, Pub. L. No. 94-437, 90 Stat. 1400 (1976) (codified as amended at 25 U.S.C. §§ 1601-1680o (2000)),[9] tribe members could receive these health services either directly from the IHS or from a third-party provider (i.e., contract health care).  Compl. ¶ 30d.  Further, federally recognized Indian tribes could contract with the IHS "to operate health care facilities and provide health care services."  Id.  All federally recognized Indian tribes are entitled to funds under the Indian Health Care Improvement Act. Decl. David T. Mather ("Mather Decl.") ¶ 22.  Congress provides funding for the IHS via annual appropriations, Compl. ¶ 30d, and since 1975, the IHS has "expended money to benefit every federally recognized tribe," Mather Decl. ¶ 24.

### C.  The Federal Circuit's Decision in Samish II Does Not Preclude the Court From Entertaining the TPA System Allegations in Plaintiff's Second Amended Complaint

Initially, the court addresses defendant's argument–raised in a footnote–that plaintiff's TPA system allegations, as a procedural matter, are not properly before the court.  Specifically, defendant contends that plaintiff's second amended complaint, filed on remand, "added several statutes and programs as bases for Plaintiff's claims."  United States' Mot. Dismiss 14 n.3. According to defendant, because "this case is on remand merely to address the remaining statutes after the Federal Circuit's decision, . . . this Court should dismiss Plaintiff's statutes that were not contained in its previous complaint."  Id.; see also United States' Corrected Reply Br. Supp. Its Mot. Dismiss Regarding Tribal Priority Allocations & Indian Health Serv. Funding 2 n.2 ("Plaintiff . . . should be restricted from raising a claim as to TPA now.").  Plaintiff responds, also via footnote, that "the TPA program is funded pursuant to a number of different statutes and the Tribe identified these statutes in its First Amended Complaint . . . ."  Samish Indian Nation's Opp'n United States' Mot. Dismiss Regarding Tribal Priority Allocations & Indian Health Serv. Funding ("Opp'n") 7 n.8.

The court notes that with respect to the TPA system, the second amended complaint merely clarifies the allegations in the first amended complaint.  In its second amended complaint, plaintiff alleges that the TPA system was a mechanism for the BIA to provide "funding to support a broad range of programs, services and benefits to federally-recognized tribes," Compl.

---

[9]  Congress has amended the Indian Health Care Improvement Act on multiple occasions. See Compl. ¶ 30d (citing Indian Health Amendments of 1992, Pub. L. No. 102-573, 106 Stat. 4526, 4544-60; Indian Health Care Amendments of 1988, Pub. L. No. 100-713, 102 Stat. 4784, 4800-12; Indian Health Care Amendments of 1980, Pub. L. No. 96-537, 94 Stat. 3173).

¶ 30a(i), and that Congress had enacted authorizing statutes for some of those programs, citing five specific statutes and all annual Department of the Interior Appropriations Acts, id. ¶ 30a(iv). Similarly, in its pre-appeal first amended complaint, plaintiff specifically cited the same five statutes and "all federal statutes appropriating funds for the Department of the Interior and related agencies." First Am. Compl. ¶¶ 5.d, 5.aa, 5.bb, 5.dd, 5.ff, 5.mm. Further, plaintiff's first amended complaint also contained a "savings" provision, expressly implicating "[o]ther federal statutes and regulations which provide programs, services or benefits to Indian tribes . . . ." Id. ¶ 5.nn. While plaintiff's first amended complaint did not specifically mention the TPA system by name, it clearly included citations to all of the statutes supporting the TPA system that were cited by plaintiff in its second amended complaint. Thus, the court can consider plaintiff's TPA system allegations. Cf. Navajo Nation II, 501 F.3d at 1337 (concluding, after reviewing plaintiff's pleadings, motions, and briefs from a prior appeal in the same case, that plaintiff had not "waived its breach of trust claim based on a network of statutes and regulations" because plaintiff's "'advocacy on behalf of jurisdiction always included the network argument, albeit in a secondary role'" (quoting the decision of the Court of Federal Claims)).

Furthermore, the court's actions render the issue moot. After receiving the Federal Circuit's mandate, the Chief Judge issued a scheduling order directing plaintiff to file an amended complaint. Thereafter, on January 27, 2006, plaintiff filed a motion for leave to file its second amended complaint, which the Chief Judge granted later that day. Thus, the Chief Judge expressly permitted plaintiff to file the complaint. The court is not willing to revisit that ruling. Plaintiff's allegations regarding the TPA system are procedurally permissible. Thus, the court proceeds to address the jurisdictional basis for plaintiff's TPA and IHS claims.

## IV. DISCUSSION

The crux of plaintiff's complaint is that both the TPA system and IHS funding are the product of a network of statutes, regulations, and administrative agency practices, and it is those networks that provide a money-mandating source of jurisdiction in the Court of Federal Claims.[10] Thus, the threshold question before the court is whether the legal frameworks underlying the TPA system or IHS funding can be analyzed as networks.

---

[10] Indeed, plaintiff does not contend that any of the statutes that comprise the TPA system or concern IHS funding are individually money-mandating. See Samish Indian Nation's Supplemental Br. (Aug. 1, 2007) 3 ("[T]he Tribe's position is that TPA and IHS are grounded in multiple statutes–and that in determining Congressional intent regarding those programs, the statutory framework must be understood as a whole. The government, in contrast, confines its argument to individual statutes viewed in isolation from one another . . . ."); see also Compl. ¶¶ 32-33 (alleging that the "underlying legal framework" for each of the "programs, services and benefits" at issue is money-mandating).

## A. The Genesis of the Network Concept

The theory that a network of statutes, regulations, and other sources of law can supply a money-mandating source of jurisdiction is rooted in the decision of the United States Supreme Court ("Supreme Court") in Mitchell v. United States, 445 U.S. 535 (1980) ("Mitchell I"). In Mitchell I, respondents claimed that the government had mismanaged the timber resources found on the Quinault Reservation and that "they were entitled to recover money damages because this alleged misconduct breached a fiduciary duty owed to them by the United States as trustee of the allotted lands under the General Allotment Act."[11] Id. at 537.  The issue before the Supreme Court was whether the General Allotment Act "authorize[d] the award of money damages against the United States for alleged mismanagement of forests located on lands allotted to Indians under that Act." Id. at 536.  The General Allotment Act provided for the allotment of land within Indian reservations to those Indians residing on the reservation and that the United States would "retain title to such allotted lands in trust for the benefit of the allottees." Id. at 540-41.  Noting that both the plain language and the purpose of the General Allotment Act indicated that the allottees, and not the government, were responsible for managing the allotted lands, the Supreme Court held that the General Allotment Act "created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." Id. at 542-43.  Accordingly, the Supreme Court concluded that "[a]ny right of the respondents to recover money damages for Government mismanagement of timber resources must be found in some source other than that Act." Id. at 546; see also id. at 546 n.7 (indicating that on remand, the United States Court of Claims ("Court of Claims")–the predecessor court to both the Federal Circuit and the Court of Federal Claims–could consider "respondents' assertion that other statutes render the United States liable in money damages" (citation omitted)).

The case brought by the Mitchell I respondents eventually returned to the Supreme Court in what emerged as the seminal case concerning whether a network of statutes can provide a money-mandating source of jurisdiction in the Court of Federal Claims.  As foreshadowed in Mitchell I, the issue before the Supreme Court was whether "timber management statutes, various statutes governing road building and rights of way, statutes governing Indian funds and government fees, and regulations promulgated under these statutes," taken together, permitted the Court of Claims to exercise jurisdiction over respondents' claims that the government mismanaged their timber lands. Mitchell II, 463 U.S. at 210-11 (citations omitted).  In particular, respondents claimed that the government's "alleged misconduct constitute[d] a breach of the fiduciary duty owed them by the United States as trustee . . . ." Id. at 210.  The Supreme Court framed the basic issue in this case as "whether the statutes or regulations at issue can be interpreted as requiring compensation." Id. at 218.

---

[11] "The respondents are 1,465 individual allottees of land contained in the Quinault Reservation, the Quinault Tribe, which now holds some allotments, and the Quinault Allottees Association, an unincorporated association formed to promote the interests of the allottees of the Quinault Reservation." Mitchell I, 445 U.S. at 537.

The Supreme Court began its analysis by examining the statutes and regulations cited by respondents. Id. at 219-23. It determined first that "[t]he timber management statutes and the regulations promulgated thereunder establish the 'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber." Id. at 222 (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145 (1980)) (citations omitted). It then determined that the government "exercises comparable control over grants of rights-of-way on Indian lands held in trust." Id. at 223. Based upon these conclusions, the Supreme Court held that "the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibility." Id. at 224 (contrasting the case with Mitchell I, 445 U.S. at 542, where it concluded that the General Allotment Act created only a limited trust relationship between the government and Indian allottees such that the government had no fiduciary responsibility to manage the allotted lands). Remarking on the comprehensive nature of the statutory and regulatory framework, the Supreme Court stated:

> [A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection."

Id. at 225 (quoting Navajo Tribe of Indians v. United States, 624 F.2d 981, 987 (Ct. Cl. 1980)) (footnote omitted). The Supreme Court found further support for the existence of a fiduciary relationship in the express language of the statutes and regulations, id. at 224-25, and "the undisputed existence of a general trust relationship between the United States and the Indian people," id. at 225. In sum, the Supreme Court held:

> Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. . . . [T]he existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust.

Id. at 226.  Accordingly, it concluded that the Court of Claims had jurisdiction over respondents' breach of trust claims.  Id. at 228.

The Supreme Court's holdings in Mitchell I and Mitchell II provided an analytical framework for determining "when it is fair to infer a fiduciary duty qualifying under the Indian Tucker Act and when it is not."  White Mountain Apache Tribe, 537 U.S. at 473 (noting the distinction between "limited" or "bare" trust relationships and trust relationships creating a "more conventional fiduciary relationship").  Almost two decades later, the Supreme Court was faced with two cases that presented a further opportunity to apply the analytical framework.[12]

First, in White Mountain Apache Tribe, the Supreme Court addressed whether the Court of Federal Claims had jurisdiction over a tribe's suit for "breach of fiduciary duty to manage land and improvements held in trust for the Tribe but occupied by the Government."  Id. at 468.  The statute at issue, enacted in 1960, provided that:

> "former Fort Apache Military Reservation" would be "held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose."

Id. at 469.  Pursuant to the statute, the Secretary of the Interior used about thirty of the buildings on the site.  Id.  Beginning in 1976, the former fort was listed as a national historic site.  Id.  However, it fell into disrepair, and it was estimated that as of 1998, $14 million was required to rehabilitate the site in accordance with the applicable historic preservation standards.  Id.  The tribe sued the government for this same amount.  Id.  Distinguishing the 1960 statute from the General Allotment Act at issue in Mitchell I, the Supreme Court determined that beyond the statutory language defining the fiduciary relationship, the 1960 statute "invest[ed] in the United States with discretionary authority to make direct use of portions of the trust corpus."  Id. at 474-75.  Further, the Supreme Court noted that because the site was "expressly subject to a trust," it was "a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee."  Id. at 475.  Thus, the Supreme Court held that the 1960 statute went "beyond a bare trust and permit[ted] a fair inference that the Government is subject to duties as a trustee and liable in damages for breach."  Id. at 474.  Accordingly, it concluded that jurisdiction in the Court of Federal Claims was proper.  Id. at 479.

The Supreme Court reached the opposite conclusion in Navajo Nation I.  The statute at issue in that case was the Indian Mineral Leasing Act of 1938, which provided that Indian tribes could, with the approval of the Secretary of the Interior, lease unallotted lands within a reservation for mining purposes.  537 U.S. at 493.  Regulations promulgated under the Indian Mineral Leasing Act further provided that the royalty rate for coal leases be a minimum of ten

---

[12] In fact, the Supreme Court issued its rulings in these two cases on the same date–March 4, 2003.

cents per ton. Id. at 494. Pursuant to the statute and regulations, the tribe entered into a lease with Peabody Coal Company ("Peabody") that "established a maximum royalty rate of 37.5 cents per ton of coal . . . 'subject to reasonable adjustment by the Secretary of the Interior or his authorized representative' on the 20-year anniversary of the Lease and every ten years thereafter." Id. at 495 (quoting the lease). As the twenty-year anniversary approached, it became clear that the tribe was receiving significantly less in royalty payments than it would have received under the law that applied to coal mined on federal lands. Id. at 495-96. Thus, the tribe attempted to negotiate a higher royalty rate with Peabody. Id. at 496. Lacking success on that front, the tribe then requested that the Secretary of the Interior adjust the royalty rate pursuant to the lease terms. Id. The Director of the BIA for the Navajo Area issued an opinion letter significantly raising the royalty rate. Id. Peabody's appeal of this decision was referred to the Deputy Assistant Secretary of the Interior, who appeared to be ready to rule in the tribe's favor. Id. However, after an ex parte meeting between Peabody and the Secretary of the Interior, the Secretary of the Interior suggested that the Deputy Assistant Secretary return the royalty adjustment issue to the parties for further negotiation. Id. at 497. The parties resumed their negotiations, which led to an agreement on a new royalty rate that was higher than the tribe had previously received, but lower than what the Area Director had decided. Id. at 498-500. The Secretary of the Interior approved the lease amendments containing the new royalty rate. Id. at 500. Eventually, the tribe sued the United States, alleging that the Secretary of the Interior's approval of the lease amendments amounted to a breach of trust. Id.

The Supreme Court rejected the tribe's contention that the statutory and regulatory scheme created by the Indian Mineral Leasing Act "attaches fiduciary duties to each Government function under that scheme, and that the Secretary acted in contravention of those duties by approving the . . . royalty contained in the amended Lease." Id. at 506-07. Because the Indian Mineral Leasing Act did not assign the Secretary of the Interior a "comprehensive managerial role" nor invest the Secretary of the Interior with the "responsibility to secure 'the needs and best interests of the Indian owner and his heirs,'" the Supreme Court concluded that "the Secretary's involvement in coal leasing under the [Indian Mineral Leasing Act] more closely resemble[d] the role provided for the Government by the [General Allotment Act] regarding allotted forest lands" described in Mitchell I. Id. at 507-08 (quoting 25 U.S.C. § 406(a)); see also id. at 508 (noting that neither the Indian Mineral Leasing Act nor its implementing regulations contained "any trust language with respect to coal leasing"). The Supreme Court further noted that "imposing fiduciary duties on the Government here would be out of line with one of the statute's principal purposes"–the enhancement of tribal self-determination. Id. at 508. Accordingly, the Supreme Court held that the Court of Federal Claims lacked jurisdiction over the tribe's claims and remanded the case to the Federal Circuit. Id. at 514.

After acknowledging the Supreme Court's conclusion that the Indian Mineral Leasing Act did not provide a money-mandating source of jurisdiction, the Federal Circuit, in turn, remanded the case to the Court of Federal Claims to "address whether the network of other statutes and regulations asserted by the Nation provide[d] the required substantive source of law. . . ." Navajo Nation II, 501 F.3d at 1329-30. The Court of Federal Claims found that the

network did not provide a money-mandating source of jurisdiction, and the tribe appealed. Id. at 1330. The Federal Circuit disagreed. Id.

The Federal Circuit noted that the network of statutes and regulations asserted by the tribe included the following: (1) the Treaty with the Navajo of September 9, 1849; (2) the Treaty Between the United States of America and the Navajo Tribe of Indians of August 12, 1868; (3) the Executive Order of May 17, 1884; (4) the Act of June 14, 1934; (5) the Navajo-Hopi Rehabilitation Act of 1950; (6) the Surface Mining Control and Reclamation Act of 1977 and its implementing regulations; (7) the Federal Oil and Gas Royalty Management Act of 1983 and its implementing regulations; (8) the policies of the Department of the Interior; (9) the provisions of the lease; (10) the Indian Lands Rights-of-Way Act of 1948 and its implementing regulations; and (11) the Indian Mineral Leasing Act and its implementing regulations. Id. at 1336-37. Initially, the Federal Circuit rejected the tribe's contention that the latter four categories could be elements of the tribe's purported network. Id. at 1338-40. Specifically, the court held that "departmental policies cannot provide the substantive source of law that mandates compensation for the government's breach of trust," id. at 1338, that because the government was not a signatory to the lease, the lease "does not constitute a substantive source of law for the Nation's breach of trust claim," id. at 1338-39, that the "the Indian Lands Rights-of-Way Act of 1948 and its implementing regulations do not provide a relevant substantive source of law," id. at 1339, and that it was foreclosed from considering the Indian Mineral Leasing Act and its implementing regulations as part of the network based upon its previous decision directing the Court of Federal Claims "to consider whether network of other statutes and regulations apart from [the Indian Mineral Leasing Act] of 1938 establishes cognizable breach of trust claim," id. However, the court held that the remaining statutes and regulations in the purported network contained explicit trust language, id. at 1340-41, and that by these statutes, the government assumed comprehensive control over coal resource planning, coal mining operations, management and collection of coal mining royalties, and coal leasing, id. at 1341-45. Accordingly, it concluded that due to "the government's comprehensive control of the Nation's coal," it was fair to interpret the tribe's asserted network as establishing "a breach of trust claim under the Indian Tucker Act." Id. at 1343; see also id. at 1345 (noting that its holding was consistent with the purposes of the statutes and regulations within the network). In other words, the Federal Circuit held that the tribe had "a cognizable money-mandating claim against the United States for the alleged breaches of trust." Id. at 1349.

A review of this "Mitchell" line of cases demonstrates that the network concept was one way in which a fiduciary relationship between the government and Indian tribes could create a money-mandating source of jurisdiction in the Court of Federal Claims. The next logical inquiry is whether the network concept can provide another way to establish jurisdiction in the Court of Federal Claims.

-14-

### B. The Court's Application of the Network Concept Is Limited to Breach of Trust Claims Like Those Presented in Mitchell II and Navajo Nation II

The Mitchell line of cases described above provides the only two instances where reviewing courts have embraced the network theory. Yet plaintiff argues that the court should not limit its jurisdictional analysis to an application of Mitchell II and Navajo Nation II. Opp'n 36-38. Instead, plaintiff argues that there are other ways for a court to find that a "statutory scheme" can be fairly interpreted as requiring the payment of money damages. Id. at 37-38. In support of this contention, plaintiff relies upon the Federal Circuit's statement in Samish II that "[c]ertain discretionary schemes also support claims within the Court of Federal Claims jurisdiction." Id. at 37 (citing 419 F.3d at 1364). However, in using the phrase "discretionary schemes," the Federal Circuit was not addressing a funding process such as the TPA system or IHS funding, but instead a single statute, the Indian Self-Determination Act. Samish II, 419 F.3d at 1364-65. The Federal Circuit's intent to limit "discretionary schemes" to individual statutes or discrete statutory programs is supported by its holding that the qualifying "discretionary schemes" are comprised of those "statutes (1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." Id. at 1364 (citation omitted). Here, plaintiff is not alleging that particular statutes or specific statutory programs are money-mandating, but that certain funding mechanisms, which are based upon a variety of statutes, regulations, and administrative agency practices, are money-mandating. Neither the TPA funding mechanism nor the IHS funding process are "statutes" or discrete statutory programs. Accordingly, the court's analysis is limited to whether the network analysis performed by the Supreme Court in Mitchell II and the Federal Circuit in Navajo Nation II can be applied in the instant case.

### C. The Network Concept Does Not Apply in the Instant Case

Mitchell II and Navajo Nation II, like all of the cases flowing from Mitchell I, addressed the circumstances in which Indian tribes could sue the government for a breach of fiduciary duty in the Court of Federal Claims. The Supreme Court and the Federal Circuit have consistently held that for a breach of fiduciary duty claim to be cognizable under the Indian Tucker Act, there must be more than a "limited" or "bare" trust relationship between the tribe and the United States. See Navajo Nation I, 537 U.S. at 508 ("Similarly here, the [Indian Mineral Leasing Act] and its regulations do not assign to the Secretary managerial control over coal leasing. Nor do they even establish the "limited trust relationship" existing under the [General Allotment Act] . . . ." (quoting Mitchell I, 445 U.S. at 542) (citation omitted)); White Mountain Apache Tribe, 537 U.S. at 474 ("The 1960 Act goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee and liable in damages for breach."); Mitchell II, 463 U.S. at 224 ("In contrast to the bare trust created by the General Allotment Act, the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians."); Mitchell I, 445 U.S. at 542 ("We conclude that the Act created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources.").

Further, "[a]lthough 'the undisputed existence of a general trust relationship between the United States and the Indian people' can 'reinforc[e]' the conclusion that the relevant statute or regulation imposes fiduciary duties, that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act." Navajo Nation I, 537 U.S. at 506 (quoting Mitchell II, 463 U.S. at 225) (citation omitted); see also Navajo Nation II, 501 F.3d at 1341 (concluding that "explicit trust language . . . is necessary but not sufficient for an Indian Tucker Act breach of trust claim"). Instead, "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." Navajo Nation I, 537 U.S. at 507.

As noted above, the Supreme Court found qualifying trust relationships in Mitchell II and White Mountain Apache Tribe, and the Federal Circuit found a qualifying trust relationship in Navajo Nation II. In each of these cases, the courts found (1) express statutory and regulatory language supporting the existence of a fiduciary relationship, see White Mountain Apache Tribe, 537 U.S. at 474-75; Mitchell II, 445 U.S. at 224-25; Navajo Nation II, 501 F.3d at 1341-44, and (2) such elaborate or comprehensive government control over Indian property as to constitute a common-law trust, see White Mountain Apache Tribe, 537 U.S. at 474-76 & n.3; Mitchell II, 445 U.S. at 225; Navajo Nation II, 501 F.3d at 1341-45.[13] Both elements are missing in the instant case.

**1.  Plaintiff Has Not Identified any Statutory or Regulatory Language That Creates More Than a Limited Trust Relationship**

Plaintiff asserts that some of the statutes that form the basis of the TPA system and IHS funding process contain express or explicit trust-creating language. Specifically, plaintiff quotes text from five statutes. See Samish Indian Nation's Supplemental Br. (Feb. 1, 2008) 7-9. First, as part of the Higher Education Tribal Grant Authorization Act, Congress found that services related to assisting Indians' pursuit of higher education "are part of the Federal Government's continuing trust responsibility to provide education services to American Indian and Alaska Natives." 25 U.S.C. § 3302(7). Next, as part of the Indian Alcohol and Substance Abuse Prevention and Treatment Act of 1986, Congress found that "the Federal Government has a historical relationship and unique legal and moral responsibility to Indian tribes and their members" and "included in this responsibility is the treaty, statutory, and historical obligation to assist the Indian tribes in meeting the health and social needs of their members." Id. § 2401(1)-(2). Third, in the Indian Child Welfare Act, Congress, "[r]ecognizing the special relationship between the United States and the Indian tribes and their members and the Federal responsibility to Indian people," found that it, "through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources" and "that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." Id.

---

[13]  In addition, in two of the cases, the courts found that the existence of a qualifying fiduciary relationship was consistent with the statutory and regulatory purposes. See Mitchell II, 445 U.S. at 226; Navajo Nation II, 501 F.3d at 1345.

§ 1901.  Next, in the Indian Child Protection and Family Violence Protection Act, Congress recognized "the historical and special relationship of the Federal Government with Indian people."  Id. § 3201(a).  Finally, in the Indian Health Care Improvement Act, Congress found that "Federal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people."  Id. §1601(a).

The language quoted by plaintiff from these statutes is merely an expression of the general trust relationship between the United States and the Indian people.  None of the quoted text, nor any of the remaining statutory text, contain the level of detail found by the courts in Mitchell II, White Mountain Apache Tribe, and Navajo Nation II.  For example, in Mitchell II, the Supreme Court commented on the explicit trust language found in the relevant statutes and regulations:

> The language of these statutory and regulatory provisions directly supports the existence of a fiduciary relationship.  For example, § 8 of the 1910 Act, as amended, expressly mandates that sales of timber from Indian trust lands be based upon the Secretary's consideration of "the needs and best interests of the Indian owner and his heirs" and that proceeds from such sales be paid to owners "or disposed of for their benefit."  Similarly, even in its earliest regulations, the Government recognized its duties in "managing the Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests."

445 U.S. at 224 (citations omitted).  Because this language directly implicated a fiduciary relationship, the court concluded that "the Government has 'expressed a firm desire that the Tribe should retain the benefits derived from the harvesting and sale of reservation timber.'"  Id. at 224-25 (quoting Bracker, 448 U.S. at 149).  Then, in White Mountain Apache Tribe, the Supreme Court discussed the relevant trust language:

> The statutory language, of course, expressly defines a fiduciary relationship in the provision that Fort Apache be "held by the United States in trust for the White Mountain Apache Tribe."  Unlike the [General] Allotment Act, however, the statute proceeds to invest the United States with discretionary authority to make direct use of portions of the trust corpus. . . .  As to the property subject to the Government's actual use, . . . the United States has not merely exercised daily supervision but has enjoyed daily occupation, and so has obtained control at least as plenary as its authority over the timber in Mitchell II.  While it is true that the 1960 Act does not, like the statutes cited in that case, expressly subject the Government to duties of management and conservation, the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee.

537 U.S. at 474-75 (footnote & citation omitted).  The court concluded that given the United States' duty to preserve the trust assets, "'it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.'"  Id. 475-76 (quoting Mitchell II, 445 U.S. at 226).  Finally, in Navajo Nation II, after identifying the general trust language from a number of sources, the Federal Circuit discussed how the relevant statutes and regulations established specific fiduciary duties in the areas of coal resource planning, coal mining operations, coal mining royalties, and coal leasing.  501 F.3d at 1341-44.

Because the courts in Mitchell II, White Mountain Apache Tribe, and Navajo Nation II concluded that the relevant statutes contained "specific rights-creating or duty-imposing . . . prescriptions," Navajo Nation I, 537 U.S. at 507, they held that jurisdiction was proper under the Indian Tucker Act, 537 U.S. at 479; 463 U.S. at 228; 501 F.3d at 1343, 1348-49.  However, in the instant case, there is no such detailed, prescriptive language.  Neither the TPA system nor the IHS funding process contemplates the creation of a fiduciary relationship where the United States is directed to control and administer specific trust property for plaintiff.

### 2. Plaintiff Has Not Identified a Common-Law Trust Relationship

It is a fundamental principle that a common-law trust is a fiduciary relationship that "involves three elements":

> (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries.

Restatement (Third) of Trusts § 2, cmt. f (2003); see also Mitchell II, 463 U.S. at 225 (citing Restatement (Second) of Trusts § 2, cmt. h (1959)).  Further, the Supreme Court has held that "'where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties . . . .'"  Mitchell II, 445 U.S. at 225 (quoting Navajo Tribe of Indians, 624 F.2d at 987).

Significantly, plaintiff concedes that this case does not involve trust property.  Opp'n 37 n.50.  However, plaintiff argues that the TPA and IHS funding itself is equivalent to a trust asset.  See id. ("[T]he United States had control over TPA and IHS funding–and the Samish Tribe had no control at all.").  In support of this contention, plaintiff cites LeBeau v. United States, in which the Federal Circuit concluded that "[t]he terms of the 1972 Distribution Act created a trust responsibility because the United States retained control over tribal monies while the Tribes were preparing their rolls subject to the Secretary's approval, and while the Secretary was preparing the roll of lineal descendants."  Id. (citing 474 F.3d 1334, 1341 n.5 (Fed. Cir. 2007)).  LeBeau is easily distinguishable from the instant case, however.  The claims in LeBeau stemmed from the United States' breach of certain treaty obligations.  474 F.3d at 1336.  The United States entered

into a settlement agreement with the affected tribes that required it to set aside almost $6 million for the tribes.  Id.  To satisfy the terms of the settlement, Congress appropriated the necessary funds, which were deposited into a trust account.  Id. at 1337.  Congress subsequently enacted the 1972 Distribution Act, which established a formula for distributing the funds in the trust account to the members of the tribes.  Id.  Thus, from these facts alone, it is apparent that the LeBeau court was dealing with Indian monies held in trust for Indian tribes and their members, and not just appropriated funds.  Accord Quick Bear v. Leupp, 210 U.S. 50, 77 (1908) (distinguishing between "gratuitous appropriation of public moneys" that belong to the government and "moneys which belong to the Indians and which is administered for them by the government").  Accordingly, the funding appropriated by Congress for the benefit of the Indian people via the TPA system and IHS funding process is not trust property.  Because plaintiff has not shown the existence of trust property, there necessarily can be no trustee to manage the trust property or beneficiary for whom the trust property is managed.  Thus, plaintiff has failed to prove the existence of a common-law trust.

Because the network concept has only been applied where an Indian tribe has alleged a breach of fiduciary duty by the government and plaintiff's claims in this case concern nothing more than a limited trust relationship, the court lacks jurisdiction over plaintiff's TPA and IHS funding claims.  Because plaintiff does not allege jurisdiction other than via its network theory, the court's analysis is complete.

## V.  CONCLUSION

As previously mentioned, due to a discovery dispute, only limited issues from defendant's motion to dismiss are presently before the court.  Therefore, for the reasons set forth above, the court **GRANTS IN PART** defendant's motion to dismiss and **DISMISSES** plaintiff's first claim for relief with respect to the TPA system and the IHS funding process.

**By no later than Monday, June 23, 2008**, the parties shall file a joint status report suggesting how the court should handle the remainder of defendant's motion to dismiss.  Upon its receipt of the joint status report, the court will contact the parties to schedule a status conference.

**IT IS SO ORDERED**.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge