# In the United States Court of Federal Claims

No. 02-1383L
(Filed: November 30, 2009)

**************************************

| | | |
|---|---|---|
| SAMISH INDIAN NATION, a federally recognized Indian tribe, | * * * | RCFC 12(b)(1); Justiciability; Federal Grant-in-Aid Programs; Antideficiency Act; Federal Revenue Sharing; Housing |
| Plaintiff, | * * | Programs; WIC Program; Commodity Food Distribution Program; Block Grants; |
| v. | * * | Employment and Training Programs; Appropriations Acts; Discretionary |
| THE UNITED STATES, | * * | Schemes; Money-Mandating Network; Breach of Fiduciary Duty; Limited Trust; |
| Defendant. | * | Common-Law Trust |

**************************************

<u>Craig J. Dorsay</u>, Portland, OR, for plaintiff.

<u>Devon Lehman McCune</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff in the instant action is a federally recognized Indian tribe that seeks compensation for the programs, services, and benefits that it claims it would have received between 1969 and 1996, if it had been properly recognized by the federal government during that time period. The court previously ruled that it lacked jurisdiction to entertain those portions of plaintiff's second amended complaint specifically implicating the Tribal Priority Allocation ("TPA") system and the Indian Health Service ("IHS") funding process. In its renewed motion to dismiss, the government contends that this court also lacks jurisdiction over the remainder of plaintiff's second amended complaint. As explained in more detail below, the court concludes that it lacks jurisdiction to entertain most of plaintiff's remaining allegations. However, where jurisdiction is properly invoked, the court finds plaintiff's allegations to be moot. Accordingly, plaintiff's second amended complaint must be dismissed in its entirety.

## I. BACKGROUND[1]

Plaintiff, the Samish Indian Nation, is a federally recognized Indian tribe that descends from a signatory tribe to the 1855 Treaty of Point Elliott.  Second Am. Compl. ("Compl.") ¶¶ 1, 3, 7-8.  In 1958, the Indian Claims Commission recognized the modern tribe's right to sue for damages for lands lost under the treaty.  Id. ¶ 8.  Then, in 1969, the United States Department of the Interior ("Department of the Interior") omitted plaintiff from its list of Indian tribes.  Id. ¶ 9.  Although "the list was not intended to be a list of federally recognized tribes, it was nevertheless used by the United States to identify federally recognized Indian tribes."  Id.; see also id. ("There was no lawful authority to create such a list and there was no rational basis for excluding the Samish Indian Nation from the list.").  As a result of this omission, plaintiff and its members were "deprived of all of the programs, benefits and services afforded by the United States to all other federally recognized Indian tribes and their members . . . ."  Id.  Accordingly, beginning in 1972, plaintiff sought to confirm its status as a federally recognized Indian tribe.  Id. ¶ 10.  After almost thirty years of administrative proceedings and multiple appeals to the federal courts, id. ¶¶ 10-18, plaintiff's status as a federally recognized Indian tribe was conclusively established on October 15, 1996, id. ¶ 15.

In an attempt to recover compensation for all of the benefits it would have received from 1969 to 1996 had the United States properly treated it as a federally recognized Indian tribe, plaintiff filed the instant action on October 11, 2002.  As explained in more detail in a prior ruling by the undersigned, the Honorable Edward J. Damich dismissed plaintiff's complaint, holding that the relevant claims ran afoul of the statute of limitations.[2]  See Samish III, 82 Fed. Cl. at 56 (citing Samish I, 58 Fed. Cl. at 115).  On appeal, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") held that although the United States Court of Federal Claims ("Court of Federal Claims") lacked jurisdiction to consider plaintiff's claims under the Indian Self-Determination and Education Assistance Act and the Snyder Act, the claims alleged by plaintiff based on other statutes were not barred by the statute of limitations.[3]  Id. (citing

---

[1]  Because only a brief factual recitation is necessary for the purposes of this ruling, the court derives the facts in this section solely from plaintiff's second amended complaint.  A more detailed fact statement can be found in Samish Indian Nation v. United States, 419 F.3d 1355 (Fed. Cir. 2005) ("Samish II").  The court derives the procedural history from its prior rulings in this case.  See Samish Indian Nation v. United States, 85 Fed. Cl. 525 (2009) ("Samish IV"); Samish Indian Nation v. United States, 82 Fed. Cl. 54 (2008) ("Samish III") (citing Samish Indian Nation v. United States, 58 Fed. Cl. 114 (2003) ("Samish I")).

[2]  The case was transferred to the undersigned on November 1, 2007.

[3]  Specifically, the Federal Circuit held that plaintiff's other claims for past benefits did not accrue until November 1, 1996, when the district court entered its final judgment determining that plaintiff should have been federally recognized between 1969 and 1996.  Samish II, 419 F.3d at 1373-74.

Samish II, 419 F.3d at 1357).  It thus remanded the case to the Court of Federal Claims to determine whether the other statutes identified by plaintiff that benefitted federally recognized Indian tribes conferred jurisdiction on the court.  Id.

After remand, plaintiff filed a second amended complaint in conformance with the Federal Circuit's ruling.  Id.  In its second amended complaint, plaintiff enumerates the myriad of statutes and regulations that established programs, services, and benefits for federally recognized Indian tribes from 1969 to 1996, and then alleges two claims for relief.  Plaintiff's first claim for relief seeks damages for the government's failure to provide it with the identified programs, services, and benefits from 1969 to 1996.  Compl. ¶¶ 31-36.  Plaintiff contends that the "underlying legal framework" of each program, service, or benefit provides a money-mandating basis for jurisdiction because it "provides clear standards for paying money to recipients, compels payment upon the satisfaction of pre-set conditions, and the amounts that each recipient will receive can be readily determined."  Id. ¶¶ 32-33.  Plaintiff's second claim for relief seeks damages for the government's failure to properly treat it as a federally recognized Indian tribe. Id. ¶¶ 37-44.  Plaintiff alleges that all of the cited statutes, taken together, "comprise a network of statutes defining . . . the federal government's trust responsibility" to Indian tribes that provides a money-mandating basis for jurisdiction.  Id. ¶¶ 41, 43.

After plaintiff filed its second amended complaint, defendant moved to dismiss the complaint for lack of subject matter jurisdiction.  Samish III, 82 Fed. Cl. at 56.  In response to defendant's motion, plaintiff sought limited discovery, which Judge Damich ultimately allowed. Id. at 56-57.  As a result of disputes that arose concerning the permitted discovery, Judge Damich limited the scope of the issues to be decided by defendant's motion to dismiss to those concerning the TPA system and the IHS funding process.  Id. at 57.  The case was subsequently reassigned to the undersigned, who ultimately ruled on defendant's motion to dismiss, as limited by Judge Damich, in a May 27, 2008 Opinion and Order.  See id. at 54-69.

In its opinion, the court began its discussion by observing that the crux of plaintiff's allegations was "that both the TPA system and IHS funding are the product of a network of statutes, regulations, and administrative agency practices, and it is those networks that provide a money-mandating source of jurisdiction in the Court of Federal Claims."  Id. at 61.  Given plaintiff's allegations, the court reviewed the relevant case law, id. at 61-65, and concluded that a network of statutes and regulations "could create a money-mandating source of jurisdiction in the Court of Federal Claims," but only if the network described "a fiduciary relationship between the government and Indian tribes,"[4] id. at 65-66.  The court described the two factors identified in controlling precedent as necessary to establish the existence of a fiduciary relationship that was

---

[4] In so concluding, the court rejected plaintiff's contention that it need not show the existence of a fiduciary relationship to establish jurisdiction using the network theory.  Samish III, 82 Fed. Cl. at 65-66 (holding that the "discretionary schemes" described in Federal Circuit precedent were limited to "individual statutes or discrete statutory programs," and did not include the networks alleged by plaintiff).

defined by a network of statutes and regulations: "(1) express statutory and regulatory language supporting the existence of a fiduciary relationship and (2) such elaborate or comprehensive government control over Indian property as to constitute a common-law trust."[5] <u>Id.</u> at 66 (citations omitted).  Upon analyzing the network of statutes and regulations underlying the TPA system and IHS funding process, the court determined that neither factor described in the case law was present in the case <u>sub judice</u>. <u>Id.</u> at 66-69.  Specifically, the court held that "[n]either the TPA system nor the IHS funding process contemplates the creation of a fiduciary relationship where the United States is directed to control and administer specific trust property for plaintiff," <u>id.</u> at 68, and that because "the funding appropriated by Congress for the benefit of the Indian people via the TPA system and IHS funding process is not trust property . . . , plaintiff has failed to prove the existence of a common-law trust," <u>id.</u> at 68-69.  Accordingly, the court dismissed "plaintiff's first claim for relief with respect to the TPA system and the IHS funding process" for lack of jurisdiction. <u>Id.</u> at 69.

Subsequently, plaintiff moved, pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims ("RCFC"), for the entry of judgment on the court's ruling. <u>Samish IV</u>, 85 Fed. Cl. at 525-26.  The court denied plaintiff's motion, holding that plaintiff's TPA system and IHS funding process allegations were not individual, cognizable claims for the purposes of entry of judgment. <u>Id.</u> at 526, 530.  Then, in concluding that there was a just reason for delaying entry of judgment, the court outlined the three ways in which plaintiff could demonstrate the money-mandating nature of the remaining programs, services, and benefits: if "(1) the program, service, or benefit is the product of a network of statutes and regulations; (2) the program, service, or benefit is a qualifying discretionary scheme; or (3) one of the statutes or regulations that comprise the program, service, or benefit is individually money-mandating." <u>Id.</u> at 531 (citations omitted).

Thereafter, the court directed defendant to file a renewed motion to dismiss that addressed (1) "whether, as averred in plaintiff's first claim for relief, the 'underlying legal framework' of each program, service, or benefit identified in the complaint (with the exception of the Tribal Priority Allocation system and the Indian Health Service funding process) provides a money-mandating basis for jurisdiction" and (2) "whether, as averred in plaintiff's second claim for relief, all of [the] statutes cited by plaintiff, taken together, 'comprise a network of statutes defining . . . the federal government's trust responsibility' to Indian tribes that provides a

---

[5]  The three referenced decisions were, at that time, the only decisions in which a reviewing court had found the existence of a fiduciary relationship that was defined by a network of statutes and regulations, and included: <u>United States v. White Mountain Apache Tribe</u>, 537 U.S. 465 (2003); <u>United States v. Mitchell</u>, 463 U.S. 206 (1983) ("<u>Mitchell II</u>"); and <u>Navajo Nation v. United States</u>, 501 F.3d 1327 (Fed. Cir. 2007).  The United States Supreme Court ("Supreme Court") subsequently reversed the Federal Circuit's decision in <u>United States v. Navajo Nation</u>, 129 S. Ct. 1547 (2009).

money-mandating basis for jurisdiction."[6]  Order 1-2, Mar. 5, 2009.  Briefing has now concluded on the instant motion.  The court deems oral argument unnecessary.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

In ruling on a motion to dismiss pursuant to RCFC 12(b)(1), the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction.  Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747.  If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).

Plaintiff asserts jurisdiction under both 28 U.S.C. § 1491 ("Tucker Act") and 28 U.S.C. § 1505 ("Indian Tucker Act").  The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2006).  The Indian Tucker Act waives sovereign immunity for claims brought by "any tribe, band, or other identifiable group of American Indians" against the United States that are founded upon "the Constitution, laws or treaties of the United States, or Executive orders of the President," as well as claims that "otherwise would be cognizable in the

---

[6]  In the same order, the court denied the remaining portions of defendant's then-pending motion to dismiss.

Court of Federal Claims if the claimant were not an Indian tribe, band or group." Id. § 1505. However, both the Tucker Act and the Indian Tucker Act are merely jurisdictional statutes, and do not create "a substantive right enforceable against the Government by a claim for money damages." United States v. Navajo Nation, 537 U.S. 488, 503, 506 (2003); White Mountain Apache Tribe, 537 U.S. at 472.

Instead, the substantive right must appear in another source of law, Mitchell II, 463 U.S. at 216, that, in general, "'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained,'" United States v. Testan, 424 U.S. 392, 400 (1976) (quoting Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1009 (Ct. Cl. 1967)). To make such a showing, a plaintiff must only demonstrate that the substantive source of law is "reasonably amenable to the reading that it mandates a right of recovery in damages." White Mountain Apache Tribe, 537 U.S. at 473. "While the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." Id. (citation omitted).

As a general rule, "[a] statute is not money-mandating when it gives the government complete discretion over the decision whether or not to pay an individual or group." Doe v. United States, 463 F.3d 1314, 1324 (Fed. Cir. 2006). "There is a presumption that the use of the word 'may' in a statute creates discretion" that "may be rebutted by 'the intent of Congress and other inferences'" that may be drawn "'from the structure and purpose of the statute at hand.'" Id. (quoting McBryde v. United States, 299 F.3d 1357, 1362 (Fed. Cir. 2002)). Thus, jurisdiction in the Court of Federal Claims may derive from "[c]ertain discretionary schemes," including those "statutes (1) that provide 'clear standards for paying' money to recipients; (2) that state the 'precise amounts' that must be paid; or (3) as interpreted, compel payment on satisfaction of certain conditions." Samish II, 419 F.3d at 1364 (citation omitted).

Jurisdiction can also be based upon a network of statutes and regulations that describes a fiduciary relationship between the government and Indian tribes.[7] Mitchell II, 463 U.S. at 226. However, there must be more than a "limited" or "bare" trust relationship. Id. at 224; Navajo Nation, 537 U.S. at 508; White Mountain Apache Tribe, 537 U.S. at 474; Mitchell v. United States, 445 U.S. 535, 542 (1980) ("Mitchell I"); see also Navajo Nation, 537 U.S. at 506 (noting that the "'general trust relationship between the United States and the Indian people' . . . alone is insufficient to support jurisdiction under the Indian Tucker Act" (quoting Mitchell II, 463 U.S. at 225 (citation omitted))). Rather, "the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." Navajo Nation, 537 U.S. at 506. Thus, the elements of a qualifying fiduciary relationship are: (1) express statutory and regulatory language supporting the existence of a fiduciary relationship, see White Mountain Apache Tribe, 537 U.S. at 474-75; Mitchell II, 445 U.S. at 224-25, and (2) such elaborate or comprehensive government

---

[7] A more detailed discussion of the genesis and application of the theory that a network of statutes, regulations, and other sources of law can supply a money-mandating source of jurisdiction can be found in Samish III, 82 Fed. Cl. at 61-65.

control over Indian property as to constitute a common-law trust, see White Mountain Apache Tribe, 537 U.S. at 474-76 & n.3; Mitchell II, 445 U.S. at 225.

### III.  PLAINTIFF'S FIRST CLAIM FOR RELIEF

As noted above, plaintiff seeks compensation for the programs, services, and benefits it would have received between 1969 and 1996, if it had been treated as a federally recognized Indian tribe during that time period.  Plaintiff contends that because Congress provided funding for these programs, services, and benefits "with the clear intent that they benefit every federally recognized tribe, it is fair to reason that Congress intended a damages remedy to be available where a federal agency denied one tribe the benefits of such funding by its arbitrary and wrongful refusal to recognize that tribe."  Samish Indian Nation's Opp'n United States' Renewed Mot. Dismiss ("Opp'n") 2.  In particular, plaintiff argues that the statutes and regulations underlying each program, service, and benefit expressly mandate the payment of money damages or, alternatively, that the "underlying legal framework" of each program, service, and benefit constitutes a discretionary scheme mandating the payment of money damages.  The court begins its analysis with a discussion of whether the type of programs, services, and benefits identified by plaintiff can, in general, constitute a money-mandating source of jurisdiction.  It then specifically addresses each of the programs, services, and benefits identified by plaintiff.

### A.  Federal Grant-In-Aid Programs

Broadly speaking, a federal grant is "financial assistance authorized by federal law to support autonomous programs of states or local governments or groups, which the federal government does not dictate but does wish to encourage."  Paul G. Dembling & Malcolm S. Mason, Essentials of Grant Law Practice § 2.02 (1991).  Grants are characterized by "a maximum of autonomy in the program essentials, coupled with a necessary minimum of fiscal control to assure integrity."  Id.; see also Dixson v. United States, 465 U.S. 482, 508 (1984) (O'Connor, J., dissenting) (noting that the "main defining characteristic" of federal grant programs is that the recipient of the grant has autonomy, i.e., "considerable discretion to design and execute the federally assisted programs without federal intrusion").  Grants may be distinguished by their mandatory or discretionary nature.  Mandatory or entitlement grants are those "in which the recipient, which is typically a state, has a right to receive the grant, if it meets the qualifying conditions."  Dembling & Mason, supra, at § 2.04(a).  Discretionary or project grants "are those in which the recipient applies for assistance, and a discretionary choice is made by a federal agency among the applicants."  Id. § 2.04(b).  Thus, federal agencies have the discretion to refuse the grant, to condition the grant, and to determine the amount of the grant.  Id.  Grants may also be distinguished by their purpose.  Id.  Categorical grants "are those that are made for a narrowly defined purpose" and block grants "are those that are made for broadly defined purposes . . . ."[8]  Id. § 2.04(c).  Generally speaking, revenue sharing programs, loans, and

---

[8]  In fact, block grants are a form of federal aid provided to state and local governments as a substitute for the more numerous and more specific categorical programs.  U.S. Gen.

subsidies are not considered to be grants.  Id. § 2.05; see also Goolsby v. Blumenthal, 581 F.2d 455, 465 (5th Cir. 1978) (Thornberry, J., dissenting) (distinguishing between block grants and revenue sharing), aff'd, 590 F.2d 1369 (5th Cir. 1979) (en banc); Ely v. Velde, 497 F.2d 252, 256 (4th Cir. 1974) ("A block grant is not the same as unencumbered revenue sharing, for the grant comes with strings attached."); S. Rep. No. 92-1050, pt. 1 (1972) ("[O]ne of the principal virtues of revenue sharing is the fact that this program is different from the categorical grant programs.").  But see Malone v. United States, 34 Fed. Cl. 257, 258 (1995) (asserting that subsidies provided to landowners under section 8 of the Housing Act of 1973 constituted a grant-in-aid program).  Accordingly, based upon these definitions, and as apparent from the descriptions provided below, most of the programs, services, and benefits identified by plaintiff are federal grants.[9]

Thus, the question arises whether the statutes creating federal grant programs are money-mandating, so as to permit the Court of Federal Claims' exercise of jurisdiction.  The Supreme Court addressed this issue in Bowen v. Massachusetts, 487 U.S. 879 (1988).  The overarching issue in Bowen was whether a federal district court had jurisdiction under the Administrative Procedure Act to review the final order of the Secretary of the United States Department of Health and Human Services ("Secretary of HHS") "refusing to reimburse a State for a category of expenditures under its Medicaid program," a federal grant-in-aid program.  Id. at 882 & n.1.  The Secretary of HHS argued that the United States Claims Court ("Claims Court")–now the Court of Federal Claims–"had exclusive jurisdiction over the State's claim."  Id. at 890.

In discussing this court's jurisdiction under the Tucker Act, the Supreme Court noted that although there are "many statutory actions over which the Claims Court has jurisdiction to enforce a statutory mandate for the payment of money," such statutes all "provide compensation for specific instances of past injuries or labors; suits brought under these statutes do not require the type of injunctive and declaratory powers that the district courts can bring to bear in suits under the Medicaid Act."  Id. at 900 n.31; see also id. at 904 n.39 (concluding that Tucker Act jurisdiction was proper to "remedy particular categories of past injuries and labors," while Administrative Procedure Act jurisdiction was proper when "[m]anaging the relationships between States and the Federal Government that occur over time and that involve constantly shifting balance sheets"), 905 n.42 (reiterating that statutes found to mandate the payment of money damages under the Tucker Act typically "attempt to compensate a particular class of persons for past injuries or labors").  In contrast, "the statutory mandate of a federal grant-in-aid

_____

Accounting Office, GAO/HEHS-95-74, Block Grants: Characteristics, Experience, and Lessons Learned 1 (1995) ("GAO Block Grant Report").  Governmental entities that receive such grants "are given greater flexibility to use funds based on their own priorities and to design programs and allocate resources as they determine to be appropriate."  Id. at 21.

[9]  The exceptions are the Federal Revenue Sharing program, those programs created by the United States Housing Act of 1937 ("Housing Act") to provide loans and subsidies, and the Commodity Food Distribution Program, which provides surplus food to low-income individuals.

program directs the Secretary to pay money to the State, not as compensation for a past wrong, but to subsidize future state expenditures." Id. at 905 n.42. Thus, the Supreme Court concluded that the state's suit was "not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it [was] a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." Id. at 900; accord Suburban Mortgage Assocs. v. U.S. Dep't of Hous. & Urban Dev., 480 F.3d 1116, 1125 (Fed. Cir. 2007) (citing the distinction with approval); Nat'l Ctr. for Mfg. Scis. v. United States, 114 F.3d 196, 200 (Fed. Cir. 1997) (same); Malone, 34 Fed. Cl. at 262-63 (same).

Plaintiff contends that the precedent cited above is inapplicable to its first claim for relief because the decisions concerned the "'jurisdictional boundary between the Tucker Act and the Administrative Procedure Act,'" and did not turn "on the type of federal funds at issue . . . ." Opp'n 33 (quoting Suburban Mortgage Assocs., 480 F.3d at 1117). It further asserts that those decisions concerned "whether the primary relief sought by the plaintiff is to correct the future application of agency policy, secure specific performance, or obtain other prospective relief," and that here, it seeks no prospective relief, only money damages. Id. While plaintiff is correct that the aforementioned decisions turned on the actual nature of the relief sought, it overlooks the Supreme Court's unambiguous statement in Bowen that "the statutory mandate of a federal grant-in-aid program directs the Secretary to pay money to the State, not as compensation for a past wrong, but to subsidize future state expenditures." 487 U.S. at 905 n.42 (emphasis added). In other words, statutes creating federal grant-in-aid programs are not designed to provide for a damages remedy. Thus, plaintiff's attempt to use the underlying statutes and regulations to obtain money damages for the government's failure to provide the specified programs, services, and benefits must fail.[10] Jurisdiction for plaintiff's first claim for relief must arise from a source

_____

[10] Moreover, to the extent that this court possesses jurisdiction to provide a monetary remedy when grant funds are not properly disbursed by the federal government, its ability to do so is limited by operation of the Antideficiency Act. The Antideficiency Act provides, in relevant part, that "[a]n officer or employee of the United States Government . . . may not . . . make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation[.]" 31 U.S.C. § 1341(a)(1)(A) (2006). Thus, "[f]unds appropriated for an agency's use can become unavailable in three circumstances: if the appropriation lapses; if the funds have already been awarded to other recipients; or if Congress rescinds the appropriation." City of Houston, Tex. v. Dep't of Hous. & Urban Dev., 24 F.3d 1421, 1426 (D.C. Cir. 1994); accord Star-Glo Assocs. v. United States, 414 F.3d 1349, 1354 (Fed. Cir. 2005) (noting that if a statute imposes a cap on expenditures for a particular purpose, "payments in excess of the cap would violate the Anti-deficiency Act"). The only situation in which a court may award funds after an appropriation lapses is when the lawsuit was instituted prior to the lapse date. City of Houston, Tex., 24 F.3d at 1426; accord Star-Glo Assocs. v. United States, 59 Fed. Cl. 724, 734-35 (2004), aff'd, 414 F.3d at 1349. Here, plaintiff has not alleged that (1) the appropriations for any of the grant programs have not lapsed since November 1, 1996, the last date for which plaintiff seeks unawarded grant funds; (2) the appropriations for any of the grant programs had not lapsed on the date it filed suit; or (3) the grant program funds

of law distinct from grant-creating statutes and regulations.  Because plaintiff has not relied upon any other substantive sources of law, dismissal of plaintiff's grant program allegations is warranted.

Although the court's conclusion disposes of nearly all of plaintiff's allegations in its first claim for relief, for the benefit of the parties, the court will individually address all of the programs, services, and benefits identified by plaintiff, regardless of whether they constitute federal grants-in-aid.  The court groups the programs, services, and benefits into five categories: (1) federal revenue sharing; (2) housing programs; (3) food and nutrition programs; (4) block grants for community services, health services, and home energy assistance; and (5) employment and training programs.  The court discusses each category in turn.

### B.  Federal Revenue Sharing

Plaintiff first asserts that it was entitled to receive funds via the Federal Revenue Sharing program.[11]  Congress created the Federal Revenue Sharing program in 1972 to provide fiscal assistance to state and local governments.  See State and Local Fiscal Assistance Act of 1972, 86 Stat. at 919.  The assistance was characterized as an entitlement.  See, e.g., id. § 102, 86 Stat. at 919 ("[T]he Secretary [of the United States Department of the Treasury] shall, for each entitlement period, pay out . . . to . . . each State government . . . and . . . each unit of local government a total amount equal to the entitlement of such unit."), § 107(a), 86 Stat. at 922 ("The State government shall be entitled to receive one-third of the amount allocated to that State for each entitlement period.  The remaining portion of each State's allocation shall be allocated

---

had not all been awarded to other recipients.  Accordingly, the operation of the Antideficiency Act would moot plaintiff's grant program allegations.  See City of Houston, Tex., 24 F.3d at 1426-27 (affirming the district court's grant of summary judgment on mootness grounds).

[11]  Plaintiff cites the following three statutes in its second amended complaint: State and Local Fiscal Assistance Act of 1972, Pub. L. No. 92-512, 86 Stat. 919 (appropriating funds for the period of January 1, 1972, through December 31, 1976), amended by State and Local Fiscal Assistance Amendments of 1976, Pub. L. No. 94-488, 90 Stat. 2341 (appropriating funds for the period of January 1, 1977, through September 30, 1980), and State and Local Fiscal Assistance Act Amendments of 1980, Pub. L. No. 96-604, 94 Stat. 3516 (appropriating funds for the period of October 1, 1980, through September 30, 1983).  The Federal Revenue Sharing program authorized by the State and Local Fiscal Assistance Act of 1972 terminated on September 30, 1983.  State and Local Fiscal Assistance Act Amendments of 1980, § 2(a)-(b), 94 Stat. at 3516.  However, although the underlying statutes are not cited by plaintiff, the Federal Revenue Sharing program continued to exist.  See, e.g., Act of Sept. 13, 1982, Pub. L. No. 97-258, 96 Stat. 877, 1010-31 (codifying title 31 of the United States Code), amended by Local Government Fiscal Assistance Amendments of 1983, Pub. L. No. 98-185, § 2, 97 Stat. 1309, 1309 (extending the program through September 30, 1986), repealed by Consolidated Omnibus Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82, 327-28.

among the units of local government of that State . . . ."), § 108(b)(6)(A), 86 Stat. at 925 ("[T]he entitlement of any unit of local government for any entitlement period shall be the amount allocated to such unit . . . ."). Among the units of local government covered by the program were Indian tribes: "If . . . there is an Indian tribe . . . which has a recognized governing body which performs substantial government functions, then . . . there shall be allocated to such tribe . . . a portion of the amount allocated . . . ." Id. § 108(b)(4), 86 Stat. at 925; see also id. at § 108(d)(1), 86 Stat. at 927 (noting that Indian tribes constituted units of local government for the purposes of most provisions of the statute, including those cited here). Funds were allocated to state and local governments in accordance with a complex formula based on population, general tax effort, and relative income. Id. §§ 106-109, 86 Stat. at 921-31. Initially, local governments were required to use their allocated funds for the following "priority expenditures": public safety, environmental protection, public transportation, health, recreation, libraries, social services, and financial administration. Id. § 103(a), 86 Stat. at 919. Within these general categories, local governments could use the funds "in accordance with local needs and priorities and without the attachment of strings by the Federal Government." S. Rep. No. 92-1050, at 1 (1972). Subsequently, when Congress amended the Act in 1976, it eliminated the need to use the allocated funds for "priority expenditures." State and Local Fiscal Assistance Amendments of 1976, § 3(a), 90 Stat. at 2341; see also S. Rep. No. 94-1207, at 1 (1976) (characterizing the provision of fiscal assistance as "unrestricted").

The United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") addressed whether the Claims Court had jurisdiction to entertain claims brought under the Federal Revenue Sharing program in National Ass'n of Counties v. Baker, 842 F.2d 369 (D.C. Cir. 1988).[12] In particular, the plaintiff-appellees, various local governments, sought to recover revenue sharing funds that had been sequestered pursuant to a statute aimed at eliminating the federal budget deficit. Id. at 371-72. The Secretary of the United States Department of the Treasury ("Treasury Secretary") argued that the local governments' claims belonged in the Claims Court pursuant to the Tucker Act. Id. at 371. Specifically, he contended that the Federal Revenue Sharing statute mandated compensation because the withheld funds were entitlements. Id. at 374. The D.C. Circuit disagreed, explaining:

> First, we do not believe that the Revenue Sharing Act can fairly be interpreted as mandating the compensation which the local governments seek. Second, we believe that the compensation mandating requirement refers to cases where "classical money damages" are sought by the plaintiff and not to cases such as the present case where the relief sought is only a disbursal of the money to which a statute allegedly entitles them.

---

[12] The specific statute addressed by the D.C. Circuit was the Act of Sept. 13, 1982, which codified the Revenue Sharing Program at title 31 of the United States Code. See Nat'l Ass'n of Counties, 842 F.2d at 371-72. The relevant provisions in the Act of Sept. 13, 1982 are substantively similar to those in the statutes cited by plaintiff.

Id.  With respect to the former holding, the D.C. Circuit noted that the only language in the statute that might support the Treasury Secretary's position provided: "'Each unit of general local government is entitled to an amount equal to any amount allocated to the government under this chapter for each entitlement period.  Each State government shall be paid an amount equal to any allocation made for each entitlement period.'"  Id. at 374-75 (quoting 31 U.S.C. § 6702 (1982)) (second emphasis added).  It concluded, however, that this language could not "be fairly interpreted as compensation mandating."  Id. at 375.

Amplifying the latter holding, the D.C. Circuit elucidated:

The Revenue Sharing Act contains no provision that expressly makes the United States liable for mismanagement of the Revenue Sharing [funds].  Nor is there any indication in the legislative history that Congress intended to provide the local governments with a substantive right to recover money damages due to mismanagement of the Revenue Sharing [funds].

. . . .

We are reluctant to interpret the Revenue Sharing Act as mandating compensation in the absence of clear Congressional intent, because to do so would result in an implied right of action in favor of [fund] recipients.  A substantive right to recover is not to be implied in the absence of clear Congressional intent.  We do not believe the Revenue Sharing Act or its legislative history reflects an intent by Congress to provide the local governments with a substantive right to recover damages due to the improper withholding of funds by the Secretary.

Id. (citations omitted).  In sum, the D.C. Circuit concluded:

The Revenue Sharing Act creates monetary entitlements, or rights, and the local governments seek only to enforce those rights.  They do not seek monetary compensation because their rights have been abridged.  Thus, the local governments seek specific relief.  There is a difference between monetary relief in the form of compensation on the one hand, and monetary relief in the form of specific relief, on the other.

Id. at 380.

The D.C. Circuit's holding that the Federal Revenue Sharing statute did not mandate the payment of money damages appears to stand in contrast with the Federal Circuit's decision in Agwiak v. United States, 347 F.3d 1375 (Fed. Cir. 2003), which also addressed the appropriate statutory construction of the terms "is entitled" and "shall be paid."  In Agwiak, the plaintiff-appellants, who had been employed by the United States Department of Health and Human

Services, sought, among other things, remote worksite pay pursuant to 5 U.S.C. § 5942(a).  Id. at 1376-77.  The statute provided:

> [A]n employee of an Executive department or an independent establishment who is assigned to duty, except temporary duty, at a site so remote from the nearest established communities or suitable places of residence as to require an appreciable degree of expense, hardship, and inconvenience, beyond that normally encountered in metropolitan commuting, on the part of the employee in commuting to and from his residence and such worksite, is entitled, in addition to pay otherwise due him, to an allowance of not to exceed $10 a day.  The allowance shall be paid under regulations prescribed by the President establishing the rates at which the allowance will be paid and defining and designating those sites, areas, and groups of positions to which the rates apply.

5 U.S.C. § 5942(a) (2000) (emphasis added), cited in Agwiak, 347 F.3d at 1378-79.  The government argued that this statute and its implementing regulations were not money-mandating. Agwiak, 347 F.3d at 1379.  The Federal Circuit disagreed, explaining:

> The relevant statute in this case provides that an employee at a remote duty site "is entitled" to the remote duty allowance.  The statute further provides that "[t]he allowance shall be paid under regulations prescribed by the President."  We have repeatedly recognized that the use of the word "shall" generally makes a statute money-mandating.  Indeed, we have held that 37 U.S.C. § 204 is money-mandating, and it contains substantively identical language to the statute at issue here: "The following persons are entitled to the basic pay of the pay grade to which assigned or distributed[.]".

Id. at 1380 (second alteration added) (citations omitted); see also id. (noting that "the implementing regulations for section 5942(a) contain similar language"); accord Greenlee County, Ariz. v. United States, 487 F.3d 871, 877 (Fed. Cir. 2007) (holding that the Payment in Lieu of Taxes Act, which provided that the government "shall make a payment for each fiscal year to each unit of general local government in which entitlement land is located," was "'reasonably amenable' to a reading that it is money-mandating"); Britell v. United States, 372 F.3d 1370, 1378 (Fed. Cir. 2004) (holding that the regulations implementing the military's health insurance plan, which provided that the plan "will pay" benefits "directly" to the insured, were "'reasonably amenable to the reading that [they] mandate[] a right of recovery in damages'"). Accordingly, the Federal Circuit concluded that section 5942 and its implementing regulations were money-mandating.  Agwiak, 347 F.3d at 1380.

In the instant case, as in both National Ass'n of Counties and Agwiak, the court is presented with language indicating that Indian tribes are "entitled to" funds and "shall be allocated" those funds, and that the Treasury Secretary "shall . . . pay out" the funds to the Indian tribes.  Although National Ass'n of Counties concerns the same statutory program as the case at

bar, it is only persuasive, not controlling, precedent.  See Admiral Fin. Corp. v. United States,
378 F.3d 1336, 1340 (Fed. Cir. 2004) ("[W]e accord great weight to the decisions of our sister
circuits when the same or similar issues come before us, and we 'do not create conflicts among
the circuits without strong cause.'" (quoting Wash. Energy Co. v. United States, 94 F.3d 1557,
1561 (Fed. Cir. 1996))); Bankers Trust N.Y. Corp. v. United States, 225 F.3d 1368, 1371 (Fed.
Cir. 2000) ("While these decisions [of two federal appellate courts] are not binding on the Court
of Federal Claims, the court found them persuasive in their own right . . . .").  The Federal Circuit
in Agwiak addressed language nearly identical to the language contained in the Federal Revenue
Sharing statutes cited by plaintiff.  Accordingly, the court must follow this binding precedent and
conclude that the State and Local Fiscal Assistance Act of 1972, as amended, is money-
mandating.

However, this conclusion does not end the court's inquiry.  While the court possesses
jurisdiction over plaintiff's Federal Revenue Sharing program allegations, it must consider
whether those allegations have been rendered moot by operation of the Antideficiency Act.[13]  See

---

[13]  The court's jurisdictional inquiry is distinct from its inquiry into the justiciability of a
claim.  Baker v. Carr, 369 U.S. 186, 198 (1962); Murphy v. United States, 993 F.2d 871, 872
(Fed. Cir. 1993).  An issue is justiciable if it is within the court's competency to supply relief.
Murphy, 993 F.2d at 872; see also Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005)
(panel portion) (noting that justiciability "encompasses a number of doctrines under which courts
will decline to hear and decide a cause," including the "doctrines of standing, mootness, ripeness,
and political question").  Thus, the court may find that it possesses jurisdiction over the subject
matter of a case but that the dispute is nonjusticiable.  Baker, 369 U.S. at 198; Oryszak v.
Sullivan, 576 F.3d 522, 526 n.3 (D.C. Cir. 2009) ("That a particular dispute is nonjusticiable,
however, does not mean the court lacks jurisdiction over the subject matter.").

The D.C. Circuit's opinion in Oryszak deserves further comment.  The opinion was
unanimous, save for the footnote in which the quotation set forth above appears.  See 476 F.3d
523 n.* (noting that the Honorable Brett M. Kavanaugh concurred "in all but footnote 3 of the
opinion of the court").  Notably, the Honorable Douglas H. Ginsburg, who authored the opinion
of the court, also filed a concurring opinion that further addressed the distinction between
jurisdiction and justiciability, as well as the proper mechanism of dismissing a suit on
justiciability grounds:

> That a plaintiff makes a claim that is not justiciable . . . does not mean the court
> lacks subject matter jurisdiction over his case, as the opinion of the court helps to
> clarify.  Upon a proper motion, a court should dismiss the case for failure to state
> a claim.  . . .
>
> That the nonjusticiability of a claim may not be waived does not render
> justiciability a jurisdictional issue, and this court has been careful to distinguish
> between the two concepts.

Star-Glo Assocs., 414 F.3d at 1354; City of Houston, Tex., 24 F.3d at 1426-27.  As noted above, the court is unable to award funds if an appropriation has lapsed unless an aggrieved party files suit before the appropriation lapses.  City of Houston, Tex., 24 F.3d at 1426.  The three Federal Revenue Sharing statutes cited by plaintiff appropriated funds for three time periods: (1) January 1, 1972, through December 31, 1976; (2) January 1, 1977, through September 30, 1980; and (3) October 1, 1980, through September 30, 1983.  Thus, the appropriations for the Federal Revenue Sharing program, as alleged by plaintiff, lapsed on September 30, 1983, almost twenty years before plaintiff filed suit in the Court of Federal Claims.  As a result, plaintiff's Federal Revenue Sharing program allegations are moot.

## C.  Housing Programs

Plaintiff next contends that it would have been eligible to receive housing assistance pursuant to the Housing Act, as amended, and via the Housing Improvement Program.  The court addresses each in turn.

---

That the court may in its discretion address a threshold question before establishing that it has jurisdiction does not render the question jurisdictional nor, significantly, does it mean the court must address that question at the outset of the case.  Because justiciability is not jurisdictional, a court need not necessarily resolve it before addressing the merits. . . .  For a court to retain this discretion it is important to distinguish among failure to state a claim, a claim that is not justiciable, and a claim over which the court lacks subject matter jurisdiction.

Id. at 526-27 (Ginsburg, J., concurring) (citations omitted).

-15-

**1. United States Housing Act of 1937**[14]

In enacting the Housing Act, Congress sought to "remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwelling-conditions for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation."  § 1, 50 Stat. at 888.  Funding was provided "to construct, maintain, and rehabilitate low-income housing through programs such as Development, Subsidies, and Modernization."  GAO Housing Report, supra, at 3.  For some programs, funding was awarded on a competitive basis.  Id. at 4.  For the remaining programs, funding was allocated "noncompetitively through a formula or on a first-come, first-served basis."  Id.  Whatever the funding mechanism, to obtain assistance, a tribal governing authority, like any state or local unit of government, was typically required "to enact an ordinance creating a housing

---

[14]  Plaintiff cites the following three statutes in its second amended complaint: Housing Act, ch. 896, 50 Stat. 888, amended in relevant part by Housing and Community Development Act of 1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 653–67, and Indian Housing Act of 1988, Pub. L. No. 100-358, 102 Stat. 676.  In its opposition to defendant's renewed motion to dismiss, plaintiff cites another statute amending the Housing Act, the Native American Housing Assistance and Self-Determination Act of 1996, Pub. L. No. 104-330, 110 Stat. 4016.  This Act terminated the assistance available to Indian tribes under the Housing Act as of September 30, 1997.  Id. § 502, 110 Stat. at 4043.  Moreover, the substantive provisions of the Act specifically cited by plaintiff–§§ 101, 301, 110 Stat. at 4022-23, 4036–had an effective date of October 1, 1997.  Id. § 107, 110 Stat. at 4030; see also U.S. Gen. Accounting Office, GAO/RCED-99-16, Native American Housing: Information on HUD's Funding of Indian Housing Programs 3 (1998) ("GAO Housing Report") (noting that after rulemaking concluded on March 12, 1998, the Act "went into effect on April 13, 1998").  Because plaintiff was reestablished as a federally recognized Indian tribe on November 1, 1996, almost a year before the provisions of the Native American Housing Assistance and Self-Determination Act of 1996 went into effect, the Act is not applicable here.

Plaintiff also cites the following statutory provisions in its second amended complaint, although they do not directly amend the Housing Act: (1) Housing and Community Development Act of 1977, Pub. L. No. 95-128, § 901, 91 Stat. 1111, 1148 and (2) Housing and Community Development Act of 1974, §§ 102(a)(1), 103, 88 Stat. at 635, 637, amended by Housing and Community Development Act of 1977, §§ 102(a)(6), 103(a), 91 Stat. at 1112-13.  The cited provision of the Housing and Community Development Act of 1977 created a Special Assistant for Indian and Alaska Native Programs in the United States Department of Housing and Urban Development ("HUD") to coordinate housing and community development for Indian tribes.  The cited provisions of the Housing and Community Development Act of 1974 authorized the Secretary of HUD to provide grants to Indian tribes to help finance approved Community Development programs.

authority" to administer the programs upon receipt of funding.[15]  Indian Housing, supra, at 4.
Assistance was available to all Indian housing authorities, regardless of whether the establishing
tribe was federally recognized.  See, e.g., 24 C.F.R. § 805.104 (1976).  Once it had established an
Indian housing authority, a tribe could submit an application to HUD to develop a project.  See,
e.g., id. §§ 805.206-.207.  To obtain approval for a project, an Indian housing authority was
required to demonstrate, among other things, that it was capable of administering the project.
See, e.g., id. § 805.207(a).

For many of the programs authorized by the Housing Act, the Secretary of HUD had the
discretion to make the relevant grants and loans.  See, e.g., Housing and Community
Development Act of 1974, § 201(a), 88 Stat. at 656 ("The Secretary may make loans . . . to
public housing agencies to help finance or refinance the development, acquisition, or operation of
low-income housing projects by such agencies.  . . .  The Secretary may make annual
contributions to public housing agencies to assist in achieving and maintaining the low-income
character of their projects."), 662 ("The Secretary is authorized to enter into annual contribution
contracts with public housing agencies . . . ."), 666 ("[T]he Secretary may make annual
contributions to public housing agencies for the operation of low-income housing projects.").
However, plaintiff contends that two statutory provisions were nondiscretionary in nature.
Plaintiff first quotes from a 1974 amendment to the Act:

> [T]he Secretary [of HUD] shall enter into contracts for annual contributions, out
> of the aggregate amount of contracts for annual contributions authorized under
> this section . . . , to assist in financing the development or acquisition cost of
> low-income housing for families who are members of any Indian tribe . . . which
> is recognized by the Federal Government as eligible for service from the Bureau
> of Indian Affairs, or who are wards of any State government . . . .

Id. § 201(a), 88 Stat. at 657.  Plaintiff then quotes from a 1988 amendment to the Act: "The
Secretary [of HUD] shall carry out programs to provide lower income housing on Indian
reservations and other Indian areas in accordance with the provisions of [title II of the Housing
Act]."  Indian Housing Act of 1988, § 2, 102 Stat. at 676.  According to plaintiff, these quoted
provisions demonstrate a congressional intent to benefit Indian tribes, and therefore render the
Housing Act money-mandating.

The court has previously held that the Housing Act is not a money-mandating source of
jurisdiction to the extent that it authorizes federal grant-in-aid programs.  However, even if the
court looks beyond the grant-in-aid aspects of the Housing Act, it could not find that the
provisions of the Housing Act cited by plaintiff are money-mandating.  As an initial matter,
plaintiff has not cited any language demonstrating that the Housing Act is "reasonably amenable

---

[15]  Indian housing authorities could also be established pursuant to state law.  See, e.g., 24
C.F.R. § 805.108(b) (1976); see also Staff of S. Comm. on Interior & Insular Affairs, 94th Cong.,
Indian Housing in the United States 4 (Comm. Print 1975) ("Indian Housing").

to the reading that it mandates a right of recovery in damages." <u>White Mountain Apache Tribe</u>, 537 U.S. at 473.  The only language cited by plaintiff–that the government "shall enter into contracts" and "shall carry out programs"–does not suffice to mandate compensation.  <u>Accord</u> <u>Britell</u>, 372 F.3d at 1377-78 (holding that a statute providing that the government "shall contract . . . for medical care" and that an insured "is entitled . . . to the medical and dental care" was not money-mandating).

Morever, plaintiff has not demonstrated that any of the programs, services, or benefits authorized by the Housing Act constitute a discretionary scheme that is money-mandating.  First, plaintiff has not shown that the statutes and regulations it cites provide clear standards for paying money to recipients.  In some of the authorized programs, funding is awarded on a competitive basis.  Thus, not all applicants automatically receive funding.  Rather, it remains within the government's complete discretion to determine the successful applicant.  Plaintiff's nonspecific allegation that funding is provided on a noncompetitive basis pursuant to a formula in some programs is not sufficient evidence that the relevant portions of the Housing Act rise to the level of money-mandating.  Second, the statutes and regulations cited by plaintiff do not provide that precise amounts must be paid.  Third, the statutes and regulations cited by plaintiff do not compel payment on satisfaction of certain conditions.  In order to qualify for funding under Housing Act programs, an Indian tribe is required to (1) establish a housing authority, (2) submit an application to develop a project, and (3) demonstrate that it was capable of administering the project.  However, the mere submission of an application to develop a project does not result in the award of funding to the Indian housing authority.  And, it is within the discretion of the Secretary of HUD to determine whether the housing authority is capable of administering the project.  In sum, plaintiff has not established a discretionary scheme that is money-mandating with respect to the Housing Act.

## 2. Housing Improvement Program[16]

The Bureau of Indian Affairs ("BIA") of the Department of the Interior created the Housing Improvement Program in 1965 "in an effort to respond to the housing needs of those Indian families with exceptionally low incomes or no income at all . . . ." Indian Housing, supra, at 7. The Housing Improvement Program "provides grants for repairs, major rehabilitation, down payments, and some new housing construction" and "is designed to provide these various forms of assistance to Indian people who are unable to obtain it from any other source." Id. Grants may be made to individuals to enable them to do their own work, or the project grant money can be used by a tribe or the BIA to perform the work. Id.; 25 C.F.R. § 300.6 (1976) (noting that the BIA can disburse funds through direct grants to individuals, negotiated contracts and grant agreements with Indian tribes, contracts with non-Indian firms, and BIA programs); see also 25 C.F.R. § 300.3 (1976) ("To the maximum extent possible, the program will be administered through tribes, tribal housing authorities, or other tribal organizations, or by having tribal officials participate in the applicant selection process."). "Annual [Housing Improvement Program] appropriations are distributed . . . according to tribal needs and relative priorities for housing repair services to Indian homes . . . ." Indian Housing, supra, at 7; see also 25 C.F.R. § 300.5(a) (1976) ("Priority is given to families with the greatest need in relation to income, family size, and of not being eligible for other available programs providing housing assistance."). Beginning in 1983, the annual appropriations acts for the Department of the Interior expressly provided funding for the "construction, repair, and improvement of Indian

---

[16] Plaintiff asserts that beginning in 1983, Congress provided funding for the Housing Improvement Program in its annual appropriations acts pertaining to the Department of the Interior and related agencies. In particular, plaintiff cites: Department of the Interior and Related Agencies Appropriations Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-192 (1996); Department of the Interior and Related Agencies Appropriations Act, 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-169 to -170; Department of the Interior and Related Agencies Appropriations Act, 1995, Pub. L. No. 103-332, 108 Stat. 2499, 2510 (1994); Department of the Interior and Related Agencies Appropriations Act, 1994, Pub. L. No. 103-138, 107 Stat. 1379, 1390 (1993); Department of the Interior and Related Agencies Appropriations Act, 1993, Pub. L. No. 102-381, 106 Stat. 1374, 1388 (1992); Department of the Interior and Related Agencies Appropriations Act, 1992, Pub. L. No. 102-154, 105 Stat. 990, 1005 (1991); Department of the Interior and Related Agencies Appropriations Act, 1991, Pub. L. No. 101-512, 104 Stat. 1915, 1930 (1990); Act of Oct. 23, 1989, Pub. L. No. 101-121, 103 Stat. 701, 714 (Fiscal Year 1990); Act of Sept. 27, 1988, Pub. L. No. 100-446, 102 Stat. 1774, 1795 (Fiscal Year 1989); Department of the Interior and Related Agencies Appropriations Act, 1988, Pub. L. No. 100-202, 101 Stat. 1329, 1329-229 (1987); Department of the Interior and Related Agencies Appropriations Act, 1987, Pub. L. No. 99-500, 100 Stat. 1783, 1783-256 (1986); Act of Dec. 19, 1985, Pub. L. No. 99-190, 99 Stat. 1185, 1236 (Fiscal Year 1986); Department of the Interior and Related Agencies Appropriations Act, 1985, Pub. L. No. 98-473, 98 Stat. 1837, 1849 (1984); Act of Nov. 4, 1983, Pub. L. No. 98-146, 97 Stat. 919, 929 (Fiscal Year 1984).

housing . . . ."  See, e.g., Act of Nov. 4, 1983, 97 Stat. at 929 ("For . . . construction, repair, and improvement of Indian housing, $78,920,000, to remain available until expended[.]").

The court has previously held that the statutes and regulations constituting the Housing Improvement Program are not money-mandating sources of jurisdiction due to the Housing Improvement Program's status as a federal grant-in-aid program.  However, even if the Housing Improvement Program was not a federal grant program, or if grant programs were not categorically excluded from having money-mandating status, the court could not conclude that the underlying legal framework of the Housing Improvement Program is money-mandating.  To begin, neither the appropriations acts cited by plaintiff, nor the regulations implementing the Housing Improvement Program, are "reasonably amenable to the reading that [they] mandate[] a right of recovery in damages."  White Mountain Apache Tribe, 537 U.S. at 473.  The appropriations acts merely set aside a sum of money for the BIA for the "construction, repair, and improvement of Indian housing" and do not otherwise specify who would ultimately receive the funds, much less indicate that funds are earmarked specifically for the Housing Improvement Program.  Similarly, the regulations are bereft of any provision that mandates the payment of money to Indian tribes; they merely direct that funding should be funneled through tribes to the "maximum extent possible."

In addition, plaintiff has not established that the legal framework underlying the Housing Improvement Program constitutes a discretionary scheme that is money-mandating.  First, plaintiff has not demonstrated that the statutes and regulations it cites provide clear standards for paying money to recipients.  As already noted, the appropriations acts contain no guidance concerning who should receive Housing Improvement Program funds.  And, not only do the regulations indicate that funding could flow through tribes or be provided directly to the individual requiring assistance, they also indicate that grants are awarded on a competitive basis, thus evidencing the BIA's absolute discretion to determine grant recipients.  Second, the statutes and regulations cited by plaintiff do not provide that precise amounts must be paid.  Third, the statutes and regulations cited by plaintiff do not compel payment on satisfaction of certain conditions.  In fact, neither the statutes nor the regulations set forth any steps that an Indian tribe must take to obtain funds under the Housing Improvement Program.  The regulations merely provide that tribes may receive funds through negotiated contracts or grant agreements.  For these reasons, plaintiff has not established a discretionary scheme that is money-mandating with respect to the Housing Improvement Program.

### D.  Food and Nutrition Programs

Third, plaintiff asserts that it was eligible to receive food and nutrition benefits via a special supplemental nutrition program for women, infants, and children ("WIC Program") and the Commodity Food Distribution Program.[17]  The court addresses each program in turn.

---

[17]  In its second amended complaint, plaintiff also asserts that it was eligible to receive benefits pursuant to the Food Stamp program.  However, in its opposition to defendant's renewed

### 1. Supplemental Nutrition Program for Women, Infants, and Children[18]

Congress created the WIC Program in 1972 to enable "local health or welfare agencies or private nonprofit agencies . . . to carry out a program under which supplemental foods will be made available to pregnant or lactating women and to infants determined by competent professionals to be nutritional risks because of inadequate nutrition and inadequate income." Act of Sept. 26, 1972, § 9, 86 Stat. at 729 (adding section 17 to the Child Nutrition Act of 1966). The Secretary of the United States Department of Agriculture ("Secretary of Agriculture") was authorized to make cash grants to states for the purposes of funding the WIC Program. Id. ("[T]he Secretary shall make cash grants to the health department or comparable agency of each State . . . ."). In 1973, Congress extended eligibility for the receipt of cash grants to Indian tribes. National School Lunch and Child Nutrition Act Amendments of 1973, § 6(a), 87 Stat. at 563 (amending the statute to read: "[T]he Secretary shall make cash grants to the health department or comparable agency of each State; Indian tribe, band, or group recognized by the Department of the Interior; or the Indian Health Service of the Department of Health, Education, and Welfare . . . ."); see also Child Nutrition Amendments of 1978, § 3, 92 Stat. at 3613 (providing that "the Secretary shall make cash grants to State agencies," including Indian tribes, "for the purpose of administering the program" and that any eligible local agency, including an Indian tribe, "that applies to participate in . . . the program . . . shall immediately be provided with the necessary funds to carry out the program"). As of 1998, many, but not all,[19] federally recognized Indian tribes in the continental United States participated in the WIC Program. USDA WIC Report, supra, at 3, 6.

motion to dismiss, plaintiff indicates that it has abandoned its Food Stamp program claim. Thus, the court need not address this now-abandoned contention.

[18] Plaintiff cites the following statutory provisions in its second amended complaint: Act of Sept. 26, 1972, Pub. L. No. 92-433, § 9, 86 Stat. 724, 729-31 (amending the Child Nutrition Act of 1966, Pub. L. No. 89-642, 80 Stat. 885), amended by National School Lunch and Child Nutrition Act Amendments of 1973, Pub. L. No. 93-150, § 6(a), 87 Stat. 560, 563. In its opposition to defendant's renewed motion to dismiss, plaintiff cites another statutory provision amending the Child Nutrition Act of 1966, the Child Nutrition Amendments of 1978, Pub. L. No. 95-627, § 3, 92 Stat. 3603, 3611-19. The WIC Program is currently codified at 42 U.S.C. § 1786.

[19] About 100 of the 385 federally recognized Indian tribes or tribal organizations in the continental United States were represented by Indian Tribal Organizations operating as state agencies, while about fifty-six Indian tribes or tribal councils operated local agencies. Nancy Cole, U.S. Dep't of Agric., WIC-02-NAM, The Characteristics of Native American WIC Participants, On and Off Reservations 3, 6 (2002) ("USDA WIC Report").

To receive WIC Program funds, an Indian tribe must have "executed an agreement with the Department [of Agriculture] and received approval of its State Plan of Program Operation and Administration." 7 C.F.R. § 246.14(a) (1980). Beginning in 1980, funds appropriated by Congress for the WIC Program were allocated among states and Indian tribes according to a formula. See id. § 246.14(b) ("Funds . . . shall be distributed . . . on the basis of funding formulas which allocate funds to all State agencies for food costs and operational and administrative costs."); Child Nutrition Amendments of 1978, § 3, 92 Stat. at 3617 ("[T]he Secretary [of Agriculture] shall divide, among the State agencies, the funds provided in accordance with this section on the basis of a formula determined by the Secretary.").

The court has previously held that the statutes and regulations comprising the WIC Program are not money-mandating sources of jurisdiction due to the WIC Program's status as a federal grant-in-aid program. Accordingly, the court need not further analyze whether the underlying legal framework of the WIC Program is expressly money-mandating or constitutes a discretionary scheme that is money-mandating.

## 2. Commodity Food Distribution Program[20]

The Commodity Food Distribution Program originated in statutes permitting the use of price supports to "encourage the domestic consumption" of agricultural commodities "by increasing their utilization through benefits, indemnities, donations or by other means, among persons in low income groups . . . ." Act of Aug. 24, 1935, ch. 641, § 32, 49 Stat. 750, 774, amended by Act of June 30, 1939, ch. 253, 53 Stat. 939, 975. "[T]o prevent the waste of food commodities acquired through price support operations which are found to be in danger of loss through deterioration or spoilage," Congress provided that the United States Department of Agriculture ("USDA") could make such commodities available to "the Bureau of Indian Affairs and Federal, State, and local public welfare organizations for the assistance of needy Indians and other needy persons[.]" Agricultural Act of 1949, § 416, 63 Stat. at 1058.

In amending the Food Stamp Act in 1977, Congress reaffirmed its policy "to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." Food and Agriculture Act of 1977, § 1301, 91 Stat. at 958. It also reaffirmed the application of the Commodity Food Distribution Program to Indian tribes, providing:

---

[20] Plaintiff cites the following two statutes: Food and Agriculture Act of 1977, Pub. L. No. 95-113, 91 Stat. 913; Agricultural Act of 1949, ch. 792, § 416, 63 Stat. 1051, 1058. The Commodity Food Distribution Program is currently codified at 7 U.S.C. § 612c. Further provisions related to the distribution of commodities on Indian reservations are currently codified at 7 U.S.C. § 2013(b). Although the program, as it applies to Indian tribes, is currently referred to as the Food Distribution Program on Indian Reservations, for simplicity, the court uses the original name, the Commodity Food Distribution Program.

Distribution of commodities, . . . shall also be made whenever a request for . . . food program operations . . . is made by a tribal organization.  In the event of distribution on all or part of an Indian reservation, the appropriate agency of the State government in the area involved shall be responsible for such distribution, except that, if the Secretary [of Agriculture] determines that the tribal organization is capable of effectively and efficiently administering such distribution, then such tribal organizations shall administer such distributions. . . .  The Secretary is authorized to pay such amounts for administrative costs of such distribution on Indian reservations as the Secretary finds necessary for effective administration of such distribution by a State agency or tribal organization.

Id. § 1301, 91 Stat. at 961; see also id. § 1304(a), 91 Stat. at 980 ("[T]he Secretary [of Agriculture] may, . . . purchase and distribute sufficient agricultural commodities . . . to maintain the traditional level of assistance for food assistance programs as are authorized by law, including . . . distribution to . . . Indians, whenever a tribal organization requests distribution of federally donated foods pursuant to [section 1301 of the Food and Agricultural Act of 1977].").

It appears that during the period for which the federal government did not properly recognize plaintiff as a tribe, i.e., between 1969 and 1996, funds appropriated for the Commodity Food Distribution Program were distributed to regional USDA offices based on fixed percentages of unknown origin, and then the regional USDA offices negotiated funding levels with individual tribal organizations.  See Pl.'s Ex. 96 at 1, 4-5.  As of June 2009, many, but not all,[21] Indian tribes in the United States participated in the Commodity Food Distribution Program. Pl.'s Ex. 94.

The court finds that the underlying statutory framework of the Commodity Food Distribution Program is not money-mandating.  To begin, the statutes cited by plaintiff are not "reasonably amenable to the reading that [they] mandate[] a right of recovery in damages." White Mountain Apache Tribe, 537 U.S. at 473.  The Food and Agriculture Act of 1977 provides that "[d]istribution of commodities . . . shall . . . be made" and that the Secretary of Agriculture is "authorized to pay" the administrative costs of the distribution.  This language does not mandate a payment of money.  Accord Britell, 372 F.3d at 1377-78 (holding that a statute providing that the government "shall contract . . . for medical care" and that an insured "is entitled . . . to the medical and dental care" was not money-mandating).  It only mandates the distribution of food, leaving the payment of incidental administrative costs to the discretion of the Secretary of Agriculture.

Furthermore, plaintiff has not demonstrated that the statutory framework underlying the Commodity Food Distribution Program constitutes a discretionary scheme that is money-mandating.  First, plaintiff has not established that the statutes it cites provide clear standards for paying money to recipients.  Indeed, as previously noted, the Food and Agriculture Act of 1977

---

[21]  About 243 Indian tribes received food under the program.  Pl.'s Ex. 94.

primarily speaks in terms of providing commodities, not money, to recipients. The payment of administrative costs only occurs when commodities are distributed, and is at the discretion of the Secretary of Agriculture. Second, the statutes cited by plaintiff do not provide that precise amounts must be paid. Third, the statutes cited by plaintiff do not compel payment on satisfaction of certain conditions. Again, the payment of money is not compelled under the Commodity Food Distribution Program. Thus, there are no relevant conditions. In sum, plaintiff has not established a discretionary scheme that is money-mandating with respect to the Commodity Food Distribution Program.

### E.  Block Grant Programs

Plaintiff next contends that it was entitled to receive a variety of block grants in the areas of community services, health services, and home energy assistance pursuant to the Omnibus Budget Reconciliation Act of 1981 ("OBRA").[22] Specifically, the block grants authorized by OBRA included: Community Services Block Grants,[23] Preventative Health and Health Services Block Grants,[24] Alcohol and Drug Abuse and Mental Health Services Block Grants,[25] Primary

---

[22]  Pub. L. No. 97-35, 95 Stat. 357. The block grant programs created in OBRA "replace[d] a large number of programs . . . administered by the Federal Government, transfer[red] primary responsibility for their administration to the States, and confer[red] substantial discretion on the States as to the use of the block grant funds." Block Grant Programs, 46 Fed. Reg. 48582, 48582 (Oct. 1, 1981).

[23]  Plaintiff cites the following statutory provision: OBRA, tit. VI, subtit. B, 95 Stat. at 512-19. The Community Services Block Grant program is currently codified at 42 U.S.C. §§ 9901-9926.

[24]  Plaintiff cites the following statutory provision: OBRA, tit. IX, subtit. A, § 901, 95 Stat. at 535-43 (amending the Public Health Service Act, ch. 373, 58 Stat. 682 (1944)). The Preventative Health and Health Services Block Grant program is currently codified at 42 U.S.C. §§ 300w to 300w-9.

[25]  Plaintiff cites the following statutory provision: OBRA, tit. IX, subtit. A, § 901, 95 Stat. at 543-52 (amending the Public Health Service Act, 58 Stat. at 682). The Alcohol and Drug Abuse and Mental Health Services Block Grant program–now known as the Mental Health and Substance Abuse Block Grant program–is currently codified at 42 U.S.C. §§ 300x to 300x-66.

Care Health Block Grants,[26] and the Low Income Home Energy Assistance Program.[27]  Except as otherwise noted, the statutory provisions describing each of the five block grant programs contained substantially the following language:

> (c)(1)  If, with respect to any State, the Secretary [of HHS]–,
>
> (A)  receives a request from the governing body of an Indian tribe or tribal organization within the State that assistance under this subtitle be made directly to such tribe or organization; and
>
> (B)  determines that the members of such tribe or tribal organization would be better served by means of grants made directly to provide benefits under this subtitle;

the Secretary shall reserve from amounts which would otherwise be allotted to such State under this subtitle for the fiscal year the amount determined under paragraph (2).

> (2)  The Secretary shall reserve for the purpose of paragraph (1) from sums that would otherwise be allotted to such State not less than 100 percent of an amount which bears the same ratio to the State's allotment for the fiscal year involved as the population of all eligible Indians for whom a determination under this paragraph has been made bears to the population of all individuals eligible for assistance under this subtitle in such State.[28]

---

[26]  Plaintiff cites the following statutory provisions: OBRA, tit. IX, subtit. A, § 901, 95 Stat. at 552-59 (amending the Public Health Service Act, 58 Stat. at 682), repealed by Health Services Amendments Act of 1986, Pub. L. No. 99-280, § 5, 100 Stat. 399, 400.  The Primary Care Health Block Grant program was formerly codified at 42 U.S.C. §§ 300y to 300y-11.

[27]  Plaintiff cites the following statutory provisions: OBRA, tit. XXVI, 95 Stat. at 893-902; Home Energy Assistance Act of 1980, Pub. L. No. 96-223, tit. III, 94 Stat. 229, 288-99, repealed by OBRA, tit. XXVI, § 2611, 95 Stat. at 902.  The Low Income Home Energy Assistance Program was formerly codified at 42 U.S.C. §§ 8601-8612 and is now codified at 42 U.S.C. §§ 8621-8630.

[28]  For the three health-related block grants, this paragraph contains language substantively identical to the following:

> (2)  The Secretary shall reserve for the purpose of paragraph (1) from amounts that would otherwise be allotted to such State under subsection (a) an amount equal to the amount which bears the same ratio to the State's allotment for the fiscal year involved as the total amount provided or allotted for fiscal year 1981

(3)  The sums reserved by the Secretary on the basis of a determination under this subsection shall be granted to the Indian tribe or tribal organization serving the individuals for whom such a determination has been made.[29]

(4)  In order for an Indian tribe or tribal organization to be eligible for an award for a fiscal year under this subsection, it shall submit to the Secretary a plan for such fiscal year which meets such criteria as the Secretary may prescribe by regulation.[30]

(5)  The terms "Indian tribe" and "tribal organization" mean those tribes, bands, or other organized groups of Indians recognized in the State in which they reside or considered by the Secretary of the Interior to be an Indian tribe or an Indian organization for any purpose.[31]

---

by the Secretary to such tribe or tribal organization under the provisions of law referred to in subsection (a) bore to the total amount provided or allotted for such fiscal year by the Secretary to the State and entities (including Indian tribes and tribal organizations) in the State under such provisions of law.

OBRA, § 901, 95 Stat. at 536; accord id. § 901, 95 Stat. at 544, 553.  For the Low Income Home Energy Assistance Program, this paragraph reads:

(2)  The amount determined under this paragraph for a fiscal year is the amount which bears the same ratio to the amount which would (but for this subsection) be allotted to such State under this title for such fiscal year . . . as the number of Indian households described in subparagraphs (A) and (B) of section 2605(b)(2) in such State with respect to which a determination under this subsection is made bears to the number of all households described in subparagraphs (A) and (B) of section 2605(b)(2) in such State.

Id. § 2604(d)(2), 95 Stat. at 895.

[29]  For the Low Income Home Energy Assistance Program, an additional sentence was included in this paragraph, which provided that in situations where "there is no tribal organization serving an individual" eligible for funds, the funds will be provided to "such other entity as the Secretary determines has the capacity to provide assistance pursuant to" the program.  See OBRA, § 2604(d)(3), 95 Stat. at 895.

[30]  This paragraph is not included in the statutory provision describing the Primary Care Block Grant program.  See OBRA, § 901, 95 Stat. at 553

[31]  For the health-related block grant programs, the definitions of "Indian tribe" and "tribal organization" are instead derived from sections 4(b) and 4(c) of the Indian Self-

OBRA, § 674, 95 Stat. at 512-13 (footnotes added); accord id. at §§ 901, 2604, 95 Stat. at 536, 544, 553, 895-96.  The regulations implementing the block grant programs contained the determination required by OBRA:

> The Secretary has determined that Indian tribes and tribal organizations would be better served by means of grants provided directly by the Secretary to such tribes and organizations out of the State's allotment of block grant funds than if the State were awarded its entire allotment.  Accordingly, where provided for by statute, the Secretary will, upon request of an eligible Indian tribe or tribal organization, reserve a portion of a State's allotment and, upon receipt of the complete application and related submission that meets statutory requirements, grant it directly to the tribe or organization.

45 C.F.R. § 96.41(a) (1982).

The court has previously held that the statutes and regulations comprising the OBRA block grant programs are not money-mandating sources of jurisdiction due to the programs' status as federal grant-in-aid programs.  Accordingly, the court need not further analyze whether the underlying legal framework of the OBRA block grant programs is expressly money-mandating or constitutes a discretionary scheme that is money-mandating.

### F.  Employment and Training Programs

Plaintiff next asserts that, beginning in 1973, it was eligible to receive federal employment and training assistance.[32]  Congress enacted the Comprehensive Employment and Training Act of 1973 "to provide job training and employment opportunities for economically disadvantaged, unemployed, and underemployed persons, and to assure that training and other services lead to maximum employment opportunities and enhance self-sufficiency by

---

Determination and Education Assistance Act.  OBRA, § 901, 95 Stat. at 536, 544, 553.  In addition, this paragraph is not included at all in the statutory provision describing the Low Income Home Energy Assistance Program.  See id. § 2604, 95 Stat. at 896.

[32]  Plaintiff cites the following statutory provisions: Job Partnership Act, Pub. L. No. 97-300, § 401, 96 Stat. 1322, 1368-69 (1982); Comprehensive Employment and Training Act of 1973, Pub. L. No. 93-203, §§ 204(a)(2), 302, 87 Stat. 839, 850, 858-59, amended by Youth Employment and Demonstration Projects Act of 1977, Pub. L. No. 95-93, § 303, 91 Stat. 627, 650, and Comprehensive Employment and Training Act Amendments of 1978, Pub. L. No. 95-524, § 2, 92 Stat. 1909, 1962-63.  The Job Partnership Act repealed the Comprehensive Employment and Training Act of 1973.  § 184(a)(1), 96 Stat. at 1358.  The funding provided by the Comprehensive Employment and Training Act of 1973 and the Job Partnership Act was and is considered to be block grants.  See GAO Block Grant Report, supra, at 3, 22 & n.14, 23.

establishing a flexible and decentralized system of Federal, State, and local programs." § 2, 87 Stat. at 839.  Thus, under title II of the Act, states, units of local government, and "Indian tribes on Federal or State reservations and which include areas of substantial unemployment" were eligible to apply for financial assistance for transitional employment and related training and manpower services.  Id. § 204(a), 87 Stat. at 850.  Congress also found, in title III of the Act, that certain target populations deserved additional manpower services due to their "particular disadvantages in the labor market."  Id. § 301(a), 87 Stat. at 857.  One such target population was members of Indian communities, who Congress found to be seriously economically disadvantaged.  Id. § 302(a), 87 Stat. at 858.  Thus, "because of the special relationship between the Federal Government and most of those to be served by [the additional programs] . . . [,] such programs shall be available to federally recognized Indian tribes . . . ."  Id. § 302(b), 87 Stat. at 858.  An Indian tribe was permitted to provide manpower services directly if the Secretary of the United States Department of Labor ("Secretary of Labor") determined that it was possible for the tribe to provide the services and that the tribe "demonstrated the capability to effectively administer a comprehensive manpower program . . . ."  Id. § 302(c)(1), 87 Stat. at 858.  Further, the tribe was required to submit  "a comprehensive plan" to the Secretary of Labor.  Id. However, the Secretary of Labor was free to "determine[] not to utilize Indian tribes . . . ."  Id. § 302(d), 87 Stat. at 858.

Funds appropriated under title II of the Comprehensive Employment and Training Act of 1973 were allocated as follows:

> (a)  Eighty per centum of funds available for any fiscal year under this title shall be allocated among eligible applicants in accordance with the number of unemployed residing in areas of substantial unemployment within the jurisdiction of the applicant compared to the number of unemployed residing in all such areas.

> (b)  The remainder may be distributed by the Secretary [of Labor] in his discretion taking into account the severity of unemployment within such areas.

Id. § 202, 87 Stat. at 850.  Funds appropriated under title III were allocated according to the following formula: "25 percent of the Title III allocation is based on the number of unemployed in the area, and 75 percent is based on the number of low-income persons in the area."  Native American Grantees Under Section 302 of the Comprehensive Employment and Training Act, 44 Fed. Reg. 66088, 66089 (Nov. 16, 1979).

Although Congress repealed the Comprehensive Employment and Training Act of 1973 in 1982, it retained the program designed to provide Indian tribes with the additional manpower services described in title III of that Act.[33]  See Job Partnership Act, §§ 184(a)(1), 401, 96 Stat. at

---

[33]  The Job Partnership Act also provided funding to Indian tribes for summer youth employment and training programs.  §§ 251-254, 96 Stat. at 1364.  Plaintiff does not make a claim for these program benefits.

1358, 1368-69.  The retained program, located in title IV of the Job Partnership Act, expanded the available programs to include all training and employment services, but was described using language substantially similar to that contained in the Comprehensive Employment and Training Act of 1973.  See id. § 401, 96 Stat. at 1368-69.  In addition, the regulations implementing the Job Partnership Act contained a slightly altered formula for allocating program funds: "The formula for allocating Title IV, Section 401 funds provides that 25 percent of the funding will be based on the number of unemployed Native Americans in the grantee's area, and 75 percent will be based on the number of poverty-level Native Americans in the grantee's area."  Proposed Total Allocation Formulas, 51 Fed. Reg. 44132, 44133 (Dec. 8, 1986).

        The court has previously held that the statutes and regulations constituting the employment and training programs are not money-mandating sources of jurisdiction due to the programs' status as federal grant-in-aid programs.  However, even if the employment and training programs were not federal grant programs, or if grant programs were not categorically excluded from having money-mandating status, the court could not find that the underlying legal framework of the programs is money-mandating.  As an initial matter, the statutes and regulations cited by plaintiff are not "reasonably amenable to the reading that [they] mandate[] a right of recovery in damages."  White Mountain Apache Tribe, 537 U.S. at 473.  The only mandatory language in the statutes provides that the additional manpower programs "shall be available to federally recognized Indian tribes," which in no way mandates the payment of money.  Accord Britell, 372 F.3d at 1377-78 (holding that a statute providing that the government "shall contract . . . for medical care" and that an insured "is entitled . . . to the medical and dental care" was not money-mandating).  And, the applicable regulations contain no mandatory language at all.

        In addition, plaintiff has not established that the legal framework underlying the employment and training programs constitutes a discretionary scheme that is money-mandating.  First, plaintiff has not shown that the statutes and regulations it cites provide clear standards for paying money to recipients.  Funds for the employment and training programs do not necessarily have to be disbursed to Indian tribes, and the statutes and regulations do not indicate when, if at all, the Secretary of Labor is required to disburse funds to tribes.  Second, the statutes and regulations cited by plaintiff do not provide that precise amounts must be paid.  Third, the statutes and regulations cited by plaintiff do not compel payment on satisfaction of certain conditions.  Prior to the disbursement of funds directly to Indian tribes for the provision of employment and training programs, the Secretary of Labor is required to determine that it is possible for a tribe to provide the programs and that the tribe is capable of administering a comprehensive program, and the tribe is required to submit a comprehensive plan for providing the services.  It is entirely conceivable that although a tribe might want to administer a program, the Secretary of Labor could conclude, for whatever reason, that it is not possible for the tribe to do so.  Thus, a determination of whether a tribe should receive funding to provide employment and training programs is wholly within the discretion of the Secretary of Labor.  In sum, plaintiff has not demonstrated a discretionary scheme that is money-mandating with respect to employment and training programs.

### G.  Department of the Interior Appropriations Acts

Finally, plaintiff contends that it received programs, services, and benefits via all of the annual appropriations acts for the period covering 1969 through 1996 pertaining to Department of the Interior and related agencies.[34]  However, plaintiff fails to point to any language beyond what the court has previously addressed that could be construed as money-mandating.  See supra Part III.C.2 (discussing the following language: "For . . . construction, repair, and improvement of Indian housing, $78,920,000, to remain available until expended[.]").  Further, "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."  Lincoln v. Vigil, 508 U.S. 182, 192 (1993).  Indeed, "a fundamental principle of appropriations law is that where 'Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions . . . on' the agency."  Id. (quoting LTV Aerospace Corp., 55 Comp. Gen. 307, 319 (1975)); see also id. at 193 (noting that "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes (though not . . . just in the legislative history)").  Accordingly, without more specific allegations as to which provisions of these appropriations acts are money-mandating, either in plaintiff's second amended complaint or its opposition to defendant's renewed motion to dismiss, the court declines to find the appropriations acts to be money-mandating sources of jurisdiction.

---

[34]  Plaintiff cites, in addition to those already mentioned, see supra note 16, the following appropriations acts: Act of Dec. 30, 1982, Pub. L. No. 97-394, 96 Stat. 1966 (Fiscal Year 1983); Act of Dec. 23, 1981, Pub. L. No. 97-100, 95 Stat. 1391 (Fiscal Year 1982); Act of Dec. 12, 1980, Pub. L. No. 96-514, 94 Stat. 2957 (Fiscal Year 1981); Act of Nov. 27, 1979, Pub. L. No. 96-126, 93 Stat. 954 (Fiscal Year 1980); Act of Oct. 17, 1978, Pub. L. No. 95-465, 92 Stat. 1279 (Fiscal Year 1979); Act of July 26, 1977, Pub. L. No. 95-74, 91 Stat. 285 (Fiscal Year 1978); Department of the Interior and Related Agencies Appropriation Act, 1977, Pub. L. No. 94-373, 90 Stat. 1043 (1976); Department of the Interior and Related Agencies Appropriation Act, 1976, Pub. L. No. 94-165, 89 Stat. 977 (1975); Department of the Interior and Related Agencies Appropriation Act, 1975, Pub. L. No. 93-404, 88 Stat. 803 (1974); Department of the Interior and Related Agencies Appropriation Act, 1974, Pub. L. No. 93-120, 87 Stat. 429 (1973); Department of the Interior and Related Agencies Appropriation Act, 1973, Pub. L. No. 92-369, 86 Stat. 508 (1972); Department of the Interior and Related Agencies Appropriation Act, 1972, Pub. L. No. 92-76, 85 Stat. 229, 230 (1971); Department of the Interior and Related Agencies Appropriation Act, 1971, Pub. L. No. 91-361, 84 Stat. 669, 670 (1970); Department of the Interior and Related Agencies Appropriation Act, 1970, Pub. L. No. 91-98, 83 Stat. 147, 148 (1969); Department of the Interior and Related Agencies Appropriation Act, 1969, Pub. L. No. 90-425, 82 Stat. 425, 427 (1968).

### H.  Conclusion

To summarize, the court lacks jurisdiction to consider allegations concerning federal grant programs, including the qualifying Housing Act programs, the Housing Improvement Program, the WIC Program, the OBRA block grant programs, and the employment and training programs.  Moreover, even if the court possessed jurisdiction over federal grant-in-aid programs, the legal frameworks underlying the Housing Act grants, the Housing Improvement Program, and the employment and training programs are not otherwise money-mandating.  Further, the court does not possess jurisdiction over the nongrant portions of the Housing Act or the Commodity Food Distribution Program.  Thus, the court has found that it possesses jurisdiction to entertain plaintiff's first claim for relief only with respect to the Federal Revenue Sharing program.  However, by operation of the Antideficiency Act, plaintiff's Federal Revenue Sharing program allegations are moot.  Accordingly, the court must dismiss the entirety of plaintiff's first claim for relief.

### IV.  PLAINTIFF'S SECOND CLAIM FOR RELIEF

In its second claim for relief, plaintiff seeks damages for the government's failure to properly treat it as a federally recognized Indian tribe, alleging that the statutes and regulations underlying the cited programs, services, and benefits, taken together, constitute a money-mandating network conferring jurisdiction on the Court of Federal Claims.  The court previously considered this argument with respect to plaintiffs' TPA system and IHS funding process allegations, concluding that a network of statutes and regulations "could create a money-mandating source of jurisdiction in the Court of Federal Claims," but only if the network described "a fiduciary relationship between the government and Indian tribes" that was more than just a bare or general trust relationship.  Samish III, 82 Fed. Cl. at 65-66 (citing Navajo Nation, 537 U.S. at 508; White Mountain Apache Tribe, 537 U.S. at 474; Mitchell II, 463 U.S. at 224, 226; Mitchell I, 445 U.S. at 542).  In its opposition to defendant's renewed motion to dismiss, plaintiff requests that the court revisit this holding, arguing that (1) "federal recognition imposes a duty to provide services and benefits to a tribe" that can only be terminated by Congress, which did not occur in plaintiff's case; (2) there is "a strong legal, historical and moral foundation" underlying "the federal responsibility to provide assistance to tribes"; and (3) it would be denied equal protection if it was deprived of the funding available to all other Indian tribes between 1969 and 1996.  Opp'n 37-39.

While the court is sympathetic to plaintiff's plight, it must decline plaintiff's request.  Plaintiff supplied no authority that supports the proposition that its network theory provides the basis for jurisdiction in the absence of a fiduciary relationship between the Indian tribe and the federal government.  Indeed, plaintiff admits that "the court decisions to date which have addressed money-mandating networks have done so in the context where the government

assumed responsibility for and control over a trust asset." <u>Id.</u> at 37.  The court is unwilling to depart from this well-established Supreme Court precedent.[35]

Applying that precedent, it is clear that plaintiff's network argument must fail.  As noted previously, the elements of a qualifying fiduciary relationship are: (1) express statutory and regulatory language supporting the existence of a fiduciary relationship and (2) such elaborate or comprehensive government control over Indian property as to constitute a common-law trust.  Plaintiff has not alleged that any of the statutes or regulations underlying any of the programs, services, or benefits described in its second amended complaint contain anything more than limited or bare trust language, and the court did not encounter more expansive language when reading the cited statutes and regulations.  Moreover, plaintiff has not alleged the existence of a common-law trust, <u>i.e.</u>, the existence of a trustee, one or more beneficiaries, and trust property.[36] <u>See</u> Restatement (Third) of Trusts § 2, cmt. f (2003).  Indeed, a common-law trust does not exist here.  The only "property" at issue are the funds that plaintiff might have received if it was treated as a federally recognized Indian tribe between 1969 and 1996, but such funds are not trust property.  <u>See Quick Bear v. Leupp</u>, 210 U.S. 50, 77 (1908) (distinguishing between "gratuitous appropriation of public moneys" that belong to the government and "moneys which belong to the Indians and which is administered for them by the government").  And, because plaintiff has not shown the existence of trust property, there necessarily can be no trustee to manage the trust property or beneficiary for whom the trust property is managed.  Accordingly, plaintiff has failed to demonstrate a qualifying fiduciary relationship to support its network theory of jurisdiction.  The court must dismiss plaintiff's second claim for relief.

## V.  CONCLUSION

It is readily apparent that the federal government's failure to treat plaintiff as a recognized Indian tribe between 1969 and 1996 deprived plaintiff of many of the federal benefits enjoyed by

---

[35]  As an aside, the court notes that plaintiff's equal protection argument lacks merit.  Plaintiff correctly cites <u>Gentry v. United States</u>, 546 F.2d 343 (Ct. Cl. 1976), in support of the proposition that "violations of equal protection can be a proper component of money-mandating claims–where implementation of a federal statute that provides for the payment of money implicates equal protection."  Opp'n 39.  However, there would be no occasion to adjudicate a constitutional question in the absence of a money-mandating statute.  Plaintiff has turned the proposition enunciated in <u>Gentry</u> on its head by attempting to use an equal protection argument to create a money-mandating source of jurisdiction.  There is no support in the case law for such an approach.

[36]  In fact, in its response in opposition to defendant's prior motion to dismiss, plaintiff conceded that this case did not involve trust property.  <u>Samish III</u>, 82 Fed. Cl. at 68.

other federally recognized Indian tribes during that time period.[37]   However, the relief plaintiff seeks is not available in the Court of Federal Claims.  Indeed, if plaintiff is lagging behind some of its sister tribes as a result of the deprivation of federal benefits, its avenue for relief is with Congress.

For the reasons set forth above, the court **GRANTS IN PART** defendant's renewed motion to dismiss and **DISMISSES** for lack of jurisdiction (1) plaintiff's first claim for relief with respect to all remaining programs, benefits, and services except the Federal Revenue Sharing program and (2) plaintiff's second claim for relief.  The court further **DISMISSES** plaintiff's Federal Revenue Sharing program allegations as **MOOT**.  No costs.  The clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[37]   It is also true that in the absence of federal recognition, plaintiff's members could have received or possibly did receive assistance under some of the programs, services, and benefits that plaintiff discusses in its second amended complaint.  Thus, plaintiff's members may not have been fully deprived of benefits by virtue of the government's failure to properly recognize plaintiff.